# 25-914-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

JEFFERIES STRATEGIC INVESTMENTS, LLC,
LEUCADIA ASSET MANAGEMENT HOLDINGS LLC,

*Plaintiffs-Appellees,*

— v. —

GEORGE WEISS,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 1 of 5 (Pages A-1 to A-253)

SCOTT BALBER
MICHAEL P. JONES
DANIEL GOMEZ
HERBERT SMITH FREEHILLS
  KRAMER NEW YORK LLP
*Attorneys for Plaintiffs-Appellees*
200 Park Avenue, 16th Floor
New York, New York 10166
(917) 542-7810

BRIAN A. KATZ
PETER M. SARTORIUS
DANIEL M. STONE
OLSHAN FROME WOLOSKY LLP
*Attorneys for Defendant-Appellant*
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300

CP COUNSEL PRESS    (800) 4-APPEAL • (382243)

i

# TABLE OF CONTENTS

**Page**

United States District Court Docket Entries .............. A-1

Notice of Removal, by Defendant, dated
June 7, 2024 ............................................................. A-12

Exhibit A to Notice -
Summons and Complaint in the New York State
Supreme Court Matter *Jefferies Strategic
Investments, LLC and Leucadia Asset
Management Holdings LLC v. George Weiss*
("New York State Matter"), dated May 6, 2024 .... A-17

Order Regulating Proceedings, by the Honorable
Alvin K. Hellerstein, dated October 11, 2024 ....... A-39

Answer to Complaint, dated October 25, 2024 ......... A-40

Notice of Motion, by Defendant, for an Order
Granting Summary Judgment, dated
November 5, 2024 .................................................... A-52

Memorandum of Law, by Defendant, in Support of
Motion, dated November 5, 2024 ......................... A-54

Statement of Material Facts, by Defendant, in
Support of Motion, dated November 5, 2024 ........ A-83

Declaration of Defendant George Weiss, in Support
of Motion, dated November 5, 2024 ...................... A-97

Declaration of Jeffrey Dillabough, in Support of
Motion, dated November 5, 2024 ......................... A-104

Exhibit 1 to Foregoing Documents -
Draft Forbearance Agreement, dated
February 1, 2024 .................................................... A-112

ii

**Page**

Exhibit 2 to Foregoing Documents -
Email from Jeffrey Dillabough to Sonia Han
Levovitz, dated February 12, 2024 ....................... A-120

Exhibit 3 to Foregoing Documents -
Forbearance Agreement, dated February 12, 2024 A-123

Exhibit 4 to Foregoing Documents -
Redlined Forbearance Agreement, dated
February 11, 2024 ................................................. A-136

Exhibit 5 to Foregoing Documents -
Email from Scott Balber to Jeffrey Dillabough,
dated February 12, 2024 ........................................ A-150

Exhibit 6 to Foregoing Documents -
Email from Nick Daraviras to
jvisser@hweiss.com, dated February 17, 2024 ..... A-155

    Attached to Email -
    (i) Draft Redacted Complaint............................. A-156

Exhibit 7 to Foregoing Documents -
Email from Scott Balber to Tracy Kelstadt, dated
March 26, 2024 ..................................................... A-183

    Attached to Email -
    (i) Draft Complaint ........................................... A-184

Notice of Motion, by Plaintiffs, for an Order
Granting Summary Judgment, dated
November 5, 2024 ................................................ A-209

Table of Contents of Documents Related to
Plaintiffs' Motion for Summary Judgment, dated
November 5, 2024 ................................................ A-211

Declaration of Scott S. Balber, for Plaintiffs, in
Support of Motion, dated November 5, 2024 ........ A-215

iii

**Page**

Exhibit 1 to Balber Declaration -
Declaration of Nicholas Daraviras, in the United
State Bankruptcy Court for the Southern District
of New York Matter *In Re: Weiss Multi-Strategy
Advisers LLC, et al.*, dated August 22, 2024 ......... A-221

    Exhibit A to Daraviras Declaration -
    Strategic Relationship Agreement, dated
    May 1, 2018 ........................................................ A-228

    Exhibit B to Daraviras Declaration -
    Note Purchase Agreement, dated
    December 3, 2019 ............................................... A-254

    Exhibit C to Daraviras Declaration -
    Note, dated January 13, 2020 ............................ A-291

    Exhibit D to Daraviras Declaration -
    Note, dated December 3, 2019 ........................... A-294

    Exhibit E to Daraviras Declaration -
    Assignment and Assumption Agreement, dated
    December 1, 2021 ............................................... A-297

    Exhibit F to Daraviras Declaration -
    Note Purchase Agreement, dated
    December 1, 2021 ............................................... A-301

    Exhibit G to Daraviras Declaration -
    Note, dated September 21, 2022 ........................ A-330

    Exhibit H to Daraviras Declaration -
    Notice of Optional Redemption ......................... A-333

    Exhibit I to Daraviras Declaration -
    Forbearance Agreement, dated
    February 12, 2024 .............................................. A-335

iv

**Page**

Exhibit J to Daraviras Declaration -
UCC Financing Statement .................................. A-349

Exhibit K to Daraviras Declaration -
Copy of Spreadsheet ........................................... A-351

Exhibit L to Daraviras Declaration -
Invoices Reflecting Attorneys' Fees .................. A-356

Exhibit 2 to Balber Declaration -
Chapter 11 Voluntary Petition for Non-Individual,
in the Bankruptcy Matter, dated April 29, 2024,
with Exhibits.............................................................. A-360

Exhibit 3 to Balber Declaration -
Chapter 11 Voluntary Petition for Non-Individual
in the United States Bankruptcy Court for the
Southern District of New York Matter *In Re:
GWA, LLC*, dated April 29, 2024, with Exhibits.... A-370

Exhibit 4 to Balber Declaration -
Chapter 11 Voluntary Petition for Non-Individual
in the United States Bankruptcy Court for the
Southern District of New York Matter *In Re:
OGI, LLC,* dated April 29, 2024 ........................... A-380

Exhibit 5 to Balber Declaration -
Chapter 11 Voluntary Petition for Non-Individual
in the United States Bankruptcy Court for the
Southern District of New York Matter *In Re:
Weiss Special Operations LLC*, dated
April 29, 2024........................................................ A-390

Exhibit 6 to Balber Declaration -
Declaration of Pierce Archer, in the United State
Bankruptcy Court for the Southern District of
New York Matter *In Re: Weiss Multi-Strategy
Advisers LLC, et al.*, dated April 30, 2024............. A-400

v

**Page**

Exhibit 7 to Balber Declaration - Declaration Under Penalty of Perjury for Non-Individual Debtors, with Exhibits, in the United States Bankruptcy Court for the Southern District of New York Matter *In Re: Weiss Multi-Strategy Advisers LLC, et al.*, dated June 11, 2024.............. A-449

Exhibit 8 to Balber Declaration - Declaration Under Penalty of Perjury for Non-Individual Debtors, with Exhibits, in the United States Bankruptcy Court for the Southern District of New York Matter *In Re: GWA, LLC*, dated June 11, 2024 ........................ A-453

Exhibit 9 to Balber Declaration - Declaration Under Penalty of Perjury for Non-Individual Debtors, with Exhibits, in the United States Bankruptcy Court for the Southern District of New York Matter *In Re: OGI, LLC*, dated June 11, 2024 ........................ A-455

Exhibit 10 to Balber Declaration - Declaration Under Penalty of Perjury for Non-Individual Debtors, with Exhibits, in the United States Bankruptcy Court for the Southern District of New York Matter *In Re: OGI, LLC*, dated June 11, 2024 ........................ A-457

Exhibit 11 to Balber Declaration - Chapter 11 Voluntary Petition for Non-Individual, with Exhibits, in the United States Bankruptcy Court for the Southern District of New York Matter *In Re: Weiss Multi-Strategy Funds LLC*, dated June 19, 2024 ................................ A-459

vi

Page

Exhibit 12 to Balber Declaration -
Global Notes, Methodology and Specific
Disclosures Regarding WMSF's Schedules of
Assets and Liabilities and Statement of Financial
Affairs, in the United States Bankruptcy Court
for the Southern District of New York Matter *In
Re: Weiss Multi-Strategy Funds LLC*, filed
June 28, 2024 .......................................................... A-461

Exhibit 13 to Balber Declaration -
Complaint to Avoid and Recover Avoidable
Transfers, in the United States Bankruptcy Court
for the Southern District of New York Matter
*GWA, LLC et al. v. Jefferies Strategic
Investments, LLC et al.* ("Adversary
Proceeding"), dated April 29, 2024 ....................... A-484

Exhibit 14 to Balber Declaration -
First Amended Complaint in the Adversary
Proceeding, dated June 25, 2024 ........................... A-506

Exhibit 15 to Balber Declaration -
Memorandum of Law, by Plaintiffs, in Support of
Partial Motion, in the Adversary Proceeding,
dated July 16, 2024 ................................................ A-541

Exhibit 16 to Balber Declaration -
Memorandum of Law, by Plaintiffs, in
Opposition to Motion, in the Adversary
Proceeding, dated August 6, 2024 ......................... A-571

Exhibit 17 to Balber Declaration -
Transcript of Proceedings held before the
Honorable Martin Glenn, in the Adversary
Proceeding, dated September 11, 2024................... A-601

Exhibit 18 to Balber Declaration -
BrokerCheck Report for George Allen Weiss........ A-671

vii

Page

Local Rule 56.1 Statement in Support of Plaintiffs'
Motion for Summary Judgment, dated
November 5, 2024 ................................................ A-680

Memorandum of Law, by Plaintiffs, in Support of
Motion for Summary Judgment, dated
November 5, 2024 ................................................ A-689

Memorandum of Law, by Defendant, in Opposition
to Motion for Summary Judgment, dated
November 22, 2024 .............................................. A-705

Defendant's Response to Plaintiffs' Local Rule 56.1
Statement, dated November 22, 2024 ................... A-741

Declaration of Brian A. Katz, for Defendant, in
Opposition to Motion for Summary Judgment,
dated November 22, 2024 ..................................... A-754

Exhibit A to Katz Declaration -
Reply in Support of Partial Motion to Dismiss
First Amended Complaint in the Adversary
Proceeding, dated August 16, 2024 ...................... A-756

Exhibit B to Katz Declaration -
Order of the Honorable Martin Glenn in the
Adversary Proceeding, dated September 24, 2024 ... A-771

Exhibit C to Katz Declaration -
Examiner's Report of Christopher K. Kiplok, in
the Adversary Proceeding, dated
November 21, 2024 .............................................. A-847

Local Rule 56.1 Counterstatement of Material Facts
in Opposition to Plaintiffs' Motion for Summary
Judgment, dated November 22, 2024 ................... A-931

viii

**Page**

Memorandum of Law, by Plaintiffs, in Opposition
to Defendant's Motion for Summary Judgment,
dated November 22, 2024 ...................................... A-983

Reply Memorandum of Law, by Defendant, in
Further Support of Motion for Summary
Judgment, dated December 4, 2024 ...................... A-1006

Reply, by Defendant, to Plaintiff's Local Rule 56.1
Counterstatement .................................................... A-1030

Reply Memorandum of Law, by Plaintiffs, in
Further Support of Motion for Summary
Judgment, dated December 4, 2024 ...................... A-1082

Opinion and Order of the Honorable Alvin K.
Hellerstein, dated March 12, 2025 ...................... A-1108

Judgment, dated March 12, 2025 .............................. A-1117

Attachment to Judgment -
(i) United States District Court for the Southern
District of New York Appeal Instructions and
Forms ...................................................................... A-1118

Notice of Motion, by Defendant, for an Order
Granting Reconsideration of and/or Amending
and Altering the Order and Judgment, dated
March 26, 2025 ...................................................... A-1128

Memorandum of Law, by Defendant, in Support of
Motion for Reconsideration, dated
March 26, 2025 ...................................................... A-1130

Notice of Motion, by Plaintiffs, for an Order
Correcting Omission in Judgment, dated
March 26, 2025 ...................................................... A-1146

ix

**Page**

Exhibit A to Notice -
Proposed Corrected Judgment ............................... A-1148

Exhibit B to Notice -
Plaintiffs' Calculation of Pre-Judgment Interest
and Total Amounts Owed ...................................... A-1150

Memorandum of Law, by Plaintiffs, in Support of
Motion to Correct Judgment, dated
March 26, 2025 ...................................................... A-1156

Memorandum of Law, by Plaintiffs, in Opposition
to Motion for Reconsideration, dated
April 9, 2025 .......................................................... A-1163

Memorandum of Law, by Defendant, in Opposition
to Motion to Correct Judgment, dated
April 9, 2025 .......................................................... A-1178

Notice of Appeal, by Defendant, dated April 10,
2025, with Opinion and Order, Appealed From .... A-1191

Reply Memorandum of Law, by Defendant, in
Further Support of Motion for Reconsideration,
dated April 16, 2025 .............................................. A-1202

Reply Memorandum of Law, by Plaintiffs, in
Further Support of Motion to Correct Judgment,
dated April 16, 2025 .............................................. A-1213

Order of the Honorable Alvin K. Hellerstein, dated
May 15, 2025 ......................................................... A-1224

Order of the Honorable Alvin K. Hellerstein, dated
May 16, 2025 ......................................................... A-1226

Amended Order of the Honorable Alvin K.
Hellerstein, dated May 20, 2025 ............................ A-1229

Corrected Judgment, dated May 21, 2025 ................. A-1232

x

**Page**

Attachment to Judgment -
(i) United States District Court for the Southern
District of New York Appeal Instructions and
Forms ........................................................................ A-1233

Amended Notice of Appeal, by Defendant, dated
May 22, 2025 ........................................................ A-1243

Exhibit 1 to Amended Notice -
Opinion and Order of the Honorable Alvin K.
Hellerstein, dated March 12, 2025......................... A-1245

Exhibit 2 to Amended Notice -
Order of the Honorable Alvin K. Hellerstein,
dated May 15, 2025 ............................................... A-1254

Exhibit 3 to Amended Notice -
Amended Order of the Honorable Alvin K.
Hellerstein, dated May 20, 2025............................ A-1256

A-1

SDNY CM/ECF NextGen Version 1.8.3

**Query    Reports    Utilities    Help    Log Out**

CLOSED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:24-cv-04369-AKH

| | |
|---|---|
| Jefferies Strategic Investments, LLC et al v. Weiss | Date Filed: 06/07/2024 |
| Assigned to: Judge Alvin K. Hellerstein | Date Terminated: 03/12/2025 |
| Cause: 28:1332nr Diversity: Notice of Removal | Jury Demand: None |
| | Nature of Suit: 190 Contract: Other |
| | Jurisdiction: Diversity |

**Plaintiff**

**Jefferies Strategic Investments, LLC**        represented by   **Scott Sonny Balber**
Herbert Smith Freehills New York LLP
NY
200 Park Avenue
16th Floor
New York
New York, NY 10166
917-542-7810
Email: scott.balber@hsfkramer.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Gomez**
Herbert Smith Freehills New York LLP
450 Lexington Avenue
Ste 14th Floor
New York, NY 10017
917-542-7600
Email: daniel.gomez@hsf.com
*ATTORNEY TO BE NOTICED*

**Dmitriy Gelfand**
Herbert Smith Freehills New York LLP
200 Park Avenue
Ste 16th Floor
New York, NY 10166
917-542-7600
Email: dgelfand@mrllp.com
*ATTORNEY TO BE NOTICED*

**Michael Paul Jones**
Herbert Smith Freehills New York LLP
200 Park Avenue
16th Floor
New York, NY 10166
917-542-7852

A-2

Fax: 917-542-7601
Email: michael.jones@hsfkramer.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Leucadia Asset Management Holdings LLC**　　　　　　represented by　**Scott Sonny Balber**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel Gomez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dmitriy Gelfand**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Michael Paul Jones**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**George Weiss**　　　　　　represented by　**Howard Jay Kaplan**
Kaplan Rice LLP
142 West 57th Street
New York, NY 10019
212-235-0300
Fax: 212-235-0301
Email: hkaplan@kaplanrice.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian Andrew Katz**
Olshan Frome Wolosky LLP
1325 Avenue of the Americas
New York, NY 10019
212-451-2300
Fax: 212-451-2222
Email: bkatz@olshanlaw.com
*ATTORNEY TO BE NOTICED*

**Daniel Martin Stone**
Olshan Frome Wolosky LLP
Olshan Frome Wolosky LLP
1325 Avenue of the Americas
New York, NY 10019
10019
New York, NY 10019
212-451-2300
Email: dstone@olshanlaw.com

A-3

*ATTORNEY TO BE NOTICED*

**Michelle A. Rice**
Kaplan Rice LLP
142 W. 57th St.
New York, NY 10019
(212) 333-0227
Fax: (212) 333-2350
Email: mrice@kaplanrice.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/07/2024 | 1 | NOTICE OF REMOVAL from Supreme Court of New York, County of New York. Case Number: 652329/2024. (Filing Fee $ 405.00, Receipt Number ANYSDC-29458407).Document filed by George Weiss..(Kaplan, Howard) (Entered: 06/07/2024) |
| 06/07/2024 | 2 | CIVIL COVER SHEET filed..(Kaplan, Howard) (Entered: 06/07/2024) |
| 06/07/2024 | 3 | NOTICE OF APPEARANCE by Howard Jay Kaplan on behalf of George Weiss..(Kaplan, Howard) (Entered: 06/07/2024) |
| 06/07/2024 | 4 | NOTICE OF APPEARANCE by Michelle A. Rice on behalf of George Weiss..(Rice, Michelle) (Entered: 06/07/2024) |
| 06/10/2024 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above-entitled action is assigned to Judge Alvin K. Hellerstein. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district-judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf-related-instructions..(pc) (Entered: 06/10/2024) |
| 06/10/2024 | | Magistrate Judge Gary Stein is designated to handle matters that may be referred in this case. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018-06/AO-3.pdf. (pc) (Entered: 06/10/2024) |
| 06/10/2024 | | Case Designated ECF. (pc) (Entered: 06/10/2024) |
| 06/10/2024 | | ***NOTICE TO ATTORNEY REGARDING CIVIL. CASE OPENING STATISTICAL ERROR CORRECTION: Notice to attorney Howard Jay Kaplan. The following case opening statistical information was erroneously selected/entered: Citizenship Plaintiff code 1 (Citizen of This State); County code New York; Fee Status code due (due);. The following correction(s) have been made to your case entry: the Citizenship Plaintiff code has been modified to 4 (Incorporated/Principal Place of Business-This State); the County code has been modified to XX Out of State; the Fee Status code has been modified to pd (paid);. (pc) (Entered: 06/10/2024) |
| 06/13/2024 | 5 | NOTICE OF APPEARANCE by Brian Andrew Katz on behalf of George Weiss..(Katz, Brian) (Entered: 06/13/2024) |
| 06/13/2024 | 6 | NOTICE OF APPEARANCE by Daniel Martin Stone on behalf of George Weiss..(Stone, Daniel) (Entered: 06/13/2024) |

| 06/20/2024 | 7 | PROPOSED STIPULATION AND ORDER. Document filed by George Weiss..(Katz, Brian) (Entered: 06/20/2024) |
|---|---|---|
| 06/20/2024 | 8 | STIPULATION AND ORDER EXTENDING TIME TOANSWER COMPLAINT,, IT IS HEREBY STIPULATED AND AGREED by and between Plaintiffs and Defendant that: 1. Defendant acknowledges proper service of the Complaint as of the date of this stipulation. 2. Defendant's time to answer or otherwise respond to the Complaint in this action is hereby extended through and including August 15, 2024. 3. If Defendant moves to dismiss the Complaint, Plaintiff's opposition to Defendant's motion will be due October 17, 2024. 4. Defendants reply to Plaintiff's opposition brief will be due November 7, 2024. SO ORDERED. (George Weiss answer due 8/15/2024.)( Replies due by 11/7/2024., Responses due by 10/17/2024) (Signed by Judge Alvin K. Hellerstein on 6/20/24) (yv) (Entered: 06/21/2024) |
| 06/21/2024 | 9 | NOTICE OF APPEARANCE by Scott Sonny Balber on behalf of Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC..(Balber, Scott) (Entered: 06/21/2024) |
| 06/21/2024 | 10 | NOTICE OF APPEARANCE by Michael Paul Jones on behalf of Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC..(Jones, Michael) (Entered: 06/21/2024) |
| 06/21/2024 | 11 | NOTICE OF APPEARANCE by Dmitriy Gelfand on behalf of Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC..(Gelfand, Dmitriy) (Entered: 06/21/2024) |
| 07/12/2024 | | ***DELETED DOCUMENT. Deleted document number 12 ORDER. The document was incorrectly filed in this case. (tro) (Entered: 07/15/2024) |
| 07/15/2024 | 12 | NOTICE OF APPEARANCE by Daniel Gomez on behalf of Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC..(Gomez, Daniel) (Entered: 07/15/2024) |
| 08/15/2024 | 13 | **FILING ERROR - DEFICIENT DOCKET ENTRY - (SUPPORTING DOCUMENTS TO BE FILED SEPARATELY) -** MOTION to Dismiss *Plaintiff's Complaint Pursuant to Rule 12(b)(6) Of The Federal Rules of Civil Procedure and, In Addition Or As An Alternative, For A Stay Of The Action*. Document filed by George Weiss. (Attachments: # 1 Supplement Defendant George Weiss's Motion To Dismiss Plaintiff's Complaint And, In Addition Or as an Alternative, For Stay of the Action, # 2 Supplement Declaration of Howard J. Kaplan, # 3 Exhibit Exhibit A, # 4 Exhibit Exhibit B).(Kaplan, Howard) Modified on 9/11/2024 (lb). (Entered: 08/15/2024) |
| 09/11/2024 | | ***NOTICE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Notice to Attorney Howard Jay Kaplan to RE-FILE Document 13 MOTION to Dismiss *Plaintiff's Complaint Pursuant to Rule 12(b)(6) Of The Federal Rules of Civil Procedure and, In Addition Or As An Alternative, For A Stay Of The Action*.. ERROR(S): Supporting documents are filed separately, each receiving their own document #. (lb) (Entered: 09/11/2024) |
| 09/11/2024 | 14 | NOTICE of Motion To Dismiss Plaintiff's Complaint. Document filed by George Weiss.. (Kaplan, Howard) (Entered: 09/11/2024) |
| 09/11/2024 | 15 | MOTION to Dismiss *Plaintiff's Complaint Pursuant to Rule 12(b)(6) Of The Federal Rules of Civil Procedure and, In Addition Or As An Alternative, For A Stay Of The Action*. Document filed by George Weiss..(Kaplan, Howard) (Entered: 09/11/2024) |
| 09/11/2024 | 16 | DECLARATION of Howard J. Kaplan in Support re: 15 MOTION to Dismiss *Plaintiff's Complaint Pursuant to Rule 12(b)(6) Of The Federal Rules of Civil Procedure and, In* |

| | | |
|---|---|---|
| | | *Addition Or As An Alternative, For A Stay Of The Action.*. Document filed by George Weiss. (Attachments: # 1 Exhibit First Amended Complaint, # 2 Exhibit Forbearance Agreement).(Kaplan, Howard) (Entered: 09/11/2024) |
| 09/13/2024 | 17 | SCHEDULING ORDER: The parties are hereby ordered to appear for a status conference on September 20, 2024, at 10:00 a.m., which will be held via the following call-in number: Call-in number: 888-363-4749, Access code: 7518680. Finally, no later than September 17, 2024, at 12:00 p.m., the parties shall jointly submit to the court (via the email address HellersteinNYSDChambers@nysd.uscourts.gov) a list of all counsel expected to appear on the record, along with their contact information. SO ORDERED. (Telephone Conference set for 9/20/2024 at 10:00 AM before Judge Alvin K. Hellerstein.) (Signed by Judge Alvin K. Hellerstein on 9/13/24) (yv) (Entered: 09/13/2024) |
| 09/17/2024 | 18 | SCHEDULING ORDER: The conference scheduled for September 20, 2024 is adjourned to October 11, 2024 at 10:00 a.m. The status conference on October 11 will be held via the following call-in number: Call-in number: 888-363-4749, Access code: 7518680. Finally, no later than October 8, at 12:00 p.m., the parties shall jointly submit to the court (via the email address HellersteinNYSDChambers@nysd.uscourts.gov) a list of all counsel expected to appear on the record, along with their contact information. SO ORDERED. ( Telephone Conference set for 10/11/2024 at 10:00 AM before Judge Alvin K. Hellerstein.) (Signed by Judge Alvin K. Hellerstein on 9/17/24) (yv) (Entered: 09/17/2024) |
| 10/11/2024 | 19 | ORDER denying 15 Motion to DismissDefendants motion to dismiss the complaint, since it is based on facts outside the complaint, is premature. Defendants motion for a stay is denied since defendant himself, as the alleged guarantor, is the defendant, not his company. (HEREBY ORDERED by Judge Alvin K. Hellerstein)(Text Only Order) (Hellerstein, Alvin) (Entered: 10/11/2024) |
| 10/11/2024 | 20 | ORDER: An initial case management conference was held on October 11, 2024, and it was considered appropriate to proceed with motions practice. All motions must be made by November 1, 2024. All opposition papers must be filed by November 22, 2024. All replies must be filed by December 4, 2024. No adjournments will be granted. SO ORDERED. ( Motions due by 11/1/2024., Replies due by 12/4/2024., Responses due by 11/22/2024) (vfr) (Entered: 10/11/2024) |
| 10/25/2024 | 21 | ANSWER to Complaint. Document filed by George Weiss..(Katz, Brian) (Entered: 10/25/2024) |
| 10/31/2024 | 22 | PROPOSED STIPULATION AND ORDER. Document filed by George Weiss..(Katz, Brian) (Entered: 10/31/2024) |
| 10/31/2024 | 23 | STIPULATION AND ORDER EXTENDING TIME TO SUBMIT OPENING MOTIONS FOR SUMMARY JUDGMENT: NOW THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned counsel for the parties, who respectfully request that the Court So Order, that: 1. The deadline to file the Motions is extended by mutual consent to November 5, 2024. 2. Any opposition to the Motions must be filed by November 22, 2024 and all replies in further support of the Motions must be filed by December 4, 2024. 3. This Stipulation may be executed in counterparts and a facsimile or electronic signature shall have the same force and effect as an original signature. SO ORDERED. ( Motions due by 11/5/2024., Replies due by 12/4/2024., Responses due by 11/22/2024) (Signed by Judge Alvin K. Hellerstein on 10/31/2024) (vfr) (Entered: 10/31/2024) |
| 11/05/2024 | 24 | MOTION for Summary Judgment *(NOTICE OF DEFENDANT GEORGE WEISSS MOTION FOR SUMMARY JUDGMENT)*. Document filed by George Weiss..(Katz, Brian) (Entered: 11/05/2024) |

A-6

| 11/05/2024 | 25 | MEMORANDUM OF LAW in Support re: 24 MOTION for Summary Judgment *(NOTICE OF DEFENDANT GEORGE WEISSS MOTION FOR SUMMARY JUDGMENT)*. . Document filed by George Weiss..(Katz, Brian) (Entered: 11/05/2024) |
|---|---|---|
| 11/05/2024 | 26 | RULE 56.1 STATEMENT. Document filed by George Weiss..(Katz, Brian) (Entered: 11/05/2024) |
| 11/05/2024 | 27 | DECLARATION of GEORGE WEISS in Support re: 24 MOTION for Summary Judgment *(NOTICE OF DEFENDANT GEORGE WEISSS MOTION FOR SUMMARY JUDGMENT)*.. Document filed by George Weiss..(Katz, Brian) (Entered: 11/05/2024) |
| 11/05/2024 | 28 | DECLARATION of JEFFREY DILLABOUGH in Support re: 24 MOTION for Summary Judgment *(NOTICE OF DEFENDANT GEORGE WEISSS MOTION FOR SUMMARY JUDGMENT)*.. Document filed by George Weiss. (Attachments: # 1 Exhibit 1- February 1, 2024 draft forbearance agreement, # 2 Exhibit 2- Email chain, # 3 Exhibit 3- Forbearance agreement, # 4 Exhibit 4- Redlined forbearance agreement, # 5 Exhibit 5- Jefferies outside counsels email and letter, # 6 Exhibit 6- Redacted draft complaint, # 7 Exhibit 7- email with draft complaint).(Katz, Brian) (Entered: 11/05/2024) |
| 11/05/2024 | 29 | MOTION for Summary Judgment . Document filed by Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC. Responses due by 11/22/2024 (Attachments: # 1 Appendix Table of Contents).(Balber, Scott) (Entered: 11/05/2024) |
| 11/05/2024 | 30 | DECLARATION of Scott S. Balber in Support re: 29 MOTION for Summary Judgment .. Document filed by Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC. (Attachments: # 1 Exhibit 1 - Declaration of Nicholas Daraviras, # 2 Exhibit 2 - Chapter 11 Voluntary Petitiofor Non-Individual filed by Weiss Multi-Strategy Advisers, LLCn, # 3 Exhibit 3 - Chapter 11 Voluntary Petitionfor Non-Individual filed by GWA, LLC in In re GWA, LLC, # 4 Exhibit 4 - Chapter 11 Voluntary Petition for Non-Individual filed by OGI Associates, LLC, # 5 Exhibit 5 - Chapter 11 Voluntary Petitionfor Non-Individual filed by Weiss Special Operations LLC, # 6 Exhibit 6 - Declaration of Pierce Archer, # 7 Exhibit 7 - Declaration for Non-Individual Debtors filed by Weiss Multi Strategy Advisers, LLC, # 8 Exhibit 8 - Declaration for Non-Individual Debtors filed by GWA, LLC, # 9 Exhibit 9 - Declaration for Non-Individual Debtors filed by OGI Associates, # 10 Exhibit 10 - Declaration for Non-Individual Debtors filed by Weiss Special Operations LLC, # 11 Exhibit 11 - Chapter 11 Voluntary Petition for Non-Individual filed by Weiss Multi-Strategy Funds, LLC, # 12 Exhibit 12 - Global Notes, Methodology and Specific Disclosures Regarding Weiss Multi-Strategy Funds, LLCs, # 13 Exhibit 13 - Complaint, # 14 Exhibit 14 - First Amended Complaint, # 15 Exhibit 15 - Memorandum of Law in Support of Plaintiffs Partial Motion to Dismiss, # 16 Exhibit 16 - Plaintiffs Memorandum of Law in Opposition to Defendants Partial Motion to Dismiss, # 17 Exhibit 17 - Transcript of a hearing held on September 11, 2024, # 18 Exhibit 18 - BrokerCheck Report).(Balber, Scott) (Entered: 11/05/2024) |
| 11/05/2024 | 31 | RULE 56.1 STATEMENT. Document filed by Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC..(Balber, Scott) (Entered: 11/05/2024) |
| 11/05/2024 | 32 | MEMORANDUM OF LAW in Support re: 29 MOTION for Summary Judgment . . Document filed by Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC..(Balber, Scott) (Entered: 11/05/2024) |
| 11/22/2024 | 33 | MEMORANDUM OF LAW in Opposition re: 29 MOTION for Summary Judgment . . Document filed by George Weiss..(Katz, Brian) (Entered: 11/22/2024) |
| 11/22/2024 | 34 | COUNTER STATEMENT TO 31 Rule 56.1 Statement. Document filed by George Weiss..(Katz, Brian) (Entered: 11/22/2024) |

A-7

| | | |
|---|---|---|
| 11/22/2024 | 35 | DECLARATION of BRIAN A. KATZ in Opposition re: 29 MOTION for Summary Judgment .. Document filed by George Weiss. (Attachments: # 1 Exhibit A - Reply Brief, # 2 Exhibit B - Bankruptcy Order, # 3 Exhibit C - Examiners Report).(Katz, Brian) (Entered: 11/22/2024) |
| 11/22/2024 | 36 | RULE 56.1 STATEMENT. Document filed by Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC..(Balber, Scott) (Entered: 11/22/2024) |
| 11/22/2024 | 37 | MEMORANDUM OF LAW in Opposition re: 24 MOTION for Summary Judgment *(NOTICE OF DEFENDANT GEORGE WEISSS MOTION FOR SUMMARY JUDGMENT)*. . Document filed by Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC..(Balber, Scott) (Entered: 11/22/2024) |
| 12/04/2024 | 38 | REPLY MEMORANDUM OF LAW in Support re: 24 MOTION for Summary Judgment *(NOTICE OF DEFENDANT GEORGE WEISSS MOTION FOR SUMMARY JUDGMENT)*. *DEFENDANT GEORGE WEISSS REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT*. Document filed by George Weiss..(Katz, Brian) (Entered: 12/04/2024) |
| 12/04/2024 | 39 | REPLY re: 36 Rule 56.1 Statement *DEFENDANT WEISSS REPLY TO JEFFERIES LOCAL RULE 56.1 COUNTERSTATEMENT*. Document filed by George Weiss..(Katz, Brian) (Entered: 12/04/2024) |
| 12/04/2024 | 40 | REPLY MEMORANDUM OF LAW in Support re: 29 MOTION for Summary Judgment . . Document filed by Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC..(Balber, Scott) (Entered: 12/04/2024) |
| 03/12/2025 | 41 | OPINION AND ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT re: 24 MOTION for Summary Judgment. filed by George Weiss, 29 MOTION for Summary Judgment . filed by Leucadia Asset Management Holdings LLC. Based on the foregoing, I grant Plaintiffs' motion for summary judgment and deny Defendant's cross-motion. The Clerk of Court shall enter final judgment in favor of Plaintiffs and tax costs. She shall also terminate ECF Nos. 24 and 29, and close this case. SO ORDERED. (Signed by Judge Alvin K. Hellerstein on 3/12/2025) (ar) Transmission to Orders and Judgments Clerk for processing. (Entered: 03/12/2025) |
| 03/12/2025 | 42 | CLERK'S JUDGMENT re: 41 Memorandum & Opinion in favor of Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC against George Weiss.It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion and Order dated March 12, 2025, Plaintiffs' motion for summary judgment is granted and Defendant's cross-motion is denied. Final judgment is entered in favor of Plaintiffs; accordingly, the case is closed. (Signed by Clerk of Court Tammi M Hellwig on 3/12/2025) (Attachments: # 1 Appeal Package) (km) (Entered: 03/12/2025) |
| 03/26/2025 | 43 | MOTION for Reconsideration re; 42 Clerk's Judgment,, *NOTICE OF DEFENDANT GEORGE WEISSS MOTION FOR RECONSIDERATION AND/OR TO AMEND AND ALTER THE JUDGMENT*. Document filed by George Weiss..(Katz, Brian) (Entered: 03/26/2025) |
| 03/26/2025 | 44 | MEMORANDUM OF LAW in Support re: 43 MOTION for Reconsideration re; 42 Clerk's Judgment,, *NOTICE OF DEFENDANT GEORGE WEISSS MOTION FOR RECONSIDERATION AND/OR TO AMEND AND ALTER THE JUDGMENT. (DEFENDANT GEORGE WEISSS MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR RECONSIDERATION AND/OR TO AMEND AND ALTER THE JUDGMENT)*. Document filed by George Weiss..(Katz, Brian) (Entered: 03/26/2025) |

A-8

| 03/26/2025 | 45 | MOTION to Amend/Correct *Omission of Judgment*. Document filed by Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC..(Balber, Scott) (Entered: 03/26/2025) |
|---|---|---|
| 03/26/2025 | 46 | MEMORANDUM OF LAW in Support re: 45 MOTION to Amend/Correct *Omission of Judgment*. . Document filed by Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC..(Balber, Scott) (Entered: 03/26/2025) |
| 04/09/2025 | 47 | MEMORANDUM OF LAW in Opposition re: 43 MOTION for Reconsideration re; 42 Clerk's Judgment,, *NOTICE OF DEFENDANT GEORGE WEISSS MOTION FOR RECONSIDERATION AND/OR TO AMEND AND ALTER THE JUDGMENT*. . Document filed by Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC.. (Balber, Scott) (Entered: 04/09/2025) |
| 04/09/2025 | 48 | MEMORANDUM OF LAW in Opposition re: 45 MOTION to Amend/Correct *Omission of Judgment*. *(DEFENDANT GEORGE WEISSS MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS MOTION TO CORRECT OMISSION IN JUDGMENT)*. Document filed by George Weiss..(Katz, Brian) (Entered: 04/09/2025) |
| 04/10/2025 | 49 | NOTICE OF APPEAL from 41 Memorandum & Opinion,, 42 Clerk's Judgment,,. Document filed by George Weiss. Filing fee $ 605.00, receipt number ANYSDC-30914304. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Katz, Brian) Modified on 4/11/2025 (nd). (Entered: 04/10/2025) |
| 04/11/2025 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 49 Notice of Appeal,..(nd) (Entered: 04/11/2025) |
| 04/11/2025 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 49 Notice of Appeal, filed by George Weiss were transmitted to the U.S. Court of Appeals..(nd) (Entered: 04/11/2025) |
| 04/16/2025 | 50 | MEMORANDUM OF LAW in Support re: 43 MOTION for Reconsideration re; 42 Clerk's Judgment,, *NOTICE OF DEFENDANT GEORGE WEISSS MOTION FOR RECONSIDERATION AND/OR TO AMEND AND ALTER THE JUDGMENT*. *(DEFENDANT GEORGE WEISSS MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS MOTION FOR RECONSIDERATION AND/OR TO AMEND AND ALTER THE JUDGMENT)*. Document filed by George Weiss..(Katz, Brian) (Entered: 04/16/2025) |
| 04/16/2025 | 51 | REPLY MEMORANDUM OF LAW in Support re: 45 MOTION to Amend/Correct *Omission of Judgment*. . Document filed by Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC..(Balber, Scott) (Entered: 04/16/2025) |
| 05/01/2025 | 52 | NOTICE OF REQUIRED CASE STATUS UPDATE re: 49 Notice of Appeal. A notice of appeal was filed in this case on April 10, 2025. Since at least one motion cited in FRAP 4(a)4 has been filed in the district court this appeal is stayed pending resolution of the motion(s). Appellant is directed to inform this Court in writing of the status of the motion(s) at 30 day intervals beginning 30 days from the date of this notice, and within 14 days after final disposition of the last outstanding motion. Appellant is also directed to provide the Court with a copy of all dispositive orders. (tp) (Entered: 05/01/2025) |
| 05/15/2025 | 53 | ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION denying 43 Motion for Reconsideration. Accordingly, the revised forbearance agreement constitutes a valid contract between the parties, and has the force of law. Thus, I deny Defendant's motion for reconsideration. The Clerk of Court shall terminate ECF No. 43. SO ORDERED. (Signed by Judge Alvin K. Hellerstein on 5/15/2025) (jca) (Entered: 05/15/2025) |

| 05/19/2025 | 54 | ORDER GRANTING PLAINTIFFS' MOTION TOCORRECT JUDGMENT granting 45 Motion to Amend/Correct 42 Clerk's Judgment,. The Clerk shall enter final judgment in favor of Plaintiffs, and against Defendant, in the sum of $113,493,250.00, which accounts for the principal guaranteed, plus prejudgment interest. The Clerk shall also assess post-judgment interest at a rate equal to the weekly average one-year constant maturity Treasmy yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. See 28 U.S.C. § 196l(a). The Clerk of Court shall terminate ECF No. 45. SO ORDERED. (Signed by Judge Alvin K. Hellerstein on 5/19/25) (yv) Transmission to Orders and Judgments Clerk for processing. (Entered: 05/19/2025) |
| --- | --- | --- |
| 05/20/2025 | 55 | AMENDED ORDER GRANTING PLAINTIFFS' MOTION TO CORRECT JUDGMENT: I grant Plaintiffs' motion to correct my Opinion, and the Clerk's judgment, of March 12, 2025, ECF Nos. 41-42, as to specify the precise amount owed and prescribe interest. Accordingly, the Clerk shall enter final judgment in favor of Plaintiffs, and against Defendant, in the sum of $113,493,250.00 (which accounts for the principal guaranteed and prejudgment interest), and post-judgment interest at a rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. See 28 U.S.C. § 196l(a). The Clerk of Court shall terminate ECF No. 45. (And as further set forth herein.)SO ORDERED. (Signed by Judge Alvin K. Hellerstein on 5/20/2025) (jca) Transmission to Finance Unit (Cashiers) for processing. Transmission to Orders and Judgments Clerk for processing. (Entered: 05/20/2025) |
| 05/21/2025 | 56 | CLERK'S CORRECTED JUDGMENT re: 55 Order in favor of Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC against George Weiss in the amount of $113,493,250.00. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Amended Order dated May 20, 2025, final judgment is entered in favor of Plaintiffs, and against Defendant, in the sum of $113,493,250.00 (which accounts for the principal guaranteed and prejudgment interest), and post-judgment interest at a rate equal to the weekly average one-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding. See 28 U.S.C. § 196l(a). (Signed by Clerk of Court Tammi M Hellwig on 5/21/2025) (Attachments: # 1 Appeal Package) (km) (Entered: 05/21/2025) |
| 05/22/2025 | 57 | AMENDED NOTICE OF APPEAL re: 49 Notice of Appeal, 41 Memorandum & Opinion,. Document filed by George Weiss. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3).(Katz, Brian) (Entered: 05/22/2025) |
| 05/22/2025 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 57 Amended Notice of Appeal.(km) (Entered: 05/22/2025) |
| 05/22/2025 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 57 Amended Notice of Appeal filed by George Weiss were transmitted to the U.S. Court of Appeals.(km) (Entered: 05/22/2025) |
| 05/22/2025 | 58 | ORDER of USCA (Certified Copy) as to 49 Notice of Appeal, filed by George Weiss, 57 Amended Notice of Appeal filed by George Weiss. USCA Case Number 25-0914. On April 30, 2025, the Court issued a notice pursuant to Federal Rule of Appellate Procedure 4(a) (4), staying this appeal due to pending motions in the district court. The district court having ruled on the last motion on May 19, 2025, IT IS ORDERED that the stay of this appeal is hereby lifted. Appellant must file a Local Rule 31.2 scheduling notification within 14 days of the date of this order. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 5/22/2025..(nd) (Entered: 05/22/2025) |
| 05/28/2025 | 59 | JOINT LETTER addressed to Judge Alvin K. Hellerstein from Scott S. Balber dated May 28, 2025 re: Joint Letter Pursuant to Rule 2.E of the Court's Individual Rules Regarding |

| | | Subpoenas. Document filed by Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC..(Balber, Scott) (Entered: 05/28/2025) |
|---|---|---|
| 05/29/2025 | 60 | DISCOVERY ORDER: I lift the automatic 30-day stay provided under Fed. R. Civ. P. 62(a). See Huzhou Chuangtai Rongyuan Inv. Mgmt. P'ship v. Hui Qin, 21 Civ. 9221 (KPF), 2022 U.S. Dist. LEXIS196796, at *2 (S.D.N.Y. Oct. 28, 2022). The purpose of Rule 62(a)'s automatic stay is to afford litigants the opportunity to file an appeal and/or to move for reconsideration or correction of the court's judgment. See United States v. One 1962 Ford Galaxie Sedan, 41 F.R.D. 156, 157 (S.D.N.Y. 1966). Here, both parties have done so, and thus, an automatic stay under Rule 62(a) is not necessary. With respect to the parties' contentions as to discovery production deadlines,Defendant shall begin a rolling production in response to Plaintiffs' subpoenas. Defendant'sproduction shall be completed within 21 days from the entry of this Order.SO ORDERED. (Signed by Judge Alvin K. Hellerstein on 5/29/2025) (vfr) (Entered: 05/29/2025) |
| 06/04/2025 | 61 | PROPOSED ABSTRACT OF JUDGMENT. Filing fee $ 12.00, receipt number ANYSDC-31181474. Abstract of Judgment to be Picked up by the Party. Document filed by Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC. Document Number of Related Judgment: 56 ..(Balber, Scott) **Proposed document to be reviewed and processed by Clerk's Office staff (No action required by chambers).** (Entered: 06/04/2025) |
| 06/04/2025 | | ABSTRACT OF JUDGMENT ISSUED on June 4, 2025, in favor of Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC against George Weiss in the amount of $113,493,250.00. Abstract of Judgment to be Picked up by the Party. (tp) (Entered: 06/04/2025) |
| 06/04/2025 | 62 | SUGGESTION OF BANKRUPTCY upon the record as to George Weiss . Document filed by George Weiss.(Katz, Brian) (Entered: 06/04/2025) |
| 06/06/2025 | 63 | ORDER of USCA (Certified Copy) as to 49 Notice of Appeal, filed by George Weiss, 57 Amended Notice of Appeal filed by George Weiss USCA Case Number 25-0914. By notice filed June 5, 2025, Appellant advised this Court that he filed a bankruptcy proceeding in the U.S. Bankruptcy Court for the Southern District of Florida on June 4, 2025. In accordance with the stay provisions of the U.S. Bankruptcy Code, 11 U.S.C. § 362, It is hereby ORDERED that this appeal is stayed. Appellant is directed to inform this Court, in writing, as to the status of the automatic stay, within 14 days of the date of this order, thereafter at 30-day intervals, and immediately when the stay is lifted or when there are other developments in the bankruptcy proceedings which permit this matter to proceed or otherwise be resolved. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 6/5/2025. (tp) (Entered: 06/06/2025) |
| 06/10/2025 | 64 | NOTICE OF CHANGE OF ADDRESS by Scott Sonny Balber on behalf of Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC. New Address: Herbert Smith Freehills Kramer New York LLP, 200 Park Ave, New York, New York, United States 10166, 9175427600..(Balber, Scott) (Entered: 06/10/2025) |
| 06/10/2025 | 65 | NOTICE OF CHANGE OF ADDRESS by Michael Paul Jones on behalf of Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC. New Address: Herbert Smith Freehills Kramer New York LLP, 200 Park Ave, New York, New York, United States 10166, 9175427600..(Jones, Michael) (Entered: 06/10/2025) |
| 06/10/2025 | 66 | NOTICE OF CHANGE OF ADDRESS by Daniel Gomez on behalf of Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC. New Address: Herbert Smith Freehills Kramer New York LLP, 200 Park Ave, New York, New York, United States 10166, 9175427600..(Gomez, Daniel) (Entered: 06/10/2025) |

A-11

| 07/31/2025 | 67 | TRUE COPY ORDER of USCA as to 49 Notice of Appeal, filed by George Weiss, 57 Amended Notice of Appeal filed by George Weiss USCA Case Number 25-914. USCA Case Number 25-914. On June 5, 2025, the Court stayed this appeal due to pending bankruptcy proceedings in the U.S. Bankruptcy Court for the Southern District of Florida. By letter dated July 31, 2025, Appellant informs the Court that the bankruptcy court entered an order granting Appellant's motion for relief from the automatic stay and lifting the automatic stay to permit this appeal to proceed. Upon consideration thereof, IT IS ORDERED that the stay of this appeal is hereby lifted. Appellant's principal brief and appendix are due October 16, 2025. The appeal is dismissed effective October 16, 2025, if the brief is not filed by that date. Catherine O'Hagan Wolfe, Clerk USCA or the Second Circuit. Certified: 7/31/2025.(km) (Entered: 08/01/2025) |
| 08/01/2025 | | Transmission of USCA Mandate/Order to the District Judge re: 67 USCA Order.(km) (Entered: 08/01/2025) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/05/2025 14:52:42 | | |
| **PACER Login:** | cpnycpara16 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:24-cv-04369-AKH |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

A-12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                              :
JEFFERIES STRATEGIC INVESTMENTS, LLC and          :    **NOTICE OF REMOVAL**
LEUCADIA ASSET MANAGEMENT HOLDINGS LLC            :
                                                              :    Removed from:
                              Plaintiffs,                      :    Supreme Court of the State of
                                                              :    New York, County of New York
              -against-                                        :
                                                              :    Index No. 652329/2024
GEORGE WEISS,                                        :
                                                              :
                              Defendant.                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

     **PLEASE TAKE NOTICE** that, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, Defendant

George Weiss, by and through his undersigned counsel, hereby removes the action entitled

*Jefferies Strategic Investments, LLC and Leucadia Asset Management Holdings LLC*, Index No.

652329/2024 (the "Action") from the Supreme Court of New York, County of New York (the

"State Court") to the United States District Court for the Southern District of New York, and states

as follows:

**BACKGROUND**

**The Action and Service**

     1.     On May 6, 2024, Plaintiffs Jefferies Strategic Investments, LLC ("JSI") and

Leucadia Asset Management Holdings LLC ("LAMH") commenced the Action against Defendant

George Weiss ("Weiss") by filing a summons and complaint in New York Supreme Court. Copies

of the summons and complaint in the Action are attached hereto as Exhibit A.  In the complaint,

Plaintiffs assert two causes of action for breach of contract, alleging that Weiss breached a

forbearance agreement.  The complaint seeks damages totaling $101,295,570 for alleged breach

of a performance guarantee, and $470,379.98 for breach of an alleged spending cap.

2.      Weiss contends that he did not breach the forbearance agreement, and that the express terms of the forbearance agreement make clear the he was not guaranteeing payment of Jefferies Debt.  Nor was there a breach of the alleged spending cap.

3.      In addition, the forbearance agreement is being challenged in an adversary proceeding on the ground that it is unenforceable because it constitutes a preference under bankruptcy law.  The bankruptcy case is In re Weiss Multi-Strategy Fund Advisors LLC, *et al*., Case No. 24-10743 (MG) (Jointly Administered).

4.      The summons and complaint have not yet been served on Weiss.

**BASIS FOR REMOVAL**

5.      Weiss removes this case based on diversity jurisdiction, pursuant to 28 U.S.C. §§ 1332(c)(1), 1441(a), and 1446.

6.      Plaintiff JSI is a limited liability company organized under the laws of Delaware with its principal place of business located in New York.

7.      Plaintiff LAMH is a limited liability company organized under the laws of Delaware with its principal place of business located in New York.

8.      Weiss is an individual who resides in and is domiciled in Florida.

9.      Although the complaint does not plead the place(s) of citizenship of the members of Plaintiffs JSI and LAMH,[1] the summons states that "Plaintiffs reside in [New York] County." *See* Exhibit A.  Moreover, upon information and belief, based on publicly available documents, each Plaintiff is a citizen of New York because the sole member of each of these limited liability companies – Jefferies Financial Group Inc. ("JFG") – is a citizen of New York.

---

[1]      A limited liability company "takes the citizenship of all of its members." *Platinum-Montaur Life Sciences, LLC v. Navidea Biopharmaceuticals, Inc.*, 943 F.3d 613, 615 (2d Cir. 2019).

10.    Pursuant to 28 U.S.C. § 1332(c)(1), "a corporation shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business." Upon information and belief, JFG is incorporated in New York and its principal place of business is in New York. Therefore, insofar as JFG is the sole member of both JSI and LAMH, each Plaintiff is a citizen of New York.

11.    "An individual's citizenship, within the meaning of the diversity statute, is determined by his domicile." *Van Buskirk v. United Group of Companies, Inc.,* 935 F.3d 49, 53 (2d Cir. 2019). Weiss is domiciled in Florida.

12.    Accordingly, because Plaintiffs are citizens of New York and Defendant is a citizen of Florida, there is complete diversity of citizenship between Plaintiffs and Defendant.

13.    Plaintiffs claim damages of $101,295,570.00 in their first cause of action and $470,370.98 in their second cause of action. Therefore, the $75,000 jurisdictional threshold is satisfied. 28 U.S.C. § 1346(c)(2).

14.    Accordingly, this Court has subject matter jurisdiction under 28 U.S.C. § 1332.

15.    As Weiss has not yet been served, this Notice of Removal is timely filed. 28 U.S.C. § 1446(b)(1) ("[t]he notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based"). The thirty period does not begin to run until service. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347-48 (1999); *Pietrangelo v. Alvas Corp.*, 686 F.3d 62, 65 (2d Cir. 2012); *Creative Kids Far East Inc. v. Griffin*, No. 15-cv-06027, 2016 WL 8710479, at *3 (S.D.N.Y. Jan. 22, 2016) (for purposes of § 1446 "one becomes a party officially, and is required to take action in that

A-15

capacity, only upon service of a summons or other authority-asserting measure stating the time within which the party served must appear and defend") (quoting *Murphy*, 526 U.S. at 350).

16.     This action is being removed "to the district court of the United States for the district and division embracing the place where such action is pending," pursuant to 28 U.S.C. § 1441(a).  The United States District Court for the Southern District of New York embraces New York County where the action is pending.  28 U.S.C. § 112(b).

17.     No previous application has been made for the removal requested herein.

18.     Written notice of the filing of this Notice of Removal will be served upon Plaintiffs, and a copy of this Notice of Removal will be filed with the Clerk of the Supreme Court of New York, County of New York, in accordance with 28 U.S.C. § 1446(d).

19.     By filing this Notice of Removal, Defendant does not waive any defenses available to him and does not admit any allegations in Plaintiffs' complaint.

A-16

WHEREFORE, Defendant Weiss respectfully gives notice that the above-captioned civil

action pending in the Supreme Court of the State of New York, County of New York, is removed

to this Court, pursuant to 28 U.S.C. §§ 1332, 1441 and 1446.

Dated: New York, New York
        June 7, 2024

KAPLAN RICE LLP


By:  */s/Howard J. Kaplan*
        Howard J. Kaplan
        Michelle A. Rice

142 West 57th Street
Suite 4A
New York, NY 10019
Tel. (212) 235-0300
Fax (212) 235-0301
hkaplan@kaplanrice.com
mrice@kaplanrice.com


OLSHAN FROME WOLOSKY LLP
Brian A. Katz, Esq.
1325 Avenue of the Americas
New York, New York 10019
Tel.  (212) 451-2300
Fax  (212) 451-2222
bkatz@olshanlaw.com

*Attorneys for Defendant George Weiss*

# EXHIBIT A

A-18

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS LLC, | Index No. _____ |
| Plaintiffs, | |
| -against- | **SUMMONS** |
| GEORGE WEISS, | |
| Defendant. | |

**TO THE ABOVE-NAMED DEFENDANT:**

**YOU ARE HEREBY SUMMONED** to appear in this action and to serve a copy of your answer to the complaint in this action upon the undersigned attorneys for plaintiffs Jefferies Strategic Investments, LLC and Leucadia Asset Management Holdings LLC ("Plaintiffs") within twenty (20) days after service of this summons, exclusive of the day of service, or within thirty (30) days after service is completed if the summons is not personally delivered to you within the State of New York.  In case of your failure to answer or appear, judgment will be taken against you by default for the relief demanded in the complaint.

Plaintiffs designate New York County as the place of trial pursuant to: (i) C.P.L.R. § 501 because defendant consented to venue in this Court pursuant to the agreement that is at issue in this case; and (ii) C.P.L.R. § 503(a) because Plaintiffs reside in this County and a substantial part of the events or omissions giving rise to Plaintiffs claims occurred in this County.

*[Remainder of Page Intentionally Blank – Signature Page Follows]*

1

A-19

FILED: NEW YORK COUNTY CLERK 05/06/2024 03:49 PM

NYSCEF DOC. NO. 1

INDEX NO. 652329/2024

RECEIVED NYSCEF: 05/06/2024

Dated: New York, New York
May 6, 2024

HERBERT SMITH FREEHILLS
NEW YORK LLP
By: /s/ Scott S. Balber
Scott S. Balber
Michael P. Jones
Daniel Gomez
450 Lexington Avenue
New York, New York 10017
Telephone:  (917) 542-7600
Facsimile:  (917) 542-7601
Email:        Scott.Balber@hsf.com
Michael.Jones@hsf.com
Daniel.Gomez@hsf.com

*Attorneys for Plaintiffs*
*Jefferies Strategic Investments, LLC and*
*Leucadia Asset Management Holdings LLC*

2

**A-20**

FILED: NEW YORK COUNTY CLERK 05/06/2024 03:49 PM
NYSCEF DOC. NO. 2
INDEX NO. 652329/2024
RECEIVED NYSCEF: 05/06/2024

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

|  |  |
|---|---|
| JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS LLC, | Index No. _____ |
| Plaintiffs, | |
| -against- | **COMPLAINT** |
| GEORGE WEISS, | |
| Defendant. | |

Plaintiffs Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC ("LAM Holdings," and with JSI, "Plaintiffs"), by and through their undersigned counsel, allege against defendant George Weiss as follows:

**PRELIMINARY STATEMENT**

1.      This case arises from defendant George Weiss' failure to pay more than $100 million worth of debts that are owed by a series of companies that he owns and controls (the "George Weiss Companies"), and which he personally guaranteed.

2.      The George Weiss Companies' inability to pay Plaintiffs has been exacerbated by Weiss' use of the George Weiss Companies as a personal piggy bank, diverting company funds (which should have been used to pay the amounts owed to Plaintiffs) to pay for private air travel and personal litigation matters, and to line the pockets of members of his inner circle.

3.      In an extreme exercise of sufferance and good faith, Plaintiffs were willing to overlook these transgressions in the dashed hopes that Weiss' misconduct would cease, and that Weiss would assist—as he promised—the George Weiss Companies in repaying the debts owed to Plaintiffs.

A-21

INDEX NO. 652329/2024

Case 1:24-cv-04369-AKH     Document 1     Filed 06/07/24     Page 10 of 27

RECEIVED NYSCEF: 05/06/2024

4.  Indeed, Weiss' transgressions were substantially responsible for the George Weiss Companies' insolvency.  Plaintiffs were willing to work with and support Weiss and the George Weiss Companies so they could raise capital that would enable them to pay off their debts.  To that end, the parties entered into a formal forbearance agreement that included, among other things, a "Deferral Condition" that required the George Weiss Companies to implement a compensation plan with cash deferral and equity grants to preserve much-needed cash and capital.

5.  By September 2022, the Debtors' financial condition continued to deteriorate, and Plaintiffs had the right to call for the immediate payment of the debts owed to them.  Yet Plaintiffs again agreed to forbear from exercising their rights until July 2023.  Weiss once again promised that the George Weiss Companies would continue to abide by the Deferral Condition and its restrictions on employee compensation.

6.  Finally, by the end of 2023, as the Debtors' financial position continued to deteriorate, Plaintiffs demanded full repayment.

7.  During this entire time—and, in particular, at the end of 2023 and the beginning of 2024—Weiss repeatedly informed Plaintiffs that he was in the process of raising additional capital that could have revived the George Weiss Companies and, in turn, assisted in the repayment of the debts owed to Plaintiffs.  In keeping with their good-faith accommodation, Plaintiffs agreed to forebear on their right to take action to recover the amounts they were owed to give Weiss one more chance.  Again, Weiss' results failed to match his words.

8.  Throughout all of the George Weiss Companies' breaches and liquidity crunches, including when Weiss chose to liquidate his fund and close down his business, Weiss repeatedly

2

FILED: NEW YORK COUNTY CLERK 05/06/2024 03:49 PM

INDEX NO. 652329/2024
NYSCEF DOC. NO. 2 Case 1:24-cv-04369-AKH    Document 1    Filed 06/07/24    Page 11 of 27   RECEIVED NYSCEF: 05/06/2024

confirmed that Plaintiffs have acted appropriately in their dealings with him and the George Weiss Companies.

9.      Weiss, however, did not return that favor.  Instead, he abused Plaintiffs' good faith, including during the George Weiss Companies' insolvency and recent liquidation.  In what can only be viewed as an exercise in subterfuge or worse, Weiss induced Plaintiffs to forebear on their rights to collect more than $100 million by personally guaranteeing the George Weiss Companies' existing debts to Plaintiffs.  Yet, after inducing Plaintiffs' forbearance, Weiss refused to repay even a single penny that he owes to Plaintiffs.

10.     Accordingly, Plaintiffs bring this action to collect damages from Weiss for his failure to perform under the contractual guarantee.

### PARTIES

11.     JSI is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 520 Madison Avenue, New York, New York, 10022.

12.     LAM Holdings is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 520 Madison Avenue, New York, New York, 10022.

13.     On information and belief, Weiss is the founder and Chief Executive Officer of the George Weiss Companies.

### JURISDICTION AND VENUE

14.     This Court may exercise personal jurisdiction over Weiss pursuant to C.P.L.R. § 302(a)(1) because he transacted business within the State of New York by entering into the February Forbearance Agreement (defined below) with JSI and LAM Holdings, limited liability companies with their principal places of business in New York.  Under Section 10(h) of the

3

February Forbearance Agreement, Weiss agreed that "any dispute arising out of this Agreement shall be subject to the exclusive jurisdiction of the New York courts and irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in (i) any state court in the State of New York or (ii) any federal court in the State of New York, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum."

15.    Venue is proper pursuant to C.P.L.R. § 302(a) because:  (i) Plaintiffs are limited liability companies that reside in New York County; and (ii) a substantial part of the events giving rise to Plaintiffs' claims, including Weiss' execution of the February Forbearance Agreement, occurred in New York.

## FACTS

### I.    GWA Executes the Note Purchase Agreements and Receives $53 Million in Loans

16.    On or about December 3, 2019, JFG Funding LLC entered into a Note Purchase Agreement with GWA LLC ("GWA") and Weiss Multi-Strategy Advisers LLC ("WMSA") (the "2019 Note Purchase Agreement").

17.    Pursuant to Section 2 of the 2019 Note Purchase Agreement, GWA issued $50 million in notes (each a "Note"), comprised of:  (i) a $31,250,000.00 Note issued on December 3, 2019; and (ii) a $18,750,000.00 Note issued on January 13, 2020.

18.    In exchange for the Notes, JFG Funding LLC loaned GWA $50,000,000.00.

19.    JFG Funding LLC subsequently assigned its interest in the 2019 Note Purchase Agreement and the Notes to JSI, which was acknowledged by GWA.

20.    Separately, on September 21, 2022, GWA and JSI entered into an additional Note Purchase Agreement (the "2022 Note Purchase Agreement").  That same day, and pursuant to

the 2022 Note Purchase Agreement, GWA issued and delivered to JSI a Note in the principal

amount of $3,000,000.00.  In exchange for the Note, JSI loaned GWA $3,000,000.00.

21.     Both the 2019 Note Purchase Agreement and 2022 Note Purchase Agreement

contain several provisions that are relevant to this action.  Because the provisions are largely

similar, for ease of reference, this Complaint refers to the "Note Purchase Agreement," which is

the 2019 Note Purchase Agreement.

22.     *First*, the Note Purchase Agreement contains redemption provisions.  Section 7.2

of the Note Purchase Agreement provides JSI (and GWA) with "the right to redeem each Note,

in whole but not in part, on each applicable Optional Redemption Date," which is defined as "the

last calendar day of each month, beginning the third anniversary of the" relevant closing, "by at

least 10 calendar days' prior written notice to the other party prior to the applicable Optional

Redemption Date . . . ."  Upon exercise of the option to redeem the Notes, the amounts due under

the Notes "become due and payable on the applicable Optional Redemption Date . . . ."  The

"Optional Redemption Date" is defined to be the last calendar day of each month beginning on

the third anniversary of the December 2019 and the January 2020 Note issuances.  Or, in other

words, JSI had the right to redeem the Notes at its option beginning in December 2022 and

January 2023, respectively.[1]

23.     Separately, Section 7.3 of the Note Purchase Agreement provides JSI with the

right to redeem the Notes if GWA's members' equity in GWA dropped to less than $10 million

(a "Trigger Redemption").

---

[1]     The 2022 Note Purchase Agreement defines "Optional Redemption Date" as "monthly, on the last calendar day of each month."  Accordingly, JSI had the right to redeem that Note, monthly, at its discretion.

FILED: NEW YORK COUNTY CLERK 05/06/2024 03:49 PM          INDEX NO. 652329/2024
NYSCEF DOC. NO. 2          Case 1:24-cv-04369-AKH     Document 1     Filed 06/07/24          Page 14 of 27          RECEIVED NYSCEF: 05/06/2024

24.     *Second*, the Note Purchase Agreement sets forth specific "Events of Default" which included, *inter alia*, GWA's failure to pay the amounts due at redemption.

25.     If an Event of Default occurs under the Note Purchase Agreement, "the Notes . . . automatically become immediately due and payable" and "any holder of the Notes may at any time at its option, by notice to the Company, declare the Notes to be immediately due and payable."

26.     *Third*, the Note Purchase Agreement provides that JSI shall be entitled to recover "all costs and expenses of such holder incurred in any enforcement or collection . . . including reasonable attorneys' fees, expenses and disbursements."

## II.     GWA Enters into the Strategic Relationship Agreement

27.     Separate and apart from the loans made by JSI to GWA, on or about May 1, 2018, LAM Holding LLC, the predecessor to LAM Holdings, and GWA entered into a Strategic Relationship Agreement.

28.     Under the Strategic Relationship Agreement, Leucadia Funding LLC, a predecessor of JSI, opened an investment account to be managed by WMSA.  In return, GWA agreed to a two-tiered mechanism for revenue and profit-sharing.

29.     *First*, within 30 days of April 30, 2019, GWA was required to share a portion of the profits that it, or its subsidiaries, recognized between May 1, 2018 and April 30, 2019 (the "Profit Share Period").

30.     *Second,* upon the expiration of the Profit Share Period, GWA agreed to share—on a quarterly basis—a portion of the revenues that it, or its subsidiaries, generated.

31.     In addition, under Section 5(b) of the Strategic Relationship Agreement, GWA agreed to "indemnify and hold harmless LAM and each of its Affiliates and their respective

FILED: NEW YORK COUNTY CLERK 05/06/2024 03:49 PM          INDEX NO. 652329/2024

NYSCEF DOC. NO. 2     Case 1:24-cv-04369-AKH     Document 1     Filed 06/07/24     Page 15 of 27     RECEIVED NYSCEF: 05/06/2024

directors, officers, employees, agents and representatives . . . to the fullest extent permitted by

law from and against any and all costs, losses, Claims, Taxes incurred, damages, liabilities and

expenses, including reasonable costs of investigation and defense, and reasonable attorneys' fees

and expenses . . . incurred by the Indemnified Party as a result of, in connection with, or related

to this Agreement . . . ."

### III.   The George Weiss Companies Breach the Agreements

32.   After Plaintiffs provided GWA with millions of dollars of capital, GWA's

business floundered, all exacerbated by Weiss' apparent mismanagement of GWA's business.

33.   For example, the George Weiss Companies' financial statements indicate that

between 2020 and 2023, the George Weiss Companies spent more than $7.3 million dollars on

"transportation expense[s]."  Upon information and belief, the expenses were largely attributed

to funding private air travel for Weiss on a Dassault Falcon private aircraft owned and operated

by the George Weiss Companies through a subsidiary company, Weiss Special Operations LLC.

Upon information and belief, Weiss utilized this aircraft for personal travel.

34.   Similarly, upon information and belief, Weiss has also used, or directed the use

of, monies extracted from the George Weiss Companies to fund litigation expenses in a personal

lawsuit that he commenced against the Commissioner of the United States Internal Revenue

Service.  The George Weiss Companies' financial statements indicate that between 2020 and

2023, more than $31.4 million dollars was spent on "consultation and professional fees," a

significant portion of which, upon knowledge and belief, were attributable to Weiss' personal

lawsuit.

35.   As a result of Weiss' mismanagement of GWA, in late 2021, the value of GWA's

members' equity fell to below $10 million, which authorized JSI to redeem the Notes.  Instead of

A-27

exercising its rights to redeem the Notes, and as a purely good faith accommodation to Weiss and the George Weiss Companies, JSI entered into a forbearance agreement.

36.     As consideration for entering into the forbearance agreement, GWA also entered into an amendment to the Strategic Relationship Agreement.  In that amendment, GWA agreed to abide by a "Deferral Condition" that required GWA to implement and maintain a compensation plan with cash deferral and equity grants.  Upon information and belief, GWA failed to maintain and consistently abide by the compensation plan that it implemented.

37.     By September 1, 2022, it became apparent that GWA's members would not be able to secure the capital required to avoid triggering JSI's right of redemption.  Nevertheless, JSI again accommodated Weiss and the George Weiss Companies, and entered into an additional forbearance agreement with GWA, pursuant to which it agreed to not exercise its Trigger Redemption right until July 1, 2023.

38.     Having failed to secure the capital required to avoid JSI's right of redemption by July 1, 2023, however, GWA remained in breach of the Note Purchase Agreement.  Once again, JSI accommodated Weiss and the George Weiss Companies and entered into a forbearance agreement.  This third forbearance agreement provided that JSI would not exercise its Trigger Redemption right until September 1, 2024.

39.     In each of the forbearance agreements, JSI left open its ability to exercise its option to redeem the Notes pursuant to Section 7.2 of the Note Purchase Agreement.

40.     Plaintiffs also entered into multiple amendments to the Strategic Relationship Agreement, which deferred GWA's obligation to make payments as long as it abided by the "Deferral Condition."

A-28

#### IV.    GWA Fails to Repay the Amounts Due Under the Notes

41.    On or about December 21, 2023, JSI exercised its option to redeem the full amounts owed under the Notes.

42.    Pursuant to the Note Purchase Agreements, the full amount owed under the Notes, $54,223,111.00, became due and owing on December 31, 2023.  To date, GWA has failed to pay the full amount that it owes under the Notes.

43.    That failure constituted a separate Event of Default in breach of GWA's obligations under the Notes.  Because of the numerous Events of Default, JSI is also entitled to default interest.  As of March 31, 2024, GWA owed JSI a total of $32,411,661.00 in interest.

44.    On February 15, 2024, GWA repaid $3 million that it owed under the Notes.

45.    However, at least $50,393,178.00 remains outstanding under the Notes as of the date of this filing.

#### V.    The George Weiss Companies Make Nearly $30 Million In Improper Transfers

46.    As a result of Weiss' mismanagement, the George Weiss Companies have long been insolvent, as is recognized by their own internal documents.

47.    One such document indicates that, by the end of year 2021, the George Weiss Companies had a total net equity value of *negative* $15.9 million dollars.  Similarly, the George Weiss Companies' financial statements for the fiscal year ending December 31, 2022 indicate that the George Weiss Companies had a total net equity value of *negative* $63.8 million dollars.

48.    Over the years, the George Weiss Companies' insolvency has worsened.  A preliminary financial statement prepared by the George Weiss Companies states that as of December 31, 2023, the George Weiss Companies had a total adjusted equity value of *negative*

FILED: NEW YORK COUNTY CLERK 05/06/2024 03:49 PM

NYSCEF DOC. NO. 2

INDEX NO. 652329/2024

RECEIVED NYSCEF: 05/06/2024

$110.8 million dollars. Moreover, the George Weiss Companies' most recent cash flow projections reflect that, as of February 1, 2024, they had only $39.8 million in cash on hand.

49.    In late 2023, Weiss represented that he was pursuing a new "strategic relationship" with a large, institutional multi-fund manager. Weiss claimed that this new relationship would result in an infusion of capital to the George Weiss Companies, which would be used to pay down the debt owed to Plaintiffs.

50.    Consistent with their past practice of accommodating Weiss and the George Weiss Companies, Plaintiffs elected not to immediately pursue all remedies available to them. However, in light of the George Weiss Companies' insolvency, Plaintiffs did ask for assurances that the George Weiss Companies would not make unnecessary payments while insolvent, or otherwise prioritize the payment of other creditors above the debts owed to Plaintiffs, until a transaction could be concluded with the multi-fund manager. That proposed transaction never materialized.

51.    In early 2024, Plaintiffs received information indicating that the George Weiss Companies intended to pay, at the end of February 2024, more than $30 million, comprised of $2.7 million in "management fees," $8 million in staff and management "bonuses," and $19.6 million in "strategy payouts," notwithstanding that the George Weiss Companies: (i) owed JSI approximately $50.3 million under the Notes; and (ii) were hopelessly insolvent.

52.    In response to Plaintiffs' concerns, Edwards, WMSA's Deputy Chief Investment Officer, repeatedly represented to Plaintiffs that the George Weiss Companies would not make those payments until the end of February 2024, so long as Plaintiffs agreed not to take immediate action to enforce their rights.

FILED: NEW YORK COUNTY CLERK 05/06/2024 03:49 PM   INDEX NO. 652329/2024
NYSCEF DOC. NO. 2                                   RECEIVED NYSCEF: 05/06/2024

53.     Based upon the representations made by Michael Edwards that the George Weiss Companies would not make those payments until late February 2024, on February 2, 2024, Plaintiffs sent the George Weiss Companies a draft forbearance agreement.

54.     The draft forbearance agreement prohibited the George Weiss Companies from paying, granting, or transferring bonus compensation to any of their employees.

55.     Upon receiving that draft, Jeffrey Dillabough, WMSA's General Counsel, sent an email to JSI assuring that George Weiss Companies were "operating the business in the normal course."

56.     Contrary to Edwards' and Dillabough's representations, the George Weiss Companies were not operating in the "normal course." Instead, the George Weiss Companies were liquidating assets under their control so that they could then fund excessive and improper bonus payments.

57.     On February 8, 2024, being fully informed that Plaintiffs were in good faith refraining from enforcing their rights against the George Weiss Companies in exchange for their agreement to not pay unnecessary and improper compensation, the George Weiss Companies surreptitiously—that is, without any notice to or discussion with Plaintiffs they had induced to forbear—made nearly $30 million in bonus payments (the "Payouts") to 86 employees of the George Weiss Companies, all ahead of schedule and in complete disregard of their representations and contractual obligations to Plaintiffs.

58.     Some, if not all, of the Payouts were inconsistent with the George Weiss Companies' deferred cash compensation plan and, in turn, represent a failure to abide by the "Deferral Condition." Accordingly, all amounts owed under the Strategic Relationship Agreement became immediately due and payable within five business days.

11

FILED: NEW YORK COUNTY CLERK 05/06/2024 03:49 PM

NYSCEF DOC. NO. 2

INDEX NO. 652329/2024

RECEIVED NYSCEF: 05/06/2024

Case 1.24-cv-04369-AKH    Document 1    Filed 06/07/24    Page 20 of 27

59.     Under the revenue sharing provisions of the Strategic Relationship Agreement,

GWA owes LAM Holdings $50,902,392.00 of revenue sharing fees.

60.     GWA has failed to pay the amounts that it owes to LAM Holdings under the

Strategic Relationship Agreement.

## VI.     Weiss Personally Guarantees the George Weiss Companies' Performance

61.     Following the improper bonus payments, Weiss again pleaded with Plaintiffs not

to exercise their rights.

62.     Accordingly, on February 12, 2024, Weiss executed a further forbearance

agreement (the "February Forbearance Agreement").

63.     Pursuant to Section 1 of the February Forbearance Agreement, the George Weiss

Companies and Weiss agreed that:

> [P]ursuant to the terms of the Note Purchase Agreements, the Notes
> and the Redemption Notice, GWA is past due with respect to the
> following payment obligations to JSI (each calculated as of
> February 29, 2024): (i) $18,432,823.54 on the Note dated December
> 3, 2019, (ii) $27,921,516.09 on the Note dated January 13, 2020 and
> (iii)  $3,478,222.39  on  the  Note  dated  September  21,  2022
> (collectively, the 'Past Due Obligations'). Each party further agrees
> that the Past Due Obligations are owed without defense, set-off or
> counter claim, and are past due.

64.     Pursuant to Section 2(c) of the February Forbearance Agreement, the George Weiss

Companies agreed that "none of them will . . . pay, grant or transfer (directly or indirectly) to any

other person or entity an aggregate amount in excess of $10,000 on any day, except for payments

made in the course of normal course trading consistent with past practices (*e.g.*, payments to prime

and executing brokers, payments against delivery and payments to ISDA counterparties)," and that

they would not "take any other action or fail to take any action that would be reasonably expected

to reduce the net asset value of the Weiss Parties or their subsidiaries, in each case without the

12

Case 1:24-cv-04369-AKH     Document 1     Filed 06/07/24     Page 21 of 27

prior written consent of the Jefferies Parties, which may be granted or withheld in their sole and absolute discretion."

65.     Section 3(a) of the February Forbearance Agreement further provides that each of the George Weiss Companies "(other than GWA) . . . irrevocably and unconditionally guarantees to each of JSI and LAM Holdings . . . and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other [of the George Weiss Companies] when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations (as herein defined)."

66.     The Guaranteed Obligations included "all the obligations of GWA and each other [of the George Weiss Companies] arising under any Note Purchase Agreement, the Notes, the [Strategic Relationship] Agreement and this Agreement, and any loss, damage, penalty, action, judgment, suit, cost, expense, disbursement, liability, claim or other obligation, incurred by or behalf of [JSI and LAM Holdings] (including but not limited to reasonable out-of-pocket attorneys' fees and costs) arising out or, relating to or in connection with any Note Purchase Agreement, any Note, the [Strategic Relationship] Agreement, this Agreement or the transaction contemplated thereby."

67.     To induce Plaintiffs to enter into the February Forbearance Agreement, Weiss personally guaranteed the performance of the Weiss Parties under the February Forbearance Agreement, the Note Purchase Agreements, the Notes, and the Strategic Relationship Agreement.

68.     Specifically, in Section 9 of the February Forbearance Agreement, Weiss expressly agreed that he "unconditionally and irrevocably guaranteed to [LAM Holdings, JSI, and their affiliates] the accuracy of the representations made by, and the performance of the agreements of, the [George Weiss Companies] hereunder." This performance guarantee included the George

13

Case 1:24-cv-04369-AKH     Document 1     Filed 06/07/24     Page 22 of 27

Weiss Companies' agreements (i) that $54,528,115.78 was due and owing under the Note Purchase Agreements, and the Notes, and (ii) to guarantee any amounts owed under the Note Purchase Agreements, the Notes, and the Strategic Relationship Agreement. Weiss also agreed that he would "take all actions within his control, including by exercising all of his voting, governance, management and other rights and powers with respect to each of the other [George Weiss Companies], any of their subsidiaries and any of his personal or his family's trusts to cause such persons to comply with the terms of this Agreement."

**VII.   Weiss Breaches His Personal Guarantee**

69.     Despite Plaintiffs' good-faith effort to resolve the matter, Weiss again abused Plaintiffs' goodwill and breached his obligations under the February Forbearance Agreement in at least three ways.

70.     *First*, Weiss breached his contractual guarantee to ensure that the George Weiss Companies paid the amounts owed under the Notes. Specifically, under Section 9 of the February Forbearance Agreement, Weiss contractually guaranteed the "performance of the agreements" made by the George Weiss Companies, which includes: (i) the George Weiss Companies' agreement that $54,528,115.78, was due and owing under the Note Purchase Agreements and the Notes; and (ii) the George Weiss Companies' agreement to pay all amounts owed under the Note Purchase Agreements and the Notes.

71.     Despite Plaintiffs' demands that Weiss fulfil the George Weiss Companies' obligations to Plaintiffs, including by paying the amounts currently owed under the Notes, Weiss has taken no action to do so. To the contrary, for weeks Weiss led Plaintiffs to believe that there would be a monetary resolution of this matter. With the benefit of hindsight, Weiss' representations were merely further subterfuge to buy time for legal machinations.

14

FILED: NEW YORK COUNTY CLERK 05/06/2024 03:49 PM
NYSCEF DOC. NO. 2

INDEX NO. 652329/2024
RECEIVED NYSCEF: 05/06/2024

72.    *Second*, Weiss breached his contractual guarantee to pay the amounts owed under the Strategic Relationship Agreement.  In particular, the Payouts were cash payments to the George Weiss Companies' employees that were, at least in part, inconsistent with the "Deferral Condition," which required the George Weiss Companies to implement a compensation plan with cash deferral and equity grants.

73.    Accordingly, by making the Payouts, the George Weiss Companies breached the amendments to the Strategic Relationship Agreement, which required that GWA comply with the "Deferral Condition" by maintaining and implementing a compensation plan with cash deferral and equity grants.  In turn, the $50,597,604.00 owed under the Strategic Relationship Agreement became due immediately.

74.    Under Section Section 9 of the February Forbearance Agreement, Weiss expressly guaranteed the George Weiss Companies' agreement to pay all amounts owed under the Strategic Relationship Agreement.  Yet, notwithstanding the George Weiss Companies' failure to repay the $50,597,604.00 owed under the Strategic Relationship Agreement, and Weiss' personal guarantee of the George Weiss Companies' performance, Weiss has refused to pay any of the $50,902,392.00 owed under the Strategic Relationship Agreement.

75.    *Third*, the George Weiss Companies breached the February Forbearance Agreement by making additional unauthorized payments without JSI's authorization.

76.    In particular, on or about March 1, 2024, the George Weiss Companies made four payments, each worth more than $10,000.00 (for a total of nearly $500,000.00) without providing any notice to JSI.

INDEX NO. 652329/2024

RECEIVED NYSCEF: 05/06/2024

Case 1.24-cv-04369-AKH    Document 1    Filed 06/07/24    Page 24 of 27

77.     Upon information and belief, Weiss directed the George Weiss Companies to make these payments, in breach of his obligation to "take all actions within his control . . . to cause [the George Weiss Companies] to comply with the terms of" the February Forbearance Agreement.

78.     JSI did not approve those payments.

79.     Since March 1, 2024, the George Weiss Companies have continued to make additional payments worth more than $10,000.00 without JSI's approval.

## FIRST CAUSE OF ACTION
### (Breach of Personal Guarantee)

80.     Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

81.     JSI, LAM Holdings, and Weiss formed a valid contract, specifically, the February Forbearance Agreement

82.     Under the February Forbearance Agreement, Weiss guaranteed the "performance of the agreements" made by the George Weiss Companies, including the George Weiss Companies' agreements:  (i) that $54,528,115.78 was due and owing under the Note Purchase Agreements and the Notes and (ii) that they would guarantee all amounts owed under the Note Purchase Agreements, the Notes, and the Strategic Relationship Agreement.

83.     JSI and LAM Holdings performed their obligations under the February Forbearance Agreement.

84.     As set forth above, the George Weiss Companies' breached their obligations under each of the Note Purchase Agreements, the Notes, and the Strategic Relationship Agreement.

85.     In turn, Weiss breached the February Forbearance Agreement by failing pay to JSI and LAM Holdings the amounts due under the Note Purchase Agreements, the Notes, and

16

FILED: NEW YORK COUNTY CLERK 05/06/2024 03:49 PM

NYSCEF DOC. NO. 2

INDEX NO. 652329/2024

RECEIVED NYSCEF: 05/06/2024

the Strategic Relationship Agreement causing JSI and LAM Holdings damages in the amount of $101,295,570.00.

## SECOND CAUSE OF ACTION
### (Breach of the February Forbearance Agreement Fee Requirements)

86.     Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

87.     JSI, LAM Holdings, the George Weiss Companies, and Weiss formed a valid contract, specifically, the February Forbearance Agreement.

88.     JSI and LAM Holdings performed their obligations under the February Forbearance Agreement.

89.     GWA and WMSA breached the February Forbearance Agreement by making payments of $22,100.00, $343,051.14, $13,728.20, $30,400.00, $13,075.55, $15,000.00, and $33,016.09 without JSI's approval.

90.     Defendant Weiss breached the February Forbearance Agreement by failing to take all actions within his control, including by exercising all of his voting, governance, management and other rights and powers to prevent GWA and WMSA from breaching the February Forbearance Agreement.

91.     JSI and LAM Holdings were harmed by Weiss' breaches because, by permitting the transfer of funds in violation of the February Forbearance Agreement, Weiss reduced the funds available to satisfy the George Weiss Companies' obligations to JSI and LAM Holdings by $470,370.98.

17

A-37

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor

and against Defendants as follows:

    (a)    On the First Cause of Action, a judgment in JSI and LAM Holdings' favor and against Weiss for money damages in an amount to be determined at trial, but believed to be not less than $101,295,570.00, representing (i) the outstanding principal and interest owed to JSI under the Notes and (ii) all outstanding principal and interest owed to LAM Holdings under the Strategic Relationship Agreement as of December 31, 2023;

    (b)    On the Second Cause of Action, a judgment in JSI and LAM Holdings' favor and against Weiss for money damages in an amount to be determined at trial, but believed to be not less than $470,370.98, representing the amounts transferred by GWA and WMSA in breach of the February Forbearance Agreement; and

    (c)    An award of attorneys' fees incurred by Plaintiffs in connection with this action pursuant to Sections 10.3 and 13.1 of the Note Purchase Agreement, Section 5(b) of the Strategic Relationship Agreement, and Section 3(a) if the February Forbearance Agreement; and

    (d)    Awarding Plaintiffs such other, further, and different relief as this Court may deem just and proper.

18

FILED: NEW YORK COUNTY CLERK 05/06/2024 03:49 PM INDEX NO. 652329/2024
NYSCEF DOC. NO. 2 RECEIVED NYSCEF: 05/06/2024

Dated:  New York, New York
        May 6, 2024

Respectfully submitted,

HERBERT SMITH FREEHILLS
  NEW YORK LLP

By: /s/ *Scott S. Balber*
    Scott S. Balber
    Michael P. Jones
    Daniel Gomez
450 Lexington Avenue
New York, New York 10017
Telephone:  (917) 542-7600
Facsimile:  (917) 542-7601
Email:      Scott.Balber@hsf.com
            Michael.Jones@hsf.com
            Daniel.Gomez@hsf.com

*Attorneys for Plaintiffs*
*Jefferies Strategic Investments, LLC and*
*Leucadia Asset Management Holdings LLC*

19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
                                                             :
JEFFERIES STRATEGIC INVESTMENTS, LLC    :
and LEUCADIA ASSET MANAGEMENT           :      **ORDER REGULATING**
HOLDINGS LLC,                           :      **PROCEEDINGS**
                                                             :
                              Plaintiffs,    :      24 Civ. 4369 (AKH)
                                                             :
                 -against-                   :
                                                             :
GEORGE WEISS,                           :
                                                             :
                              Defendant.    :
                                                             :
------------------------------------------------------------ X

ALVIN K. HELLERSTEIN, U.S.D.J.:

         An initial case management conference was held on October 11, 2024, and it was

considered appropriate to proceed with motions practice.  All motions must be made by

November 1, 2024.  All opposition papers must be filed by November 22, 2024.  All replies must

be filed by December 4, 2024.  No adjournments will be granted.

         SO ORDERED.

                                                             /s/ Alvin K. Hellerstein
Dated:      October 11, 2024                _____
            New York, New York                   ALVIN K. HELLERSTEIN
                                                 United States District Judge

1

A-40

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEFFERIES STRATEGIC INVESTMENTS,
LLC and LEUCADIA ASSET
MANAGEMENT HOLDINGS LLC,

                                  Plaintiffs,

                -against-

GEORGE WEISS,

                                  Defendant.

---

**ANSWER TO COMPLAINT**

Case No. 24 Civ. 4369 (AKH)

George Weiss ("Defendant"), by his attorneys, Olshan Frome Wolosky LLP and Kaplan

Rice LLP, as and for his answer to complaint, hereby alleges as follows:

**PRELIMINARY STATEMENT**

1.     Defendant denies the allegations set forth in this paragraph.

2.     Defendant denies the allegations set forth in this paragraph.

3.     Defendant denies the allegations set forth in this paragraph.

4.     Defendant denies the allegations set forth in this paragraph.

5.     Defendant denies the allegations set forth in this paragraph.

6.     Defendant denies the allegations set forth in this paragraph.

7.     Defendant denies the allegations set forth in this paragraph.

8.     Defendant denies the allegations set forth in this paragraph.

9.     Defendant denies the allegations set forth in this paragraph.

10.     Defendant denies the allegations set forth in this paragraph.

**PARTIES**

11.     Defendant is without knowledge sufficient to admit or deny the allegations set forth in this paragraph.

12.     Defendant is without knowledge sufficient to admit or deny the allegations set forth in this paragraph.

13.     Defendant is without knowledge sufficient to admit or deny that he is founder and Chief Executive Officer of the "George Weiss Companies" because the "George Weiss Companies" is only defined as "a series of companies that [George Weiss] owns and controls." It is unclear which specific companies Plaintiffs intended to refer to by "George Weiss Companies."

**JURISDICTION AND VENUE**

14.     The allegations in this paragraph set forth a legal conclusion to which no response is required. Defendant does not contest the jurisdiction of this Court for this Action.

15.     The allegations in this paragraph set forth a legal conclusion to which no response is required. Defendant does not contest venue in this District for this action.

**FACTS**

I.     **GWA Executes the Note Purchase Agreements and Receives $53 Million in Loans**

16.     Defendant admits the allegations set forth in this paragraph.

17.     Defendant respectfully refers the Court to the 2019 Note Purchase Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

18.     Defendant respectfully refers the Court to the 2019 Note Purchase Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

19.     Defendant admits the allegations in this paragraph.

12673053-6

20.    Defendant admits that the 2022 Note Purchase Agreement is dated September 21, 2022. Otherwise, Defendant respectfully refers the Court to the 2022 Note Purchase Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

21.    Defendant respectfully refers the Court to the 2019 and 2022 Note Purchase Agreements for a complete and accurate statement of their contents, and denies the allegations in this paragraph to the extent that they are inconsistent with those documents.

22.    Defendant respectfully refers the Court to the 2019 Note Purchase Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

23.    Defendant respectfully refers the Court to the 2019 Note Purchase Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

24.    Defendant respectfully refers the Court to the 2019 Note Purchase Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

25.    Defendant respectfully refers the Court to the 2019 Note Purchase Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

26.    Defendant respectfully refers the Court to the 2019 Note Purchase Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

**II.    GWA Enters into the Strategic Relationship Agreement**

27.    Defendant admits the allegations in this paragraph.

28.    Defendant respectfully refers the Court to the Strategic Relationship Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

29.    Defendant respectfully refers the Court to the Strategic Relationship Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

30.    Defendant respectfully refers the Court to the Strategic Relationship Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

31.    Defendant respectfully refers the Court to the Strategic Relationship Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

### III.    The George Weiss Companies Breach the Agreements

32.    Defendant denies the allegations set forth in this paragraph.

33.    Defendant denies the allegations set forth in this paragraph.

34.    Defendant denies the allegations set forth in this paragraph.

35.    Defendant denies the allegations in this paragraph and refers to the Notes and Note Purchase Agreements for a complete and accurate statement of their contents, and denies the allegations in this paragraph about the Notes and Note Purchase Agreements to the extent that they are inconsistent with those documents.

36.    Defendant respectfully refers the Court to the Strategic Relationship Agreement as amended for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

37.    Defendant denies the allegations set forth in this paragraph.

38.     Defendant denies the allegations set forth in this paragraph.

39.     Defendant respectfully refers the Court to the relevant forbearance agreements for a complete and accurate statement of their contents, and denies the allegations in this paragraph to the extent that they are inconsistent with those documents.

40.     Defendant respectfully refers the Court to the Strategic Relationship Agreement as amended for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

**IV.     GWA Fails to Repay the Amounts Due Under the Notes**

41.     Defendant admits that on or about December 21, 2023, JSI sent a document entitled "Notice of Optional Redemption" purporting to exercise its option to redeem amounts owed under the Notes; otherwise the allegations in this paragraph are legal conclusions to which no response is required.

42.     Defendant denies the allegations in this paragraph except admits that GWA has not paid the entire amount owed under the Notes.

43.     Defendant respectfully refers the Court to the various Notes and Note Purchase Agreements for a complete and accurate statement of their contents, and denies the allegations in this paragraph to the extent that they are inconsistent with those documents.

44.     Defendant admits that on or around February 15, 2024, GWA paid $3 million to JSI.

45.     Defendant denies the allegations set forth in this paragraph.

**V.     The George Weiss Companies Make Nearly $30 Million in Improper Transfers**

46.     Defendant denies the allegations set forth in this paragraph.

47.     Defendant is without knowledge sufficient to admit or deny the allegations set forth in this paragraph.

A-45

48.     Defendant is without knowledge sufficient to admit or deny the allegations set forth in this paragraph.

49.     Defendant admits that in late 2023, discussions were held with a new strategic relationship that could result in the infusion of capital; otherwise, Defendant denies the allegations set forth in this paragraph.

50.     Defendant denies the allegations set forth in this paragraph.

51.     Defendant denies the allegations set forth in this paragraph.

52.     Defendant denies the allegations set forth in this paragraph.

53.     Defendant denies the allegations set forth in this paragraph.

54.     Defendant respectfully refers the Court to the draft forbearance agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

55.     Defendant denies the allegations set forth in this paragraph.

56.     Defendant denies the allegations set forth in this paragraph.

57.     Defendant denies the allegations set forth in this paragraph.

58.     Defendant respectfully refers the Court to the Strategic Relationship Agreement as amended for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

59.     Defendant respectfully refers the Court to the Strategic Relationship Agreement as amended for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

60.     Defendant admits that GWA has not paid LAM Holdings the full amount demanded pursuant to the Strategic Relationship Agreement; otherwise, Defendant denies the allegations in this paragraph.

**VI.     <u>Weiss Personally Guarantees the George Weiss Companies' Performance</u>**

61.     Defendant denies the allegations set forth in this paragraph.

62.     Admit that Defendant signed a forbearance agreement on February 12, 2024; otherwise Defendant denies the allegations in this paragraph.

63.     Defendant respectfully refers the Court to the February Forbearance Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

64.     Defendant respectfully refers the Court to the February Forbearance Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

65.     Defendant respectfully refers the Court to the February Forbearance Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

66.     Defendant respectfully refers the Court to the February Forbearance Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

67.     Defendant respectfully refers the Court to the February Forbearance Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

68.    Defendant respectfully refers the Court to the February Forbearance Agreement for a complete and accurate statement of its contents, and denies the allegations in this paragraph to the extent that they are inconsistent with that document.

**VII.    Weiss Breaches His Personal Guarantee**

69.    Defendant denies the allegations set forth in this paragraph.

70.    Defendant denies the allegations set forth in this paragraph.

71.    Defendant denies the allegations set forth in this paragraph.

72.    Defendant denies the allegations set forth in this paragraph.

73.    Defendant denies the allegations set forth in this paragraph.

74.    Defendant denies the allegations set forth in this paragraph.

75.    Defendant denies the allegations set forth in this paragraph.

76.    Defendant denies the allegations set forth in this paragraph.

77.    Defendant denies the allegations set forth in this paragraph.

78.    Defendant is without knowledge sufficient to admit or deny the allegations set forth in this paragraph.

79.    Defendant admits the allegations in this paragraph.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Breach of Personal Guarantee)**

80.    Defendant incorporates by reference the preceding responses as if fully set forth therein.

81.    The allegations in this paragraph are legal conclusions to which no response is required; to the extent this paragraph requires a response, Defendant denies the allegations set forth in this paragraph.

82.     The allegations in this paragraph are legal conclusions to which no response is required; to the extent this paragraph requires a response, Defendant denies the allegations set forth in this paragraph.

83.     The allegations in this paragraph are legal conclusions to which no response is required; to the extent this paragraph requires a response, Defendant denies the allegations set forth in this paragraph.

84.     The allegations in this paragraph are legal conclusions to which no response is required; to the extent this paragraph requires a response, Defendant denies the allegations set forth in this paragraph.

85.     The allegations in this paragraph are legal conclusions to which no response is required; to the extent this paragraph requires a response, Defendant denies the allegations set forth in this paragraph.

### AS AND FOR A SECOND CAUSE OF ACTION
**(Breach of the February Forbearance Agreement Fee Requirements)**

86.     Defendant incorporates by reference the preceding responses as if fully set forth therein.

87.     The allegations in this paragraph are legal conclusions to which no response is required; to the extent this paragraph requires a response, Defendant denies the allegations set forth in this paragraph.

88.     The allegations in this paragraph are legal conclusions to which no response is required; to the extent this paragraph requires a response, Defendant denies the allegations set forth in this paragraph.

12673053-6

89.     The allegations in this paragraph are legal conclusions to which no response is required; to the extent this paragraph requires a response, Defendant denies the allegations set forth in this paragraph.

90.     The allegations in this paragraph are legal conclusions to which no response is required; to the extent this paragraph requires a response, Defendant denies the allegations set forth in this paragraph.

91.     The allegations in this paragraph are legal conclusions to which no response is required; to the extent this paragraph requires a response, Defendant denies the allegations set forth in this paragraph.

Defendant denies each and every allegation in the Complaint not specifically admitted herein.

## AFFIRMATIVE DEFENSES

Defendant George Weiss, for his affirmative defenses, states as follows[1]:

### First Affirmative Defense

The Complaint fails to state a cause of action upon which relief may be granted.

### Second Affirmative Defense

The February Forbearance Agreement is not a valid contract because there was no meeting of the minds.

### Third Affirmative Defense

The February Forbearance Agreement is unenforceable because it was procured under dupress.

---

[1] By stating any affirmative defense, Defendant does not concede or acknowledge that it has the burden of proving such defense in this action.

12673053-6

### Fourth Affirmative Defense

The February Forbearance Agreement is void for lack of consideration.

### Fifth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, by its own inequitable conduct.

### Sixth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because of Plaintiff's own breaches of any of the purported agreements described in the Complaint.

### Seventh Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to mitigate its damages.

### Eighth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because Plaintiff has unclean hands.

### Ninth Affirmative Defense

Plaintiff's claims are barred, in whole or in part, because Plaintiff is equitably estopped from asserting the claims found in the Complaint.

### Tenth Affirmative Defense

Because no discovery has been taken at this stage of the case, Defendant reserves the right to modify or supplement these affirmative defenses.

*        *        *

WHEREFORE, defendant George Weiss respectfully requests that this Court dismiss the Complaint and enter judgment in favor of Defendant.

12673053-6

A-51

Dated: New York, New York
        October 25, 2024

KAPLAN RICE LLP

By:   */s/ Michelle Rice*
       Howard Kaplan
       Michelle Rice
       142 West 57th Street
       Suite 4A
       New York, New York 10019
       (212) 235-0300

OLSHAN FROME WOLOSKY LLP

By:   */s/ Brian A. Katz*
       Brian A. Katz
       Daniel M. Stone
       1325 Avenue of the Americas
       New York, New York 10019
       (212) 451-2300

*Attorneys for George Weiss*

12

12673053-6

A-52

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEFFERIES STRATEGIC INVESTMENTS,
LLC and LEUCADIA ASSET
MANAGEMENT HOLDINGS LLC,

                            Plaintiffs,

             -against-

GEORGE WEISS,

                            Defendant.

Case No. 1:24-cv-04369 (AH)

---

## NOTICE OF DEFENDANT GEORGE WEISS'S MOTION FOR
## SUMMARY JUDGMENT PURSUANT TO RULE 56(a)

PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law, dated November 5, 2024; and the Local Rule 56.1 Statement; the Declaration of George Weiss dated November 5, 2024 with all exhibits thereto; and the Declaration of Jeffrey Dillabough, defendant George Weiss, by his undersigned attorneys, will move the Court before the Honorable Alvin Hellerstein at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York, Courtroom 14D, at a date and time to be determined by the Court, for an order pursuant to Rule 56(a) of the Federal Rules of Civil Procedure dismissing Plaintiffs Jefferies Strategic Investments, LLC and Leucadia Asset Management Holdings LLC's complaint and for such other and further relief as the Court deems just and proper.

A-53

Dated: New York, New York
       November 5, 2024

Respectfully submitted,

KAPLAN RICE LLP


By:   */s/ Howard Kaplan*
     Howard Kaplan
     Michelle Rice
     142 West 57th Street
     Suite 4A
     New York, New York 10019
     (212) 235-0300


OLSHAN FROME WOLOSKY LLP


By:   */s/ Brian A. Katz*
     Brian A. Katz
     Daniel M. Stone
     1325 Avenue of the Americas
     New York, New York 10019
     (212) 451-2300

*Attorneys for George Weiss*

A-54

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEFFERIES STRATEGIC INVESTMENTS,
LLC and LEUCADIA ASSET
MANAGEMENT HOLDINGS LLC,

                              Plaintiffs,

              -against-

GEORGE WEISS,

                              Defendant.

Case No. 1:24-cv-04369 (AH)

**DEFENDANT GEORGE WEISS'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

12689286-14

A-55

Table of Contents

Page

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF FACTS ....................................................................2

   A.   The Parties ........................................................2

   B.   The Contracts Between Plaintiffs and Certain Weiss Companies ..................3

   C.   The Working Relationship Between the Weiss Companies and Jefferies.............3

   D.   Negotiations with the Strategic Partner and the Forbearance Agreement .........4

   E.   The Superbowl Sunday Ultimatum .........................................5

   F.   The Terms of the Forbearance Agreement...................................7

        1)   The Weiss Companies' Three Primary Obligations.........................7

        2)   Mr. Weiss's Limited Obligations .....................................8

        3)   JSI's Sole Obligation Under the Forbearance Agreement...................9

   G.   Jefferies Rejects the "Unilaterally Modified" Forbearance Agreement ..........9

   H.   Jefferies Ramps Up Threats of Litigation .................................11

RELEVANT PROCEDURAL HISTORY .......................................................13

THE APPLICABLE STANDARDS ..........................................................13

ARGUMENT ........................................................................13

   I.   The Forebearance Agreement Is Not Enforceable .............................13

   II.   Mr. Weiss Did Not Personally Guarantee Repayment of $100 Million .........16

        A.   The Plain Language of the Forbearance Agreement Establishes the Mr. Weiss Did Not Personally Guaranty the Payment of More than $100 Million to Jefferies .........................................................17

        B.   Any Ambiguity Must Be Resolved in Favor of Mr. Weiss – Both Pursuant to Rules of Construction and the Extrinsic Evidence.........................20

   CONCLUSION.....................................................................23

12689286-14

Table of Authorities

Page

CASES

*665-75 Eleventh Ave. Realty Corp. v. Schlanger*,
    265 A.D.2d 270 (N.Y. App. Div. 1999) ...............................................16

*ADCO Elec. Corp. v. HRH Constr., LLC*,
    63 A.D.3d 653 (N.Y. App. Div. 2009) ................................................15

*Aetna Life Ins. Co. v. Big Y Foods, Inc.*,
    52 F.4th 66 (2d Cir. 2022) ................................................................13

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .........................................................................13

*Autocrafting Fleet Sols., Inc. v. All. Fleet Co.*,
    148 A.D.3d 1564 (N.Y. App. Div. 2017) ............................................22

*Banco de La Republica de Colombia v. Bank of New York Mellon*,
    No. 10 Civ. 536, 2013 WL 3871419 (S.D.N.Y. July 26, 2013) .............17

*Bank of New York v. Amoco Oil Co.*,
    35 F.3d 643 (2d Cir. 1994)................................................................20

*Bombay Realty Corp. v. Magna Carta, Inc. (In re Bombay Realty Corp.)*,
    100 N.Y.2d 124 (N.Y. 2003) .............................................................16

*Brad H. v. City of New York*,
    17 N.Y.3d 180 (N.Y. 2011) ...............................................................16

*Caldor, Inc. v. Mattel, Inc.*,
    817 F. Supp. 408 (S.D.N.Y. 1993) .....................................................17

*Cleveland Wrecking Co. v. Hercules Constr. Corp.*,
    198 F.3d 233 (2d Cir. 1999).............................................................14

*Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch,
    Pierce, Fenner & Smith Inc.*,
    232 F.3d 153 (2d Cir. 2000)..............................................................23

*Compass Prods. Int'l LLC v. Charter Commc'ns, Inc.*,
    No. 22-254, 2023 WL 2358479 (2d Cir. Mar. 6, 2023)........................14

*Homayouni v. Paribas*,
    241 A.D.2d 375 (N.Y. App. Div. 1997) ..............................................14

Table of Authorities
(continued)

Page

*Int'l Paper Co. v. Suwyn*,
  966 F. Supp. 246 (S.D.N.Y. 1997) ...............................................................15

*Keybanc Cap. Mkts., Inc. v. Extreme Steel, Inc.*,
  No. 23-cv-8535, 2024 WL 3237653 (S.D.N.Y. June 27, 2024) ...............................23

*Kitchen Winners N.Y. Inc. v. Rock Fintek LLC*,
  No. 22 Civ. 5276, 2024 WL 3676931 (S.D.N.Y. Aug. 6, 2024) ...........................13

*Ladau v. Hillier Grp., Inc.*,
  No. 02 Civ.4703, 2004 WL 691520 (S.D.N.Y. Mar. 31, 2004) .............................15

*Lo-Ho LLC v. Batista*,
  62 A.D.3d 558 (N.Y. App. Div. 2009) .........................................................16

*Louis Dreyfus Energy Corp. v. MG Refining & Mktg., Inc.*,
  2 N.Y.3d 495 (N.Y. 2004) ....................................................................16

*Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC*,
  30 A.D.3d 1 (N.Y. App. Div. 2006), *aff'd*, 8 N.Y.3d 59 (N.Y. 2006)...................17

*Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC*,
  760 F. Supp. 2d 384 (S.D.N.Y. 2011).........................................................23

*Roswell Cap. Partners LLC v. Alt. Constr. Techs.*,
  No. 08 Civ. 10647, 2009 WL 497578 (S.D.N.Y. Feb. 27, 2009) ...........................22

*Short v. Churchill Benefit Corp.*,
  No. 14-CV-4561, 2016 WL 8711349 (E.D.N.Y. Apr. 8, 2016) .............................22

*Symbol Techs., Inc. v. Voicenet (Aust.) Ltd.*,
  No. CV-03-6010, 2008 WL 89626 (E.D.N.Y. Jan. 4, 2008) ......................16, 21, 22

*Thor Props., LLC v. Willspring Holdings LLC*,
  118 A.D.3d 505 (N.Y. App. Div. 2014) .......................................................14

*Two Locks, Inc. v. Kellogg Sales Co.*,
  68 F. Supp. 3d 317 (E.D.N.Y. 2014) ......................................................20, 22

*Vincent v. Nat'l Debt Relief LLC*,
  No. 24-cv-440, 2024 WL 3344227 (S.D.N.Y. July 8, 2024)..................................14

*Wedgewood Care Ctr., Inc. v. Kravitz*,
  198 A.D.3d 124 (N.Y. App. Div. 2021) .......................................................22

iii

<u>Table of Authorities</u>
(continued)

<span align="right"><u>Page</u></span>

*White Rose Food v. Saleh*,
　99 N.Y.2d 589 (N.Y. 2003) ...............................................................................16, 22

OTHER AUTHORITIES

Fed. R. Civ. P. 56(a) ................................................................................................1

Restatement (Second) of Contracts § 38(1) (A.L.I. 1981)............................................14

1 Richard A. Lord, Williston on Contracts § 5:3 (Law. Coop. Publ'g, 4th ed.
　2024) ..................................................................................................................14

Defendant George Weiss ("Mr. Weiss") respectfully submits this memorandum of law in support of his Motion for Summary Judgement dismissing the Complaint filed by plaintiffs Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC ("Leucadia") (collectively, "Jefferies" or "Plaintiffs") pursuant to Fed. R. Civ. P. 56(a).

## PRELIMINARY STATEMENT

Mr. Weiss is entitled to summary judgment dismissing Jefferies' claims. The alleged forbearance agreement at issue in this case was never actually accepted by Jefferies, which clearly contemplated further negotiations, and is therefore not a binding agreement. In addition, Jefferies' complaint should be dismissed under the plain language of Mr. Weiss's alleged "performance" guaranty and the settled law governing guarantees.

First, the undisputed record establishes that Mr. Weiss and Plaintiffs did not agree on terms. Plaintiffs insisted on one version of the forbearance agreement and Mr. Weiss insisted on, and signed, another. Jefferies plainly disagreed with Mr. Weiss's changes, which deleted Jefferies' "required" admissions. Jefferies then demanded that Mr. Weiss comply with certain representations and produce certain documents to Jefferies "in the meantime," and never signed the draft. Thus, Mr. Weiss owes Plaintiffs no obligation under that agreement.

Second, Plaintiffs posit, through a convoluted construction of the Forbearance Agreement dated February 12, 2024 (the "Forbearance Agreement") that Mr. Weiss's limited *performance* guaranty of the "agreements" of distinct Weiss entities also included an implied *payment* guaranty of more than $100 million. The language and structure of the Forbearance Agreement make clear that Mr. Weiss never agreed to a payment obligation. Indeed, the "guaranty of payment" is set forth in an entirely different section of the Forbearance Agreement in which only Weiss Multi-Strategy Funds, LLC ("WMSF"), Weiss Multi-Strategy Advisers LLC ("WMSA"), OGI Associates, LLC ("OGI") and Weiss Special Operations LLC ("WSPO") guaranteed the "complete

payment and performance" by GWA, LLC ("GWA") pursuant to its various contractual obligations. It is well established that guarantees are to be strictly construed, and a $100 million obligation cannot be implied. Had Plaintiffs believed that they were receiving a guaranty of a $100 million obligation from Mr. Weiss, such a provision was required to be expressly and plainly stated in the guaranty as they did with WMSF, WMSA, OGI and WSPO.

Moreover, the guaranty must be construed in the light most favorable to Mr. Weiss. Jefferies' proffered interpretation is not only contrary to the Forbearance Agreement but should be rejected in favor of Mr. Weiss's reasonable reading of Mr. Weiss's performance guaranty.

Jefferies' argument is further undermined by the fact that the concept of Mr. Weiss guaranteeing *any* payment was never discussed between the parties — not in any emails, term sheets, contract drafts, phone calls or letters, or even in the several iterations of "draft complaints" Plaintiffs delivered to Mr. Weiss in an effort to shock and intimidate him into paying Plaintiffs' egregious demands. The first time any such "payment guarantee" was referenced in connection with Mr. Weiss was in the complaint in this action. For all these reasons and those set forth more fully below and in the accompanying declarations of George Weiss and Jeffrey Dillabough, summary judgment in Mr. Weiss's favor is appropriate.

## STATEMENT OF FACTS

A.    The Parties

Mr. George Weiss is the founder of each of GWA, LLC ("GWA") and its subsidiaries Weiss Multi-Strategy Funds, LLC ("WMSF"), OGI Associates, LLC ("OGI"), Weiss Special Operations LLC ("WSPO"), Weiss Multi-Strategy Advisers LLC ("WMSA," and collectively with GWA, WMSF, OGI, and WSPO, the "Weiss Companies"). Defendant George Weiss's Statement of Material Facts Pursuant to Local Rule 56.1 (the "56.1 Statement") ¶ 1. Until recently, the Weiss Companies were some of the longest tenured hedge funds in the Unites States, managing

approximately $4 billion at their peak.  56.1 Statement ¶ 2.  In 46 years of operation, the Weiss

Companies ended a financial year with losses on only four occasions. 56.1 Statement ¶ 3.

Plaintiff JSI is a Delaware LLC and a subsidiary of Jefferies Financial Group.  56.1

Statement ¶ 4.  Plaintiff Leucadia is a Delaware LLC and a subsidiary of Jefferies Financial Group.

56.1 Statement ¶ 5.  Jefferies Financial Group is a New York-based investment bank that is traded

on the NASDAQ exchange.  Among other things, Jefferies specializes in the sales and trading of

securities, lending, and other capital markets-based activities.

B.    The Contracts Between Plaintiffs and Certain Weiss Companies

Jefferies has had a business relationship with the Weiss Companies since 2018, when

Leucadia entered into a "Strategic Relationship Agreement" with the Weiss Companies.  56.1

Statement ¶ 6.  As part of this arrangement, Jefferies provided financing to GWA through

promissory notes.  56.1 Statement ¶ 7.  Mr. Weiss is not personally a party to any of these

agreements and did not guarantee any of the Weiss Companies' obligations. 56.1 Statement ¶ 8.

C.    The Working Relationship Between the Weiss Companies and Jefferies

Beginning in 2018, Jefferies and the Weiss Companies worked cooperatively to market the

Weiss Companies, including to Jefferies clients.  56.1 Statement ¶ 9.  Over the years, the Weiss

Companies paid down a portion of the amounts owed under the Strategic Relationship Agreement

and the promissory notes, but the amounts owed continued to accrue and the parties operated under

the assumption that GWA would pay these amounts down as cash became available.  56.1

Statement ¶ 10.  The financial condition of the Weiss Companies was fully disclosed to Jefferies,

and the Weiss Companies regularly provided Jefferies with financial records and projections.  56.1

Statement ¶ 11.

In November 2023, Mr. Weiss began having discussions with a potential new strategic

partner (the "Strategic Partner").  56.1 Statement ¶ 12.  Mr. Weiss promptly informed Jefferies'

CEO, Mr. Richard Handler, and co-presidents Mr. Brian Friedman and Mr. Nick Daraviras, about these discussions.  56.1 Statement ¶ 13.  Jefferies expressed support for the proposed transaction. 56.1 Statement ¶ 14.

      D.      <u>Negotiations with the Strategic Partner and the Forbearance Agreement</u>

After learning of the discussions with the Strategic Partner, Jefferies began taking actions to obtain leverage in connection with these negotiations.  For the first time, Jefferies demanded that it control the decision-making regarding bonus payments to the Weiss Companies' portfolio managers and staff.  On February 1, 2024, Jefferies sent the Weiss Companies a draft Forbearance Agreement (the "Draft Forbearance Agreement").  56.1 Statement ¶ 15.  This draft purported to prohibit the Weiss Companies from paying "any bonus compensation or other compensation or other compensation or other payment in excess of base salaries to any of their employees . . . in respect of any period" unless Jefferies agreed in its "sole and absolute discretion."  56.1 Statement ¶ 16.  In exchange, JSI offered not to seek relief under title 11 of the bankruptcy code or take any other enforcement action for just *five* business days.  56.1 Statement ¶ 17.

Jeffrey Dillabough, general counsel to the Weiss Companies, informed Jefferies' representative, Mr. Daraviras, that the Weiss Companies could not agree to this provision and that the Weiss Companies had to maintain control over the payment of bonuses.  56.1 Statement ¶ 18. Mr. Dillabough and another representative of the Weiss Companies advised Mr. Daraviras that paying bonuses was necessary for the Weiss Companies to survive and for the potential pending deal with the Strategic Partner to progress.  56.1 Statement ¶ 19.  Mr. Dillabough also was concerned that delegating to a creditor this decision concerning the retention of the Weiss Companies' employees and compliance with its contractual commitments to the portfolio managers could breach the Weiss Companies' duties to their clients.  56.1 Statement ¶ 20.

During the week of February 5, 2024, Jefferies threatened to seek a temporary restraining order from a court, including in an email to Mr. Dillabough on February 8, 2024. 56.1 Statement ¶ 21. The email again demanded that the Weiss Companies not pay bonuses, including bonuses that the Weiss Companies were contractually committed to pay to its portfolio managers, even though Mr. Dillabough had just explained that failing to pay these bonuses would destroy the firm and jeopardize the negotiations with the potential Strategic Partner. 56.1 Statement ¶ 22. Mr. Weiss and Mr. Dillabough both viewed these threats by Jefferies as bullying tactics and an effort to gain leverage in connection with the negotiations with the Strategic Partner. 56.1 Statement ¶ 23.

E.    The Superbowl Sunday Ultimatum

On February 11, 2024, Jefferies was told that the Weiss Companies had in fact paid the bonuses due. 56.1 Statement ¶ 24. In response, Jefferies increased its bullying tactics, including its threats to put the Weiss Companies out of business.

These threats resulted in an ultimatum on Superbowl Sunday, February 11, 2024. Jefferies' CEO, Mr. Handler, called Mr. Weiss and accused him of committing securities fraud in "stealing" Jefferies' money. 56.1 Statement ¶ 25. He also threatened that there would be a public news article the next morning that would destroy Mr. Weiss' reputation and ruin the reputation of several key Weiss employees. *Id.* Mr. Handler further threatened that unless Defendant signed a forthcoming revised forbearance agreement, Jefferies would sue Mr. Weiss and employees of the Weiss Companies. 56.1 Statement ¶ 26.

Later that evening, on February 11, 2024, Jefferies' outside counsel, Mr. Scott Balber, arranged a call between Mr. Weiss, Mr. Dillabough, Mr. Daraviras, and others. 56.1 Statement ¶ 27. During that call, Mr. Daraviras and Mr. Balber railed against Mr. Weiss and Mr. Dillabough. *Id.* They reiterated Mr. Handler's threat to ruin the reputations of everyone involved in a public

litigation to be filed the following morning unless the Weiss Companies signed a new forbearance agreement Plaintiffs would send over later that evening.   56.1 Statement ¶ 28.   Plaintiffs also threatened to claw back compensation payments to employees, freeze the Weiss Companies' bank accounts and ruin Mr. Weiss's reputation in the industry.   56.1 Statement ¶ 29.   At no point did anyone on the call discuss Mr. Weiss personally guaranteeing any amounts owed to Jefferies.   56.1 Statement ¶ 30.

On February 12, 2024, at 2:10 am and 2:20 am, Plaintiffs sent a revised Forbearance Agreement to the Weiss Companies and reminded them of the deadline to sign "by 7 am today, Monday, Feb 12" or face litigation.   56.1 Statement ¶ 31; Dillabough Decl. Ex. 2.   The Weiss Companies believed that Plaintiffs' threats would lead to the immediate demise of the Weiss Parties. 56.1 Statement ¶ 32.   Prior to this point, only GWA and WMSA had contractual obligations to Jefferies—none of the remaining entities nor Mr. Weiss had any contractual obligations to Jefferies.   56.1 Statement ¶ 33.

There was no discussion or negotiation concerning the terms of the draft forbearance agreement.   56.1 Statement ¶ 34.   Jefferies sent the draft and demanded that Mr. Weiss sign it as written. *Id.*

On February 12, 2024, at 4:00 am, the Weiss Companies and Mr. Weiss, under threat of imminent public destruction, signed a modified version of the forbearance agreement that Jefferies had sent.   56.1 Statement ¶ 35.   Mr. Weiss signed a version of the Forbearance Agreement that the Weiss Companies edited to remove two admissions Jefferies sought from Mr. Weiss and the Weiss Companies – specifically, that the bonus payments were made "in contravention of the statements made by the Weiss" Companies.   56.1 Statement ¶ 36.

Mr. Weiss was only a party to "Sections 5(a), 9, and 10(c)."   56.1 Statement ¶ 38.

F.    <u>The Terms of the Forbearance Agreement</u>

A plain reading of the Forbearance Agreement signed by Mr. Weiss makes clear that he did not, and never intended to, guarantee the $100 million in corporate debt owed to Jefferies.

1)  The Weiss Companies' Three Primary Obligations

Pursuant to the Forbearance Agreement, the Weiss Companies purported to undertake three primary obligations.  56.1 Statement ¶ 39; Dillabough Decl. Ex. 3 §§ 2-4.  *First*, Section 2 contains the "Weiss [Companies] Agreements," which generally required the Weiss Companies to provide specific information to Jefferies no later than 5:00 pm that day.  56.1 Statement ¶ 40; Dillabough Decl. Ex. 3 § 2.  The "Weiss [Companies] Agreements" also include that they would not make any payment, grant or transfer in excess of $10,000 "except for payments made in the normal course trading consistent with past practices" "without the prior written consent of [Jefferies], which may be granted in or withheld in their sole and absolute discretion."  56.1 Statement ¶ 41; Dillabough Decl. Ex. 3 § 2(c).

*Second*, in Section 3 of the Forbearance Agreement, the Weiss Companies, other than GWA and definitionally excluding Mr. Weiss, purported to guarantee "the prompt and complete payment and performance by GWA and each other Weiss [Company] when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations. . . . [under] any Note Purchase Agreement, any Note, the [Strategic Relationship] Agreement [and] this Agreement. . . ."  56.1 Statement ¶ 42; Dillabough Decl. Ex. 3 § 3(a).  This Section 3 turned each of WMSF, OGI, and WSPO into guarantors for the notes and the Strategic Relationship Agreement.  56.1 Statement ¶ 43; Dillabough Decl. Ex. 3 § 3(a).  Section 3 was clear—as one would expect for a guaranty of approximately $100 obligation—that the "guaranty [was] an irrevocable, absolute, and continuing guaranty of the full and punctual payment and performance and not a guaranty of collection.  56.1 Statement ¶ 44; Dillabough Decl. Ex. 3 § 3(b).

12689286-14

*Third*, the Weiss Companies purported to grant Jefferies a security interest in all of their assets.  56.1 Statement ¶ 45; Dillabough Decl. Ex. 3 § 4(a).

Section 5 of the Forbearance Agreement, the "Representations," set forth several representations from the Weiss Companies, including, among others, representations that they were authorized to enter the agreements, that no default of the underlying agreements had occurred, and that the financial statements were correct.  56.1 Statement ¶ 46; Dillabough Decl. Ex. 3 § 5.

2)  Mr. Weiss's Limited Obligations

The Forbearance Agreement provides that Mr. Weiss was only a party "for purposes of Section 5(a), 9, and 10(c)."  56.1 Statement ¶ 47; Dillabough Decl. Ex. 3 Preamble, Signatures. Section 5(a) is a limited representation that the contract is enforceable, subject to "equitable principles relating to enforceability."  56.1 Statement ¶ 48; Dillabough Decl. Ex. 3 § 5(a).  Section 10(c) is a boilerplate purported acknowledgement that the agreement was supported by "reasonably equivalent value."  56.1 Statement ¶ 49; Dillabough Decl. Ex. 3 § 10(c).  The key provision for present purposes is Section 9:

> Weiss unconditionally and irrevocably personally guarantees to the Jefferies Entities the accuracy of the representations made by, and the performance of the agreements of, the Weiss [Companies] hereunder.  Weiss further agrees that he shall take all actions within his control, including by exercising all of his voting, governance management, and other rights and powers with respect to each of the other Weiss [Companies], any of their subsidiaries and any of his personal or his family's trusts to cause such persons to comply with the terms of this agreement.

56.1 Statement ¶ 50; Dillabough Decl. Ex. 3 § 9.  The reference to the "agreements of[] the Weiss [Companies] hereunder" is not a catch-all; it is a direct reference to Section 2, the "Weiss [Companies] Agreements," which required Mr. Weiss to use his authority to ensure the

performance of those agreements by the Weiss Companies. 56.1 Statement ¶ 51; Dillabough Decl. Ex. 3 § 2.

Nowhere in the agreement does Mr. Weiss guaranty any payment, much less "the full and punctual payment and performance" guaranteed by Weiss Companies. 56.1 Statement ¶ 52. There is no provision in the Forbearance Agreement pursuant to which Mr. Weiss personally guaranteed payment of over $50 million in notes or note purchase agreements. 56.1 Statement ¶ 53. There is also no provision in the Forbearance Agreement pursuant to which Mr. Weiss personally guaranteed payment of over $50 million allegedly due under the Strategic Relationship Agreement. 56.1 Statement ¶ 54. At no point prior to the initiation of this lawsuit did Jefferies ever discuss with Mr. Weiss a $100 million guaranty of the Weiss Companies' corporate debt or assert that Section 9 could be understood to include a personal payment guarantee. 56.1 Statement ¶ 55.

3) JSI's Sole Obligation Under the Forbearance Agreement.

JSI had a single obligation under the Forbearance Agreement: it simply agreed to forbear from commencing an action to recover under the notes against the Weiss Companies for no more than two business days. 56.1 Statement ¶ 56; Dillabough Decl., Ex. 3 § 6. JSI did not agree to forego suit against Mr. Weiss or any Weiss Companies' employees for any period. 56.1 Statement ¶ 57; Dillabough Decl., Ex. 3 § 6. Leucadia had no obligations whatsoever under the Forbearance Agreement. 56.1 Statement ¶ 58.

G.     Jefferies Rejects the "Unilaterally Modified" Forbearance Agreement

At 8:53 am, Jefferies' outside attorney, Mr. Balber, wrote a letter to the Weiss Companies, stating that the Weiss Companies' edits to the Forbearance Agreement were not acceptable. 56.1 Statement ¶ 59. As he explained, "At 2:20 a.m. this morning, the Jefferies Parties provided you with a draft Forbearance Agreement, pursuant to which they offered to temporarily forego commencing any Enforcement Action against the Weiss [Companies] during the Forbearance

A-68

Period.  As part of that offer, the Jefferies Parties *required* that: the Weiss [Companies] admit that they had made statements to the Jefferies Parties that they would not make certain bonus payments under the second half of February 2024 [and] admit that they had paid the bonuses on February 8, 2024."  56.1 Statement ¶ 60 (emphasis added).  As a result of the Weiss Companies' deletion of the required admissions, Jefferies made clear that there was no agreement, but nonetheless demanded that, "in the meantime," the Weiss Companies comply with their representations and the agreement to produce financial records.  56.1 Statement ¶ 61.

The letter also noted that the "Jefferies Parties reserve[d] all of their rights to bring claims and pursue remedies arising from the Weiss [Companies'] misconduct."  56.1 Statement ¶ 62.  In other words, Jefferies informed the Weiss Companies that it was not bound by its sole obligation not to bring a claim against the Weiss Companies to enforce the notes.  56.1 Statement ¶ 63.  Seemingly cognizant of the fact the parties had not reached total agreement on material terms, Jefferies never signed the Forbearance Agreement.  56.1 Statement ¶ 64.

During the week of February 12, 2024, in the hopes that Jefferies would refocus on negotiations with the Strategic Partner, the Weiss Companies transmitted all the information requested in the Forbearance Agreement — most of which Jefferies already possessed.  56.1 Statement ¶ 65.  The Weiss Companies did not, however, comply with certain provisions of the purported forbearance agreement, such as setting up account control agreements, since Jefferies never accepted or signed the Weiss Companies' modified Forbearance Agreement.  56.1 Statement ¶ 66.

On February 15, 2024, GWA repaid $3 million owed under the notes.  56.1 Statement ¶ 67.  Both the Weiss Companies and, allegedly, Jefferies refocused on the transaction with the Strategic Partner, exchanging numerous term sheets and discussing what amount Jefferies would accept to

be bought out of its position.  56.1 Statement ¶ 68.  The negotiations with the Strategic Partner included paying Jefferies a $30 million payment from the Strategic Partner, and additional consideration of approximately $12 million from the Weiss Companies, in full satisfaction of the amounts owed to Jefferies.  56.1 Statement ¶ 69.

       H.      <u>Jefferies Ramps Up Threats of Litigation</u>

Jefferies continued threatening Mr. Weiss, the Weiss Companies, and their employees.  On February 17, 2024, five days after rejecting the "unilaterally modified Forbearance Agreement," Mr. Daraviras emailed Mr. Dillabough a draft complaint (the "February Draft Complaint").  56.1 Statement ¶ 70.  The February Draft Complaint was a threat to sue Mr. Weiss, GWA, WMSA, and 79 other employees of the Company personally.  56.1 Statement ¶ 71.

Notably, the February Draft Complaint does not reference the Forbearance Agreement – presumably because Jefferies had rejected the agreement on February 12.  56.1 Statement ¶ 72. The February Draft Complaint does not allege that Mr. Weiss guaranteed the corporate debts owed to Jefferies, even while asserting claims against the corporate entities for the $100 million owed under the Strategic Relationship Agreement and the promissory notes. 56.1 Statement ¶ 73.

Shortly thereafter, Jefferies rejected that offer of $30 million from the Strategic Partner and demanded $50 million in cash.  56.1 Statement ¶ 74.  On February 28, 2024, the Strategic Partner informed Mr. Weiss that it would not agree to the transaction at the level that Jefferies was demanding.  56.1 Statement ¶ 75.

Yet Jefferies was not done attempting to extract further payment from Mr. Weiss through threats of public ruin.  On March 26, 2024, having failed to pressure Mr. Weiss into paying Jefferies anything out of pocket, Jefferies's outside counsel, Mr. Balber, sent the Weiss Companies' counsel a second draft complaint (the "March Draft Complaint").  56.1 Statement ¶ 76.  The March Draft Complaint dropped the 79 employees from the suit, focusing instead on allegations that Mr. Weiss

11

and "his close cronies" abused their position and treated the companies as their "personal piggy bank."  56.1 Statement ¶ 77.  <u>While the March Draft Complaint included new allegations that the Forbearance Agreement was valid, it tellingly does *not* allege that Mr. Weiss personally guaranteed $100 million therein</u>.  56.1 Statement ¶ 78.  Instead, the sole allegation regarding Mr. Weiss's breach of the Forbearance Agreement was that he "fail[ed] to take all actions within his control" to prevent the Weiss Companies from making the March 1 payments to vendors.  56.1 Statement ¶ 79.  The Demand for Relief summarizes Jefferies' understanding that, at most, Mr. Weiss could only be found liable for a breach of the Weiss Companies' Agreements, not for a Section 3 guaranty:

> WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against defendants as follows:
>
> (a)  On the First Cause of Action, a judgment in JSI's favor and against GWA, WMSA, WMSF, OGI, and WSPO for money damages in an amount to be determined at trial, but believed to be not less than $49,832,562.00, representing the outstanding principal and interest owed to JSI under the Notes;
>
> (b)  On the Second Cause of Action, a judgment in LAM Holdings' favor and against GWA, WMSA, WMSF, OGI, and WSPO for money damages in an amount to be determined at trial, but believed to be not less than $50,597,604.00, representing all outstanding principal and interest owed to LAM Holdings under the Strategic Relationship Agreement as of December 31, 2023;
>
> (c)  On the Third and Fourth Causes of Action, a judgment in Plaintiffs' favor and against the Insiders voiding the voidable transfers set forth above;
>
> (d)  On the Fifth Cause of Action, a judgment in JSI's and LAM Holdings' favor and against GWA, WMSA, WMSA, WMSF, OGI, WSPO, and George Weiss for money damages in an amount to be determined at trial, but believed to be not less than $470,370.98, representing the amounts transferred by GWA and WMSA in breach of the February Forbearance Agreement on March 1, 2024;

56.1 Statement ¶ 80.

At no point either prior to or after the signing of the Forbearance Agreement did anyone communicate to Mr. Weiss that Mr. Weiss might be personally responsible for the entire amount

owed; the first Mr. Weiss learned of that tortured reading of the Forbearance Agreement was on May 6, 2024, when this lawsuit was filed. 56.1 Statement ¶ 81.

## RELEVANT PROCEDURAL HISTORY

On May 6, 2024, Plaintiffs commenced an action against Mr. Weiss in New York State Supreme Court. ECF Doc. No. 1. Mr. Weiss timely removed the action to this Court on June 7, 2024 without opposition. ECF No. 1. The Court ordered the instant summary judgment briefing. ECF No. 20.[1] This Motion followed promptly.

## THE APPLICABLE STANDARDS

Summary judgment must be granted where "there is no genuine issue as to any material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A material fact is one that would affect the outcome of the suit under the governing law, and a dispute about a genuine issue of material fact occurs if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party." *Aetna Life Ins. Co. v. Big Y Foods, Inc.*, 52 F.4th 66, 72 (2d Cir. 2022) (internal quotations omitted) (cleaned up). Summary judgment may be granted in a contract dispute where "the language of the contract is wholly unambiguous." *Kitchen Winners N.Y. Inc. v. Rock Fintek LLC*, No. 22 Civ. 5276, 2024 WL 3676931, at *13 (S.D.N.Y. Aug. 6, 2024).

## ARGUMENT

**I.    THE FOREBEARANCE AGREEMENT IS NOT ENFORCEABLE**

Both of Plaintiffs' breach of contract claims are based on the Forbearance Agreement. Complaint ¶¶ 80–91. Because, however, the material terms of the Forbearance Agreement were never mutually agreed to by the parties, there was no meeting of the minds and no contract was formed.

---

[1] Mr. Weiss moved to dismiss the Complaint on August 15, 2024, which the Court denied. ECF Nos. 15, 19. On October 26, 2024, Mr. Weiss answered the Complaint. ECF No. 21.

Contractual duties and obligations may only be imposed "where there is a mutual meeting of the minds, ordinarily measured by an offer, acceptance, and consideration." *Vincent v. Nat'l Debt Relief LLC*, No. 24-cv-440, 2024 WL 3344227, at *5 (S.D.N.Y. July 8, 2024). Contract formation only occurs when a party "clearly and unequivocally accept the offeror's terms." *Thor Props., LLC v. Willspring Holdings LLC*, 118 A.D.3d 505, 507 (N.Y. App. Div. 2014). "If instead the offeree responds by conditioning acceptance on new or modified terms, that response constitutes both a rejection and a counteroffer which extinguishes the initial offer." *Id.* "Indeed, whenever a purported acceptance is even slightly at variance with the terms of an offer, the qualified response operates as a rejection and termination of—and substitution for—the initially offered terms." *Homayouni v. Paribas*, 241 A.D.2d 375, 376 (N.Y. App. Div. 1997). Fundamentally, the act of rejecting an offer extinguishes the offer and the offeree's right of acceptance.[2]

When there is no genuine dispute of material fact, the issue of contract formation, and whether there exists a "meeting of the minds," can be determined at summary judgment. *See Compass Prods. Int'l LLC v. Charter Commc'ns, Inc.*, No. 22-254, 2023 WL 2358479, at *2 (2d Cir. Mar. 6, 2023) (affirming grant of summary judgment when there was "no evidence of a meeting of the minds as to an essential term"); *Cleveland Wrecking Co. v. Hercules Constr. Corp.*, 198 F.3d 233 (2d Cir. 1999) (affirming grant of summary judgment that no contract had been formed absent meeting of the minds).

---

[2] *See, e.g.*, 1 Richard A. Lord, Williston on Contracts § 5:3 (Law. Coop. Publ'g, 4th ed. 2024) ("When an offer has been rejected, it ceases to exist, and a subsequent attempted acceptance is inoperative, even though the acceptance is made within a time which would have been sufficiently early had there been no rejection."); Restatement (Second) of Contracts § 38(1) (A.L.I. 1981) ("An offeree's power of acceptance is terminated by his rejection of the offer, unless the offeror has manifested a contrary intention.").

14

Here, Mr. Dillabough deleted certain representations in the draft forbearance agreement, and sent the revised version signed by Mr. Weiss back to Jefferies' counsel. Jefferies clearly considered this a material modification, and did not accept the "unilaterally modified Forbearance Agreement."

Four hours after receipt of Mr. Dillabough's revisions, Jefferies' outside counsel sent a letter making clear that the deleted representations were critical to Jefferies' proposed agreement. Jefferies' counsel wrote:

> At 2:20 a.m. this morning, the Jefferies Parties provided you with a draft Forbearance Agreement, pursuant to which they offered to temporarily forego commencing any Enforcement Action against the Weiss Parties during the Forbearance Period.[1] As part of that offer, the Jefferies Parties required that:
>
> 1. The Weiss Parties admit that they had made statements to the Jefferies Parties that they would not make certain bonus payments until the second half of February 2024.
>
> 2. The Weiss Parties admit that they had paid the bonuses on February 8, 2024.

56.1 Statement ¶ 60. Jefferies thus referred to its draft as an "offer," and noted that the deleted paragraphs were "required." Jefferies' letter makes clear that the Weiss Companies' removal of these admissions was a material change to the terms of the agreement, constituting a rejection and counteroffer by the Weiss Companies. *See ADCO Elec. Corp. v. HRH Constr., LLC*, 63 A.D.3d 653, 655 (N.Y. App. Div. 2009) (proposal of several material modifications constitutes "rejection of the proposed contract, and a counteroffer."); *Int'l Paper Co. v. Suwyn*, 966 F. Supp. 246, 254 (S.D.N.Y. 1997) (when acceptance is not "unequivocal" but "conditioned on terms at variance with those in the offer" it "operates as a counteroffer and terminates the original offer"). *See also Ladau v. Hillier Grp., Inc.*, No. 02 Civ.4703, 2004 WL 691520, at *3 (S.D.N.Y. Mar. 31, 2004) (modified acceptance is a counteroffer).

Jefferies recognized that the parties had not reached a meeting of the minds in closing the letter. After making clear that the deletion of the representations was not acceptable, Jefferies' counsel clarified that Jefferies was not bound by its promise to forbear from pursuing its claims,

15

but "reserve[d] all of their rights to bring claims and pursue remedies arising from the Weiss [Companies'] misconduct." 56.1 Statement ¶ 62. Counsel for Jefferies concluded by stating that, "[i]n the meantime, we expect the Weiss Parties to abide by the representations made to the Jefferies Parties in the unilaterally modified Forbearance Agreement . . . ." *See* 56.1 Statement ¶ 61. He did not state that the Weiss Companies were *bound* to provide this information, but merely stated that Jefferies *expected* the Weiss Companies to provide it while the parties continued navigating their paths forward. Having rejected the "unilaterally modified" Forbearance Agreement because it excluded "required" terms, Jefferies cannot now enforce the Forbearance Agreement. Thus, the Forbearance Agreement is not a valid and enforceable contract. Mr. Weiss's Motion for Summary Judgment should be granted for this reason alone.

## II.    MR. WEISS DID NOT PERSONALLY GUARANTEE REPAYMENT OF $100 MILLION

A guaranty is a contract like any other, to be interpreted primarily based on the words the parties used. *Louis Dreyfus Energy Corp. v. MG Refining & Mktg., Inc.*, 2 N.Y.3d 495, 500 (N.Y. 2004). "All parts of a contract must be read in harmony to determine its meaning," and "[o]ne portion . . . should not be read so as to negate another portion." *Bombay Realty Corp. v. Magna Carta, Inc. (In re Bombay Realty Corp.)*, 100 N.Y.2d 124, 127 (N.Y. 2003); *see also Brad H. v. City of New York*, 17 N.Y.3d 180, 185 (N.Y. 2011). Critically, "[t]he terms of the guaranty . . . are to be strictly construed in favor of a private guarantor." *665-75 Eleventh Ave. Realty Corp. v. Schlanger*, 265 A.D.2d 270, 272 (N.Y. App. Div. 1999).[3] That is, the obligations of the guarantor "cannot be altered, extended or enlarged by the creditor . . . without the guarantor's consent."

---

[3] *See also Symbol Techs., Inc. v. Voicenet (Aust.) Ltd.*, No. CV-03-6010, 2008 WL 89626, at *2 (E.D.N.Y. Jan. 4, 2008) ("A court must interpret a guaranty in the strictest manner in favor of the guarantor."); *White Rose Food v. Saleh*, 99 N.Y.2d 589, 591 (N.Y. 2003) ("A guaranty is to be interpreted in the strictest manner."); *Lo-Ho LLC v. Batista*, 62 A.D.3d 558, 559 (N.Y. App. Div. 2009) (same).

*Caldor, Inc. v. Mattel, Inc.*, 817 F. Supp. 408, 410-11 (S.D.N.Y. 1993) (citation omitted).  A court must also consider the reasonable expectations of the parties and the business purpose to be served by the purported guaranty.  *Madison Ave. Leasehold, LLC v. Madison Bentley Assocs. LLC*, 30 A.D.3d 1, 8 (N.Y. App. Div. 2006), *aff'd*, 8 N.Y.3d 59 (N.Y. 2006); *see also Caldor*, 817 F. Supp. at 410; *Banco de La Republica de Colombia v. Bank of New York Mellon*, No. 10 Civ. 536, 2013 WL 3871419, at *6 (S.D.N.Y. July 26, 2013).

A.    <u>The Plain Language of the Forbearance Agreement Establishes the Mr. Weiss Did Not Personally Guaranty the Payment of More than $100 Million to Jefferies</u>

The plain language of the Forbearance Agreement makes clear that Section 9 is not a guaranty of personal payment.  Instead, it is a limited guaranty of specified subsections of the Agreement.  The Forbearance Agreement expressly differentiates between the guaranty given by Mr. Weiss and the guaranties given by the Weiss Companies, both by its language and structure. The term "Weiss Parties" is defined in the preamble to include only the Weiss Companies; it does not include Mr. Weiss.  *See* 56.1 Statement ¶ 38; Dillabough Decl. Ex. 3, Preamble.  The preamble and signature page also limit Mr. Weiss's obligations only to "Section 5(a), 9 and 10(c)" of the Forbearance Agreement.  56.1 Statement ¶ 38; Dillabough Decl. Ex. 3, Preamble, Signatures.

Section 9, the section which Jefferies asserts includes Mr. Weiss's personal guarantee of the financial obligations of the Weiss Companies, provides, in relevant part:

> Weiss unconditionally and irrevocably personally guarantees to the Jefferies Entities <u>the accuracy of the representations made by, and the performance of the agreements</u> of, the Weiss [Companies] hereunder. Weiss further agrees that he shall take all actions within his control, including by exercising all of his voting, governance management, and other rights and powers with respect to each of the other Weiss [Companies], any of their subsidiaries and any of his personal or his family's trusts to cause such persons to comply with the terms of this agreement.

17

56.1 Statement ¶ 50; Dillabough Decl., Ex. 3 § 9 (emphasis added).  This provision contains two limited guaranties.  First, Mr. Weiss guaranteed the accuracy of the representations made by the Weiss Companies.  *Id.*  Those representations are found in Section 5, entitled "Representations." 56.1 Statement ¶ 46; Dillabough Decl., Ex. 3 § 5.  Second, Mr. Weiss guaranteed the "performance of the agreements of[] the Weiss [Companies] hereunder."  56.1 Statement ¶ 50; Dillabough Decl., Ex. 3 § 9.  The "agreements of the Weiss [Companies]" are also found in a helpfully entitled section: Section 2's "Weiss [Companies] Agreements." 56.1 Statement ¶ 40; Dillabough Decl. Ex. 3 § 2.

These Section 2 "agreements" include, among other things, the delivery of the following information by "no later than 5:00 p.m. on February 13, 2024":

(i)    "A schedule of bonus payments made to each employee during 2024 . . . ."

(ii)    "Schedules of assets and liabilities of each of GWA, WMSF, OGI, WSPO, WMSA and each of their subsidiaries as of each of January 31, 2024 and February 9, 2024."

(iii)    "Copies of statements from each brokerage, futures, commodities, custodial, bank, deposit or similar account held by any of the entities referred to in clause (ii) above."

(iv)    "The name and address of each entity referred to in clause (ii) above and of each bank or brokerage firm where the accounts referred to in clause (iii) above are held."

(v)    "A schedule of each client account managed by WMSA or its affiliates (the "Weiss Client Accounts"), including the amount of any accrued but unpaid fees or allocations owed to WMSA from each Weiss Client Account."

(vi)    "The operative and offering documents of each Weiss Client Account, . . ."

(vii)    "Copies of every invoice for accrued but unpaid fees or allocation that have been sent to any Weiss Client."

*Id.* Section 2 also contained a commitment not to pay anyone an amount greater than $10,000 in a single day unless it was an ordinary course payment or had approval from Jefferies. 56.1 Statement ¶ 41; Dillabough Decl. Ex. 3 § 2(c). Section 2 does not require any *payment*.

In contrast, Section 3 is clearly a carefully drafted guaranty of payment by various Weiss Companies.[4] Section 3 has four paragraphs setting forth the rights and obligations of the Guaranty. These paragraphs set forth the "Nature of the Guaranty," and identify precisely the obligations to which the guaranty applies (the "Guaranteed Obligations").[5] 56.1 Statement ¶¶ 42-44. Section 3's provisions also relate to "offsets " and "waivers." Dillabough Decl., Ex. 3 § 3(c)-(d). Section 3's guaranty language is specific in that the guaranty is made to "each of JSI and [Leucadia] . . . and their successors, transferees and assigns." *Id.* § 3(a). Section 3 details that the Weiss Companies were stepping in as "primary obligor" for the "prompt and complete payment and performance by GWA and each other Weiss [Company] when due . . . of the Guaranteed Obligations." *Id.* And it makes clear that the Section 3 Guaranty is "an irrevocable, absolute, and continuing guaranty of the full and punctual payment and performance and not a guaranty of collection." *Id.* § 3(b). These formalities are appropriate given that the Section 3 Guaranty explicitly concerned at least $53 million under the Notes and implicitly another $50 million under the Strategic Relationship Agreement. *See* Dillabough Decl., Ex. 3 §§ 1, 3(a).

By contrast, Section 9 contains none of the formalities that one would expect to find in a personal guarantee of $100 million by Mr. Weiss. Section 9 does not use the word "payment." It does not include that the guarantee was made to any of Jefferies' successors or assignees. And it

---

[4]    Indeed, in describing Mr. Weiss's "guarantee" of the Weiss Companies' agreements, Section 9 uses a different spelling from Section 3's "guaranty." 56.1 Statement ¶¶ 42, 50; Dillabough Decl., Ex. 3 §§ 3, 9.

[5]    Section 3 precisely defines "Guaranteed Obligations" to mean "all the obligations of GWA and each other Weiss [Company] arising under any Note Purchase Agreement, the Notes, the [Strategic Relationship] Agreement, and this Agreement."

makes no mention of Mr. Weiss being a primary or secondary obligor. *Id.* § 9. Nor does Section 9 reference Section 3. Jefferies' argument that Section 9 obligated Mr. Weiss to guaranty $100 million in company debts owed to Jefferies fails to give "[e]ffect and meaning . . . to every term of the contract," or attempt to "harmonize all of its terms." *Two Locks, Inc. v. Kellogg Sales Co.*, 68 F. Supp. 3d 317, 331 (E.D.N.Y. 2014).

Finally, the decision to exclude Mr. Weiss as a guarantor from Section 3 is a clear manifestation of the agreement's intent not to require a payment guaranty from Mr. Weiss with respect to the "Guaranteed Obligations" described in Section 3. If Jefferies had believed they were asking Mr. Weiss to issue a payment guaranty of $100 million, Jefferies would have added Mr. Weiss to Section 3 or at least referenced Section 3's guaranty explicitly.

Instead, Section 9's invocation of the "agreements[] of the Weiss [Companies]" should be understood to refer to the narrower Section 2 "Weiss [Companies'] Agreements." *See Bank of New York v. Amoco Oil Co.*, 35 F.3d 643, 662 (2d Cir. 1994) ("Where one interpretation is broader than another, courts should not apply the broader interpretation absent a clear manifestation of intent.").

B.   <u>Any Ambiguity Must Be Resolved in Favor of Mr. Weiss – Both Pursuant to Rules of Construction and the Extrinsic Evidence</u>

With no explanation as to why it did not simply propose to include Mr. Weiss personally in Section 3, Jefferies argues by implication that Mr. Weiss had guaranteed the payment of $100 million to Jefferies. Leaving aside that, despite numerous opportunities, Jefferies never mentioned that the Forbearance Agreement imposed a $100 million payment guaranty on Mr. Weiss, Jefferies at best proposes a competing argument to create an ambiguity in the agreement. However, Jefferies' argument fails under the well-established rules of construction.

The terms of the Guarantee are to be strictly construed in favor of Mr. Weiss. Moreover, the terms must be interpreted "in the strictest manner in favor of the guarantor," Mr. Weiss. *Symbol Techs.*, 2008 WL 89626, at *2 (citations omitted). Jefferies' attempt to expand Section 9 to apply to a section beyond the two mentioned – Section 5 (Representations) and Section 2 (Agreements) – should be rejected. Mr. Weiss's reasonable interpretation of Section 9, interpreted in the light most favorable to him, does not include a payment guaranty of the debts owed to Jefferies. A strict construction of the Forbearance Agreement excludes a personal payment guarantee.

Yet if the Court believes the Forbearance Agreement is ambiguous—and it is not—the undisputed extrinsic evidence confirms that Mr. Weiss's understanding was the parties' understanding. No one at Jefferies ever mentioned to Mr. Weiss that Jefferies was asking for a personal guaranty of their debt. 56.1 Statement ¶ 81. It was not mentioned in the Zoom meeting on the evening of February 11, 2024. 56.1 Statement ¶ 30. It was not mentioned in the call from Mr. Handler. 56.1 Statement ¶ 26. It was not mentioned in the 2:20 am email conveying Jefferies' offered forbearance agreement. 56.1 Statement ¶¶ 31, 34; Dillabough Decl., Ex. 2. There was no negotiation over the terms of the agreement. 56.1 Statement ¶ 34. The fact that Jefferies never even put Mr. Weiss on notice that they believed Mr. Weiss was guaranteeing their debt, and never once asserted such a position prior to the filing of this action, speaks volumes. And it was not mentioned in either of the two draft complaints Jefferies sent to Mr. Weiss in the weeks following February 12, 2024. 56.1 Statement ¶¶ 72, 76-81.

Mr. Weiss and Mr. Dillabough are clear that they did not understand this agreement to impose such a $100 million personal obligation on Mr. Weiss, and that Mr. Weiss would never have signed the agreement if it had included a guaranty of the $100 million debt to Jefferies. 56.1 Statement ¶ 81; Weiss Decl. ¶ 21; *see* Dillabough Decl. ¶ 23.

"The evaluation of the extrinsic evidence and determination of the parties' intent will be a jury question, unless the extrinsic evidence supports only one reasonable conclusion as to the parties' intent." *Short v. Churchill Benefit Corp.*, No. 14-CV-4561, 2016 WL 8711349, at *14 (E.D.N.Y. Apr. 8, 2016) (collecting cases). Here, therefore, the extrinsic evidence points uniformly in one direction: that the Forbearance Agreement included two limited, specific guaranties, not the $100 million guaranty now asserted by Jefferies. Mr. Weiss is entitled to summary judgment in his favor.

Further, "when faced with two interpretations of a provision, courts generally prefer the narrower interpretation absent a clear manifestation of intent." *Two Locks*, 68 F. Supp. 3d at 329; *see also Roswell Cap. Partners LLC v. Alt. Constr. Techs.*, No. 08 Civ. 10647, 2009 WL 497578, at *2 (S.D.N.Y. Feb. 27, 2009); *see also Autocrafting Fleet Sols., Inc. v. All. Fleet Co.*, 148 A.D.3d 1564, 1565 (N.Y. App. Div. 2017) ("the obligation that plaintiff seeks to enforce . . . was not included in the guarantee clause."). Mr. Weiss is also entitled to summary judgement because "any ambiguity in a portion of the [contract] should be construed against the party that drafted it." *Wedgewood Care Ctr., Inc. v. Kravitz*, 198 A.D.3d 124, 138 (N.Y. App. Div. 2021). This general principle applies with greater force to guarantees, which must "be interpreted in the strictest manner." *White Rose*, 99 N.Y.2d at 591. This strict interpretation "in favor of the guarantor" counsels that, absent clear evidence that the parties intended to include a guarantee, the Court should not find guarantees in ambiguous language. *Symbol Techs.*, 2008 WL 89626, at *2. Where, as here, there is no evidence that Mr. Weiss or Jefferies ever intended for Mr. Weiss to adopt an implied $100 million obligation, the Court must construe the Forbearance Agreement as excluding such a guaranty.

Finally, "[w]hen the parties understand the relevant language differently and both understandings are reasonable . . . the contract will be unenforceable as no meeting of the minds has occurred." *Prince of Peace Enters., Inc. v. Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 398 (S.D.N.Y. 2011); *Keybanc Cap. Mkts., Inc. v. Extreme Steel, Inc.*, No. 23-cv-8535, 2024 WL 3237653, at *4 (S.D.N.Y. June 27, 2024). The burden of proving that there was such "a meeting of the minds is on [Jefferies,] the party seeking to enforce the [agreement]." *Prince of Peace Enters.*, 760 F. Supp. 2d at 398. Here, as described above, the uncontested evidence demonstrates that Mr. Weiss and the Weiss Companies *never* understood the Forbearance Agreement to include a $100 million guarantee. 56.1 Statement ¶ 81; Weiss Decl. ¶ 21; *see* Dillabough Decl. ¶ 23. In the face of this uncontested evidence, any ambiguity must be resolved in favor of dismissal of the Complaint. *See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 159 (2d Cir. 2000) (granting summary judgment on an ambiguous contract where defendant "fail[ed] to point to sufficient extrinsic evidence in support of its interpretation").

## CONCLUSION

For the reasons described above, the Court should enter summary judgment in Mr. Weiss's favor, dismissing the complaint in its entirety.

Dated: New York, New York
       November 5, 2024

                                        KAPLAN RICE LLP


                                        By:   */s/ Howard Kaplan*
                                              Howard Kaplan
                                              Michelle Rice
                                              142 West 57th Street
                                              Suite 4A
                                              New York, New York 10019
                                              (212) 235-0300

23

OLSHAN FROME WOLOSKY LLP


By:  */s/ Brian A. Katz*
      Brian A. Katz
      Daniel M. Stone
      1325 Avenue of the Americas
      New York, New York 10019
      (212) 451-2300

      *Attorneys for George Weiss*

12689286-14

A-83

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS LLC, | Case No. 1:24-cv-04369 (AH) |
| Plaintiffs, | DEFENDANT GEORGE WEISS'S STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 |
| -against- |  |
| GEORGE WEISS, |  |
| Defendant. |  |

Pursuant to Local Rule 56.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York, defendant George Weiss respectfully submits this Statement of Material Facts in support of his motion for summary judgment against plaintiffs Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC ("Leucadia") (collectively, "Jefferies" or "Plaintiffs").

    A.    <u>The Parties</u>

    1.    George Weiss is the founder of each of GWA, LLC ("GWA"), Weiss Multi-Strategy Funds LLC ("WMSF"), OGI Associates LLC ("OGI"), Weiss Special Operations LLC ("WSPO"), Weiss Multi-Strategy Advisers LLC ("WMSA," and collectively with GWA, WMSF, OGI, and WSPO, the "Weiss Companies"). Declaration of George Weiss, dated November 5, 2024 ("Weiss Decl.") ¶ 4.

1

2.      Until recently, the Weiss Companies were some of the longest tenured hedge funds in the United States, managing approximately $4 billion at their peak.  Weiss Decl. ¶ 5.

3.      In 46 years of operation, the Weiss Companies ended a financial year with losses on only four occasions.  Weiss Decl. ¶ 5.

4.      Plaintiff JSI is a Delaware LLC and a subsidiary of Jefferies Financial Group. Complaint, ECF No. 1, Ex. A ¶ 11.

5.      Plaintiff Leucadia is a Delaware LLC and a subsidiary of Jefferies Financial Group. Complaint, ECF No. 1, Ex. A ¶ 12.

B.      <u>The Contracts Between Plaintiffs and Certain Weiss Companies</u>

6.      Jefferies has been in business with the Weiss Companies since 2018, when Leucadia entered into a "Strategic Relationship Agreement" with the Weiss Companies.  Weiss Decl. ¶ 7; Declaration of Jeffrey Dillabough, dated November 5, 2024 ("Dillabough Decl.") ¶ 5.

7.      As part of this arrangement, Jefferies provided financing to GWA through promissory notes.  Weiss Decl. ¶ 7; Dillabough Decl. ¶ 5.

8.      Mr. Weiss is not personally a party to any of these agreements and did not guaranty any of the Weiss Companies' obligations.  Weiss Decl. ¶ 7.

C.      <u>The Working Relationship Between the Weiss Companies and Jefferies</u>

9.      Beginning in 2018, Jefferies and the Weiss Companies worked cooperatively to market the Weiss Companies, including to Jefferies clients.  Dillabough Decl. ¶ 7.

10.     Over the years, the Weiss Companies paid down a portion of the amounts owed to Jefferies under the Strategic Relationship Agreement and to JSI under the promissory notes, but the amounts continued to accrue.  The parties operated under the assumption that GWA would pay these amounts down as cash became available.  Weiss Decl. ¶ 8; Dillabough Decl. ¶ 6.

2

11.     The financial condition of the Weiss Companies was fully disclosed to Jefferies, and the Weiss Companies regularly provided Jefferies with financial records and projections. Weiss Decl. ¶ 9.

12.     In November 2023, Mr. Weiss began having discussions with a potential new strategic partner (the "Strategic Partner").  Weiss Decl. ¶ 10; Dillabough Decl. ¶ 8.

13.     Mr. Weiss promptly informed Jefferies's CEO, Richard Handler, and co-presidents Brian Friedman and Nick Daraviras, about these discussions.  Weiss Decl. ¶ 11; Dillabough Decl. ¶ 9.

14.     Jefferies initially expressed support for the proposed transaction.  Weiss Decl. ¶ 11; Dillabough Decl. ¶ 9.

D.     <u>Negotiations with the Strategic Partner and the Forbearance Agreement</u>

15.     On February 1, 2024, Jefferies sent the Weiss Companies a draft Forbearance Agreement (the "Draft Forbearance Agreement").  Weiss Decl. ¶ 13; Dillabough Decl. ¶ 11; Dillabough Decl. Ex. 1

16.     This draft prohibited the Weiss Companies from paying "any bonus compensation or other compensation or other payment in excess of base salaries to any of their employees . . . in respect of any period" unless Jefferies agreed in its "sole and absolute discretion."  Dillabough Decl., Ex. 1 § 2(b).

17.     In exchange, JSI offered not to seek relief under title 11 of the bankruptcy code or take any other enforcement action for at most five business days.  Dillabough Decl., Ex. 1 § 3.

18.     Mr. Dillabough, general counsel to the Weiss Companies, informed Jefferies' representative Mr. Daraviras that the Weiss Companies could not agree to this provision and that

the Weiss Companies had to maintain control over the payment of bonuses.  Dillabough Decl. ¶ 12.

19.     Mr. Dillabough and another representative of the Weiss Companies advised Mr. Daraviras that paying the bonuses was necessary for the Weiss Companies to survive and for the potential pending deal with the Strategic Partner to progress.  Dillabough Decl. ¶ 12; *see* Weiss Decl. ¶ 14.

20.     Mr. Dillabough also was concerned that delegating to a creditor this decision concerning the retention of the Weiss Companies' employees and compliance with its contractual commitments to the portfolio managers could breach the Weiss Companies' duties to their clients. Dillabough Decl. ¶ 12.

21.     During the week of February 5, 2024, Jefferies threatened to seek a temporary restraining order from a court, including in an email to Mr. Dillabough, on February 8, 2024. Dillabough Decl. ¶ 13; Weiss Decl. ¶ 15.

22.     The email again demanded that the Weiss Companies not pay bonuses, including bonuses that the Weiss Companies were contractually committed to pay to its portfolio managers, even though Mr. Dillabough had just explained that failing to pay these bonuses would destroy the firm and would jeopardize the negotiations with the potential Strategic Partner.  Dillabough Decl. ¶ 13; Weiss Decl. ¶ 14.

23.     Mr. Weiss and Mr. Dillabough both viewed these threats as bullying tactics and an effort to gain leverage in connection with the negotiations with the Strategic Partner.  Dillabough Decl. ¶ 14; Weiss Decl. ¶ 15.

    E.     The Superbowl Sunday Ultimatum

4

24.     On February 11, 2024, Jefferies was told that the Weiss Companies had paid the bonuses due.  Dillabough Decl. ¶ 15.

25.     On February 11, 2024, Jefferies CEO, Richard Handler, called Mr. Weiss and accused him of committing securities fraud in "stealing" Jefferies' money.  Mr. Handler also said that there would be a public news article that would destroy Mr. Weiss's reputation and the reputations of key Weiss employees.  Weiss Decl. ¶ 17.

26.     Mr. Handler further threatened that unless Defendant signed a forthcoming revised forbearance agreement, Jefferies would sue Mr. Weiss and employees of the Weiss Companies. Mr. Handler did not mention a personal guarantee.  Weiss Decl. ¶ 17.

27.     On February 11, 2024, Jefferies' outside counsel, Scott Balber, arranged a call between Mr. Weiss, Mr. Dillabough, Mr. Daraviras, and others.  During that call, Mr. Daraviras and Mr. Balber railed against Mr. Weiss and Mr. Dillabough.  Weiss Decl. ¶ 18; Dillabough Decl. ¶ 15.

28.     They reiterated Mr. Handler's threat to ruin the reputations of everyone involved in a public litigation to be filed the following morning unless the Weiss Companies signed a new forbearance agreement they would send over later that evening.  Weiss Decl. ¶ 18; Dillabough Decl. ¶ 15.

29.     Plaintiffs also threatened to claw back compensation payments to employees, freeze the Weiss Companies' bank accounts and ruin Mr. Weiss's reputation in the industry.  Weiss Decl. ¶ 18; Dillabough Decl. ¶ 15.

30.     At no point did anyone on the February 11, 2024 call arranged by Mr. Balber discuss Mr. Weiss personally guaranteeing any amounts owed to Jefferies.  Weiss Decl. ¶ 18; Dillabough Decl. ¶ 16.

31.     On February 12, 2024, at 2:10 am and 2:20 am, Plaintiffs sent a revised Forbearance Agreement to the Weiss Companies and reminded them of the deadline to sign "by 7 am today, Monday, Feb 12" or face litigation.  Dillabough Decl. ¶ 17; Dillabough Decl., Ex. 2.

32.     The Weiss Companies believed that Jefferies' threats would lead to the immediate demise of the Weiss Companies.  Dillabough Decl. ¶ 24.

33.     Before this point, only GWA and WMSA had contractual obligations to Jefferies— none of the remaining entities nor Mr. Weiss had any contractual obligations to Jefferies.  *See* Dillabough Decl. ¶ 22; *see also* Dillabough Decl., Ex. 3 Recitals.

34.     There was no discussion or negotiation concerning the terms of the draft forbearance agreement.  Jefferies sent the draft and demanded that Weiss sign it as written. Dillabough Decl. ¶ 17; Weiss Decl. ¶ 20.

F.      The Terms of the Forbearance Agreement

35.     On February 12, 2024, at 4 am, the Weiss Companies and Mr. Weiss, under threat of imminent public destruction, signed a modified version of the forbearance agreement that Jefferies had sent.  Weiss Decl. ¶ 22; Dillabough Decl. ¶ 24; Dillabough Decl., Ex. 2.

36.     Mr. Weiss signed a version of the Forbearance Agreement that the Weiss Companies edited to remove two admissions Jefferies sought from Mr. Weiss and the Weiss Companies – specifically, that the bonus payments were made "in contravention of the statements made by the Weiss" Companies.   Dillabough Decl. ¶¶ 18, 24; Dillabough Decl., Ex. 4.

37.     This version of the Forbearance Agreement has three categories of parties: the Weiss Companies; Mr. Weiss himself; and Jefferies.  *See* Dillabough Decl. ¶ 24; Dillabough Decl., Ex. 3.

38.    Mr. Weiss was only a party to "Sections 5(a), 9, and 10(c)."  Dillabough Decl., Ex. 3 Preamble, Signatures.

    1)  The Weiss Companies' Obligations Three Primary Obligations

39.    Pursuant to the Forbearance Agreement, the Weiss Companies purported to undertake three primary obligations.  Dillabough Decl., Ex. 3 §§ 2-4.

40.    *First*, Section 2 contains the "Weiss [Companies] Agreements," which generally required the Weiss Companies to provide specific information to Jefferies no later than 5:00 pm on February 13.  Dillabough Decl. ¶ 20; Dillabough Decl., Ex. 3 § 2.

41.    The "Weiss [Companies] Agreements" also include that they would not make any payment, grant or transfer in excess of $10,000 "except for payments made in the course of normal trading consistent with past practices" "without the prior written consent of [Jefferies], which may be granted or withheld in their sole and absolute discretion."  Dillabough Decl. ¶ 20; Dillabough Decl., Ex. 3 § 2(c).

42.    *Second*, in Section 3 of the Forbearance Agreement, the Weiss Companies, other than GWA and definitionally excluding Mr. Weiss, purported to guaranty "the prompt and complete payment and performance by GWA and each other Weiss [Company] when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations . . . [under] any Note Purchase Agreement, any Note, the [Strategic Relationship] Agreement [and] this Agreement . . . ."  Dillabough Decl., Ex. 3 § 3(a); *see* Dillabough Decl. ¶ 22.

43.    Section 3 turned each of WMSF, OGI, and WSPO into guarantors for the notes and the SR Agreement.  *See* Dillabough Decl. ¶ 22; Dillabough Decl., Ex. 3 § 3(a).

12687684-5

44.    Section 3 was clear that the "guaranty [was] an irrevocable, absolute, and continuing guaranty of the full and punctual payment and performance and not a guaranty of collection." Dillabough Decl., Ex. 3 § 3(b).

45.    *Third*, the Weiss Companies agreed to grant Jefferies a security interest in all of their assets. Dillabough Decl., Ex. 3 § 4(a).

46.    Section 5 of the Forbearance Agreement, the "Representations," set forth several representations from the Weiss Companies, including, among others, representations that they were authorized to enter the agreements, that no default of the underlying agreements had occurred, and that the financial statements were correct. Dillabough Decl., Ex. 3 § 5.

2)  Mr. Weiss's Limited Obligations

47.    The Forbearance Agreement provides that Mr. Weiss was only a party "for purposes of Section 5(a), 9, and 10(c)." Dillabough Decl., Ex. 3 Preamble, Signatures.

48.    Section 5(a) is a limited representation that the contract is enforceable, subject to "equitable principles relating to enforceability." Dillabough Decl., Ex. 3 § 5(a).

49.    Section 10(c) is a purported acknowledgement that the agreement was supported by "reasonably equivalent value." Dillabough Decl., Ex. 3 § 10(c).

50.    Section 9 provides:

> Weiss unconditionally and irrevocably personally guarantees to the Jefferies Entities the accuracy of the representations made by, and the performance of the agreements of, the Weiss [Companies] hereunder. Weiss further agrees that he shall take all actions within his control, including by exercising all of his voting, governance management and other rights and powers with respect to each of the other Weiss [Companies], any of their subsidiaries and any of his personal or his family's trusts to cause such persons to comply with the terms of this agreement.

Dillabough Decl., Ex. 3 § 9.

8

51.     The reference to the "agreements of[] the Weiss [Companies] hereunder" in Section 9 is a direct reference to Section 2, the "Weiss [Companies] Agreements," which required Mr. Weiss to use his authority to ensure the performance of those agreements by the Weiss Companies. Dillabough Decl., Ex. 3 § 2.

52.     Nowhere in the agreement does Mr. Weiss guarantee any payment, much less "the full and punctual payment and performance" guaranteed by Weiss Companies.  Dillabough Decl., Ex. 3 §§ 3(b), 9.

53.     There is no provision in the Forbearance Agreement pursuant to which Mr. Weiss personally guaranteed payment of over $50 million in notes or note purchase agreements. Dillabough Decl. ¶ 25; *see* Dillabough Decl., Ex. 3.

54.     There is also no provision in the Forbearance Agreement pursuant to which Mr. Weiss personally guaranteed payment of over $50 million allegedly due under the Strategic Relationship Agreement.  Dillabough Decl. ¶ 25; *see* Dillabough Decl., Ex. 3.

55.     At no point prior to the initiation of this lawsuit did Jefferies ever discuss with Mr. Weiss a $100 million guaranty of the Weiss Companies' corporate debts or assert that Section 9 could be understood to include a personal payment guarantee.  Weiss Decl. ¶ 31

3)  JSI's Sole Obligation Under the Forbearance Agreement.

56.     JSI had a single obligation under the Forbearance Agreement: it simply agreed to forbear from commencing an action to recover under the notes against the Weiss Companies for no more than two business days.  Dillabough Decl., Ex. 3 § 6.

57.     JSI did not agree to forego suit against Mr. Weiss or any Weiss Companies' employees for any period.  Dillabough Decl., Ex. 3 § 6.

58.    Leucadia had no obligations whatsoever under the Forbearance Agreement.  *See* Dillabough Decl., Ex. 3.

G.    <u>Jefferies Rejects the "Unilaterally Modified" Forbearance Agreement</u>

59.    At 8:53 am on February 12, 2024, Jefferies' outside attorney, Mr. Balber, wrote a letter to the Weiss Companies stating that the Weiss Companies' edits to the Forbearance Agreement were not acceptable.  Dillabough Decl. ¶ 27; Dillabough Decl., Ex. 5.

60.    Mr. Balber explained, "At 2:20 a.m. this morning, the Jefferies Parties provided you with a draft Forbearance Agreement, pursuant to which they offered to temporarily forego commencing any Enforcement Action against the Weiss [Companies] during the Forbearance Period.  As part of that offer, the Jefferies Parties ***required*** that: the Weiss [Companies] admit that they had made statements to the Jefferies Parties that they would not make certain bonus payments under the second half of February 2024 . . . [and] admit that they had paid the bonuses on February 8, 2024."  Dillabough Decl., Ex. 5 (emphasis added).

61.    As a result of the Weiss Companies' deletion of the required admissions, Jefferies made clear that there was no agreement, but nonetheless demanded that, "in the meantime," the Weiss Companies comply with their representations and the agreement to produce financial records.  Dillabough Decl., Ex. 5.

62.    The letter also noted that the "Jefferies Parties reserve[d] all of their rights to bring claims and pursue remedies arising from the Weiss [Companies'] misconduct."  Dillabough Decl., Ex. 5.

63.    In other words, Jefferies informed the Weiss Companies that it was not bound by its sole obligation not to bring a claim to enforce the notes.  Dillabough Decl. Ex. 5; Dillabough Decl. Ex. 3 § 6.

10

64.     Jefferies never signed the Forbearance Agreement.  Dillabough Decl. ¶ 28.

65.     During the week of February 12, in the hopes that Jefferies would refocus on negotiations with the Strategic Partner, the Weiss Companies transmitted the information requested in the Forbearance Agreement — most of which Jefferies already possessed.  Dillabough Decl. ¶ 28.

66.     The Weiss Companies did not comply with certain provisions of the purported forbearance agreement, such as setting up account control agreements, since Jefferies never accepted or signed the modified Forbearance Agreement that Mr. Dillabough had sent them. Dillabough Decl. ¶ 28.

67.     On February 15, 2024, GWA repaid $3 million owed under the notes.  Dillabough Decl. ¶ 29.

68.     Both the Weiss Companies and Jefferies refocused on the transaction with the Strategic Partner, exchanging numerous term sheets and discussing what amount Jefferies would accept to be bought out of its position.  Dillabough Decl. ¶ 29.

69.     The negotiations with the Strategic Partner included paying Jefferies a $30 million payment from the Strategic Partner, and additional consideration of approximately $12 million from the Weiss Companies, in full satisfaction of the amounts owed to Jefferies.  Weiss Decl. ¶ 25; Dillabough Decl. ¶ 8.

H.     <u>The Weiss Companies Shut Down and Jefferies Ramps Up Threats of Litigation to Maximize Its Payment</u>

70.     On February 17, five days after rejecting the "unilaterally modified Forbearance Agreement," Mr. Daraviras emailed Mr. Dillabough a draft complaint (the "February Draft Complaint").  Dillabough Decl. ¶ 30; Dillabough Decl., Ex. 6; Weiss Decl. ¶ 26.

11

71.    The February Draft Complaint was a threat to sue Mr. Weiss, GWA, WMSA, and 79 other employees of the Company personally.  Dillabough Decl. ¶ 30; Dillabough Decl., Ex. 6; Weiss Decl. ¶ 26.

72.    The February Draft Complaint does not reference the Forbearance Agreement.  *See* Dillabough Decl. Ex. 6.

73.    The February Draft Complaint does not allege that Mr. Weiss guaranteed the corporate debts owed to Jefferies.  *See* Dillabough Decl., Ex. 6.

74.    After transmitting the February Draft Complaint, Jefferies rejected the $30 million offer made by the Strategic Partner and demanded $50 million in cash.  Weiss Decl. ¶ 28; Dillabough Decl. ¶ 31.

75.    On February 28, 2024, the Strategic Partner informed Mr. Weiss that it would not agree to the transaction at the level that Jefferies was demanding.  Weiss Decl. ¶ 29; Dillabough Decl. ¶ 31.

76.    On March 26, 2024, Jefferies, through counsel, Mr. Balber, sent a second draft complaint (the "March Draft Complaint").  Dillabough Decl. ¶ 32; Dillabough Decl., Ex. 7; Weiss Decl. ¶ 30.

77.    The March Draft Complaint dropped the 79 employees from the suit, and alleged that Mr. Weiss and "his close cronies" abused their position and treated the companies as their "personal piggy bank."  *See* Dillabough Decl., Ex. 7 ¶ 1.

78.    The March Draft Complaint does *not* allege that Mr. Weiss personally guaranteed the corporate debts owed to Jefferies.  Dillabough Decl., Ex. 7 ¶¶ 70-78.

A-95

79.     The sole allegation regarding Mr. Weiss's breach of the Forbearance Agreement was that he "fail[ed] to take all actions within his control" to prevent the Weiss Companies from making the March 1 payments to vendors.  Dillabough Decl., Ex. 7 ¶¶ 76, 106-09.

80.     The Demand for Relief summarizes Jefferies' understanding that Mr. Weiss could only be found liable for a breach of the Weiss Party Agreements, not for a Section 3 guaranty:

> WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against defendants as follows:
>
> (a)     On the First Cause of Action, a judgment in JSI's favor and against GWA, WMSA, WMSF, OGI, and WSPO for money damages in an amount to be determined at trial, but believed to be not less than $49,832,562.00, representing the outstanding principal and interest owed to JSI under the Notes;
>
> (b)     On the Second Cause of Action, a judgment in LAM Holdings' favor and against GWA, WMSA, WMSF, OGI, and WSPO for money damages in an amount to be determined at trial, but believed to be not less than $50,597,604.00, representing all outstanding principal and interest owed to LAM Holdings under the Strategic Relationship Agreement as of December 31, 2023;
>
> (c)     On the Third and Fourth Causes of Action, a judgment in Plaintiffs' favor and against the Insiders voiding the voidable transfers set forth above;
>
> (d)     On the Fifth Cause of Action, a judgment in JSI's and LAM Holdings' favor and against GWA, WMSA, WMSA, WMSF, OGI, WSPO, and George Weiss for money damages in an amount to be determined at trial, but believed to be not less than $470,370.98, representing the amounts transferred by GWA and WMSA in breach of the February Forbearance Agreement on March 1, 2024;

Dillabough Decl., Ex. 7, Demand for Relief (emphasis added).

81.     At no point before, during or after the signing of the Forbearance Agreement did anyone communicate to Mr. Weiss that Mr. Weiss might be personally responsible for the entire amount owed.  Weiss Decl. ¶¶ 3, 21, 23, 31.

A-96

Dated: New York, New York
      November 5, 2024

KAPLAN RICE LLP


By:    */s/ Howard Kaplan*
      Howard Kaplan
      Michelle Rice
      142 West 57th Street
      Suite 4A
      New York, New York 10019
      (212) 235-0300

OLSHAN FROME WOLOSKY LLP


By:    */s/ Brian A. Katz*
      Brian A. Katz
      Daniel M. Stone
      1325 Avenue of the Americas
      New York, New York 10019
      (212) 451-2300

*Attorneys for George Weiss*

14

12687684-5

A-97

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JEFFERIES STRATEGIC INVESTMENTS, LLC :    Case No. 1:24-cv-04369(AH)
and LEUCADIA ASSET MANAGEMENT :
HOLDINGS LLC, :
            :
          Plaintiffs, :
            :
     -against- :
            :
GEORGE WEISS, :
            :
          Defendant. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF GEORGE WEISS

I, George Weiss, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the

following is true and correct:

1.      I am the defendant in this action. This declaration is based on my personal

knowledge and if called to testify, I could testify competently to the facts in this declaration.

2.      I submit this declaration in support of my motion for summary judgment, which

seeks a dismissal of the complaint filed by plaintiffs Jefferies Strategic Investments, LLC ("JSI")

and its affiliate Leucadia Asset Management Holdings LLC ("Leucadia", and together with JSI,

"Jefferies").

3.      Jefferies claims that a forbearance agreement that I signed obligated me to pay them

$100 million, but I have never personally agreed to pay Jefferies any such financial obligation.

When I signed the February 12, 2024 forbearance agreement at issue in this case, I did not

understand it to include a personal payment guarantee of $100 million in debt owed to Jefferies.

Jefferies never communicated to me that the forbearance agreement included such a personal

payment guarantee, or even that they were asking me to make such a guarantee. I would not have signed the forbearance agreement if it included such a personal payment guarantee.

**Background**

4.      I began my career as a stockbroker, and founded George Weiss Associates, an investment Management firm, in 1978. Over the last 46 years, I have had a successful career managing investments for clients. I am the founder and CEO of GWA, LLC ("GWA"), Weiss Multi-Strategy Funds, LLC, OGI Associates, LLC, Weiss Special Operations LLC, and Weiss Multi-Strategy Advisors LLC ("WMSA" and collectively with the other entities, the "Weiss Companies").

5.      Over the years, my management team and I grew the Weiss Companies to $4 billion in assets under management. Our success over the years is indisputable, having had a negative return in only four of the last 46 years. Our success is largely due to our ability to build successful investment teams led by talented and experienced portfolio managers. The retention of those talented portfolio managers was thus critical to our business.

**The Jefferies Relationship**

6.      Our successful investment strategies and capacity to deploy additional capital attracted Jefferies.

7.      In May 2018, GWA, a holding company that holds the equity interests in other Weiss Companies, entered into a strategic partnership agreement with Leucadia. In late 2019, GWA entered into a related financing agreement with JSI. This partnership was premised on Jefferies' ability to jointly market and raise capital for the Weiss Companies. I am not personally a party to any of these agreements and did not guarantee any of the Weiss Companies' obligations thereunder.

{00129870.2}                                        2

8.      The Weiss Companies and Jefferies worked together to further grow the business, and Plaintiffs agreed that the contracting Weiss entities would pay the Jefferies entities under their respective agreements as funds became available.

9.      Pursuant to their agreements, the Weiss Companies provided Jefferies with detailed financial statements and information, including projections.  The Weiss Companies also frequently discussed with Jefferies the financial condition of the various entities and provided projections of cash flow and upcoming payment obligations.

**Negotiations With The Potential New Strategic Partner**

10.      In late November 2023, I began discussions with another potential strategic partner. These discussions included a potential buyout of Jefferies.

11.      I informed Jefferies' CEO, Richard Handler, at a lunch on December 4, 2023 of the conversations with the potential strategic partner, and I confirmed that we were having negotiations with the potential strategic partner with Jefferies' President, Brian Friedman, and the Co-President of Leucadia, Nick Daravaras, at a December 10, 2023, meeting held at the Weiss Companies' New York office.  All three initially supported the potential transaction.

12.      Shortly thereafter, Plaintiffs became increasingly hostile and aggressive.

13.      Knowing full well that the Weiss Companies' investment professionals were the most critical asset of the collective businesses, Jefferies embarked upon a campaign to interfere with our ability to retain them.  Without any prior discussion, on February 1, 2024, Jefferies emailed to my team a draft "forbearance agreement," which sought to prohibit the Weiss Companies from paying contractual bonuses to our investment professionals for their 2023 performance, unless Jefferies approved the bonuses in its sole discretion.  Unquestionably, Jefferies knew that the Weiss Companies were required by contract to pay our portfolio managers a percentage of the profits they made.

14.    Within the Weiss Companies, it was our belief that compliance with this draft agreement would have caused our investment professionals to leave the company, would have ended our negotiations with the new strategic partner and we knew this would have destroyed the firm.  Moreover, we were concerned with our duties that we owed to clients if we allowed a creditor to have control over the retention of our portfolio managers.  We refused to sign the draft agreement.  Jefferies accordingly knew and understood that we would pay bonuses to our investment professionals and staff as we had done every year.

15.    Plaintiffs immediately resorted to unwarranted threats and accusations to increase their leverage over the Weiss Companies and the strategic partner.  On February 8, 2024, Mr. Daraviras threatened to go to court to get a "TRO" apparently to stop us from paying our business expenses.  He demanded (among other things) that we sign the forbearance agreement that Jefferies had delivered on February 1st.

16.    Jefferies' pressure campaign escalated after it learned that the Weiss Companies had paid bonuses to its professionals for their 2023 performance.  Jefferies demanded that the Weiss Companies agree to a revised forbearance agreement, though they never specified what revisions they were making.  This ultimatum was delivered on Superbowl Sunday, February 11, 2024.

17.    That afternoon, I received a call from Mr. Handler, the CEO of Jefferies, whom I have known for about 15 years.  Mr. Handler claimed that, in paying the bonuses, we had stolen Jefferies' money.  He threatened me personally, accusing me of securities fraud.  He also threatened that there would be a public news article the next morning that would destroy my reputation and ruin the reputation of several key Weiss employees.  He further threatened to have Jefferies sue our firm the next day, and to name in the lawsuit me and all the portfolio managers who received their contractual bonuses, among others.  Mr. Handler demanded that we sign a forthcoming

revised forbearance agreement but did not state that it would include a personal payment guarantee from me.

18.     My call with Mr. Handler was followed by a "zoom" conference just before the start of the Superbowl with Mr. Daraviras and an outside lawyer hired by Jefferies.  I can only describe this call as an effort to bully me through further threats.  They falsely accused us of lying to Jefferies, including about the bonus payments, and again threatened to sue the Weiss Companies and its employees.  They threatened to claw back compensation payments to the Weiss Companies' employees, freeze their bank accounts, and file lawsuits ruining my reputation in the industry. They again demanded that the Weiss Companies sign a forthcoming revised forbearance agreement but never stated that it would include a personal payment guarantee from me.

**The Forbearance Agreement**

19.     I fell asleep that evening with no further communication from Jefferies.  I awoke just before 4 a.m. and saw that Jefferies had sent a draft forbearance agreement at 2:20 a.m., demanding that the agreement be signed by 7:00 a.m. that day.  I also noticed that the Weiss Companies' general counsel, Jeff Dillabough, had sent me an email with a revised draft of that agreement.

20.     The bottom line was that over the course of the evening Jefferies essentially had given the Weiss Companies an ultimatum to sign this agreement or be sued, along with their employees, that morning.

21.     My understanding was that Jefferies had added a provision requiring me to ensure that certain Weiss Companies complied with new information requests and spending restrictions imposed by Jefferies.  I did not understand that this agreement would bind me to pay the $100 million that Jefferies claimed the Weiss Companies owed.  Had I understood that the agreement included a $100 million personal guarantee, I would not have signed it.

22.    I signed the revised draft of the forbearance agreement on my cell phone at about 4:03 a.m.  This is the only forbearance agreement I signed personally.

23.    No one from Jefferies had ever asked me to guarantee the amounts they claim were owed by the Weiss companies.  This subject was never even mentioned by Jefferies.  Nor did anyone at the Weiss Companies ever tell me that Jefferies had raised this issue.

24.    Indeed, as Jefferies well knew, the Weiss Companies were effectively insolvent at this time and could not repay Jefferies.  Essentially, Jefferies' argument in this case is that I agreed to pay them $100 million even though I was not personally obligated under any of the agreements with Jefferies.

25.    This also makes no sense in the context of the then-active negotiations, in which Jefferies participated, concerning the transaction with the new strategic partner.  It was proposed that Jefferies would receive only $30 million from the strategic partner in addition to approximately $12 million from the Weiss Companies in full settlement of the obligations owed by GWA to them.

**Jefferies Sends Draft Complaints and the Funds Wind Down**

26.    Regrettably, signing the forbearance agreement did not lessen the aggressive actions of Jefferies.  On February 17, 2024, Jefferies counsel sent us a draft complaint naming me, GWA, WMSA, and all the employees who received contractual bonuses (among others).  I believe Jefferies sent this draft complaint to obtain leverage to extract additional compensation in the transaction with the potential strategic partner.  The draft complaint purported to assert a number of claims, including for clawback of all the bonuses and for defaults under the financing and the strategic relationship agreement, seeking more than $100 million.

27.    There is no claim asserting that I had personally guaranteed the $100 million debt Jefferies claimed was due and owing.

28.    Shortly after sending us the draft complaint, Jefferies rejected the $30 million offer from the strategic partner plus $12 million from the Weiss Companies and countered with a demand for $50 million to resolve the outstanding debt.

29.    The strategic partner refused and the transaction fell apart shortly thereafter. Jefferies demanded that we liquidate the firm, and in light of the threats of litigation, we agreed to discontinue operations.

30.    The Jefferies threats continued.  On March 26, 2024, Jefferies sent a second draft complaint, threatening to sue me and two other Weiss executives for the bonuses that were paid to our investment professionals and staff, and the Weiss Companies for repayment on the notes.  This draft complaint specifically asserts claims under the Forbearance Agreement, but again, this complaint did not state that I had personally guaranteed repayment of $100 million.

31.    Jefferies filed this lawsuit on May 6, 2024.  This lawsuit was the first time anyone from Jefferies had asserted that I had guaranteed the $100 million debt claimed to be owed to Jefferies under the forbearance agreement.

Dated: November 5, 2024

_____
GEORGE WEISS

A-104

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS LLC, | : : : : | Case No. 1:24-cv-04369(AH) |
|  | : |  |
| Plaintiffs, | : : |  |
|  | : |  |
| -against- | : : |  |
|  | : |  |
| GEORGE WEISS, | : : |  |
|  | : |  |
| Defendant. | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF JEFFREY DILLABOUGH

I, Jeffrey Dillabough, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I am, and at all relevant times have been, General Counsel of GWA, LLC ("GWA"), Weiss Multi-Strategy Funds LLC, OGI Associates LLC, Weiss Special Operations LLC, and Weiss Multi-Strategy Advisers LLC (collectively the "Weiss Companies"). I have never served as George Weiss's personal counsel. In my capacity as General Counsel of the Weiss Companies, I have personal knowledge of the matters set forth herein. If called upon to testify, I could testify competently to the facts in this declaration.

2.    I submit this declaration in support of Defendant George Weiss's motion for summary judgment against Plaintiffs Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC ("Leucadia") (I refer to JSI and Leucadia, which are affiliates, collectively as "Plaintiffs" or "Jefferies") pursuant to Fed. R. Civ. P. 56(a).

1

3.      This declaration, and the information provided herein, are not intended to waive any attorney-client privilege or work product protection relating to my role as in-house counsel to the Weiss Companies, and all such rights and privileges are hereby reserved.

4.      To be absolutely clear, I never understood the February 12, 2024 forbearance agreement to include a personal guarantee of payment to Jefferies by Mr. Weiss.  Jefferies never communicated to me that they understood the forbearance agreement to include a personal payment guarantee from Mr. Weiss.

**Background**

5.      Leucadia and JSI have had a business relationship with the Weiss Companies in 2018, when Leucadia entered into a "Strategic Relationship Agreement" with the Weiss Companies.  As part of this arrangement, Jefferies provided financing to GWA, the parent company of the Weiss Companies, through promissory notes.

6.      Over the years, the Weiss Companies paid down a portion of the amounts owed to Leucadia under the parties' Strategic Relationship Agreement, and to JSI under its promissory notes, but the amounts continued to accrue.  The parties operated under the assumption that GWA would pay the amounts due as cash became available.

**The Jefferies Relationship**

7.      Beginning in 2018, Jefferies and the Weiss Companies worked cooperatively to market the Weiss Companies, including to Jefferies' clients.  The Weiss Companies, for their part, routinely provided Jefferies with financial records and projections, including records concerning the Weiss Companies' bonus payments.

8.      In the fall of 2023, George Weiss, our founder and CEO, began having discussions with a potential new strategic partner.  As these discussions progressed, the transaction included

2

potentially making a $30 million payment from the strategic partner to Jefferies to settle GWA's obligations to Leucadia and JSI.

9.      I was present during a December 10, 2023 meeting held at the Weiss Companies' New York office with Jefferies' President, Brian Friedman, and Leucadia's Co-President, Nick Daraviras.  During that meeting, Jefferies appeared supportive of the proposed transaction with the new strategic partner.

10.     Based on discussions that I and other Weiss representatives had with Jefferies in December 2023, Jefferies was well aware of the Weiss Companies' financial condition and the specific amounts that the Weiss Companies would be paying to its professionals and staff for 2023 contractual and discretionary bonuses.

**The Forbearance Agreement**

11.     In early 2024, Jefferies appears to have decided to seek increased leverage in the negotiations with the new strategic partner.  On February 1, 2024, Jefferies sent a draft forbearance agreement to me and others that would have dramatically changed the relationship among the parties.  This agreement would have prohibited us from paying bonuses, including contractual bonuses owed to our investment professionals, unless Jefferies agreed in its "sole and absolute discretion."  A true and correct copy of the February 1, 2024 draft forbearance agreement and the email transmitting it is attached hereto as **Exhibit 1**.

12.     After receiving this document, I had a call with Mr. Daraviras where I advised him that Weiss could not agree to this provision, and that the Company had to maintain control over the payment of bonuses.  I and another representative advised him that it was necessary to pay these bonuses for the company to survive and the pending potential deal with the new strategic partner to progress.  In addition, we were concerned that delegating to a creditor the decisions

concerning retention of Weiss employees and compliance with Weiss contractual obligations could breach our duties to our clients.

13.    During the week of February 5, Jefferies threatened to seek a temporary restraining order from a court, including in an email to me on February 8, 2024. Jefferies continued to demand that we not pay bonuses, even though we had just explained why we needed to do so.  We refused to agree to any such restriction.

14.    As we were continuing to negotiate the deal with the potential strategic partner, I viewed Jefferies's bullying tactics as another effort to try to obtain leverage over the parties to extract more money in the deal.

15.    After Jefferies learned on February 11, 2024, that we had in fact paid the bonuses due, Jefferies increased its bullying tactics, including its threats to put the Weiss Companies out of business.  On February 11, 2024, Superbowl Sunday, I had a call with Mr. Daraviras, Jefferies' outside and in-house counsel, as well as other Jefferies participants.  George Weiss also attended this call.  During the call, Mr. Daraviras and the Jefferies lawyers berated and threatened us with lawsuits against us personally.  They also accused us of lying about the payment of the bonuses, even though they clearly knew the amounts that were to be paid and that we intended to pay them. We denied making any misstatements to Jefferies and told them they had no right to stop the company from paying bonuses.  This call ended with another Jefferies threat: either sign the new forbearance agreement that they would be sending later that evening or they would ruin Mr. Weiss's reputation, sue the Weiss Companies, and seek a TRO the next morning clawing back employee compensation and freezing the Weiss Companies' bank accounts.

A-108

16.     Throughout these discussions, none of the Jefferies representatives ever requested that George Weiss guarantee the payment of the debt claimed to be owed to them.  To my knowledge, this subject was never raised.

17.     Jefferies did not send a new forbearance agreement until 2:10 am (with another version being sent at 2:20 am) on Monday morning, February 12, 2024.  The email demanded a response "by 7 am today, <u>Monday</u>, <u>Feb 12</u>."  *See* **Exhibit 2.**  There was no discussion or negotiation with Jefferies concerning the terms of the draft, only an ultimatum to sign it.

18.     I reviewed the draft, which included statements that we had lied about the timing of the payment of the bonuses.  I believed that these statements were untrue and that the agreement could not be signed with them included.  I deleted those statements.

19.     I also noted that Jefferies had added a provision (section 9) in which George Weiss guaranteed the accuracy of the Weiss Companies' representations and agreed to take all actions within his control to ensure that the Weiss Companies complied with the new limitations that Jefferies was imposing on them in section 2.  Specifically, Section 9's "guaranty of performance" was limited to the Weiss Parties' "agreements," which I understood to be a reference section 2, which is entitled the "Weiss Parties Agreements."

20.     Section 2 generally obligated the Weiss Companies to provide specific information to Jefferies no later than 5:00 pm on February 13, 2024 and other information as requested by Jefferies.  Section 2 also provided that the Weiss Companies would not make any payment, grant or transfer in excess of $10,000, except for payments made in the course of normal course trading consistent with past practice, "without the prior written consent of [Jefferies], which may be granted in or withheld in their sole and absolute discretion."

21.    Section 2 makes no reference to any payment obligation to Jefferies under the promissory notes or the Strategic Relationship Agreement.

22.    Jefferies also added to the forbearance agreement a separate Section 3, through which the GWA subsidiaries collectively guaranteed repayment of the notes and the Strategic Relationship Agreement.  None of the subsidiaries had previously guaranteed GWA's obligations to Jefferies.

23.    George Weiss was not included in Section 3, and did not provide a guaranty of payment to Jefferies.  If Jefferies had included George Weiss in this section, I would have deleted his name.

24.    Under threat of litigation that would have resulted in the imminent public destruction of the Weiss Companies, it was clear to us that we needed to sign the agreement.  I sent the revised draft to George Weiss, and he signed.  At 4:13 am on February 12, 2024, I emailed to Jefferies a revised version of the forbearance agreement, along with a redline showing the deletion of the false accusation that we had lied about the timing of the bonus payments.  A true and correct copy of the 4:13 am email is attached hereto as **Exhibit 2**.  A true and correct copy of the forbearance agreement signed by the Weiss Companies and Weiss is attached hereto as **Exhibit 3**.  A true and correct copy of the redline version of the forbearance agreement is attached hereto as **Exhibit 4.**

25.    There is no provision in the forbearance agreement saying that George Weiss personally guaranteed payment of over $100 million allegedly due under the note purchase agreements or the Strategic Relationship Agreement.

26.    At no point prior to the filing of the complaint in this lawsuit did I understand or contemplate that Section 9 could be understood to include a personal guaranty of payment of the

Weiss Companies' financial obligations.  I was never told by Jefferies that they were seeking George Weiss's personal guaranty of more than $100 million.  I would have rejected that request out of hand.

27.    At 8:53 am on February 12, 2024, Jefferies' counsel sent a letter stating that Jefferies would not accept our changes to the forbearance agreement, because the deleted phrases were "required."  A true and correct copy of Jefferies' outside counsel's email and the attached letter are attached hereto as **Exhibit 5.**

**The Draft Complaints**

28.    On February 12, 2024, in the hopes of moving forward with the strategic partner, the Weiss Companies transmitted all of the information that Jefferies identified in Section 2 of the forbearance agreement, although Jefferies possessed much of this information already. The Weiss Companies did not comply with certain provisions of purported forbearance agreement, such as setting up account control agreements, since Jefferies never accepted or signed the modified forbearance agreement that I had sent them.

29.    On February 15, 2024, GWA repaid Jefferies $3 million owed under the notes.  At this point, we hoped that Jefferies would refocus on the potential strategic transaction, and engaged with them over terms sheets.

30.    Instead of negotiating with us, on February 17, 2024, Jefferies transmitted a draft complaint against Mr. Weiss, GWA, WMSA, and 79 other employees (including myself) to claw-back bonus compensation. A true and correct copy of this draft complaint, redacted to remove sensitive employee information, is attached hereto as **Exhibit 6.**  Jefferies also asserted claims for the $100 million owed to Jefferies, but did not name Weiss in those counts and did not assert that Weiss had guaranteed these obligations.

7

31.     Jefferies then demanded $50 million from the new strategic partner, more than $20 million higher than the original offer.  On February 28, 2024, we learned that the strategic partner was unwilling to buy Jefferies out at this level and was not going to move forward with the transaction.

32.     On March 26, 2024, Jefferies sent a second draft complaint, threatening to sue Mr. Weiss, me and another Weiss executive for the bonuses we received, and also asserted claims against the Weiss Companies for breach of the forbearance Agreement (among other claims).  This draft also did not assert that Mr. Weiss had personally guaranteed repayment of $100 million, and did not assert such a claim under the forbearance Agreement.  A true and correct copy of this draft complaint is attached as **Exhibit** 7.

Dated:  November 5, 2024

By:  *Jeffrey Dillabough*
_____

Name:   Jeffrey Dillabough
        General Counsel of the Weiss
        Companies

Sidley Draft 2/1/2024

## FORBEARANCE AGREEMENT

**THIS FORBEARANCE AGREEMENT** ("<u>Agreement</u>") is made and entered into this February __, 2024, by and between GWA, LLC, a Connecticut limited liability company ( "<u>GWA</u>"), Weiss Multi-Strategy Funds, LLC, a Delaware limited liability company ("<u>WMSF</u>"), OGI Associates, LLC, a Delaware limited liability company ("<u>OGI</u>"), and Weiss Multi-Strategy Advisers LLC, a Delaware limited liability company ("<u>WMSA</u>" and collectively with GWA, WMSF and OGI, the "<u>Weiss Parties</u>"), and, LAM Holding LLC ("<u>LAM Holding</u>") and Jefferies Strategic Investments, LLC, a Delaware limited liability company ("<u>JSI</u>").

## RECITALS

WHEREAS, LAM Holding LLC ("<u>LAM Holding</u>") and GWA entered into the Strategic Relationship Agreement dated as of May 1, 2018 (as amended, the "<u>SR Agreement</u>");

WHEREAS, in connection with LAM Holding entering into the SR Agreement, WMSA and JSI (under its former name "Leucadia Funding LLC") entered into the Investment Management Agreement dated May 1, 2018 (as amended, the "<u>IMA</u>");

WHEREAS, LAM Holding assigned all of its rights under the SR Agreement to Leucadia Asset Management Holdings LLC, a Delaware limited liability company ("<u>LAM Holdings</u>" and collectively with JSI and their affiliated entities, the "<u>Jefferies Parties</u>"), pursuant to the Assignment and Assumption Agreement dated as of October 18, 2018, between LAM Holding and LAM Holdings;

WHEREAS, LAM Holding merged with and into LAM Holdings as of December 1, 2021, with LAM Holdings as the surviving company;

WHEREAS, GWA, WMSA, and JSI, as successor in interest to JFG Funding LLC, are parties to that certain Note Purchase Agreement, dated as of December 3, 2019 (as amended, the "<u>2019 Note Purchase Agreement</u>");

WHEREAS, GWA, WMSA, and JSI are parties to that certain Note Purchase Agreement, dated as of September 21, 2021 (as amended, the "<u>2021 Note Purchase Agreement</u>" and collectively with the 2019 Note Purchase Agreement, the "<u>Note Purchase Agreements</u>");

WHEREAS, pursuant to the terms of the Note Purchase Agreements, GWA has issued (i) a $31,250,000 Note dated December 3, 2019, (ii) a $18,750,000 Note dated January 13, 2020, and (iii) a $3,000,000 Note dated September 21, 2022 (collectively, the "<u>Notes</u>");

WHEREAS, JSI has entered into Forbearance Letters on each of January 1, 2022, September 1, 2022 and July 25, 2023, with GWA and WMSA, an affiliate of GWA, pursuant to which JSI agreed to forebear from exercising certain remedies subject to certain conditions;

WHEREAS, on December 21, 2023, JSI delivered to GWA that certain Notice of Optional Redemption (the "<u>Redemption Notice</u>"); and

WHEREAS, JSI currently has the right to immediately commence an enforcement action, suit, litigation, claim or other action with respect to the Past Due Obligations (as defined below) (collectively "Enforcement Actions") against GWA.

NOW THEREFORE, in good and valuable consideration of the covenants and mutual promises hereinafter set forth, the sufficiency of which the parties heretofore acknowledge, the parties hereto agree as follows:

1.  Past Due Obligations. Each party agrees that pursuant to the terms of the Note Purchase Agreements, the Notes and the Redemption Notice, GWA is past due with respect to the following payment obligations to JSI (each calculated as of January 15, 2024): (i) $23,650,410.10 on the Note dated December 3, 2019, (ii) $27,457,310.08 on the Note dated January 13, 2020 and (iii) $3,420,395.60 on the Note dated September 21, 2022 (collectively, the "Past Due Obligations"). Each party further agrees that the Past Due Obligations are owed without defense, set-off or counter claim, and are past due.

2.  Maintenance of Capital.

(a)  The Weiss Parties hereby represent and warrant (i) that the projections of OGI's end of period net asset value provided to the Jefferies Parties on December 28, 2023 accurately set forth the OGI's projected net asset value for January 31, 2024 (e.g., $45 million) (such net asset value, the "Benchmark Amount") and (ii) that as of the date of this Agreement, there has not been any event or development that would cause the actual net asset value of OGI on January 31, 2024 to be lower than the Benchmark Amount. The Weiss Parties further agree to provide prompt written notice to the Jefferies Parties if there is any expected or actual material diminution of the net asset value of OGI from the Benchmark Amount either before or after January 31, 2024.

(b)  The Weiss Parties hereby agree that none of them will (i) pay, grant or transfer (directly or indirectly) any bonus compensation or other compensation or other payment in excess of base salaries to any of their employees (or any of their independent contractors or consultants acting in a similar manner to employees) in respect of any period (e.g., whether in respect of prior, current or future periods), (ii) take any action or fail to take any action that may result in OGI's net assets being reduced or diminished in any respect other than permitting normal course trading consistent with past practices or (iii) take any other action or fail to take any action that would be reasonably expected to materially reduce the net asset value of the Weiss Parties except for payment of operational liabilities paid in the normal course consistent with past practice, but not including those set forth in clause (i) above, in each case without the prior written consent of the Jefferies Parties, which may be granted or withheld in their sole and absolute discretion (the "Capital Maintenance Obligations").

3.  Forbearance. In exchange for the Weiss Parties agreeing to and complying with the Capital Maintenance Obligations and subject to the terms of this Agreement, JSI agrees to (a) forbear from seeking relief or exercising any remedies under title 11 of the United State Code (the "Bankruptcy Code"), including, but not limited to, commencing an involuntary case against GWA under sections 301 or 303 of the Bankruptcy Code, as well as initiating or causing the

4853-3137-0401v.10

initiation of an assignment for the benefit of creditors proceeding, a receivership or other similar insolvency proceeding and (b) forbear from filing an Enforcement Action, in each case, for the period (the "Forbearance Period") beginning on the date hereof until the earlier of (x) five Business Days after such date or (y) the occurrence of any Forbearance Default, except that the Forbearance Period will be automatically extended by an additional five Business Days at the conclusion of the Forbearance Period unless the Jefferies Parties give written notice of a termination of the Forbearance Period to the Weiss Parties on or prior to the conclusion of the Forbearance Period.  (For the avoidance of doubt, the Forbearance Period shall automatically terminate upon the occurrence of a Forbearance Default.)  For the purposes hereof, "Forbearance Default" shall mean the occurrence of any of the events described on Exhibit A attached hereto and "Business Day" shall have the meaning given to such term in the SR Agreement.

    4.    Reservation of Rights.  Except as expressly set forth herein, this Agreement shall not, by implication or otherwise, constitute a termination, waiver or amendment of, or otherwise affect the rights and remedies of JSI as a holder of the Notes, as party to the Note Purchase Agreements or under any other document.  JSI reserves all rights and remedies, including but not limited to rights to interest under the Notes, any netting and set-off, and defenses, that JSI is entitled to exercise under the Notes, the Note Purchase Agreement, the Redemption Notice, any related documents or otherwise at law or in equity.  For the avoidance of doubt, this Agreement shall not extinguish the obligations for the payment of money outstanding under the Notes or discharge or release the priority of the Notes or any other security therefor.  Nothing herein contained shall be construed as a substitution or novation of the obligations outstanding on the Notes or under the Note Purchase Agreement or any instruments, documents and agreements securing the same, which shall remain in full force and effect.  Nothing in this Agreement shall be construed as a release or other discharge of GWA or its affiliates from any of its obligations and liabilities under the Note or the Note Purchase Agreement.  No delay by a JSI or any of JSI's affiliates in exercising any right or remedy in respect of the Notes or the Note Purchase Agreement or related documents or in respect of applicable law or equities will be deemed to constitute a waiver or forbearance of any such right or remedy.  No verbal communication from or on behalf of JSI or any of JSI's affiliates by any source with respect to the subject matter of this Agreement shall constitute any agreement of JSI or any of JSI's affiliates with respect to the subject matter hereof, which shall be effective only if in writing and duly executed on behalf of JSI or such affiliate.

    5.    IMA Fees.  WMSA hereby agrees as of date hereof (i) to extend the due date of the payment of any amounts that JSI owes to WMSA pursuant to the IMA for the period of January 1, 2023 through December 31, 2023, including but not limited to the Investment Teams Bonus Fee (all such amounts collectively, the "2023 Fee") until such date as JSI determines in its sole discretion and (ii) that the Jefferies Parties may elect in their sole discretion by providing written notice to WMSA to treat any amounts JSI owes WMSA pursuant to the IMA (including but not limited to the 2023 Fee) as offsetting GWA's payment obligations to JSI under the Notes, in which case (A) JSI shall not pay such amounts to WMSA and (B) any amount not paid pursuant to clause (A) hereof shall be deemed to be a receipt by JSI of a payment by GWA on the Notes of such amount.

3

6.     Miscellaneous.

(a)     This Agreement may be executed in counterparts, each of which shall together be deemed an original instrument and all of which shall constitute one and the same agreement.

(b)     The parties hereto represent that they shall do all acts, and execute and deliver all documents necessary, convenient, or desirable to effectuate all provisions of this Agreement.

(c)     All parties acknowledge and agree that they have received adequate and sufficient consideration for entering into this Agreement.

(d)     Each party represents and warrants that it has full power and authority to enter into and perform this Agreement, and that the person executing this Agreement on behalf of that party has been properly authorized and empowered to enter into this Agreement and to bind that party hereto.

(e)     This Agreement addresses the Past Due Obligations and the amounts under the IMA referenced in Section 5 hereof. This Agreement does not pertain to any other indebtedness and/or obligations of the Weiss Parties to the Jefferies Parties not specifically addressed in this Agreement (including but not limited to any amounts owed under the SR Agreement or the Placement Agreement between Jefferies LLC and certain of the Weiss Parties). All terms and provisions of any agreements between one or more Weiss Parties and one or more Jefferies Parties, not specifically modified herein, shall remain in full force and effect in accordance with their terms.

(f)     No modification, waiver or amendment of this Agreement shall be valid unless the same is in writing and executed by all parties hereto. Waiver of any one provision shall not be deemed to be a waiver of any other provision herein.

(g)     This Agreement shall be binding upon the parties hereto and their predecessors, representatives, successors and permitted assigns, and shall inure to the benefit of said parties, and each of them, and their respective predecessors, representatives, successors and permitted assigns.

(h)     All agreements, covenants, representations and warranties, express or implied, oral and written, of the parties hereto concerning the subject matter hereof, are contained herein.  No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any party hereto to any other concerning the subject matter hereof.  All prior and contemporaneous conversations, negotiations, possible and alleged agreements, representations, covenants and warranties concerning the subject matter hereto are merged herein.

(i)     This Agreement shall be governed by and construed and administered in accordance with the internal substantive laws of the State of New York without regard to principles of conflict of laws. Each party agrees that any dispute arising out of this Agreement shall be subject to the exclusive jurisdiction of the New York courts and

4

irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in (i) any state court in the State of New York or (ii) any federal court in the State of New York, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(j)     In the event that any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be constructed as if such invalid or unenforceable provisions had never been contained in this Agreement.

(k)     All notices or other communications required or permitted to be given hereunder shall be in writing and shall be sent by electronic mail or sent, postage prepaid, by registered, certified or express mail or overnight courier service and shall be deemed given when received, as follows:

(i)     if to a Jefferies Party, to:

c/o Leucadia Asset Management Holdings LLC
520 Madison Avenue
New York, New York 10022
Attn: Nick Daraviras, Sonia Han Levovitz, Matthew Smith
E-mail:         ndaraviras@jefferies.com; shan@jefferies.com;
          matt.smith@jefferies.com

With copies to:
Sidley Austin LLP
787 7th Avenue
New York, New York 10019
Attn: David A. Form
Email: dform@sidley.com

(ii)     [if to a Weiss Party, to:]

*[Signature Page Follows]*

5

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

**GWA, LLC**

By:_____
Name:
Title:

**WEISS MULTI-STRATEGY ADVISERS LLC**

By:_____
Name:
Title:

**WEISS MULTI-STRATEGY FUNDS, LLC**

By:_____
Name:
Title:

**OGI ASSOCIATES, LLC**

By:_____
Name:
Title:

A-118

      **IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

                                  **JEFFERIES STRATEGIC INVESTMENTS, LLC**

                                  By:_____
                                  Name:
                                  Title:

                                  **LEUCADIA ASSET MANAGEMENT HOLDINGS LLC**

                                  By:_____
                                  Name:
                                  Title:

A-119

**EXHIBIT A**

A "<u>Forbearance Default</u>" shall be deemed to have occur if any of the following evets occurs:

    a)      any breach of a Capital Maintenance Obligation;

    b)      any Weiss Party shall have: (i) applied for, or consented to, the appointment of a custodian, receiver, fiscal agent, trustee or liquidator of all or a substantial part of its assets; (ii) filed a voluntary petition in bankruptcy, or sought dissolution or reorganization under any law; (iii) filed an answer admitting the material allegations of a bankruptcy or reorganization petition; or (iv) an involuntary proceeding under sections 301 or 303 Bankruptcy initiated against it by a third party (i.e., not a Jefferies Party);

    c)      any Weiss Party shall have: (i) a custodian, receiver, fiscal agent, trustee or liquidator appointed without its consent for all or a substantial part of its assets; (ii) have an involuntary petition filed against it in bankruptcy for dissolution or reorganization; or (iii) have been adjudicated a bankrupt or had a plan of reorganization submitted by any creditor or committee approved; or

    d)      any Weiss Party: (i) dissolves, liquidates or ceases operations; or (ii) agrees to the sale of, or a sale of all or substantially all of the property or assets of, such Weiss Party.

8

**To:** Sonia Han Levovitz[shan@jefferies.com]; Jordi Visser[jvisser@gweiss.com]; George Weiss[George@gweiss.com]
**Cc:** Michael Sharp[msharp@jefferies.com]; Nick Daraviras[ndaraviras@jefferies.com]; Balber, Scott[Scott.Balber@hsf.com]
**From:** Jeffrey Dillabough[jdillabough@gweiss.com]
**Sent:** Mon 2/12/2024 9:13:26 AM (UTC)
**Subject:** RE: Call
Jefferies_Weiss Forbearance Agreement_signed.pdf
Jefferies_Weiss Forbearance Agreement_marked-.docx

Case 1:24-cv-02369-AKH   Document 28-2   Filed 11/05/24   Page 3 of 4

Hi Sonia,

Attached please find the signed Forbearance Agreement. We made 2 minor changes in the recitals because we do not agree with the characterization of the facts. The substantive provisions remain unchanged. Thank you for working through the night on this.

Regards,

Jeff

---

**From:** Sonia Han Levovitz <shan@jefferies.com>
**Sent:** Monday, February 12, 2024 2:20 AM
**To:** Jordi Visser <jvisser@gweiss.com>; George Weiss <George@gweiss.com>; Jeffrey Dillabough <jdillabough@gweiss.com>
**Cc:** Michael Sharp <msharp@jefferies.com>; Nick Daraviras <ndaraviras@jefferies.com>; Balber, Scott <Scott.Balber@hsf.com>
**Subject:** RE: Call

Thank you, Jordi.
Please use this draft instead (fixed a typo).
And per my last email, please respond by 7am EST today, <u>Monday</u>, <u>Feb 12</u>.
Regards,
Sonia

---

**From:** Jordi Visser <jvisser@gweiss.com>
**Sent:** Monday, February 12, 2024 12:14 AM
**To:** Sonia Han Levovitz <shan@jefferies.com>; George Weiss <George@gweiss.com>; Jeffrey Dillabough <jdillabough@gweiss.com>
**Cc:** Michael Sharp <msharp@jefferies.com>; Nick Daraviras <ndaraviras@jefferies.com>; Balber, Scott <Scott.Balber@hsf.com>
**Subject:** RE: Call

Received and Understood.

Thank you,

Jordi

---

**From:** Sonia Han Levovitz <shan@jefferies.com>
**Sent:** Monday, February 12, 2024 2:10 AM
**To:** George Weiss <George@gweiss.com>; Jeffrey Dillabough <jdillabough@gweiss.com>; Jordi Visser <jvisser@gweiss.com>
**Cc:** Michael Sharp <msharp@jefferies.com>; Nick Daraviras <ndaraviras@jefferies.com>; Balber, Scott <Scott.Balber@hsf.com>
**Subject:** RE: Call

As we discussed, attached is the updated forbearance agreement.  Please respond by 7am EST tomorrow.  Thank you.

-----Original Appointment-----
**From:** Balber, Scott <Scott.Balber@hsf.com>
**Sent:** Sunday, February 11, 2024 5:05 PM
**To:** Balber, Scott; george@gweiss.com; jdillabough@gweiss.com; jvisser@gweiss.com; Nick Daraviras; Sonia Han Levovitz; Michael Sharp
**Subject:** Call
**When:** Sunday, February 11, 2024 7:15 PM-7:45 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** https://us06web.zoom.us/j/85454673584?pwd=0b3ICiHjHytU22gKfwxsKM6vMTuNJ7.1

[External Message]

Scott Balber is inviting you to a scheduled Zoom meeting.

Join Zoom Meeting
https://us06web.zoom.us/j/85454673584?pwd=0b3ICiHjHytU22gKfwxsKM6vMTuNJ7.1

Meeting ID: 854 5467 3584
Passcode: 607323

---

One tap mobile
+16469313860,,85454673584#,,,,*607323# US
+19292056099,,85454673584#,,,,*607323# US (New York)

---

Dial by your location
• +1 646 931 3860 US
• +1 929 205 6099 US (New York)
• +1 301 715 8592 US (Washington DC)
• +1 305 224 1968 US
• +1 309 205 3325 US
• +1 312 626 6799 US (Chicago)
• +1 564 217 2000 US
• +1 669 444 9171 US
• +1 669 900 6833 US (San Jose)
• +1 689 278 1000 US
• +1 719 359 4580 US
• +1 253 205 0468 US
• +1 253 215 8782 US (Tacoma)
• +1 346 248 7799 US (Houston)
• +1 360 209 5623 US
• +1 386 347 5053 US
• +1 507 473 4847 US

Meeting ID: 854 5467 3584
Passcode: 607323

Find your local number: https://us06web.zoom.us/u/kmMz2Ekb9

---

Join by SIP
• 85454673584@zoomcrc.com

---

Join by H.323
• 162.255.37.11 (US West)
• 162.255.36.11 (US East)
• 115.114.131.7 (India Mumbai)
• 115.114.115.7 (India Hyderabad)
• 213.19.144.110 (Amsterdam Netherlands) • 213.244.140.110 (Germany) • 103.122.166.55 (Australia Sydney) • 103.122.167.55 (Australia Melbourne) • 149.137.40.110 (Singapore) • 64.211.144.160 (Brazil) • 149.137.68.253 (Mexico) • 69.174.57.160 (Canada Toronto) • 65.39.152.160 (Canada Vancouver) • 207.226.132.110 (Japan Tokyo) • 149.137.24.110 (Japan Osaka)

Meeting ID: 854 5467 3584
Passcode: 607323

Herbert Smith Freehills New York LLP and Herbert Smith Freehills, an Australian Partnership, are separate member firms of the international legal practice known as Herbert Smith Freehills.

This message is confidential and may be covered by legal professional privilege. If you are not the intended recipient you must not disclose or use the information contained in it. If you have received this email in error please notify us immediately by return email or by calling our main switchboard on +1 917 542 7600 and delete the email.

Further information is available from www.herbertsmithfreehills.com, including our Privacy Policy which describes how we handle personal information.

Herbert Smith Freehills New York LLP is a limited liability partnership registered in England and Wales with registered number OC375072. Its registered office is at Exchange House, Primrose Street, London EC2A 2EG.

This message was not intended or written to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer under U.S. Federal tax law.

Some of this material may constitute attorney advertising within the meaning of sections 1200.1 and 1200.6-8 of Title 22 of the New York Codes, Rules and Regulatory Advertising Regulations. The following statement is made in accordance with those rules: ATTORNEY ADVERTISING: PRIOR RESULTS DO NOT GUARANTEE A SIMILAR OUTCOME.

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

This communication is not intended as an offer to sell or a solicitation for the purchase or sale of any security or a recommendation to buy or sell any securities that may be mentioned. This communication may contain privileged or confidential information, or may otherwise be protected from disclosure, and is intended solely for use of the intended recipient(s). If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is strictly prohibited. Please notify the sender that you have received this communication in error and delete and destroy all copies in your possession. Advisory services offered by Weiss Multi-Strategy Advisers LLC, an SEC-registered investment adviser and securities offered through its affiliate, Weiss Multi-Strategy Funds LLC, a registered broker-dealer, member FINRA/SIPC. Weiss Multi-Strategy Advisers LLC and its affiliates reserve the right, to the extent permitted under applicable law, to monitor electronic communications that are sent by or sent to its associated persons. The firm's Privacy Policy is available at www.gweiss.com

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

This e-mail is being sent to you for your information pursuant to your request. This information is not warranted as to completeness or accuracy. The views expressed in the message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of George Weiss Associates, Inc. or any of its affiliated entities. This message is for the named person's use only. It may contain sensitive and private proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any mis-transmission. You must not, directly or indirectly, use, disclose, distribute, print or copy any part of this message if you are not the intended recipient.

## FORBEARANCE AGREEMENT

**THIS FORBEARANCE AGREEMENT** ("Agreement") is made and entered into this February 12, 2024, by and between GWA, LLC, a Connecticut limited liability company ("GWA"), Weiss Multi-Strategy Funds, LLC, a Delaware limited liability company ("WMSF"), OGI Associates, LLC, a Delaware limited liability company ("OGI"), Weiss Special Operations LLC, a Delaware limited liability company ("WSPO"), Weiss Multi-Strategy Advisers LLC, a Delaware limited liability company ("WMSA" and collectively with GWA, WMSF, WSPO and OGI, the "Weiss Parties"), George A. Weiss ("Weiss") for purposes of Section 5(a), 9 and 10(c) hereof, and, Leucadia Asset Management Holdings LLC ("LAM Holdings") and Jefferies Strategic Investments, LLC, a Delaware limited liability company ("JSI").

## RECITALS

WHEREAS, LAM Holding LLC ("LAM Holding") and GWA entered into the Strategic Relationship Agreement dated as of May 1, 2018 (as amended, the "SR Agreement");

WHEREAS, in connection with LAM Holdings entering into the SR Agreement, WMSA and JSI (under its former name "Leucadia Funding LLC") entered into the Investment Management Agreement dated May 1, 2018 (as amended, the "IMA");

WHEREAS, LAM Holding assigned all of its rights under the SR Agreement to LAM Holdings (under its former name, Jefferies Asset Management Holdings LLC) (LAM Holdings, collectively with JSI and their affiliated entities, the "Jefferies Parties"), pursuant to the Assignment and Assumption Agreement dated as of October 18, 2018, between LAM Holding and LAM Holdings;

WHEREAS, LAM Holding merged with and into LAM Holdings as of December 1, 2021, with LAM Holdings as the surviving company;

WHEREAS, GWA, WMSA, and JSI, as successor in interest to JFG Funding LLC, are parties to that certain Note Purchase Agreement, dated as of December 3, 2019 (as amended, the "2019 Note Purchase Agreement");

WHEREAS, GWA, WMSA, and JSI are parties to that certain Note Purchase Agreement, dated as of September 21, 2022 (as amended, the "2022 Note Purchase Agreement" and collectively with the 2019 Note Purchase Agreement, the "Note Purchase Agreements");

WHEREAS, pursuant to the terms of the Note Purchase Agreements, GWA has issued (i) a $31,250,000 Note dated December 3, 2019, (ii) a $18,750,000 Note dated January 13, 2020, and (iii) a $3,000,000 Note dated September 21, 2022 (collectively, the "Notes");

WHEREAS, JSI has entered into Forbearance Letters on each of January 1, 2022, September 1, 2022 and July 25, 2023, with GWA and WMSA, pursuant to which JSI agreed to forebear from exercising certain remedies subject to certain conditions;

WHEREAS, on December 21, 2023, JSI delivered to GWA that certain Notice of Optional Redemption (the "Redemption Notice");

WHEREAS, representatives of the Jefferies Parties and the Weiss Parties have been in ongoing discussions since December 2023 regarding the terms under which the Jefferies Parties may be willing to forebear from exercising their remedies in connection with the Enforcement Actions;

WHEREAS, the Jefferies Parties delivered to the Weiss Parties on February 1, 2024 a draft Forbearance Agreement that was conditioned upon such bonus payment not being paid and such bonus payments were made by the Weiss Parties on February 8, 2024; and

WHEREAS, JSI currently has the right to immediately commence an enforcement action, suit, litigation, claim or other action with respect to the Past Due Obligations (as defined below) and the actions of the Weiss Parties referred to above (collectively "Enforcement Actions") against GWA.

NOW THEREFORE, in good and valuable consideration of the covenants and mutual promises hereinafter set forth, the sufficiency of which the parties heretofore acknowledge, the parties hereto agree as follows:

1.    Past Due Obligations. Each party agrees that pursuant to the terms of the Note Purchase Agreements, the Notes and the Redemption Notice, GWA is past due with respect to the following payment obligations to JSI (each calculated as of January 15, 2024): (i) $23,650,410.10 on the Note dated December 3, 2019, (ii) $27,457,310.08 on the Note dated January 13, 2020 and (iii) $3,420,395.60 on the Note dated September 21, 2022 (collectively, the "Past Due Obligations"). Each party further agrees that the Past Due Obligations are owed without defense, set-off or counter claim, and are past due.

2.    Weiss Parties Agreements.

(a)    To the extent they have not done so prior to the execution of this Agreement, the Weiss Parties agree to deliver the following information to the Jefferies Parties no later than 5:00 p.m. on February 13, 2024:

(i)    A schedule of bonus payments made to each employee during 2024 including (A) the name of the recipient employee, (B) the aggregate amounts paid to such recipient employee, and (C) the date or dates on which such bonus payments were made to such employee.

(ii)    Schedules of assets and liabilities of each of GWA, WMSF, OGI, WSPO, WMSA and each of their subsidiaries as of each of January 31, 2024 and February 9, 2024.

(iii)    Copies of statements from each brokerage, futures, commodities, custodial, bank, deposit or similar account held by any of the entities referred to in clause (ii) above.

2

(iv)    The name and address of each entity referred to in clause (ii) above and of each bank or brokerage firm where the accounts referred to in clause (iii) above are held.

(v)    A schedule of each client account managed by WMSA or its affiliates (the "Weiss Client Accounts"), including the amount of any accrued but unpaid fees or allocations owed to WMSA from each Weiss Client Account.

(vi)    The operative and offering documents of each Weiss Client Account, including each Private Placement Memorandum, Offering Memorandum, Limited Partnership Agreement, Limited Liability Company Agreement, Memorandum and Articles of Association, Investment Management Agreement and all similar documents.

(vii)    Copies of every invoice for accrued but unpaid fees or allocation that have been sent to any Weiss Client.

(b)    The Weiss Parties agree to provide promptly, and in any event within 24 hours of such request, any other information requested by the Jefferies Parties related to the Weiss Parties' and any of their subsidiaries' respective financial operations or financial conditions, the Past Due Obligations or the representations or obligations set forth in this Agreement.

(c)    The Weiss Parties hereby agree that none of them will (i) pay, grant or transfer (directly or indirectly) to any other person or entity an aggregate amount in excess of $10,000 on any day, except for payments made in the course of normal course trading consistent with past practices (*e.g.*, payments to prime and executing brokers, payments against delivery and payments to ISDA counterparties), (ii) take any action or fail to take any action that may result in OGI's net assets being reduced or diminished in any respect other than permitting normal course trading consistent with past practices or (iii) take any other action or fail to take any action that would be reasonably expected to reduce the net asset value of the Weiss Parties or their subsidiaries, in each case without the prior written consent of the Jefferies Parties, which may be granted or withheld in their sole and absolute discretion.

3.    Guaranty.

(a)    Guaranty of Obligations.  Each Weiss Party (other than GWA) hereby irrevocably and unconditionally guarantees to each of JSI and LAM Holdings (collectively, the "Beneficiaries") and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other Weiss Party when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations (as herein defined).  This guaranty shall remain in full force and effect until the Guaranteed Obligations are paid in full, notwithstanding any increase in the amount of the Guaranteed Obligations or any modification or amendment of any instrument governing the Guaranteed Obligations.  As used herein, the term "Guaranteed Obligations" shall mean all the obligations of GWA and each other Weiss Party arising under any Note

3

Purchase Agreement, the Notes, the SR Agreement and this Agreement, and any loss, damage, penalty, action, judgment, suit, cost, expense, disbursement, liability, claim or other obligation, incurred by or behalf of any Beneficiary (including but not limited to reasonable out-of-pocket attorneys' fees and costs) arising out or, relating to or in connection with any Note Purchase Agreement, any Note, the SR Agreement, this Agreement or the transaction contemplated thereby.

(b)    Nature of Guaranty.  This guaranty is an irrevocable, absolute, and continuing guaranty of the full and punctual payment and performance and not a guaranty of collection.  This guaranty may not be revoked by any Weiss Party and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by any Weiss Party.

(c)    Guaranteed Obligations Not Reduced by Offset.  No payment or payments made by any Weiss Party, any other guarantor or any other person or received or collected by any Beneficiary from any Weiss Party, any other guarantor or any other person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Guaranteed Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Weiss Party hereunder until all of the Guaranteed Obligations have been repaid in full. Each Weiss Party shall remain liable under this Agreement until the Guaranteed Obligations are satisfied and paid in full.

(d)    Waivers.  Each Weiss Party hereby acknowledges the applicable provisions of the Note Purchase Agreement, the Notes and the SR Agreement, and hereby waives notice of (i) any transactions thereunder, whether characterized as loans or advances, (ii) acceptance of this guaranty, (iii) any amendment or extension of the Guaranteed Obligations or any document evidencing or governing the Guaranteed Obligations, (iv) the execution and delivery by any Beneficiary or any other Weiss Party of any other agreement or other documents arising in connection with the Guaranteed Obligations, (v) the occurrence of any breach by any Weiss Party under any document or agreement governing the Guaranteed Obligations, (vi) a Beneficiary's transfer or disposition of any of its rights under the documents governing the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, including the Collateral, (viii) protest, proof of non-payment or default by any Weiss Party, or (ix) any other action at any time taken or omitted by the Beneficiaries, and, generally, except to the extent required by the terms hereof, all other demands and notices of every kind in connection with this guaranty, or any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations.

4.    Grant Of Security.

(a)    Grant of Security Interest.  Each Weiss Party hereby grants and pledges to Secured Party (as defined below), to secure the full and punctual payment of the Guaranteed Obligations when due (whether at the stated maturity, by acceleration or otherwise), a continuing security interest in all of such Weiss Party's right, title and interest in, to and under the Collateral, wherever located, whether now owned or hereafter acquired

4

or arising, and all proceeds and products thereof. The Secured Party's security interest shall continually exist until all Guaranteed Obligations have been paid in full. Each Weiss Party shall make notations, reasonably satisfactory to the Secured Party, on its books and records disclosing the existence of this security interest in the Collateral. "Collateral" shall mean all goods, accounts, equipment, inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, general intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, securities accounts, certificates of deposit, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and all of each Weiss Party's books and records relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing. Terms used in this definition shall have the meanings given to such terms in Article 9 of the Code (as defined below), as applicable.

(b) <u>Priority of Security Interest</u>. Each Weiss Party represents, warrants, and covenants that the security interest granted herein, and until expiration of the security interests as provided in Section 4(a), is and shall at all times continue to be a first priority perfected security interest in the Collateral (subject only, in the case of deposit account and securities account, to ordinary course liens in favor of that applicable depositary institutions and securities intermediaries that do not secure indebtedness for borrowed money).

(c) <u>Authorization to File Financing Statements</u>. Each Weiss Party hereby authorizes Secured Party to file financing statements, without notice to any Weiss Party, with all appropriate jurisdictions to perfect or protect the Secured Party's interest or rights hereunder, including a notice that any disposition of the Collateral, by either such Weiss Party or any other person, other than in accordance with this Agreement shall be deemed to violate the rights of Secured Party under the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of New York or any other applicable jurisdiction as the context may require (the "Code").

(d) <u>Termination of Liens; Release of Collateral</u>. Upon payment in full of all Guaranteed Obligations in accordance with the terms hereof, (i) the lien in the Collateral granted by each Weiss Party in favor of the Secured Party under, or pursuant to, this Agreement shall automatically be terminated and released without any further action by any person and all rights therein shall revert to the applicable Weiss Party and (ii) the Secured Party shall, at the Weiss Party's sole cost and expense, release its lien in the Collateral and execute and deliver to the applicable Weiss Party such documents reasonably requested by such Weiss Party to evidence such release.

(e) <u>Account Control Agreement</u>. Each Weiss Party shall within five Business Days of this Agreement, execute and deliver an account control agreement in respect of each account referred to in Section 2(a)(iii) to provide the Secured Party with perfection by control of its security interest in each such account, each in form and substance reasonable acceptable to the Secured Party.

(f)    _Further Assurances_. Each Weiss Party shall execute any and all further documents, financing statements, agreements and instruments, and shall take all such further actions, which may be required under any applicable law or which Secured Party may reasonably request in order to grant, preserve, protect, perfect and evidence the validity and priority of the security interests created or intended to be created by this Agreement (including, without limitation, the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), all at the sole cost and expense of the Weiss Parties.

(g)    _Appointment of Secured Party_. Each of JSI and LAM Holdings hereby appoints JSI to act as its collateral agent (JSI, together with its successors and assigns in such capacity, the "_Secured Party_") for purposes of perfecting the lien granted to the Secured Party in this Agreement. The Secured Party shall have no rights or duties other than as expressly provided herein, and may assign its rights under this Agreement to any Beneficiary or any affiliate thereof, solely with the consent of the Beneficiaries. The Secured Party shall be authorized to apply any proceeds of the Collateral to the Guaranteed Obligations in such order as it may determine in its sole discretion.

5.    _Representations_.

(a)    _Enforceability_. Each Weiss Party and Weiss hereby represents and warrants that (x) this Agreement has been duly executed and delivered by such Weiss Party and Weiss and (y) this Agreement is the legal, valid and binding obligation of such Weiss Party and Weiss, and is enforceable against each such Weiss Party and Weiss, in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by equitable principles relating to enforceability.

(b)    _Authorization; No Conflicts_. Each Weiss Party hereby represents and warrants that its execution, delivery and performance of this Agreement, are within its corporate or limited liability company powers and have been duly authorized by all necessary corporate, limited liability company and, if required, stockholder action of such Weiss Party. The execution, delivery and performance of this Agreement, (i) do not require any consent or approval of, registration or filing with, or any other action by, any governmental authority, except (a) such as have been obtained or made and are in full force and effect, and (b) for filings and registrations necessary to perfect liens created hereunder, (ii) will not violate any law, rule or regulation applicable to any Weiss Party, (iii) will not result in a default or breach under any of its constituent documents or any instrument or agreement binding on it or any of its assets, and (iv) will not result in the creation or imposition of any lien on any asset of any Weiss Party, or any of its subsidiaries, except liens created hereby.

(c)    _No Default; Representations and Warranties_. Each Weiss Party hereby represents and warrants that except as disclosed to the Beneficiaries in writing (i) no default or breach has occurred under any Note Purchase Agreement, any Note, the SR Agreement or this Agreement and (ii) all of the representations and warranties of each Weiss Party, as applicable, contained in any of any Note Purchase Agreement, any Note, the SR Agreement

or this Agreement are true and correct in all material respects as of the date hereof, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date.

(d)     Disclosure. Each Weiss Party hereby represents and warrants that none of the reports, financial statements, certificates or other information furnished by or on behalf of any Weiss Party to the Secured Party or any Beneficiary in connection with the negotiation of this Agreement or delivered pursuant to hereto contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

6.     Forbearance.  In exchange for the Weiss Parties agreeing to and complying with the terms of this Agreement, JSI agrees to (a) forbear from seeking relief or exercising any remedies under title 11 of the United State Code (the "Bankruptcy Code"), including, but not limited to, commencing an involuntary case against GWA under sections 301 or 303 of the Bankruptcy Code, as well as initiating or causing the initiation of an assignment for the benefit of creditors proceeding, a receivership or other similar insolvency proceeding and (b) forbear from filing an Enforcement Action, in each case, for the period (the "Forbearance Period") beginning on the date hereof until the earlier of (x) two Business Days after such date or (y) the occurrence of any Forbearance Default, except that the Forbearance Period will be automatically extended by an additional one Business Day at the conclusion of the Forbearance Period unless the Jefferies Parties give written notice of a termination of the Forbearance Period to the Weiss Parties on or prior to the conclusion of the Forbearance Period.  (For the avoidance of doubt, the Forbearance Period shall automatically terminate upon the occurrence of a Forbearance Default.)  For the purposes hereof, "Forbearance Default" shall mean the occurrence of any of the events described on Exhibit A attached hereto and "Business Day" shall have the meaning given to such term in the SR Agreement.

7.     Reservation of Rights.  Except as expressly set forth herein, this Agreement shall not, by implication or otherwise, constitute a termination, waiver or amendment of, or otherwise affect the rights and remedies of any Beneficiary as a holder of the Notes, as party to the Note Purchase Agreements, as a party to the SR Agreement or under any other document.  Each Beneficiary reserves all rights and remedies, including but not limited to rights to interest under the Notes and the SR Agreement, any netting and set-off, and defenses, that such Beneficiary is entitled to exercise under the Notes, the Note Purchase Agreement, the Redemption Notice, the SR Agreement, any related documents or otherwise at law or in equity.  For the avoidance of doubt, this Agreement shall not extinguish the obligations for the payment of money outstanding under the Notes or SR Agreement or discharge or release the priority of the Notes or any other security therefor.  Nothing herein contained shall be construed as a substitution or novation of the obligations outstanding on the Notes, under the Note Purchase Agreement or the SR Agreement or any instruments, documents and agreements securing the same, which shall remain in full force and effect.  Nothing in this Agreement shall be construed as a release or other discharge of any Weiss Party or its affiliates from any of its obligations and liabilities under the Note, the Note Purchase Agreement or the SR Agreement.  No delay by any Beneficiary or any of its affiliates in exercising any right or remedy in respect of the Notes or the Note Purchase Agreement or the SR

Agreement or related documents or in respect of applicable law or equities will be deemed to constitute a waiver or forbearance of any such right or remedy.  No verbal communication from or on behalf of any Beneficiary or any of its affiliates by any source with respect to the subject matter of this Agreement shall constitute any agreement of any Beneficiary or any of its affiliates with respect to the subject matter hereof, which shall be effective only if in writing and duly executed on behalf of such Beneficiary or such affiliate.

8.    IMA Fees.  WMSA hereby agrees as of date hereof to treat any amounts JSI owes WMSA pursuant to the IMA (including but not limited to any amounts for the period of January 1, 2023 through December 31, 2023, including but not limited to the Investment Teams Bonus Fee) as offsetting GWA's payment obligations to JSI under the Notes, and as a result (i) JSI shall have been deemed to have paid such amounts to WMSA and (ii) such deemed paid amounts shall be deemed to be a receipt by JSI of a payment by GWA on the Notes of such amount.

9.    Weiss Guarantee. Weiss unconditionally and irrevocably personally guarantees to the Jefferies Entities the accuracy of the representations made by, and the performance of the agreements of, the Weiss Parties hereunder.  Weiss further agrees that he shall take all actions within his control, including by exercising all of his voting, governance, management and other rights and powers with respect to each of the other Weiss Parties, any of their subsidiaries and any of his personal or his family's trusts to cause such persons to comply with the terms of this Agreement.

10.    Miscellaneous.

(a)    This Agreement may be executed in counterparts, each of which shall together be deemed an original instrument and all of which shall constitute one and the same agreement.

(b)    The parties hereto represent that they shall do all acts, and execute and deliver all documents necessary, convenient, or desirable to effectuate all provisions of this Agreement.

(c)    Each Weiss Party and Weiss acknowledges and agrees that it is receiving a direct benefit from the transactions contemplated by this Agreement, and the terms of this Agreement, including the guaranty provided herein and the security interests granted herein, constitute reasonably equivalent value for the benefit it is receiving from entering into this Agreement. Each Weiss Party and Weiss agrees that it shall not, nor shall it cause, directly or indirectly, any person controlled by, or under common control with, it, to take any action inconsistent with the terms of this Agreement. Each party represents and warrants that it has full power and authority to enter into and perform this Agreement, and that the person executing this Agreement on behalf of that party has been properly authorized and empowered to enter into this Agreement and to bind that party hereto.

(d)    This Agreement addresses the Past Due Obligations and the amounts under the IMA referenced in Section 8 hereof. This Agreement does not pertain to any other indebtedness and/or obligations of the Weiss Parties to the Jefferies Parties not specifically addressed in this Agreement (including but not limited to any amounts owed under the

8

Placement Agreement between Jefferies LLC and certain of the Weiss Parties). All terms and provisions of any agreements between one or more Weiss Parties and one or more Jefferies Parties, not specifically modified herein, shall remain in full force and effect in accordance with their terms.

(e)    No modification, waiver or amendment of this Agreement shall be valid unless the same is in writing and executed by all parties hereto. Waiver of any one provision shall not be deemed to be a waiver of any other provision herein.

(f)    This Agreement shall be binding upon the parties hereto and their predecessors, representatives, successors and permitted assigns, and shall inure to the benefit of said parties, and each of them, and their respective predecessors, representatives, successors and permitted assigns.

(g)    All agreements, covenants, representations and warranties, express or implied, oral and written, of the parties hereto concerning the subject matter hereof, are contained herein.  No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any party hereto to any other concerning the subject matter hereof.  All prior and contemporaneous conversations, negotiations, possible and alleged agreements, representations, covenants and warranties concerning the subject matter hereto are merged herein.

(h)    This Agreement shall be governed by and construed and administered in accordance with the internal substantive laws of the State of New York without regard to principles of conflict of laws. Each party agrees that any dispute arising out of this Agreement shall be subject to the exclusive jurisdiction of the New York courts and irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in (i) any state court in the State of New York or (ii) any federal court in the State of New York, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(i)    In the event that any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be constructed as if such invalid or unenforceable provisions had never been contained in this Agreement.

(j)    All notices or other communications required or permitted to be given hereunder shall be in writing and shall be sent by electronic mail or sent, postage prepaid, by registered, certified or express mail or overnight courier service and shall be deemed given when received, as follows:

(i)    if to a Jefferies Party, to:

c/o Leucadia Asset Management Holdings LLC
520 Madison Avenue

9

New York, New York 10022
Attn: Nick Daraviras, Sonia Han Levovitz, Matthew Smith
E-mail: ndaraviras@jefferies.com; shan@jefferies.com;
      matt.smith@jefferies.com

With copies to:

Herbert Smith Freehills
450 Lexington Avenue
New York NY 10017
Attn: Scott S. Balber
Email: Scott.Balber@hsf.com

(ii)     if to a Weiss Party, to:

c/o GWA, LLC
320 Park Avenue
20th Floor
New York, New York 10022
Attention: Jeffrey Dillabough
Email: jdillabough@gweiss.com

*[Signature Page Follows]*

A-133

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

**GWA, LLC**

By:_____
Name: George A. Weiss
Title: Manager

**WEISS MULTI-STRATEGY ADVISERS LLC**

By:_____
Name: George A. Weiss,
Title: Manager

**WEISS MULTI-STRATEGY FUNDS, LLC**

By:_____
Name: George A. Weiss
Title: Authorized Signatory

**OGI ASSOCIATES, LLC**

By:_____
Name: George A. Weiss
Title: Manager

**WEISS SPECIAL OPERATIONS LLC**

By:_____
Name: George A. Weiss
Title: Authorized Signatory

**GEORGE A. WEISS,** for purposes of Sections 5(a), 9 and 10(c)

_____

A-134

**JEFFERIES STRATEGIC INVESTMENTS, LLC**

By:_____
Name:
Title:

**LEUCADIA ASSET MANAGEMENT HOLDINGS LLC**

By:_____
Name:
Title:

**EXHIBIT A**

A "<u>Forbearance Default</u>" shall be deemed to have occur if any of the following evets occurs:

      a)     any breach by a Weiss Party or Weiss of its obligations under this Agreement;

      b)     any of the representations made by the Weiss Parties in Section 5 hereof ceasing to be true;

      c)     any Weiss Party shall have: (i) applied for, or consented to, the appointment of a custodian, receiver, fiscal agent, trustee or liquidator of all or a substantial part of its assets; (ii) filed a voluntary petition in bankruptcy, or sought dissolution or reorganization under any law; (iii) filed an answer admitting the material allegations of a bankruptcy or reorganization petition; or (iv) an involuntary proceeding under sections 301 or 303 Bankruptcy initiated against it by a third party (i.e., not a Jefferies Party);

      d)     any Weiss Party shall have: (i) a custodian, receiver, fiscal agent, trustee or liquidator appointed without its consent for all or a substantial part of its assets; (ii) have an involuntary petition filed against it in bankruptcy for dissolution or reorganization; or (iii) have been adjudicated a bankrupt or had a plan of reorganization submitted by any creditor or committee approved; or

      e)     any Weiss Party: (i) dissolves, liquidates or ceases operations; or (ii) agrees to the sale of, or a sale of all or substantially all of the property or assets of, such Weiss Party.

1 |                                                                    ~~Draft 2/11/2024~~

## FORBEARANCE AGREEMENT

**THIS FORBEARANCE AGREEMENT** ("Agreement") is made and entered into this February 12, 2024, by and between GWA, LLC, a Connecticut limited liability company ( "GWA"), Weiss Multi-Strategy Funds, LLC, a Delaware limited liability company ("WMSF"), OGI Associates, LLC, a Delaware limited liability company ("OGI"), Weiss Special Operations LLC, a Delaware limited liability company ("WSPO"), Weiss Multi-Strategy Advisers LLC, a Delaware limited liability company ("WMSA" and collectively with GWA, WMSF, WSPO and OGI, the "Weiss Parties"), George A. Weiss ("Weiss") for purposes of Section 5(a), 9 and 10(c) hereof, and, Leucadia Asset Management Holdings LLC ("LAM Holdings") and Jefferies Strategic Investments, LLC, a Delaware limited liability company ("JSI").

## RECITALS

WHEREAS, LAM Holding LLC ("LAM Holding") and GWA entered into the Strategic Relationship Agreement dated as of May 1, 2018 (as amended, the "SR Agreement");

WHEREAS, in connection with LAM Holdings entering into the SR Agreement, WMSA and JSI (under its former name "Leucadia Funding LLC") entered into the Investment Management Agreement dated May 1, 2018 (as amended, the "IMA");

WHEREAS, LAM Holding assigned all of its rights under the SR Agreement to LAM Holdings (under its former name, Jefferies Asset Management Holdings LLC) (LAM Holdings, collectively with JSI and their affiliated entities, the "Jefferies Parties"), pursuant to the Assignment and Assumption Agreement dated as of October 18, 2018, between LAM Holding and LAM Holdings;

WHEREAS, LAM Holding merged with and into LAM Holdings as of December 1, 2021, with LAM Holdings as the surviving company;

WHEREAS, GWA, WMSA, and JSI, as successor in interest to JFG Funding LLC, are parties to that certain Note Purchase Agreement, dated as of December 3, 2019 (as amended, the "2019 Note Purchase Agreement");

WHEREAS, GWA, WMSA, and JSI are parties to that certain Note Purchase Agreement, dated as of September 21, 2022 (as amended, the "2022 Note Purchase Agreement" and collectively with the 2019 Note Purchase Agreement, the "Note Purchase Agreements");

WHEREAS, pursuant to the terms of the Note Purchase Agreements, GWA has issued (i) a $31,250,000 Note dated December 3, 2019, (ii) a $18,750,000 Note dated January 13, 2020, and (iii) a $3,000,000 Note dated September 21, 2022 (collectively, the "Notes");

WHEREAS, JSI has entered into Forbearance Letters on each of January 1, 2022, September 1, 2022 and July 25, 2023, with GWA and WMSA, pursuant to which JSI agreed to forbear from exercising certain remedies subject to certain conditions;

WHEREAS, on December 21, 2023, JSI delivered to GWA that certain Notice of Optional Redemption (the "Redemption Notice");

WHEREAS, representatives of the Jefferies Parties and the Weiss Parties have been in ongoing discussions since December 2023 regarding the terms under which the Jefferies Parties may be willing to forebear from exercising their remedies in connection with the Enforcement Actions and in connection therewith representatives of the Weiss Parties made statements to the representatives of the Jefferies Parties that certain bonus payments would not be made until the second half of February 2024;

WHEREAS, the Jefferies Parties delivered to the Weiss Parties on February 1, 2024 a draft Forbearance Agreement that was conditioned upon such bonus payment not being paid and such bonus payments were made by the Weiss Parties on February 8, 2024 in contravention of the statements made by the Weiss Parties; and

WHEREAS, JSI currently has the right to immediately commence an enforcement action, suit, litigation, claim or other action with respect to the Past Due Obligations (as defined below) and the actions of the Weiss Parties referred to above (collectively "Enforcement Actions") against GWA.

NOW THEREFORE, in good and valuable consideration of the covenants and mutual promises hereinafter set forth, the sufficiency of which the parties heretofore acknowledge, the parties hereto agree as follows:

1.    Past Due Obligations. Each party agrees that pursuant to the terms of the Note Purchase Agreements, the Notes and the Redemption Notice, GWA is past due with respect to the following payment obligations to JSI (each calculated as of January 15, 2024): (i) $23,650,410.10 on the Note dated December 3, 2019, (ii) $27,457,310.08 on the Note dated January 13, 2020 and (iii) $3,420,395.60 on the Note dated September 21, 2022 (collectively, the "Past Due Obligations"). Each party further agrees that the Past Due Obligations are owed without defense, set-off or counter claim, and are past due.

2.    Weiss Parties Agreements.

(a)    To the extent they have not done so prior to the execution of this Agreement, the Weiss Parties agree to deliver the following information to the Jefferies Parties no later than 5:00 p.m. on February 12, 2024:

(i)    A schedule of bonus payments made to each employee during 2024 including (A) the name of the recipient employee, (B) the aggregate amounts paid to such recipient employee, and (C) the date or dates on which such bonus payments were made to such employee.

(ii)    Schedules of assets and liabilities of each of GWA, WMSF, OGI, WSPO, WMSA and each of their subsidiaries as of each of January 31, 2024 and February 9, 2024.

(iii)    Copies of statements from each brokerage, futures, commodities,

2

custodial, bank, deposit or similar account held by any of the entities referred to in clause (ii) above.

(iv)    The name and address of each entity referred to in clause (ii) above and of each bank or brokerage firm where the accounts referred to in clause (iii) above are held.

(v)    A schedule of each client account managed by WMSA or its affiliates (the "Weiss Client Accounts"), including the amount of any accrued but unpaid fees or allocations owed to WMSA from each Weiss Client Account.

(vi)    The operative and offering documents of each Weiss Client Account, including each Private Placement Memorandum, Offering Memorandum, Limited Partnership Agreement, Limited Liability Company Agreement, Memorandum and Articles of Association, Investment Management Agreement and all similar documents.

(vii)    Copies of every invoice for accrued but unpaid fees or allocation that have been sent to any Weiss Client.

(b)    The Weiss Parties agree to provide promptly, and in any event within 24 hours of such request, any other information requested by the Jefferies Parties related to the Weiss Parties' and any of their subsidiaries' respective financial operations or financial conditions, the Past Due Obligations or the representations or obligations set forth in this Agreement.

(c)    The Weiss Parties hereby agree that none of them will (i) pay, grant or transfer (directly or indirectly) to any other person or entity an aggregate amount in excess of $10,000 on any day, except for payments made in the course of normal course trading consistent with past practices (*e.g.*, payments to prime and executing brokers, payments against delivery and payments to ISDA counterparties), (ii) take any action or fail to take any action that may result in OGI's net assets being reduced or diminished in any respect other than permitting normal course trading consistent with past practices or (iii) take any other action or fail to take any action that would be reasonably expected to reduce the net asset value of the Weiss Parties or their subsidiaries, in each case without the prior written consent of the Jefferies Parties, which may be granted or withheld in their sole and absolute discretion.

3.    Guaranty.

(a)    Guaranty of Obligations.  Each Weiss Party (other than GWA) hereby irrevocably and unconditionally guarantees to each of JSI and LAM Holdings (collectively, the "Beneficiaries") and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other Weiss Party when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations (as herein defined).  This guaranty shall remain in full force and effect until the Guaranteed Obligations are paid in full, notwithstanding any increase in the amount of the Guaranteed Obligations or any modification or amendment

3

of any instrument governing the Guaranteed Obligations. As used herein, the term "Guaranteed Obligations" shall mean all the obligations of GWA and each other Weiss Party arising under any Note Purchase Agreement, the Notes, the SR Agreement and this Agreement, and any loss, damage, penalty, action, judgment, suit, cost, expense, disbursement, liability, claim or other obligation, incurred by or behalf of any Beneficiary (including but not limited to reasonable out-of-pocket attorneys' fees and costs) arising out or, relating to or in connection with any Note Purchase Agreement, any Note, the SR Agreement, this Agreement or the transaction contemplated thereby.

(b)    Nature of Guaranty. This guaranty is an irrevocable, absolute, and continuing guaranty of the full and punctual payment and performance and not a guaranty of collection. This guaranty may not be revoked by any Weiss Party and shall continue to be effective with respect to any Guaranteed Obligations arising or created after any attempted revocation by any Weiss Party.

(c)    Guaranteed Obligations Not Reduced by Offset. No payment or payments made by any Weiss Party, any other guarantor or any other person or received or collected by any Beneficiary from any Weiss Party, any other guarantor or any other person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Guaranteed Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Weiss Party hereunder until all of the Guaranteed Obligations have been repaid in full. Each Weiss Party shall remain liable under this Agreement until the Guaranteed Obligations are satisfied and paid in full.

(d)    Waivers. Each Weiss Party hereby acknowledges the applicable provisions of the Note Purchase Agreement, the Notes and the SR Agreement, and hereby waives notice of (i) any transactions thereunder, whether characterized as loans or advances, (ii) acceptance of this guaranty, (iii) any amendment or extension of the Guaranteed Obligations or any document evidencing or governing the Guaranteed Obligations, (iv) the execution and delivery by any Beneficiary or any other Weiss Party of any other agreement or other documents arising in connection with the Guaranteed Obligations, (v) the occurrence of any breach by any Weiss Party under any document or agreement governing the Guaranteed Obligations, (vi) a Beneficiary's transfer or disposition of any of its rights under the documents governing the Guaranteed Obligations, or any part thereof, (vii) sale or foreclosure (or posting or advertising for sale or foreclosure) of any collateral for the Guaranteed Obligations, including the Collateral, (viii) protest, proof of non-payment or default by any Weiss Party, or (ix) any other action at any time taken or omitted by the Beneficiaries, and, generally, except to the extent required by the terms hereof, all other demands and notices of every kind in connection with this guaranty, or any documents or agreements evidencing, securing or relating to any of the Guaranteed Obligations.

4.    Grant Of Security.

(a)    Grant of Security Interest. Each Weiss Party hereby grants and pledges to Secured Party (as defined below), to secure the full and punctual payment of the

4

Guaranteed Obligations when due (whether at the stated maturity, by acceleration or otherwise), a continuing security interest in all of such Weiss Party's right, title and interest in, to and under the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof. The Secured Party's security interest shall continually exist until all Guaranteed Obligations have been paid in full. Each Weiss Party shall make notations, reasonably satisfactory to the Secured Party, on its books and records disclosing the existence of this security interest in the Collateral.
"Collateral" shall mean all goods, accounts, equipment, inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, general intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, securities accounts, certificates of deposit, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and all of each Weiss Party's books and records relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing. Terms used in this definition shall have the meanings given to such terms in Article 9 of the Code (as defined below), as applicable.

(b)    Priority of Security Interest. Each Weiss Party represents, warrants, and covenants that the security interest granted herein, and until expiration of the security interests as provided in Section 4(a), is and shall at all times continue to be a first priority perfected security interest in the Collateral (subject only, in the case of deposit account and securities account, to ordinary course liens in favor of that applicable depositary institutions and securities intermediaries that do not secure indebtedness for borrowed money).

(c)    Authorization to File Financing Statements. Each Weiss Party hereby authorizes Secured Party to file financing statements, without notice to any Weiss Party, with all appropriate jurisdictions to perfect or protect the Secured Party's interest or rights hereunder, including a notice that any disposition of the Collateral, by either such Weiss Party or any other person, other than in accordance with this Agreement shall be deemed to violate the rights of Secured Party under the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of New York or any other applicable jurisdiction as the context may require (the "Code").

(d)    Termination of Liens; Release of Collateral. Upon payment in full of all Guaranteed Obligations in accordance with the terms hereof, (i) the lien in the Collateral granted by each Weiss Party in favor of the Secured Party under, or pursuant to, this Agreement shall automatically be terminated and released without any further action by any person and all rights therein shall revert to the applicable Weiss Party and (ii) the Secured Party shall, at the Weiss Party's sole cost and expense, release its lien in the Collateral and execute and deliver to the applicable Weiss Party such documents reasonably requested by such Weiss Party to evidence such release.

5

(e)    <u>Account Control Agreement</u>.  Each Weiss Party shall within five Business Days of this Agreement, execute and deliver an account control agreement in respect of each account referred to in Section 2(a)(iii) to provide the Secured Party with perfection by control of its security interest in each such account, each in form and substance reasonable acceptable to the Secured Party.

(f)    <u>Further Assurances</u>. Each Weiss Party shall execute any and all further documents, financing statements, agreements and instruments, and shall take all such further actions, which may be required under any applicable law or which Secured Party may reasonably request in order to grant, preserve, protect, perfect and evidence the validity and priority of the security interests created or intended to be created by this Agreement (including, without limitation, the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), all at the sole cost and expense of the Weiss Parties.

(g)    <u>Appointment of Secured Party</u>.  Each of JSI and LAM Holdings hereby appoints JSI to act as its collateral agent (JSI, together with its successors and assigns in such capacity, the "<u>Secured Party</u>") for purposes of perfecting the lien granted to the Secured Party in this Agreement.  The Secured Party shall have no rights or duties other than as expressly provided herein, and may assign its rights under this Agreement to any Beneficiary or any affiliate thereof, solely with the consent of the Beneficiaries.  The Secured Party shall be authorized to apply any proceeds of the Collateral to the Guaranteed Obligations in such order as it may determine in its sole discretion.

5.    <u>Representations</u>.

(a)    <u>Enforceability</u>.  Each Weiss Party and Weiss hereby represents and warrants that (x) this Agreement has been duly executed and delivered by such Weiss Party and Weiss and (y) this Agreement is the legal, valid and binding obligation of such Weiss Party and Weiss, and is enforceable against each such Weiss Party and Weiss, in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by equitable principles relating to enforceability.

(b)    <u>Authorization; No Conflicts</u>.  Each Weiss Party hereby represents and warrants that its execution, delivery and performance of this Agreement, are within its corporate or limited liability company powers and have been duly authorized by all necessary corporate, limited liability company and, if required, stockholder action of such Weiss Party. The execution, delivery and performance of this Agreement, (i) do not require any consent or approval of, registration or filing with, or any other action by, any governmental authority, except (a) such as have been obtained or made and are in full force and effect, and (b) for filings and registrations necessary to perfect liens created hereunder, (ii) will not violate any law, rule or regulation applicable to any Weiss Party, (iii) will not result in a default or breach under any of its constituent documents or any instrument or agreement binding on it or any of its assets, and (iv) will not result in the creation or imposition of any lien on any asset of any Weiss Party, or any of its subsidiaries, except liens created hereby.

6

(c)    No Default;  Representations and Warranties.  Each Weiss Party hereby represents and warrants that except as disclosed to the Beneficiaries in writing (i) no default or breach has occurred under any Note Purchase Agreement, any Note, the SR Agreement or this Agreement and (ii) all of the representations and warranties of each Weiss Party, as applicable, contained in any of any Note Purchase Agreement, any Note, the SR Agreement or this Agreement are true and correct in all material respects as of the date hereof, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date.

(d)    Disclosure. Each Weiss Party hereby represents and warrants that none of the reports, financial statements, certificates or other information furnished by or on behalf of any Weiss Party to the Secured Party or any Beneficiary in connection with the negotiation of this Agreement or delivered pursuant to hereto contains any untrue statement of a material fact or omits any material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances under which they are made, not misleading as of the time when made or delivered.

6.    Forbearance.  In exchange for the Weiss Parties agreeing to and complying with the terms of this Agreement, JSI agrees to (a) forbear from seeking relief or exercising any remedies under title 11 of the United State Code (the "Bankruptcy Code"), including, but not limited to, commencing an involuntary case against GWA under sections 301 or 303 of the Bankruptcy Code, as well as initiating or causing the initiation of an assignment for the benefit of creditors proceeding, a receivership or other similar insolvency proceeding and (b) forbear from filing an Enforcement Action, in each case, for the period (the "Forbearance Period") beginning on the date hereof until the earlier of (x) two Business Days after such date or (y) the occurrence of any Forbearance Default, except that the Forbearance Period will be automatically extended by an additional one Business Day at the conclusion of the Forbearance Period unless the Jefferies Parties give written notice of a termination of the Forbearance Period to the Weiss Parties on or prior to the conclusion of the Forbearance Period.  (For the avoidance of doubt, the Forbearance Period shall automatically terminate upon the occurrence of a Forbearance Default.) For the purposes hereof, "Forbearance Default" shall mean the occurrence of any of the events described on Exhibit A attached hereto and "Business Day" shall have the meaning given to such term in the SR Agreement.

7.    Reservation of Rights.  Except as expressly set forth herein, this Agreement shall not, by implication or otherwise, constitute a termination, waiver or amendment of, or otherwise affect the rights and remedies of any Beneficiary as a holder of the Notes, as party to the Note Purchase Agreements, as a party to the SR Agreement or under any other document.  Each Beneficiary reserves all rights and remedies, including but not limited to rights to interest under the Notes and the SR Agreement, any netting and set-off, and defenses, that such Beneficiary is entitled to exercise under the Notes, the Note Purchase Agreement, the Redemption Notice, the SR Agreement, any related documents or otherwise at law or in equity.  For the avoidance of doubt, this Agreement shall not extinguish the obligations for the payment of money outstanding under the Notes or SR Agreement or discharge or release the priority of the Notes or any other security therefor.  Nothing herein contained shall be construed as a substitution or novation of the obligations outstanding on the Notes, under the Note Purchase Agreement or the SR

Agreement or any instruments, documents and agreements securing the same, which shall remain in full force and effect.  Nothing in this Agreement shall be construed as a release or other discharge of any Weiss Party or its affiliates from any of its obligations and liabilities under the Note, the Note Purchase Agreement or the SR Agreement.  No delay by any Beneficiary or any of its affiliates in exercising any right or remedy in respect of the Notes or the Note Purchase Agreement or the SR Agreement or related documents or in respect of applicable law or equities will be deemed to constitute a waiver or forbearance of any such right or remedy. No verbal communication from or on behalf of any Beneficiary or any of its affiliates by any source with respect to the subject matter of this Agreement shall constitute any agreement of any Beneficiary or any of its affiliates with respect to the subject matter hereof, which shall be effective only if in writing and duly executed on behalf of such Beneficiary or such affiliate.

8.    <u>IMA Fees</u>.  WMSA hereby agrees as of date hereof to treat any amounts JSI owes WMSA pursuant to the IMA (including but not limited to any amounts for the period of January 1, 2023 through December 31, 2023, including but not limited to the Investment Teams Bonus Fee) as offsetting GWA's payment obligations to JSI under the Notes, and as a result (i) JSI shall have been deemed to have paid such amounts to WMSA and (ii) such deemed paid amounts shall be deemed to be a receipt by JSI of a payment by GWA on the Notes of such amount.

9.    <u>Weiss Guarantee</u>. Weiss unconditionally and irrevocably personally guarantees to the Jefferies Entities the accuracy of the representations made by, and the performance of the agreements of, the Weiss Parties hereunder.  Weiss further agrees that he shall take all actions within his control, including by exercising all of his voting, governance, management and other rights and powers with respect to each of the other Weiss Parties, any of their subsidiaries and any of his personal or his family's trusts to cause such persons to comply with the terms of this Agreement.

10.    <u>Miscellaneous</u>.

(a)    This Agreement may be executed in counterparts, each of which shall together be deemed an original instrument and all of which shall constitute one and the same agreement.

(b)    The parties hereto represent that they shall do all acts, and execute and deliver all documents necessary, convenient, or desirable to effectuate all provisions of this Agreement.

(c)    Each Weiss Party and Weiss acknowledges and agrees that it is receiving a direct benefit from the transactions contemplated by this Agreement, and the terms of this Agreement, including the guaranty provided herein and the security interests granted herein, constitute reasonably equivalent value for the benefit it is receiving from entering into this Agreement. Each Weiss Party and Weiss agrees that it shall not, nor shall it cause, directly or indirectly, any person controlled by, or under common control with, it, to take any action inconsistent with the terms of this Agreement. Each party represents and warrants that it has full power and authority to enter into and perform this Agreement, and that the person executing this Agreement on behalf of that party has been

properly authorized and empowered to enter into this Agreement and to bind that party hereto.

(d)     This Agreement addresses the Past Due Obligations and the amounts under the IMA referenced in Section 8 hereof. This Agreement does not pertain to any other indebtedness and/or obligations of the Weiss Parties to the Jefferies Parties not specifically addressed in this Agreement (including but not limited to any amounts owed under the Placement Agreement between Jefferies LLC and certain of the Weiss Parties). All terms and provisions of any agreements between one or more Weiss Parties and one or more Jefferies Parties, not specifically modified herein, shall remain in full force and effect in accordance with their terms.

(e)     No modification, waiver or amendment of this Agreement shall be valid unless the same is in writing and executed by all parties hereto. Waiver of any one provision shall not be deemed to be a waiver of any other provision herein.

(f)     This Agreement shall be binding upon the parties hereto and their predecessors, representatives, successors and permitted assigns, and shall inure to the benefit of said parties, and each of them, and their respective predecessors, representatives, successors and permitted assigns.

(g)     All agreements, covenants, representations and warranties, express or implied, oral and written, of the parties hereto concerning the subject matter hereof, are contained herein.  No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any party hereto to any other concerning the subject matter hereof.  All prior and contemporaneous conversations, negotiations, possible and alleged agreements, representations, covenants and warranties concerning the subject matter hereto are merged herein.

(h)     This Agreement shall be governed by and construed and administered in accordance with the internal substantive laws of the State of New York without regard to principles of conflict of laws. Each party agrees that any dispute arising out of this Agreement shall be subject to the exclusive jurisdiction of the New York courts and irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in (i) any state court in the State of New York or (ii) any federal court in the State of New York, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(i)     In the event that any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be constructed as if such invalid or unenforceable provisions had never been contained in this Agreement.

(j)    All notices or other communications required or permitted to be given hereunder shall be in writing and shall be sent by electronic mail or sent, postage prepaid, by registered, certified or express mail or overnight courier service and shall be deemed given when received, as follows:

(i)    if to a Jefferies Party, to:

c/o Leucadia Asset Management Holdings LLC
520 Madison Avenue
New York, New York 10022
Attn: Nick Daraviras, Sonia Han Levovitz, Matthew Smith
E-mail:       ndaraviras@jefferies.com; shan@jefferies.com;
matt.smith@jefferies.com

With copies to:

Herbert Smith Freehills
450 Lexington Avenue
New York NY 10017
Attn: Scott S. Balber
Email: Scott.Balber@hsf.com

(ii)    if to a Weiss Party, to:

c/o GWA, LLC
320 Park Avenue
20th Floor
New York, New York 10022
Attention: Jeffrey Dillabough
Email: jdillabough@gweiss.com

*[Signature Page Follows]*

10

A-146

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the day and year first above written.

GWA, LLC

By:_____
Name: George A. Weiss
Title:

**WEISS MULTI-STRATEGY ADVISERS LLC**

By:_____
Name: George A. Weiss
Title:

**WEISS MULTI-STRATEGY FUNDS, LLC**

By:_____
Name: George A. Weiss
Title:

**OGI ASSOCIATES, LLC**

By:_____
Name: George A. Weiss
Title:

**WEISS SPECIAL OPERATIONS LLC**

By:_____
Name: George A. Weiss
Title:

**GEORGE A. WEISS,** for purposes of Sections 5(a), 9 and 10(c)

_____

**JEFFERIES STRATEGIC INVESTMENTS, LLC**

By:_____
Name:
Title:


**LEUCADIA ASSET MANAGEMENT HOLDINGS LLC**

By:_____
Name:
Title:

### EXHIBIT A

A "Forbearance Default" shall be deemed to have occur if any of the following evets occurs:

a)      any breach by a Weiss Party or Weiss of its obligations under this Agreement;

b)      any of the representations made by the Weiss Parties in Section 5 hereof ceasing to be true;

c)      any Weiss Party shall have: (i) applied for, or consented to, the appointment of a custodian, receiver, fiscal agent, trustee or liquidator of all or a substantial part of its assets; (ii) filed a voluntary petition in bankruptcy, or sought dissolution or reorganization under any law; (iii) filed an answer admitting the material allegations of a bankruptcy or reorganization petition; or (iv) an involuntary proceeding under sections 301 or 303 Bankruptcy initiated against it by a third party (i.e., not a Jefferies Party);

d)      any Weiss Party shall have: (i) a custodian, receiver, fiscal agent, trustee or liquidator appointed without its consent for all or a substantial part of its assets; (ii) have an involuntary petition filed against it in bankruptcy for dissolution or reorganization; or (iii) have been adjudicated a bankrupt or had a plan of reorganization submitted by any creditor or committee approved; or

e)      any Weiss Party: (i) dissolves, liquidates or ceases operations; or (ii) agrees to the sale of, or a sale of all or substantially all of the property or assets of, such Weiss Party.

A-149

## Track Changes

| 1 | Delete | *Author* |
|---|--------|----------|
| 2 | Delete | *Author* |
| 3 | Insert | *Author* |
| 4 | Delete | *Author* |
| 5 | Insert | *Author* |
| 6 | Insert | *Author* |
| 7 | Insert | *Author* |
| 8 | Insert | *Author* |
| 9 | Insert | *Author* |

A-150

Case 1:24-cv-04385-AKH   Document 28-5   Filed 11/05/24   Page 7 of 8

**To:** Jeffrey Dillabough[jdillabough@gweiss.com]; Jordi Visser[jvisser@gweiss.com]; George Weiss[George@gweiss.com]
**Cc:** Michael Sharp[msharp@jefferies.com]; Nick Daraviras[ndaraviras@jefferies.com]; Sonia Han Levovitz[shan@jefferies.com]
**From:** Balber, Scott[Scott.Balber@hsf.com]
**Sent:** Mon 2/12/2024 3:53:06 PM (UTC)
**Subject:** RE: Call
2024.02.12 - Letter re Jefferies and Leucadia.pdf

See attached.

---

**From:** Jeffrey Dillabough <jdillabough@gweiss.com>
**Sent:** Monday, February 12, 2024 4:13 AM
**To:** Sonia Han Levovitz <shan@jefferies.com>; Jordi Visser <jvisser@gweiss.com>; George Weiss <George@gweiss.com>
**Cc:** Michael Sharp <msharp@jefferies.com>; Nick Daraviras <ndaraviras@jefferies.com>; Balber, Scott <Scott.Balber@hsf.com>
**Subject:** RE: Call

Hi Sonia,

Attached please find the signed Forbearance Agreement. We made 2 minor changes in the recitals because we do not agree with the characterization of the facts. The substantive provisions remain unchanged. Thank you for working through the night on this.

Regards,

Jeff

---

**From:** Sonia Han Levovitz <shan@jefferies.com>
**Sent:** Monday, February 12, 2024 2:20 AM
**To:** Jordi Visser <jvisser@gweiss.com>; George Weiss <George@gweiss.com>; Jeffrey Dillabough <jdillabough@gweiss.com>
**Cc:** Michael Sharp <msharp@jefferies.com>; Nick Daraviras <ndaraviras@jefferies.com>; Balber, Scott <Scott.Balber@hsf.com>
**Subject:** RE: Call

Thank you, Jordi.
Please use this draft instead (fixed a typo).
And per my last email, please respond by 7am EST today, Monday, Feb 12.
Regards,
Sonia

---

**From:** Jordi Visser <jvisser@gweiss.com>
**Sent:** Monday, February 12, 2024 12:14 AM
**To:** Sonia Han Levovitz <shan@jefferies.com>; George Weiss <George@gweiss.com>; Jeffrey Dillabough <jdillabough@gweiss.com>
**Cc:** Michael Sharp <msharp@jefferies.com>; Nick Daraviras <ndaraviras@jefferies.com>; Balber, Scott <Scott.Balber@hsf.com>
**Subject:** RE: Call

Received and Understood.

Thank you,

Jordi

---

**From:** Sonia Han Levovitz <shan@jefferies.com>
**Sent:** Monday, February 12, 2024 2:10 AM
**To:** George Weiss <George@gweiss.com>; Jeffrey Dillabough <jdillabough@gweiss.com>; Jordi Visser <jvisser@gweiss.com>
**Cc:** Michael Sharp <msharp@jefferies.com>; Nick Daraviras <ndaraviras@jefferies.com>; Balber, Scott <Scott.Balber@hsf.com>
**Subject:** RE: Call

As we discussed, attached is the updated forbearance agreement.  Please respond by 7am EST tomorrow.  Thank you.

A-151

-----Original Appointment----- Case 1:24-cv-04369-AKH    Document 28-5    Filed 11/05/24    Page 3 of 6
**From:** Balber, Scott <Scott.Balber@hsf.com>
**Sent:** Sunday, February 11, 2024 5:05 PM
**To:** Balber, Scott; george@gweiss.com; jdillabough@gweiss.com; jvisser@gweiss.com; Nick Daraviras; Sonia Han Levovitz; Michael Sharp
**Subject:** Call
**When:** Sunday, February 11, 2024 7:15 PM-7:45 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** https://us06web.zoom.us/j/85454673584?pwd=0b3ICiHjHytU22gKfwxsKM6vMTuNJ7.1

[External Message]

Scott Balber is inviting you to a scheduled Zoom meeting.

Join Zoom Meeting
https://us06web.zoom.us/j/85454673584?pwd=0b3ICiHjHytU22gKfwxsKM6vMTuNJ7.1

Meeting ID: 854 5467 3584
Passcode: 607323

---

One tap mobile
+16469313860,,85454673584#,,,,*607323# US
+19292056099,,85454673584#,,,,*607323# US (New York)

---

Dial by your location
• +1 646 931 3860 US
• +1 929 205 6099 US (New York)
• +1 301 715 8592 US (Washington DC)
• +1 305 224 1968 US
• +1 309 205 3325 US
• +1 312 626 6799 US (Chicago)
• +1 564 217 2000 US
• +1 669 444 9171 US
• +1 669 900 6833 US (San Jose)
• +1 689 278 1000 US
• +1 719 359 4580 US
• +1 253 205 0468 US
• +1 253 215 8782 US (Tacoma)
• +1 346 248 7799 US (Houston)
• +1 360 209 5623 US
• +1 386 347 5053 US
• +1 507 473 4847 US

Meeting ID: 854 5467 3584
Passcode: 607323

Find your local number: https://us06web.zoom.us/u/kmMz2Ekb9

---

Join by SIP
• 85454673584@zoomcrc.com

---

Join by H.323
- 162.255.37.11 (US West)
- 162.255.36.11 (US East)
- 115.114.131.7 (India Mumbai)
- 115.114.115.7 (India Hyderabad)
- 213.19.144.110 (Amsterdam Netherlands) • 213.244.140.110 (Germany) • 103.122.166.55 (Australia Sydney) • 103.122.167.55 (Australia Melbourne) • 149.137.40.110 (Singapore) • 64.211.144.160 (Brazil) • 149.137.68.253 (Mexico) • 69.174.57.160 (Canada Toronto) • 65.39.152.160 (Canada Vancouver) • 207.226.132.110 (Japan Tokyo) • 149.137.24.110 (Japan Osaka)

Meeting ID: 854 5467 3584
Passcode: 607323

Herbert Smith Freehills New York LLP and Herbert Smith Freehills, an Australian Partnership, are separate member firms of the international legal practice known as Herbert Smith Freehills.

This message is confidential and may be covered by legal professional privilege. If you are not the intended recipient you must not disclose or use the information contained in it. If you have received this email in error please notify us immediately by return email or by calling our main switchboard on +1 917 542 7600 and delete the email.

Further information is available from www.herbertsmithfreehills.com, including our Privacy Policy which describes how we handle personal information.

Herbert Smith Freehills New York LLP is a limited liability partnership registered in England and Wales with registered number OC375072. Its registered office is at Exchange House, Primrose Street, London EC2A 2EG.

This message was not intended or written to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer under U.S. Federal tax law.

Some of this material may constitute attorney advertising within the meaning of sections 1200.1 and 1200.6-8 of Title 22 of the New York Codes, Rules and Regulatory Advertising Regulations. The following statement is made in accordance with those rules: ATTORNEY ADVERTISING: PRIOR RESULTS DO NOT GUARANTEE A SIMILAR OUTCOME.

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

This communication is not intended as an offer to sell or a solicitation for the purchase or sale of any security or a recommendation to buy or sell any securities that may be mentioned. This communication may contain privileged or confidential information, or may otherwise be protected from disclosure, and is intended solely for use of the intended recipient(s). If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or use of the information contained herein (including any reliance thereon) is strictly prohibited. Please notify the sender that you have received this communication in error and delete and destroy all copies in your possession. Advisory services offered by Weiss Multi-Strategy Advisers LLC, an SEC-registered investment adviser and securities offered through its affiliate, Weiss Multi-Strategy Funds LLC, a registered broker-dealer, member FINRA/SIPC. Weiss Multi-Strategy Advisers LLC and its affiliates reserve the right, to the extent permitted under applicable law, to monitor electronic communications that are sent by or sent to its associated persons. The firm's Privacy Policy is available at www.gweiss.com

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

This e-mail is being sent to you for your information pursuant to your request. This information is not warranted as to completeness or accuracy. The views expressed in the message are those of the individual sender, except where the message states otherwise and the sender is authorized to state them to be the views of George Weiss Associates, Inc. or any of its affiliated entities. This message is for the named person's use only. It may contain sensitive and private proprietary or legally privileged information. No confidentiality or privilege is waived or lost by any mis-transmission. You must not, directly or indirectly, use, disclose, distribute, print or copy any part of this message if you are not the intended recipient.

A-153

 HERBERT
SMITH
FREEHILLS

Jeffrey Dillabough, Esq.
General Counsel and Partner
Weiss Multi-Strategy Advisers LLC
320 Park Avenue
New York, New York 10022
Email:   jdillabough@gweiss.com

Herbert Smith Freehills New York LLP
450 Lexington Avenue, 14th floor
New York, NY 10017
USA
T  +1 917 542 7600
F  +1 917 542 7601
D  +1 917 542 7810
E  Scott.Balber@hsf.com
www.herbertsmithfreehills.com

By email

Date
February 12 2024

**Re:     Leucadia Asset Management Holdings LLC**
**and Jefferies Strategic Investments, LLC**

Dear Mr. Dillabough:

As you are aware, this Firm represents Leucadia Asset Management Holdings LLC ("LAM Holdings") and Jefferies Strategic Investments LLC ("JSI," and with LAM Holdings, the "Jefferies Parties") in connection with, *inter* alia, the Strategic Relationship Agreement dated as of May 1, 2018 (as amended, the "SR Agreement"), the Investment Management Agreement dated May 1, 2018, the Note Purchase Agreements dated December 3, 2019 and September 21, 2022, and the notes that were issued pursuant thereto (the "Notes").

As you are also aware, GWA, LLC ("GWA") currently owes to JSI approximately $54.5 million in amounts that are past due under the Notes.  GWA also has approximately $60 million in liabilities to LAM Holdings under the SR Agreement.

At 2:20 a.m. this morning, the Jefferies Parties provided you with a draft Forbearance Agreement, pursuant to which they offered to temporarily forego commencing any Enforcement Action against the Weiss Parties during the Forbearance Period.[1]  As part of that offer, the Jefferies Parties required that:

1.  The Weiss Parties admit that they had made statements to the Jefferies Parties that they would not make certain bonus payments until the second half of February 2024.

2.  The Weiss Parties admit that they had paid the bonuses on February 8, 2024.

---

[1]     Capitalized Terms not otherwise defined herein shall have the meanings set forth in the draft Forbearance Agreement sent by the Jefferies Parties.

Herbert Smith Freehills New York LLP and Herbert Smith Freehills, an Australian Partnership, are separate member firms of the international legal practice known as Herbert Smith Freehills.

Herbert Smith Freehills New York LLP is a limited liability partnership registered in England and Wales with registered number OC375072. Its registered office is at Exchange House, Primrose Street, London EC2A 2EG.

A-154

 HERBERT
SMITH
FREEHILLS

Date
February 12 2024
Letter to
George Weiss

3. The Weiss Parties provide a detailed set of information to the Jefferies Parties regarding the bonus payments by no later than 5:00 p.m. February 12, 2024, including among other things the name of each recipient employee and the amount paid to each recipient employee.

In response, you unilaterally modified portions of the draft Forbearance Agreement, including by deleting the Weiss Parties' acknowledgement that they had previously stated that the bonus payments would not be made until the second half of February 2024. The Weiss Parties executed your modified draft of the Forbearance Agreement.

To be clear, the Weiss Parties did, in fact, make statements indicating that they would not make the bonus payments until the second half of February 2024, which the Weiss Parties have now admitted were false. The Jefferies Parties reserve all of their rights to bring claims and pursue remedies arising from the Weiss Parties' misconduct.

In the meantime, we expect the Weiss Parties to abide by the representations made to the Jefferies Parties in the unilaterally modified Forbearance Agreement, including by providing all of the information regarding the bonus payments by no later than 5:00 p.m. today.

Sincerely,

Scott S. Balber

2

A-155

**To:**     jvisser@gweiss.com[jvisser@gweiss.com]
**Cc:**     Jeffrey Dillabough (jdillabough@gweiss.com)[jdillabough@gweiss.com]; Michael Sharp[msharp@jefferies.com]
**From:**   Nick Daraviras[ndaraviras@jefferies.com]
**Sent:**   Sat 2/17/2024 8:46:34 PM (UTC)
**Subject:** As discussed.
Weiss complaint.pdf

Please see attached.

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

A-156

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

JEFFERIES STRATEGIC INVESTMENTS, LLC
and LEUCADIA ASSET MANAGEMENT
HOLDINGS LLC,

                Plaintiffs,

      -against-

GWA, LLC, WEISS MULTI-STRATEGY
ADVISERS LLC, GEORGE WEISS, ██████ JEFFREY
DILLABOUGH,

Index No: _____

**COMPLAINT**

1



Defendants.

Plaintiffs Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC ("LAM Holdings," and with JSI, "Plaintiffs"), by and through their undersigned counsel, allege against defendants GWA, LLC ("GWA"), Weiss Multi-Strategy Advisers LLC ("WMSA," and with GWA and any of their wholly owned or controlled subsidiaries, the "George Weiss Companies"), as well as George Weiss, ███████████████ Jeffrey Dillabough, ████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████        ██████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████ (collectively, the

"Insiders"), as follows:

## PRELIMINARY STATEMENT

1.    This case arises from the George Weiss Companies' admitted failure to pay more

than $100 million that is owed to Plaintiffs, and their fraudulent transfer of nearly $30 million

dollars to the Insiders, which was in direct contravention of their representations to Plaintiffs and

which unlawfully deprived Plaintiffs of the money they are owed.

2.    The George Weiss Companies' own records unequivocally acknowledge their

debts to Plaintiffs and confirm that they are insolvent and unable to pay the monies they owe.

Notwithstanding the George Weiss Companies' dire financial circumstances, and solely as a

good faith accommodation, Plaintiffs repeatedly attempted to work with the George Weiss

Companies to address the outstanding indebtedness and to forebear on their right to take action

to recover the amounts they were owed.  Indeed, the George Weiss Companies have repeatedly

confirmed that Plaintiffs have acted appropriately in their dealings.

3.    The George Weiss Companies and their executives, however, have abused

Plaintiffs' good faith.  In order to induce Plaintiffs to forebear on their rights to collect more than

$100 million, the George Weiss Companies repeatedly represented that they would implement a

compensation plan "with cash deferral."  Defendants George Weiss, ██████████, and

Jeffrey Dillabough also expressly and repeatedly represented to Plaintiffs that the George Weiss

Companies were, and would continue, operating the business in the "normal course."  These

representations were false.  Far from acting in the "normal course," the George Weiss

Companies liquidated nearly all of their available assets and then, on February 8, 2024,

distributed nearly all of their cash in the form of "bonus" payments and "incentive"

compensation to its executives, employees, and other insiders, including ██████████ to

3

Defendants ████████ and Jeffrey Dillabough, the very individuals who had been making assurances to Plaintiffs. The George Weiss Companies were left with nearly no funds to satisfy the debts they owe to Plaintiffs.

4.      Accordingly, Plaintiffs bring this action to: (i) collect damages from the George Weiss Companies for their breaches of contract; and (ii) void the fraudulent transfers of the George Weiss Companies' assets to the Insiders.

## PARTIES

5.      JSI is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 520 Madison Avenue, New York, New York, 10022.

6.      LAM Holdings is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 520 Madison Avenue, New York, New York, 10022.

7.      On information and belief, GWA is a limited liability company organized and existing under the laws of Connecticut with its principal place of business located at 400 Capital Blvd, Rocky Hill, Connecticut, 06067.

8.      On information and belief, WMSA is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 320 Park Avenue, 20th Floor, New York, New York, 10022.

9.      On information and belief, George Weiss is the founder and Chief Executive Officer of the George Weiss Companies.

10.     On information and belief, ████████████████████████████
████████████

4

11.    On information and belief, Jeffrey Dillabough is the General Counsel of WMSA and the General Counsel and a Partner at GWA.

12.    On information and belief, █████████████████████████████████
███████████████

13.    On information and belief, ████████████████████████████████
███████

14.    On information and belief, ████████████████████████████████
███████

15.    On information and belief, █████████████████████████████████████
███████

16.    On information and belief, █████████████████████████████████

17.    On information and belief, ████████████████████████████

18.    On information and belief, ████████████████████████
██████████████

19.    On information and belief, ████████████████████████████
███████████████

20.    On information and belief, █████████████████████████████████
██████

21.    On information and belief, ████████████████████████████
███████████████

22.    On information and belief, ██████████████████████████████████

23.    On information and belief, ██████████████████████████████████

24.    On information and belief, ████████████████████████████

25.    On information and belief, ███████████████████████

26.    On information and belief, █████████████████████

27.    On information and belief, ████████████████

28.    On information and belief, ████████████████

29.    On information and belief, ███████████████████████

████████████

30.    On information and belief, █████████████████

31.    On information and belief, ████████████████

32.    On information and belief, █████████████████

33.    On information and belief, ██████████████

34.    On information and belief, ██████████████

35.    On information and belief, █████████████████

36.    On information and belief, █████████████████

37.    On information and belief, ████████████████

38.    On information and belief, ██████████████

39.    On information and belief, █████████████

40.    On information and belief, ███████████████

41.    On information and belief, ██████████████

42.    On information and belief, ██████████████

43.    On information and belief, ███████████████

44.    On information and belief, █████████████

45.    On information and belief, ███████████████

46.    On information and belief, ██████████████

47. On information and belief, ██████████████████████████████

48. On information and belief, ████████████████████

49. On information and belief, ███████████████████████

50. On information and belief, ██████████████████████

51. On information and belief, ███████████████████████

52. On information and belief, █████████████████

53. On information and belief, ███████████████████████

54. On information and belief, █████████████████████

55. On information and belief, ███████████████████████

56. On information and belief, ██████████████████████

57. On information and belief, ██████████████████████

58. On information and belief, █████████████████████████████

59. On information and belief, ██████████████████████

60. On information and belief, ██████████████████████

61. On information and belief, ██████████████████████

62. On information and belief, █████████████████.

63. On information and belief, ███████████████████████

64. On information and belief, ███████████████████████

65. On information and belief, ██████████████████████

66. On information and belief, ██████████████████████

67. On information and belief, ██████████████████████

68. On information and belief, ██████████████████████

69. On information and belief, ██████████████████████



70.    On information and belief,

71.    On information and belief,

72.    On information and belief,

73.    On information and belief,

74.    On information and belief,

75.    On information and belief,

76.    On information and belief,

77.    On information and belief,

78.    On information and belief,

79.    On information and belief,

80.    On information and belief,

81.    On information and belief,

82.    On information and belief,

83.    On information and belief,

84.    On information and belief,

85.    On information and belief,

86.    On information and belief,

87.    On information and belief,

## JURISDICTION AND VENUE

88.    This Court may exercise personal jurisdiction over GWA pursuant to C.P.L.R.

§ 302(a)(1) because GWA transacted business within the State of New York by entering into the

Note Purchase Agreement (defined below) with JSI, a limited liability company with a principal

place of business in New York.  Under Section 17.6 of the Note Purchase Agreement, GWA

"irrevocably submit[ed] to the non-exclusive jurisdiction of any New York State or federal court

sitting in the Borough of Manhattan, the City of New York, over any suit, action or proceeding arising out of or relating to this Agreement or a Note."

89.    This Court may exercise personal jurisdiction over WMSA pursuant to C.P.L.R. § 301 because it maintains its principal place of business in the State of New York. WMSA also consented to this Court's exercise of personal jurisdiction over WMSA under § 17.6 of the Note Purchase Agreement.

90.    This Court may exercise personal jurisdiction over the Insiders pursuant to: (i) C.P.L.R. 301 because they are either residents of New York or, through their employment with WMSA (which is headquartered in and operates from New York), they continuously and systematically do business in New York; and/or (ii) C.P.L.R. 302(a)(3)(iii) because to the extent any Insider is not a resident of New York, they: (a) committed a "tortious act without the state causing injury to person or property within the state" by receiving fraudulent conveyances from the George Weiss Companies which frustrate Plaintiffs' ability to collect on any judgment that they may obtain against the George Weiss Companies in New York; (b) expect or should reasonably expect that their receipt of the fraudulent conveyances would have consequences in New York, where Plaintiffs are headquartered; and (c) derive substantial revenue from interstate commerce.

91.    Venue is proper pursuant to C.P.L.R. § 302(a) because: (i) Plaintiffs are limited liability companies that reside in New York County; and (ii) a substantial part of the events giving rise to Plaintiffs' claims, including the George Weiss Companies' execution of the Note Purchase Agreements and the Strategic Relationship Agreement occurred in New York.

## FACTS

I.    **GWA Executes the Note Purchase Agreements and Receives $53 Million in Loans**

92.    On or about December 3, 2019, JFG Funding LLC entered into a Note Purchase Agreement with GWA and WMSA (the "2019 Note Purchase Agreement"). A true and correct copy of the 2019 Note Purchase Agreement is attached to this Complaint as Exhibit A.

93.    Pursuant to Section 2 of the 2019 Note Purchase Agreement, GWA issued $50 million in notes (each a "Note"): (i) a $31,250,000.00 Note issued on December 3, 2019; and (ii) a $18,750,000.00 Note issued on January 13, 2020. (*See id.* § 3). True and correct copies of the Notes are attached to this Complaint as Exhibits B and C, respectively.

94.    In exchange for the Note, JFG Funding LLC provided GWA with $50,000,000.00.

95.    JFG Funding LLC subsequently assigned its interest in the 2019 Note Purchase Agreement and the Notes to JSI, which was acknowledged by GWA.

96.    Separately, on September 21, 2022, GWA and JSI entered into an additional Note Purchase Agreement (the "2022 Note Purchase Agreement"). A true and correct copy of the 2022 Note Purchase Agreement is attached to this Complaint as Exhibit D. That same day, and pursuant to the 2022 Note Purchase Agreement, GWA issued and delivered to JSI a Note in the principal amount of $3,000,000.00. A true and correct copy of the that Note is attached to this Complaint as Exhibit E.

97.    Both the 2019 Note Purchase Agreement and 2022 Note Purchase Agreement contain several provisions that are relevant to this action. Because the provisions are largely similar, for ease of reference, this Complaint refers to the "Note Purchase Agreement," which is the 2019 Note Purchase Agreement.

98.    *First*, Section 5.7 of the Note Purchase Agreement required that GWA only utilize the proceeds of the Notes for specific purposes. Specifically, Section 5.7 of the Note Purchase Agreement provides that GWA was to "apply the proceeds of the sale of the Notes . . . to invest in [OGI Associates, LLC ("OGI")] . . . ." (Ex. A § 5.7). GWA also agreed that it would not withdraw any of the proceeds obtained from the sale of the Notes from OGI, "[e]xcept to (i) fund [GWA]'s operating expenses that are incurred in the Ordinary Course of Business, (ii) make capital investments on terms and conditions reasonably satisfactory to [JSI], (iii) repurchase the Notes pursuant to their terms or (iv) fund an Authorized Partner Withdrawal, subject to the condition that [GWA] provide [JSI] with 5 Business Days' prior notice written notice of any such Authorized Partner Withdrawal for so long as the Notes are outstanding." (*Id.*).

99.    "Ordinary Course of Business" is defined in the Note Purchase Agreement by reference to a Strategic Relationship Agreement dated as of May 1, 2018, which is discussed below. (*Id.* at A-4). Under that agreement, "Ordinary Course of Business" is defined as "the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency)."

100.    *Second*, the Note Purchase Agreement contains redemption provisions. Section 7.2 of the Note Purchase Agreement provides JSI (and GWA) with "the right to redeem each Note, in whole but not in part, on each applicable Optional Redemption Date," which is defined as "the last calendar day of each month, beginning the third anniversary of the" relevant closing, "by at least 10 calendar days' prior written notice to the other party prior to the applicable Optional Redemption Date . . . ." (*Id.* § 7.2). Upon exercise of the option to redeem the Notes, the amounts due under the Notes "become due and payable on the applicable Optional Redemption Date. . . ." (*Id.* § 7.4). The "Optional Redemption Date" is defined to be the last

11

calendar day of each month beginning on the third anniversary of the December 2019 and the

January 2020 Note issuances. (*Id.* at A-4). Or, in other words, JSI had the right to redeem the

Notes at its option beginning in December 2022 and January 2023, respectively.[1]

101.    Separately, Section 7.3 of the Note Purchase Agreement provides JSI with the

right to redeem the Notes if GWA's members' equity in GWA dropped to less than $10 million

(a "Trigger Redemption").

102.    *Third*, the Note Purchase Agreement sets forth specific "Events of Default" which

included, *inter alia*, GWA's failure to pay the amounts due at redemption (*id.* § 9(a)).

103.    If an Event of Default occurs under the Note Purchase Agreement, "the Notes . . .

automatically become immediately due and payable," and "any holder of the Notes may at any

time at its option, by notice to the Company, declare the Notes to be immediately due and

payable." (*Id.* § 10.1).

104.    *Fourth*, the Note Purchase Agreement provides that JSI shall be entitled to

recover "all costs and expenses of such holder incurred in any enforcement or collection . . . ,

including reasonable attorneys' fees, expenses and disbursements." (*Id.* §§ 10.3, 13.1).

II.    **GWA Enters Into the Strategic Relationship Agreement**

105.    Separate and apart from the loans made by JSI to GWA, on or about May 1, 2018,

LAM Holding LLC, the predecessor to LAM Holdings, and GWA entered into a Strategic

Relationship Agreement.

---

[1]    The 2022 Note Purchase Agreement defines "Optional Redemption Date" as "monthly,
on the last calendar day of each month." Accordingly, JSI had the right to redeem that Note,
monthly, at its discretion.

106. Under the Strategic Relationship Agreement, Leucadia Funding LLC, a predecessor of LAM Holdings, opened an investment account to be managed by WMSA. In return, GWA agreed to a two-tiered mechanism for revenue and profit-sharing.

107. *First*, within 30 days of April 30, 2019, GWA was required to share a portion of the profits that it, or its subsidiaries, recognized between May 1, 2018 and April 30, 2019 (the "Profit Share Period").

108. *Second,* upon the expiration of the Profit Share Period, GWA agreed to share—on a quarterly basis—a portion of the revenues that it, or its subsidiaries, generated.

109. In addition, under Section 5(b) of the Strategic Relationship Agreement, GWA agreed to "indemnify and hold harmless LAM and each of its Affiliates and their respective directors, officers, employees, agents and representatives . . . to the fullest extent permitted by law from and against any and all costs, losses, Claims, Taxes incurred, damages, liabilities and expenses, including reasonable costs of investigation and defense, and reasonable attorneys' fees and expenses . . . incurred by the Indemnified Party as a result of, in connection with, or related to this Agreement . . . ."

III. **GWA and Defendant George Weiss Improperly Utilizes the Proceeds of the Notes**

110. Upon information and belief, GWA and its Chief Executive Officer, Defendant George Weiss, have improperly utilized the proceeds of the Notes to cover personal expenses.

111. As noted above, Section 5.7 of the Note Purchase Agreement required GWA to "apply the proceeds of the sale of the Notes . . . to invest in OGI," subject to a right of withdrawal for very limited purposes.

112. In what appear to constitute several breaches of Section 5.7 of the Note Purchase Agreement, GWA has withdrawn more than $50 million from OGI. To the best of Plaintiffs'

understanding, GWA did not utilize these funds, which included the cash proceeds of JSI's purchase of the Notes, exclusively to fund the categories of expenses authorized by Section 5.7 of the Note Purchase Agreement. Instead, many of these withdrawals were made to fund Defendant George Weiss's personal expenses or to otherwise enrich the George Weiss Companies and its employees. For example, the George Weiss Companies' financial statements indicate that between 2020 and 2022, the George Weiss Companies spent more than $5.7 million dollars funding a private aircraft. Upon information and belief, Defendant George Weiss, and possibly other executives of the George Weiss Companies, utilized this aircraft for personal travel. In addition, upon information and belief, Defendant George Weiss has also used monies extracted from OGI to fund litigation expenses in a lawsuit that he commenced against the Commissioner of the United States Internal Revenue Service.

113. Plaintiffs repeatedly questioned the George Weiss Companies' and George Weiss's improper use of these funds to pay for impermissible personal expenses. In response, the George Weiss Companies and Defendant George Weiss assured Plaintiffs that the use of these funds for improper purposes would cease. Yet, despite these promises, the improper expenditures continued. While Plaintiffs do not know the total amount of funds that have been improperly transferred to Defendant George Weiss for his personal benefit, upon information and belief the improper expenditures total tens of millions of dollars.

IV.    **The George Weiss Companies Default Under the Agreements**

114.    In late 2021, the value of GWA's members' equity fell to below $10 million, which constituted an Event of Default and authorized JSI to redeem the Notes. Instead of exercising its rights to redeem the Notes, and as a purely good faith accommodation to Defendant George Weiss and the George Weiss Companies, JSI entered into a forbearance agreement.

115.    As consideration for entering into the forbearance agreement, GWA also entered into an amendment to the Strategic Relationship Agreement. In that amendment, GWA agreed to abide by a "Deferral Condition," which required GWA to implement and maintain a compensation plan with cash deferral and equity grants. Upon information and belief, GWA failed to maintain and consistently abide by the compensation plan that it implemented.

116.    By September 1, 2022, it became apparent that GWA's members would not be able to secure the capital required to cure the default under the Notes. Nevertheless, JSI again accommodated Defendant George Weiss and the George Weiss Companies, and entered into an additional forbearance agreement with GWA, pursuant to which it agreed to not exercise its Trigger Redemption right until July 1, 2023.

117.    Having failed to cure its default by July 1, 2023, however, GWA remained in breach of the Note Purchase Agreement. Once again, JSI accommodated Defendant George Weiss and the George Weiss Companies and entered into a forbearance agreement. This third forbearance agreement provided that JSI would not exercise its Trigger Redemption right until September 1, 2024.

118.    In each of the forbearance agreements, JSI left open its ability to exercise its option to redeem the Notes pursuant to Section 7.2 of the Note Purchase Agreement.

119.    Plaintiffs also entered into multiple amendments to the Strategic Relationship Agreement, which deferred GWA's obligation to make payments so long as it abided by the "Deferral Condition."

## V.    GWA Fails to Repay the Amounts Due Under the Notes

120.    On or about December 21, 2023, JSI exercised its option to redeem the full amounts owed under the Notes.

121.    Pursuant to the Note Purchase Agreements, the full amount owed under the Notes, $54,223,110.00, became due and owing on December 31, 2023. To date, GWA has failed to pay the full amount that it owes under the Notes.

122.    That failure constituted a separate Event of Default in breach of GWA's obligations under the Notes.  Because of the numerous Events of Default, JSI is also entitled to default interest, totaling $913,604.62 as of February 15, 2024.

123.    On February 15, 2024, GWA repaid $3 million that it owed under the Notes.

124.    However, at least $49,554,837.16 remains outstanding under the Notes as of the date of this filing.

## VI.    The George Weiss Companies Fraudulently Transfer Nearly $30 Million to Insiders

125.    The George Weiss Companies have long been insolvent, as is recognized by their own internal documents.

126.    One such document indicates that, by the end of year 2021, the George Weiss Companies had a total net equity value of *negative* $15.9 million dollars. Similarly, the George Weiss Companies' financial statements for the fiscal year ending December 31, 2022 indicate that the George Weiss Companies had a total net equity value of *negative* $63.8 million dollars.

127.    Over the years, the George Weiss Companies' insolvency has worsened.  A preliminary financial statement prepared by the George Weiss Companies states that as of December 31, 2023, the George Weiss Companies had a total adjusted equity value of *negative* $110.8 million dollars.  Moreover, the George Weiss Companies' most recent cash flow projections reflect that, as of February 1, 2024, they had only $39.8 million in cash on hand.

128.    In light of the George Weiss Companies' insolvency, Plaintiffs repeatedly asked Defendants George Weiss, ███████████, and Jeffrey Dillabough, as well as other representatives of the George Weiss Companies, for assurances that the George Weiss Companies would not make unnecessary payments, or otherwise prioritize the payment of other creditors above the debts owed to Plaintiffs.

129.    Plaintiffs received information indicating that the George Weiss Companies intended to pay, at the end of February 2024, more than $30 million, comprised of $2.7 million in "management fees," $8 million in staff and management "bonuses," and $19.6 million in "strategy payouts," notwithstanding that the George Weiss Companies:  (i) owed JSI approximately $54.5 million under the Notes; and (ii) were hopelessly insolvent.

130.    In response to Plaintiffs' concerns, Defendants George Weiss and ████████ ███████ repeatedly assured Plaintiffs that the George Weiss Companies would not make those payments so long as Plaintiffs agreed not to take immediate action to enforce their rights.  Those assurances were false when made.

131.    Based upon the representations made by George Weiss and ████████████ that the George Weiss Companies would not make those payments, on February 2, 2024, Plaintiffs sent the George Weiss Companies a draft forbearance agreement.

132.    In response, Defendant Jeffrey Dillabough sent an email to JSI assuring that George Weiss Companies were "operating the business in the normal course."

133.    Contrary to the representations of Defendants George Weiss, ███████, and Jeffrey Dillabough, the George Weiss Companies were not operating in the "normal course." Instead, the George Weiss Companies were liquidating assets under their control so that they could then fund the excessive and unnecessary bonus payments that Defendants George Weiss, ███████, and Jeffrey Dillabough had promised not to make.

134.    Contrary to the representations of Defendants George Weiss, ███████, and Jeffrey Dillabough, on February 8, 2024, the George Weiss Companies issued nearly $30 million in bonus payments (the "Payouts") ahead of schedule and without any notice to or discussion with Plaintiffs, and in complete disregard of their representations and contractual obligations to Plaintiffs.

135.    On February 11, 2024, Defendant ███████ admitted to Plaintiffs that the George Weiss Companies had made the Payouts.

136.    Plaintiffs have since discovered that not only were the representations of Defendants George Weiss, ███████, and Jeffrey Dillabough false, but that they themselves pocketed at least $1.05 million in Payouts.

137.    As set forth immediately below, Defendants ███████ and Jeffrey Dillabough, as well as the other Insiders of the George Weiss Companies, received millions of dollars in Payouts on February 8, 2024.

| Insider | Payout |
|---|---|
| ███████ | ███████ |
| Jeffrey Dillabough | $550,000 |

138.    At least some of these Payouts were inconsistent with the George Weiss Companies' deferred cash compensation plan and, in turn, represent a failure to maintain said plan. Accordingly, all amounts owed under the Strategic Relationship became immediately due and payable within five business days.

139.    The George Weiss Companies' own internal documents demonstrate that, under the revenue sharing provisions of the Strategic Relationship Agreement, GWA owes LAM Holdings $60,067,854.00 of revenue sharing fees.

140.    GWA has failed to pay the amounts that it owes to LAM Holdings under the Strategic Relationship Agreement.

## FIRST CAUSE OF ACTION
### (Breach of the Note Purchase Agreement as to GWA and WMSA)

141.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

142.    JSI, GWA, and WMSA formed valid contracts, specifically, the Note Purchase Agreements dated December 3, 2019, and September 21, 2022.

143.   JSI performed its obligations under the Note Purchase Agreements by purchasing the Notes.

144.   GWA and WMSA breached the Note Purchase Agreement by:  (i) withdrawing funds from OGI to fund expenses not authorized by Section 5.7 of the Note Purchase Agreement, including to pay bonuses to the Insiders; and (ii) failing to repay JSI the amounts due and owing under the Notes.

145.   JSI has been harmed by GWA's and WMSA's wrongful withdrawal of funds from OGI because, by using the funds for purposes other than those permitted by the Note Purchase Agreement, GWA and WMSA have depleted funds which could be used to satisfy GWA's obligations under the Note Purchase Agreements.

146.   JSI has been further harmed by GWA's failure to pay the at least $49,554,837.16 that it is owed under the Notes.

## SECOND CAUSE OF ACTION
### (Breach of the Strategic Relationship Agreement as to GWA)

147.   Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

148.   LAM Holdings and GWA formed a valid contract, specifically, the Strategic Relationship Agreement, on or about May 1, 2018.

149.   LAM Holdings performed its obligations under the Strategic Relationship Agreement.

150.   GWA breached the Strategic Relationship Agreement by failing to pay LAM Holdings the portions of profit and revenue required by the Strategic Relationship Agreement, causing LAM Holdings damages in the amount of $60,067,854.00.

### THIRD CAUSE OF ACTION
#### (Voidable Transfer Under § 273 of the Uniform
#### Voidable Transactions Act Against the Insiders)

151.   Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

152.   The George Weiss Companies transferred funds to Defendant George Weiss, which he then utilized to pay personal expenses, including to fund private aircraft expenses and to fund personal litigation with the United States Internal Revenue Service.

153.   The George Weiss Companies transferred the Payouts to the Insiders on February 8, 2024.

154.   These transfers, including the Payouts, were made with the actual intent to hinder, delay, or defraud Plaintiffs and their ability to collect the more than $100 million that they are owed, as evidenced by the facts that:  (i) the payments were made to the George Weiss Companies' executives, employees, and other affiliates, including Defendants George Weiss, ███████████, and Jeffrey Dillabough; (ii) the payments were actively concealed from Plaintiffs by, *inter alia*, Defendants George Weiss, ███████████, and Jeffrey Dillabough, who assured Plaintiffs that the payments would not be made; (iii)  the Payouts were not made in the normal course of the George Weiss Companies' business, but instead were made earlier than bonus payments typically would have been made; (iv) the payments involved nearly all of the George Weiss Companies' available cash on hand; and (v) the payments were made while George Weiss Companies were insolvent.

155.   Accordingly, the Court may avoid all of these payments, including the Payouts, that were made to the Insiders.

## FOURTH CAUSE OF ACTION
### (Voidable Transfer Under § 274 of the Uniform
### Voidable Transactions Act Against the Insiders)

156.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

157.    The George Weiss Companies transferred funds to Defendant George Weiss, which he then utilized to pay personal expenses, including to fund private aircraft expenses and to fund personal litigation with the United States Internal Revenue Service.

158.    The George Weiss Companies transferred the Payouts to the Insiders on February 8, 2024.

159.    These transfers, including the Payouts, were made to the Insiders who are all executives or employees of the George Weiss Companies.

160.    The transfers, including the Payouts, were made to the Insiders while the George Weiss Companies were insolvent.

161.    The Insiders had reasonable cause to believe that the George Weiss Companies were insolvent, as they are all members of the George Weiss Companies' executive leadership team, high level portfolio managers or senior analysts who are regularly apprised of the George Weiss Companies' financial situation by the George Weiss Companies' executive leadership team, and/or employees that are aware of the George Weiss Companies' obligations to the Plaintiffs.

### DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against defendants as follows:

(a)    On the First Cause of Action, a judgment in JSI's favor and against GWA and WMSA for money damages in an amount to be determined at trial, but believed to be not less than $49,554,837.16, representing the outstanding principal and interest owed to JSI under the Notes;

(b)    On the Second Cause of Action, a judgment in LAM Holdings' favor and against GWA for money damages in an amount to be determined at trial, but believed to be not less than $60,067,854.00, representing all outstanding principal and interest owed to LAM Holdings under the Strategic Relationship Agreement as of December 31, 2023;

(c)    On the Third and Fourth Causes of Action, a judgment in Plaintiffs' favor and against the George Weiss Companies' Insiders voiding the voidable transfers set forth above, including the Payouts, and requiring the Insiders to return the Payouts or any of the proceeds thereof;

(d)    An award of attorneys' fees incurred by Plaintiffs in connection with this action pursuant to Sections 10.3 and 13.1 of the Note Purchase Agreement and Section 5(b) of the Strategic Relationship Agreement; and

(e)    Awarding Plaintiffs such other, further, and different relief as this Court may deem just and proper.

Dated:   New York, New York  
       February    , 2024

Respectfully submitted,

HERBERT SMITH FREEHILLS  
  NEW YORK LLP  
By: /s/ *DRAFT*  
    Scott S. Balber  
    Michael P. Jones  
    Daniel Gomez  
450 Lexington Avenue  
New York, New York 10017  
Telephone:  (917) 542-7600  
Facsimile:   (917) 542-7601  
Email:       Scott.Balber@hsf.com  
             Michael.Jones@hsf.com  
             Daniel.Gomez@hsf.com

*Attorneys for Plaintiffs*  
*Jefferies Strategic Investments, LLC and*  
*Leucadia Asset Management Holdings LLC*

**To:** George Weiss[George@gweiss.com]
**From:** Tracy Klestadt[TKlestadt@klestadt.com]
**Sent:** Wed 3/27/2024 2:05:13 PM (UTC)
**Subject:** FW: Weiss

2024.03.26 - DRAFT - JSI and LAM v. Weiss - Complaint.pdf

---

**From:** Balber, Scott <Scott.Balber@hsf.com>
**Sent:** Tuesday, March 26, 2024 5:28 PM
**To:** Tracy Klestadt <TKlestadt@klestadt.com>; John Jureller <JJureller@klestadt.com>
**Cc:** Grossi, Anthony R. <agrossi@sidley.com>; Form, David A. <dform@sidley.com>; Curtin, William E. <wcurtin@sidley.com>
**Subject:** RE: Weiss

Tracy –

Just giving you a heads up that we have been instructed to file the attached complaint.   Please let us know if there is anything your clients want to discuss.

Regards,

**Scott S. Balber**
Managing Partner
Herbert Smith Freehills New York LLP

T  +1 917 542 7810  M  +1 646 431 4622  F  +1 917 542 7601
www.herbertsmithfreehills.com

Herbert Smith Freehills New York LLP and Herbert Smith Freehills, an Australian Partnership, are separate member firms of the international legal practice known as Herbert Smith Freehills.

This message is confidential and may be covered by legal professional privilege. If you are not the intended recipient you must not disclose or use the information contained in it. If you have received this email in error please notify us immediately by return email or by calling our main switchboard on +1 917 542 7600 and delete the email.

Further information is available from www.herbertsmithfreehills.com, including our Privacy Policy which describes how we handle personal information.

Herbert Smith Freehills New York LLP is a limited liability partnership registered in England and Wales with registered number OC375072. Its registered office is at Exchange House, Primrose Street, London EC2A 2EG.

This message was not intended or written to be used, and it cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer under U.S. Federal tax law.

Some of this material may constitute attorney advertising within the meaning of sections 1200.1 and 1200.6-8 of Title 22 of the New York Codes, Rules and Regulatory Advertising Regulations. The following statement is made in accordance with those rules: ATTORNEY ADVERTISING: PRIOR RESULTS DO NOT GUARANTEE A SIMILAR OUTCOME.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

| | |
|---|---|
| JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS LLC, | Index No. _____ |
| Plaintiffs, | |
| -against- | **COMPLAINT** |
| GWA, LLC, WEISS MULTI-STRATEGY ADVISERS LLC, WEISS MULTI-STRATEGY FUNDS, LLC, OGI ASSOCIATES, LLC, WEISS SPECIAL OPERATIONS LLC, GEORGE WEISS, MICHAEL EDWARDS, and JEFFREY DILLABOUGH, | |
| Defendants. | |

Plaintiffs Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC ("LAM Holdings," and with JSI, "Plaintiffs"), by and through their undersigned counsel, allege against Defendants GWA, LLC ("GWA"), Weiss Multi-Strategy Advisers LLC ("WMSA"), Weiss Multi-Strategy Funds, LLC ("WMSF"), OGI Associates, LLC ("OGI"), Weiss Special Operations LLC ("WSPO," with GWA, WMSA, WMSF and OGI and any of their wholly owned or controlled subsidiaries, the "George Weiss Companies"); as well as George Weiss, Michael Edwards, and Jeffrey Dillabough (the "Insiders") as follows:

## PRELIMINARY STATEMENT

1.      This case arises from Defendant George Weiss's improper use of a web of companies bearing his own name to personally enrich himself and his close cronies at the Plaintiffs' expense.  Indeed, the George Weiss Companies' own records unequivocally acknowledge that they owe Plaintiffs nearly $100 million.  Those same records also confirm that the George Weiss Companies are insolvent and unable to pay the monies that they owe.  Yet,

1

despite these indisputable facts, Defendant George Weiss has used the George Weiss Companies as a personal piggy bank, diverting company funds (which should have been used to pay the amounts owed to Plaintiffs) to pay for private air travel and personal litigation matters, and to line the pockets of the members of his inner circle.

2.     Notwithstanding the George Weiss Companies' dire financial circumstances and Defendant George Weiss's extraordinary bad faith, Plaintiffs have repeatedly attempted to work with Defendant George Weiss and the George Weiss Companies to address the outstanding indebtedness and to forebear on their right to take action to recover the amounts they were owed. Indeed, the George Weiss Companies have repeatedly confirmed that Plaintiffs have acted appropriately in their dealings.

3.     Defendant George Weiss and the George Weiss Companies, however, have routinely abused Plaintiffs' good faith.  In order to induce Plaintiffs to forebear on their rights to collect nearly $100 million, Defendants Michael Edwards and Jeffrey Dillabough expressly and repeatedly represented to Plaintiffs that the George Weiss Companies were, and would continue, operating the business in the "normal course," and represented that they would implement a compensation plan "with cash deferral."  These representations were false.  Far from acting in the "normal course," the George Weiss Companies—at Defendant George Weiss's direction— liquidated nearly all of their available assets and then, on February 8, 2024, distributed nearly all of their cash in the form of "bonus" payments and "incentive" compensation to its executives, employees, and other insiders, including $1.05 million to Defendants Michael Edwards and Jeffrey Dillabough, the very individuals who had been making assurances to Plaintiffs.  The George Weiss Companies were left with nearly no funds to satisfy the debts they owe to Plaintiffs.

4.      Accordingly, Plaintiffs bring this action to: (i) collect damages from the George Weiss Companies and the Insiders for their breaches of contract and fraudulent conduct; and (ii) void the fraudulent transfers of the George Weiss Companies' assets to the Insiders.

**PARTIES**

5.      JSI is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 520 Madison Avenue, New York, New York, 10022.

6.      LAM Holdings is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 520 Madison Avenue, New York, New York, 10022.

7.      On information and belief, GWA is a limited liability company organized and existing under the laws of Connecticut with its principal place of business located at 400 Capital Blvd, Rocky Hill, Connecticut, 06067.

8.      On information and belief, WMSA is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 320 Park Avenue, 20th Floor, New York, New York, 10022.

9.      On information and belief, WMSF is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 320 Park Avenue, 20th Floor, New York, New York, 10022.

10.     On information and belief, OGI is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 320 Park Avenue, 20th Floor, New York, New York, 10022.

11.     On information and belief, WSPO is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 320 Park Avenue, 20th Floor, New York, New York, 10022.

12.     On information and belief, George Weiss is the founder and Chief Executive Officer of the George Weiss Companies.

13.     On information and belief, Michael Edwards is the Deputy Chief Investment Officer of the George Weiss Companies.

14.     On information and belief, Jeffrey Dillabough is the General Counsel of WMSA and the General Counsel and a Partner at GWA.

## JURISDICTION AND VENUE

15.     This Court may exercise personal jurisdiction over GWA pursuant to C.P.L.R. § 302(a)(1) because GWA transacted business within the State of New York by entering into the Note Purchase Agreement (defined below) with JSI, a limited liability company with a principal place of business in New York.  Under Section 17.6 of the Note Purchase Agreement, GWA "irrevocably submit[ed] to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan, the City of New York, over any suit, action or proceeding arising out of or relating to this Agreement or a Note."

16.     This Court may exercise personal jurisdiction over WMSA pursuant to C.P.L.R. § 301 because it maintains its principal place of business in the State of New York. WMSA also consented to this Court's exercise of personal jurisdiction over WMSA under § 17.6 of the Note Purchase Agreement.

17.     This Court may exercise personal jurisdiction over WMSF, OGI, WSPO, and George Weiss pursuant to C.P.L.R. § 302(a)(1) because each of them transacted business within the State of New York by entering into a February Forbearance Agreement (defined below) with

4

JSI and LAM Holdings, limited liability companies with their principal places of business in New York.  Under Section 10(h) of the February Forbearance Agreement, WMSF, OGI, WSPO, and George Weiss agreed that "any dispute arising out of this Agreement shall be subject to the exclusive jurisdiction of the New York courts and irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in (i) any state court in the State of New York or (ii) any federal court in the State of New York, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum."

18.    This Court may exercise personal jurisdiction over the Insiders pursuant to:  (i) C.P.L.R. 301 because they are either residents of New York or, through their employment with WMSA, WMSF, OGI, and WSPO (which are headquartered in and operate from New York), they continuously and systematically do business in New York; and/or (ii) C.P.L.R. 302(a)(3)(iii) because to the extent any Insider is not a resident of New York, they:  (a) committed a "tortious act without the state causing injury to person or property within the state" by receiving fraudulent conveyances from the George Weiss Companies which frustrate Plaintiffs' ability to collect on any judgment that they may obtain against the George Weiss Companies in New York; (b) expect or should reasonably expect that their receipt of the fraudulent conveyances would have consequences in New York, where Plaintiffs are headquartered; and (c) derive substantial revenue from interstate commerce.

19.    Venue is proper pursuant to C.P.L.R. § 302(a) because: (i) Plaintiffs are limited liability companies that reside in New York County; and (ii) a substantial part of the events

giving rise to Plaintiffs' claims, including the George Weiss Companies' execution of the Note

Purchase Agreements and the Strategic Relationship Agreement occurred in New York.

**FACTS**

I.      **GWA Executes the Note Purchase Agreements and Receives $53 Million in Loans**

20.     On or about December 3, 2019, JFG Funding LLC entered into a Note Purchase

Agreement with GWA and WMSA (the "2019 Note Purchase Agreement").  A true and correct

copy of the 2019 Note Purchase Agreement is attached to this Complaint as Exhibit A.

21.     Pursuant to Section 2 of the 2019 Note Purchase Agreement, GWA issued $50

million in notes (each a "Note"):  (i) a $31,250,000.00 Note issued on December 3, 2019; and (ii)

a $18,750,000.00 Note issued on January 13, 2020.  (*See id.* § 3).  True and correct copies of the

Notes are attached to this Complaint as Exhibits B and C, respectively.

22.     In exchange for the Note, JFG Funding LLC provided GWA with

$50,000,000.00.

23.     JFG Funding LLC subsequently assigned its interest in the 2019 Note Purchase

Agreement and the Notes to JSI, which was acknowledged by GWA.

24.     Separately, on September 21, 2022, GWA and JSI entered into an additional Note

Purchase Agreement (the "2022 Note Purchase Agreement").  A true and correct copy of the

2022 Note Purchase Agreement is attached to this Complaint as Exhibit D.  That same day, and

pursuant to the 2022 Note Purchase Agreement, GWA issued and delivered to JSI a Note in the

principal amount of $3,000,000.00.  A true and correct copy of the that Note is attached to this

Complaint as Exhibit E.

25.     Both the 2019 Note Purchase Agreement and 2022 Note Purchase Agreement

contain several provisions that are relevant to this action.  Because the provisions are largely

6

similar, for ease of reference, this Complaint refers to the "Note Purchase Agreement," which is the 2019 Note Purchase Agreement.

26.    *First*, Section 5.7 of the Note Purchase Agreement required that GWA only utilize the proceeds of the Notes for specific purposes.  Specifically, Section 5.7 of the Note Purchase Agreement provides that GWA was to "apply the proceeds of the sale of the Notes . . . to invest in [OGI Associates, LLC ("OGI")] . . . ."  (Ex. A § 5.7).  GWA also agreed that it would not withdraw any of the proceeds obtained from the sale of the Notes from OGI, "[e]xcept to (i) fund [GWA]'s operating expenses that are incurred in the Ordinary Course of Business, (ii) make capital investments on terms and conditions reasonably satisfactory to [JSI], (iii) repurchase the Notes pursuant to their terms or (iv) fund an Authorized Partner Withdrawal, subject to the condition that [GWA] provide [JSI] with 5 Business Days' prior notice written notice of any such Authorized Partner Withdrawal for so long as the Notes are outstanding."  (*Id.*).

27.    "Ordinary Course of Business" is defined in the Note Purchase Agreement by reference to a Strategic Relationship Agreement dated as of May 1, 2018, which is discussed below.  (*Id.* at A-4).  Under that agreement, "Ordinary Course of Business" is defined as "the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency)."

28.    *Second*, the Note Purchase Agreement contains redemption provisions.  Section 7.2 of the Note Purchase Agreement provides JSI (and GWA) with "the right to redeem each Note, in whole but not in part, on each applicable Optional Redemption Date," which is defined as "the last calendar day of each month, beginning the third anniversary of the" relevant closing, "by at least 10 calendar days' prior written notice to the other party prior to the applicable Optional Redemption Date . . . ."  (*Id.* § 7.2).  Upon exercise of the option to redeem the Notes,

the amounts due under the Notes "become due and payable on the applicable Optional Redemption Date. . . ." (*Id.* § 7.4). The "Optional Redemption Date" is defined to be the last calendar day of each month beginning on the third anniversary of the December 2019 and the January 2020 Note issuances. (*Id.* at A-4). Or, in other words, JSI had the right to redeem the Notes at its option beginning in December 2022 and January 2023, respectively. [1]

29.    Separately, Section 7.3 of the Note Purchase Agreement provides JSI with the right to redeem the Notes if GWA's members' equity in GWA dropped to less than $10 million (a "Trigger Redemption").

30.    *Third*, the Note Purchase Agreement sets forth specific "Events of Default" which included, *inter alia*, GWA's failure to pay the amounts due at redemption (*id.* § 9(a)).

31.    If an Event of Default occurs under the Note Purchase Agreement, "the Notes . . . automatically become immediately due and payable," and "any holder of the Notes may at any time at its option, by notice to the Company, declare the Notes to be immediately due and payable." (*Id.* § 10.1).

32.    *Fourth*, the Note Purchase Agreement provides that JSI shall be entitled to recover "all costs and expenses of such holder incurred in any enforcement or collection . . . , including reasonable attorneys' fees, expenses and disbursements." (*Id.* §§ 10.3, 13.1).

## II.    GWA Enters into the Strategic Relationship Agreement

33.    Separate and apart from the loans made by JSI to GWA, on or about May 1, 2018, LAM Holding LLC, the predecessor to LAM Holdings, and GWA entered into a Strategic Relationship Agreement.

---

[1]    The 2022 Note Purchase Agreement defines "Optional Redemption Date" as "monthly, on the last calendar day of each month." Accordingly, JSI had the right to redeem that Note, monthly, at its discretion.

34.    Under the Strategic Relationship Agreement, Leucadia Funding LLC, a predecessor of LAM Holdings, opened an investment account to be managed by WMSA.  In return, GWA agreed to a two-tiered mechanism for revenue and profit-sharing.

35.    *First*, within 30 days of April 30, 2019, GWA was required to share a portion of the profits that it, or its subsidiaries, recognized between May 1, 2018 and April 30, 2019 (the "Profit Share Period").

36.    *Second,* upon the expiration of the Profit Share Period, GWA agreed to share—on a quarterly basis—a portion of the revenues that it, or its subsidiaries, generated.

37.    In addition, under Section 5(b) of the Strategic Relationship Agreement, GWA agreed to "indemnify and hold harmless LAM and each of its Affiliates and their respective directors, officers, employees, agents and representatives . . . to the fullest extent permitted by law from and against any and all costs, losses, Claims, Taxes incurred, damages, liabilities and expenses, including reasonable costs of investigation and defense, and reasonable attorneys' fees and expenses . . . incurred by the Indemnified Party as a result of, in connection with, or related to this Agreement . . . ."

**III.    GWA and Defendant George Weiss Improperly Utilize the Proceeds of the Notes**

38.    Defendant George Weiss has dominated the George Weiss Companies and abused the privilege of doing business in the corporate form to perpetuate a fraud against Jefferies and LAM Holdings.

39.    For example, Section 5.7 of the Note Purchase Agreement required GWA to "apply the proceeds of the sale of the Notes . . . to invest in OGI," subject to a right of withdrawal for very limited purposes.

40.    In what appear to constitute several egregious breaches of Section 5.7 of the Note

Purchase Agreement, GWA has withdrawn more than $50 million from OGI.  To the best of

Plaintiffs' understanding, GWA did not utilize these funds, which included the cash proceeds of

JSI's purchase of the Notes, exclusively to fund the categories of expenses authorized by Section

5.7 of the Note Purchase Agreement.  Instead, many of these withdrawals were made to fund

Defendant George Weiss's personal expenses or to otherwise improperly enrich the George

Weiss Companies and its employees.  For example, the George Weiss Companies' financial

statements indicate that between 2020 and 2023, the George Weiss Companies spent more than

$7.3 million dollars on "transportation expenses" which, upon information and belief, were

largely attributed to funding private air travel.  The George Weiss Companies owned and

operated a Dassault Falcon private aircraft through a subsidiary company, Weiss Special

Operations LLC.  Upon information and belief, Defendant George Weiss, and possibly other

executives of the George Weiss Companies, utilized this aircraft for personal travel.  In addition,

upon information and belief, Defendant George Weiss has also used, or directed the use of,

monies extracted from OGI to fund litigation expenses in a personal lawsuit that he commenced

against the Commissioner of the United States Internal Revenue Service.  The George Weiss

Companies financial statements indicate that between 2020 and 2023, more than $31.4 million

dollars was spent on "consultation and professional fees," a significant portion of which, upon

knowledge and belief, were attributable to the personal lawsuit.

      41.    Plaintiffs repeatedly questioned the George Weiss Companies' and George

Weiss's improper use of these funds to pay for impermissible personal expenses.  In response,

the George Weiss Companies and Defendant George Weiss assured Plaintiffs that the use of

these funds for improper purposes would cease.  Yet, despite these promises, the improper

expenditures continued.  Indeed, the George Weiss Companies intentionally delayed selling the

private aircraft, both increasing the costs associated with the plane and decreasing the value and usable life of the asset prior to the ultimate sale.  While Plaintiffs do not know the total amount of funds that have been improperly transferred to or on behalf of Defendant George Weiss for his personal benefit, upon information and belief, the improper expenditures total tens of millions of dollars.

### IV.    The George Weiss Companies Default Under the Agreements

42.    In late 2021, the value of GWA's members' equity fell to below $10 million, which constituted an Event of Default and authorized JSI to redeem the Notes.  Instead of exercising its rights to redeem the Notes, and as a purely good faith accommodation to Defendant George Weiss and the George Weiss Companies, JSI entered into a forbearance agreement.

43.    As consideration for entering into the forbearance agreement, GWA also entered into an amendment to the Strategic Relationship Agreement. In that amendment, GWA agreed to abide by a "Deferral Condition," which required GWA to implement and maintain a compensation plan with cash deferral and equity grants. Upon information and belief, GWA failed to maintain and consistently abide by the compensation plan that it implemented.

44.    By September 1, 2022, it became apparent that GWA's members would not be able to secure the capital required to cure the default under the Notes.  Nevertheless, JSI again accommodated Defendant George Weiss and the George Weiss Companies, and entered into an additional forbearance agreement with GWA, pursuant to which it agreed to not exercise its Trigger Redemption right until July 1, 2023.

45.    Having failed to cure its default by July 1, 2023, however, GWA remained in breach of the Note Purchase Agreement.  Once again, JSI accommodated Defendant George

Weiss and the George Weiss Companies and entered into a forbearance agreement. This third forbearance agreement provided that JSI would not exercise its Trigger Redemption right until September 1, 2024.

46.    In each of the forbearance agreements, JSI left open its ability to exercise its option to redeem the Notes pursuant to Section 7.2 of the Note Purchase Agreement.

47.    Plaintiffs also entered into multiple amendments to the Strategic Relationship Agreement, which deferred GWA's obligation to make payments as long as it abided by the "Deferral Condition."

**V.    GWA Fails to Repay the Amounts Due Under the Notes**

48.    On or about December 21, 2023, JSI exercised its option to redeem the full amounts owed under the Notes.

49.    Pursuant to the Note Purchase Agreements, the full amount owed under the Notes, $54,223,111.00, became due and owing on December 31, 2023. To date, GWA has failed to pay the full amount that it owes under the Notes.

50.    That failure constituted a separate Event of Default in breach of GWA's obligations under the Notes. Because of the numerous Events of Default, JSI is also entitled to default interest, totaling [$1,191,329.00 as of February 29, 2024].

51.    On February 15, 2024, GWA repaid $3 million that it owed under the Notes.

52.    However, at least $49,832,562.00 remains outstanding under the Notes as of the date of this filing.

**VI.    The George Weiss Companies Transfer More than $1 Million to the Insiders**

53.    The George Weiss Companies have long been insolvent, as is recognized by their own internal documents.

54.    One such document indicates that, by the end of year 2021, the George Weiss Companies had a total net equity value of ***negative*** $15.9 million dollars.  Similarly, the George Weiss Companies' financial statements for the fiscal year ending December 31, 2022 indicate that the George Weiss Companies had a total net equity value of ***negative*** $63.8 million dollars.

55.    Over the years, the George Weiss Companies' insolvency has worsened.  A preliminary financial statement prepared by the George Weiss Companies states that as of December 31, 2023, the George Weiss Companies had a total adjusted equity value of ***negative*** $110.8 million dollars.  Moreover, the George Weiss Companies' most recent cash flow projections reflect that, as of February 1, 2024, they had only $39.8 million in cash on hand.

56.    In light of the George Weiss Companies' insolvency, Plaintiffs repeatedly asked Defendants Michael Edwards and Jeffrey Dillabough, as well as other representatives of the George Weiss Companies, for assurances that the George Weiss Companies would not make unnecessary payments while insolvent, or otherwise prioritize the payment of other creditors above the debts owed to Plaintiffs.

57.    Plaintiffs received information indicating that the George Weiss Companies intended to pay, at the end of February 2024, more than $30 million, comprised of $2.7 million in "management fees," $8 million in staff and management "bonuses," and $19.6 million in "strategy payouts," notwithstanding that the George Weiss Companies:  (i) owed JSI approximately $54.5 million under the Notes; and (ii) were hopelessly insolvent.

58.    In response to Plaintiffs' concerns, Defendant Michael Edwards repeatedly represented to Plaintiffs that the George Weiss Companies would not make those payments until the end of February 2024, so long as Plaintiffs agreed not to take immediate action to enforce their rights.  Those assurances were false when made.

59.     Based upon the representations made by Defendant Michael Edwards that the George Weiss Companies would not make those payments until late February 2024, on February 2, 2024, Plaintiffs sent the George Weiss Companies a draft forbearance agreement.

60.     The draft forbearance agreement prohibited the George Weiss Companies from paying, granting, or transferring bonus compensation to any of their employees.

61.     In response, Defendant Jeffrey Dillabough sent an email to JSI assuring that George Weiss Companies were "operating the business in the normal course."

62.     Contrary to the representations of Defendants Michael Edwards and Jeffrey Dillabough, the George Weiss Companies were not operating in the "normal course."  Instead, the George Weiss Companies were liquidating assets under their control so that they could then fund the excessive and unnecessary bonus payments that Defendants Michael Edwards and Jeffrey Dillabough had promised they would not make for several additional weeks.

63.     Contrary to the representations of Defendants Michael Edwards and Jeffrey Dillabough, on February 8, 2024, Defendant George Weiss caused the George Weiss Companies to issue nearly $30 million in bonus payments (the "Payouts") to 86 employees of the George Weiss Companies, all ahead of schedule and without any notice to or discussion with Plaintiffs, while the George Weiss Companies were insolvent, and in complete disregard of their representations and contractual obligations to Plaintiffs.

64.     Plaintiffs have since discovered that not only were the representations of Defendants Michael Edwards and Jeffrey Dillabough false, but that they themselves pocketed at least $1.05 million in Payouts.

65.     At least some of the Payouts were inconsistent with the George Weiss Companies' deferred cash compensation plan and, in turn, represent a failure to maintain said

14

plan.  Accordingly, all amounts owed under the Strategic Relationship became immediately due and payable within five business days.

66.    Under the revenue sharing provisions of the Strategic Relationship Agreement, GWA owes LAM Holdings $50,597,604.00 of revenue sharing fees.

67.    GWA has failed to pay the amounts that it owes to LAM Holdings under the Strategic Relationship Agreement.

**VII.    The George Weiss Companies and George Weiss
Enter into the February Forbearance Agreement**

68.    During the week of February 5, 2012, the George Weiss Companies admitted that they had made nearly $30 million in Payouts, notwithstanding their prior representations.

69.    Nonetheless, Defendant George Weiss again requested that Plaintiffs forbear exercising their rights.

70.    Accordingly, on February 12, 2024, the George Weiss Companies and Defendant George Weiss executed a further forbearance agreement (the "February Forbearance Agreement").  A true and correct copy of the February Forbearance Agreement is attached to this Complaint as Exhibit G.

71.    Pursuant to Section 2(c) of the February Forbearance Agreement, the George Weiss Companies and Defendant George Weiss agreed that "none of them will (i) pay, grant or transfer (directly or indirectly) to any other person or entity an aggregate amount in excess of $10,000 on any day, except for payments made in the course of normal course trading consistent with past practices (*e.g.*, payments to prime and executing brokers, payments against delivery and payments to ISDA counterparties) . . . ."

72.    Section 3(a) of the February Forbearance Agreement further provides that each of the George Weiss Companies "(other than GWA) . . . irrevocably and unconditionally guarantees

to each of JSI and LAM Holdings . . . and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other [the George Weiss Companies] when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations (as herein defined)."

73.     The Guaranteed Obligations included "all the obligations of GWA and each other [of the George Weiss Companies] arising under any Note Purchase Agreement, the Notes, the [Strategic Relationship] Agreement and this Agreement, and any loss, damage, penalty, action, judgment, suit, cost, expense, disbursement, liability, claim or other obligation, incurred by or behalf of [JSI and LAM Holdings] (including but not limited to reasonable out-of-pocket attorneys' fees and costs) arising out or, relating to or in connection with any Note Purchase Agreement, any Note, the [Strategic Relationship] Agreement, this Agreement or the transaction contemplated thereby."

74.     As further security for the George Weiss Companies' obligations, in Section 9 of the February Forbearance Agreement, Defendant George Weiss agreed "unconditionally and irrevocably" to "guarantee[] to [LAM Holdings, JSI, and their affiliates] the accuracy of the representations made by, and the performance of the agreements of, the [George Weiss Companies] hereunder," and "take all actions within his control, including by exercising all of his voting, governance, management and other rights and powers with respect to each of the other [George Weiss Companies], any of their subsidiaries and any of his personal or his family's trusts to cause such persons to comply with the terms of this Agreement."

### VIII.    The George Weiss Companies and George Weiss
### Immediately Breach the February Forbearance Agreement

75.     Despite the Plaintiffs' good faith effort to resolve the matter, Defendant George Weiss again abused Plaintiffs' goodwill, continuing to deplete the George Weiss Companies of its limited remaining assets.

76.     For example, on or about March 1, 2024, the George Weiss Companies made four payments, each worth more than $10,000.00 (for a total of nearly $500,000.00) without providing any notice to JSI.

77.     Upon information and belief, the George Weiss Companies made these payments at the direction of Defendant George Weiss.

78.     JSI did not approve those payments.

### FIRST CAUSE OF ACTION
**(Breach of the Note Purchase Agreements as to GWA and WMSA and Breach of Guarantee as to WMSF, OGI, and WSPO)**

79.     Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

80.     JSI, GWA, and WMSA formed valid contracts, specifically, the Note Purchase Agreements dated December 3, 2019, and September 21, 2022.

81.     Under the February Forbearance Agreement, each of WMSF, OGI, and WSPO guaranteed GWA's and WMSA's performance under the Note Purchase Agreements and Notes.

82.     JSI performed its obligations under the Note Purchase Agreements by purchasing the Notes.

83.     GWA and WMSA breached the Note Purchase Agreement by: (i) withdrawing funds from OGI to fund expenses not authorized by Section 5.7 of the Note Purchase Agreement,

including to pay bonuses to their Executive Committee and Senior Management; and (ii) failing to repay JSI the amounts due and owing under the Notes.

84.     None of WMSF, OGI, or WSPO have made any payment pursuant to the Guarantee in the February Forbearance Agreement.

85.     JSI has been harmed by GWA's and WMSA's wrongful withdrawal of funds from OGI because, by using the funds for purposes other than those permitted by the Note Purchase Agreement, GWA and WMSA have depleted funds which could be used to satisfy GWA's obligations under the Note Purchase Agreements.

86.     JSI has been further harmed by the George Weiss Companies' failure to pay the $49,832,562.00 that it is owed under the Notes.

**SECOND CAUSE OF ACTION**
**(Breach of the Strategic Relationship Agreement as to GWA and**
**Breach of Guarantee as to WMSA, WMSF, OGI, and WSPO)**

87.     Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

88.     LAM Holdings and GWA formed a valid contract, specifically, the Strategic Relationship Agreement, on or about May 1, 2018.

89.     Under the February Forbearance Agreement, each of WMSA, WMSF, OGI, and WSPO guaranteed GWA's performance under the Strategic Relationship Agreement.

90.     LAM Holdings performed its obligations under the Strategic Relationship Agreement.

91.     The George Weiss Companies breached the Strategic Relationship Agreement and the February Forbearance Agreement by failing to pay LAM Holdings the portions of profit and revenue required by the Strategic Relationship Agreement, causing LAM Holdings damages in the amount of $50,597,604.00.

18

### THIRD CAUSE OF ACTION
**(Voidable Transfer Under § 273 of the
Uniform Voidable Transactions Act Against the Insiders)**

92.     Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

93.     The George Weiss Companies transferred funds to or on behalf of Defendant George Weiss, which he then utilized to pay personal expenses, including to fund private aircraft expenses and to fund personal litigation with the United States Internal Revenue Service.

94.     The George Weiss Companies transferred $1.05 million of Payouts to Defendants Michael Edwards and Jeffrey Dillabough on February 8, 2024.

95.     These transfers to or on behalf of Defendants George Weiss, Michael Edwards, and Jeffrey Dillabough were made with the actual intent to hinder, delay, or defraud Plaintiffs and their ability to collect the nearly $100 million that they are owed, as evidenced by the facts that:  (i) the payments were made to senior executives of the George Weiss Companies; (ii) the payments were actively concealed from Plaintiffs by, *inter alia*, Defendants Michael Edwards and Jeffrey Dillabough, who assured Plaintiffs that the payments would not be made when they were; (iii) the Payouts were not made in the normal course of the George Weiss Companies' business, but instead were made earlier than bonus payments typically would have been made; and (iv) the payments were made while the George Weiss Companies were insolvent.

96.     Accordingly, the Court may avoid all of the payments that were made to the Insiders.

### FOURTH CAUSE OF ACTION
### (Voidable Transfer Under § 274 of the
### Uniform Voidable Transactions Act Against the Insiders)

97.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth

herein.

98.    The George Weiss Companies transferred funds to or on behalf Defendant George

Weiss, which were utilized to pay personal expenses, including to fund private aircraft expenses

and to fund personal litigation with the United States Internal Revenue Service.

99.    The George Weiss Companies transferred $1.05 million of Payouts to Defendants

Michael Edwards and Jeffrey Dillabough on February 8, 2024.

100.    These transfers were made to the Insiders, who are all executives or employees of

the George Weiss Companies.

101.    The transfers were made to the Insiders while the George Weiss Companies were

insolvent.

102.    The Insiders had reasonable cause to believe that the George Weiss Companies

were insolvent, as they are all members of the George Weiss Companies' executive leadership

and senior management teams who are regularly apprised of the George Weiss Companies'

financial situation by other members of the George Weiss Companies' executive leadership

team, and/or employees that are aware of the George Weiss Companies' obligations to the

Plaintiffs.

### FIFTH CAUSE OF ACTION
### (Breach of the February Forbearance Agreement as to
### GWA, George Weiss, WMSA, WMSF, OGI, and WSPO)

103.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth

herein.

104.    JSI, LAM Holdings, the George Weiss Companies, and George Weiss formed a valid contract, specifically, the February Forbearance Agreement.

105.    JSI and LAM Holdings performed their obligations under the February Forbearance Agreement.

106.    GWA and WMSA breached the February Forbearance Agreement by issuing payments of $22,100.00, $343,051.14, $13,728.20, $30,400.00, $13,075.55, $15,000.00, and $33,016.09 without JSI's approval.

107.    Each of WMSA, WMSF, OGI, and WSPO guaranteed GWA's performance under the February Forbearance Agreement.

108.    George Weiss breached the February Forbearance Agreement by failing to take all actions within his control, including by exercising all of his voting, governance, management and other rights and powers with respect to prevent GWA and WMSA from breaching the February Forbearance Agreement.

109.    JSI and LAM Holdings were harmed by GWA's, WMSA's, WMSA's, WMSF's, OGI's, WSPO's, and George Weiss's breaches because, by transferring the funds in violation of the February Forbearance Agreement, GWA and WMSA reduced the funds available to satisfy their obligations to JSA and LAM Holdings by $470,370.98.

**SIXTH CAUSE OF ACTION**
**(Fraudulent Misrepresentation as to**
**Michael Edwards and Jeffrey Dillabough)**

110.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

111.    Defendant Michael Edwards expressly and repeatedly represented to Plaintiffs that the George Weiss Companies would not make the Payouts until late February 2024.

112.    Defendants Michael Edwards and Jeffrey Dillabough also expressly and repeatedly represented to Plaintiffs that the George Weiss Companies were, and would continue, operating the business in the "normal course."

113.    Those representations were false.  Instead, on February 8, 2024, the George Weiss Companies issued the Payouts without any notice to or discussion with Plaintiffs, and in complete disregard of their prior representations and contractual obligations to Plaintiffs

114.    Defendants Michael Edwards and Jeffrey Dillabough knew those representations were false when made.

115.    Defendants Michael Edwards and Jeffrey Dillabough made the representations to the Plaintiffs in order to cause Plaintiffs to believe that the George Weiss Companies would not diminish the funds that were available to pay back the amounts owed to Plaintiffs, and to prevent the Plaintiffs from exercising rights and remedies that would have protected the Plaintiffs' interests and preserved the George Weiss Companies' assets.

116.    In reliance on Defendants Michael Edwards' and Jeffrey Dillabough's representations, Plaintiffs did not exercise their rights and remedies which would have enabled them to stop the Payouts and otherwise preserve the assets of the George Weiss Companies

117.    In reliance on Defendants' Michael Edwards' and Jeffrey Dillabough's representations, Plaintiffs incurred out-of-pocket expenses, including the costs of negotiating proposed forbearance agreements which were, in effect, a sham.

118.    The Plaintiffs' reliance on the Defendants Michael Edwards' and Jeffrey Dillabough's misrepresentations was both reasonable and justifiable because as managing members of the George Weiss Companies, Defendants Michael Edwards and Jeffrey Dillabough

exercised control over the George Weiss Companies, and could stop them from making the Payouts.

119.    As a direct and proximate result of relying on the Defendants Michael Edwards' and Jeffrey Dillabough's misrepresentations, Plaintiffs did not take actions that would have stopped the George Weiss Companies from making the Payouts, which have depleted funds which could be used to satisfy the George Weiss Companies' obligations under the Note Purchase Agreements, and the Strategic Relationship Agreement.

120.    As a result of the Defendants Michael Edwards' and Jeffrey Dillabough's fraud, Plaintiffs are entitled to an award of damages in an amount to be proved at trial, as well as punitive damages.

### SEVENTH CAUSE OF ACTION
**(George Weiss is the Alter Ego of the George Weiss Companies and is Individually Responsible for their Liabilities)**

121.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

122.    Upon information and belief, defendant George Weiss totally dominated and controlled the George Weiss Companies, including but not limited to control of its finances, policy and business practices such that none of the George Weiss Companies had a separate mind, will or existence of their own.

123.    For example, upon information and belief, the George Weiss Companies and George Weiss commingled funds, including using funds for George Weiss's personal benefit, failed to observe corporate formalities and failed to adequately capitalize the George Weiss Companies.  As a result, the George Weiss Companies lack individual identity apart from George Weiss, are mere instrumentalities or agents of George Weiss, and have operated as a single economic entity serving George Weiss's personal interests.

23

124.    Upon information and belief, George Weiss affirmatively chose to make the Payouts at the direct expense of the George Weiss Companies' creditors, including the Plaintiffs.

125.    As a result, defendant George Weiss used his domination and control of the George Weiss Companies to interfere with the George Weiss Companies' ability to meet their obligations under the Note Purchase Agreements, and the Strategic Relationship Agreement.

126.    Upon information and belief, the George Weiss Companies are so manipulated by George Weiss that they are mere puppets or tools for George Weiss's personal interests.  George Weiss had authority to authorize and instruct GWA and WMSA to sign the Note Purchase Agreements, and GWA to sign the Strategic Relationship Agreement.

127.    As a result, the corporate veil of the George Weiss Companies should be pierced and George Weiss should be held liable as the alter-ego of the George Weiss Companies.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against defendants as follows:

(a)    On the First Cause of Action, a judgment in JSI's favor and against GWA, WMSA, WMSF, OGI, and WSPO for money damages in an amount to be determined at trial, but believed to be not less than $49,832,562.00, representing the outstanding principal and interest owed to JSI under the Notes;

(b)    On the Second Cause of Action, a judgment in LAM Holdings' favor and against GWA, WMSA, WMSF, OGI, and WSPO for money damages in an amount to be determined at trial, but believed to be not less than $50,597,604.00, representing all outstanding principal and interest owed to LAM Holdings under the Strategic Relationship Agreement as of December 31, 2023;

(c)    On the Third and Fourth Causes of Action, a judgment in Plaintiffs' favor and against the Insiders voiding the voidable transfers set forth above;

(d)    On the Fifth Cause of Action, a judgment in JSI's and LAM Holdings' favor and against GWA, WMSA, WMSA, WMSF, OGI, WSPO, and George Weiss for money damages in an amount to be determined at trial, but believed to be not less than $470,370.98, representing the amounts transferred by GWA and WMSA in breach of the February Forbearance Agreement on March 1, 2024;

A-208

(e)  On the Sixth Cause of Action, a judgment in JSI's and LAM Holdings' favor and against Defendants Michael Edwards and Jeffrey Dillabough for actual and punitive damages in an amount to be determined at trial;

(f)  On the Seventh Cause of Action, a judgment in JSI's and LAM Holdings' favor that George Weiss is individually liable for the debts of the George Weiss Companies, including any amounts owed as a result of the First through Sixth Causes of Action, as well as an award of punitive damages against George Weiss because his wrongdoing and abuse of the corporate form represents a high degree of moral turpitude and demonstrates wanton dishonesty;

(g)  An award of attorneys' fees incurred by Plaintiffs in connection with this action pursuant to Sections 10.3 and 13.1 of the Note Purchase Agreement, Section 5(b) of the Strategic Relationship Agreement, and Section 3(a) if the February Forbearance Agreement; and

(h)  Awarding Plaintiffs such other, further, and different relief as this Court may deem just and proper.

Dated:  New York, New York
          March 26, 2024

Respectfully submitted,

HERBERT SMITH FREEHILLS
  NEW YORK LLP
By: /s/ DRAFT
    Scott S. Balber
    Michael P. Jones
    Daniel Gomez
450 Lexington Avenue
New York, New York 10017
Telephone:  (917) 542-7600
Facsimile:   (917) 542-7601
Email:       Scott.Balber@hsf.com
             Michael.Jones@hsf.com
             Daniel.Gomez@hsf.com

*Attorneys for Plaintiffs*
*Jefferies Strategic Investments, LLC and*
*Leucadia Asset Management Holdings LLC*

25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JEFFERIES STRATEGIC INVESTMENTS, LLC
and LEUCADIA ASSET MANAGEMENT
HOLDINGS LLC,

                    Plaintiffs,

         -against-

GEORGE WEISS,

                    Defendant.

Case No. 1:24-cv-04369-AKH

## <u>NOTICE OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>

**PLEASE TAKE NOTICE** that, upon: (i) the accompanying Memorandum of Law in Support of Jefferies Strategic Investments, LLC and Leucadia Asset Management Holdings LLC's (together, the "Plaintiffs") Motion for Summary Judgment; (ii) the Local Rule 56.1 Statement in Support of Plaintiffs' Motion For Summary Judgment; (iii) the Declaration of Scott S. Balber in Support of Plaintiffs' Motion for Summary Judgment (and the exhibits thereto); and (iv) all prior pleadings and proceedings in this action, the Plaintiffs, by and through their undersigned counsel, will move this Court, pursuant to Fed. R. Civ. P. 56, for entry of an order granting them summary judgment against defendant George Weiss ("Weiss") and decreeing that Plaintiffs are entitled to recover:

- $52,473,259.00, representing amounts it is undisputed are owed under the Strategic Relationship Agreement, which Weiss guaranteed;

- $43,190,924.00, representing amounts it is undisputed are owed under the Notes and Note Purchase Agreements, which Weiss guaranteed; as well as

- An award of attorneys' fees incurred by Plaintiffs in an amount to be determined by the Court upon subsequent application by the Plaintiffs.

A-210

Plaintiffs' motion shall be made before the Honorable Alvin K. Hellerstein at the Daniel Patrick

Moynihan Courthouse, at 500 Pearl St., New York, New York 10007, Courtroom 14D, at a time

to be determined by the Court.

       **PLEASE TAKE FURTHER NOTICE** that, pursuant to the Court's order dated October

31, 2024 (ECF. No. 23), Weiss shall serve answering affidavits and any other papers in

opposition to this motion on or before November 22, 2024.

Dated:  New York, New York
        November 5, 2024

Respectfully submitted,

HERBERT SMITH FREEHILLS
  NEW YORK LLP
By: /s/ *Scott S. Balber*
   Scott S. Balber
   Michael P. Jones
   Daniel Gomez
200 Park Avenue
New York, New York 10166
Tel: (917) 542-7810
Fax: (917) 542-7601
Email:    Scott.Balber@hsf.com
         Michael.Jones@hsf.com
         Daniel.Gomez@hsf.com

*Attorneys for Plaintiffs*
*Jefferies Strategic Investments, LLC and*
*Leucadia Asset Management Holdings LLC*

A-211

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS LLC, | Case No. 1:24-cv-04369-AKH |
| Plaintiffs, | |
| -against- | |
| GEORGE WEISS, | |
| Defendant. | |

**TABLE OF CONTENTS OF DOCUMENTS RELATED TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 2(C) of the Individual Rules of the Honorable Alvin K. Hellerstein, United States District Court Southern District of New York, plaintiffs Jefferies Strategic Investments LLC and Leucadia Asset Management Holdings LLC ("Plaintiffs") respectfully submit this Table of Contents of the motion papers associated with their motion for summary judgment in the above-referenced action. The documents relevant to the Plaintiffs' motion for summary judgment are as follows.

- Notice of Plaintiff's Motion for Summary Judgment

- Local Rule 56.1 Statement in Support of Plaintiffs' Motion for Summary Judgment

- Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment

- Declaration of Scott S. Balber in Support of Plaintiffs' Motion for Summary Judgment

    o Exhibit 1: Declaration of Nicholas Daraviras

        ▪ Exhibit 1-A: Strategic Relationship Agreement Between Leucadia Asset Management Holdings LLC and GWA, LLC.

- Exhibit 1-B:  Note Purchase Agreement between JFG Funding LLC and GWA, LLC and Weiss Multi-Strategy Advisers, LLC.

- Exhibit 1-C:  Note issued by GWA dated as of January 13, 2020.

- Exhibit 1-D:  Note issued by GWA dated as of December 3, 2019.

- Exhibit 1-E:  Assignment and Assumption Agreement Between JFG Funding LLC and Jefferies Strategic Investments, LLC.

- Exhibit 1-F:  Note Purchase Agreement between JFG Funding LLC and GWA and Weiss Multi-Strategy Advisers, LLC dated as of September 21, 2022.

- Exhibit 1-G:  Note issued by GWA dated as of September 21, 2022.

- Exhibit 1-H:  Notice of Optional Redemption.

- Exhibit 1-I:  Forbearance Agreement between the Plaintiffs, GWA, LLC, Weiss Multi-Strategy Advisers, LLC, Weiss Multi-Strategy Funds, LLC, OGI Associates, LLC, Weiss Special Operations LLC, and George A. Weiss dated as of February 12, 2024.

- Exhibit 1-J:  UCC Financing Statement.

- Exhibit 1-K:  Spreadsheet of Amounts Owed to Plaintiffs

- Exhibit 1-L:  Attorneys' Fees Invoices

o  Exhibit 2:  Chapter 11 Voluntary Petition for Non-Individual filed by Weiss Multi-Strategy Advisers, LLC in *In re Weiss Multi-Strategy Advisers LLC*, No. 24-10743 (Bankr. S.D.N.Y.).

o  Exhibit 3:  Chapter 11 Voluntary Petition for Non-Individual filed by GWA, LLC in *In re GWA, LLC*, No. 24-10744 (Bankr. S.D.N.Y.).

o  Exhibit 4:  Chapter 11 Voluntary Petition for Non-Individual filed by OGI Associates, LLC in *In re OGI, LLC*, No. 24-10745 (Bankr. S.D.N.Y.).

o  Exhibit 5:  Chapter 11 Voluntary Petition for Non-Individual filed by Weiss
Special Operations LLC in *In re Weiss Special Operations LLC*,
No. 24-10746 (Bankr. S.D.N.Y.).

o  Exhibit 6:  Declaration of Pierce Archer.

o  Exhibit 7:  Declaration for Non-Individual Debtors filed by Weiss Multi
Strategy Advisers, LLC in *In re Weiss Multi-Strategy Advisers LLC*,
No. 24-10743 (Bankr. S.D.N.Y.).

o  Exhibit 8:  Declaration for Non-Individual Debtors filed by GWA, LLC in
*In re Weiss Multi-Strategy Advisers LLC*, No. 24-10743
(Bankr. S.D.N.Y.).

o  Exhibit 9:  Declaration for Non-Individual Debtors filed by OGI Associates,
LLC in *In re Weiss Multi-Strategy Advisers LLC*, No. 24-10743
(Bankr. S.D.N.Y.).

o  Exhibit 10:  Declaration for Non-Individual Debtors filed by Weiss Special
Operations LLC in *In re Weiss Multi-Strategy Advisers LLC*,
No. 24-10743 (Bankr. S.D.N.Y.).

o  Exhibit 11:  Chapter 11 Voluntary Petition for Non-Individual filed by Weiss
Multi-Strategy Funds, LLC in *In re Weiss Multi-Strategy Funds
LLC*, No. 24-11075 (Bankr. S.D.N.Y.).

o  Exhibit 12:  Global Notes, Methodology and Specific Disclosures Regarding
Weiss Multi-Strategy Funds, LLC's Schedules of Assets and
Liabilities and Statement of Financial Affairs filed by Weiss
Multi-Strategy Funds, LLC in *In re Weiss Multi-Strategy Funds,
LLC*, No. 24-11075 (Bankr. S.D.N.Y.).

o  Exhibit 13:  Complaint to Avoid and Recover Avoidable Transfers, filed by
GWA, LLC, Weiss Multi-Strategy Advisers, LLC, OGI
Associates, LLC, Weiss Special Operations LLC in *GWA, LLC v.
Jefferies Strategic Investments, LLC*, No. 24-01350
(Bankr. S.D.N.Y.) (the "Adversary Proceeding")

o  Exhibit 14:  First Amended Complaint Filed by GWA, LLC, Weiss
Multi-Strategy Advisers, LLC, Weiss Multi-Strategy Funds, LLC,
OGI Associates, LLC, Weiss Special Operations LLC in
the Adversary Proceeding

o  Exhibit 15:  Memorandum of Law in Support of Plaintiff's
Partial Motion to Dismiss the First Amended
Complaint Filed in the Adversary Proceeding

o   Exhibit 16:   Plaintiffs' Memorandum of Law in Opposition to Defendants'
                  Partial Motion to Dismiss the First Amended Complaint Filed by
                  GWA, LLC, Weiss Multi-Strategy Advisers, LLC, Weiss Multi
                  Strategy Funds, LLC, OGI Associates, LLC, Weiss Special
                  Operations LLC in the Adversary Proceeding.

o   Exhibit 17:   Transcript of a hearing held on September 11, 2024
                  Before the United States Bankruptcy Court for the
                  Southern District of New York.

o   Exhibit 18:   BrokerCheck Report for George Allen Weiss.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS LLC,<br><br>       Plaintiffs,<br><br>   -against-<br><br>GEORGE WEISS,<br><br>       Defendant. | Case No. 1:24-cv-04369-AKH |

**DECLARATION OF SCOTT S. BALBER IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Scott S. Balber, declare as follows:

  1.  I am a partner at Herbert Smith Freehills New York LLP, counsel of record for plaintiffs Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC ("LAM Holdings," and with JSI, the "Plaintiffs") in the above-captioned action.

  2.  I submit this declaration to place before the Court certain documents and record materials that are relevant to the Jefferies Entities' motion for summary judgment.  I make this Declaration based upon my personal knowledge and if called upon to testify, I could and would testify competently thereto.

  3.  Attached as **Exhibit 1** is a true and correct copy of the Declaration of Nicholas Daraviras in Support of Jefferies Strategic Investments, LLC and Leucadia Asset Management Holdings LLC's Proof of Claims (the "Daraviras Declaration" or "Daraviras Decl."), which was submitted to the George Weiss Companies' claims agent in the bankruptcy cases captioned *In re Weiss Multi-Strategy Advisers, LLC*, No. 24-10743 (MG) (Bankr. S.D.N.Y.), *In re GWA, LLC*, No. 24-10744(MG) (Bankr. S.D.N.Y.); *In re OGI, LLC*, No. 24-10745(MG) (Bankr. S.D.N.Y.),

*In re Weiss Special Operations LLC*, No. 24-10746(MG) (Bankr. S.D.N.Y.), *In re Weiss Multi-Strategy Funds LLC*, No. 24-11075(MG) (Bankr. S.D.N.Y.) on August 23, 2024.  The Daraviras Declaration attached, as its own exhibits, the following documents which are relevant to this case.

      a.      A Strategic Relationship Agreement between LAM Holdings and GWA, LLC ("GWA") dated as of May 1, 2018.  (*See* Daraviras Decl. Ex. A).

      b.      A Note Purchase Agreement between JFG Funding LLC and GWA and Weiss Multi-Strategy Advisers, LLC ("WMSA") dated as of December 3, 2019.  (*See* Daraviras Decl. Ex. B).

      c.      A Note issued by GWA dated as of January 13, 2020.  (*See* Daraviras Decl. Ex. C).

      d.      A Note issued by GWA dated as of December 3, 2019.  (*See* Daraviras Decl. Ex. D).

      e.      An Assignment and Assumption Agreement between JFG Funding LLC and JSI dated as of December 1, 2021.  (*See* Daraviras Decl. Ex. E).

      f.      A Note Purchase Agreement between JFG Funding LLC and GWA and WMSA dated as of September 21, 2022.  (*See* Daraviras Decl. Ex. F).

      g.      A Note issued by GWA dated as of September 21, 2022.  (*See* Daraviras Decl. Ex. G).

      h.      A Notice of Optional Redemption.  (*See* Daraviras Decl. Ex H).

      i.      A Forbearance Agreement between the Plaintiffs, on the one hand, and GWA, WMSA, Weiss Multi-Strategy Funds, LLC ("WMSF"), OGI Associates, LLC ("OGI"), Weiss Special Operations LLC ("WSPO"), and George A. Weiss, on the other hand, dated as of February 12, 2024.  (*See* Daraviras Decl. Ex. I).

j.     A UCC Financing Statement.  (*See* Daraviras Decl. Ex J).

k.     A copy of a spreadsheet.  (*See* Daraviras Decl. Ex K).

l.     Copies of invoices reflecting attorneys' fees charged to the Plaintiffs.  (*See* Daraviras Decl. Ex L).

4.     Attached as **Exhibit 2** is a true and correct copy of the Chapter 11 Voluntary Petition for Non-Individual, along with its accompanying exhibits, which was filed in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") by WMSA on or about April 29, 2024, in an action captioned *In re Weiss Multi-Strategy Advisers LLC*, No. 24-10743 (MG) (Bankr. S.D.N.Y.) (the "Bankruptcy Proceeding").

5.     Attached as **Exhibit 3** is a true and correct copy of the Chapter 11 Voluntary Petition for Non-Individual, along with its accompanying exhibits, which was filed in the Bankruptcy Court by GWA, on or about April 29, 2024, in an action captioned *In re GWA, LLC*, No. 24-10744 (MG) (Bankr. S.D.N.Y.).

6.     Attached as **Exhibit 4** is a true and correct copy of the Chapter 11 Voluntary Petition for Non-Individual, along with its accompanying exhibits, which was filed in the Bankruptcy Court by OGI on or about April 29, 2024, in an action captioned *In re OGI, LLC*, No. 24-10745 (MG) (Bankr. S.D.N.Y.).

7.     Attached as **Exhibit 5** is a true and correct copy of the Chapter 11 Voluntary Petition for Non-Individual, along with its accompanying exhibits, which was filed in the Bankruptcy Court by WSPO on or about April 29, 2024, in an action captioned *In re Weiss Special Operations LLC*, No. 24-10746 (MG) (Bankr. S.D.N.Y.).

8.     Attached as **Exhibit 6** is a true and correct copy of the Declaration of Pierce Archer, Senior Vice President and Chief Operating Officer of the Debtors Pursuant to Local Bankruptcy

Rule 1007-2 in Support of Chapter 11 Petitions, which was filed in the Bankruptcy Proceeding by WMSA on or about April 30, 2024.

9.      Attached as **Exhibit 7** is a true and correct copy of the Declaration Under Penalty of Perjury for Non-Individual Debtors, along with its accompanying exhibits, which was filed in the Bankruptcy Proceeding by WMSA on or about June 11, 2024.

10.     Attached as **Exhibit 8** is a true and correct copy of the Declaration Under Penalty of Perjury for Non-Individual Debtors, along with its accompanying exhibits, which was filed in the Bankruptcy Proceeding by GWA on or about June 11, 2024.

11.     Attached as **Exhibit 9** is a true and correct copy of the Declaration Under Penalty of Perjury for Non-Individual Debtors, along with its accompanying exhibits, which was filed in the Bankruptcy Proceeding by OGI on or about June 11, 2024.

12.     Attached as **Exhibit 10** is a true and correct copy of the Declaration Under Penalty of Perjury for Non-Individual Debtors, along with its accompanying exhibits, which was filed in the Bankruptcy Proceeding by WSPO on or about June 11, 2024.

13.     Attached as **Exhibit 11** is a true and correct copy of the Chapter 11 Voluntary Petition for Non-Individual, along with its accompanying exhibits, filed in the Bankruptcy Court by WMSF on or about June 19, 2024, in an action captioned, *In re Weiss Multi-Strategy Funds LLC*, No. 24-11075 (MG) (Bankr. S.D.N.Y.).

14.     Attached as **Exhibit 12** is a true and correct copy of the Global Notes, Methodology and Specific Disclosures Regarding WMSF's Schedules of Assets and Liabilities and Statement of Financial Affairs which was filed in the Bankruptcy Court by WMSF on or about June 28, 2024, in an action captioned, *In re Weiss Multi-Strategy Funds, LLC*, No. 24-11075 (MG) (Bankr. S.D.N.Y.).

15.     Attached as **Exhibit 13** is a true and correct copy of the Complaint to Avoid and Recover Avoidable Transfers, which was filed in the Bankruptcy Court by GWA, WMSA, WSPO, and OGI on or about April 29, 2024, in an action captioned *GWA, LLC et al v. Jefferies Strategic Investments, LLC et al.*, No. 24-01350 (MG) (Bankr. S.D.N.Y.) (the "Adversary Proceeding").

16.     Attached as **Exhibit 14** is a true and correct copy of the First Amended Complaint, which was filed by GWA, WMSA, WSPO, OGI, and WMSF on June 25, 2024, in the Adversary Proceeding.

17.     Attached as **Exhibit 15** is a true and correct copy of the Memorandum of Law In Support of Jefferies Strategic Investments, LLC's and Leucadia Asset Management Holdings LLC's Partial Motion to Dismiss the First Amended Complaint, which was filed by Plaintiffs on or about July 16, 2024, in the Adversary Proceeding.

18.     Attached as **Exhibit 16** is a true and correct copy of the Plaintiffs' Memorandum of Law in Opposition to Defendants' Partial Motion to Dismiss the First Amended Complaint, which was filed by GWA, WMSA, WSPO, OGI, and WMSF on August 6, 2024, in the Adversary Proceeding.

19.     Attached as **Exhibit 17** is a true and correct copy of a transcript of a hearing held on September 11, 2024 before the Bankruptcy Court.

20.     Attached as **Exhibit 18** is a true and correct copy of a BrokerCheck Report for George Allen Weiss, which I obtained online at https://files.brokercheck.finra.org/individual/individual_462367.pdf.

A-220

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    November 5, 2024                    /s/ *Scott S. Balber*
          New York, New York                 Scott S. Balber

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| WEISS MULTI-STRATEGY ADVISERS LLC, *et al.*[1] | Case No. 24-10743 (MG) |
|  | (Jointly Administered) |
| Debtors. |  |

### DECLARATION OF NICHOLAS DARAVIRAS IN SUPPORT OF JEFFERIES STRATEGIC INVESTMENTS, LLC AND LEUCADIA ASSET MANAGEMENT HOLDINGS LLC'S PROOF OF CLAIMS

I, Nicholas Daraviras, declare under penalty of perjury as follows:

1.      I am over eighteen years of age and otherwise competent to make the statements set forth in this Declaration.

2.      I am Co-President of Leucadia Asset Management Holdings LLC ("LAM Holdings"), located at 520 Madison Avenue, New York, New York, 10022.

3.      I submit this declaration in support of the proofs of claim being filed by LAM Holdings and Jefferies Strategic Investments, LLC ("JSI") (with LAM Holdings, the "Leucadia Entities") in the above-captioned bankruptcy proceeding.

4.      I have personal knowledge of the facts set forth in this Declaration and have been authorized to make this Declaration on behalf of the Leucadia Entities.  If called upon as a witness, I could and would testify competently under oath as to all such facts based upon my personal knowledge and my review of the business records of the the Leucadia Entities.

---

[1]      The "Debtors" in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Weiss Multi-Strategy Advisers LLC (7518); GWA, LLC (7079); OGI Associates LLC (4493); Weiss Special Operations LLC (7626); and Weiss Multi-Strategy Funds LLC (8004).  The location of Debtor Weiss Multi-Strategy Advisers LLC's principal place of business is 320 Park Avenue, 20th Floor, New York, New York 10022 and the Debtors' service address in these Chapter 11 Cases is P.O. Box 2857, Meriden, Connecticut 06450.

5.      On or about May 1, 2018, LAM Holdings and GWA, LLC ("GWA") entered into a strategic relationship agreement (the "Strategic Relationship Agreement").  Under the Strategic Relationship Agreement, GWA agreed, under certain conditions, to share with LAM Holdings defined amounts of profit and revenue that it realized.  A true and correct copy of the Strategic Relationship Agreement is attached hereto as **Exhibit A**.

6.      To the extent that GWA was "delayed in delivering any payment as and when due, the amount owed shall accrue interest at the annual rate of [the Wall Street Journal] Prime Rate plus two percent (2%), compounded monthly, until such time as such payment is paid in full to payee." (Ex. A § 1(f)).

7.      In addition, the Strategic Relationship Agreement provides that LAM Holdings shall be "indemnify[ied] and h[eld] harmless . . . against any and all costs, losses . . . and expenses including reasonable costs of investigation and defense, and reasonable attorneys' fees and expenses (collectively, 'Losses') incurred by [the Leucadia Entities] as a result of, in connection with, or related to this [Strategic Relationship] Agreement."  (Ex. A § 5(b)).

8.      Separately, on or about December 3, 2019, JFG Funding LLC entered into a Note Purchase Agreement with GWA (the "2019 Note Purchase Agreement").  A true and correct copy of the 2019 Note Purchase Agreement is attached hereto as **Exhibit B**.

9.      Pursuant to the 2019 Note Purchase Agreement, JSI purchased $50 million in notes (each a "Note") from GWA.  A true and correct copy of the Notes issued pursuant to the 2019 Note Purchase Agreement are attached hereto as **Exhibits C** and **D**.

10.     JFG Funding LLC subsequently assigned its interest in the 2019 Note Purchase Agreement and the Notes to JSI, which was acknowledged by GWA.  A true and correct copy of that assignment is attached hereto as **Exhibits E**.

2

11.     On September 21, 2022, GWA and JSI entered into an additional Note Purchase Agreement (the "2022 Note Purchase Agreement," together with the 2019 Note Purchase Agreement, the "Note Purchase Agreements").  A true and correct copy of the 2022 Note Purchase Agreement is attached hereto as **Exhibit F**.

12.     That same day, and pursuant to the 2022 Note Purchase Agreement, GWA issued and delivered to JSI a Note in the principal amount of $3,000,000.00.  A true and correct copy of the 2022 Note Purchase Agreement is attached hereto as **Exhibit G**.

13.     Section 7.2 of the Note Purchase Agreements provides JSI (and GWA) with the right to redeem the Notes "in whole but not in part, on each applicable Optional Redemption Date . . . by at least 10 calendar days' prior written notice to the other party prior to the applicable Optional Redemption Date . . . ."  (*Id.* § 7.2).  Upon exercise of the option to redeem the Notes, the amounts due under the Notes "become due and payable on the applicable Optional Redemption Date. . . ."  (*Id.* § 7.4).  The "Optional Redemption Date" is defined to be the last calendar day of each month beginning on the third anniversary of the December 2019 and the January 2020 Note issuances.  (*Id.* at A-4).  Or, in other words, JSI had the right to redeem the Notes at its option beginning in December 2022 and January 2023, respectively.[2]

14.     In addition, the Note Purchase Agreements provides that JSI shall be entitled to recover "all costs and expenses of such holder incurred in any enforcement or collection . . . including reasonable attorneys' fees, expenses and disbursements."  (*Id*. § 10.3).

---

[2]     The 2022 Note Purchase Agreement defines "Optional Redemption Date" as "monthly, on the last calendar day of each month."  Accordingly, JSI had the right to redeem that Note, monthly, at its discretion.

15.     On or about December 21, 2023, JSI exercised its option to redeem the full amounts owed under the Notes through a Notice of Optional Redemption.  A true and correct copy of that Notice of Optional Redemption is attached hereto as **Exhibit H**.

16.      Pursuant to the Note Purchase Agreements, the full amount owed under the Notes became due and owing on December 31, 2023.

17.     On February 2, 2024, all the Debtors executed a further forbearance agreement (the "Forbearance Agreement").  A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit I**.

18.     Section 3(a) of the Forbearance Agreement provides that each of the Debtors "(other than GWA) . . . irrevocably and unconditionally guarantees to each of JSI and LAM Holdings . . . and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other [of the remaining non-GWA Debtors] when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations (as herein defined)."

19.     The Guaranteed Obligations included "all the obligations of GWA and each other [of the remaining Debtors] arising under any Note Purchase Agreement, the Notes, the [Strategic Relationship] Agreement and this Agreement, and any loss, damage, penalty, action, judgment, suit, cost, expense, disbursement, liability, claim or other obligation, incurred by or behalf of [JSI and LAM Holdings] (including but not limited to reasonable out-of-pocket attorneys' fees and costs) arising out or, relating to or in connection with any Note Purchase Agreement, any Note, the [Strategic Relationship] Agreement, this Agreement or the transaction contemplated thereby." *Id*.

Docusign Envelope ID: CD9B5563-5DA7-42EA-B769-FC3EB376B5C7

20.     Pursuant to the Forbearance Agreement, each of the Debtors "irrevocably and unconditionally guarantee[d] . . . prompt and complete payment and performance by GWA" and the other Debtors  "when due . . . of the Guaranteed Obligations." *Id*.  Since the Guaranteed Obligations include "any Note Purchase Agreement, the Notes, the [Strategic Relationship] Agreement . . . and any . . . other obligation incurred by or behalf of [JSI and LAM Holdings]," each of the Debtors was required to repay the amounts owed under the Notes and the Strategic Relationship Agreement. *Id*.

21.     Pursuant to Section 4(a) of the Forbearance Agreement, each of the Debtors granted the Leucadia Entities "a first priority perfected security interest in" "all goods, accounts, equipment, inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, general intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, securities accounts, certificates of deposit, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and all of each [Debtor]'s books and records." *Id.*

22.     On or about February 13, 2024, JSI filed a UCC Financing Statement, with the New York Department of State, recording the security interest granted in Section 4(a) of the Forbearance Agreement.  A true and correct copy of the first page of that UCC Financing Statement, obtained from the Department of State's website, is attached hereto as **Exhibit J**.

23.     At this time, none of the Debtors have repaid their obligations under the Notes or the Strategic Relationship Agreement.

24.    Pursuant to 11 U.S.C. § 503, the Leucadia Entities are filing a Proof of Claim to recover the debt the Debtors owe them under the Strategic Relationship Agreement and the Notes. The Proof of Claim is being filed contemporaneously with this Declaration.

25.    Attached hereto as **Exhibit K** is a spreadsheet setting forth the Leucadia Entities' calculation of the amounts owed by the Debtors through the Petition Date.  As reflected in **Exhibit K**, Debtors owe LAM Holdings $51,312,401.00 in revenue sharing fees pursuant to the Strategic Relationship Agreement, and Debtors owe JSI $50,922,307.00 in principal and interest under the Notes.

26.    Attached hereto as **Exhibit L** are invoices reflecting attorneys' fees charged to the Leucadia Entities as part of efforts to recover the debt through the Petition Date, which the Leucadia Entities are entitled to be reimbursed for under Section 5(b) of the Strategic Relationship Agreement and Section 10.3 of the Note Purchase Agreements, totaling $187,058.10.  The total is calculated by adding together the "Total" amounts stated on each monthly invoice.

27.    The Leucadia Entities hereby reserve all rights, including but not limited to their right to change the amount sought in their Proof of Claim as additional information becomes available.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 22, 2024

Nicholas Daraviras

**DocuSign**

## Certificate Of Completion

Envelope Id: CD9B5E63EDA743EAB769FC3E8376B5C7                                Status: Completed
Subject: Complete with Docusign: 2024.08.22 - N. Daraviras Decl. in Support of Proof of Claim.pdf
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 6 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 1 | Initials: 0 | WALE BAKARE |
| AutoNav: Enabled | | 520 Madison Avenue |
| EnvelopeId Stamping: Enabled | | 10th Floor |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | New York, NY  10022 |
| | | wbakare@jefferies.com |
| | | IP Address: 169.196.240.2 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: WALE BAKARE | Location: DocuSign |
|    8/22/2024 12:36:04 PM |    wbakare@jefferies.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Nick Daraviras | *Nick Daraviras* | Sent: 8/22/2024 12:36:57 PM |
| ndaraviras@jefferies.com | 7BE147E29B3D44E2... | Viewed: 8/22/2024 12:46:30 PM |
| Authorized Person | | Signed: 8/22/2024 12:47:52 PM |
| Jefferies LLC | | |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style | |
| | Using IP Address: 69.114.76.158 | |
| | Signed using mobile | |
| **Electronic Record and Signature Disclosure:** | | |
|    Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 8/22/2024 12:36:57 PM |
| Certified Delivered | Security Checked | 8/22/2024 12:46:30 PM |
| Signing Complete | Security Checked | 8/22/2024 12:47:52 PM |
| Completed | Security Checked | 8/22/2024 12:47:52 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

# Exhibit A

## STRATEGIC RELATIONSHIP AGREEMENT

**THIS STRATEGIC RELATIONSHIP AGREEMENT** (this "Agreement") is dated as of May 1, 2018 by and between LAM Holding LLC, a Delaware limited liability company ("LAM"), and GWA, LLC, a Connecticut limited liability company (the "Company"). LAM and the Company, are sometimes referred to herein individually as a "Party" and collectively as the "Parties." Capitalized terms used in this Agreement have the meanings ascribed to them by definition in Section 9.

**WHEREAS**, concurrently with the execution of this Agreement, Leucadia Funding LLC, a Delaware limited liability company and an Affiliate of LAM, and Weiss Multi-Strategy Advisers LLC, a Delaware limited liability company and an Affiliate of the Company ("WMSA"), are entering into that certain Investment Management Agreement (the "Investment Management Agreement"), pursuant to which Leucadia Funding LLC will open an investment account and fund it with $250,000,000 of Notional Value, which will be managed by WMSA on the terms and conditions set forth therein (the "Managed Account");

**WHEREAS,** the Company intends to transfer to LAM and LAM intends to acquire rights under this Agreement which shall constitute an equity interest in the Company and be deemed a "profits interest" (within the meaning of Revenue Procedure 93-27, 1993-2 C.B. 343 (June 9, 1993) and 2001-43, 2001-2 C.B. 191 (August 3, 2001); and

**WHEREAS**, the Parties intend to delineate their respective rights and obligations with respect to the Managed Account solely as set forth in this Agreement and the Investment Management Agreement.

**NOW**, **THEREFORE**, in consideration of the foregoing premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1.  Profit Share, Revenue Share, Sale Proceeds Share and Related Rights of LAM.

    (a)  Profit Share. LAM shall have a right to receive the Profit Share Percentage of the Company Profits for the Profit Share Period (the "Profit Share Amount"). The Profit Share Amount shall be calculated and paid in accordance with the terms of this Section 1.

    (b)  Revenue Share. LAM shall have a perpetual right to receive the Revenue Share Percentage of the Company Revenues for each Revenue Share Period (the "Revenue Share Amount"). The Revenue Share Amount shall be calculated and paid in accordance with the terms of this Section 1.

    (c)  Calculation of the Profit Share and the Revenue Share. Notwithstanding the foregoing, (i) the Company Profits for the Profit Share Period and (ii) the Company Revenues for each Revenue Share Period shall each be calculated to include any additional revenue the Company or any Company Subsidiary would have received if no Unauthorized Withdrawal Events or Unauthorized Weiss Salary Events had occurred prior to the conclusion of the Profit Share Period or such Revenue Share Period, as applicable. For purposes of calculating LAM's Profit

Share Amount and Revenue Share Amount, in no event shall the amount of the Company's consolidated gross revenue amount be reduced by (a) any and all losses connected with the open Tax Audits, (b) without duplication in respect of the amounts in this Section 1(c)(a), pre-closing Taxes, (c) without duplication in respect of the amounts in this Sections 1(c)(a) and 1(c)(b), any financial statement reserves for uncertain income tax positions in respect of pre-closing taxable years, (d) without duplication in respect of the amounts in this Sections 1(c)(a), 1(c)(b) and 1(c)(c), any Taxes indirectly borne by the Company in respect of any funds, managed accounts, proprietary capital trading and/or other client accounts that the Company directly or indirectly provides investment management services in respect of pre-closing taxable years.

(d)     _Payment of the Profit Share and the Revenue Share_.  The Company shall, within thirty (30) days of the end of the Profit Share Period or a Revenue Share Period, as the case may be, pay to LAM (i) the Profit Share Amount for the Profit Share Period or (ii) the Revenue Share Amount for the applicable Revenue Share Period, each as calculated using the unaudited financial information available at that time.  Within twelve (12) days following the completion of the audited financial statements required by Section 1(h)(i) for each fiscal year, the Company shall provide LAM with a copy of any updated calculations for (i) the Profit Share Amount for the Profit Share Period or (ii) the Revenue Share Amounts for any applicable Revenue Share Period.  If there has been an over-payment or under-payment of the Profit Share Amount or an applicable Revenue Share Amount, then within five (5) Business Days following the delivery of such audited financials and any updated calculations either (i) the Company shall pay LAM the amount of such under-payment, or (ii) LAM shall repay to the Company the amount of such over-payment, as the case may be.

(e)     Monetization Event.   Unless otherwise agreed among the Parties, the Company shall not be the subject of any Monetization Event for a period of five (5) years following the date hereof.  Thereafter, the Company shall provide LAM with at least thirty (30) days' prior written notice of any proposed Monetization Event of the Company or the Company Subsidiaries.  Such notice shall provide LAM with the names of the parties involved in such Monetization Event, the amount of the proceeds or other compensation to be paid in connection with the bona fide offer for such Monetization Event (together, the "Sale Proceeds"), and the effective date of such Monetization Event.  LAM shall be required to participate in such Monetization Event and shall receive the Sale Proceeds Share Percentage of the Sale Proceeds; provided, that the Revenue Share Percentage shall be permanently reduced to an amount equal to the product of (i) the Revenue Share Percentage in effect immediately prior to LAM participating in such Monetization Event, and (ii) the Reduction Percentage.  The Company shall use best efforts to ensure that LAM receives its portion of the Sale Proceeds at the same time as all other participants in such Monetization Event.  For purposes of this Agreement, "Reduction Percentage" means (i) one hundred percent (100%) minus (ii) the percentage of the equity interests or assets of the Company sold in the Monetization Event.

(f)     Method of Payment.  All amounts payable under this Section 1 (including any interest) shall be paid by wire transfer of immediately available funds in U.S. dollars to an account designated in writing by the payee.  In the event the payor is delayed in delivering any payment as and when due, the amount owed shall accrue interest at the annual rate of Prime Rate plus two percent (2%), compounded monthly, until such time as such payment is paid in full to payee.

(g)    <u>Disputes regarding Payment Amounts</u>.  In connection with the payments to be made to LAM under this <u>Section 1</u>, the Company shall furnish to LAM, at the time of such payment, a report showing the applicable calculations and the amount of the resulting payments. The Company shall cooperate, in good faith, with LAM to determine if such calculations are accurate.  In connection therewith, the Company shall take all reasonable steps to make the auditors of the Company available to LAM to discuss such calculations, and the Company shall provide any such information that LAM may reasonably request pursuant to <u>Section 1(h)(iii)</u> and/or <u>Section 1(i)</u>.  If LAM and the Company are unable to agree on the amount of a payment owed to LAM under this <u>Section 1</u>, then the Company and LAM hereby agree that the final determination of the amount of any such payment shall be determined by an independent certified public accountant selected by LAM, who is either (i) included on the list of approved independent certified public accountant set forth in <u>Schedule 1(g)</u> attached hereto, or (ii) the Company consents to (such consent not to be unreasonably withheld or delayed).  Such determination shall be made following a review of the books and records of the Company or any Company Subsidiary by such independent certified public accountant.  In connection with such review which shall be in addition to the addition to the audit of the Company pursuant to <u>Section 1(h)(i)</u>, the Company shall, during regular business hours at such place or places where such records are customarily kept, make its records and the records of its Representatives (including, but not limited to, accountants' work papers) available for review to verify that the payments due hereunder were correctly determined. The results of each review, if any, shall be reported in writing to the Company promptly after the review and, in the absence of manifest error, shall be binding on LAM, on the one hand, and the Company, on the other hand.  LAM shall bear the full cost of such review unless such review discloses an underpayment or overpayment by the Company of more than five percent (5%) of the relevant payment amount, in which case the Company shall reimburse LAM for all costs incurred by LAM in connection with such review.  In the event there is an underpayment to LAM, the Company shall pay to LAM the amount of such underpayment within five (5) Business Days of receiving a copy of the review report.  If the discrepancy is an overpayment to LAM, LAM shall pay to the Company the amount of such overpayment within five (5) Business Days of receiving a copy of the review report.

(h)    <u>Reports</u>.

(i)    The Company shall deliver to LAM: (A) as soon as practicable following the end of each fiscal year, but in any event no later than July 15 of the next year, the consolidated balance sheet and the related consolidated statements of income, stockholders' equity and cash flows of the Company and each Company Subsidiary and any related notes thereto, and all such financial statements shall be audited and certified by a "Big Four" accounting firm and the cost of such audits shall be an expense of the Company and (B) as soon as practicable, but in any event within thirty (30) days after the end of each quarter, an unaudited balance sheet, the related unaudited statements of income, stockholders' equity and cash flows of the Company and each Company Subsidiary and any related notes thereto.

(ii)    The Company shall cause to be prepared and delivered to LAM, either by mail or electronically, (A) an estimated Schedule K-1 for each fiscal year no later than April 15 of the following fiscal year and (B) such other information (including, but not limited to, Schedule K-1s) with respect to the Company as may be necessary for the preparation of LAM's U.S. federal, state, local or other income tax returns promptly following completion of the

Company's audit for the applicable fiscal year, and in no event later than July 15 of the following fiscal year.

(iii)    The Company agrees to furnish, or cause a Company Subsidiary to furnish, to LAM such additional information as LAM may reasonably request from time to time regarding the operation of the Company and/or the Company Subsidiaries and the calculations of any payments to be made to LAM under this Section 1.

(i)    Records; Audit and Inspection Rights.    The Company shall maintain complete and accurate books and records, which shall contain sufficient detail to enable LAM to calculate and verify all amounts due hereunder.  All such records and documents shall be open to inspection and copying by LAM or any of its Representatives upon prior written notice by LAM or such Representatives at any reasonable time during business hours.

(j)    Tax Treatment.

(i)    For income tax purposes, this Agreement is intended to establish LAM as the owner of a "profits interest" (within the meaning of Revenue Procedure 93-27, 1993-2 C.B. 343 (June 9, 1993) and 2001-43, 2001-2 C.B. 191 (August 3, 2001);

(ii)    If LAM is entitled to a Profit Share for a Profit Share Period, for income tax purposes, the Company shall allocate to LAM an amount of its taxable income for such period that equals its Profit Share, provided that to the extent any amount is not included in the calculation of such Profit Share pursuant to Section 1(c), such item shall not be allocated to LAM;

(iii)    If LAM is entitled to a Revenue Share for a Revenue Share Period, for income tax purposes, LAM shall be allocated items of gross income in an amount equal to such Revenue Share and, if the Company's  gross income includes gross income items having different tax characteristics (for example, dividends and long term capital gain) then, to the extent possible and otherwise consistent with this Agreement, the aggregate gross income allocation to the LAM shall include proportionate amounts of such different items;

(iv)    If for any reason, LAM becomes entitled to payments in excess of the amounts otherwise allocated to LAM pursuant to subsections (ii) and (iii), then the Company shall allocate to LAM additional items of gross income equal to such excess;

(v)    George Weiss is hereby appointed as the "partnership representative" of the Company within the meaning of Section 6223(a) of the Code.  If permissible under the Code and applicable Treasury Regulations, the partnership representative shall make the election provided by Section 6221(b) of the Partnership Tax Audit Rules to have Subchapter C of Chapter 63 of the Code not apply.  If the election provided by Section 6221(b) is not available, then the partnership representative shall make the election provided in Section 6226 of the Partnership Tax Audit Rules with respect to any "imputed underpayment" described in Section 6225(b) of the Partnership Tax Audit Rules.

2.    Additional Rights of LAM and Ongoing Covenants of the Company.

(a)    Restrictions with Respect to Certain Transactions of the Company.  The Company shall not, and shall not enter into any agreements or other arrangements with any Person to, take any action that could reasonably be expected to prevent, restrict or delay the Company from making any payment due under Section 1, including, without limitation, any agreement or other arrangement that could have the effect of diluting or subordinating LAM's interest in the Company Profits or the Company Revenues (including, but not limited to, revenue share or profit share arrangements); provided, however, that (i) changes in product fee levels and (ii) actions or entering into agreements that result in investment losses (including, without limitation, the launch of new Company Products and the hiring of new portfolio managers) will not alone constitute a violation of this provision.  In addition, the Company shall not, and shall not permit any Company Affiliate to, either directly or indirectly, take any of the following actions without the prior written consent of LAM (which consent shall not be unreasonably withheld or delayed), and any such act or transaction entered into without such consent shall be null and void *ab initio*, and of no force or effect:

(i)    enter into or engage in any transaction with, or modify or waive rights under any agreement or arrangement with, a Company Affiliate (including, without limitation, changes in the compensation paid by the Company or a Company Subsidiary to a Partner) in a manner that adversely affects the amount of and/or timing of any payment that LAM is to receive under this Agreement;

(ii)    change the accounting or reporting methods, principles or practices of the Company or its subsidiaries, except as required by GAAP;

(iii)    cause the Company, or any Company Subsidiary, to guarantee the obligations of any third-party;

(iv)    cause the Company, or any Company Subsidiary, to incur, after the date hereof, any debt other than debt incurred in the Ordinary Course of Business;

(v)    amend the Operating Agreement of the Company in a manner that adversely affects the amount of and/or timing of any payment that LAM is to receive under this Agreement;

(vi)    make or change any material tax election that adversely affects the amount of and/or timing of any payment that LAM is to receive under this Agreement;

(vii)    settle or compromise any material claim related to Taxes, enter into any closing agreement or similar agreement relating to Taxes, otherwise settle any dispute relating to Taxes, surrender any right to claim a Tax refund, offset or reduce any Tax liability, or request any ruling or similar guidance with respect to Taxes that adversely affects the amount of and/or timing of any payment that LAM is to receive under this Agreement;

(viii)    change the Company's or any Company Subsidiary's "pass-through" tax status;

(ix)    take any action that would reduce the regulatory capital of the Limited Purpose Broker Dealer; or

(x)    agree to do any of the foregoing.

For purposes of clarity, Section 2(a)(vii) shall not provide LAM with any consent right regarding settlement or claims made by the Partners that do not affect the Tax liability or a Tax refund of the Company itself or a Company Subsidiary.

(b)    Ongoing Covenants.  The Company hereby covenants and agrees that it shall:

(i)    cause the accounts of the Company and the Company Subsidiaries to be audited (at the expense of the Company) as of the close of each fiscal year by a nationally recognized independent public accounting firm;

(ii)    provide LAM with copies of all financial statements, reports and other updates provided to investors in the Company Products at substantially the same time that such financial statements, reports and other updates are provided to such investors;

(iii)    prohibit a Partner Withdrawal, other than an Authorized Partner Withdrawal, unless approved in writing by LAM;

(iv)    not pay, or permit the Company Subsidiaries to pay, a salary to Weiss for any fiscal year that in the aggregate exceeds the Weiss Salary Limit for such fiscal year;

(v)    comply, and cause the Company Subsidiaries to comply, with respect to itself, its business, its properties and its assets, in all material respects with all applicable Laws.

(vi)    amend the Articles of Organization of the Company to remove the required dissolution date and permit the Company to have perpetual existence prior to such required dissolution date;

(vii)    take all action necessary to permit the Company to make non-pro rata distributions pursuant to Section 6.3 of the Company Agreement; and

(viii)    continue to operate its business, and cause the Company Subsidiaries to operate their businesses, in a manner consistent with the Ordinary Course of Business (including, without limitation, paying all Taxes in a timely manner).

(c)    Notifications.  The Company shall promptly notify LAM of the occurrence of any of the following:

(i)    the receipt by the Company or any Company Subsidiary, during any three (3) month period, of requests to withdraw or redeem $10,000,000 or more from any Company Product;

(ii)    any changes to the composition of the Executive Committee of the Company;

(iii)    the withdrawal and/or termination of four (4) or more Partners as a members of the Company, during any six (6) month period;

(iv)    the commencement of any Tax Audit or Tax Proceeding involving the Company or any Company Subsidiary; and

(v)    any other event that is reasonably likely to have a Material Adverse Effect.

3.    <u>Confidentiality; Publicity</u>.

(a)    (i)    In addition to, and not by way of limitation of, the confidentiality provisions contained in any Transaction Document, all information relating to the terms of this Agreement as well as the discussions relating to this Agreement among the Parties (collectively, "<u>Confidential Information</u>") shall be held in strictest confidence by all Parties, and each Party agrees to use reasonable best efforts to ensure that such Party's Affiliates, Company Affiliates (in the case of the Company), principals and employees (collectively, "<u>Covered Persons</u>") hold the Confidential Information in confidence and not use the Confidential Information for any purpose unrelated to the matters covered by this Agreement.

(ii)    Each Party acknowledges and agrees that such Party shall not disclose, and shall use reasonable best efforts to ensure that such Party's Covered Persons do not disclose, any such Confidential Information other than to such Party's or such Covered Person's, attorneys, accountants and professional advisers (provided, in each case, that such Party or Covered Person is subject to customary obligations of confidentiality) or to another Party or Covered Person; provided, that this confidentiality undertaking on behalf of a given Party or Covered Person shall not prohibit or restrict the disclosure of: (A) any Confidential Information which becomes generally available to the public other than as a result of disclosure, directly or indirectly, by such Party or Covered Person; or (B) any Confidential Information in response to any subpoena, court order, interrogatory, request for information or documents, civil investigative demand or similar legal process, or pursuant to any request or demand (whether or not having the force of Law) of, or in the course of any examination by, any court, governmental or regulatory body or agency or self-regulatory organization, including any tax audit, or to reduce or eliminate any taxes under Section 1471–1474 of the Code (collectively, a "<u>Proceeding Requesting Disclosure</u>"); provided, that the tax treatment and tax structure of the transaction herein shall not be treated as Confidential Information.

(b)    If a Party receives a request to disclose all or any part of the Confidential Information known to such Party in connection with any Proceeding Requesting Disclosure, such Party agrees, at such Party's expense, to: (i) Notify the other Parties immediately of the existence, terms and circumstances surrounding such request to disclose; (ii) consult with the other Parties on the advisability of such Party taking, or making it possible for one or more other Parties to take, legally available steps to resist or narrow such request; (iii) furnish only such Confidential Information as he or she is required or requested (in the case of a request, by a regulatory authority with jurisdiction over such Party or any of its Affiliates) to disclose; and (iv) exercise his or her reasonable efforts to obtain an order or other reliable assurance that confidential treatment shall be accorded to the disclosed Confidential Information.

7

(c)    No Party shall issue a press release or make any other public announcement relating to or concerning the transactions contemplated by this Agreement or any other agreement, certificate, document or instrument contemplated hereby without the express prior written consent of the other Parties.

(d)    To the extent any filings to a Governmental Body by the Company or a Company Affiliate require an amendment as a result of the execution of this Agreement, the Company shall amend, or cause the applicable Company Affiliate to amend, such filing to a Governmental Body as promptly as practicable (and in any event no later than the time required under applicable Law).  The Company shall cooperate with LAM with respect to any such amendments described in the immediately preceding sentence, and LAM shall timely provide such information with respect to LAM and its Affiliates as is reasonably necessary to be disclosed in such amendments.  The Company shall provide LAM with copies of each such amendment in advance of such amendment being filed with the applicable Governmental Body.

(e)    As promptly as practicable following a request by LAM, the Company and each Company Subsidiary shall amend any Company Disclosure Documents identified by LAM to reflect the terms of this Agreement.  The Company shall cooperate with LAM with respect to such amendments to the Company Disclosure Documents.  The Company shall provide LAM with copies of each such amended Company Disclosure Documents in advance of such Company Disclosure Documents being delivered to any third-party.

(f)    The Company shall provide LAM with copies of any filings to a Governing Body or Company Marketing Materials which reference LAM or its Affiliates, and any such reference must be approved by LAM prior to such filings being made with the applicable Governmental Body or such Company Marketing Material being shared with any third-party; provided, that a failure by LAM to respond to any request for approval within five (5) Business Days shall be treated as an approval of the relevant reference.

(g)    Notwithstanding the foregoing, either Party and its Affiliates shall be permitted to disclose Confidential Information (i) as required to be disclosed by applicable Law, (ii) on filings to be made to a Governmental Body, subject to Sections 3(d) and 3(f), (iii) for financial reporting purposes (including, without limitation, in reports required to be made to the Securities and Exchange Commission or other regulatory authorities), (iv) in investor communications, subject to Sections 3(e) and 3(f), and (v) to its Affiliates and Representatives as necessary in connection with the Ordinary Course of Business of their respective businesses.

4.    Representations and Warranties of the Parties.

(a)    LAM.  LAM hereby represents and warrants to the Company that each statement contained in this Section 4(a) is true and correct as of the date hereof:

(i)    *Existence; Foreign Qualifications*.  LAM is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is formed and has all requisite power and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted.

(ii)    *Authority; Authorization; Enforceability*.  LAM has the requisite power and authority to execute, deliver, perform and consummate the transactions contemplated by this Agreement and the other Transaction Documents to which it is a party.  LAM has taken all actions necessary to authorize the execution and delivery by it of this Agreement and each other Transaction Document to which it is a party and the performance of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby.  This Agreement has been, and each other Transaction Document to which it is a party will be, when executed and delivered, duly executed and delivered by LAM and constitutes or will constitute (as the case may be) valid and binding obligations of LAM, enforceable against LAM in accordance with their respective terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other similar laws affecting the enforceability of creditors' rights generally, general principles of equity and the discretion of courts in granting equitable remedies.

(b)    <u>Company</u>.  The Company hereby represents and warrants to LAM that, except as set forth in the disclosure schedules delivered by the Company in connection with this Agreement (the "<u>Disclosure Schedule</u>"), each statement contained in this <u>Section 4(b)</u> is true and correct as of the date hereof:

(i)    *Existence; Foreign Qualifications*.  The Company, and each Company Subsidiary, is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated or formed and has all requisite power and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted.  The Company, and each Company Subsidiary, is duly qualified and authorized to do business and is in good standing in each of the jurisdictions in which the ownership, use or leasing of its assets and properties, or the conduct or nature of its business, makes such qualification or authorization necessary, except such other jurisdictions where the failure to be so qualified or licensed or in good standing would not have a Material Adverse Effect.

(ii)    *Authority; Authorization; Enforceability*.  The Company, and each Company Subsidiary, has the requisite power and authority to execute, deliver, perform and consummate the transactions contemplated by this Agreement and the other Transaction Documents to which it is a party.  The Company has taken all actions necessary to authorize the execution and delivery by it of this Agreement and each other Transaction Document to which it is a party and the performance of its obligations hereunder and thereunder, and the consummation of the transactions contemplated hereby and thereby.  This Agreement has been, and each other Transaction Document to which it is a party will be, when executed and delivered, duly executed and delivered by the Company and constitutes or will constitute (as the case may be) valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other similar laws affecting the enforceability of creditors' rights generally, general principles of equity and the discretion of courts in granting equitable remedies.

(iii)    *Capitalization*.  The issued and outstanding shares and equity interests of the Company and each of the Company Subsidiaries (a) were not issued in violation of the organizational documents of the applicable entity, and (b) are not subject to, any preemptive rights, rights of first refusal, rights of first offer, purchase options, call options or other similar rights of any Person.

(iv)    *Financial Statements*.    Set forth in <u>Section 4(b)(iv)(A) of the Disclosure Schedule</u> are the consolidated balance sheet and the related statements of income and stockholders' equity and cash flows of the Company and the Company Subsidiaries (the "<u>Financial Statements</u>") for the years ended December 31, 2015, December 31, 2016 and December 31, 2017 and the one-month period ended January 31, 2018.    The Financial Statements (A) have been prepared in accordance with GAAP, consistently applied throughout the specified periods and all prior periods, based on the books and records of the Company and the Company Subsidiaries, and (B) are complete and correct in all material respects and present fairly, in all material respects, the financial condition of the Company and the Company Subsidiaries as of the indicated dates and the results of operations and cash flows of the Company and the Company Subsidiaries for the indicated periods, in each case in accordance with GAAP, consistently applied throughout the specified periods and all prior periods, except for the absence of footnotes in the case of the unaudited Financial Statements and subject, in the case of the unaudited Financial Statements, to normal year-end adjustments.    Except as expressly set forth in this Agreement, the Transaction Documents and on <u>Section 4(b)(iv)(B) of the Disclosure Schedule</u>, the Company, and each Company Subsidiary, has no liabilities, obligations or commitments of any type over $250,000 per year.

(v)    *No Conflict*.    Except as set forth in <u>Section 4(b)(v) of the Disclosure Schedule</u>, the execution and delivery by the Company of this Agreement and the other Transaction Documents to which it is a party, the performance and consummation by the Company of the transactions contemplated hereby and thereby, and compliance by the Company with the provisions hereof and thereof, will not (with or without the passage of time, notice or both) (A) violate or conflict with the organizational documents of the Company, (B) violate or give rise to any right of termination, cancellation, or acceleration under, any material agreement, contract, lease, note, bond, mortgage, indenture, security, license, permit, or instrument to which the Company is a party or to which the Company or any of its material assets is subject, or other agreement material to the operation of the Company's business, (C) result in the imposition of any lien on any material asset of the Company, (D) violate any Laws applicable to the Company, or (E) require any consent, approval or other action of, notice to, or filing with any Person, except, in the case of the immediately preceding clauses (B), (C) and (D), where such violation, breach, default, termination, acceleration, lien or cancellation would not have a Material Adverse Effect.

(vi)    *Additional Tax Matters*.

a.    All Taxes (whether or not shown on any Tax Return) for which the Company or any Company Subsidiary may be liable have been timely paid.    All Tax Returns required to have been filed by or with respect to the Company or any Company Subsidiary have been timely filed.    All such Tax Returns are complete and accurate and disclose all Taxes required to be paid by or with respect to the Company and each Company Subsidiary for the periods covered thereby.    The charges, accruals and reserves for Taxes with respect to the Company (excluding any provision for deferred income taxes) are adequate to cover tax liabilities accruing through the date thereof and neither the Company nor any Company Subsidiary has incurred or accrued any liability for Taxes subsequent to such date other than in the Ordinary Course of Business.    Except as set forth on <u>Section 4(b)(vi)(a) of the Disclosure Schedule</u>, no extension of time within which to file any such Tax Return is in effect.

b.    Except as set forth on <u>Section 4(b)(vi)(b)(1) of the Disclosure Schedule</u>, no waiver of any statute of limitations relating to Taxes for which the Company or any Company Subsidiary may be liable is in effect, and no written request for such a waiver is outstanding. <u>Section 4(b)(vi)(b)(2) of the Disclosure Schedule</u> sets forth a schedule of the Tax Returns referred to in clause (a) with respect to which neither the appropriate Governmental Body has completed its examination (with all issues finally resolved) nor the period for assessment of the associated Taxes (taking into account all applicable extensions and waivers) has expired.

c.    Except as set forth on <u>Section 4(b)(vi)(c) of the Disclosure Schedule</u>, there is no action, suit, investigation, audit, Claim or assessment pending or proposed or threatened with respect to Taxes for which the Company or any Company Subsidiary may be liable.  No claim has ever been made by a Governmental Body in a jurisdiction where the Company or any Company Subsidiary has never paid Taxes or filed Tax Returns asserting that the Company or such Company Subsidiary is or may be subject to Taxes assessed by such jurisdiction.  All deficiencies asserted or assessments made as a result of any examination of the Tax Returns referred to in <u>Section 4(b)(vi)(a)</u> have been paid in full or otherwise finally resolved.

d.    There are no Tax rulings, requests for rulings, or closing agreements relating to Taxes for which the Company or any Company Subsidiary may be liable that could affect the Company's or any Company Subsidiary's liability for Taxes for any taxable period ending after the date hereof. Neither the Company nor any Company Subsidiary will be required to include or accelerate the recognition of any item in income, or exclude or defer any deduction or other tax benefit, in each case in any taxable period (or portion thereof) after the date hereof, as a result of any change in method of accounting, closing agreement, intercompany transaction, installment sale or the receipt of any prepaid amount, in each case prior to the date hereof.

e.    There are no Liens for Taxes upon the assets of the Company or any Company Subsidiary except Liens relating to current Taxes not yet due.

f.    All Taxes which the Company or any Company Subsidiary is required by Law to withhold or to collect for payment have been duly withheld and collected and have been paid to the appropriate Governmental Body.

g.    Neither the Company nor any Company Subsidiary has any liability for Taxes of another Person under Treasury Regulation § 1.1502-6 (or any similar provision of state, local or foreign Law), under any agreement or arrangement, as a transferee or successor, or otherwise.  Neither the Company nor any Company Subsidiary is a party to any written or unwritten agreement or arrangement providing for (i) the allocation or payment of Tax liabilities or for Tax benefits between or among members of any group of corporations that files, will file, or has filed Tax Returns on a combined, consolidated or unitary basis and (ii) one Person to pay any other Person for the use of or benefit derived from such Person's Tax assets or deductions.

h.    Neither the Company nor any Company Subsidiary has participated in any "listed transaction" within the meaning of Treasury Regulation § 1.6011-

11

4(b)(2) and, with respect to each transaction in which the Company or any Company Subsidiary has participated that is a "reportable transaction" within the meaning of Treasury Regulation § 1.6011-4(b)(1), such participation has been properly disclosed on IRS Form 8886 (Reportable Transaction Disclosure Statement) and on any corresponding form required under state, local or other Law.

            i.      There are no Tax credits, grants or similar amounts that are or could be subject to clawback or recapture as a result of (i) this Agreement or (ii) a failure by the Company or any Company Subsidiary to satisfy one or more requirements on which the credit, grant or similar amount is or was conditioned.

            j.      No Transaction is subject to withholding under Section 1445 of the Code (relating to "FIRPTA").  No real property transfer or gains Tax, sales Tax, use Tax, stamp Tax, stock transfer Tax or other similar Tax will be imposed on the Transactions.

            k.      During the last three years, neither the Company nor any Company Subsidiary has been a party to any transaction treated by the parties thereto as one to which Section 355 of the Code (or any similar provision of state, local or foreign Law) applied.

            (vii)      *Compliance with Laws*.  The Company and each Company Subsidiary is, with respect to itself, its business, its properties and its assets, in compliance in all material respects with all applicable Laws.  The Company and each Company Subsidiary has obtained all regulatory licenses, authorizations and consents from any applicable Governmental Body in order to operate its business, except where the failure to obtain such license, authorization or consent would not have a Material Adverse Effect.  Neither the Company nor any Company Subsidiary is in material default with respect to compliance with its operating agreement and governing documents.

            (viii)      *Litigation; Investigations*.  No investigation or inquiry is pending or threatened (to the Company's knowledge after due inquiry) against or involving the Company or any Company Subsidiary by any Governmental Body with authority over the Company or such Company Subsidiary.  No Claim is pending or threatened (to the Company's knowledge after due inquiry) against or involving against the Company or any Company Affiliate related to the operation of the Company or the Company Subsidiaries.  No Company Affiliate has been charged with or convicted of any criminal offense or been a party to or held liable in a civil action, arbitration or administrative proceeding, by judgment or settlement, for (A) violation of any applicable securities laws, (B) fraud, (C) breach of fiduciary duty, (D) misrepresentation or (E) money laundering.  Except as previously disclosed to LAM, neither the Company nor any Company Subsidiary has had any correspondence, including any communications or notifications, with a Governmental Body in the last three (3) years that would be material to LAM's determination whether to enter into this Agreement.

            (ix)      *Certain Anti-Money Laundering Matters*.  (A)  Since formation, neither the Company nor any of the Company Subsidiaries nor any director, general partner, manager, member, officer, or employee thereof, nor, to the knowledge of the Company, any Company Affiliate or Representative of the Company or the Company Subsidiaries, is a person

that is, or is owned or controlled by a Person that is:  (1) the subject of any sanctions administered or enforced by the U.S. Department of Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union, the World Bank, or any other relevant sanctions authority (collectively, "Sanctions"); or (2) located, organized or resident in a country or territory that is the subject of Sanctions (including, without limitation, Burma/Myanmar, Cuba, Iran, Libya, North Korea, Sudan and Syria).  (B) The Company shall not, directly or indirectly, lend, contribute or otherwise make available funds to any subsidiary, joint venture partner or other Person: (1) to fund or facilitate any activities or business of or with any Person or in any country or territory that, at the time of such funding or facilitation, is the subject of Sanctions; (2) in any other manner that will result in a violation of Sanctions by any Person (including LAM).  (C) The Company and each Company Subsidiary has not engaged in, is not now engaged in, and shall not engage in, any dealings or transactions with any Person, or in any country or territory, that at the time of the dealing or transaction is or was the subject of Sanctions.  (D)  Neither the Company nor any the Company Subsidiaries nor any director, general partner, manager, member, officer, or employee thereof, nor, to the knowledge of the Company, any Company Affiliate or Representative of the Company or the Company Subsidiaries, nor any Person acting on its or their behalf, has entered into any transaction or engaged in any activity prohibited by any resolution issued by the United Nations Security Council under Chapter VII of the UN Charter.

(x)    _No Untrue Statement or Omission of a Material Fact_.    To the knowledge of the Company, the representations and warranties of the Company set forth herein or in the Disclosure Schedule attached hereto, any information relating to the Company, its subsidiaries and their respective businesses furnished by or on behalf of the Company in connection with the transactions contemplated by this Agreement or any other Transaction Document delivered hereunder does not contain any untrue statement of a material fact or omit any material fact necessary in order to make the statements made, in light of the circumstances in which made, not misleading,  In the event that any of the representations and warranties in this Section 4(b) is no longer true and accurate in all material respects, the Company shall notify LAM as promptly as reasonably practicable.

5.    Remedies; Indemnification.

(a)    Each Party acknowledges that monetary damages may be an inadequate remedy for breach or threatened breach of this Agreement because of the difficulty of ascertaining the amount of damage that will be suffered in the event that this Agreement is breached.  Each Party shall be entitled to seek equitable relief, including an injunction and specific performance, without the requirement of posting a bond or other security, in the event of any breach or threatened breach of the provisions of this Agreement by the other Parties or any of its representatives, in addition to all other remedies available to such Party at law or in equity, subject to the terms of this Agreement.

(b)    The Company shall indemnify and hold harmless LAM and each of its Affiliates and their respective directors, officers, employees, agents and representatives (each, an "Indemnified Party") to the fullest extent permitted by law from and against any and all costs, losses, Claims, Taxes incurred, damages, liabilities and expenses, including reasonable costs of investigation and defense, and reasonable attorneys' fees and expenses (collectively, "Losses") incurred by the Indemnified Party as a result of, in connection with, or related to this Agreement; provided, that, if any Loss arises out of any action or omissions of an Indemnified Party no such

13

indemnification shall be due if such action or omission constituted willful misconduct or fraud on the part of such Indemnified Party. For the avoidance of doubt, "Losses" shall not include investment losses incurred by LAM that LAM would not be indemnified for pursuant to the terms of the Investment Management Agreement. Further, if not otherwise taken into account under <u>Section 1(c)</u> hereof, the Company shall hold LAM harmless from any and all Losses incurred by the Company connected with the open Tax Audits.

6.      <u>Expenses</u>. Except as otherwise expressly provided in this Agreement or any Transaction Document, each Party shall pay its own costs and expenses incurred in anticipation of, relating to and in connection with the negotiation and execution of this Agreement, the Transaction Documents and the transactions contemplated hereby and thereby.

7.      <u>Non-Disparagement</u>. Each Party agrees that it will not make, or cause or allow any of its Affiliates (including, in the case of the Company, the Company Affiliates) to make, any oral or written statement to any third party that disparages, defames, or reflects adversely upon any of the other Parties and/or any of their Affiliates, or any of their respective partners, officers, employees, partners or members (such statements "<u>Disparaging Remarks</u>"); provided, that the foregoing shall not be interpreted to limit a Party's rights to make statements in connection with any proceeding to enforce such Party's rights or another Party's obligations under this Agreement. Further, each Party hereby agrees that it shall be responsible for any Disparaging Remarks made by one of its Affiliates (including, in the case of the Company, the Company Affiliates).

8.      <u>Miscellaneous</u>.

(a)      <u>Entire Agreement</u>. This Agreement and the Investment Management Agreement embody the entire agreement and understanding of the Parties with respect to the Managed Account and, together, supersede all prior discussions, negotiations, agreements and understandings among LAM, the Company and the Company Affiliates with respect to the Managed Account and the subject matter of this Agreement.

(b)      <u>Governing Law; Choice of Forum; Waiver of Jury Trial</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to any choice of law or conflicts of law provisions or rule of any jurisdiction that would cause the laws of any other jurisdiction to apply. Each Party hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the federal courts of the United States sitting in the Southern District of New York, or if such federal court declines to exercise jurisdiction over any action filed pursuant to this Agreement, the courts of the State of New York sitting in the County of New York, and any court to which an appeal may be taken in connection with any action filed pursuant to this Agreement, for the purposes of all legal Proceedings arising out of or relating to this Agreement and the Parties agree not to commence any action, suit or Proceeding relating hereto except in such courts. In connection with the foregoing consent, each Party irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the court's exercise of personal jurisdiction over such Party to this Agreement or the laying of venue of any such Proceeding brought in such a court and any claim that any such Proceeding brought in such a court has been brought in an inconvenient forum. Each Party further irrevocably waives its right to a trial by jury and consents that service of process may be effected in any manner permitted under the laws of the State of New York.

(c)     <u>Amendment</u>.  This Agreement may be amended, and any provisions hereof may be waived, only by a writing signed by both Parties.

(d)     <u>Assignment</u>.  The Company may not assign this Agreement or any of its rights hereunder by operation of law or otherwise without the prior written consent of LAM.  LAM may assign any or all of its rights under this Agreement to an Affiliate without the prior consent of the Company.  This Agreement shall be binding upon any successors and permitted assigns of the Parties.

(e)     <u>Termination</u>.  LAM shall have the right to unilaterally terminate this Agreement and reduce the Revenue Share Percentage to zero percent (0%).  LAM may also terminate its revenue share rights in respect of any Company Subsidiary at its sole discretion.  LAM may exercise this right at any time and for any reason.  Any such termination shall be effective immediately upon delivery of notice to the Company of such termination.

(f)     <u>Severability</u>.  If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by applicable law.

(g)     <u>Parties in Interest</u>.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns and, except as otherwise expressly provided herein, nothing in this Agreement, express or implied, is intended to or shall confer upon any third-party, any legal or equitable right, title, privilege, benefit, interest, remedy or claim of any nature whatsoever under or by reason of this Agreement, or any term or provision hereof.

(h)     <u>Notices</u>.  Notice given pursuant to any of the provisions of this Agreement shall be in writing and shall be mailed or delivered:

If to LAM, to:

LAM Holding LLC
c/o Leucadia National Corporation
520 Madison Avenue
New York, New York 10022
Attention:  General Counsel
Fax:  (646) 786-5053
Email:  msharp@leucadia.com

With a required copy (which shall not constitute notice) to:

Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
Attention:  David Form

15

Fax:  (212) 839-5599
Email:  dform@sidley.com

If to the Company, to:

GWA, LLC
c/o Weiss Multi-Strategy Advisers LLC
320 Park Avenue
20th Floor
New York, NY 10022
Attention:  Jeffrey Dillabough
Fax:
Email:  jdillabough@gweiss.com

With a required copy (which shall not constitute notice) to:

Morgan, Lewis & Bockius LLP
One State Street
Hartford, CT 06103
Attention: Robert Dombroff
Fax: (860) 240-2800
Email: robert.dombroff@morganlewis.com

(i)    <u>Headings</u>.  The headings and subheadings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

(j)    <u>Counterparts</u>.  This Agreement may be executed in separate facsimile or electronic counterparts, each of which when executed shall be deemed to be an original, and all of which, taken together, shall be deemed to constitute one and the same instrument.

9.    <u>Definitions</u>.  The following terms are defined as follows:

(a)    "<u>Affiliate</u>" means, with respect to any Person, any other Person with regard to which the Person is controlling, controlled or commonly controlled (which shall be deemed to include, without limitation, by reason of one such Person owning, directly or indirectly, a majority of the voting securities or other voting power of such other Person, as applicable, or otherwise by reason of such Person having the power or authority, directly or indirectly, to direct the management or policies of such other Person, as applicable).

(b)    "<u>Agreement</u>" has the meaning set forth in the preamble.

(c)    "<u>Authorized Partner Withdrawal</u>" means (i) a Partner Withdrawal made by a Partner (other than Weiss or Jordi Visser) in connection with such Partner's withdrawal and/or termination as a member of the Company, (ii) a Partner Withdrawal made by a Partner (other than Weiss) that does not cause the aggregate amount of all Partner Withdrawals during the previous six (6) months to exceed $500,000, (iii)  a Partner Withdrawal after which the aggregate net asset value of all Partner Investments would be greater than or equal to $100,000,000, (iv) a Partner Withdrawal,

16

which LAM has consented to pursuant to <u>Section 2(b)(iv)</u>, or (v) any distribution by the Company to a Partner (other than Weiss or Jordi Visser) pursuant to Section 6.3 of the Company Agreement in connection with any Taxes with respect to such Partner's interest in the Company for any taxable period, which ends after December 31, 2016; provided that any distribution by the Company to a Partner pursuant to this clause (v) shall not exceed the applicable Taxes owed by such Partner with respect to its interest in the Company for the applicable taxable period, as determined by the Company in consultation with the Company's accountants. Notwithstanding the foregoing, if a Partner Withdrawal is made pursuant to clause (v) of the preceding sentence and such Partner Withdrawal results in the aggregate net asset value of all Partner Investments being less than $100,000,000, then for the next twelve (12) months following such Partner Withdrawal, no Authorized Partner Withdrawal may be made pursuant to clause (ii) of the preceding sentence unless the aggregate net asset value of all Partner Investments would be greater than or equal to $100,000,000 following such Partner Withdrawal pursuant to clause (ii) of the preceding sentence.

(d)    "<u>Business Day</u>" means any day, other than Saturday, Sunday or any other day on which banks located in the State of New York are authorized or required to close.

(e)    "<u>Claim</u>" means any hearing, claim, suit, action, arbitration, cause of action, criminal prosecution, demand letter or Proceeding, whether at Law or at equity, before or by any Governmental Body, any arbitrator or other tribunal.

(f)    "<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

(g)    "<u>Company</u>" has the meaning set forth in the preamble.

(h)    "<u>Company Affiliate</u>" means (i) a Company Subsidiary, (ii) an Affiliate of the Company or a Company Subsidiary, (iii) a Partner, or (iv) a Related Person of a Partner.

(i)    "<u>Company Disclosure Documents</u>" means a private placement memorandum, limited partnership agreement, investment management agreement or similar disclosure documents provided to a client or investor in an investment product, vehicle or account managed or advised by the Company or a Company Affiliate.

(j)    "<u>Company Marketing Materials</u>" means any marketing, offering, publicity or similar materials prepared by the Company or a Company Affiliate with respect to the Company, any Company Subsidiary, or any Company Product.

(k)    "<u>Company Product</u>" mean any investment product, vehicle or account managed or advised by the Company and/or a Company Affiliate.

(l)    "<u>Company Profits</u>" shall mean, with respect to a time period, the Company's items of income and gain for such time period to the extent they exceed the Company's items of loss, expense, and deduction for such time period as determined under GAAP; <u>provided</u>, <u>however</u>, that during the Profit Share Period the Company shall only incur items of loss, expense, and deduction in a manner consistent with the Ordinary Course of Business; and, <u>provided</u>, <u>further</u>, that Company Profits shall not include any income received by the Company with respect to the Notes.

(m)    "Company Revenues" shall mean, for any Revenue Share Period, the consolidated gross revenue recognized by the Company and each Company Subsidiary during such Revenue Share Period; provided, however, that Company Revenues shall not include (i) any income received by the Company with respect to the Notes, (ii) revenue from the sublease of the Company's leasehold interests in real property located at One State Street, Hartford CT 06103 to unaffiliated third parties, but only to the extent that such revenue is less than the Company's expenses with respect to such leasehold (during such Revenue Share Period), (iii) revenue from the sublease of the a Company Subsidiary's leasehold interests in real property located at 320 Park Avenue, New York, NY 10022 to unaffiliated third parties, but only to the extent that such revenue is less than such Company Subsidiary's expenses with respect to such leasehold (during such Revenue Share Period), (iv) revenue to a Company's Subsidiary attributable to the chartering of the Company Subsidiary's corporate aircraft, but only to the extent that such aircraft is operated at a net loss, and (v) revenue to the Limited Purpose Broker Dealer from payments made by the Company or Company Subsidiaries to the Limited Purpose Broker Dealer for the purpose of maintaining the Limited Purpose Broker Dealer's compliance with applicable regulatory capital requirements and related rules.  Notwithstanding the foregoing, and solely for the purposes of this definition, the revenue of the Company or a Company Subsidiary derived from performance fees or other similar incentive arrangements shall only be deemed to be recognized when such amounts are crystalized.

(n)    "Company Subsidiary" means a Subsidiary of the Company (including any such Subsidiaries formed after the date hereof) and each of such Subsidiaries predecessors.

(o)    "Confidential Information" has the meaning set forth in Section 3(a)(i).

(p)    "Covered Person" has the meaning set forth in Section 3(a)(i).

(q)    "Disclosure Schedule" has the meaning set forth in Section 4(b).

(r)    "Disparaging Remarks" has the meaning set forth in Section 7.

(s)    "Family" means, with respect to a Person that is a natural person: (i) such Person's ancestors and issue; (ii) such Person's spouse, widow, or widower; and (iii) such Person's siblings, their spouses, and their issue.

(t)    "Financial Statements" has the meaning set forth in Section 4(b)(iv).

(u)    "GAAP" means United States generally accepted accounting principles, consistently applied.

(v)    "Governmental Body" means the United States or any other nation and any state, province, or any municipal or political subdivision or agency or instrumentality of any of the foregoing, including any governmental, regulatory or administrative agency, any department, board or commission, any non-governmental or quasi-governmental self-regulatory agency or accreditation agency, any court or tribunal of judicial authority or any arbitrator, or any contractor or agent of any of the foregoing.

(w)    "Indemnified Party" has the meaning set forth in Section 5(b).

(x)     "Investment Management Agreement" has the meaning set forth in the recitals.

(y)     "LAM" has the meaning set forth in the preamble.

(z)     "Law" or "Laws" means all laws, rules, regulations, ordinances, orders, judgments, injunctions, decrees and other legislative, administrative or judicial restrictions.

(aa)    "Lien" means any lien, mortgage, pledge, encumbrance, charge, security interest, adverse Claim, liability, interest, charge, preference, priority, proxy, transfer restriction (other than restrictions under the U.S. Securities Act of 1933, as amended, and state securities Laws), encroachment, Tax, Order, community property interest, equitable interest, option, warrant, right of first refusal, easement, profit, license, servitude, right of way, covenant or zoning restriction.

(bb)    "Limited Purpose Broker Dealer" means Weiss Multi-Strategy Funds LLC, a Company Subsidiary.

(cc)    "Losses" has the meaning set forth in Section 5(b).

(dd)    "Managed Account" has the meaning set forth in the recitals.

(ee)    "Material Adverse Effect" means any event, change, circumstance, effect or other matter that has a material adverse effect on (i) the amount of and/or (ii) timing of any payment that LAM is entitled to receive pursuant to this Agreement.

(ff)    "Monetization Event" means with respect to any Person, (i) a merger or consolidation into or with any other Person, or a sale, transfer, exchange or other disposition of the equity interests of such Person in a single transaction or a series of related transactions, in each case, such that the Persons who, immediately prior to such transaction or series of related transactions, beneficially owned, directly or indirectly, at least twenty five percent (25%) of the equity interests of such party or equivalent interest in any successor entity immediately after such transaction or series of related transactions, shall cease to retain such beneficial ownership following such transaction or series of transactions; or (ii) a single transaction or series of related transactions, pursuant to which any other Person or Persons acquire all or substantially all of such Person's and its Affiliates' assets determined on a consolidated basis.

(gg)    "Notes" means those certain notes set forth in Section 9(ff) of the Disclosure Schedule, which were originally issued by Banco Espirito Santo, S.A., assumed by Novo Banco, S.A. in 2014, and retransferred from Novo Banco, S.A. back to Banco Espirito Santo, S.A. by the Bank of Portugalon on December 29, 2015.

(hh)    "Notional Value" has the meaning ascribed to such term in the Investment Management Agreement.

(ii)    "Order" means any order, award, decision, injunction, judgment, ruling, decree, charge, writ, subpoena, settlement agreement, or verdict entered, issued, made or rendered by or with any Governmental Body, mediator or arbitrator.

(jj)    "Ordinary Course of Business" means the ordinary course of business consistent with past custom and practice (including with respect to quantity and frequency).

(kk)    "Partner" means each Person who, directly or indirectly, holds an equity interest in the Company.

(ll)    "Partner Account" means the account operated on behalf of the Company by OGI Associates LLC through which the Partners trade their proprietary capital and any similar accounts managed on behalf of the Partners and their Affiliates.

(mm)    "Partner Investment" means any investment by a Company Affiliate in any Partner Account.

(nn)    "Partner Withdrawal" means any withdrawal, redemption or similar action by a Company Affiliate of all, or any portion of, a Partner Investment.

(oo)    "Partnership Tax Audit Rules" means Sections 6221 through 6241 of the Code, as amended by section 1101 of the Bipartisan Budget Act of 2015, Pub. L. No. 114-74 and section 411 of the Protecting Americans from Tax Hikes Act of 2015, Pub. L. 114-113. div. Q, together with any guidance issued thereunder or successor provisions and any similar provision of state or local tax laws.

(pp)    "Party" or "Parties" has the meaning set forth in the preamble.

(qq)    "Person" means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company or other legal entity or organization.

(rr)    "Prime Rate" shall mean the "Wall Street Journal Prime Rate" of interest as listed in *The Wall Street Journal* or another rate agreed to by the Company and LAM.

(ss)    "Prior Tax Period" means any taxable period that ends on or before the date hereof and the portion of any Straddle Period ending on the date hereof.

(tt)    "Proceeding" means any action, proceeding, audit, lawsuit, litigation, investigation or arbitration, mediation, complaint, charge, claim, demand, hearing, inquiry, investigation or like matter (in each case, whether civil, criminal or administrative) by or before or on behalf of any Governmental Body, whether administrative, judicial or arbitral in nature.

(uu)    "Proceeding Requesting Disclosure" has the meaning set forth in Section 3(a)(ii).

(vv)    "Profit Share Amount" has the meaning set forth in Section 1(a).

(ww)    "Profit Share Percentage" means ten percent (10%).

(xx)    "Profit Share Period" means the period that starts on the date the Managed Account is funded with $250,000,000 of Notional Value, and ends on April 30, 2019.

(yy)    "Reduction Percentage" has the meaning set forth in Section 1(e).

(zz)    "Related Person" means, with respect to any Person that is a natural person, (i) any member of such Person's Family, and (ii) any corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company or other legal entity or organization controlled by such Person or such Person's Family.

(aaa)    "Representative" means, with respect to any Party, such Party's Affiliates and its and their officers, directors, stockholders, members, partners, employees, financial and other advisors, attorneys, accountants, financiers, consultants, agents or any other representatives.

(bbb)    "Revenue Share Amount" has the meaning set forth in Section 1(b).

(ccc)    "Revenue Share Percentage" means fifteen percent (15%).  Notwithstanding the foregoing, if Leucadia Funding LLC reduces its Notional Value other than in a manner permitted under the Investment Management Agreement, then the Revenue Share Percentage shall be automatically reduced to zero percent (0%).  For the avoidance of doubt, there shall be no adjustment to the Revenue Share Percentage if Leucadia Funding LLC reduces its Notional Value in accordance with the terms of the Investment Management Agreement.

(ddd)    "Revenue Share Period" means the period that starts immediately upon the expiration of the Profit Share Period, in the case of the initial Revenue Share Period, and for each Revenue Share Period thereafter, the period that starts on the day immediately following the last day of the preceding Revenue Share Period that ends on the earliest of the following dates: (i) the end of each calendar quarter, and (ii) any other date determined by the Parties.

(eee)    "Sale Proceeds" has the meaning set forth in Section 1(e).

(fff)    "Sale Proceeds Share Percentage" means nineteen and ninety-nine one hundredths percent (19.99%).

(ggg)    "Sanctions" has the meaning set forth in Section 4(b)(vii).

(hhh)    "Straddle Period" means any taxable year or period beginning on or before and ending after the date hereof.

(iii)    "Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any manager, management board, managing director or general partner of such business

entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

(jjj)    "Tax" or "Taxes" means (a) any federal, state, local, or foreign net income, gross income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, production, ad valorem, premium, windfall profits, environmental (including, but not limited to, taxes under Section 59A of the Code), customs duties, capital stock, franchise, profits, withholding on amounts paid to or by any Person, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, unclaimed property, escheat payments, or other tax of any kind whatsoever, including any interest, penalty, or additional amounts imposed by any Governmental Body, whether disputed or not, and (b) any liability for the payment of amounts determined by reference to amounts described in clause (a) as a result of having been a member of any group of corporations that files, will file, or has filed Tax Returns on a combined, consolidated or unitary basis, as a result of any obligation under any agreement or arrangement, as a result of being a transferee or successor, or otherwise.

(kkk)    "Tax Audit" means (i) the U.S. Federal income audits of the Company for taxable years 2009 and 2010, and (ii) the New York State Department of Taxation and Finance's sales and use tax audit of Weiss Multi-Strategy Advisers LLC for the period September 1, 2015 through February 28, 2018.

(lll)    "Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(mmm)    "Transaction Document" means the Investment Management Agreement and any other agreement entered into between Parties hereto (or their Affiliates) in connection with the diligence, discussion and/or execution of the transactions contemplated by this Agreement.

(nnn)    "Unauthorized Weiss Salary Event" means the payment of salary to Weiss by the Company or the Company Subsidiaries in a fiscal year in an aggregate amount in excess of the Weiss Salary Limit for such fiscal year.

(ooo)    "Unauthorized Withdrawal Event" means either (i) a Partner Withdrawal other than an Authorized Partner Withdrawal, or (ii) any distribution by the Company to a Partner pursuant to Section 6.3 of the Company Agreement in connection with any Taxes for any taxable period prior to the date hereof, including but not limited to Taxes associated with the Tax Audits (or any similar distribution from a Company Subsidiary).

(ppp)    "Weiss" means George Weiss and his Related Persons.

(qqq)    "Weiss Salary Limit" means, with respect to a fiscal year, the lesser of (i) $1,000,000 and (ii) the aggregate of amount of salary or guaranteed payment to be paid to Weiss by the Company and/or the Company Subsidiaries that would cause the Company Profits for such fiscal year to equal $0. For the avoidance of doubt, if the Company Profits for a fiscal year (calculated without regard to any salary or guaranteed payment paid to Weiss by the Company or any Company

Subsidiary) are equal to or less than $0, then the Weiss Salary Limit shall be $0 for such fiscal year. Notwithstanding the foregoing, the Weiss Salary Limit for 2018 shall be $1,000,000.

    (rrr)    "<u>WMSA</u>" has the meaning set forth in the recitals.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement as of the date first written above.

**LAM HOLDING LLC**

By: _____
      Name:  Nick Daraviras
      Title:   Authorized Person


**GWA, LLC**

By: _____
      Name:
      Title:

[Signature Page to Strategic Relationship Agreement]

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement as of the date first written above.

**LAM HOLDING LLC**

By: _____

　　　Name:
　　　Title:


**GWA, LLC**

By: _____

　　　Name:
　　　Title:

**Jeffrey D. Dillabough**
**Senior Vice President**
**General Counsel**