# 25-914-cv

## United States Court of Appeals
### *for the*
## Second Circuit

---

JEFFERIES STRATEGIC INVESTMENTS, LLC,
LEUCADIA ASSET MANAGEMENT HOLDINGS LLC,

*Plaintiffs-Appellees,*

– v. –

GEORGE WEISS,

*Defendant-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 3 of 5 (Pages A-506 to A-755)

SCOTT BALBER
MICHAEL P. JONES
DANIEL GOMEZ
HERBERT SMITH FREEHILLS
  KRAMER NEW YORK LLP
*Attorneys for Plaintiffs-Appellees*
200 Park Avenue, 16th Floor
New York, New York 10166
(917) 542-7810

BRIAN A. KATZ
PETER M. SARTORIUS
DANIEL M. STONE
OLSHAN FROME WOLOSKY LLP
*Attorneys for Defendant-Appellant*
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300

CP COUNSEL PRESS    (800) 4-APPEAL • (382243)

i

# TABLE OF CONTENTS

**Page**

United States District Court Docket Entries ............. A-1

Notice of Removal, by Defendant, dated
June 7, 2024 ............................................................ A-12

Exhibit A to Notice -
Summons and Complaint in the New York State
Supreme Court Matter *Jefferies Strategic
Investments, LLC and Leucadia Asset
Management Holdings LLC v. George Weiss*
("New York State Matter"), dated May 6, 2024 .... A-17

Order Regulating Proceedings, by the Honorable
Alvin K. Hellerstein, dated October 11, 2024 ....... A-39

Answer to Complaint, dated October 25, 2024 ......... A-40

Notice of Motion, by Defendant, for an Order
Granting Summary Judgment, dated
November 5, 2024 ................................................... A-52

Memorandum of Law, by Defendant, in Support of
Motion, dated November 5, 2024 .......................... A-54

Statement of Material Facts, by Defendant, in
Support of Motion, dated November 5, 2024 ........ A-83

Declaration of Defendant George Weiss, in Support
of Motion, dated November 5, 2024...................... A-97

Declaration of Jeffrey Dillabough, in Support of
Motion, dated November 5, 2024 .......................... A-104

Exhibit 1 to Foregoing Documents -
Draft Forbearance Agreement, dated
February 1, 2024 .................................................... A-112

ii

**Page**

Exhibit 2 to Foregoing Documents -
Email from Jeffrey Dillabough to Sonia Han
Levovitz, dated February 12, 2024 ....................... A-120

Exhibit 3 to Foregoing Documents -
Forbearance Agreement, dated February 12, 2024     A-123

Exhibit 4 to Foregoing Documents -
Redlined Forbearance Agreement, dated
February 11, 2024 ................................................. A-136

Exhibit 5 to Foregoing Documents -
Email from Scott Balber to Jeffrey Dillabough,
dated February 12, 2024 ........................................ A-150

Exhibit 6 to Foregoing Documents -
Email from Nick Daraviras to
jvisser@hweiss.com, dated February 17, 2024 ..... A-155

    Attached to Email -
    (i) Draft Redacted Complaint.............................. A-156

Exhibit 7 to Foregoing Documents -
Email from Scott Balber to Tracy Kelstadt, dated
March 26, 2024 ...................................................... A-183

    Attached to Email -
    (i) Draft Complaint ............................................ A-184

Notice of Motion, by Plaintiffs, for an Order
   Granting Summary Judgment, dated
   November 5, 2024 ................................................. A-209

Table of Contents of Documents Related to
   Plaintiffs' Motion for Summary Judgment, dated
   November 5, 2024 ................................................. A-211

Declaration of Scott S. Balber, for Plaintiffs, in
   Support of Motion, dated November 5, 2024 ........ A-215

iii

**Page**

Exhibit 1 to Balber Declaration -
Declaration of Nicholas Daraviras, in the United
State Bankruptcy Court for the Southern District
of New York Matter *In Re: Weiss Multi-Strategy
Advisers LLC, et al.*, dated August 22, 2024 ......... A-221

    Exhibit A to Daraviras Declaration -
    Strategic Relationship Agreement, dated
    May 1, 2018 ....................................................... A-228

    Exhibit B to Daraviras Declaration -
    Note Purchase Agreement, dated
    December 3, 2019 .............................................. A-254

    Exhibit C to Daraviras Declaration -
    Note, dated January 13, 2020............................. A-291

    Exhibit D to Daraviras Declaration -
    Note, dated December 3, 2019............................ A-294

    Exhibit E to Daraviras Declaration -
    Assignment and Assumption Agreement, dated
    December 1, 2021 .............................................. A-297

    Exhibit F to Daraviras Declaration -
    Note Purchase Agreement, dated
    December 1, 2021 .............................................. A-301

    Exhibit G to Daraviras Declaration -
    Note, dated September 21, 2022 ........................ A-330

    Exhibit H to Daraviras Declaration -
    Notice of Optional Redemption.......................... A-333

    Exhibit I to Daraviras Declaration -
    Forbearance Agreement, dated
    February 12, 2024 ............................................. A-335

iv

|  | **Page** |
|---|---|
| Exhibit J to Daraviras Declaration - UCC Financing Statement | A-349 |
| Exhibit K to Daraviras Declaration - Copy of Spreadsheet | A-351 |
| Exhibit L to Daraviras Declaration - Invoices Reflecting Attorneys' Fees | A-356 |
| Exhibit 2 to Balber Declaration - Chapter 11 Voluntary Petition for Non-Individual, in the Bankruptcy Matter, dated April 29, 2024, with Exhibits | A-360 |
| Exhibit 3 to Balber Declaration - Chapter 11 Voluntary Petition for Non-Individual in the United States Bankruptcy Court for the Southern District of New York Matter *In Re: GWA, LLC*, dated April 29, 2024, with Exhibits | A-370 |
| Exhibit 4 to Balber Declaration - Chapter 11 Voluntary Petition for Non-Individual in the United States Bankruptcy Court for the Southern District of New York Matter *In Re: OGI, LLC,* dated April 29, 2024 | A-380 |
| Exhibit 5 to Balber Declaration - Chapter 11 Voluntary Petition for Non-Individual in the United States Bankruptcy Court for the Southern District of New York Matter *In Re: Weiss Special Operations LLC*, dated April 29, 2024 | A-390 |
| Exhibit 6 to Balber Declaration - Declaration of Pierce Archer, in the United State Bankruptcy Court for the Southern District of New York Matter *In Re: Weiss Multi-Strategy Advisers LLC, et al.*, dated April 30, 2024 | A-400 |

v

**Page**

Exhibit 7 to Balber Declaration -
Declaration Under Penalty of Perjury for Non-
Individual Debtors, with Exhibits, in the United
States Bankruptcy Court for the Southern District
of New York Matter *In Re: Weiss Multi-Strategy
Advisers LLC, et al.*, dated June 11, 2024.............. A-449

Exhibit 8 to Balber Declaration -
Declaration Under Penalty of Perjury for Non-
Individual Debtors, with Exhibits, in the United
States Bankruptcy Court for the Southern District
of New York Matter *In Re: GWA, LLC*, dated
June 11, 2024 ........................................................ A-453

Exhibit 9 to Balber Declaration -
Declaration Under Penalty of Perjury for Non-
Individual Debtors, with Exhibits, in the United
States Bankruptcy Court for the Southern District
of New York Matter *In Re: OGI, LLC*, dated
June 11, 2024 ........................................................ A-455

Exhibit 10 to Balber Declaration -
Declaration Under Penalty of Perjury for Non-
Individual Debtors, with Exhibits, in the United
States Bankruptcy Court for the Southern District
of New York Matter *In Re: OGI, LLC*, dated
June 11, 2024 ........................................................ A-457

Exhibit 11 to Balber Declaration -
Chapter 11 Voluntary Petition for Non-Individual,
with Exhibits, in the United States Bankruptcy
Court for the Southern District of New York
Matter *In Re: Weiss Multi-Strategy Funds LLC*,
dated June 19, 2024 ................................................ A-459

vi

**Page**

Exhibit 12 to Balber Declaration -
Global Notes, Methodology and Specific
Disclosures Regarding WMSF's Schedules of
Assets and Liabilities and Statement of Financial
Affairs, in the United States Bankruptcy Court
for the Southern District of New York Matter *In
Re: Weiss Multi-Strategy Funds LLC*, filed
June 28, 2024 .......................................................... A-461

Exhibit 13 to Balber Declaration -
Complaint to Avoid and Recover Avoidable
Transfers, in the United States Bankruptcy Court
for the Southern District of New York Matter
*GWA, LLC et al. v. Jefferies Strategic
Investments, LLC et al.* ("Adversary
Proceeding"), dated April 29, 2024 ....................... A-484

Exhibit 14 to Balber Declaration -
First Amended Complaint in the Adversary
Proceeding, dated June 25, 2024 ........................... A-506

Exhibit 15 to Balber Declaration -
Memorandum of Law, by Plaintiffs, in Support of
Partial Motion, in the Adversary Proceeding,
dated July 16, 2024 ................................................ A-541

Exhibit 16 to Balber Declaration -
Memorandum of Law, by Plaintiffs, in
Opposition to Motion, in the Adversary
Proceeding, dated August 6, 2024 ......................... A-571

Exhibit 17 to Balber Declaration -
Transcript of Proceedings held before the
Honorable Martin Glenn, in the Adversary
Proceeding, dated September 11, 2024.................. A-601

Exhibit 18 to Balber Declaration -
BrokerCheck Report for George Allen Weiss........ A-671

vii

**Page**

Local Rule 56.1 Statement in Support of Plaintiffs'
    Motion for Summary Judgment, dated
        November 5, 2024 ................................................. A-680

Memorandum of Law, by Plaintiffs, in Support of
    Motion for Summary Judgment, dated
        November 5, 2024 ................................................. A-689

Memorandum of Law, by Defendant, in Opposition
    to Motion for Summary Judgment, dated
        November 22, 2024 ............................................... A-705

Defendant's Response to Plaintiffs' Local Rule 56.1
    Statement, dated November 22, 2024.................... A-741

Declaration of Brian A. Katz, for Defendant, in
    Opposition to Motion for Summary Judgment,
        dated November 22, 2024....................................... A-754

    Exhibit A to Katz Declaration -
    Reply in Support of Partial Motion to Dismiss
    First Amended Complaint in the Adversary
    Proceeding, dated August 16, 2024 ...................... A-756

    Exhibit B to Katz Declaration -
    Order of the Honorable Martin Glenn in the
    Adversary Proceeding, dated September 24, 2024 A-771

    Exhibit C to Katz Declaration -
    Examiner's Report of Christopher K. Kiplok, in
    the Adversary Proceeding, dated
        November 21, 2024 ............................................... A-847

Local Rule 56.1 Counterstatement of Material Facts
    in Opposition to Plaintiffs' Motion for Summary
        Judgment, dated November 22, 2024 .................... A-931

viii

Page

Memorandum of Law, by Plaintiffs, in Opposition
to Defendant's Motion for Summary Judgment,
dated November 22, 2024 ....................................  A-983

Reply Memorandum of Law, by Defendant, in
Further Support of Motion for Summary
Judgment, dated December 4, 2024 ......................  A-1006

Reply, by Defendant, to Plaintiff's Local Rule 56.1
Counterstatement .....................................................  A-1030

Reply Memorandum of Law, by Plaintiffs, in
Further Support of Motion for Summary
Judgment, dated December 4, 2024 ......................  A-1082

Opinion and Order of the Honorable Alvin K.
Hellerstein, dated March 12, 2025 .......................  A-1108

Judgment, dated March 12, 2025 ...............................  A-1117

Attachment to Judgment -
(i) United States District Court for the Southern
District of New York Appeal Instructions and
Forms ......................................................................  A-1118

Notice of Motion, by Defendant, for an Order
Granting Reconsideration of and/or Amending
and Altering the Order and Judgment, dated
March 26, 2025 ......................................................  A-1128

Memorandum of Law, by Defendant, in Support of
Motion for Reconsideration, dated
March 26, 2025 ......................................................  A-1130

Notice of Motion, by Plaintiffs, for an Order
Correcting Omission in Judgment, dated
March 26, 2025 ......................................................  A-1146

ix

**Page**

Exhibit A to Notice -
Proposed Corrected Judgment ............................... A-1148

Exhibit B to Notice -
Plaintiffs' Calculation of Pre-Judgment Interest
and Total Amounts Owed ...................................... A-1150

Memorandum of Law, by Plaintiffs, in Support of
Motion to Correct Judgment, dated
March 26, 2025 ...................................................... A-1156

Memorandum of Law, by Plaintiffs, in Opposition
to Motion for Reconsideration, dated
April 9, 2025 .......................................................... A-1163

Memorandum of Law, by Defendant, in Opposition
to Motion to Correct Judgment, dated
April 9, 2025 .......................................................... A-1178

Notice of Appeal, by Defendant, dated April 10,
2025, with Opinion and Order, Appealed From .... A-1191

Reply Memorandum of Law, by Defendant, in
Further Support of Motion for Reconsideration,
dated April 16, 2025 .............................................. A-1202

Reply Memorandum of Law, by Plaintiffs, in
Further Support of Motion to Correct Judgment,
dated April 16, 2025 .............................................. A-1213

Order of the Honorable Alvin K. Hellerstein, dated
May 15, 2025 ......................................................... A-1224

Order of the Honorable Alvin K. Hellerstein, dated
May 16, 2025 ......................................................... A-1226

Amended Order of the Honorable Alvin K.
Hellerstein, dated May 20, 2025 ........................... A-1229

Corrected Judgment, dated May 21, 2025 ................. A-1232

x

**Page**

Attachment to Judgment -
(i) United States District Court for the Southern
District of New York Appeal Instructions and
Forms ........................................................................ A-1233

Amended Notice of Appeal, by Defendant, dated
May 22, 2025 ......................................................... A-1243

Exhibit 1 to Amended Notice -
Opinion and Order of the Honorable Alvin K.
Hellerstein, dated March 12, 2025......................... A-1245

Exhibit 2 to Amended Notice -
Order of the Honorable Alvin K. Hellerstein,
dated May 15, 2025 ............................................... A-1254

Exhibit 3 to Amended Notice -
Amended Order of the Honorable Alvin K.
Hellerstein, dated May 20, 2025............................ A-1256

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP
Tracy L. Klestadt
John E. Jureller, Jr.
Lauren C. Kiss
Stephanie R. Sweeney
200 West 41st Street, 17th Floor
New York, New York 10036
(212) 972-3000

*Attorneys for Debtors and Debtors-in-Possession*
*Weiss Multi-Strategy Advisors LLC and its affiliated debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **WEISS MULTI-STRATEGY ADVISERS LLC, *et al.*,**[1] | **Case No. 24-10743 (MG)** |
| **Debtors.** | **(Jointly Administered)** |
| GWA, LLC, WEISS MULTI-STRATEGY ADVISERS LLC, OGI ASSOCIATES, LLC, WEISS SPECIAL OPERATIONS LLC, and WEISS MULTI-STRATEGY FUNDS LLC, | |
| Plaintiffs, | Adv. Proc. No. 24-01350 (MG) |
| vs. | **FIRST AMENDED COMPLAINT** |
| JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS, LLC, | |
| Defendants. | |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Weiss Multi-Strategy Advisers LLC (7518); GWA, LLC ("GWA") (7079); OGI Associates LLC ("OGI") (4493); Weiss Special Operations LLC ("WSO") (7626); and Weiss Multi-Strategy Funds LLC ("WMSF") (8004). The location of Debtor Weiss Multi-Strategy Advisers LLC's principal place of business is 320 Park Avenue, 20th Floor, New York, New York 10022 and the Debtors' service address in these Chapter 11 Cases is P.O. Box 2857, Meriden, Connecticut 06450.

GWA, WMSA, OGI, WSO (collectively, the "Initial Debtors") and WMSF (the "New Debtor" and together with the Initial Debtors, the "Debtors" or the "Plaintiffs"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), by their counsel, file this amended complaint (the "Complaint") to, *inter alia*, avoid and recover certain transfers made by one or more of the Plaintiffs to or for the benefit of Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings, LLC ("LAM Holdings", and with JSI as the "Defendants"), on knowledge as to themselves and as to all other matters on information and belief, respectfully allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs seek a judgment avoiding as a preferential transfer and/or fraudulent conveyance that certain alleged amended forbearance agreement, dated February 12, 2024 ("Amended Forbearance Agreement"), the transfer of property of the Debtors' estates set forth therein, and any security interest granted or perfected or guarantees issued in furtherance thereof. The Amended Forbearance Agreement, entered into under duress less than 90 days prior to the Petition Date (defined later herein), purports to provide Defendants, who were at all times unsecured creditors of only GWA and WMSA and without any guarantees by any parties, with, among other things, (i) a first priority security interest in all of the Debtors' assets, (ii) joint and several guarantees by each of the Debtors (regardless of whether they were obligors under the Notes (as defined later herein)), and (iii) an offset on substantial fees owed by JSI to GWA under the IMA (as defined later herein), in exchange for a "forbearance" for all of *two business days*.

2.      Alternatively, Plaintiffs seek recission of the Amended Forbearance Agreement due to the agreement being entered into by the Debtors under duress, including threats of unlawful actions that would result in irreparable harm to the Debtors.  Finally, Plaintiffs seek a judgment

2

Case: 25-914, 10/16/2025, DktEntry: 45.1, Page 14 of 261

A-508

24-01350-mg Doc 63-2 KH Filed 06/25/24 30 Entered 06/25/24 17:19 Page Exhibit A -
Proposed First Amended Complaint    Pg 3 of 35

that the Amended Forbearance Agreement never became effective and is null and void due to, *inter alia*, lack of consideration to the other parties thereto, statements that the terms, as modified, were unacceptable to them, and the Jefferies Parties' failure to sign and return the agreement.

3.    Plaintiffs seek a money judgment relating to an avoidable preferential transfer of $3 million made by Plaintiffs to JSI on February 15, 2024 within the ninety (90) days preceding the commencement of the Initial Debtors' bankruptcy cases.

4.    Plaintiffs seek a money judgment relating to avoidable fraudulent transfers in the aggregate sum of $20,000,000 paid during the two (2) year period preceding the commencement of the Initial Debtors' bankruptcy cases (each transfer, an "Avoidable Transfer" and, collectively, the "Avoidable Transfers"). The Avoidable Transfers are set forth on Schedule 1 hereto. Plaintiffs were insolvent at the time of the transfers or otherwise rendered insolvent as a result of the Avoidable Transfers, and the Avoidable Transfers were made for less than reasonably equivalent value, including that the Debtors were required to make such transfers notwithstanding the agreed Maturity Dates under the respective Notes and terms of the Note Purchase Agreement.

5.    Specifically, Plaintiffs seek entry of a judgment against Defendants (a) avoiding, (i) pursuant to 11 U.S.C. § 547(b), preferential transfers to or for the benefit of the Defendants, and (ii) pursuant to 11 U.S.C. § 548(a)(1)(B) any transfers that may have been fraudulent conveyances, including the Amended Forbearance Agreement and security interests and guarantees contained therein; (b) for recission of the Amended Forbearance Agreement for duress; (c) declaring that the Amended Forbearance Agreement was null and void; (d) preserving for the benefit of the estate, the Avoidable Transfers or the value thereof pursuant to 11 U.S.C. § 551; (e) pursuant to 11 U.S.C. § 550(a), directing Defendants to pay to Plaintiffs an amount to be determined at trial that is not less than the amount of the Avoidable Transfers, plus interest and

3

Case: 25-914, 10/16/2025, DktEntry: 45.1, Page 15 of 261

A-509

24-01350-pncv-D4c03-2KH File 006/26/24 30EnteredFile06/25/2426:1417:P3ageExh1b06A -
Proposed First Amended Complaint    Pg 4 of 35

costs; and (f) pending such payment, disallowing any claim of Defendants against the Debtors

pursuant to 11 U.S.C. § 502(d) ("Section 502").

6.      To the extent that Defendants have filed a proof of claim or have a claim listed on

the Debtors' schedules as undisputed, liquidated, and not contingent, or have otherwise requested

payment from the Debtors or the Debtors' Chapter 11 estates (collectively, the "Claims"), this

Complaint is not intended to be, nor should it be construed as, a waiver of the Debtors' right to

object to such Claims for any reason including, but not limited to, Section 502, and such rights are

expressly reserved.  Further, this Complaint is not intended to be, nor should it be construed as, a

waiver of the Debtors' right to assert any other claim against the Defendants, including any claim

for monies owed by Defendants to the Debtors.

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the Southern District of New York

(this "Court") has subject matter jurisdiction over this adversary proceeding pursuant to

28 U.S.C. §§ 157, 1331 and 1334(b).

8.      The statutory and legal predicates for the relief sought herein are sections 502(d),

547(b), 548(a)(1)(B), 550 and 551 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532

(the "Bankruptcy Code") and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules").

9.      This proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2).

10.     Venue in this district is proper pursuant to 28 U.S.C. § 1409 because this

proceeding arises in a case under the Bankruptcy Code pending in this district.

## PARTIES

**Plaintiffs**

4

Case: 25-914, 10/16/2025, DktEntry: 45.1, Page 16 of 261

A-510

24-01350-amc Doc 363-2 KHF Filed 06/25/24 30 Entered 06/25/24 16:17:29 Exhibit A -
Proposed First Amended Complaint    Pg 5 of 35

11.    GWA is a Connecticut limited liability company with offices formerly located at 400 Capital Boulevard, Suite 201, Rocky Hill, Connecticut 06067.

12.    WMSA is a Delaware limited liability company with offices formerly located at 320 Park Avenue, 20th Floor, New York, New York 10022.

13.    OGI is a Connecticut limited liability company with offices formerly located at 400 Capital Boulevard, Suite 201, Rocky Hill, Connecticut 06067.

14.    WSO is a Connecticut limited liability company with offices formerly located at 400 Capital Boulevard, Suite 201, Rocky Hill, Connecticut 06067.

15.    WMSF is a New York limited liability company with offices formerly located at 400 Capital Boulevard, Suite 201, Rocky Hill, Connecticut 06067.

**Defendants**

16.    JSI is a Delaware limited liability company with offices located at 520 Madison Avenue, New York, New York.

17.    LAM Holdings is a Delaware limited liability company with offices located at 520 Madison Avenue, New York, New York.

## BACKGROUND

18.    On April 29, 2024 (the "Petition Date"), the Initial Debtors commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.    WMSF filed its chapter 11 petition on June 19, 2024.

19.    The Debtors continue to operate their businesses as debtors and debtors-in-possession.

20.    To date, no trustee has been appointed for the Debtors or their estates.

**A. The Debtors' Businesses.**

5

21.    GWA is a holding company, which holds the equity interests of the other Debtor entities.

22.    WMSA acts as a discretionary investment adviser to a number of private investment funds organized by WMSA, a mutual fund and a UCITS fund. WMSA also advises managed accounts owned by institutional investors over which it exercises sole investment discretion.

23.    On behalf of its clients, WMSA invests and trades in a wide range of U.S. and non-U.S. equities, fixed income securities, convertibles, options, other derivatives such as swaps, credit default protection and contracts for differences, futures, forward contracts, debt instruments and other types of financial instruments.  In connection with client trading, WMSA employs short-selling techniques and may utilize leverage and/or make margin purchases. There are generally no restrictions on WMSA's use of leverage or borrowing, other than those which may be imposed by applicable statutes and regulations or by the owner of a separately managed account.

24.    OGI is an investment company that contains GWA's excess capital.

25.    WSO was originally established to provide administrative services for the investment funds.  In 2016, it assigned its employees to WMSA and since then has been in the process of liquidating its assets.

26.    Until June 4, 2024, WMSF was a broker-dealer, which was formed solely for regulatory purposes, and after 2011 never carried customer accounts for clients of the Debtors or any others, and did not hold customer assets.   On June 4, 2024, the U.S. Securities and Exchange Commission ("SEC") approved the withdrawal and termination of the broker-dealer.

27.    As of December 31, 2023, WMSA managed approximately $ 2.3 billion dollars in net assets on a discretionary basis.

28.    On March 1, 2024, as a result of, *inter alia*, actions taken by Defendants as set forth

6

below, the Debtors and any non-debtor affiliates announced their intentions to cease operations,

terminate their advisory and affiliated businesses, close the managed funds and begin the process

of returning capital to its clients.  To date, the majority of the Debtors' managed funds' assets have

been liquidated and the majority of the proceeds have been in the process of being distributed to

the investors.

**B. Agreements between Parties.**

29.     Over the course of their relationship, certain of the Debtors (GWA and WMSA)

and Defendants were parties to certain agreements (as amended and restated), including wherein

at relevant times Defendants held profit equity interests in certain of the Debtors and were entitled

to a share of the revenue of the Debtors.

30.     LAM Holding LLC ("LAM Holding") and GWA entered into that certain Strategic

Relationship Agreement dated as of May 1, 2018 (as amended, the "SR Agreement").

31.     In connection with LAM Holding entering into the SR Agreement, WMSA and JSI

(under its former name "Leucadia Fundings LLC") entered into the Investment Management

Agreement dated May 1, 2018 (as amended, the "IMA").

32.     LAM Holding assigned all of its rights under the SR Agreement to LAM Holdings

(under its former name Jefferies Asset Management Holdings LLC)(LAM Holdings, collectively

with JSI and their affiliated entities, the "Jefferies Parties"), pursuant to the Assignment and

Assumption Agreement dated as of October 18, 2018 between LAM Holding and LAM Holdings.

33.     LAM Holding merged with and into LAM Holdings as of December 1, 2021, with

LAM Holdings as the surviving company.

34.     GWA, WMSA, and JSI, as successor in interest to JFG Funding LLC, are parties

to that certain Note Purchase Agreement, dated as of December 3, 2019 (as amended, the "2019

Case: 25-914, 10/16/2025, DktEntry: 45.1, Page 19 of 261

A-513

24-01350-cgb Doc 363-2 KH Filed 06/25/24 30 Entered 06/25/24 16:17:19 Exhibit A -
Proposed First Amended Complaint    Pg 8 of 35

Note Purchase Agreement").

35.    Pursuant to the 2019 Note Purchase Agreement, GWA issued (a) a $31,250,000

Note dated December 3, 2019, which had a negotiated five (5) year Maturity Date of December 3,

2024 and (b) a $18,750,000 Note dated January 13, 2020, with a negotiated five (5) year Maturity

Date of January 13, 2025.

36.    GWA, WMSA, and JSI are parties to that certain Note Purchase Agreement, dated

as of September 21, 2022 (as amended, the "2022 Note Purchase Agreement" and collectively with

the 2019 Note Purchase Agreement, the "Note Purchase Agreements").

37.    Pursuant to the 2022 Note Purchase Agreement, GWA issued a $3,000,000 Note

dated September 21, 2022, with a negotiated seven (7) year Maturity Date of September 21, 2029.

The December 3, 2019 note, the January 13, 2020 note and the September 21, 2022 note are

referred to herein collectively as the "Notes".   As set forth below, at the time of execution of the

$3 million note, Plaintiffs were already in forbearance under the December 3, 2019 and January

13, 2020 notes.

38.    Under the Note Purchase Agreements and the Notes, JSI was at all relevant times

an unsecured creditor of GWA and WMSA.  There were no guarantees, security interests or rights

of setoff under the Note Purchase Agreements or the Notes.

39.    OGI, WSO and WMSF (i) were not parties to the Note Purchase Agreements, the

Notes or any other agreement with the Jefferies Parties related thereto, (ii) did not guarantee any

obligations thereunder, (iii) did not grant any security interest with respect thereto, (iv) did not

provide for any offset with respect thereto, and (v) did not receive any consideration with respect

thereto.

40.    At all relevant times, LAM Holdings was an unsecured creditor under the SR

Case: 25-914, 10/16/2025, DktEntry: 45.1, Page 20 of 261

A-514

24-01885-smc   Doc 63 KH   Filed 06/25/24   Entered 06/25/24 17:13   Page Exhibit A -
Proposed First Amended Complaint   Pg 9 of 35

Agreement.

41.     WMSA, OGI, WSO and WMSF (i) were not parties to the SR Agreement with the Jefferies Parties, (ii) did not guarantee the SR Agreements or any obligations thereunder, (iii) did not grant any security interest with respect thereto, (iv) did not provide for any offset with respect thereto, and (v) did not receive any consideration with respect thereto.

42.     In or about January 1, 2022, with approximately three (3) years left before the Maturity Dates of the December 3, 2019 and January 13, 2020 Notes, Defendants presented a "Repayment Schedule" to Plaintiffs requiring paydown of the notes in an aggregate amount of $35 million. Although Defendants never provided Plaintiffs with written notice of the occurrence of a default and the right and intent to exercise a Trigger Redemption, the repayment schedule was presented in the form of a "forbearance letter agreement" on the basis that a "Members Equity Event" had occurred such that Defendants could exercise a Trigger Redemption at any time should any of the payments be missed.  Under the 2019 Note Purchase Agreement, a "'Members Equity Event' shall be deemed to have occurred if, on any day, the Members Equity is equal to or less than $10 million, calculated as if the Notes had been redeemed in full as of such day" (giving rise to the ability to redeem the notes "in whole, but not in part.").  Nonetheless, Defendants, without any interruption, continued to invest client funds in the Debtors' managed accounts and continued to market these managed accounts to their clients, until at least February 2024 in the ordinary course, making it evident that this covenant default was deemed not material by Defendants.

43.     Unable to repay the full amounts of the Notes at such times, GWA and WMSA were compelled to enter into the January 1, 2022 forbearance letter with JSI.  The January 1, 2022 forbearance letter stated, in pertinent part,

"[N]otwithstanding (a) anything to the contrary in section 7.3(b) [(Trigger Redemption)] of the [2019] Note Purchase Agreement and (b) the occurrence and continuation of a

Case: 25-914, 10/16/2025, DktEntry: 45.1, Page 21 of 261

A-515

24-01850-dkg-cv-0 Doc 234 KH Filed 06/25/24 30 Entered 06/25/24/26:17 Page Exhibit A -
Proposed First Amended Complaint    Pg 10 of 35

Members Equity Event, JSI hereby agrees that it will not exercise its rights to affect a Trigger Redemption prior to July 1, 2023 (the "Forbearance"); provided that the Notes shall be repaid by the Company in accordance with the following schedule (the "Repayment Schedule"): (i) at least $5,000,000 aggregate principal amount thereof, on or prior to April 30, 2022, (ii) an additional aggregate principal amount thereof of at least $10,000,000, on or prior to July 31, 2022, and (iii) an additional aggregate principal amount thereof of at least $20,000,000, on or prior to July 1, 2023."

44.    The January 1, 2022 forbearance letter was effectively a unilateral renegotiation of the agreed Maturity Dates under these Notes by Defendants.    Redemption under the Notes was required to be in whole and not in part. Pursuant to the January 1, 2022 forbearance letter, GWA was coerced to pay JSI the sum of $5,000,000 on April 29, 2022 and $10,000,000 on July 29, 2022. Even if these payments were applied to obligations under the Notes, they were arbitrarily required to be paid approximately three (3) years prior to the negotiated Maturity Dates based upon a immaterial covenant default. GWA and WMSA did not receive reasonably equivalent value given that there was no clear right to declare a Trigger Redemption from which JSI agreed to forbear. Further, the modification of the Notes under the January 1, 2022 forbearance letter was made at a time that GWA and WMSA were insolvent, or made GWA and WMSA insolvent, or otherwise caused them to incur a debt beyond their ability to pay as such debts matured.

45.    In fact, on April 29, 2022, the same date as the $5,000,000 payment, the Debtors provided Defendants by email with their First Quarter 2022 Financial Reports ("1ˢᵗ Q Financials"), including consolidated and unaudited financials for GWA LLC and its subsidiaries as of March 31, 2022.  The 1ˢᵗ Q Financials balance sheet indicated (i) assets of $342,802,679, (ii) liabilities of $368,237,411, and (iii) members' equity of ($25,434,732).  The Debtors provided Defendants with the financial reporting on a quarterly, and thereafter monthly, basis, and Defendants were aware of their financial circumstances at all relevant times.

46.    Two months after the Debtors' $10 million payment to JSI, on September 21, 2022,

despite the agreed terms of and payments made under the January 1, 2022 forbearance letter and without notice of any new covenant default, JSI required that GWA and WMSA execute a second forbearance letter agreeing to the same "Forbearance" as defined in the January 1, 2022 forbearance letter provided that the Debtors make payment of the aggregate sum of $20,000,000 on or prior to July 1, 2023.

47.     The September 21, 2022 forbearance letter was another action by Defendants to assert leverage and control over GWA and WMSA, and manipulate this leverage to obtain an accelerated payment under the Notes.  With no other options, GWA and WMSA entered into the September 21, 2022 forbearance letter.   Again, GWA and WMSA did not receive reasonably equivalent value for the modification of the Maturity Dates under the Notes and the accelerated payment thereunder, particularly since no extension of the existing forbearance was offered and no new default was identified. Again, Plaintiffs did not execute any acknowledgement of the occurrence of a default. Further, the modification of the Notes under the September 21, 2022 forbearance letter was made at a time that GWA and WMSA were insolvent, or made GWA and WMSA insolvent as a result of entering into such an agreement, or otherwise caused them to incur a debt beyond their ability to pay as such debts matured.

48.     Notwithstanding the foregoing, on the same date, JSI purchased the $3 million note from GWA.

49.     GWA and WMSA were unable to make the $20,000,000 payment by July 1, 2023 as set forth in the January 1, 2022 and September 21, 2022 forbearance letters.  Defendants, who were receiving detailed monthly financial statements from the Debtors at this time and in constant communication with the Debtors about such situation, were well aware of the Debtors' precarious financial situation at all relevant times.

50.    On July 25, 2023, GWA and WMSA entered into a third forbearance letter with JSI (the January 1, 2022, September 1, 2022 and July 25, 2023 forbearance letters, the "Initial Forbearance Agreements").   The July 25, 2023 forbearance letter states ""[N]otwithstanding (a) anything to the contrary in section 7.3(b) of the [2019] Note Purchase Agreement and (b) the occurrence and continuation of a Members Equity Event, *JSI hereby agrees that it will not exercise its rights to affect a Trigger Redemption prior to September 1, 2024*" (emphasis added). Because Defendants were aware of the Debtors' financial situation, there was no payment obligation during this third forbearance period.

51.    Under each of the Initial Forbearance Agreements, and with Defendants' knowledge and consent, GWA and WMSA continued to operate in the ordinary course of business, including, among other things, payment of ordinary course obligations including bi-monthly salary and year-end bonus/compensation.   As per industry standard, the majority of the employees' annual compensation was paid at year-end in February.   At no time were such compensation and bonuses payments prohibited under the terms of the Purchase Agreements or any of the Debtors' agreements with Defendants.

52.    Despite the third forbearance letter whereby Defendants agreed to forbear until September 1, 2024, Defendants' receipt of detailed monthly financial reports, and Defendants' (and their clients') continued investment in and marketing of the Debtors' managed funds, the Jefferies Parties extracted an additional $2 million from the Debtors on November 28, 2023.

53.    Finally, again despite the third forbearance letter whereby Defendants agreed to forbear until September 1, 2024, their receipt of detailed monthly financial reports, and their continued investment in and marketing of the Debtors' managed funds, on December 21, 2023, JSI delivered to GWA a purported Notice of Optional Redemption requiring GWA to repay in full

Case: 25-914, 10/16/2025, DktEntry: 45.1, Page 24 of 261

A-518

24-01885-amc-Doc1353-4KH Filed 06/26/24 30 Entered 06/25/24 16:17 Page 34 of 38 Exhibit A -
Proposed First Amended Complaint    Pg 13 of 35

the outstanding amount of $54,223,110 within ten (10) days by December 31, 2023.  While styled as an optional redemption, by its terms the Notice of Optional Redemption required the same immediate payment of the Redemption Amount as would a notice of Trigger Redemption – the remedy from which Defendants had agreed to forbear from exercising until September 2024.

54.     At the time of the issuance of the Notice of Optional Redemption, Defendants were fully aware that GWA and WMSA were unable to make the required $54 million payment.  This action was just another effort by Defendants to gain leverage over the Debtors, which is evident by their failure to take any action related to the Notice of Optional Redemption prior to the Petition Date more than five (5) months later.   At the time, Defendants had full knowledge, and were in the loop, with respect to a potential third-party transaction involving the Debtors, which, among other things, would have paid or substantially paid amounts due under the Notes.

**C. Amended Forbearance Agreement.**

55.     In February 2024, under the unlawful threat of the Threatened State Court Action (as defined below), Defendants demanded that the Debtors enter into the Amended Forbearance Agreement.  The Amended Forbearance Agreement purported to substantially enhance the nature and priority of Defendants' security for repayment of the Notes over all other creditors, all without any consideration.

56.     The Debtors initially refused to enter into an amended forbearance agreement in or about February 1, 2024, which would have, among other things, restricted payments to their employees, violated their ongoing fiduciary obligations to their clients and their regulatory obligations and undermine the potential third party transaction.

57.     Prior to this draft amended forbearance agreement, none of the agreements with the Defendants, including the Initial Forbearance Agreements, restricted or limited the Debtors'

payments of annual compensation to their employees. In fact, the Debtors made similar ordinary course compensation and bonus payments to their employees each year, in February thereof, from 2020 through 2024. None of the agreements permitted the Defendants to control, limit, restrict or approve any such payments; nonetheless, the Defendants had full knowledge and notice thereof.

58.     At 2:10 am in the morning of Monday, February 12, 2024, Defendants sent the Amended Forbearance Agreement to the Debtors' founder and CEO, George Weiss, and demanded that the Debtors sign by 7 a.m. Defendants threatened that, if this deadline were not met, Defendants would commence unlawful litigation against the Debtors and their founder seeking to, among other things, (i) collect damages due to the Debtors' purported breaches of the Note Purchase Agreements and Notes, and (ii) clawback what Defendants claimed were fraudulent transfers of the compensation payments made to the Debtors' employees. Defendants additionally threatened to unlawfully freeze the Debtors' bank accounts. Most egregiously, Defendants stated that this would get "extremely ugly" and threatened to ruin Mr. Weiss's reputation in the industry including by filing fraud claims against him.

59.     Defendants had no legal right to take threatened enforcement actions against GWA and WMSA that they were under a preexisting obligation to forbear from taking through September 1, 2024. Defendants had no legal right to take threatened enforcement actions against any of the remaining Debtors or their founder who were not parties to the Notes or Initial Forbearance Agreements. Defendants had no legal right to seek to clawback compensation payments that were not prohibited by any agreement. Defendants had no legal right to freeze the Defendants' bank accounts.

60.     From the Debtors' standpoint, this was not just a threat of litigation but also the certainty of loss of key personnel, the collapse of the aforementioned third-party transaction, and

14

the demise of the companies without the ability (1) for an orderly winddown for the benefit of clients and all interested parties or (2) to comply with their fiduciary duties and obligations to regulatory agencies including the SEC, CFTC and the IRS.

61.    Under this duress, at approximately 4 a.m. (EST) on February 12, 2024, the Debtors, as well as their founder and CEO George Weiss, individually, were compelled to sign that certain Amended Forbearance Agreement with Defendants.

62.    The purpose of the Amended Forbearance Agreement was to grant additional benefits to the Defendants, all of which were transfers of interests of the Debtors in property, under the guise of a forbearance.   These additional benefits and property interests made up the entirety of the Amended Forbearance Agreement. The two-day forbearance period granted GWA and WMSA, while already effectively meaningless by virtue of its duration, was ice in winter because Defendants were under a preexisting obligation not to call the Notes through September 2024 pursuant to the July 25, 2023 forbearance letter. The purported forbearance granted to any of the other parties to the Amended Forbearance Agreement was no consideration at all given that they were under no prior obligations with respect to the Purchase Agreements or the Notes or the Initial Forbearance Agreements.

63.    The Amended Forbearance Agreement contained the following new provisions and clauses, each of which provided the Defendants with significant additional benefits under the Note Purchase Agreement and the Notes[2]:

a.  Security interest:

> Each Weiss Party [the Debtors] grants and pledges to Secured Party
> [JSI] (as defined below), to secure the full and punctual payment of
> the Guaranteed Obligations when due (whether at the stated maturity,
> by acceleration or otherwise), a continuing security interest in all of

[2] The recited portions of the Amended Forbearance Agreement are for explanatory purposes.  The full and complete Amended Forbearance Agreement shall apply.

15

Case: 25-914, 10/16/2025, DktEntry: 45.1, Page 27 of 261

A-521

24-01850-mg Doc 63-2 Filed 06/25/24 Entered 06/25/24 17:12 Page Exhibit A - Proposed First Amended Complaint   Pg 16 of 35

*such Weiss Party's right, title and interest in, to and under the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof. The Secured Party's security interest shall continually exist until all Guaranteed Obligations have been paid in full. Each Weiss Party shall make notations, reasonably satisfactory to the Secured Party, on its books and records disclosing the existence of this security interest in the Collateral. "Collateral" shall mean all goods, accounts, equipment, inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, general intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, securities accounts, certificates of deposit, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and all of each Weiss Party's books and records relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds or any or all of the foregoing. Terms used in this definition shall have the meanings given to such terms in Article 9 of the Code (as defined below), as applicable.*

b.  Guarantees[3]:

*Guaranty of Obligations. Each Weiss Party (other than GWA) hereby irrevocably and unconditionally guarantees to each of JSI and LAM Holdings (collectively, the "Beneficiaries") and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other Weiss Party when due (whether at the states maturity, by acceleration or otherwise) of the Guaranteed Obligations (as defined herein). This guaranty shall remain in full force and effect until the Guaranteed Obligations are paid in full, notwithstanding any increase in the amount of the Guaranteed Obligations or any modification or amendment of any instrument governing the Guaranteed Obligations. As used herein, the term "Guaranteed Obligations" shall mean all the obligations of GWA and each other Weiss Party arising under any Note Purchase Agreement, the Notes, the SR Agreement and this Agreement, any loss, damage, penalty, action, judgment, suit, cost, expense, disbursement, liability, claim or other obligation, incurred by or behalf of any Beneficiary*

[3]OGI and WSO were not signatories to any of the Notes, Note Purchase Agreements or SR Agreement, and were not guarantors thereunder.

16

*(including but not limited to reasonable out-of-pocket attorneys'
fees and costs) arising out or, relating to or in connection with any
Note Purchase Agreement, any Note, the SR Agreement, this
Agreement or the transaction contemplated thereby.*

<u>*Nature of Guaranty*</u>. *This guaranty is an irrevocable, absolute, and
continuing guaranty of the full and punctual payment and
performance and not a guaranty of collection. This Guaranty may
not be revoked by any Weiss Party and shall continue to be effective
with respect to any Guaranteed Obligations arising or created after
any attempted revocation by any Weiss Party.*

c.  Offset of indebtedness.

<u>*IMA Fees*</u>. *WMSA hereby agrees as of the date hereto to treat any
amounts JSI owes WMSA pursuant to the IMA (including but not
limited to any amounts for the period of January 1, 2023 through
December 31, 2023, including but not limited to the Investment
Teams Bonus Fees) as offsetting GWA's payment obligations to JSI
under the Notes, and as a result (I) JSI shall have been deemed to
have paid such amounts to WMSA and (ii) such deemed paid
amounts shall be deemed to be a receipt by JSI of a payment by GWA
on the Notes of such amounts.*

64.    The other material provisions of the Amended Forbearance Agreement are

requirements by the Debtors to provide updated financial reporting; however, at the time, the

Debtors had already been providing monthly financial reports to the Defendants for at least two

years.

65.    In exchange for the substantial benefits received under the Amended Forbearance

Agreement, the Defendants agreed to a Forbearance Period (as defined therein) of **"the earlier of**

**(i) two Business Days … or (y) the occurrence of any Forbearance Default**" [as defined therein]

(emphasis added).  The Defendants did not provide any other purported consideration under the

Amended Forbearance Agreement.

66.    Under duress of the Defendants, among other things, bringing an unlawful action

to clawback the compensation from its employees, on February 12, 2024, the Debtors executed

17

Case: 25-914, 10/16/2025, DktEntry: 45.1, Page 29 of 261

A-523

24-01850-lgb Doc 68-2 KH Filed 06/25/24 Entered 06/25/24 17:12 Page 18 of 36 - Exhibit B -
Proposed First Amended Complaint    Pg 18 of 35

the Amended Forbearance Agreement.  To date, the Debtors have not received a counter-signed copy of the Amended Forbearance Agreement; nonetheless, on February 12, 2024 and February 13, 2024 Defendants filed UCC-1 financing statements against certain of the parties to the Amended Forbearance Agreement, in an effort to seek to perfect the security interests purportedly granted under the Amended Forbearance Agreement (the "Perfected Security Interests").   Upon information and belief, Defendants did not seek to perfect any purported security interest against WMSF.

67.    The Amended Forbearance Agreement was a transfer of the Debtors' interests in property and/or an incurrence of an obligation by the Debtors, all for less than reasonably equivalent value.  Further, OGI, WSO or WMSF were not obligors or recipients under the Notes, not parties to the other agreements, and did not receive any consideration under the Amended Forbearance Agreement.

68.    On February 17, 2024, Defendants delivered to the Debtors a draft State Court complaint (the "Threatened State Court Action"), whereby they furthered their threat of commencing an action against GWA and WMSA for breach of contract, and each of the employees of the Debtors who had received their annual compensation/bonus payment in February 2024 under causes of action for avoidance of fraudulent conveyances as a result of, *inter alia*, certain purported fraudulent or false statements or false or misleading actions, i.e. the "clawback" of their respective annual compensation/bonus payment.

69.    On March 26, 2024, the Defendants delivered to the Debtors a draft of a second State Court complaint (the "Second Threatened State Court Action"), whereby they furthered their threats, albeit with completely different claims, to commence an action against GWA and WMSA for breach of contract, and certain of the Debtors' officers for purported fraudulent or false

statements or false or misleading actions, i.e. the "clawback" of their respective annual compensation/bonus payment. The Defendants knew that the threat of these allegations would cause a ripple effect within the Debtors' organization, especially the fraud allegations against the officers which, if asserted, would have adverse effects on them personally in the industry.

**D. Preferential Transfer to Defendants.**

70.     During the ninety (90) days before the Petition Date, that is between January 31, 2024, and April 29, 2024, (the "Preference Period"), the Initial Debtors continued to operate their business affairs, including the transfer of property, either by checks, cashier checks, wire transfers, ACH transfers, direct deposits, or otherwise to certain entities, including to Defendants.

71.     During the Preference Period, and during the forbearance period set forth in the July 25, 2023 forbearance letter, JSI contacted the Debtors and demanded that a $3 million payment be made to JSI. OGI, on behalf of GWA, therefore made such $3 million payment to JSI. Except with respect to the Amended Forbearance Agreement, OGI had no obligation to JSI for any payment. At the time, GWA had other creditors to which it owed obligations. In either case, JSI received more than it would have received in a chapter 7 proceeding.

72.     The Initial Debtors are seeking to avoid the $3 million payment made by OGI, on behalf of GWA, to JSI during the Preference Period as a preferential transfer.

**E. Avoidable Transfers to Defendants.**

73.     During the two (2) years before the Petition Date, that is between April 29, 2022, and April 29, 2024, (the "Fraudulent Conveyance Period"), the Debtors conducted transfers and/or incurred obligations to operate their business affairs, including the transfer of property, either by checks, cashier checks, wire transfers, ACH transfers, direct deposits, or otherwise to Defendants.

74.     During the Fraudulent Conveyance Period, respectively, the Debtors made certain

19

Case: 25-914, 10/16/2025, DktEntry: 45.1, Page 31 of 261

A-525

24-01850-jmc Doc 6834 KH Filed 06/25/24 Entered 06/25/24 16:17:12 Page 21 of 36
24-01850-jmc Doc 663 AKH Filed 06/26/24 Entered 06/26/24 16:17:13 Page 21 of 36 - Exhibit A -
Proposed First Amended Complaint    Pg 20 of 35

of the Avoidable Transfers to the Defendants, as set forth on <u>Schedule 1</u> hereto.

75.    On information and belief, the Avoidable Transfers were on account of an antecedent debt or were not prepayments for goods and/or services subsequently received, the Debtors did not receive reasonably equivalent value in exchange for the Avoidable Transfers, either (a) because the value of the services and/or goods received was in fact less than the Avoidable Transfers or (b) because the Debtors that received such goods and/or services were not the parties that had incurred the debt, and the Debtors were: (i) insolvent on the dates of the Avoidable Transfers or became insolvent as a result of the Avoidable Transfers; and/or (ii) engaged in business or a transaction for which any property remaining with the Debtors were an unreasonably small capital at the time of, or as a result of, the Avoidable Transfers; and/or (iii) the Debtors intended to incur, or believed that the Debtors would incur, debts that would be beyond the Debtors' ability to pay as such debts matured.

76.    The Avoidable Transfers were provided for less than reasonably equivalent value in that they were paid as a result of, *inter alia*, (i) a manipulated acceleration of the negotiated Maturity Dates under the Notes, (ii) a manufactured or immaterial covenant default under the Notes such that the purported forbearance was illusory, (iii) "bad faith" by the Defendants in their dealings with the Debtors, including with full knowledge of the Debtors' financial condition, while at the same time continuing to invest, and invest their clients' money, with the Debtors' managed funds, and market the Debtors' managed funds to their clients, and (iv) in breach of the Initial Forbearance Agreements.

77.    The Debtors are seeking to avoid all applicable Avoidable Transfers of an interest in any of the Debtors' property made by the Debtors to Defendants within the Preference Period and the Fraudulent Conveyance Period.

78.    During the course of this proceeding, the Debtors may learn (through discovery or otherwise) of additional transfers made to Defendants during the Preference Period, the Fraudulent Conveyance Period or that are otherwise avoidable.  It is the Debtors' intention to avoid and recover all transfers made by the Debtors of an interest of the Debtors in property to or for the benefit of Defendants.

79.    To the extent that the Debtors' records do not accurately identify all transfers made by the Debtors of an interest in the Debtors' property, including but not limited to any transfers that cleared post-petition, the Debtors reserve their rights to amend this Complaint to include: (a) further information regarding the Avoidable Transfers, (b) additional transfers, (c) modifications of and/or revision of the Defendants' name or identity, (d) additional defendants, and/or (e) additional causes of action (collectively, the "Amendments") that may become known to the Debtors at any time during the pendency of this adversary proceeding, through formal discovery or otherwise, and for the Amendments to relate back to this Complaint.

### COUNT I - TO AVOID AMENDED FORBEARANCE AGREEMENT AS A PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547(b)

80.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 79 above as if fully set forth herein.

81.    During the Preference Period, the Initial Debtors and Defendants entered into the Amended Forbearance Agreement.

82.    During the Preference Period, Defendants were creditors of certain of the Initial Debtors within the meaning of Bankruptcy Code section 547(b)(1) at the time of entry into the Amended Forbearance Agreement by virtue of, *inter alia*, the Note Purchase Agreements, the Notes and the SR Agreement for which certain of the Initial Debtors were obligated to pay in accordance with the terms thereof.

21

83.    The Amended Forbearance Agreement, and the terms set forth therein, was a transfer of an interest of the Initial Debtors in property, including, among other things, (i) the granting of a priority security interest in all of the Initial Debtors' assets, (ii) the issuance of joint and several guarantees by each of the Initials Debtors (whether or not a party to the Note Purchase Agreements, Notes, or SR Agreement), and (iii) an offset of significant fees owed by JSI to GWA under the IMA.

84.    The Amended Forbearance Agreement was made to, or for the benefit of, Defendants because the terms thereof provided additional benefits to Defendants, with little to no consideration therefor, to reduce or pay a debt to Defendants.

85.    The Amended Forbearance Agreement was for or on account of antecedent debts owed by certain of the Plaintiffs to Defendants.

86.    The Amended Forbearance Agreement was entered into during a time that the Initial Debtors were insolvent.  The Initial Debtors are entitled to the presumption of insolvency for each transfer made during the Preference Period pursuant to 11 U.S.C. § 547(f).

87.    The Amended Forbearance Agreement was made on or entered within ninety (90) days prior to the Petition Date.

88.    The Amended Forbearance Agreement enabled Defendants to receive more than they would receive if (a) the Initial Debtors' cases was cases under chapter 7 of the Bankruptcy Code, (b) the Amended Forbearance Agreement had not been made, and (c) Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

89.    Defendants were either the initial beneficiary of the Amended Forbearance Agreement, the entity for whose benefit the Amended Forbearance Agreement was made or were the immediate or mediate transferee of the initial transferee receiving the Amended Forbearance

22

Agreement.

90.     By reason of the foregoing, the Amended Forbearance Agreement should be avoided and set aside as a preferential transfer pursuant to 11 U.S.C. § 547(b).

91.     To the extent the Amended Forbearance Agreement is not avoided in its entirety, all provisions therein which purport to transfer property of the Initial Debtors should be avoided and set aside as a preferential transfer pursuant to 11 U.S.C. § 547(b).

## COUNT II - TO AVOID AMENDED FORBEARANCE AGREEMENT AS A FRAUDULENT TRANSFER PURSUANT TO 11 U.S.C. § 548(a)(1)(B)

92.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 91 above as if fully set forth herein.

93.     The Amended Forbearance Agreement was made or entered into within two (2) years prior to the Petition Date.

94.     The Amended Forbearance Agreement was made to, or for the benefit of, the Defendants.

95.     The Amended Forbearance Agreement, and the terms set forth therein, was a transfers of an interest of the Debtors in property, or an incurrence of an obligation by the Debtors, including, among other things, (i) the granting of a priority security interest in all of Plaintiffs' assets, (ii) the issuance of joint and several guarantees by each of the Debtors (whether or not a party to the Note Purchase Agreements, Notes, or SR Agreement), and (iii) an offset on any fees that JSI owes to GWA or any other Debtor under the IMA.

96.     Plaintiffs did not receive reasonably equivalent value in exchange for the Amended Forbearance Agreement, or the grant of security or additional compensation thereunder, either (a) because the value of the services and/or goods received was in fact less than the value of the Amended Forbearance Agreement or (b) because the Debtors that entered into the Amended

Forbearance Agreement were not the parties (i.e. Plaintiffs) that had incurred or had any obligation

for the debt, and the Debtors were: (i) insolvent on the dates of the Amended Forbearance

Agreement or became insolvent as a result of the Amended Forbearance Agreement; and/or (ii)

engaged in business or a transaction for which any property remaining with the Debtors was an

unreasonably small capital at the time of, or as a result of, the Amended Forbearance Agreement;

and/or (iii) the Debtors intended to incur, or believed that the Debtors would incur, debts that

would be beyond the Debtors' ability to pay as such debts matured.

97.    By reason of the foregoing, the Amended Forbearance Agreement should be

avoided and set aside as a fraudulent transfer.

### COUNT III - TO AVOID THE PERFECTED SECURITY INTERESTS AND GUARANTEES AS PREFERENTIAL TRANSFERS AND/OR FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. §§ 547(b) AND 548(a)(1)(B)

98.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

through 97 above as if fully set forth herein.

99.    As set forth more fully above, the Amended Forbearance Agreement, and all

transfers of property or obligations incurred thereunder, should be avoided and set aside as a

preferential transfer pursuant to 11 U.S.C. § 547(b) and/or a fraudulent transfer pursuant to 11

U.S.C. § 548(a)(1)(B).

100.    The Perfected Security Interests and guarantees granted under the Amended

Forbearance Agreement are transfers of property of the Debtors' estates, and/or an incurrence of

an obligation of the Debtors' estates, all without fair or reasonable consideration therefor, and

enabled Defendants to receive more than they would receive if (a) Plaintiffs' cases was cases under

chapter 7 of the Bankruptcy Code, (b) the Amended Forbearance Agreement and Perfected

Security Interests and guarantees had not been made, and (c) Defendants received payment of such

debt to the extent provided by the provisions of the Bankruptcy Code.

24

101.    By reason of the foregoing, the Perfected Security Interests, including any UCC-1 filing in furtherance thereof, and the guarantees resulting from the Amended Forbearance Agreement should also be avoided and set aside as either a preferential transfer or fraudulent transfer.

**COUNT IV - TO PRESERVE**
**PROPERTY PURSUANT TO 11 U.S.C. § 551**

102.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 101 above as if fully set forth herein.

103.    The interests and obligations incurred and/or transferred under the Amended Forbearance Agreement, including the Perfected Security Interests and guarantees, are property of Plaintiffs' estates.

104.    Therefore, interests and obligations incurred and/or transferred under the Amended Forbearance Agreement, or the value thereof, should be preserved for the benefit of Plaintiffs' estates pursuant to § 551 of the Bankruptcy Code.

**COUNT V - TO RECOVER AVOIDABLE**
**TRANSFERS PURSUANT TO 11 U.S.C. § 550**

105.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 104 above as if fully set forth herein.

106.    Plaintiffs are entitled to avoid the Amended Forbearance Agreement, and any security interests and guarantees granted therein, pursuant to 11 U.S.C. § 547(b) as a preferential transfer and the Amended Forbearance Agreement, and any security interests and guarantees granted therein, pursuant to 11 U.S.C. § 548(a)(1)(B) as a fraudulent transfer.

107.    Defendants were an initial transferee of one or more of the interests and obligations incurred and/or transferred under the Amended Forbearance Agreement, the immediate or mediate transferee of such initial transferee, or the person for whose benefit the Amended Forbearance

Case: 25-914, 10/16/2025, DktEntry: 45.1, Page 37 of 261

A-531

24-01885-dmic-Doc6334KH Filed 06/26/2430 Entered 06/25/24/26:17 Page 27 hibit A -
Proposed First Amended Complaint    Pg 26 of 35

Agreement was made.

108.    Pursuant to 11 U.S.C. § 550(a), Plaintiffs are entitled to avoid the Amended

Forbearance Agreement, including the Perfected Security Interests and guarantees.

### COUNT VI – RECISSION OF
### AMENDED FORBEARANCE AGREEMENT

109.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1

through 108 above as if fully set forth herein.

110.    At 2:10 am in the morning of Monday, February 12, 2024, the Jefferies Parties sent

the Amended Forbearance Agreement to the Debtors' founder and CEO, George Weiss, and

demanded that the Debtors sign by 7 a.m.  Defendants threatened that, if this deadline were not

met, Defendants would commence unlawful litigation against the Debtors and their founder

seeking to, among other things, (i) collect damages due to the Debtors' breaches of the Note

Purchase Agreements and Notes, and (ii) clawback what Defendants claimed was the fraudulent

transfers of the compensation payments to the Debtors' employees.  Defendants additionally

threatened to unlawfully freeze the Debtors' bank accounts.  Most egregiously, Defendants stated

that this would get "extremely ugly" and threatened to ruin Mr. Weiss's reputation in the industry

including by filing fraud claims against him.

111.    Defendants had no legal right to take threatened enforcement actions against GWA

and WMSA that they were under a preexisting obligation to forbear from taking through

September 1, 2024. Defendants had no legal right to take threatened enforcement actions against

any of the remaining Debtors or their founder who were not parties to the Notes or Initial

Forbearance Agreements. Defendants had no legal right to seek to clawback compensation

payments that were not prohibited by any agreement. Defendants had no legal right to freeze the

Defendants' bank accounts.

112.    Defendants knew and intended, that from the Debtors' standpoint, this was not just a threat of litigation but also the certainty of loss of key personnel, collapse of the aforementioned third-party transaction, and the demise of the companies without the ability (1) for an orderly winddown for the benefit of clients and all interested parties or (2) to comply with their fiduciary duties and obligations to regulatory agencies including the SEC, CFTC and the IRS.

113.    Under this duress, at approximately 4 a.m. (EST) on February 12, 2024, the Debtors, as well as their founder and CEO George Weiss, individually, were compelled to sign that certain Amended Forbearance Agreement with Defendants.

114.    As such, Defendants threatened actions that it had no right to take and prevented the free will of Plaintiffs by giving them no alternative to signing the Amended Forbearance Agreement but irreparable harm.

115.    The Amended Forbearance Agreement was signed under duress, based upon the bad acts and threats from Defendants.

116.    There is no adequate remedy at law, and the recission of the Amended Forbearance Agreement will restore the status quo for the relevant parties.

117.    Based upon the foregoing, Plaintiffs are entitled to a recission of the Amended Forbearance Agreement.

## COUNT VII – AMENDED FORBEARANCE
## AGREEMENT IS NULL AND VOID

118.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 117 above as if fully set forth herein.

119.    As set forth herein, Plaintiffs were coerced, under duress, to execute the Amended Forbearance Agreement on February 12, 2024.

120.    Defendants, who had specific obligations under the Amended Forbearance

27

Agreement, never executed and returned the Amended Forbearance Agreement.  In fact, they indicated that they did not agree with certain of the modified terms.  In addition, Defendants' actions further indicated that they had no intention of complying with the Amended Forbearance Agreement, including subsequent continued correspondence and threat to commence action against the Debtors and their employees.  In fact, Defendants were already in violation of the July 25, 2023 forbearance letter in which they agreed to forbear from enforcing the Notes until September 1, 2024.

121.    The two-day forbearance period granted GWA and WMSA, while already effectively meaningless by virtue of its duration, was ice in winter because the Jefferies Parties were under a preexisting obligation not to call the Notes through September 2024 pursuant to the July 25, 2023 forbearance letter. The purported forbearance granted to any of the other parties to the Amended Forbearance Agreement was no consideration at all given that they were under no prior obligations with respect to the Purchase Agreements or the Notes or the Initial Forbearance Agreements.

122.    Defendants lack of intent to comply with the Amended Forbearance Agreement and lack of any consideration, along with the failure to sign and return the Amended Forbearance Agreement, renders the agreement null and void.

123.    Plaintiffs demand judgment holding that the Amended Forbearance Agreement is null and void, and unenforceable.

**COUNT VIII - TO AVOID PREFERENTIAL
TRANSFERS PURSUANT TO 11 U.S.C. § 547(b)**

124.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 123 above as if fully set forth herein.

125.    During the Preference Period, Plaintiffs made an avoidable transfer to, or for the

benefit of, the Defendants in the amount of $3,000,000 on February 15, 2024.

126.    During the Preference Period, Defendants were creditors of Plaintiffs within the meaning of Bankruptcy Code section 547(b)(1) at the time of such avoidable transfer by virtue of the Note Purchase Agreements and the Notes for which Plaintiffs were obligated to pay in accordance with the Agreements.

127.    The avoidable transfer of $3 million was a transfer of an interest of Plaintiffs in property.

128.    According to the Debtors' books and records, the $3 million avoidable transfer was made to, or for the benefit of, Defendants because it either reduced or fully satisfied a debt or debts then owed by Plaintiffs to Defendants.

129.    The $3 million avoidable transfer was made for or on account of antecedent debts owed by Plaintiffs to the Defendants.

130.    The $3 million avoidable transfer was made while Plaintiffs were insolvent. Plaintiffs are entitled to the presumption of insolvency for each transfer made during the Preference Period pursuant to 11 U.S.C. § 547(f).

131.    The $3 million avoidable transfer was made on or within ninety (90) days prior to the Petition Date.

132.    The $3 million avoidable transfer enabled Defendants to receive more than they would receive if (a) Plaintiffs' cases was cases under chapter 7 of the Bankruptcy Code, (b) the Avoidable Transfers had not been made, and (c) Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

133.    Defendants were either the initial transferee of the $3 million avoidable transfer, the entity for whose benefit the $3 million avoidable transfer was made, or were the immediate or

mediate transferee of the initial transferee receiving the $3 million avoidable transfer.

134.    By reason of the foregoing, the $3 million avoidable transfer on February 15, 2024 should be avoided and set aside as a preferential transfer pursuant to 11 U.S.C. § 547(b).

### COUNT IX - TO AVOID FRAUDULENT
### TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(B)

135.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 134 above as if fully set forth herein.

136.    The Avoidable Transfers were made within two (2) years prior to the Petition Date.

137.    The Avoidable Transfers were made to, or for the benefit of, the Defendants.

138.    Plaintiffs did not receive reasonably equivalent value in exchange for the Avoidable Transfers, either (a) because the value of the services and/or goods received was in fact less than the Avoidable Transfers or (b) because the Debtors that received such goods and/or services were not the parties (i.e. Plaintiffs) that had incurred the debt, and Plaintiffs were: (i) insolvent on the dates of the Avoidable Transfers or became insolvent as a result of the Avoidable Transfers; and/or (ii) engaged in business or a transaction for which any property remaining with Plaintiffs was an unreasonably small capital at the time of, or as a result of, the Avoidable Transfers; and/or (iii) Plaintiffs intended to incur, or believed that Plaintiffs would incur, debts that would be beyond Plaintiffs' ability to pay as such debts matured.

139.    By reason of the foregoing, the Avoidable Transfers should be avoided and set aside as fraudulent transfers.

### COUNT X - TO PRESERVE
### PROPERTY PURSUANT TO 11 U.S.C. § 551

140.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 139 above as if fully set forth herein.

141.    The Avoidable Transfers are property of Plaintiffs' estates.

30

142.    Therefore, the Avoidable Transfers, or the value thereof, should be preserved for the benefit of Plaintiffs' estates pursuant to § 551 of the Bankruptcy Code.

**COUNT XI - TO RECOVER AVOIDABLE
TRANSFERS PURSUANT TO 11 U.S.C. § 550**

143.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 142 above as if fully set forth herein.

144.    Plaintiffs are entitled to avoid the Avoidable Transfers pursuant to 11 U.S.C. § 547(b), and the Avoidable Transfers pursuant to 11 U.S.C. § 548(a)(1)(B).

145.    Defendants were an initial transferee of one or more of the Avoidable Transfers, the immediate or mediate transferee of such initial transferee, or the person for whose benefit one or more of the Avoidable Transfers were made.

146.    Pursuant to 11 U.S.C. § 550(a), Plaintiffs are entitled (i) to avoid the Amended Forbearance Agreement and (ii) to recover from Defendants an amount to be determined at trial that is not less than the amount of the Avoidable Transfers as set forth on Schedule 1 hereof, plus interest thereon to the date of payment and the costs of this action.

**COUNT XII - TO DISALLOW
CLAIMS PURSUANT TO 11 U.S.C. § 502(d)**

147.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 147 above as if fully set forth herein.

148.    Defendants are entities from which property is recoverable under 11 U.S.C. § 550.

149.    Defendants are the initial transferees of the Amended Forbearance Agreement and/or Avoidable Transfers, the immediate or mediate transferee of such initial transferee, or the person for whose benefit the Amended Forbearance Agreement was entered into, or one or more of the Avoidable Transfers were made.

150.    Defendants have not paid the amount of any one of the Avoidable Transfers, or

turned over such property, for which Defendants are liable under 11 U.S.C. § 550.

151.    Pursuant to 11 U.S.C. § 502(d), any and all Claims of Defendants and/or their assignees, against the Debtors' Chapter 11 estate or the Debtors must be disallowed until such time as the Amended Forbearance Agreement is deemed null and void and/or the Defendants pay to Plaintiffs all amounts sought for the Avoidable Transfers as set forth above.

[*Continued on Next Page*]

**WHEREFORE**, for the foregoing reasons, Plaintiffs respectfully request that this

Court enter judgment against Defendants:

a) avoiding the Amended Forbearance Agreement, including the Perfected Security Interests and guarantees arising thereunder, as a Preferential Transfer pursuant to 11 U.S.C. § 547(b), or, in the alternative, as a Fraudulent Transfer pursuant to 11 U.S.C. § 548(a)(1)(B);

b) rescinding the Amended Forbearance Agreement for duress;

c) deeming the Amended Forbearance Agreement null and void for the failure of the Defendants to execute same and lack of consideration to Plaintiffs thereunder;

d) avoiding the Avoidable Transfers as Preferential Transfers pursuant to 11 U.S.C. § 547(b), or, in the alternative, as Fraudulent Transfers pursuant to 11 U.S.C. § 548(a)(1)(B);

e) preserving for the benefit of the Debtors' estate interests or obligations purportedly transferred under the Amended Forbearance Agreement, the Perfected Security Interests and guarantees and/or the Avoidable Transfers or the value thereof pursuant to 11 U.S.C. § 551;

f) pursuant to 11 U.S.C. § 550(a), directing (a) that the Amended Forbearance Agreement, and the Perfected Security Interests and guarantees arising thereunder, is null and void and/or (b) Defendant to pay to Plaintiffs an amount to be determined at trial that is not less than the aggregate amount of the Avoidable Transfers as set forth on Schedule 1 hereof, plus interests and costs;

g) disallowing any Claim of Defendants against the Debtors pursuant to 11 U.S.C. § 502(d);

h) requiring Defendants to pay forthwith the amount of the Judgment; and

i) granting Plaintiffs such other and further relief as the Court deems just and proper.

A-539

24-01050-mg   Doc 63-2   Filed 06/26/24   Entered 06/25/24 17:19:38   Exhibit A -
Proposed First Amended Complaint    Pg 34 of 35

Dated:  New York, New York
        June 25, 2024

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP

By: */s/John E. Jureller, Jr.*_____
    Tracy L. Klestadt
    John E. Jureller, Jr.
    Lauren C. Kiss
    Stephanie R. Sweeney
200 West 41st St., 17th Floor
New York, New York 10036
Tel: (212) 972-3000
Email: tklestadt@klestadt.com
      jjureller@klestadt.com
      lkiss@klestadt.com
      ssweeney@klestadt.com

24-01850-mg  Doc 63-2  Filed 06/25/24  Entered 06/25/24 13:17:19  Exhibit A -
Proposed First Amended Complaint    Pg 35 of 35

**SCHEDULE 1**

| Transferor | Transferee | Date | Amount |
|---|---|---|---|
| GWA, LLC | JSI | 4/29/2022 | $5,000,000 |
| GWA, LLC | JSI | 7/29/2022 | $10,000,000 |
| GWA, LLC | JSI | 11/28/2023 | $2,000,000 |
| OGI Associates, LLC[4] | JSI | 2/15/2024 | $3,000,000 |
| | | | $20,000,000 |

---

[4] This amount was paid by OGI Associates, LLC on behalf of GWA, LLC.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>WEISS MULTI-STRATEGY ADVISERS LLC, *et al.*[1]<br><br>Debtors. | Chapter 11<br>Case No. 24-10743 (MG)<br>Case No. 24-10744 (MG)<br>Case No. 24-10745 (MG)<br>Case No. 24-10746 (MG)<br>(Jointly Administered) |
| GWA, LLC, WEISS MULTI-STRATEGY ADVISERS LLC, OGI ASSOCIATES, LLC, WEISS SPECIAL OPERATIONS LLC, and WEISS MULTI-STRATEGY FUNDS LLC<br><br>Plaintiffs,<br><br>vs.<br><br>JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS, LLC,<br><br>Defendants. | Adv. Proc. No. 24-01350 (MG) |

**MEMORANDUM OF LAW IN SUPPORT OF JEFFERIES STRATEGIC**
**INVESTMENTS, LLC'S AND LEUCADIA ASSET MANAGEMENT HOLDINGS LLC'S**
**PARTIAL MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

---

[1] The "Debtors" in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Weiss Multi-Strategy Advisers LLC (7518); GWA, LLC (7079); OGI Associates LLC (4493); Weiss Special Operations LLC (7626); and Weiss Multi-Strategy Funds LLC (8004). The location of Debtor Weiss Multi-Strategy Advisers LLC's principal place of business is 320 Park Avenue, 20th Floor, New York, New York 10022 and the Debtors' service address in these Chapter 11 Cases is P.O. Box 2857, Meriden, Connecticut 06450.

## TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** ....................................................................................ii

**PRELIMINARY STATEMENT** ........................................................................... 1

**STATEMENT OF ALLEGED FACTS** ............................................................. 4

I.      Debtors Incurred More than $100
        Million in Liabilities to the Jefferies Entities ......................................... 4

II.     GWA Makes $17 Million in Payments to
        JSI Between April 2022 and November 2023 .......................................... 6

III.    Debtors Sign the Forbearance Agreement and Terminate Operations ............... 7

**ARGUMENT** ............................................................................................................ 10

I.      Debtors Cannot Avoid the Forbearance
        Agreement as Either a Preferential or Fraudulent Transfer .............................. 10

        A.      The Forbearance Agreement is Not a
                Transfer of an Interest of the Debtor in Property................................ 11

        B.      Debtors Admit that the Purported
                "Fraudulent Transfers" Were Made for Antecedent Debts................... 12

II.     Debtors' Claim that the Forbearance
        Agreement was the Product of Duress Fails ........................................... 15

III.    Debtors' Claims that the Forbearance Agreement
        Lacked Consideration or Countersignatures are Meritless ............................ 16

        A.      The Forbearance Agreement was Supported by Consideration.......... 16

        B.      The Forbearance Agreement was Accepted ...................................... 17

IV.     Debtors Fail to Plead Facts Demonstrating that the
        $3 Million Payment to JSI Constitutes a Preferential Transfer ....................... 18

V.      Debtors Cannot Avoid The $17 Million
        in Payments to JSI as Fraudulent Transfers ......................................... 19

VI.     Debtors' Claims Under 11 U.S.C. §§ 550
        and 551 Are Not Independent Causes of Action ...................................... 22

VII.    Debtors Cannot Vitiate the Jefferies Entities'
        Claims by Commencing this Meritless Adversary Proceeding ..................... 23

**CONCLUSION** ...................................................................................................... 25

i

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Asesores y Consejeros Aconsec CIA, S.A. v. Glob. Emerging Markets N. Am., Inc.*,
    841 F. Supp. 2d 762 (S.D.N.Y. 2012) ........................................................ 17

*Begier v. I.R.S.*,
    496 U.S. 53 (1990) ...................................................................................... 11

*Dan-Bunkering (Am.), Inc. v. Tecnologias Relacionadas
    con Energia y Servicios Especializados, S.A. de C.V.*,
    2020 WL 3893281 (S.D.N.Y. July 10, 2020) ............................................ 17

*In re AppliedTheory Corp.*,
    323 B.R. 838 (Bankr. S.D.N.Y. 2005) *aff'd*, 330 B.R. 362 (S.D.N.Y. 2005).......... 15

*In re Atl. Comput. Sys.*,
    173 B.R. 858 (S.D.N.Y. 1994)..................................................................... 25

*In re BH Sutton Mezz LLC*,
    2016 WL 8352445 (Bankr. S.D.N.Y. Dec. 1, 2016)........................... 13, 20

*In re Brown*,
    2023 WL 6051957 (Bankr. S.D.N.Y. Sept. 15, 2023) .............................. 24

*In re CIL Ltd.*,
    582 B.R. 46 (Bankr. S.D.N.Y. 2018) ................................................... 22, 23

*In re Corp. Res. Servs., Inc.*,
    2020 WL 2278416 (Bankr. S.D.N.Y. May 6, 2020) ................................. 13

*In re Duke & Benedict, Inc.*,
    265 B.R. 524 (Bankr. S.D.N.Y. 2001) .............................................. 11, 13

*In re Hobaica*,
    77 B.R. 392 (Bankr. N.D.N.Y. 1987) ........................................................ 19

*In re Iridium Operating LLC*,
    373 B.R. 283 (Bankr. S.D.N.Y. 2007) ....................................................... 21

*In re Lyondell Chem. Co.*,
    585 B.R. 41 (Bankr. S.D.N.Y. 2018) ................................................... 19, 21

*In re MF Glob. Inc.*,
    531 B.R. 424 (Bankr. S.D.N.Y. 2015) ....................................................... 24

*In re Operations NY LLC*,
    490 B.R. 84 (Bankr. S.D.N.Y. 2013) ................................................... 19, 22

*In re PennySaver USA Publ'g, LLC*,
    587 B.R. 445 (Bankr. D. Del. 2018) .......................................................... 24

ii

*In re Stage Presence, Inc.*,
  2013 WL 209645 (Bankr. S.D.N.Y. Jan. 17, 2013) ................................... 5

*In re TMST, Inc*,
  518 B.R. 329 (Bankr. D. Md. 2014) ................................................. 11, 12

*In re Teligent, Inc.*,
  307 B.R. 744 (Bankr. S.D.N.Y. 2004) ................................................. 22

*In re Trans World Airlines, Inc.*,
  180 B.R. 389 (Bankr. D. Del. 1994) ................................................... 21

*In re Trinsum Grp., Inc.*,
  460 B.R. 379 (Bankr. S.D.N.Y. 2011) .............................................. 14, 20

*In re Vivaro Corp.*,
  524 B.R. 536 (Bankr. S.D.N.Y. 2015) .............................................. 13, 20

*Innovative Custom Brands, Inc. v. Minor*,
  2016 WL 308805 (S.D.N.Y. Jan. 25, 2016) ............................................ 22

*Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*,
  655 F.3d 136 (2d Cir. 2011) ....................................................... 15, 16

*Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*,
  234 B.R. 293 (Bankr. S.D.N.Y. 1999) ................................................. 23

*MM Arizona Holdings LLC v. Bonanno*,
  658 F. Supp. 2d 589 (S.D.N.Y. 2009) ................................................. 17

*Oquendo v. CCC Terek*,
  111 F. Supp. 3d 389 (S.D.N.Y. 2015) ................................................. 15

*Pereira v. United Jersey Bank, N.A.*,
  201 B.R. 644 (S.D.N.Y. 1996) ........................................................ 12

*Silverberg v. SML Acquisition LLC*,
  2017 WL 758520 (S.D.N.Y. Feb. 27, 2017) ............................................ 16

*Thiam v. Am. Talent Agency, Inc.*,
  2012 WL 1034901 (S.D.N.Y. Mar. 27, 2012) ........................................... 16

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*,
  2012 WL 3100778 (N.D. Tex. July 31, 2012) .......................................... 12

*Wade Park Land Holdings, LLC v. Kalikow*,
  589 F. Supp. 3d 335 (S.D.N.Y. 2022) ......................................... 13, 15, 20

**Statutes**

11 U.S.C. § 101 ...................................................................... 21

11 U.S.C. § 502 ........................................................... 3, 23, 24, 25

11 U.S.C. § 547 ............................................................................................. *passim*

11 U.S.C. § 548 ............................................................................................. *passim*

11 U.S.C. § 550 ............................................................................. 3, 22, 23, 24

11 U.S.C. § 551 ................................................................................. 3, 22, 23

**Rules**

Fed. R. Bankr. P. 7012 ....................................................................................... 1

Fed. R. Civ. P. 12 ............................................................................................. 1

Pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to this adversary proceeding through Fed. R. Bankr. P. 7012, defendants Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC ("LAM Holdings," and collectively, the "Jefferies Entities") respectfully submit this memorandum of law in support of their partial motion to dismiss (the "Motion") the First Amended Complaint (ECF No. 13-2, the "FAC") filed by GWA LLC ("GWA"), Weiss Multi-Strategy Advisers LLC ("WMSA"), OGI Associates, LLC, Weiss Special Operations LLC ("WSO"), and Weiss Multi-Strategy Funds LLC ("WMSF," collectively, the "Debtors") in the above-captioned adversary proceeding.

**PRELIMINARY STATEMENT**

1.      The FAC is the Debtors' second attempt to excuse George Weiss, the Debtors' founder and Chief Executive Officer and a non-party to these proceedings, from a contractual guarantee of more than $100 million in liabilities, which Weiss executed as part of a February 12, 2024 Forbearance Agreement (the "Forbearance Agreement").

2.      In their Memorandum of Law in Support of their Motion to Dismiss (ECF No. 7-1, the "Initial Memo"), the Jefferies Entities established that nearly all of the claims set forth in the Debtors' original complaint should be dismissed.  Faced with the authority foreclosing their claims as pleaded, the Debtors opted to amend their Complaint.

3.      The FAC, however, fails to address nearly any of the deficiencies identified in the Initial Memo.  Instead, the FAC largely repeats the complaint's originally deficient allegations, and then adds two new unsupportable theories in an effort to excuse George Weiss's guarantee.  The new allegations do nothing to shore up the Debtors' meritless case.  Nearly all

of the Debtors' causes of action against the Jefferies Entities remain legally meritless and, in turn, should be dismissed for at least six reasons.[2]

4.      *First*, in their first through third causes of action, the Debtors ask that the Court avoid, as either a fraudulent or preferential transfer, the entirety of the Forbearance Agreement. However, as set out in the Initial Memo, only "transfer[s] of an interest of the debtor in property" or "obligation[s]" of a debtor—and not entire agreements—are avoidable.  Further, the Debtors acknowledge that the Forbearance Agreement was entered into on account of their antecedent debts, which precludes any claim that it was not "for value," as required to establish a fraudulent transfer claim.  The Debtors have failed to cure these pleading deficiencies and, accordingly, Plaintiffs' causes of action to void the Forbearance Agreement as a whole should be dismissed.

5.      *Second*, in an apparent acknowledgment that the Forbearance Agreement itself is not avoidable under the Bankruptcy Code, the Debtors assert two new causes of action seeking declarations that the Forbearance Agreement is void, as either a product of duress or for lack of consideration.  Yet the only facts Plaintiffs allege to support their claim of duress is that the Jefferies Entities threatened to pursue their legal rights, which is insufficient.  And the Debtors' claim that there was no consideration for the Forbearance Agreement is directly contradicted by the forbearance agreement itself.

6.      *Third*, the Debtors ask that this Court avoid—as a preferential transfer—a $3 million payment that OGI made to JSI on February 15, 2024.  Yet, despite having been alerted that the Debtors bear the burden of pleading facts to show that on account of the $3 million

---

[2]      While the Jefferies Entities have meritorious defenses to the remaining causes of action, they are not subject to dismissal on this threshold Rule 12(b)(6) motion.

payment, JSI received more than it would have under a hypothetical chapter 7 case involving OGI, the FAC does not plead even a single fact regarding OGI's assets and liabilities. As a result, the FAC fails to plead facts necessary to permit the court to assess whether JSI received more than it was entitled to, which is necessary to assert a preference claim.

7.      *Fourth*, the Debtors seek to avoid, as constructive fraudulent transfers, $17 million in payments that were made to JSI under the Notes. However, the Debtors still do not plead, as they must, any facts to show that these payments were made: (i) for "less than a reasonably equivalent value," or (ii) that the debtors were insolvent at the time of the payments, both of which are required to plead a constructive fraudulent transfer claim. Nor do the Debtors attempt to shy away from their admissions in other binding judicial filings that the $17 million in payments were made to discharge portions of the Debtors' pre-existing debts. For either reason, the constructive fraudulent transfer claims should be dismissed.

8.      *Fifth*, the Debtors assert a series of claims seeking to avoid the above-referenced transfers under 11 U.S.C. § 550 or 11 U.S.C. § 551. However, as set out in the Initial Memo, these sections of the Bankruptcy Code do not provide independent causes of action to the Debtors. Despite having notice of the frivolity of these claims, the Debtors continue to pursue them in the FAC. They should not be permitted to proceed.

9.      *Sixth*, the Debtors invoke 11 U.S.C. § 502(d) and seek a declaration that the entirety of the Jefferies Entities' more than $100 million in claims against the Debtors should be disallowed. Yet again, Debtors ignore that Section 502(d) may be invoked only after the Court addresses the merits of the Debtors' preference and fraudulent conveyance claims against the Jefferies Entities. Therefore, this claim should be dismissed as premature.

3

**STATEMENT OF ALLEGED FACTS**[3]

**I.    Debtors Incurred More than $100 Million in Liabilities to the Jefferies Entities**

10.    Each of the Debtors is part of a constellation of financial services companies which, at the direction of George A. Weiss (the Debtors' eponymous founder and chief executive officer), operated as a hedge fund since approximately 1978.   (*See* Declaration of Pierce Archer, *In re Weiss Multi Strategy Advisors, et al.*, No. 24 bk 10743 (MG) (Apr. 30, 2024) (ECF No. 6 ¶ 16.)).

11.    GWA operates as a holding company that owns a variety of Weiss-affiliated entities, including the other Debtors in this proceeding.  (*See* FAC ¶ 21).  WMSA acted as an investment advisor managing accounts owned by institutional investors.  (*Id*. ¶ 22).  OGI was used to carry certain of the Weiss-related entities' excess capital.  (*Id*. ¶ 24).  WSO is the administrative arm of WMSA.  (*Id*. ¶ 25).  WMSF was a broker-dealer formed for regulatory purposes.  (*Id.* ¶ 26).

12.    From 2018 to 2022, GWA executed several contracts with the Jefferies Entities, through which it obtained financial support for the Debtors' business operations in exchange for certain payment obligations.  (*Id*. ¶¶ 30–37).

13.    For instance, on May 1, 2018, LAM Holdings' predecessor and GWA entered into a strategic relationship agreement (the "Strategic Relationship Agreement"), pursuant to which LAM Holdings obtained a "profit equity interest" in GWA, which entitled LAM Holdings

---

[3]    For purposes of this motion only, the Jefferies Entities assume, but do not admit, the truth of all well-pleaded factual allegations contained in the FAC.

4

to "a share of the Debtors' revenue." (*Id.* ¶¶ 30–32; ECF No. 7-3).[4]

14.    Separately, in December 2019 and September 2022 JSI agreed to purchase $53 million in notes (the "Notes") issued by GWA under two "Note Purchase Agreements." (FAC ¶¶ 35–37; ECF Nos. 7-4, 7-5).

15.    Under Section 7.2 of the Note Purchase Agreements, JSI (and GWA) had "the right to redeem each Note, in whole but not in part, on each applicable Optional Redemption Date." The Optional Redemption Date, in turn, is defined as "the last calendar day of each month, beginning the third anniversary of the" relevant closing, "by at least 10 calendar days' prior written notice to the other party prior to the applicable Optional Redemption Date . . . ."[5] (ECF Nos. 7-4, 7-5). Upon exercise of the option to redeem the Notes, the amounts due under the Notes "become due and payable on the applicable Optional Redemption Date. . . ." (ECF Nos. 7-4, 7-5). The "Optional Redemption Date" is defined to be the last calendar day of each month beginning on the third anniversary of the December 2019 and the January 2020 Note issuances. Or, in other words, JSI had the right to redeem the Notes at its option beginning in December 2022 and January 2023, so long as it provided at least 10 calendar days' notice.

_____

[4]    On a motion to dismiss, the Court may consider "documents on which the plaintiff relied in bringing suit," *In re Stage Presence, Inc.*, 2013 WL 209645, at *4 (Bankr. S.D.N.Y. Jan. 17, 2013), which in this case includes the Strategic Relationship Agreement. Unless otherwise stated, any references to the docket (*e.g.*, "ECF") will refer to *GWA LLC v. Jefferies Strategic Investments, LLC*, Adv. Proc. No. 24-01350 (MG).

[5]    The Note Purchase Agreement from 2022 defines "Optional Redemption Date" as "monthly, on the last calendar day of each month." Accordingly, JSI had the right to redeem that Note, monthly, at its discretion.

16.     Entirely separately, Section 7.3 of the Note Purchase Agreement provided JSI with the right to redeem the Notes if GWA's members' equity in GWA dropped to less than $10 million (a "Trigger Redemption").  (ECF Nos. 7-4, 7-5).

**II.     GWA Makes $17 Million in Payments to
         JSI Between April 2022 and November 2023**

17.     Following the execution of the Strategic Relationship Agreement, certain of the Debtors generated revenues which entitled LAM Holdings to collect revenue sharing fees. (FAC ¶¶ 30–32; ECF No. 7-3).  As a result, GWA admits that as of the commencement of this action, it owed approximately $52.5 million to LAM Holdings under the Strategic Relationship Agreement.  (Declaration of George Weiss, *In re Weiss Multi Strategy Advisors, et al.*, No. 24 bk 10743 (MG) (May 2, 2024) (ECF No. 12 at 2)).

18.     Separately, GWA also owed JSI more than $50 million, plus interest, under the Notes that it had issued.  Accordingly, "on account of [GWA's] antecedent debt," GWA made $17 million in payments to JSI between April 29, 2022 and November 28, 2023.  (*See*, *e.g.*, FAC ¶¶ 74–75).

19.     The FAC alleges just one fact regarding GWA's financial condition at the time that any of these payments were made:  that, on April 29, 2022, GWA *and its subsidiaries* had "assets of $342,802,679, . . . liabilities of $368,237,411," resulting in an overall calculation of the "members' equity" of negative $25,434,732."  (*Id.* ¶ 45).

20.     However, the Debtors do not allege what GWA's or any of its subsidiaries' individual assets or liabilities were on April 29, 2022.  Nor does the Complaint contain any facts regarding the assets or liabilities of any of the Debtors on July 29, 2022, November 28, 2023, or February 15, 2024.

6

21.    In late 2021, the value of GWA's members' equity fell to below $10 million, which authorized JSI to redeem the Notes pursuant to the Trigger Redemption. (ECF No. 7-8 ¶ 114). However, instead of taking steps to enforce its rights under the Notes, JSI agreed to provide GWA with a lifeline by executing a series of forbearance agreements. (FAC ¶¶ 44–50). The last of these forbearance agreements was executed on July 25, 2023. In that agreement, JSI committed that it would "not exercise its rights to affect a Trigger Redemption prior to September 1, 2024." (ECF No. 15-8 § 1). However, JSI was still free to "redeem each Note, in whole but not in part, on each applicable Optional Redemption Date." (*See* ECF Nos. 7-4, 7-5).

**III.    Debtors Sign the Forbearance Agreement and Terminate Operations**

22.    On December 21, 2023, JSI delivered a Notice of Optional Redemption, not a Trigger Redemption, under the Notes. (FAC ¶ 53; ECF No. 7-6). As a result, GWA's was required to pay all outstanding aggregate principal and interest on the Notes on December 31, 2023. (FAC ¶ 53; ECF No. 7-6). However, December 31, 2023, came and passed, and the Debtors failed to repay the amounts then outstanding under the Notes. (ECF No. 7-8 ¶ 121).

23.    Accordingly, as of December 31, 2023, JSI had the right to commence litigation against GWA to compel it to repay the amounts that were owed under the Notes. (ECF No. 7-4 §§ 9(a), 10.2, 7-5 §§ 9(a), 10.2).

24.    The Debtors, all a collection of related entities that operated under GWA's control, implored JSI to forbear from exercising its rights. (*See* ECF No. 7-8 ¶ 131). While the Jefferies Entities were willing to work with the Debtors regarding their indebtedness, they were concerned that the Debtors' management team might prioritize the payment of other creditors above the Jefferies Entities. (*Id.* ¶ 128). In particular, the Jefferies Entities raised concerns that

the Debtors might make approximately $30 million in bonus payments to employees which, in turn, would reduce the pool of assets available to satisfy the debts owed to the Jefferies Entities. (*Id.* ¶ 129). Accordingly, on February 1, 2024, the Jefferies Entities delivered to the Debtors (and a non-debtor affiliate) a draft forbearance agreement. (*Id.* ¶ 131). Under that draft agreement, the Jefferies Entities offered to forbear from commencing any litigation against the Debtors, as long as the Debtors agreed to not make the $30 million in bonus payments. (*Id.*).

25.    While the Debtors' management team initially informed the Jefferies Entities that they were operating in the "normal course," those promises proved to be a sham. (*See id.* ¶¶ 132–33). Instead, one week after receiving the draft forbearance agreement, the Debtors revealed that they had paid their employees more than $30 million in bonuses. (FAC ¶ 57; ECF No. 7-8 ¶ 135). Those payments were in breach of provisions of the Strategic Relationship Agreement, and, in turn, all amounts owed under the Strategic Relationship Agreement became due and payable within five business days of February 8, 2024. (ECF No. 7-8 ¶ 138).

26.    Faced with the Debtors' duplicity, the Jefferies Entities informed the Debtors that—barring an agreement—they would initiate litigation, seeking to: (i) recover damages from the Debtors based upon their failure to repay the debts that they owed; and (ii) avoid certain of the bonus payments as either fraudulent of preferential transfers. (*See* FAC ¶¶ 68–69).

27.    Once again, the Debtors implored the Jefferies Entities to forbear from exercising their rights under the Notes and the Strategic Relationship Agreement. Accordingly, on February 12, 2024, the Debtors signed the Forbearance Agreement. (ECF No. 7-7).

28.    In exchange for JSI's and LAM Holdings' agreement to temporarily forbear from exercising their rights under the Notes and Strategic Relationship Agreement, the Debtors

agreed to take four categories of action relevant here.  *First*, each of the Debtors (other than GWA) guaranteed GWA's obligations under the Notes and the Strategic Relationship Agreement.  (ECF No. 7-7 § 3(a)).

29.    *Second*, the Debtors' founder and chief executive officer, George Weiss, agreed that he "unconditionally and irrevocably guaranteed to [LAM Holdings, JSI, and their affiliates] the accuracy of the representations made by, and the performance of the agreements of, the [Debtors and non-debtor WMSF] hereunder."  Weiss also agreed to "take all actions within his control . . . with respect to each of the other [Debtors and non-debtor WMSF], any of their subsidiaries and any of his personal or his family's trusts to cause such persons to comply with the terms of [the Forbearance] Agreement."  (*Id.* § 9).

30.    *Third*, the Debtors granted the Jefferies Entities a security interest in substantially all of their assets.  Debtors represented and warranted that the security interest would be a "first priority perfected security interest in the Collateral," as defined in the Forbearance Agreement.  (*Id.* § 4(b)).

31.    *Finally*, WMSA agreed to offset any amounts owed by JSI to WMSA under a separate agreement by the amounts owed to JSI under the Notes.  (*Id.* § 8 ("WMSA hereby agrees as of date hereof to treat any amounts JSI owes WMSA pursuant to the IMA . . . as offsetting GWA's payment obligations to JSI under the Notes . . . .")).

32.    Following the execution of the Forbearance Agreement, on February 15, 2024, OGI paid JSI $3,000,000 toward the outstanding Notes.  (FAC Schedule 1).  In turn, approximately $50 million under the Notes remains due and payable.  (ECF No. 7-8 ¶ 146).

9

33.     The Debtors then commenced these bankruptcy proceedings by filing a petition on April 29, 2024.  (ECF No. 1).  In court papers, GWA admits it owes $43,190,924.00 to JSI under the Notes, and $52,473,259.00 to LAM pursuant to the Strategic Relationship Agreement.  (*See, e.g.*, Declaration of George Weiss, *In re Weiss Multi Strategy Advisors, et al.*, No. 24 bk 10743 (MG) (May 2, 2024) (ECF No. 12)).  Both OGI and WSO acknowledge that the Jefferies Entities are their only creditors.  (*See* Declaration of George Weiss, *In re OGI, LLC*, No. 24-10745 (May 2, 2024) (ECF No. 5); Declaration of George Weiss, *In re Weiss Special Operations LLC*, No. 24-10746 (May 2, 2024) (ECF No. 5) Schedules (June 28, 2024) (ECF No. 117)).  WMSA also acknowledges its debt of $95,664,183.00 to the Jefferies Entities.  While WMSA lists a handful of additional liabilities, nearly all of those liabilities are categorized as "contingent" by the Debtors.  (*See* Declaration of George Weiss, *In re Weiss Multi Strategy Advisors, et al.*, No. 24 bk 10743 (MG) (May 2, 2024) (ECF No. 12)).

## ARGUMENT

### I.    Debtors Cannot Avoid the Forbearance Agreement as Either a Preferential or Fraudulent Transfer

34.     In Counts I and II of the FAC, Debtors seek to avoid the entire Forbearance Agreement, either as:  (i) a preferential transfer pursuant to 11 U.S.C. § 547(b); or (ii) a fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B).  (*See* FAC ¶¶ 80–97).  However, the Forbearance Agreement itself is not a "transfer" of "an interest of the debtor in property" or an "obligation" that is voidable under the Bankruptcy Code.  Accordingly, to the extent Counts I and II seek to either:  (i) avoid the entirety of the Forbearance Agreement; or (ii) assert fraudulent transfer claims, those counts should be dismissed.

10

### A.    The Forbearance Agreement is Not a
### Transfer of an Interest of the Debtor in Property

35.    To plead that the Forbearance Agreement is avoidable as either a preferential or

fraudulent transfer, Debtors must allege facts showing that the Forbearance Agreement, *as a*

*whole*, constitutes a transfer of an interest of the Debtors' property or, alternatively, imposes an

obligation on the Debtors.

36.    Specifically, Sections 547(b) and 548(a)(1) of the Bankruptcy Code authorize

the Court to avoid only "any *transfer* of an *interest of the debtor* in property," or, in the case of

fraudulent transfers, an "obligation . . . incurred by the debtor." 11 U.S.C. §§ 547(b), 548 (a)(1)

(emphasis added); *see also Begier v. I.R.S.*, 496 U.S. 53, 58 (1990) ("[Section] 547(b)'s

avoidance power is . . . limited to transfers of 'property of the debtor.'"); *In re Duke & Benedict,*

*Inc.*, 265 B.R. 524, 531 (Bankr. S.D.N.Y. 2001) ("The court may only avoid a 'transfer of an

interest of the debtor.'"  (citation omitted)).

37.    Accordingly, to the extent a transaction does not "transfer an interest" in a

debtor's property, or impose an "obligation" upon a debtor, that portion of the transaction is not

avoidable.  For example, in *In re TMST, Inc.*, a trustee sought to avoid a series of restructuring

agreements executed by the debtors.  518 B.R. 329, 347–48 (Bankr. D. Md. 2014), *vacated in*

*part on other grounds*, 2014 WL 6390312 (Bankr. D. Md. Nov. 14, 2014).  The Court explained,

however, that the trustee's attempt to avoid the agreements in their entirety (as opposed to those

parts of the agreement that transferred property or imposed obligations on the debtor) were "not

supportable," and that any "argument that an entire agreement can be avoided as opposed to

specific transfers and obligations therein[] fails as a matter of law."  *Id.*

11

38.    In their FAC, the Debtors seek to avoid the Forbearance Agreement in its entirety.  (*See* FAC ¶¶ 90, 97 ("[T]he . . . Forbearance Agreement should be avoided and set aside . . . .")).  However, the Forbearance Agreement contains provisions that do not involve transfers of any interests of the Debtors at all, including:  (i) a guarantee issued by non-debtor George Weiss (*see* ECF No. 7-7 § 9); (ii) the guarantees issued by Debtors (*id.* § 3); and (iii) the offset of payment (*id.* § 8).  All of these provisions of the Forbearance Agreement are immune from avoidance under Section 547(b) of the Bankruptcy Code because they are not "transfers" of the Debtors' property.  *See* 11 U.S.C. § 547(b); *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 2012 WL 3100778, at *5 (N.D. Tex. July 31, 2012) ("When a debtor . . . makes a guarantee . . . it does not transfer any property."); *Pereira v. United Jersey Bank, N.A.*, 201 B.R. 644, 661 (S.D.N.Y. 1996) ("If a party properly exercises its right of setoff, then the transfer 'may not be recovered as a preferential transfer.'"  (citation omitted)).

39.    Because there is no legal basis to support the Debtors' conclusion that an entire agreement can be avoided as opposed to specific transfers and obligations, Count I through II of the FAC—to the extent they seek to avoid the entirety of the Forbearance Agreement—should be dismissed.  *See In re TMST, Inc.*, 518 B.R. at 348 (granting motion to dismiss claim that sought to vacate agreement as a whole).

**B.    *Debtors Admit that the Purported "Fraudulent Transfers" Were Made for Antecedent Debts***

40.    Counts II and III of the FAC separately seek to avoid the Forbearance Agreement, or the security interests and guarantees therein, as constructive fraudulent transfers. To state this claim, the FAC must allege that the transfer or obligation—made within two years

of the petition date—"was made for less than reasonably equivalent value." *In re BH Sutton Mezz LLC*, 2016 WL 8352445, at *33 (Bankr. S.D.N.Y. Dec. 1, 2016).

41.     To plead that the debtor did not receive reasonably equivalent value, the debtor must state facts that give rise to an inference that the consideration that it received in exchange for a transfer or obligation was disproportionately small compared with the value of the property given up. *See In re Duke & Benedict, Inc.*, 265 B.R. at 530 ("Defined quantitatively, the debtor should receive 'a fair equivalent' or an 'amount not disproportionately small' as compared with the value of the property or obligation the debtor has given up.").

42.     However, if a debtor admits that the transfer was made on account of an antecedent debt, the Court should presume—absent the pleading of specific and contrary facts—that the transfer was for reasonably equivalent value. *See In re Vivaro Corp.*, 524 B.R. 536, 556 (Bankr. S.D.N.Y. 2015) ("The Note obligation is an antecedent debt, and any payments made on account of that Note obligation are payments made on account of that antecedent debt and are 'presumed [to be] made "for value."'" (citation omitted) (alteration in original)); *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 397 (S.D.N.Y. 2022) (collecting cases), *amended*, 2022 WL 2479110 (S.D.N.Y. July 6, 2022).

43.     In the FAC, the Debtors admit that the transfers contemplated by the Forbearance Agreement, which included the issuance of the guarantees and security interests, were "for or on account of antecedent debts owed by certain of the [Debtors] to the Defendants."[6]  (FAC ¶ 85).

_____

[6]     The Debtors' allegation that the Forbearance Agreement "was for or on account of antecedent debts" is a judicial admission by which Debtors are bound.  *In re Corp. Res. Servs., Inc.*, 2020 WL 2278416, at *10 (Bankr. S.D.N.Y. May 6, 2020) ("An assertion of fact in a

44.    Accordingly, this Court should construe any transfers or obligations incurred under the Forbearance Agreement as having been made for reasonably equivalent value.  *See In re Trinsum Grp., Inc.*, 460 B.R. 379, 388–89 (Bankr. S.D.N.Y. 2011) ("Specifically, the transfers are viewed as paying an antecedent debt (the notes), and it is presumed the transfers were made 'for value.' . . . The Amended Complaints, then, fail to meet the reasonably equivalent value requirement because the transfers are considered 'for value' under the statute." (citation omitted)).

45.    The Debtors' do not contest that a transfer on account of an antecedent debt is presumptively for value.  Instead, the Debtors allege that because JSI had previously agreed not to exercise a Trigger Redemption until September 1, 2024 (FAC¶ 120), the Jefferies Entities' agreement to not pursue remedies was not for "reasonably equivalent value."  However, while JSI had agreed not to exercise a Trigger Redemption until September 1, 2024, it remained free to bring suit under other provisions of the Note Purchase Agreements.  (*See* ECF No. 15-8 § 1).  Moreover, LAM Holdings was not a party to that original forbearance agreement.   (*Id.*).  Accordingly, the additional promise to forbear in the Forbearance Agreement contained new promises and value which are presumptively valid.  Accordingly, the Debtors' claims seeking to void the Forbearance Agreement as a constructive fraudulent transfer should be dismissed. *In re Trinsum Grp., Inc.*, 460 B.R. at 389 ("Because the Amended Complaints fail to sufficiently plead the less than reasonably equivalent value requirement, the Court concludes that the constructive fraudulent transfer claims under section 548(a)(1)(B) do not survive the Motions

_____

pleading is a judicial admission by which [a party] normally is bound throughout the course of the proceeding." (citation omitted) (alteration in original)).

14

to Dismiss."); *Wade Park Land Holdings, LLC*, 589 F. Supp. 3d at 397  (collecting cases) ("[M]any cases under the Bankruptcy Code have . . . held that securing an antecedent debt is not, as a matter of law, a constructive fraudulent conveyance." (alterations in original)); *In re AppliedTheory Corp.*, 323 B.R. 838, 844 (Bankr. S.D.N.Y. 2005) ("[T]his Court continues to believe, and holds, that the granting of a security interest in respect of antecedent debt constitutes reasonably equivalent value or fair consideration . . . ."), *aff'd*, 330 B.R. 362 (S.D.N.Y. 2005).

## II.    <u>Debtors' Claim that the Forbearance Agreement was the Product of Duress Fails</u>

46.    In Count VI, the Debtors separately ask this Court to declare that the Forbearance Agreement is null and void on the grounds that it "was signed under duress, based upon the bad acts and threats from Defendants."  (FAC ¶ 115).

47.    However, in order to plead a claim to void an agreement on the basis of duress, the Debtors must plead facts to "show that its agreement was procured by means of (1) a wrongful threat that (2) precluded the exercise of its free will," *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011).

48.    The Debtors fail to plead any "wrongful threat" at all.  The Debtors' only allegation to support this claim is that the Jefferies Entities "threatened" to "commence unlawful litigation," despite JSI's "preexisting obligation to forbear from taking [filing suit] through September 1, 2024" (FAC ¶¶ 110–11)  However, "[u]nder New York law, threats to enforce a party's legal rights under a contract—or even that party's *interpretation* of its rights—cannot constitute a wrongful threat sufficient to establish a claim of economic duress."  *Oquendo v. CCC Terek*, 111 F. Supp. 3d 389, 408 (S.D.N.Y. 2015) (emphasis in original) (citation omitted). Indeed, "it is axiomatic that [a party] cannot be guilty of economic duress for failing to grant

further forbearance when [it] ha[s] no legal duty to do so." *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 143 (2d Cir. 2011) (citations omitted).

49.     Moreover, "[a] threatened breach of contract for which there are adequate legal remedies does not" amount to a wrongful threat. *Oquendo*, 111 F. Supp. 3d at 408.  Thus, to the extent JSI did have "a preexisting obligation to forbear from taking [filing suit] through September 1, 2024" (FAC ¶¶ 110–11), any threat to breach of that obligation could not constitute a "wrongful threat" because the Debtors "would have had other legal remedies available," including a potential claim against JSI. *Thiam v. Am. Talent Agency, Inc.*, 2012 WL 1034901, at *6 (S.D.N.Y. Mar. 27, 2012) (threats not to perform under prior agreement insufficient to constitute duress because there were "other legal remedies available"); *Silverberg v. SML Acquisition LLC*, 2017 WL 758520, at *8 (S.D.N.Y. Feb. 27, 2017) (no duress where "Plaintiff could have refused to sign [the new agreement] and instead pursued his legal remedies under the [original] Agreement.").

## III.    Debtors' Claims that the Forbearance Agreement Lacked Consideration or Countersignatures are Meritless

50.     Separately, in Count VII, the Debtors seek a declaration that the Forbearance Agreement is "null and void" because it allegedly "lack[ed] . . . any consideration," and was not "sign[ed] and return[ed]."  (FAC ¶ 122).  Neither argument has any merit.

### A.    The Forbearance Agreement was Supported by Consideration

51.     As an initial matter, the Debtors request that this Court void the Forbearance Agreement on the ground that it lacked valid consideration because the "two-day forbearance period" was "effectively meaningless by virtue of its duration."  (FAC ¶ 121).

52.    However, in New York, "consideration . . . can take the form of either a promise or performance, and can be either a bargained for gain or advantage to the promisee or a bargained for legal detriment or disadvantage to the promisor.  It is enough that something is promised, done, forborne or suffered by the promisee . . . as consideration for the promise made to him."  *Dan-Bunkering (Am.), Inc. v. Tecnologias Relacionadas con Energia y Servicios Especializados, S.A. de C.V.*, 2020 WL 3893281, at *7 (S.D.N.Y. July 10, 2020) (cleaned up).

53.    The Debtors cannot allege that they received no consideration under the Forbearance Agreement.  Indeed, the Debtors readily concede that the promises in the Forbearance Agreement were made "in exchange for a 'forbearance' for all of ***two business days***."  (FAC ¶ 1 (emphasis in original)).  Despite the Debtors' unhappiness with their bargain, "[u]nder New York law, forbearance of any length can constitute valid consideration."  *MM Arizona Holdings LLC v. Bonanno*, 658 F. Supp. 2d 589, 593 (S.D.N.Y. 2009).  And, "[c]ourts have not hesitated to find sufficient consideration not only in what is now the proverbial peppercorn, but in a horse or a canary, or a tomtit if the promisee chose."  *Dan-Bunkering (Am.), Inc.*, 2020 WL 3893281, at *7 (finding that forbearance was sufficient consideration).

### B.    The Forbearance Agreement was Accepted

54.    Plaintiffs separately allege that the Forbearance Agreement is void because the Jefferies Entities "never executed and returned the Amended Forbearance Agreement" and "indicated that they did not agree with certain of the modified terms."  (FAC ¶ 120).  Yet Plaintiffs themselves have pleaded facts which establish the Jefferies Entities accepted the Amended Forbearance Agreement, which forecloses their current claim.

55.     "Under New York law, a contract need not be signed by either or both parties in order to be enforceable. . . .   In the absence of a signed writing, parties can demonstrate the existence of a contractual agreement by making a showing of the 'objective manifestations of the intent of the parties as gathered by their expressed words and deeds.'"  *Asesores y Consejeros Aconsec CIA, S.A. v. Glob. Emerging Markets N. Am., Inc.*, 841 F. Supp. 2d 762, 766 (S.D.N.Y. 2012) (citations omitted).

56.     The FAC acknowledges that following the execution of the Forbearance Agreement, the Jefferies Entities promptly fil[ed] "UCC-1 financing statements against certain of the parties to the . . . Forbearance Agreement, in an effort to seek to perfect the security interests . . . granted under the . . . Forbearance Agreement."  (FAC ¶ 66).  These actions show that the Jefferies Entities took "objective actions support[ing] the conclusion that [they] accepted [the Forbearance A]greement . . . ."  *Asesores*, 841 F. Supp. 2d at 767.

## IV.    Debtors Fail to Plead Facts Demonstrating that the $3 Million Payment to JSI Constitutes a Preferential Transfer

57.     Count VIII of the FAC seeks to avoid OGI's payment of $3 million to JSI on behalf of GWA as an avoidable preferential transfer under Section 547(b) of the Bankruptcy Code.  (*See* FAC ¶¶ 124–34).  However, the FAC fails to plead facts to show that, as a result of the challenged transfer, JSI received more than it would have received in a hypothetical chapter 7 proceeding.  In turn, Count VIII should be dismissed.

58.     To plead its preferential transfer claim under Section 547(b) of the Bankruptcy Code, OGI must plead facts to show that the transfer at issue "enables [the] creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the

extent provided by the provisions of this title."  11 U.S.C. § 547(b)(5).  This requires the "bankruptcy court . . . to construct the hypothetical distribution" under chapter 7, taking into account "administrative expenses."  *In re Hobaica*, 77 B.R. 392, 394 (Bankr. N.D.N.Y. 1987).

59.    Here, other than the Debtors' conclusory allegation that "JSI received more than it would have received in a chapter 7 proceeding," the FAC contains no allegations supporting the premise that that would be the case.  (FAC ¶ 71).  Indeed, the FAC contains no allegations about OGI's assets or liabilities as of the petition date.  (*See generally id.*).  As a result, the FAC fails to plead facts sufficient to allow the Court to construct a hypothetical chapter 7 case.  *See In re Operations NY LLC*, 490 B.R. 84, 102 (Bankr. S.D.N.Y. 2013) ("The Complaint does not include any allegations regarding the Debtor's assets and liabilities on the petition date, the starting point for the analysis . . . .").  Therefore, the Debtors' claim seeking to avoid the $3 million payment to OGI as a preferential transfer should be dismissed.  *See id.* (dismissing preferential transfer claim).[7]

**V.    Debtors Cannot Avoid The $17 Million in Payments to JSI as Fraudulent Transfers**

60.    Count IX of the FAC, which seeks to recoup $17 million of payments made by GWA to JSI, as purportedly constructive fraudulent transfers under 11 U.S.C. § 548(a)(1)(B),

---

[7]    The only allegation of insolvency in the FAC at all is that, on April 29, 2022—long before the petition date—GWA—a different Debtor—had "assets of $342,802,679, . . . liabilities of $368,237,411, and . . . members' equity of ($25,434,732)."  (FAC ¶ 45).  But even if those numbers were applicable to OGI, they would fail to account for the *fair value* of OGI's assets, as required to plead insolvency.  *See, e.g.*, *In re Lyondell Chem. Co.*, 585 B.R. 41, 63 (Bankr. S.D.N.Y. 2018) ("A balance sheet . . . which shows the 'book value' of assets and liabilities" is a "useful starting point for [an insolvency] inquiry, but, absent unusual circumstances, is not its endpoint.").

should also be dismissed because the Debtors fail to allege facts necessary to establish multiple elements of their claim. (*See* FAC ¶¶ 88–92).

61.    In particular, to state a constructive fraudulent transfer claim under Section 548(a) of the Bankruptcy Code, the Debtors must plead facts to show that (i) the $17 million payments were made for less than reasonably equivalent value; and (ii) at the time of the transfers, the Debtors were either insolvent, had unreasonably small capital, or incurred or believed they would incur debts beyond their ability to pay. *In re BH Sutton Mezz LLC*, 2016 WL 8352445, at *33. The FAC fails on both levels.

62.    *First*, the FAC does not allege any facts to show that the transfers were made for less than reasonably equivalent value. To the contrary, the FAC admits (as the original complaint did) that the $17 million was paid "on account of an antecedent debt." (FAC ¶ 75). And, as noted above, a constructive fraudulent transfer claim under Section 548(b) of the Bankruptcy Code is presumptively not viable when it seeks to avoid a debtor's payment of antecedent debts. *In re Vivaro Corp.*, 524 B.R. at 556 (citations omitted); *In re Trinsum Grp., Inc.*, 460 B.R. at 389 ("The transfers were made pursuant to antecedent debt and the Distributing Agent cannot seek to avoid the promissory notes as those claims would be time-barred."); *see also Wade Park Land Holdings, LLC*, 589 F. Supp. 3d at 397 ("Similarly, 'courts find fair consideration where, in exchange for the grant of collateral, a debtor obtains maturity date extensions.'" (citation omitted)). And the FAC pleads no facts to show that these payments were for anything other than the antecedent debts, or were for "less than reasonably equivalent value."

63.     *Second*, the Debtors' fail to allege facts supporting that they were insolvent at the time of the transfer.  The Initial Memo explained how the Debtors bear the burden to plead facts—as opposed to conclusions—that would demonstrate that the relevant transferring Debtor was insolvent at the date of each transfer.  The FAC fails to even attempt to remedy the original complaint's lack of factual allegations.  Instead, the FAC simply alleges that on April 29, 2022—the date of only one of the relevant transfers—GWA had "assets of $342,802,679, . . . liabilities of $368,237,411, and . . . members' equity of ($25,434,732)."  (FAC ¶ 45).  That is insufficient.

64.     11 U.S.C. §101(32)(A) defines "insolvency" as a "financial condition such that the sum of [the] entity's debts is greater than all of [the] entity's property, ***at a fair valuation***, exclusive of property transferred, concealed, or removed with intent to hinder, delay, or defraud [the] entity's creditors and property."  (emphasis added).  Accordingly, the Debtors must plead facts permitting a Court to determine the "fair market price of the debtor's assets that could be obtained if [the assets were] sold in a prudent manner within a reasonable period of time to pay the debtor's debts."  *In re Iridium Operating LLC*, 373 B.R. 283, 343 (Bankr. S.D.N.Y. 2007).  The Debtors' allegation that they had a negative net worth on a balance sheet, without more, is insufficient.  *See, e.g.*, *In re Trans World Airlines, Inc.*, 180 B.R. 389, 405 (Bankr. D. Del. 1994) ("[F]or a §101(32) insolvency analysis, balance sheet numbers do not necessarily reflect the fair value of assets. . . . [S]ome assets of substantial value . . . [may] not even [be] listed."), *rev'd on other grounds*, 203 B.R. 890 (D. Del. 1996); *In re Lyondell Chem. Co.*, 585 B.R. at 63.

65.     Moreover, even if the Debtors' balance sheet allegations could suffice to plead insolvency, the Debtors fail to plead facts regarding their solvency at the time of each of the transfers.  The FAC focuses on the Debtors' balance sheet  as of April 29, 2022.  (FAC ¶ 45).

But the FAC does not allege any facts regarding the assets or liabilities of any of the Debtors on July 29, 2022, November 28, 2023, or February 15, 2024.  This too is fatal to the Debtors' constructive fraudulent transfer claims and warrants dismissal of Count IX of the FAC.  *See, e.g.*, *Innovative Custom Brands, Inc. v. Minor*, 2016 WL 308805, at *3 (S.D.N.Y. Jan. 25, 2016) (granting defendant's motion to dismiss where plaintiff failed to plead "that the corporation's liabilities exceed[ed] [its] assets ***at the time the transfers took place***'" (alterations in original) (emphasis added)); *In re Operations NY LLC.*, 490 B.R. at 98 (dismissing constructive fraudulent transfer claims where plaintiff failed to allege facts about the debtors' capital and ability to pay debts); *id.* at 99 (dismissing counts for constructive fraudulent transfer claims where the complaint did not allege any facts relating to debtor's intent to incur debt that it believed it would be unable to pay).

**VI.     Debtors' Claims Under 11 U.S.C. §§ 550
and 551 Are Not Independent Causes of Action**

66.     In Counts IV, V, X, and XI, Debtors attempt to assert separate causes of action under Section 550 and 551 of the Bankruptcy Code.

67.     However, Sections 550 and 551 of the Bankruptcy Code set forth certain "statutory effects" that occur when an interest or obligation is avoided under, *inter alia*, Sections 547 or 548 of the Bankruptcy Code.  *In re CIL Ltd.*, 582 B.R. 46, 97 (Bankr. S.D.N.Y. 2018), *amended in other part on reconsideration*, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018); *see also* 11 U.S.C. §§ 550(a) (provision applies "to the extent that a transfer is avoided"); 551 (applying to "[a]ny transfer avoided").  As a result, these provisions provide remedies once a debtor or trustee successfully establishes that a transfer is avoidable under a separate section of the Bankruptcy Code.  *See In re Teligent, Inc.*, 307 B.R. 744, 750 (Bankr. S.D.N.Y. 2004)

("Once the grounds for setting aside a transfer have been shown, the Trustee faces the second hurdle of establishing a means of recovery under § 550(a) . . . , which requires the Trustee to identify a specific category of persons from whom recovery of the fraudulent transfer may be had."); *In re CIL Ltd.*, 582 B.R. at 97 (Section 551 "does not provide for an independent cause of action. Rather, it creates a statutory effect to a transfer that has been avoided under, for instance, sections 544 or 548. That effect is automatic, and springs into existence upon a successful avoidance under other sections of the Code . . .").

68.     Neither Section, however, provides any independent cause of action that can be asserted against a defendant.  *See In re CIL Ltd.*, 582 B.R. at 97 (granting motion to dismiss claim under § 551 because that section does "not provide for an independent cause of action"); *Sec. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 312 (Bankr. S.D.N.Y. 1999) ("[R]ecovery for the estate under § 550(a) is available only to the extent a transfer has been successfully avoided pursuant to any of the avoidance sections of the Bankruptcy Code."). Accordingly, Counts IV and VII should both also be dismissed.

**VII.     Debtors Cannot Vitiate the Jefferies Entities' Claims by Commencing this Meritless Adversary Proceeding**

69.     In Count XII, Debtors seek to disallow any and all claims made by the Jefferies Entities "until such time as the . . . Forbearance Agreement is deemed null and void and/or the Defendants pay to [the Debtors] all amounts sought for the Avoidable Transfers as set forth" in the FAC.  (FAC ¶ 151).

70.     Yet the Debtors' claim is premature and procedurally improper.  Section 502(d) of the Bankruptcy Code states, in relevant part, as follows:

> [T]he court shall disallow any claim of any entity from which property is recoverable under section . . . 550 . . . of this title or that is a transferee of a transfer avoidable under section . . . 547, 548 . . . of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee **_is liable_** under section . . . 550 . . . of this title.

(emphasis added).

71.      As is clear on its face, Section 502(d) permits the Court to disallow a claim only once it has determined that the creditor "**_is liable_**" on account of a voidable transfer.  *Id.*; *see also In re PennySaver USA Publ'g, LLC*, 587 B.R. 445, 468 (Bankr. D. Del. 2018) ("Disallowing a claim under Section 502(d) requires a judicial determination that a claimant is liable . . . .  Where the debtor 'has merely commenced an adversary proceeding,' the Court will hold that Section 502(d) is inapplicable." (citation omitted)).  Accordingly, the Court may not apply Section 502(d) until these adversary proceeding claims have been resolved.  *See In re Brown*, 2023 WL 6051957, at *12 (Bankr. S.D.N.Y. Sept. 15, 2023) (refusing to disallow a claim under Section 502(d) pending resolution of an adversary proceeding).

72.      There has been no finding that any of the Jefferies Entities are liable for any avoidable transfers.  The Debtors' claims in this case were brought to resolve this very question.  Accordingly, the Debtors' request for a declaration disallowing the Jefferies Entities' claims is premature and should be dismissed.  *See, e.g.*, *In re Brown*, 2023 WL 6051957, at *1 ("Section 502(d) will not be triggered unless and until the Trustee obtains a judgment . . . on one or more of the fraudulent conveyance counts . . . .  [T]he Court denies the Trustee's request to disallow the Claim under section 502(d) . . . ."); *In re MF Glob. Inc.*, 531 B.R. 424, 429 (Bankr. S.D.N.Y. 2015) ("A claim should not be disallowed pursuant to section 502(d) without the court initially determining whether the claimant is required to turn over property of the estate." (citation

omitted)); *In re Atl. Computer Sys.*, 173 B.R. 858, 862 (S.D.N.Y. 1994) ("[Section 502(d)] clearly envisions some sort of determination of the claimant's liability before its claims are disallowed . . . .").

## **CONCLUSION**

73.    For the foregoing reasons, Defendants respectfully request that the Court dismiss Counts I, II, and IV through XII of the Debtors' FAC in their entirety, and Count III to the extent it asserts a constructive fraudulent conveyance claim.

Respectfully submitted,

Dated: New York, New York
      July 16, 2024

**HERBERT SMITH FREEHILLS
  NEW YORK LLP**

By: */s/ Scott S. Balber*
   Scott S. Balber
   Michael P. Jones
   Daniel Gomez
200 Park Avenue
New York, New York 10166
Tel: (917) 542-7810
Fax: (917) 542-7601
Email: Scott.Balber@hsf.com
      Michael.Jones@hsf.com
      Daniel.Gomez@hsf.com

*Attorneys for Jefferies Strategic
Investments, LLC and Leucadia
Asset Management Holdings LLC*

KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP
Tracy L. Klestadt
John E. Jureller, Jr.
Lauren C. Kiss
Stephanie R. Sweeney
200 West 41st Street, 17th Floor
New York, New York 10036
(212) 972-3000

*Attorneys for Debtors and Debtors-in-Possession*
*Weiss Multi-Strategy Advisors LLC and its affiliated debtors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| **WEISS MULTI-STRATEGY ADVISORS LLC, _et al._,**[1] | **Case No. 24-10743 (MG)** |
| **Debtors.** | **(Jointly Administered)** |
| **GWA, LLC, WEISS MULTI-STRATEGY ADVISORS LLC, OGI ASSOCIATES, LLC, WEISS SPECIAL OPERATIONS LLC and WEISS MULTI-STRATEGY FUND LLC,** | |
| **Plaintiffs,** | **Adv. Proc. No. 24-01350 (MG)** |
| **vs.** | |
| **JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS, LLC,** | |
| **Defendants.** | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**PARTIAL MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Weiss Multi-Strategy Advisers LLC (7518); GWA, LLC (7079); OGI Associates LLC (4493); Weiss Special Operations LLC (7626); and Weiss Multi-Strategy Funds LLC (8004). The location of Debtor Weiss Multi-Strategy Advisers LLC's principal place of business was formerly 320 Park Avenue, 20th Floor, New York, New York 10022 and the Debtors' service address in these Chapter 11 Cases is P.O. Box 2857, Meriden, Connecticut 06450.

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................1

PROCEDURAL AND FACTUAL BACKGROUND.................................................4

ARGUMENT ...........................................................................................................5

     I.    Avoidance of Amended Forbearance Agreement .........................................8

        i.    The Amended Forbearance Agreement was a Preferential Transfer ..................10

        ii.   The Amended Forbearance Agreement was a Fraudulent Transfer....................14

        iii.  The First Amended Complaint Adequately Alleges Cause of Action
            for Rescission...........................................................................................18

        iv.  The First Amended Complaint Adequately Alleges Cause of Action to hold
            Amended Forbearance Agreement Null and Void ................................19

    II.    Avoidance of $3 million Payment as a Preferential Transfer .....................20

   III.   Avoidance of $17 million Payment as Fraudulent Transfers.......................21

   IV.  Complaint Sufficiently Pleads Claims under Bankruptcy Code Sections
        550 and 551...................................................................................................24

    V.   Complaint Sufficiently Pleads Claim under Section 502(d)........................25

   VI.  Leave to File Further Amended Complaint .................................................25

CONCLUSION........................................................................................................25

A-573

## TABLE OF AUTHORITIES

*Cases:*

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ...................................................................6, 7

*Bangkok Crafts Corporation v. Capitolo Di San Pietro In* Vaticano,
2006 WL 1997628 (S.D.N.Y. July 18, 2006) ........................................................18

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) ............................................6

*Chambers v. Time Warner, Inc., 282 F.3d 147 (2d Cir. 2002)* ..........................22

*Conley v. Gibson,* 355 U.S. 41 (1957) ....................................................................6

*Cooper v. Parsky,* 140 F.3d 433, 440 (2d Cir. 1998*)* .............................................6

*Eaves v. Designs for Finance, Inc., 785 F. Supp. 2d 229,(S.D.N.Y. 2011)* ...................22

*Harison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.)*
507 B.R. 452 (Bankr. S.D.N.Y. 2014) ...................................................................15

*In re 360Networks (USA) Inc.*, 338 B.R. 194 (Bankr. S.D.N.Y. 2005) ...................16, 24

*In re AppliedTheory Corp.,* 323 B.R. 838 (Bankr. S.D.N.Y. 2005) .............................17

*In re Dura-Built Homes, Inc.*, 170 B.R. 170, 172 (Bankr. M.D. Ala. 1989) ...............11

*In re FBN Food Servs., Inc.*, 185 B.R. 265, 272 (N.D. Ill. 1995), *aff'd and remanded sub nom.*
*Matter of FBN Food Servs., Inc.*, 82 F.3d 1387 (7th Cir. 1996) ...................11

*In re Gas-Mart, Inc.,* 598 B.R. 274, 278 (Bankr. W.D. Mo 2019) ...............................16

*In re General Time Corp.*, 328 B.R. 243, 247 (Bankr. N.D. GA 2005) ......................16

*In re Moskowitz,* 85 B.R. 8 (E.D.N.Y. 1988) ..............................................................24

*In re Ruffini,* 2014 WL 714732 ..................................................................................15

*In re Texas Rangers Baseball Partners*, 498 B.R. 679, 713 (Bankr. N.D. Tex. 2013) ...............11

*In re TMST, Inc.,* 518 B.R. 329, 347 (Bankr. S.D.N.Y. 2014) ...................6, 11, 12, 19

*In re Trinsum*, 460 B.R. 379 (Bankr. S.D.N.Y. 2011) ................................................17

*In re Vivaro Corporation,* 524 B.R. 536 (Bankr. S.D.N.Y. 2015) .............................7, 15, 21, 25

*Jackson v. Mishikin (In re Adler Coleman Clearing Corp.,* 263 B.R. 406 (S.D.N.Y. 2001) ........15

*Lamonica v. Tilton (In re Transcare Corporation),*
2020 WL 8021060, (Bankr. S.D.N.Y. July 6, 2020) ....................................................11

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) .................................................................6

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),* 2020 WL 401822 (Bankr. S.D.N.Y. Jan. 23, 2020) .............................................6

*Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178 (2d Cir. 2008) ...................7

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 127 S. Ct. 2499 (2007) ..........6

*Unity Electric Co. Inc. v. Microdesk, Inc.* 2023 WL 5000992 (S.D.N.Y. Aug. 4, 2023)..............20

*Wade Park Land Holdings, LLC v. Kalikow*, 589 F.Supp.3d 335 (S.D.N.Y. 2022) ...................17

**Other Authorities:**

11 U.S.C. § 101(54)...................................................................................11

11 U.S.C. § 502(d)...........................................................................4, 8, 24, 25

11 U.S.C. § 547(a)(1) .................................................................................10

11 U.S.C. § 547(b)...........................................................................10, 14, 21, 24

11 U.S.C. § 547(f)...................................................................................12, 21

11 U.S.C. § 548(a)(1)(B) .......................................................................10, 14, 24, 25

11 U.S.C. § 550.................................................................................4, 8, 24, 25

11 U.S.C. § 551.................................................................................4, 8, 24, 25

*3 Moore's Federal Practice § 1508[2]* .................................................................25

Federal Rule of Bankruptcy Procedure 7015 ........................................................5, 25

Federal Rule of Civil Procedure 12(b)(6) ............................................................5, 6

Federal Rule of Civil Procedure 15(a) ...............................................................5, 25

Federal Rule of Civil Procedure 15(a)(1)(B) ............................................................5

iii

GWA, LLC ("GWA"), Weiss Multi-Strategy Advisers LLC ("WMSA"), OGI Associates LLC ("OGI"), Weiss Special Operations LLC ("WSO"), and Weiss Multi-Strategy Funds LLC ("WMSF", and collectively with WMSA, GWA, OGI and WSO, "Debtors" or "Plaintiffs"), debtors and debtors-in-possession in the above-captioned Chapter 11 cases and plaintiffs in the adversary proceeding, by their undersigned counsel, respectfully submit this opposition to the motion of Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC ("Leucadia Holdings", and with JSI, the "Defendants") for partial dismissal of the First Amended Complaint (the "Motion"), and respectfully represent as follows:

## PRELIMINARY STATEMENT

The claims asserted by Plaintiffs in the First Amended Complaint (as defined below) seek to avoid the Amended Forbearance Agreement (as defined below) as a preference entered into within ninety (90) days of the Petition Date (as defined below), avoid transfers of property interests and incurrence of obligations under the Amended Forbearance Agreement, and recover material preferential and constructively fraudulent payments that were compelled by Defendants' actions, threats, coercion and manipulation.   The facts are clearly pleaded in the First Amended Complaint. Defendants' efforts in the Motion to complicate the claims are unavailing.

As alleged in the First Amended Complaint, on February 12, 2024, within the Preference Period[2], the Debtors were compelled to enter into the Amended Forbearance Agreement under coercion and duress from Defendants.  Defendants threatened that they would (a) commence litigation seeking to, among other things, claw back ordinary course year-end compensation and bonus payments made to the Debtors' employees under contractual obligations and industry standards, (b) unlawfully freeze the Debtors' bank accounts, and (c) seek to ruin George Weiss's

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Amended Complaint.

1

reputation in the industry including by filing improper fraud claims against him. From the Debtors'

standpoint, this was not just a threat of litigation, but also the certain loss of key personnel, collapse

of a third-party transaction which was in late-stage negotiations, and the demise of these companies

and their managed funds without the ability for an orderly winddown for the benefit of all

interested parties. Further, Defendants' threatened actions jeopardized the Debtors' ability to

comply with their fiduciary duties and obligations to regulatory agencies such as the Securities

and Exchange Commission, Commodity Futures Trading Commission, Internal Revenue Service,

Department of Treasury, or under regulations including Investment Advisers Act of 1940 or

Employee Retirement Income Security Act of 1974.

The First Amended Complaint asserts that the Amended Forbearance Agreement, entered

into within 90 days of the Petition Date, effectively provided Defendants with significantly

superior property rights than previously negotiated and agreed with the Debtors. Up until this

time, Defendants were unsecured, with no cross-corporate guarantees by the Debtors.

Nonetheless, the Amended Forbearance Agreement purported to grant security interests in all

assets of the Debtors, provide unlimited guarantees from each of the Debtors, and setoff significant

amounts owed by JSI to GWA. The purported "consideration" was a two-day (at most)

forbearance by Defendants to GWA and WMSA (and no consideration to the Debtors who were

previously unobligated). Yet, this was a "forbearance" agreement in name only; in actuality, it

was Defendants' attempted unilateral renegotiation of the antecedent debt, executed under threat

of catastrophic litigation and false fraud claims against Plaintiffs' principal, with no consideration

and no new value, within the Preference Period. As alleged in the First Amended Complaint,

under the Amended Forbearance Agreement there can be no question that Defendants would

receive more than they would have in a chapter 7 case. In fact, it would effectively give Defendants

2

a right to all of the Debtors' assets, leaving nothing for the Debtors' other unsecured creditors who collectively hold or assert more than $24 million in claims, which Defendants were fully aware of.

The First Amended Complaint alternatively alleges that the Amended Forbearance Agreement was a fraudulent transfer, made by the Debtors for less than reasonably equivalent value, and was executed under duress and therefore void *ab initio*. The Amended Forbearance Agreement was solely intended by Defendants to gain control over the rights to these additional property interests, all without any consideration. Each claim is adequately pled, and dismissal of is not appropriate at this juncture. The First Amended Complaint adequately puts Defendants on notice of the viable claims asserted against them in this adversary proceeding.

In addition to extracting security interests and guarantees, Defendants continued their bullying tactics by compelling the Debtors to make a preferential $3 million payment three days later, on February 15, 2024. The argument in the Motion that the First Amended Complaint fails to establish that Defendants received more than they would have in a chapter 7 case is unconvincing. The payment was made by OGI, an entity that, up until the February 12, 2024 Amended Forbearance Agreement, had no agreement with Defendants, had no obligation to Defendants, and received no consideration from Defendants.

The First Amended Complaint alleges that, during the two-year period prior to the Petition Date, the Debtors paid an additional $17 million to the Defendants. These payments were made for less than equivalent value and at a time when the Debtors were insolvent or rendered insolvent thereby. Defendants demanded that these payments be made more than three (3) years prior to the negotiated Maturity Dates under the Notes and Note Purchase Agreements. The First Amended Complaint alleges that Defendants were fully aware of the Debtors' lack of financial wherewithal at the time of these transfers, as they were receiving monthly disclosures of the Debtors' financial

3

statements.  In fact, on the <u>exact</u> date of the first payment, Defendants received financial records showing that the Debtors had significant negative equity.  The First Amended Complaint adequately pleads constructive fraudulent transfer claims, and at the very least, that material questions of fact exist as to whether these payments were made under duress and without reasonably equivalent value.  The First Amended Complaint adequately puts Defendants on notice of these significant claims for fraudulent conveyances as asserted against them in this adversary proceeding.

Finally, the First Amended Complaint sufficiently pleads each of the claims under Sections 550, 551 and 502(d), each of which are conditioned upon the avoidance actions being established and upheld by the Court.

## PROCEDURAL AND FACTUAL BACKGROUND[3]

On April 29, 2024 (the "<u>Petition Date</u>"), the Initial Debtors commenced with this Court voluntary petitions under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

The Debtors continue to operate their businesses as debtors and debtors-in-possession.  To date, no trustee has been appointed for the Debtors or their estates.  On May 17, 2024, the Office of the United States Trustee filed its *Notice of Inability to Appoint an Official Committee of Unsecured Creditors* [ECF No. 33][4].

On April 29, 2024, the Initial Debtors commenced the adversary proceeding, by the filing of the complaint ("<u>Complaint</u>") [Adv. Proc. ECF No. 1].

On May 30, 2024, Defendants filed their initial Motion for Partial Dismissal of the Adversary Complaint ("<u>Initial Motion to Dismiss</u>") [Adv. Proc. ECF. No. 7].

---

[3] The factual background is set forth in the First Amended Complaint and incorporated herein by reference.
[4] "ECF" shall refer to the bankruptcy docket for Case 24-10743 (MG); "Adv. Proc. ECF" shall refer to the docket for Adversary Proceeding No. 24-01350 (MG).

4

On June 19, 2024, WMSF, an affiliate of the Initial Debtors, filed its chapter 11 petition. It was not filed on the Initial Debtors' Petition Date because it had only recently become eligible for chapter 11 after being de-registered as a broker dealer.

On June 19, 2024, within 21 days from the filing of the Partial Dismissal Motion, Plaintiffs filed a letter indicating its intent to file an amended complaint pursuant to Federal Rule 15(a)(1)(B) as a matter of course, including to, among other things, (i) add WMSF, now a debtor and debtor-in-possession and a party to the Amended Forbearance Agreement, as a party plaintiff therein, (ii) to assert additional claims related to the Amended Forbearance Agreement, and (iii) to supplement certain of the claims asserted therein.

In compliance with the Court's Case Management Order, on June 25, 2024 Plaintiffs filed a motion seeking an order granting leave to amend the Complaint pursuant to Federal Rule 15(a), as made applicable by Bankruptcy Rule 7015. [Adv. Proc. ECF No. 13].  The proposed first amended complaint ("First Amended Complaint") was attached as Exhibit A [Adv. Proc ECF No. 13-2] to the Declaration of John E. Jureller Jr. in Support of Plaintiffs' Motion for Leave to Amend Adversary Complaint [Adv. Proc. ECF No. 13-1].

On June 25, 2024, Plaintiffs also filed their opposition to the Initial Motion to Dismiss due to the then-existing deadline [Adv. Proc. ECF No. 15].

By Stipulation and Order, dated July 16, 2024, the Motion for Leave to Amend was approved, the First Amended Complaint was deemed filed, the Initial Motion to Dismiss was deemed moot, and a briefing schedule was set for the instant Motion [Adv. Proc. ECF No. 18].

## ARGUMENT

In considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the "allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*,

416 U.S. 232, 236 (1974); *see also Conley v. Gibson*, 355 U.S. 41, 45-6 (1957) (holding that a motion to dismiss must be denied "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). The "court must accept a complaint's allegations as true," and "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 663-64 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)). In considering a motion to dismiss, courts must consider the complaint in its entirety as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which the court may take judicial notice." *In re SunEdison, Inc.*, 2021 WL 3176070, at *4 (Bankr. S.D.N.Y. July 27, 2021) (citing *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff Inv. Sec. LLC),* 2020 WL 401822, at *4 (Bankr. S.D.N.Y. Jan. 23, 2020) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 322, 127 S. Ct. 2499 (2007)). Further, when reviewing the sufficiency of a complaint, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer*, 416 U.S. at 236. A court's role in evaluating a motion to dismiss is to determine the legal feasibility of the complaint, not to weigh the evidence that may be offered to support it. *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998). The court's "review of a complaint upon a motion to dismiss for failure to state a cause of action is 'context-specific' and acknowledges that courts must use their 'judicial experience and common sense…'" *In re TMST, Inc.,* 518 B.R. 329, 347 (Bankr. S.D.N.Y. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. at 679). "A claim is plausible when the factual allegations permit 'the court to draw a reasonable inference that the defendant is liable for the misconduct alleged.'" *In re Vivaro Corporation*, 524 B.R. 536, 547 (Bankr. S.D.N.Y. 2015)

6

(citing *Ashcroft v. Iqbal*, 556 U.S. at 679).  The pleading must create the possibility of a right to relief that is more than speculative. *Id.* (citing *Spool v. World Child Int'l Adoption Agency,* 520 F.3d 178, 183 (2d Cir. 2008)).

The Motion asserts the following arguments for partial dismissal of the First Amended Complaint.  First, Defendants assert that the Debtors cannot avoid the Amended Forbearance Agreement as either a preferential transfer or fraudulent conveyance, and as a result Counts I through III of the First Amended Complaint must be dismissed.  Defendants argue that the Amended Forbearance Agreement is not a transfer of an interest of the Debtors in Property, that the Amended Forbearance Agreement was on account of an antecedent debt, and that the Amended Forbearance Agreement cannot be avoided in its entirety.

Second, with respect to Count VI of the First Amended Complaint for rescission of the Amended Forbearance Agreement, the Defendants argue that Plaintiffs fail to adequately plead that the Amended Forbearance Agreement was "procured by means of (1) a wrongful threat that (2) precluded the exercise of its free will".  Further, the Defendants claims that their actions were merely exercising their available legal remedies, thus not duress.

Third, with respect to Count VII of the First Amended Complaint seeking a judgment that the Amended Forbearance Agreement was null and void, the Defendants assert that a two-business day forbearance in exchange for essentially a fully encompassing security interest in the assets of and guaranty by each of the Debtors, and the setoff of a significant receivable, was adequate consideration.  Contrary to their actions, Defendants dispute the point that there was no "meeting of the minds" on the Amended Forbearance Agreement.

Fourth, with respect to Count VIII of the First Amended Complaint seeking to avoid the $3 million payment during the Preference Period, the Defendants argue that the First Amended

Complaint fails to establish that Defendants received more than they would have in a chapter 7 case.

Fifth, with respect to Count IX seeking to avoid the other $17 million in payments made by the Debtors to Defendants during the two years preceding the Petition Date, the Defendants assert that the First Amended Complaint fails to adequately plead that the payments were made for less than reasonably equivalent value, or that the Debtors were insolvent at the time of such transfers.

Finally, Defendants argue that the claims under Sections 550 and 551 should be dismissed because they are not independent claims, and that the claim in Count XII under Section 502(d) is premature and procedurally improper.

For the reasons more fully set forth below, these arguments are without merit and dismissal of the First Amended Complaint is not warranted.

## I.    Avoidance of Amended Forbearance Agreement.

The First Amended Complaint alleges that, on February 12, 2024, under threat of, *inter alia*, Defendants' commencing litigation to claw back year-end compensation and bonus payment from all of their employees, the Debtors executed and returned the Amended Forbearance Agreement. *See* First Amended Complaint, ¶¶ 55, 58-61, 66.  More specifically, the First Amended Complaint alleges, *inter alia*, that:

- the Debtors initially refused to enter into the Amended Forbearance Agreement because it would have, among other things, restricted payments to their employees, violated their ongoing fiduciary obligations to their clients and regulatory obligations, and undermined a potential third party transaction (*see Id.* at ¶ 56);
- at approximately 2:10 a.m. in the morning, Defendants sent the Amended Forbearance Agreement and threatened if not signed, they would commence litigation against the Debtors and their founder George Weiss, who had no obligations under any of the agreements (*see Id.* at ¶ 58);

8

- that Defendants threatened to claw back compensation payments to employees (*see Id.*);
- that Defendants threatened to unlawfully freeze the Debtors' bank accounts (*see Id.* at ¶¶ 58, 59);
- that Defendants intended to ruin Mr. Weiss's reputation in the industry by filing false fraud claims against him (*see Id.* at ¶ 58); and
- that the Debtors believed that the threats would have led to the demise of the company. *See Id.* at ¶ 60.

The First Amended Complaint alleges that the Amended Forbearance Agreement was, in form and substance, a transfer of the Debtors' interests in property, without reasonably equivalent consideration (if any) in return. *Id.* at ¶¶ 62-65, 67.  In fact, the Amended Forbearance Agreement, entered into on February 12, 2024, purports to (a) grant to JSI all-asset security interests in the Debtors' assets, (b) cause all Debtors except GWA to guarantee "the prompt and complete payment and performance by GWA and each other Weiss Party when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations" and (c) set off separate and distinct amounts owed by Defendants to the Debtors.  *Id.* at ¶ 63.  The First Amended Complaint alleges that these benefits and property interests made up the entirety of the Amended Forbearance Agreement, i.e. this was fully the reason for such agreement. *Id.* at ¶ 62.  In exchange, Defendants agreed to a two-day (at most) forbearance period as to the original obligors (notwithstanding Defendants' pre-existing obligation to forbear through September 1, 2024 as provided under the Initial Forbearance Agreements).  *Id* at ¶¶ 62, 65.  This was the entirety of the Amended Forbearance Agreement, and the advancement of the Defendants' position vis-à-vis other creditors of the estates was the sole intent of Defendants in compelling the Debtors to sign this agreement. *Id.* at ¶ 62.

Plaintiffs seek to avoid the Amended Forbearance Agreement as a preferential transfer pursuant to Section 547(b) ("Count I") or alternatively, as a constructive fraudulent conveyance

9

pursuant to Section 548(a)(1)(B) ("Count II"). Similarly, Plaintiffs seek to avoid the security interests and guarantees purportedly granted under the Amended Forbearance Agreement as preferential transfers or fraudulent conveyances ("Count III").

    **i.**    **The Amended Forbearance Agreement was a Preferential Transfer.**

Count I of the First Amended Complaint sufficiently pleads a claim for avoidance of the Amended Forbearance Agreement as a preferential transfer under Bankruptcy Code Section 547(b).

Section 547(b) of the Bankruptcy Code states, in pertinent part, that:

> The trustee may . . . avoid any transfer of an interest of the debtor in property –
>
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made –
>     (A) on or within 90 days before the date of the filing of the petition, or
>     (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of the transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if –
>     (A) the case were a case under chapter 7 of this title;
>     (B) the transfer had not been made; and
>     (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The First Amended Complaint alleges Defendants were creditors of certain of the Debtors within the meaning of Section 547(a)(1). *See, e.g.,* First Amended Complaint, ¶¶ 38, 40, 82.

The First Amended Complaint alleges that the Amended Forbearance Agreement was a transfer of an interest of the Debtors in property, including, among other things, (i) the granting of a priority security interest in all of the Plaintiffs' assets, (ii) the issuance of guarantees by each of

the Debtors other than GWA (whether or not a party to the Note Purchase Agreements, Notes, or SR Agreement), and (iii) the setoff of a significant amount owed by JSI to GWA under the IMA.[5] *See* First Amended Complaint, ¶ 83. The terms of the Amended Forbearance Agreement are straight-forward, and the intent of Defendants was clear – the advancement of the Defendants' position vis-à-vis other creditors of the estates was the sole intent of Defendants in compelling the Debtors to sign this agreement. *Id.* at ¶ 62. These transactions, on the whole, were transfers of the Debtors' interests in property to Defendants. *See* 11 U.S.C. § 101(54) (defining "transfer" broadly to include "the creation of a lien; the retention of title as a security interest…[or] each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property."); *In re FBN Food Servs., Inc.*, 185 B.R. 265, 272 (N.D. Ill. 1995), *aff'd and remanded sub nom. Matter of FBN Food Servs., Inc.*, 82 F.3d 1387 (7th Cir. 1996) ("Congress intended the term 'transfer' to be construed as broadly as possible."); *Lamonica v. Tilton (In re Transcare Corporation)*, 2020 WL 8021060, at *33 (Bankr. S.D.N.Y. July 6, 2020)) (finding that the granting of a lien pursuant to a security agreement is a transfer under section 101(54)(A) of the Bankruptcy Code; *In re Dura-Built Homes, Inc.*, 170 B.R. 170, 172 (Bankr. M.D. Ala. 1989) ("A debtor's interest in his property need not be extinguished for a transfer to have occurred.").

Defendants cite only one non-binding case for the proposition that the Amended Forbearance Agreement as a whole, cannot be avoided. *See In re TMST, Inc.*, 518 B.R. 329 (Bankr. D. Md 2014), *vacated in part*, 2014 WL 6390312 (Bankr. D. Md. 2014).[6] However, the Debtors'

---

[5] Further, the set-off was made within 90 days of the Petition Date and is recoverable itself under Bankruptcy Code Section 553(b).
[6] Further, in *TMST*, it should be noted, the Court upheld a count for rescission of the agreement in its entirety in any event due to plausibly alleged economic duress exerted on plaintiff similar to Defendants' actions here. *See Id.* at 352-53 ("[A]after TMST's issuance of a 10–K…Defendants improperly made inflated margin calls for more than $600

11

obligations and transfers to be avoided are the substance of the Amended Forbearance Agreement, such that their avoidance will have the practical effect of invalidating the eve-of-bankruptcy transaction as a whole. *See, e.g.*, *In re Texas Rangers Baseball Partners*, 498 B.R. 679, 713 (Bankr. N.D. Tex. 2013) (denying motion to dismiss claim that a Shared Charter Services Agreement entered into among the debtor and other third parties on the eve of bankruptcy "should in fact be avoided as a fraudulent transfer").

The First Amended Complaint alleges that the Amended Forbearance Agreement was entered into during a time that Plaintiffs were insolvent. *Id* at ¶ 86. In any event, Plaintiffs are entitled to a presumption of insolvency for each transfer made during the Preference Period pursuant to Section 547(f). *See* 11 U.S.C. § 547(f).

There is no doubt that the Amended Forbearance Agreement, and the transfer by the Debtors of interests in property thereunder, was duly entered into within 90 days of the Petition Date. The Amended Forbearance Agreement was entered into on February 12, 2024. *Id.* at ¶¶ 61, 66, 87.

Lastly, the First Amended Complaint alleges that the Amended Forbearance Agreement enabled Defendants to receive more than they would have "if (a) Plaintiffs' cases were cases under chapter 7 of the Bankruptcy Code, (b) the Amended Forbearance Agreement had not been made, and (c) Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code." *Id.* at 88. Prior to the Amended Forbearance Agreement, Defendants were unsecured creditors of GWA and WMSA, each of which holds significant other unsecured claims. *See e.g.* First Amended Complaint, ¶¶ 38, 40. Prior to the Amended Forbearance Agreement, OGI,

---

Million…at a time during which Defendants knew that TMST had a liquidity crisis…[T]these alleged unlawful acts placed Debtors into such severe economic distress as to leave Debtors no viable choice other than to agree to the demands contained in the Override Agreement.").

12

WSO and WMSF had no obligations to Defendants. *Id.* at 39, 41. As a result of the Amended Forbearance Agreement, which the Plaintiffs assert was entered into under duress, Defendants became purported secured creditors of each of the Debtors (including prior non-obligors), received guarantees from all the Debtors (including non-obligors), and obtained setoff rights against significant amounts separately owed by JSI to WMSA under the separate and distinct IMA, all without proper consideration.

Similarly, while the prior exercise of a proper setoff under state law may not be a preferential transfer, the Amended Forbearance Agreement sought to add a right to setoff which Defendants were not otherwise authorized to exercise under the terms of the IMA. This was a new term and condition that Defendants sought to add to elevate their position. Under the IMA, Defendants owed an annual Investment Team Bonus Fee, calculated as a percentage (13%) of the profits earned by Defendants from the funds, managed accounts and other investment products held with WMSF. This Investment Team Bonus Fee was ultimately paid to WMSA's employees who managed the Defendants' accounts or other investment products. There was no right under the IMA to set off this separate and distinct obligation owed by *JSI to WMSA* against funds that were otherwise owed by *GWA to JSI* under the separate Note Purchase Agreements. In fact, at no time since the entry into these agreements did Defendants exercise or attempt to exercise any right of setoff between the two separate agreements (as owed by and to separate Debtor entities).

The remaining argument is focused on non-debtor George Weiss ("Weiss"). Weiss, the founder of the Debtors, was not a party to the original agreements with Defendants. Weiss signed the Amended Forbearance Agreement only under duress and agreed to provide, at most, a guarantee of "performance of the agreements of the Weiss Parties" under the Amended Forbearance Agreement. He did not guarantee any payments by the Debtors. Even under

13

Defendants' tortured (and incorrect) interpretation of the Amended Forbearance Agreement, if the guarantee is avoided, there is no "performance" required.

Plaintiffs submit that the First Amended Complaint sufficiently pleads a claim for avoidance of the Amended Forbearance Agreement as a preferential transfer under Bankruptcy Code Section 547(b). Further, if necessary, Count III sufficiently pleads a claim for avoidance of the security interests in the Amended Forbearance Agreement as preferential transfers.

**ii.     The Amended Forbearance Agreement was a Fraudulent Transfer.**

Alternatively, Count II of the First Amended Complaint seeks to avoid the Amended Forbearance Agreement as a constructive fraudulent conveyance pursuant to Section 548(a)(1)(B).

Section 548(a)(1)(B) states:

> The trustee may avoid any transfer … of an interest of the debtor in property, or any obligation … incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
> …
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>   (ii)  (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>       (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>       (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtors' ability to pay as such debts matured; or
>       (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. §548(a)(1)(B).

Specifically, the First Amended Complaint alleges (a) the Amended Forbearance Agreement was a transfer of an interest of the Debtors in property or incurrence of an obligation

(i.e. the security interest, guarantees, and setoff, as described above), and (b) that the Debtors did not receive reasonably equivalent value and were insolvent at the time.  *See* First Amended Complaint, ¶¶ 67, 96.

The Defendants do not dispute that the Amended Forbearance Agreement, and the terms set forth therein, was a transfer by the Debtors of an interest in property or incurrence of an obligation.  Instead, the Defendants focus their argument on whether the First Amended Complaint adequately pleads that the Debtors received less than reasonably equivalent value in exchange for the transfers of property under the Amended Forbearance Agreement.

"The question of reasonably equivalent value is based on the 'facts and circumstances of each case' and requires the court to compare what was given with what was received.'"  *In re Vivaro Corporation*, 524 B.R. at 550 (citing *In re Ruffini*, 2014 WL 714732, at *7).  "Whether the debtor received reasonably equivalent value for the alleged fraudulent transfer is ordinarily a question of fact." *Harison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.)* 507 B.R. 452, 470 (Bankr. S.D.N.Y. 2014); *see also Jackson v. Mishikin (In re Adler Coleman Clearing Corp.*, 263 B.R. 406, 466 (S.D.N.Y. 2001).  "Courts consider 'the good faith of the parties, whether it was an arm's length transaction, and what the debtor actually received.'" *In re Vivaro Corporation*, 524 B.R. at 551 (citing *In re Ruffini*, 2014 WL 714732, at *7).

The First Amended Complaint alleges that the consideration given in exchange for the significant transfers of property and incurrence of obligations under the Amended Forbearance Agreement were for less than reasonably equivalent consideration.  Compare the "consideration" provided under the Amended Forbearance Agreement:

<u>Defendants</u>:   *Two-Day forbearance (at most) to GWA and WMSA; no consideration to remaining Debtors*

15

The Debtors:   *All Asset security interest in GWA, WMSA, OGI, WSO and WMSF;*

*Cross-Corporate Guarantees by GWA, WMSA, OGI, WSO and WMSF;* and

*Set-off of $2.6 million obligations owed by JSI to WMSA* under the IMA.

While it is a question of fact as to whether the Debtors received reasonably equivalent value, the exchange on its face clearly shows that no such value was provided.  This is pled sufficiently in the First Amended Complaint.

The Motion asserts that the Court can construe that any transfer by the Debtors to Defendants was on account of the antecedent debt and thus assumed to be made "for value."[7] However, this is not the simple case of a debtor's payment made and applied to reduce such debtor's antecedent debt; the fact that a party is owed an antecedent debt by a particular debtor does not insulate such party from avoidance liability for any and all future extractions of value from that or any other debtor. Defendants were provided with significant additional value from GWA and WMSA, including all asset security interests, cross-corporate guarantees, a setoff of $2.6 million otherwise due to GWA, and a $3 million payment that was not agreed to in the Amended Forbearance Agreement. Defendants also extracted significant value from OGI, WSO and WMSF, none of which could be said to reduce any antecedent debt owed by them. The Amended Forbearance Agreement was entered into in exchange for a two-day forbearance intended solely, from the Debtors' standpoint, to avoid threatened litigation against their employees and other threats by Defendants.  There were no payments made or promised under the Amended Forbearance Agreement on account of the antecedent debt.  Other than purportedly

---

[7] To the extent that Defendants are alleging that the forbearance under the Amended Forbearance Agreement was adequate consideration (albeit irrelevant to a motion to dismiss), courts have held that a forbearance is not "new value" consideration in defense of a preference action. *See e.g. In re 360Networks (USA) Inc.*, 338 B.R. 194, 205 (Bankr. S.D.N.Y. 2005); *In re Gas-Mart, Inc.,* 598 B.R. 274, 278 (Bankr. W.D. Mo 2019); *In re General Time Corp.*, 328 B.R. 243, 247 (Bankr. N.D. GA 2005).

16

agreeing not to *immediately* sue all of the Debtors' employees, Defendants provided nothing in return to the Debtors, nor was there any reduction in the amount owed under the Notes.

The law cited in the Motion does nothing more than highlight the questions of fact relevant to this issue. In the case of *In re Vivaro Corporation*, 524 B.R. at 536, the Court found that the movant Creditors' Committee failed to rebut the presumption that payments on account of an antecedent debt were made for value merely by stating the payments were for lack of fair consideration where payments were actually made that resulted in a dollar-for-dollar reduction of the note. *Cf. also In re Trinsum*, 460 B.R. 379 (Bankr. S.D.N.Y. 2011) (holding transfers resulting in a dollar-for-dollar reduction in antecedent debt constituted equivalent value). Here, by contrast, there was no dollar-for-dollar reduction in the debt owed by the Debtors. In *In re AppliedTheory Corp.*, 323 B.R. 838 (Bankr. S.D.N.Y. 2005), the trustee sought to avoid the grant of a security interest by the debtor to secure both old and new loans, all in conjunction with the modification of the underlying agreements.[8] Here, there was no new consideration provided by Defendants. In *In re Wade Park Land Holdings, LLC v. Kalikow*, 589 F.Supp. 3d 335 (S.D.N.Y. 2022), the court held that conclusory allegations which failed to state that the debtors' pledge of land as security for an antecedent debt was for anything other than reasonably equivalent value, and an affidavit in the case stated that the debtors "were solvent and had no other creditors whose rights would be prejudiced by the conveyance of the deeds." Here, the First Amended Complaint is replete with allegations of lack of reasonably equivalent value, the Debtors have numerous other creditors whose rights are affected, and Defendants were well aware of the financial condition of the Debtors as they were receiving monthly financial reporting. Further, none of the cited cases applies with respect to OGI, WSO or WMSF, who owed no antecedent debt.

---

[8] The Court also highlighted that, while not constructively fraudulent, such a transfer may be deemed a preference. *Id.* at 842.

17

Plaintiffs submit that the First Amended Complaint sufficiently pleads, in the alternative, a claim for constructive fraudulent transfer as to the Amended Forbearance Agreement.  Further, if necessary, Count III sufficiently pleads a claim for avoidance of the security interests in the Amended Forbearance Agreement as fraudulent transfers.

### iii.    The First Amended Complaint Adequately Alleges Cause of Action for Rescission.

The detailed facts alleged in the First Amended Complaint evidence a claim of rescission by reason of duress.  Rescission is an equitable remedy posed in the interest of justice where there is no action at law. *Bangkok Crafts Corporation v. Capitolo Di San Pietro In* Vaticano, 2006 WL 1997628, *12 (S.D.N.Y. July 18, 2006).  The grounds for rescission of a contract include duress and undue influence in situations where the complaint party is compelled to agree to the contract by means of a wrongful threat which precludes the exercise of free will.  *Id.*  Rescission is appropriate where the status quo can be restored. *Id.*

The First Amended Complaint adequate pleads facts sufficient to assert a claim for rescission of the Amended Forbearance Agreement "that is plausible on its face."   Court VI of the First Amended Complaint alleges, *inter alia*, that:

- at 2:10 a.m. in the morning, Defendants sent the Amended Forbearance Agreement and threatened if not signed, they would commence litigation against the Debtors and their founder George Weiss, who had no obligations under any of the agreements (*Id.* at ¶ 110);
- Defendants threatened, if the 7 a.m. deadline was not met, Defendants would commence litigation to collect damages due to breaches under the Notes Purchase Agreement and Notes despite previously agreeing to a forbearance until September 1, 2024 (*Id.* at ¶¶ 110, 111);
- Defendants threatened to commence litigation to seek to claw back compensation payments to employees (*Id.* at ¶ 110);
- Defendants threatened to freeze the Debtors' bank accounts without any lawful right to do so (*Id.* at ¶¶ 110, 111);

18

- Defendants threatened to ruin Mr. Weiss's reputation in the industry by filing false fraud claims against him (*Id.* at ¶ 110); and
- the Debtors believed that the threats would have led to the demise of the company. *See Id.* at ¶ 112.

The First Amended Complaint sufficiently alleges that these actions constituted wrongful threats which Defendants had no right to take and prevented the free will of Plaintiffs by giving them no alternative to signing the Amended Forbearance Agreement but irreparable harm. *Id.* at ¶ 114; *see also In re TMST, Inc.*, 518 B.R. at 353 ("[F]ree will is precluded if irreparable harm would be suffered should the threat be carried out and circumstances permit no other alternative to the agreement."). The First Amended Complaint asserts that Debtors believed that "this was not just a threat of litigation but also the certainty of loss of key personnel, collapse of the aforementioned third-party transaction, and the demise of the companies …." *Id.* at ¶ 112. The First Amended Complaint alleges that there is no adequate remedy at law and the rescission of the Amended Forbearance Agreement will restore the status quo for the relevant parties. *Id.* at ¶ 116.

Plaintiffs submit that the First Amended Complaint sufficiently pleads a claim for rescission of the Amended Forbearance Agreement.

### iv. The First Amended Complaint Adequately Alleges Cause of Action to Hold Amended Forbearance Agreement Null and Void.

The First Amended Complaint sufficiently pleads, in specific detail, how the purported two-day forbearance was meaningless, especially since Defendants had already agreed to forbear on taking any action under the Notes and Note Purchase Agreements until September 1, 2024. *Id.* at ¶ 121. Further, the First Amended Complaint alleges that there was no consideration given to OGI, WSO and WMSF because they were never parties to the Jefferies Agreements in the first place.

19

As detailed above, Plaintiffs reluctantly signed the Amended Forbearance Agreement, in the middle of the night, under duress based upon the potential death-knell to their companies and their managed funds from the Defendants' threats. Nonetheless, the First Amended Complaint alleges that Defendants actually indicated that they had no intention of complying with the Amended Forbearance Agreement. *Id.* at ¶ 120. Taking the Amended Forbearance Agreement at its terms, Defendants had obligations thereunder, including to forbear on taking any action, and their refusal to be bound by the terms evidences, or at least raises a question of fact, as to whether there was even a "meeting of the minds" with respect to the Amended Forbearance Agreement. Under New York law, a contract is formed when there is a meeting of the minds. *Unity Electric Co. Inc. v. Microdesk, Inc.* 2023 WL 5000992, at *1 (S.D.N.Y. Aug. 4, 2023). "A meeting of the minds occurs when there is mutual assent to the essential terms of the contract; that is, the parties have the same understanding of the essential terms of the contract and manifest an intention to be bound by the contract." *Id.* As set forth in the First Amended Complaint, based upon Defendants statements and actions, a question of fact exists as to the validity of such agreement.

**II.    Avoidance of $3 million Payment as a Preferential Transfer.**

On February 15, 2024, the Debtors were compelled to make a payment of $3 million to the Defendants. *See* First Amended Complaint, ¶ 71; Sch. 1. At the time, the parties had already entered into the purported Amended Forbearance Agreement, as well as the Initial Forbearance Agreements under which Defendants had agreed, *inter alia*, to forbear until September 1, 2024. *Id.*

The First Amended Complaint alleges that the $3 million payment was made during the Preference Period, purportedly on account of an antecedent debt, was a transfer of an interest of the Debtors in property, while the Debtor was insolvent, and enabled the Defendants to receive

20

more than they would have "if (a) Plaintiffs' cases were cases under chapter 7 of the Bankruptcy Code, (b) the Amended Forbearance Agreement had not been made, and (c) Defendants received payment of such debt to the extent provided by the provisions of the Bankruptcy Code." *Id.* at ¶¶ 127-133.

The Motion unconvincingly argues that the First Amended Complaint fails to sufficiently plead that JSI received more than it would have in a chapter 7 proceeding. *See* Motion, ¶ 57. First, until such time as the Amended Forbearance Agreement was executed under duress on February 12, 2024, OGI, which made the transfer, had no obligation to JSI. *Id.* at ¶ 71. It was neither a party to the Notes or Note Purchase Agreements or SR Agreement, and it was also not a guarantor of any. *Id.* at ¶¶ 39, 67, 71. OGI received no consideration under any such agreements or the Amended Forbearance Agreement (to the extent deemed not avoidable). JSI would have no rights to any assets of the OGI estate in a chapter 7 liquidation. Second, the payment was made by OGI on behalf of GWA, under duress from Defendants. GWA has other unsecured creditors such that it is not clear at this early stage of the case that JSI would receive $3 million in a chapter 7 liquidation, particularly for purposes of dismissing the First Amended Complaint's allegations to the contrary. Because the payment was made within the Preference Period, there is a presumption of insolvency with respect to the payment. *See* 11 U.S.C. § 547(f).

Plaintiffs submit that the First Amended Complaint meets the pleading requirement under Bankruptcy Code Section 547(b).

### III. Avoidance of $17 million Payment as Fraudulent Transfers

During the two years prior to the Petition Date, the Debtors were caused to pay an aggregate sum of $17 million to Defendants. The First Amended Complaint alleges that these Avoidable Transfers were made for less than reasonably equivalent value.

21

The Motion asserts that a constructive fraudulent conveyance claim is "presumptively not viable" when it seeks to avoid payment of an antecedent debt.  *See* Motion, ¶ 62.  However, for the reasons set forth above, this conclusory assertion is inapplicable here, where a fact intensive analysis is required to determine whether the Defendants acted in "good faith."  A review of the facts, as pled in the First Amended Complaint and supporting documentation[9], demonstrates that there is a question of fact as to whether the Debtors received reasonably equivalent value in exchange for the $17 million in payments.  *See* Declaration of John E. Jureller, Jr. in Support of Opposition to Motion for Partial Dismissal of First Amended Complaint ("Jureller Decl.") and exhibits attached thereto.

The First Amended Complaint and the documents relied upon sufficiently plead that the Avoidable Transfers were provided for less than reasonably equivalent value in that they were paid as a result of, *inter alia,*

(a)    A manipulated acceleration of the negotiated Maturity Dates under the Notes and Note Purchase Agreements (*Id.* at ¶¶ 42, 44);

(b)    previously known and continuing covenant defaults under the Notes (*Id.* at ¶ 42);

(c)    "bad faith" by the Defendants in their dealings with the Debtors, including with full knowledge of the Debtors financial condition, while at the same time continuing to invest, and invest their clients' money, with the Debtors' managed funds, and to market the Debtors' managed funds to their clients (*Id.* at ¶¶ 45 - 47, 49, 52 – 54); and

---

[9] A court generally may not consider documents outside the pleadings on a motion to dismiss.  When deciding a motion to dismiss, the Court may consider: (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in [a] defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence. *Eaves v. Designs for Finance, Inc.*, 785 F. Supp. 2d 229, 244 (S.D.N.Y. 2011) (citations omitted).  In this context, the Second Circuit has held that the term "rely" means that "the complaint 'relies heavily upon [the document's] terms and effect', which renders the document 'integral' to the complaint."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citations omitted).  Further, the Second Circuit has made clear that "a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."  *Id.*

      (d)      in breach of the Initial Forbearance Agreements, under which Defendants agreed to forbear from calling the Notes until September 1, 2024. *Id.* at ¶¶ 53-54.

The First Amended Complaint adequately alleges material facts which establish (or may establish) that the Debtors *did not receive what was bargained for* under the Note Purchase Agreements and Notes or that such payments were made under duress or as a result of other improper actions by Defendants.

      Second, the Motion asserts that the First Amended Complaint fails to allege that the Debtors were insolvent at the time of the Avoidable Transfers.   However, a review of the First Amended Complaint and the Defendants' own actions belie this argument. Each of the Avoidable Transfers was paid at a time when the Debtors had, according to Defendants, been in default under the Note Purchase Agreements.  Each of the Avoidable Transfers occurred during a period when the Note Purchase Agreements and Notes were in forbearance with Defendant.   During the Fraudulent Transfer Period, the Debtors were providing monthly financial statements to Defendants which evidenced the situation.  The First Amended Complaint states that, on April 29, 2022, the same date as the first accelerated payment of $5,000,000, the Debtor had provided Defendants by email with their "1st Q Financials" which indicated, *inter alia*, that the Debtors had "(i) assets of $342,802,679, liabilities of $368,237,411, and a members equity of ($25,434,732). *Id.* at 45.  This financial situation persisted until the filing of the bankruptcy cases, and Defendants were acutely aware of the financial situation because they received detailed financial statements each month thereafter.  *Id.* at 49.

      The First Amended Complaint establishes, at the very least, a question of fact as to whether the Debtors were insolvent, or rendered insolvent, or left with unreasonably small capital, at the time of the Avoidable Transfers.  What cannot be in dispute is that the Defendants were aware of the Debtors' precarious financial situation and effectively used it in bad faith to exert leverage on

the Debtors to secure payments when the Debtors had no ability to make same, including to the detriment of other unsecured creditors.

> **IV.** **First Amended Complaint Sufficiently Pleads Claims under Bankruptcy Code Sections 550 and 551.**

Section 550 allows the trustee to recover the transferred property or its value to the extent the trustee has successfully invoked the avoidance power of Sections 547 and 548. Section 550(a)(1) provides that an avoided transfer can be recovered from either an "initial transferee" or "the entity for whose benefit such transfer was made". *See* 11 U.S.C. §550(a)(1); *see also In re 360Networks (USA) Inc.*, 338 B.R. at 201 (citing *In re Moskowitz*, 85 B.R. 8, 10 (E.D.N.Y. 1988)). The First Amended Complaint alleges that, upon the avoidance of a transfer under either Bankruptcy Code Section 547(b) or 548(a)(1)(B), the property or its value can then be recovered for the benefit of the Debtors' estates. *See* First Amended Complaint, ¶¶ 104, 142. Further, there is no dispute that Defendants were "initial transferees" under any of the alleged avoidable transfers plead in the First Amended Complaint. As such, Counts V and XI are adequately pled. Under Counts IV and X, the First Amended Complaint asserts, under Section 551 of the Bankruptcy Code, that any avoidable transfer should be preserved for the benefit of the Debtors' estates. This provision remains conditioned upon any of the alleged avoidable transfers being upheld by order of the Bankruptcy Court, after proofs being submitted thereon.

> **V.** **First Amended Complaint Sufficiently Pleads Claim under Section 502(d).**

Section 502(d) states: "[N]otwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property that is recoverable under sections 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section

522(i), 542, 543, 550, or 553 of this title." 11 U.S.C. § 502(d).  Because the Debtors have asserted

claims under sections 547 and 548, it is submitted that Count XII is sufficiently pled.

**VI.    Leave to File Further Amended Complaint.**

To the extent the Court determines that any of the Counts in the First Amended Complaint

should be dismissed, Plaintiffs request leave to replead such Counts in a further amended

complaint.  Rule 15(a), made applicable by Bankruptcy Rule 7015, provides that "leave to amend

shall be freely given when justice so requires. *See* FED. R. CIV. P. 15(a)*; see also In re Vivaro*

*Corporation,* 524 B.R. at 562.  Leave to amend is proper where the moving party has not been

guilty of bad faith and is not acting for purpose of delay, the opposing party will not be unduly

prejudiced, and the trial of issues will not be unduly delayed. *In re Vivaro Corporation*, 524 B.R.

at 562 (citing *3 Moore's Federal Practice § 1508[2]).*

**CONCLUSION**

For all the foregoing reasons, the Motion should be denied.

Dated:   New York, New York
         August 6, 2024

**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**

By:   _/s/John E. Jureller, Jr._
      Tracy L. Klestadt
      John E. Jureller, Jr.
      Lauren C. Kiss
      Stephanie R. Sweeney
      200 West 41st Street, 17th Floor
      New York, NY 10036
      Tel: (212) 972-3000
      Fax: (212) 972-2245
      Email: tklestadt@klestadt.com
             jjureller@klestadt.com
             lkiss@klestadt.com
             ssweeney@klestadt.com

      *Counsel to the Debtors and Debtors-in-*
      *Possession*

25

A-600

```
                                                    Page 1
 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    Case No. 24-10743-mg

 4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5    In the Matter of:

 6

 7    WEISS MULTI-STRATEGY ADVISERS, LLC

 8

 9            Debtor.

10    - - - - - - - - - - - - - - - - - - - - - - - - - - x

11    Adv. Case No. 24-01350-mg

12    - - - - - - - - - - - - - - - - - - - - - - - - - - x

13    GWA, LLC, et al.,

14                Plaintiffs,

15            v.

16    JEFFERIES STRATEGIC INVESTMENTS, LLC, et al.,

17                Defendants.

18    - - - - - - - - - - - - - - - - - - - - - - - - - - x

19                United States Bankruptcy Court

20                One Bowling Green

21                New York, NY 10004-1408

22

23                September 11, 2024

24                11:00 AM

25
```

A-602

Page 2

1    B E F O R E :

2    HON. MARTIN GLENN

3    U.S. BANKRUPTCY JUDGE

4

5    ECRO: KAREN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A-603

Page 3

1    HEARING re Adversary proceeding: 24-01350-mg GWA, LLC, et

2    al. v. Jefferies Strategic Investments, LLC, et al. Hearing

3    using Zoom for Government Re: Motion to Dismiss (Doc. #7,

4    14, 15, 18, 19 to 23)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
                                                          Page 4
 1    A P P E A R A N C E S :

 2

 3    KLESTADT WINTERS JURELLER

 4         Attorney for Plaintiffs

 5         200 West 41st Street

 6         New York, NY 10036

 7

 8    BY:  JOHN E. JURELLER

 9         TRACY L. KLESTADT

10

11    HERBERT SMITH FREEHILLS NEW YORK LLP

12         Attorney for Defendants, Jefferies Strategic

13         Investments LLC and Leucadia Asset Management Holdings

14         LLC

15         200 Park Avenue, 16th Floor

16         New York, NY 10166

17

18    BY:  MICHAEL P. JONES

19

20    KAPLAN RICE LLP

21         Attorney for George Weis

22         142 West 57th Street, Suite 4A

23         New York, NY 10019

24

25    BY:  MICHELLE A. RICE
```

```
                                                            Page 5
 1                      P R O C E E D I N G S

 2              CLERK:  All right, I'm starting the hearing

 3      calendar for September 11th, 2024 at 11 a.m.  Calling GWA

 4      LLC et al. v. Jefferies Strategic Investments LLC et al.,

 5      Case Number 24-1350.  If we could have plaintiffs' counsel

 6      give their appearance.

 7              MR. JURELLER:  Good morning, Your Honor.  John

 8      Jureller, Klestadt Winters on behalf of the plaintiffs.

 9              THE COURT:  Okay.  Is Mr. Klestadt going to be

10      joining as well?

11              MR. JURELLER:  I believe that he will, yes.

12              CLERK:  Okay, thank you.  And if we could have

13      defendants' counsel give their appearance as well.  Scott,

14      can you hear me? All right.  Adam, are you going to be

15      speaking on the record this morning?

16              MAN:  I am not, thank you.

17              CLERK:  You're not.  Okay, thank you, all right --

18              THE COURT:  Deanna?

19              CLERK:  Yes.

20              THE COURT:  Deanna, are you able to hear me?

21              CLERK:  Yes, I can, Judge.

22              THE COURT:  Okay.

23              CLERK:  You can pause again.

24              (Pause)

25              CLERK:  For the parties that have joined, if
```

A-606

Page 6

1    anyone is speaking on the record this morning, please use

2    the raised hand function in Zoom.  I will ask you to unmute

3    and take your appearance.  Michael?

4           MR. JONES:  Michael Jones from Herbert Smith

5    Freehills New York LLP on behalf of defendants Jefferies

6    Strategic Investments LLC and Leucadia Asset Management

7    Holdings LLC.

8           CLERK:  Okay, thank you.  Tracy?

9           MR. KLESTADT:  Tracy Klestadt, Klestadt Winters

10   Jureller Southard & Stevens for the plaintiffs.  My partner

11   John Jureller will be handling the matter.

12          CLERK:  Okay, thank you.  Do we have any

13   additional parties that are speaking on the record this

14   morning?  If you are and have not given your appearance,

15   please unmute and I will ask you to give your appearance.

16   All right, I don't see anyone.  You can pause again.

17          (Pause)

18          CLERK:  For the parties that just joined, if

19   anyone is speaking on the record this morning, please unmute

20   your line and state your appearance for the record.

21          Judge, would you like to get started or do you

22   want to wait a few minutes?

23          THE COURT:  We can get started.  We can get

24   started.  Thank you.  Good morning, everyone.  Who's going

25   to argue the motion to dismiss?

Page 7

1          MR. JONES:  I'll start since it's our motion.

2     It's Michael Jones from Herbert Smith Freehills on behalf of

3     defendants Jefferies Strategic Investments LLC and Leucadia

4     Asset Management Holdings LLC.

5          THE COURT:  Go ahead, Mr. Jones.  Thank you very

6     much.

7          MR. JONES:  Thank you.  This adversary proceeding

8     ultimately concerns three different categories of

9     transactions.  The first is the action seeks to avoid as

10    constructive fraudulent transfers $17 million in payments

11    that were made by the Debtor GWA to Jefferies Strategic

12    Investments under a series of notes that were issued between

13    2019 and 2022.  There were three total payments, but they

14    all have two key features.  They were made outside of the

15    preference period but within two years of the petition date.

16         The second category of transaction is really just

17    one transaction, and that is challenging a forbearance

18    agreement that was executed by all of the Debtors on

19    February 12 of 2024.  A third category is a $3 million

20    payment that was made by a separate Debtor OGI Associates,

21    to JSI on February 15th, 2024, also to pay down the notes.

22         Now, the complaint does not assert the causes of

23    actions in that -- or any cause of actions in that

24    chronological timeline; however, I think it's easiest to

25    understand our motion if we go through them chronologically

A-608

Page 8

1    and on a transfer by transfer basis.  So, I'll begin with

2    Count 9 of the complaint, which is the only cause of action

3    that takes any issue with the $17 million of prepetition

4    payments made by GWA to Jefferies Strategic Investments

5    under the notes.

6          In that count, the Debtors seek to avoid $17

7    million of payments as discussed above.  They also seek to

8    avoid the $3 million payment that was made inside the

9    preference period as a constructive fraudulent conveyance.

10   We think this count is subject to dismissal in its entirety

11   and the main reason is that under Section 548, the Debtors

12   are required to plead facts to show that the payments were

13   made for "less than reasonably equivalent value."

14         In their complaint, the Debtors have admitted that

15   the $17 million in payments were made to pay down the

16   principal amounts owing under the notes.  Paragraphs 43, 44,

17   and 52 of the amended complaint.  As Your Honor recognized

18   in the case in Re:  Vivaro, "A note obligation is an

19   antecedent debt and any payments made on account of that

20   note obligation are payments made on account of that

21   antecedent debt, and are presumed to be made for value."

22         In in Re:  Trinsum, then Chief Judge Gonzalez

23   similarly held when granting a motion to dismiss a

24   fraudulent conveyance claim that "the transfers are viewed

25   as paying an antecedent debt, the notes, were necessarily

Page 9

1    made for value."

2                We submit that should be the beginning and  the

3    end of Count 9.  In the opposition, the Debtors don't

4    challenge that law.  In fact, in a different section about

5    the forbearance agreement, they actually acknowledge that

6    this caselaw holds that "transfers resulting in a dollar for

7    dollar reduction in antecedent debt constitute equivalent

8    value."  Page 17 of their opposition.  And we think that

9    again, it ends the question.

10               The Debtors' opposition makes claims that they

11   have alleged facts relating to the underlying notes or that

12   "the Debtors didn't receive what was bargained for" under

13   those note agreements, but all of that is irrelevant.  As

14   the Court in Trinsum recognized, custom notes were

15   negotiated outside the two year fraudulent conveyance

16   period.

17               Those aren't subject to voidance and the only

18   question is whether the transfers themselves were for value.

19   The Debtors don't make any argument as to why they did not

20   receive a dollar for dollar reduction in their obligations

21   on account of those payments.  Count 9 should be dismissed.

22               Moving on to the second category of transactions,

23   the forbearance agreement, there are several different

24   causes of action relating to this agreement, but it's

25   important to know what that agreement provides.  The

Page 10

1    agreement is available as Exhibit J to the Jureller

2    declaration and it contains several different provisions.

3    Some involve the Debtors, others involve non-debtors.

4            In Section 3, each of the Debtors aside from GWA

5    guaranteed certain obligations under the notes.  In Section

6    4, all of the Debtors granted security interests and

7    critically here in Section 9, George Weiss, a non-debtor,

8    issued a personal guarantee of each of the Debtors

9    performances under that agreement.

10           Our main problem with the Debtor's complaint and

11   what our motion to dismiss is focused on is that the

12   complaint is overreaching.  We have moved to dismiss the

13   complaint to the extent the Debtors are seeking to assert

14   causes of action that would void the obligations of George

15   Weiss, a non-debtor.  There are four different theories in

16   the complaint, each under different causes of action, that

17   ask to avoid or otherwise invalidate the forbearance

18   agreement and I'll take each in order quickly.

19           In Count 1, the Debtors allege the agreement is

20   voidable as a preferential transfer under Section 547 of the

21   Bankruptcy Code.  However, the text of 547(b) is clear.  It

22   only contemplates avoiding "a transfer of an interest of the

23   Debtor and property."  As I just explained, the forbearance

24   agreement includes much more than just a transfer of

25   interest of the Debtor and property.  Section 3 and Section

Page 11

1    9 include guarantees including guarantees issued by a non-

2    debtor.  Under the plain text of Section 547 those

3    guarantees are not voidable.

4             In our brief, we cited to the in Re:  TMST case

5    where a Court specifically rejected a Debtor's attempt to

6    challenge the entirety of a restructuring agreement that

7    included nonvoidable obligations and -- obligations.  The

8    Debtors don't have any answer to this case other than to say

9    that it's not binding, but it derives from the text of the

10   statute itself.

11            They do cite an in Re:  Texas Rangers case but

12   that case, one, only avoided a claim under Section 548 and

13   two, didn't analyze whether or not obligations that go

14   beyond what is voidable under Section 547 or 548 are

15   voidable at all.  It's entirely irrelevant.  So, we think

16   Count 1 can be dismissed to the extent it seeks to avoid the

17   forbearance agreement as a whole.

18            The second theory is on Count 2 of the complaint

19   where the Debtors invoke Section 548 and a constructive

20   fraudulent conveyance theory.  That however, Section 548,

21   again the text is quite clear.  The only things that are

22   avoidable are any transfer of interest in the Debtor of

23   property or any obligation incurred by the Debtor.  All of

24   that is linked to the Debtor and not a non-debtor, and as I

25   explained previously, the forbearance agreement includes

Page 12

1    obligations of non-debtors which again justifies dismissing

2    Count 2 to the extent it seeks to avoid George Weiss'

3    personal guarantees.

4         We also think that Count 2 can be dismissed in its

5    entirety for the independent reason that the Debtors allege

6    that the forbearance agreement was entered into on account

7    of antecedent debts, namely the obligations under the notes

8    as well as a related strategic relationship agreement.  We

9    have cited caselaw not addressed in the Debtor's opposition

10   holding that securing an antecedent debt is not, as a matter

11   of law, constructive fraudulent transfer and that, too,

12   would support dismissing Count 2 as well as portions of

13   Count 3 to the extent they assert fraudulent conveyance

14   claim.

15        Third, in Count 6, the Debtors assert a count to

16   rescind the forbearance agreement as the product of duress.

17   It's not disputed that there are two elements that are

18   necessary to be pleaded for a rescission claim, one, a

19   wrongful threat, and two, that precluded the exercise of

20   free will.  And in the in Re:  TMST case, the definition of

21   a wrongful threat is a threat to do unlawful injury to the

22   party seeking to challenge the transaction.

23        Here, we don't think the complaint alleges any

24   facts that come anywhere close to an allegation of unlawful

25   injury.  Instead, the complaint generally alleges that

Page 13

1    Jefferies threatened to commence "unlawful litigation," but
2    the complaint does not explain nor does the opposition how
3    threats to collect damages for failure to pay back amounts
4    that were due under a note or another contract are somehow
5    unlawful.
6            Instead, they rely on vague subjective statements,
7    threats that the litigation would get "extremely ugly" or
8    that a reputation would be ruined or that bank accounts may
9    be frozen during the litigation.  There's no caselaw
10   suggesting, however, that the consequences of litigation
11   which itself is well founded, impossibly amount to a threat
12   of unlawful injury.
13           The only case cited in the Debtor's opposition is
14   the in Re:  TMST case which we cited in connection with our
15   earlier points.  In that case, a claim for -- to rescind a
16   contract under duress was sustained, but there were
17   particular allegations that the defendants had unlawfully
18   issued inflated margin calls and had also refused to turn
19   over principal and interest payments that were due to the
20   Debtors which created a liquidity crisis and threatened the
21   liquidation of the Debtor's assets.
22           We don't have similar facts alleged here.  The
23   Debtors don't claim that we issued illicit margin calls.
24   They don't claim that the Jefferies entities failed to fund
25   any of the notes or the requirements to create the liquidity

Page 14

1   crisis.  They only have challenged threats of litigation and

2   the attendant consequences, and we at least are aware of no

3   caselaw holding up such threats of litigation can constitute

4   unlawful injury.

5             The final theory asserted by the Debtors in Count

6   7 is a cause of action seeking a declaration that the

7   forbearance agreement was null and void, and there were two

8   arguments raised here.  The first is that there was a lack

9   of consideration and the second is because the agreement was

10  not signed and returned.  On the first point in our moving

11  papers, we cited caselaw demonstrating that a forbearance of

12  any length including just two days constitutes

13  consideration.  Debtors don't respond to this particular

14  argument, so we would consider it abandoned.

15            Instead, in the opposition, the Debtors claim they

16  alleged that "The defendants actually indicated that they

17  had no intention of complying with the amended forbearance

18  agreement."  That's at 20.  However, the Debtors complaint

19  alleges facts that are directly contrary to this assertion.

20  In Paragraph 66, the Debtors allege that the day after the

21  forbearance agreement was executed by the Debtors, the

22  Jefferies entities filed UCC financing statements "in an

23  effort to perfect the security interest granted under the

24  forbearance agreement."

25            That is conduct that represents an objective

Page 15

1    manifestation of the intent of the Jefferies entities to be

2    bound and the Debtors are bound by their allegations in the

3    complaint on this motion.

4              For all those reasons, we think counts one and two

5    can be dismissed in part.  Counts 6 and 7 should be

6    dismissed in their entirety.  That handles all of the

7    forbearance agreement claims and leaves us with one more

8    transfer that is at issue, which is the $3 million payment

9    by OGI.

10             There are two causes of action that concern that

11   payment.  The first is Count 9, which is the defendants

12   alleging that this particular payment can be avoided as a

13   fraudulent transfer.  We've already discussed that above

14   with the other $17 million in payments.  The payment was

15   made to pay down principal on the note.  That is clearly for

16   value.

17             The closer question is Count 8 where the Debtors

18   allege that they may avoid the transfer on the ground that

19   it was made within the preference period.  However, I don't

20   think there's any dispute that to plead the viable

21   preference claim, the Debtors are required to allege facts

22   that would allow the Court to begin its analysis of whether

23   on account of the payment, the defendants received more than

24   they would have in a chapter -- in a hypothetical Chapter 7

25   case.

Page 16

1          And in this complaint, there are no facts alleged

2    about OGI as distinct from any other Debtor.  Because of

3    that, you could dismiss this claim outright.  The opposition

4    doesn't attempt to argue that there are facts about OGI's

5    debts and liabilities.  Instead, they claim that it can be

6    inferred that JSI received more than it would have in the

7    hypothetical Chapter 7 proceeding because prior to the

8    forbearance agreement, OGI did not owe JSI anything; but

9    that is an irrelevant observation.

10         The question is not what was owed to JSI three

11   days before the challenge transfer occurred.  The question

12   is, did the Debtors allege facts showing that as a result of

13   the transfer, JSI received more than it would have.  The

14   payment was made when OGI was a Debtor to JSI and

15   apparently, at least it's not alleged, any other creditors.

16   That means you can dismiss the claim.

17         That covers all three of the categories of claims.

18   There are five other causes of action contained in this

19   complaint.  They all invoke various Bankruptcy Code

20   provisions.  I will address them very, very briefly.  Counts

21   4, 5, 10, and 11 all purport to assert causes of actions

22   under Section 550 and 551 of the Bankruptcy Code.

23         In our opening memo of law, we cited the in Re:

24   CIL case, which specifically held that Section 551 does not

25   provide an independent cause of action, but instead provides

Page 17

1    statutorily available remedies in the event that a Trustee

2    establishes an avoidance claim under a different Bankruptcy

3    Code provision.  Section 550 is similarly contingent upon a

4    showing that a viable avoidance claim has been pled.

5            The Debtors don't take -- attempt to take this on

6    at all in their opposition.  They just repeat their

7    allegations and cite these provisions of the Code.  I think

8    those claims could be summarily dismissed.

9            The last claim, Count 12, asserts a cause of

10   action under 502(d) seeking to disallow the Jefferies

11   entities claims in their entirety.  Our brief cited to

12   several cases including in Re:  Pennysaver, noting that

13   502(d) only allows for the disallowance of a claim if a

14   transferee "is liable."

15           And the caselaw has dismissed similar claims to

16   the Debtors here as premature because there has been no

17   finding that here, either of the Jefferies entities are

18   liable for the supposedly voidable transfers.  Accordingly -

19   - and the Debtors don't -- again, their opposition does not

20   even mention this argument.  It just repeats their claim.

21   So, we would again take the position that this has been

22   effectively abandoned and that that cause of action can be

23   dismissed as premature.

24           I'm open to answer any questions Your Honor may

25   have, but otherwise, we would just respectfully request that

Page 18

1    our motion to dismiss be granted.

2              THE COURT:  Mr. Jones, which causes of action or

3    portions of causes of action do you agree survive your

4    motion to dismiss?

5              MR. JONES:  So, we would agree that Count 1, to

6    the extent that it asserts a preference claim seeking to

7    avoid the granting of security interests has been

8    sufficiently alleged.  I think the same is true under Count

9    3.  I think that that is it.

10             THE COURT:  All right.  Mr. Jureller.

11             MR. JURELLER:  Thank you, Your Honor.  Again for

12   the record, John Jureller, Klestadt Winters, on behalf of

13   the Debtors.  Your Honor, since the outset, the Court is

14   aware that the amended forbearance agreement has been front

15   and center in these cases.  The amended forbearance was

16   entered into within 90 days of the bankruptcy filing and

17   under the amended forbearance agreement, the Debtors

18   transferred interest in property, incurred obligations

19   without any exchange of reasonably equivalent value or

20   consideration.

21             The entirety of these agreements was intended by

22   the Debtors to elevate -- excuse me, by the defendants to

23   elevate their positions as compared to other creditors.  In

24   fact, admittedly, in their motion, the defendants

25   acknowledged that they were concerned at the time that the

```
                                                    Page 19
 1    Debtors would prioritize the other creditors over their then

 2    existing unsecured debt.  The intent of the amended

 3    forbearance agreement taken as a whole was to secure the

 4    otherwise unsecured debt obligations of GWA and WMSA, Weiss

 5    Multi-Strategy Advisors, cause the other Debtor entities to

 6    grant a security interest in these assets and guarantee

 7    these obligations.  They --

 8              THE COURT:  Mr. Jureller, let me just -- let me

 9    ask this question.

10              MR. JURELLER:  Yep.

11              THE COURT:  Do you agree that the code provides no

12    prohibition on the Jefferies parties obtaining the

13    guarantees of non-debtors?

14              MR. JURELLER:  Your Honor, I would argue that --

15              THE COURT:  Specifically Mr. Weiss.

16              MR. JURELLER:  Of non-debtors?

17              THE COURT:  Yes.

18              MR. JURELLER:  Well, Mr. Weiss -- talking about

19    Mr. Weiss --

20              THE COURT:  Yes.

21              MR. JURELLER:  -- specifically, yes.  Yes, I would

22    say that there is no prohibition with respect to a guarantee

23    by Mr. Weiss.  However, I think the Court, and the caselaw

24    supports this, the Court needs to look at the facts and

25    circumstances of the particular case.  In this particular
```

Page 20

1    instance, if the amended forbearance agreement is avoided as

2    to the Debtors, whether it be as a preference, you know, a

3    secure -- for the security interest or as a fraudulent

4    conveyance with respect to the guarantees, with respect to

5    the other provisions therein, then the obligations of Mr.

6    Weiss under the amended forbearance agreement disappear.

7    His guarantee is solely --

8              THE COURT:  Well, why wouldn't --

9              MR. JURELLER:  -- guarantee.

10             THE COURT:  Why wouldn't the agreement of Mr.

11   Weiss to guarantee some or all of the debt stand, whether or

12   not the remainder of the forbearance agreement, at least

13   insofar as the Debtors are concerned, would fall?  I mean,

14   it's, you know, one of the things I've seen multiple times

15   over the years is that a creditor will often be willing to

16   forbear if it obtains a guarantee from a non-debtor

17   principal.  And that's what this is.

18             MR. JURELLER:  Well, I think, Your Honor, actually

19   if you read the terms of the amended forbearance agreement,

20   this is somewhat different than that.  Mr. Weiss has only

21   issued a performance guarantee of obligations of these

22   parties under the amended forbearance agreement, not of the

23   obligations under the loans or any other monies that are

24   owed.  This is solely a performance guarantee rather than a

25   payment guarantee.  And in fact, two points on that.  If

Page 21

1   it's only a performance guarantee and the obligations of the

2   Debtors under the amended forbearance agreement disappear

3   and are avoided, then Mr. Weiss has no further obligation.

4            Second, the Jefferies parties have sued Mr. Weiss

5   individually, which is now in District Court and this same

6   issue is actually subject to a motion to dismiss by Mr.

7   Weiss in the District Court action under the argument -- and

8   it's a lot grander than this, but under the essential

9   argument that this is a performance guarantee solely of this

10  amended forbearance agreement, and if it were to be avoided,

11  there is no longer -- obviously no longer a performance

12  required and therefore no longer any guarantee.

13           So, that's the case --

14           THE COURT:  Who was that --

15           MR. JURELLER:  -- this particular case --

16           THE COURT:  Who was that case pending before and

17  what's the status?

18           MR. JURELLER:  It's -- I don't know who it's

19  pending before and it is -- has been moved to the District

20  Court, but the status is that the motion to dismiss has been

21  filed.  Opposition has not yet been submitted.  I believe

22  the time comes up next month.  We're not representing the

23  Mr. Weiss individually in that particular case, and the

24  reply is due, I believe in December with a hearing

25  thereafter.  I don't guarantee those particular dates, but

Page 22

1    that's kind of the general idea.

2              THE COURT:  Go ahead.

3              MR. JURELLER:  So, Your Honor, as I said, the

4    amended forbearance agreement is to secure the -- which was

5    in -- let me back up.  The intent of the amended forbearance

6    agreement was solely to elevate the position of the

7    Jefferies parties.  And as such, it's either a fraudulent

8    conveyance or a preferential transfer, both of which have

9    been sufficiently pled in the first amended complaint.

10             Going through the particular arguments, Your

11   Honor, as the Court knows, this is a two prong analysis with

12   respect to a motion to dismiss.  All of the facts are deemed

13   to be true and the Court looks to see whether there are

14   plausible claims for relief.  We would assert that both of

15   those are in fact true.

16             With respect to Count 1 of the first amended

17   complaint, Count 1 seeks to avoid the amended forbearance

18   agreement as a preferential transfer under 547(b) or

19   alternatively to avoid all provisions of the amended

20   forbearance agreement which purports to transfer property of

21   the Debtors.  As counsel for the defendant says -- has just

22   stated, the only argument here in this motion is whether or

23   not to avoid the entirety of the amended forbearance

24   agreement as a transfer of property.

25             We would argue, Your Honor, that that should be

Page 23

1    the case.  As pled in the first amended complaint, the

2    amended forbearance agreement was intended to be read as a

3    whole.  The intent of the amended --

4            THE COURT:  I don't understand.  I don't

5    understand that point.

6            MR. JURELLER:  The intent of the amended

7    forbearance agreement, Your Honor, was to provide a security

8    interest against all assets of all of the Debtors.  That was

9    the intent of the agreement.  That's the substance of the

10   agreement.  And as such, it's our position, Your Honor, that

11   that agreement can be determined as a preferential transfer

12   in the entirety and --

13           THE COURT:  I don't follow that.  I don't follow

14   that argument, so, because there are non-debtor parties who

15   -- to that agreement and even if the agreement would fail as

16   to a Debtor party because it's a preference, I -- this comes

17   back to the same point about, I don't understand why that

18   would necessarily follow that the agreement would fail as to

19   Mr. Weiss as well because he's a non-debtor.

20           MR. JURELLER:  Well, it --

21           THE COURT:  It's just -- it's very typical to have

22   guarantors be non-debtor principals of a Debtor in the

23   guarantee stand.

24           MR. JURELLER:  Right, and I think the difference,

25   Your Honor, as I just -- as we just discuss is that the

Page 24

1    guarantee of Mr. Weiss goes away if the agreement is

2    avoided.  So that in itself, that in and of itself should

3    not be a block to the avoidance of the amended forbearance

4    agreement, because it's only a guarantee of obligations

5    under the amended forbearance agreement, not of payment

6    obligations under the other agreements.

7            So our position, Your Honor, is that this

8    agreement in the whole is solely intended to provide a

9    security interest in all assets of all the Debtors.  That's

10   it.  That's -- and that could be avoided as a preference and

11   the argument that Mr. Weiss has a guarantee doesn't block

12   that because the guarantee is a limited -- of a limited

13   nature.  I think that's maybe the better way to say that.

14           So, that's our position on that, and if you look

15   at the -- if you look at the language of Article 9,

16   Provision 9 of the amended forbearance agreement, it's clear

17   that this is a very limited guarantee and it only relates to

18   the amended forbearance agreement, nothing further.

19           THE COURT:  Point out that language to me if you

20   would, Mr. Jureller.

21           MR. JURELLER:  It's in Paragraph 9 of the amended

22   forbearance agreement which I believe is Exhibit J to my

23   declaration.  I'm sorry, I just lost my declaration.  I

24   believe it's Exhibit J or one of those, but I can tell you

25   in a second.  But it's attached to my declaration in

Page 25

1    opposition to the motion to dismiss.  And --

2            THE COURT:  I'd still like to know the precise

3    language that you --

4            MR. JURELLER:  You want me to read it?  Okay.

5            THE COURT:  Yes, I would.

6            MR. JURELLER:  Okay.  It says --

7            THE COURT:  I don't have it open in front of me,

8    so.

9            MR. JURELLER:  Sure.  Of course.  It says, "Weiss

10   guarantee.  Weiss unconditionally and irrevocable personally

11   guarantees to the Jefferies entities the accuracy of the

12   representations made by and the performance of the

13   agreements of the Weiss parties hereunder.  Weiss further

14   agrees that he shall take all actions within his control

15   including by exercising all of his voting governance,

16   management, and other rights and powers with respect to each

17   of the other Weiss parties, any other subsidiaries in any of

18   his personal and his family trust to cause such persons to

19   comply with the terms of this agreement, which is

20   capitalized and defined under the forbearance agreement as

21   the amended forbearance agreement itself."

22           As I said that -- this is the subject of a motion

23   to dismiss in the District Court action, but based upon the

24   language of that agreement, it's a limited -- limited to

25   performance under that --

```
                                                            Page 26
 1              THE COURT:  Is there -- are there one or two cases

 2      that you're relying on for this distinction between

 3      guarantee of performance and guarantee of payment?

 4              MR. JURELLER:  I don't have any cases with respect

 5      to that, Your Honor.

 6              THE COURT:  So, what is your -- if you don't have

 7      caselaw that supports it, what are you basing your argument

 8      on?

 9              MR. JURELLER:  I'm basing my arguing on the way --

10      the language of the amended forbearance agreement itself.

11              THE COURT:  Yeah.  But the point I'm raising is,

12      that's fine.  You're pointing the language and I'll go back

13      and look at it carefully, but is there any caselaw that

14      supports your argument that recognizes a distinction between

15      guarantee of performance and guarantee of payment?

16              MR. JURELLER:  I don't --

17              THE COURT:  I could easily see interpreting that

18      language that George Weiss guaranteed that the Jefferies

19      parties would be paid under the guarantee if not by any of

20      the Debtors, because the agreement failed because there was

21      a preference.

22              MR. JURELLER:  Your Honor, we have not cited any

23      caselaw in our opposition with respect to that provision.

24      However, as I said --

25              THE COURT:  Do you have any treatises?  Do you
```

A-627

Page 27

```
 1    have anything -- you've made the argument.

 2              MR. JURELLER:  Right.

 3              THE COURT:  But I don't -- I didn't see, that's

 4    why I'm questioning it, any governing law that would support

 5    the argument that you've made that there's a distinction

 6    between guarantee of performance and guarantee of payment.

 7              MR. JURELLER:  Again, Your Honor --

 8              THE COURT:  The performance that was looked to was

 9    payment.  Weiss guaranteed it.

10              MR. JURELLER:  Your Honor, we're relying on -- we

11    don't have any caselaw that we've submitted in the

12    opposition.  There is caselaw submitted in the motion to

13    dismiss.  We're relying on --

14              THE COURT:  Well, not on this point, there isn't.

15    Not on this point, there isn't.

16              MR. JURELLER:  Not -- no, no, in the other motion

17    to dismiss, as in the District Court case.

18              THE COURT:  Well --

19              MR. JURELLER:  -- here, is that --

20              THE COURT:  Is there caselaw in that motion that

21    you haven't called to my attention here, Weiss -- it's not

22    your motion in the District Court, but is there caselaw

23    cited in Weiss' motion in the District Court that would

24    support an argument that there's -- that the law recognizes

25    a distinction between a guarantee of performance and
```

Page 28

1    guarantee of payment.

2              MR. JURELLER:  My understanding, Your Honor --

3              THE COURT:  I'm sure you must have read it.

4              MR. JURELLER:  I did.  I did read it, Your Honor.

5    It's an extremely strong motion for dismissal --

6              THE COURT:  Whether it's strong or not, I want ---

7              MR. JURELLER:  But I don't --

8              THE COURT:  -- this precise point.

9              MR. JURELLER:  Right.  And I certainly can provide

10   the Court with the caselaw.  I don't have it directly in

11   front of me, Your Honor.

12             THE COURT:  All right.  Go on with your argument,

13   then.

14             MR. JURELLER:  Your Honor, with respect to Count 2

15   of the -- excuse me -- the first amended complaint, Count 2

16   seeks to avoid as a -- the amended forbearance agreement as

17   a constructive fraudulent conveyance, pursuant to

18   548(a)(1)(B), the first amended complaint, Your Honor

19   alleges fact sufficient to assert possible cause of action

20   for avoidance of the AFA, the amended forbearance agreement

21   as a fraudulent transfer.  These are also asserted as to the

22   specific provisions in Count 3 of the first amended --

23             THE COURT:  So, for constructive fraudulent

24   transfer, you have to allege that the Debtor was insolvent

25   at the time.  What are the facts in the complaint that

Page 29

1    support the allegation of insolvency?

2            MR. JURELLER:  Right.  Your Honor, in the

3    complaint, there's an allegation, Your Honor, regarding the

4    negative equity at the time of -- well, at the time of the

5    amended forbearance agreement, which is in the -- which is

6    in the preferential period, Your Honor, it's presumed that

7    that the Debtor is insolvent.  In addition, because there

8    was no reasonable equivalent of value at least as argued in

9    the complaint, I believe there's also a presumption of

10   insolvency with respect to that time period.  As you may

11   recall, this argument relates solely to the amended

12   forbearance agreement which was in February 12th of 2024.

13   Your Honor, in addition to that -- I'm sorry.

14           THE COURT:  No, is your allegation that the Debtor

15   was balance sheet insolvent or that it was failing to pay

16   its debts as they matured?  What is your -- because the laws

17   draws a distinction with respect to the presumption.

18           MR. JURELLER:  Right.  Your Honor, I think at that

19   particular point in time, the Debtor was both balance sheet

20   insolvent as well as insolvent for an inability to pay debts

21   as they became due.  I mean, clearly there was a forbearance

22   agreement with respect to Jefferies and their debts.  There

23   were other obligations, which were due and owing and there

24   are claims that have been asserted in the bankruptcy case

25   with respect to these obligations.

Page 30

1           So, Your Honor, there was also arguably a 100

2    million indebtedness that was due to Jefferies with respect

3    to not only the notes but also with respect to the

4    agreements that they had entered into.  So, the -- as far as

5    the presumption, Your Honor, those facts are alleged in the

6    complaint.  And in addition, Jefferies was well aware of

7    that situation.

8           The Debtors were in the -- in not only providing

9    monthly financial statements to the Jefferies entities for

10   over a two-year period, they were also involved in a

11   negotiation with a third party for investment to try to keep

12   the business up and running which Jefferies was also aware

13   of.  Based upon those, Your Honor, we believe at the time of

14   the amended forbearance agreement, the Debtor was -- and we

15   believe it's been alleged in the first amended complaint --

16   the Debtor was insolvent at that time period.

17          We also believe, Your Honor, that there was no,

18   reasonably equivalent consideration provided in -- with

19   respect to the amended forbearance agreement.  As Your Honor

20   is aware, three of the Debtor entities had no obligations to

21   the Jefferies parties as of that time period.  OGI, WSO, and

22   WMSF were not parties to any of the underlying Jefferies

23   agreements and became obligated at that time.  There was no

24   consideration given to any of them with respect to the

25   entering into that amended forbearance agreement on --

Page 31

1    again, on February 12, 2024.

2                    In addition to that, in addition to the fact that

3    that there was no obligation for these particular entities,

4    a review of the facts show that there was not reasonably

5    equivalent value given in exchange for the amended

6    forbearance agreement.  The forbearance agreement purported

7    to provide at most a two-day forbearance in exchange for

8    raising the Jefferies debt from an unsecured debt to a

9    secured debt with cross guarantees by all defendants,

10   setoffs of over $2.6 million owed by the Jefferies parties

11   to the Debtors separately.

12                   And Your Honor, the caselaw indicates that with

13   respect to these types of issues, the Court looks to the

14   facts and circumstance of the case and weighs the

15   consideration that's provided and we would --

16                   THE COURT:  Were any of the other guarantors other

17   than Weiss non-debtors?

18                   MR. JURELLER:  None of the other guarantors were

19   non-debtors.

20                   THE COURT:  Okay.

21                   MR. JURELLER:  All of the parties are Debtors,

22   Your Honor, except for Mr. Weiss himself.

23                   THE COURT:  Okay.

24                   MR. JURELLER:  Okay.  Your Honor, just finishing

25   up on that particular point, based on the caselaw, the

Page 32

1  analysis requires the Court to compare what was given with

2  what was received and we would respectfully submit that the

3  first amended complaint asserts that it was not comparable,

4  not reasonably equivalent value with respect to that.

5          Kind of looking next to Count 6, which was a claim

6  for rescission of the amended forbearance agreement due to

7  duress and undue influence, under New York law the grounds

8  for rescission include duress and undue influence where a

9  party is compelled to agree to a contract by means of

10  wrongful threat which precludes the party's free will.

11          The first amended complaint, Your Honor, goes

12  through the details with respect to the entering into of the

13  first amended agreement, starting with a demand at 2:10 in

14  the morning on a Sunday night and Monday morning that if the

15  amended forbearance agreement is not signed by 7 a.m. that

16  litigation will be commenced seeking not only --

17          THE COURT:  And the threat of litigation, I don't

18  see how that could possibly be a wrongful act.  I mean,

19  lawsuits get filed all the time.  Courts rule on motions to

20  dismiss.  What supports the argument that the threat to file

21  a lawsuit is a wrongful act sufficient to establish undue

22  influence or duress?

23          MR. JURELLER:  Your Honor -- and this was, I

24  believe, cited in the TMST case which has been relied upon

25  by the defendants, the Court looks to the facts and

Page 33

1    circumstances of what's going on at that time and what the

2    Debtor is -- what the Debtor understands at that time as to

3    whether it's irreparable harm will occur if in fact, they do

4    not enter into the agreement, and then that's exactly what

5    happened here.

6              Your Honor, the Jefferies parties -- and again, we

7    need to look at the whole -- the Jefferies parties who were

8    fully aware of what was going on, fully aware of the

9    financials, fully aware of the third-party transaction, were

10   threatening to bring law -- bring a claim the next morning

11   if this wasn't signed by 7 a.m. on a Sunday night --

12             THE COURT:  Okay, that --

13             MR. JURELLER:  -- to bring action --

14             THE COURT:  Do you agree, absent the forbearance

15   agreement, do you agree that Jefferies could file well

16   stated complaints to recover the money that it was owed?

17             MR. JURELLER:  Your Honor, we would argue that the

18   Jefferies didn't have the right to do that at that

19   particular time because they were --

20             THE COURT:  Why is that?

21             MR. JURELLER:  They were subject to a forbearance

22   agreement already which they agreed to forbear until

23   September 1st of 2024.  They were also party, Your Honor ---

24   and the Courts, too, look to the good faith of the parties -

25   - they were party to the negotiations.  They were --

Page 34

```
 1          THE COURT:  Well, you get -- you know, look.  I

 2   spent years in -- before being on the bench in hard-nosed

 3   negotiations seeking to avoid having my client sued or

 4   having my client file a suit.  That rough and tumble with

 5   large sophisticated parties with excellent representation is

 6   -- that's the grist of large commercial transactions.  And

 7   so, you're saying -- I just want to understand precisely.

 8          You're saying that absent the forbearance

 9   agreement, Jefferies could not file a well-stated complaint

10   against any of the Weiss parties.  I'm obviously including

11   the Debtors in that.  Because why?  You say that there was a

12   forbearance agreement that was in place that precluded them

13   from doing it?  Is that -- that's your position?

14          MR. JURELLER:  That's one of our positions, Your

15   Honor.  I think --

16          THE COURT:  What else?  What else?

17          MR. JURELLER:  I think, again, looking at the --

18   looking as a whole, what are -- what's the knowledge of the

19   particular parties?  Are they aware that it's going to

20   create irreparable harm?  Are they aware that --

21          THE COURT:  Are you saying --

22          MR. JURELLER:  -- the death knell --

23          THE COURT:  -- that because the filing of a

24   lawsuit will create irreparable harm, a party can't assert

25   its rights by filing a lawsuit?  The question in my mind is,
```

Page 35

1    would Jefferies have a good faith basis for stating causes

2    of action in a lawsuit it filed, absent the forbearance

3    agreement?  The fact that the parties are in negotiations is

4    not a basis for precluding a party from asserting its claim.

5            So, I will go back and look at the forbearance

6    agreement.  Is there some other document, some other

7    agreement between the parties that you believe precluded

8    Jefferies from filing a lawsuit, absent a forbearance

9    agreement?  Yes or no.

10           MR. JURELLER:  No, Your Honor.  I believe it's the

11   forbearance agreement itself.

12           THE COURT:  All right.  Go ahead with your

13   argument.

14           MR. JURELLER:  Your Honor, just to close up that

15   loop, again, looking at the circumstances as a whole and

16   what was threatened against the various parties including,

17   personal attacks and to ruin Mr. Weiss and other things like

18   that --

19           THE COURT:  How much was Jefferies --

20           MR. JURELLER:  -- taken into consideration.

21           THE COURT:  -- owed at that time?  I'm sorry, Mr.

22   Jureller.  How much was Jefferies owed at that point in

23   time, before the forbearance agreement was signed?

24           MR. JURELLER:  I believe they were owed in the

25   neighborhood of 100 million, Your Honor, under various

Page 36

1    agreement.

2            THE COURT:  And you're saying because of an

3    adverse reputational effect on Mr. Weiss, Jefferies is

4    precluded from filing a lawsuit to recover over the $100

5    million that it was owed?

6            MR. JURELLER:  No, Your Honor.  I'm saying that a

7    review of the circumstances, it's a bit unusual.  The

8    parties were walking hand in hand --

9            THE COURT:  Show me a case that says, look at the

10   unusual circumstances in deciding whether a party can or

11   cannot assert its rights in a lawsuit.

12           MR. JURELLER:  I believe --

13           THE COURT:  I will go back -- so, the only thing

14   you've pointed to specifically -- and I'm going to ask Mr.

15   Jones to point -- to address the argument specifically -- is

16   the forbearance agreement.  You say that until September,

17   they could not file a lawsuit.  I'll hear what Mr. Jones has

18   to say about that.  But reputational damage from filing a

19   lawsuit?  That's what happens when lawsuits are filed, is

20   the potential reputation damage.

21           That's not a basis for precluding a party from

22   asserting its rights.  If they didn't have rights because of

23   a forbearance agreement, that's one thing.  So, if you have

24   any other document, don't tell me facts and circumstances.

25   Okay.  That's not a basis for precluding a party from

A-637

Page 37

1    asserting its rights to recover over $100 million.  Is there

2    anything other than the forbearance agreement that you

3    believe legally precluded Jefferies from asserting a claim

4    against the Debtors and Weiss?

5            MR. JURELLER:  Your Honor, it's just the

6    forbearance agreement, is the only documentation that we're

7    pointing to.

8            THE COURT:  Okay.  All right.  Go on with your

9    argument then.

10           MR. HURFORD:  Okay.  Thank you, Your Honor.  Your

11   Honor, Count 7 of the first amended complaint asserts that

12   the amend forbearance agreement is in the alternative null

13   and void due to lack of consideration, duress, and lack of

14   meeting of the minds.  As set forth in the first amended

15   complaint, there was no consideration under the amended

16   forbearance agreement with respect to several of the

17   different parties.

18           The agreement was signed under duress, as we just

19   talked about, at least from the Debtor's standpoint and

20   based upon discussions back and forth with defendants who

21   did not sign the amended forbearance agreement.  There is a

22   question of fact as to whether the defendants had any intent

23   of complying with their obligations under the forbearance

24   agreement.  As I said, with respect to this alternative

25   argument, based upon those facts and we would assert that

```
                                                    Page 38
 1    the argument is --
 2             THE COURT:  Do you have -- I want you -- point me
 3    to one or two cases that you believe support your argument
 4    that the background facts and circumstances preclude a party
 5    from filing a lawsuit to recover money that it's
 6    contractually owed.  You've repeated it over and over and
 7    the only thing you've been able to point to in documents is
 8    a forbearance agreement.  You keep coming back to facts and
 9    circumstances.  Now, give me a case that supports that
10    argument.
11             MR. JURELLER:  Just give me one second, Your
12    Honor.  Your Honor, I believe -- I'm trying to find it
13    quickly -- that the Court in TMST Inc., 518 B.R. 329 (2014)
14    addresses this, that --
15             THE COURT:  What do you believe that case -- what
16    did the case say that supports your argument?
17             MR. JURELLER:  It says it says here, "The facts
18    alleged by plaintiff rise to a plausible basis that such
19    continuing economic duress would have existed as a result of
20    the continuing alleged wrongful acts and demands by the
21    defendants."
22             THE COURT:   So, is it a wrongful act to seek to
23    recover $100 million in debt that was owed?  I will address
24    this issue, and Mr. Jones is going to have to address the
25    issue specifically whether there was a forbearance agreement
```

Page 39

1    in place that precluded them from filing.  But absent the

2    forbearance, a binding forbearance agreement that precluded

3    them from doing that, is there something in TMST that you

4    believe would support the argument that something other than

5    a binding agreement, that if a putative plaintiff is owed,

6    I'm picking the 100 million because that's what we're

7    roughly talking about here, that they can't go ahead and

8    seek to assert those rights in a lawsuit?  You know, I'm

9    expressing skepticism.  I'm open --

10              MR. JURELLER:  No, I --

11              THE COURT:  -- to your persuading me that there's

12   caselaw that supports your argument.  I just don't, when I

13   read the cases, I didn't see anything that supported your

14   argument.

15              MR. JURELLER:  Your Honor, I had read TMST to

16   indicate that if one party believed that there would be

17   irreparable harm as a result of the actions taken by another

18   party and was able to sufficiently plead that in the

19   complaint, that that was, along with -- and we have the

20   forbearance agreement in this particular case -- was

21   sufficient for the Court to find that at this stage of the

22   litigation, the motion to dismiss stage, that claim is

23   viable or plausible.

24              So, the only case I have is the TMST case at this

25   point, but again, I would rely --

Page 40

1          THE COURT:  I'll go back and read (indiscernible),

2    Mr. Jureller.  Go ahead with your argument.

3          MR. JURELLER:  Okay.  Thank you, Your Honor.  And

4    with respect, obviously, with respect to the other -- the

5    null and void, you know, that was with respect to the

6    factual as well as what -- kind of what happened with

7    respect to that case.

8          With respect to Count 8, the first amended

9    complaint seeks to avoid a $3 million payment by OGI to JSI

10   as a preferential transfer.  The payment was made by OGI on

11   behalf of GWA.  The defendants have pled that with respect

12   to this claim, that there's no showing that that the

13   defendants would have received less than they would have in

14   a Chapter 7 case; however, OGI had no obligation prior to

15   the amended forbearance agreement three days earlier to the

16   defendants and owed no money to them.

17         So, to the extent that a payment was made without

18   an obligation, that in and of itself will establish that

19   they would get more than they would have in a Chapter 7,

20   because in a Chapter 7, they weren't entitled to any monies.

21   And if -- even if the Court were to look at the payment

22   coming from, GWA as compared to OGI, GWA in the schedules

23   has listed more than $11 million in unsecured debt,

24   therefore, a payment of 3 million.  There's was a question

25   as to whether or not they would have received more in this

Page 41

1    instance than they would have in a Chapter 7 proceeding.

2            We would suspect, Your Honor, that the first

3    amended complaint adequately pleads a preferential transfer

4    claim against the defendants with respect to the $3 million

5    payment.  With respect to Count 11, this is -- relates to

6    the $17 million in payments over the two year period prior

7    to the bankruptcy.  The first amended complaint alleges that

8    these transfers were made when the Debtors were insolvent

9    and for less than reasonably equivalent value.

10           The motion to dismiss focuses on the reasonably

11   equivalent value aspect of the claim.  We would submit that,

12   Your Honor, that the first amended complaint adequately

13   pleads that there was no reasonably equivalent value because

14   of, among other things, there was a manipulation of the

15   maturity dates under the notes, so the payments were

16   accelerated under the notes.

17           The bargained for maturity date was five years

18   after the date of the notes with respect to two of the notes

19   and seven years with respect to the third note.  However,

20   these -- the Debtors were compelled to make payment of the

21   17 million well in advance of the maturity dates under the

22   particular notes.  The reasoning for the payment was a

23   continuing and well known covenant default under the notes.

24           There was no notice of default that was provided.

25   There was bad faith by the defendants as they had full

Page 42

1    knowledge of the financial condition at the time while also

2    marketing and investing in the Debtors.  And there was also

3    a breach of this forbearance agreement that we have been

4    discussing which agreed to forbear on taking any action

5    until September 1st, 2024.

6            Again, we would say -- argue Your Honor, and

7    submit that at this stage of the case, again, the motion to

8    dismiss stage, that the first amended complaints officially

9    alleges claims with respect to a fraudulent conveyance of

10   those payments.

11           Addressing very quickly as counsel did with

12   respect to Counts 4 and 5 and Counts 10 and 11 which are

13   under 551 and 550 of the Bankruptcy Code.  These are pled,

14   Your Honor, in typical fashion.  They're all -- they're

15   dependent upon the avoidance of and recovery of claims under

16   the other causes of action and I think that they're pled

17   that way.

18           And with respect to Count 12, which is a claim

19   under 502(b), again, we would say that this is a standard

20   cause of action, which again is dependent upon the

21   determinations under the other accounts with respect to

22   preferences of fraudulent conveyance.

23           With that, Your Honor, unless you have further

24   questions.

25           THE COURT:  Thank you, Mr. Jureller.  Mr. Jones.

Page 43

1          MR. JURELLER:  You're on mute.  Sorry.

2          MR. JONES:  Just address -- Michael Jones, for the

3      record, on behalf of the defendants.  I'll just address the

4      one question that you had, which is whether or not there is

5      a forbearance agreement which would have precluded the

6      Jefferies defendants from initiating a lawsuit prior to the

7      filing of the forbearance agreement.  The plaintiff's

8      position is wrong on both the facts and the law.

9          As a factual matter, none of the forbearance

10     agreements that had been signed precluded any Jefferies

11     entity from taking "any action related to the debt."

12     Instead, the forbearances that were agreed upon were very

13     specifically defined to particular remedies under the notes

14     that existed.  The JSI had agreed to forbear from exercising

15     a capital T, Trigger, capital R, Redemption prior to

16     September 1, 2024.

17         That is not an agreement to forbear from

18     initiating a lawsuit.  The notes contain an entirely

19     separate provision that allowed for an optional redemption

20     upon a different set of notice.  That is what the Jefferies

21     entities ultimately invoked.  The Debtors admit that, which

22     is what made the notes become due and payable at the end of

23     2023 and in turn gave the Jefferies entities the right to

24     initiate the lawsuits that were contemplated and ultimately

25     threatened, and that are at issue here.

Page 44

1          But even if the Debtors' claim was correct that

2    there was some agreement that the Jefferies entities would

3    not take any action relating to their debts, that will still

4    not count as a wrongful threat under the law because there

5    would be a remedy that the Debtors could pursue in the event

6    of a breach of that agreement, which is they could then

7    allege that the -- that we breached the agreement, and that

8    goes to the first prong of the unconscionability or of the

9    duress analysis, which is --

10          THE COURT:  Let me just stop you for a second.  I

11   just want to make sure we're on the same page here.  As I

12   understand it, the September 22 initial forbearance

13   agreement in Paragraph 1 included the language, JSI hereby

14   agrees that it will not exercise its rights to effect a, and

15   then initial caps, Trigger Redemption prior to July 1, 2023.

16          MR. JONES:  Correct.

17          THE COURT:  Forbearance provided that GWA shall

18   pay at least $20 million, et cetera.  That's what you're

19   relying on.

20          MR. JONES:  Yes, exactly.

21          THE COURT:  -- the separation of trigger

22   redemption from exercising other rights.

23          MR. JONES:  Correct.  And there are similar

24   provisions and other -- the additional extensions that were

25   signed.

A-645

Page 45

1              THE COURT:  Okay.

2              MR. JONES:  The -- yeah.  So, but those are my two

3      answers to the two -- to that point.

4              THE COURT:  All right, anything else?

5              MS. RICE:  Judge Glenn?

6              THE COURT:  Yes.

7              MS. RICE:  My name is Michelle Rice and I

8      represent George Weiss in the Federal --

9              THE COURT:  Ms. Rice, I will give you chance after

10     Mr. Jones, if he's told me he's completed his argument, I'll

11     give you a chance to --

12             MS. RICE:  My apologies, Your Honor.

13             THE COURT:  -- address the Court.

14             MS. RICE:  I thought he had, but I understand

15     completely.  Thank you.

16             THE COURT:  Okay.  Mr. Jones, go ahead.

17             MR. JONES:  I have nothing further, unless Your

18     Honor has additional questions.

19             THE COURT:  What is the provision that you say --

20     well, or maybe it's the absence of a provision.  I've seen

21     the language in the agreement that deals with forbearing in

22     a trigger notice.  Is there something in the agreements

23     themselves that preserve whatever other rights JSI had to

24     assert claims against the defendants?

25             MR. JONES:  Yeah, I was -- I thought I mentioned

Page 46

1    this earlier but it's -- the notes contemplate two scenarios

2    in which the notes could be redeemed.  One is the trigger

3    redemption, but there is also a defined term called the

4    optional redemption date which could be invoked.  And on

5    that date, the Jefferies entities had the absolute right to

6    call the notes when they provide sufficient notice of the

7    event.  And that --

8            THE COURT:  And what notice was required in order

9    to trigger the optional redemption date.

10           MR. JONES:  I would have to review the notes, but

11   I, I don't believe there's any allegation that -- I think

12   it's actually --

13           THE COURT:  I just want to make sure I understand

14   whether there was an allegation in the complaint or not.

15   What is it in the agreements -- is there anything in the

16   agreements that required a notice period for exercising this

17   optional redemption date?

18           MR. JONES:  I think there is a notice period, but

19   it was satisfied.  And let me find the (indiscernible).

20   It's Section 7.2 of the note and it defines the optional

21   redemption date and it just requires ten calendar days prior

22   written notice to the other party.

23           THE COURT:  And is there something in the record

24   that shows that that ten days' notice was given?

25           MR. JONES:  I believe in the complaint itself, the

Page 47

1    -- let me confirm this, but I believe that the Debtors

2    themselves alleged that that notice was given.  Yeah.  It's

3    --

4                MR. JURELLER:  Your Honor, with respect to --

5                MR. JONES:  It's -- Paragraph 53 recognizes that a

6    -- there was notice styled as an optional redemption that

7    was provided that then required -- it was ten days' notice

8    and required repayment in full by December 31.  And it was -

9    - notice was provided on December 21.  Paragraph 53.

10               THE COURT:  Of the first amended complaint?

11               MR. JONES:  Correct.

12               THE COURT:  Okay.  Mr. Jureller, do you agree that

13   your clients were given notice of the triggering of the

14   optional redemption date?

15               MR. JURELLER:  Your Honor, yes.  We've asserted

16   that.  I was just adding that in Paragraph 53 and 54 of the

17   complaint; however, the question is whether or not we agree

18   that that was a valid as a result of the amended -- excuse

19   me, the actual forbearance being in place, which we --

20               THE COURT:  Let me --

21               MR. JURELLER:  -- the complaint --

22               THE COURT:  -- make sure Mr. Jones, I just wanted

23   to confirm.  He's saying that notice was given of this.  Is

24   there anything else you wanted to argue, Mr. Jones?

25               MR. JONES:  No, thank you, Your Honor.

Page 48

```
 1              THE COURT:  All right.  Mr. Jureller, very, very
 2      briefly.
 3              MR. JURELLER:  Of course.  Your Honor, I was just
 4      pointing to Paragraph 53 for Your Honor's reference.  It
 5      does indicate that the optional -- notice of optional
 6      redemption was given after there was already a forbearance
 7      agreement in place through September 1st of 2024 --
 8              THE COURT:  Well, but --
 9              MR. JURELLER:  -- and it does --
10              THE COURT:  -- the forbearance agreement only
11      related to the trigger of it, not to the optional
12      redemption, correct?
13              MR. JURELLER:  I guess it's the way -- whatever
14      way you interpret it, Your Honor, but our clients
15      interpreted it as if -- that they were --
16              THE COURT:  Well, interpreted by giving me the
17      language.  If you think that the forbearance agreement
18      applied to the seven -- Section 7.2 option -- optional
19      redemption date, point me to the language that you say does
20      that.
21              MR. JURELLER:  No, Your Honor, there was two
22      different redemption dates.  One was the trigger redemption.
23      One was the optional notice of redemption. Our position in
24      the complaint was that by giving a -- providing a
25      forbearance through that time period, then all of a sudden
```

```
                                                        Page 49
 1    turning around and taking another forbearance, you know --
 2              THE COURT:  So, your position is that the
 3    agreement miraculously creates rights that are not in the
 4    agreement itself.
 5              MR. JURELLER:  Our position, Your Honor, is that
 6    the actions that the parties took were not in good faith.
 7    That's -- I guess that's the extent of it.
 8              THE COURT:  Okay.  All right.  All right.  Ms.
 9    Rice, you wanted to address the Court very briefly.
10              MS. RICE:  Very briefly.  The case in the federal
11    court is in front of Judge Alvin Hellerstein and I will give
12    you a few case cites that you requested of Mr. Jureller.
13    The Caldor Inc. v. Mattel, 817 F.Supp. 408; Key Bank of Long
14    Island v. Burns, 162 A.D.2d 501; and Solco, S-O-L-C-O,
15    Plumbing Supply Inc. v. Hart, 123 A.D.3d 798.
16              THE COURT:  If you could, just tell me what the
17    status of the matter before Judge Hellerstein is.
18              MS. RICE:  Yes.  We filed the -- a motion to
19    dismiss.  Their response is due, I believe, in the next --
20    in October.  In October.  And our reply is due in November.
21              THE COURT:  Okay.  Thank you very much, Ms. Rice.
22              MS. RICE:  Thank you, Your Honor.
23              THE COURT:  Thank you.  Is there anybody else who
24    wished to be heard with respect to the motion to dismiss
25    that's pending before the Court today?  All right, I'm going
```

```
                                                      Page 50
1     to take the matter under submission.  Thank you very much

2     for your arguments and I will rule in due course.  We are

3     adjourned.

4               MR. JURELLER:  Thank you, Your Honor.

5               MR. JONES:  Thank you, Your Honor.

6               (Whereupon these proceedings were concluded at

7     12:05 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                              Page 51

 1                    C E R T I F I C A T I O N

 2

 3        I, Sonya Ledanski Hyde, certified that the foregoing

 4   transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8   Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  September 12, 2024
```

A-652

[& - absent]                                                                    Page 1

| & |
| --- |
| **&**   6:10 |

| **1** |
| --- |
| **1**   10:19 11:16 18:5 22:16,17 28:18 43:16 44:13,15 |
| **10**   16:21 42:12 |
| **100**   30:1 35:25 36:4 37:1 38:23 39:6 |
| **10004-1408**   1:21 |
| **10019**   4:23 |
| **10036**   4:6 |
| **10166**   4:16 |
| **11**   1:23 5:3 16:21 40:23 41:5 42:12 |
| **11501**   51:23 |
| **11:00**   1:24 |
| **11th**   5:3 |
| **12**   7:19 17:9 31:1 42:18 51:25 |
| **12151**   51:6 |
| **123**   49:15 |
| **12:05**   50:7 |
| **12th**   29:12 |
| **14**   3:4 |
| **142**   4:22 |
| **15**   3:4 |
| **15th**   7:21 |
| **162**   49:14 |
| **16th**   4:15 |

| **17**   7:10 8:3,6 8:15 9:8 15:14 41:6,21 |
| --- |
| **18**   3:4 |
| **19**   3:4 |
| **1st**   33:23 42:5 48:7 |

| **2** |
| --- |
| **2**   11:18 12:2,4 12:12 28:14,15 |
| **2.6**   31:10 |
| **20**   14:18 44:18 |
| **200**   4:5,15 |
| **2014**   38:13 |
| **2019**   7:13 |
| **2022**   7:13 |
| **2023**   43:23 44:15 |
| **2024**   1:23 5:3 7:19,21 29:12 31:1 33:23 42:5 43:16 48:7 51:25 |
| **21**   47:9 |
| **22**   44:12 |
| **23**   3:4 |
| **24-01350**   1:11 3:1 |
| **24-10743**   1:3 |
| **24-1350**   5:5 |
| **2:10**   32:13 |

| **3** |
| --- |
| **3**   7:19 8:8 10:4 10:25 12:13 15:8 18:9 28:22 40:9,24 |

| 41:4 |
| --- |
| **300**   51:22 |
| **31**   47:8 |
| **329**   38:13 |
| **330**   51:21 |

| **4** |
| --- |
| **4**   10:6 16:21 42:12 |
| **408**   49:13 |
| **41st**   4:5 |
| **43**   8:16 |
| **44**   8:16 |
| **4a**   4:22 |

| **5** |
| --- |
| **5**   16:21 42:12 |
| **501**   49:14 |
| **502**   17:10,13 42:19 |
| **518**   38:13 |
| **52**   8:17 |
| **53**   47:5,9,16 48:4 |
| **54**   47:16 |
| **547**   10:20,21 11:2,14 22:18 |
| **548**   8:11 11:12 11:14,19,20 28:18 |
| **550**   16:22 17:3 42:13 |
| **551**   16:22,24 42:13 |
| **57th**   4:22 |

| **6** |
| --- |
| **6**   12:15 15:5 32:5 |
| **66**   14:20 |

| **7** |
| --- |
| **7**   3:3 14:6 15:5 15:24 16:7 32:15 33:11 37:11 40:14,19 40:20 41:1 |
| **7.2**   46:20 48:18 |
| **798**   49:15 |

| **8** |
| --- |
| **8**   15:17 40:8 |
| **817**   49:13 |

| **9** |
| --- |
| **9**   8:2 9:3,21 10:7 11:1 15:11 24:15,16 24:21 |
| **90**   18:16 |

| **a** |
| --- |
| **a.d.2d**   49:14 |
| **a.d.3d**   49:15 |
| **a.m.**   5:3 32:15 33:11 |
| **abandoned**   14:14 17:22 |
| **able**   5:20 38:7 39:18 |
| **above**   8:7 15:13 |
| **absence**   45:20 |
| **absent**   33:14 34:8 35:2,8 |

**[absent - alternatively]**                                      Page 2

39:1
**absolute** 46:5
**accelerated**
41:16
**account** 8:19
8:20 9:21 12:6
15:23
**accounts** 13:8
42:21
**accuracy** 25:11
**accurate** 51:4
**acknowledge**
9:5
**acknowledged**
18:25
**act** 32:18,21
38:22
**action** 7:9 8:2
9:24 10:14,16
14:6 15:10
16:18,25 17:10
17:22 18:2,3
21:7 25:23
28:19 33:13
35:2 42:4,16
42:20 43:11
44:3
**actions** 7:23,23
16:21 25:14
39:17 49:6
**acts** 38:20
**actual** 47:19
**actually** 9:5
14:16 20:18
21:6 46:12
**adam** 5:14

**adding** 47:16
**addition** 29:7
29:13 30:6
31:2,2
**additional** 6:13
44:24 45:18
**address** 16:20
36:15 38:23,24
43:2,3 45:13
49:9
**addressed** 12:9
**addresses**
38:14
**addressing**
42:11
**adequately**
41:3,12
**adjourned**
50:3
**admit** 43:21
**admitted** 8:14
**admittedly**
18:24
**adv** 1:11
**advance** 41:21
**adversary** 3:1
7:7
**adverse** 36:3
**advisers** 1:7
**advisors** 19:5
**afa** 28:20
**agree** 18:3,5
19:11 32:9
33:14,15 47:12
47:17
**agreed** 33:22
42:4 43:12,14

**agreement**
7:18 9:5,23,24
9:25 10:1,9,18
10:19,24 11:6
11:17,25 12:6
12:8,16 14:7,9
14:18,21,24
15:7 16:8
18:14,17 19:3
20:1,6,10,12
20:19,22 21:2
21:10 22:4,6
22:18,20,24
23:2,7,9,10,11
23:15,15,18
24:1,4,5,8,16
24:18,22 25:19
25:20,21,24
26:10,20 28:16
28:20 29:5,12
29:22 30:14,19
30:25 31:6,6
32:6,13,15
33:4,15,22
34:9,12 35:3,6
35:7,9,11,23
36:1,16,23
37:2,6,12,16
37:18,21,24
38:8,25 39:2,5
39:20 40:15
42:3 43:5,7,17
44:2,6,7,13
45:21 48:7,10
48:17 49:3,4
**agreements**
9:13 18:21

24:6 25:13
30:4,23 43:10
45:22 46:15,16
**agrees** 25:14
44:14
**ahead** 7:5 22:2
35:12 39:7
40:2 45:16
**al** 1:13,16 3:2,2
5:4,4
**allegation**
12:24 29:1,3
29:14 46:11,14
**allegations**
13:17 15:2
17:7
**allege** 10:19
12:5 14:20
15:18,21 16:12
28:24 44:7
**alleged** 9:11
13:22 14:16
16:1,15 18:8
30:5,15 38:18
38:20 47:2
**alleges** 12:23
12:25 14:19
28:19 41:7
42:9
**alleging** 15:12
**allow** 15:22
**allowed** 43:19
**allows** 17:13
**alternative**
37:12,24
**alternatively**
22:19

[alvin - based]                                                    Page 3

**alvin** 49:11
**amend** 37:12
**amended** 8:17
  14:17 18:14,15
  18:17 19:2
  20:1,6,19,22
  21:2,10 22:4,5
  22:9,16,17,19
  22:23 23:1,2,3
  23:6 24:3,5,16
  24:18,21 25:21
  26:10 28:15,16
  28:18,20,22
  29:5,11 30:14
  30:15,19,25
  31:5 32:3,6,11
  32:13,15 37:11
  37:14,15,21
  40:8,15 41:3,7
  41:12 42:8
  47:10,18
**amount** 13:11
**amounts** 8:16
  13:3
**analysis** 15:22
  22:11 32:1
  44:9
**analyze** 11:13
**answer** 11:8
  17:24
**answers** 45:3
**antecedent**
  8:19,21,25 9:7
  12:7,10
**anybody** 49:23
**apologies**
  45:12

**apparently**
  16:15
**appearance**
  5:6,13 6:3,14
  6:15,20
**applied** 48:18
**arguably** 30:1
**argue** 6:25
  16:4 19:14
  22:25 33:17
  42:6 47:24
**argued** 29:8
**arguing** 26:9
**argument** 9:19
  14:14 17:20
  21:7,9 22:22
  23:14 24:11
  26:7,14 27:1,5
  27:24 28:12
  29:11 32:20
  35:13 36:15
  37:9,25 38:1,3
  38:10,16 39:4
  39:12,14 40:2
  45:10
**arguments**
  14:8 22:10
  50:2
**article** 24:15
**aside** 10:4
**aspect** 41:11
**assert** 7:22
  10:13 12:13,15
  16:21 22:14
  28:19 34:24
  36:11 37:25
  39:8 45:24

**asserted** 14:5
  28:21 29:24
  47:15
**asserting** 35:4
  36:22 37:1,3
**assertion** 14:19
**asserts** 17:9
  18:6 32:3
  37:11
**asset** 4:13 6:6
  7:4
**assets** 13:21
  19:6 23:8 24:9
**associates** 7:20
**attached** 24:25
**attacks** 35:17
**attempt** 11:5
  16:4 17:5
**attendant** 14:2
**attention** 27:21
**attorney** 4:4,12
  4:21
**available** 10:1
  17:1
**avenue** 4:15
**avoid** 7:9 8:6,8
  10:17 11:16
  12:2 15:18
  18:7 22:17,19
  22:23 28:16
  34:3 40:9
**avoidable**
  11:22
**avoidance** 17:2
  17:4 24:3
  28:20 42:15

**avoided** 11:12
  15:12 20:1
  21:3,10 24:2
  24:10
**avoiding** 10:22
**aware** 14:2
  18:14 30:6,12
  30:20 33:8,8,9
  34:19,20

**b**

**b** 2:1 10:21
  22:18 28:18
  42:19
**b.r.** 38:13
**back** 13:3 22:5
  23:17 26:12
  35:5 36:13
  37:20 38:8
  40:1
**background**
  38:4
**bad** 41:25
**balance** 29:15
  29:19
**bank** 13:8
  49:13
**bankruptcy**
  1:1,19 2:3
  10:21 16:19,22
  17:2 18:16
  29:24 41:7
  42:13
**bargained** 9:12
  41:17
**based** 25:23
  30:13 31:25
  37:20,25

[basing - clear]                                                    Page 4

**basing** 26:7,9
**basis** 8:1 35:1
  35:4 36:21,25
  38:18
**beginning** 9:2
**behalf** 5:8 6:5
  7:2 18:12
  40:11 43:3
**believe** 5:11
  21:21,24 24:22
  24:24 29:9
  30:13,15,17
  32:24 35:7,10
  35:24 36:12
  37:3 38:3,12
  38:15 39:4
  46:11,25 47:1
  49:19
**believed** 39:16
**bench** 34:2
**better** 24:13
**beyond** 11:14
**binding** 11:9
  39:2,5
**bit** 36:7
**block** 24:3,11
**bound** 15:2,2
**bowling** 1:20
**breach** 42:3
  44:6
**breached** 44:7
**brief** 11:4
  17:11
**briefly** 16:20
  48:2 49:9,10
**bring** 33:10,10
  33:13

**burns** 49:14
**business** 30:12

**c**

**c** 4:1 5:1 49:14
  51:1,1
**caldor** 49:13
**calendar** 5:3
  46:21
**call** 46:6
**called** 27:21
  46:3
**calling** 5:3
**calls** 13:18,23
**capital** 43:15
  43:15
**capitalized**
  25:20
**caps** 44:15
**carefully** 26:13
**case** 1:3,11 5:5
  8:18 11:4,8,11
  11:12 12:20
  13:13,14,15
  15:25 16:24
  19:25 21:13,15
  21:16,23 23:1
  27:17 29:24
  31:14 32:24
  36:9 38:9,15
  38:16 39:20,24
  39:24 40:7,14
  42:7 49:10,12
**caselaw** 9:6
  12:9 13:9 14:3
  14:11 17:15
  19:23 26:7,13
  26:23 27:11,12

  27:20,22 28:10
  31:12,25 39:12
**cases** 17:12
  18:15 26:1,4
  38:3 39:13
**categories** 7:8
  16:17
**category** 7:16
  7:19 9:22
**cause** 7:23 8:2
  14:6 16:25
  17:9,22 19:5
  25:18 28:19
  42:20
**causes** 7:22
  9:24 10:14,16
  15:10 16:18,21
  18:2,3 35:1
  42:16
**center** 18:15
**certain** 10:5
**certainly** 28:9
**certified** 51:3
**cetera** 44:18
**challenge** 9:4
  11:6 12:22
  16:11
**challenged**
  14:1
**challenging**
  7:17
**chance** 45:9,11
**chapter** 15:24
  15:24 16:7
  40:14,19,20
  41:1

**chief** 8:22
**chronological**
  7:24
**chronologica...**
  7:25
**cil** 16:24
**circumstance**
  31:14
**circumstances**
  19:25 33:1
  35:15 36:7,10
  36:24 38:4,9
**cite** 11:11 17:7
**cited** 11:4 12:9
  13:13,14 14:11
  16:23 17:11
  26:22 27:23
  32:24
**cites** 49:12
**claim** 8:24
  11:12 12:14,18
  13:15,23,24
  14:15 15:21
  16:3,5,16 17:2
  17:4,9,13,20
  18:6 32:5
  33:10 35:4
  37:3 39:22
  40:12 41:4,11
  42:18 44:1
**claims** 9:10
  15:7 16:17
  17:8,11,15
  22:14 29:24
  42:9,15 45:24
**clear** 10:21
  11:21 24:16

**[clearly - court]**                                                    Page 5

**clearly** 15:15
29:21
**clerk** 5:2,12,17
5:19,21,23,25
6:8,12,18
**client** 34:3,4
**clients** 47:13
48:14
**close** 12:24
35:14
**closer** 15:17
**code** 10:21
16:19,22 17:3
17:7 19:11
42:13
**collect** 13:3
**come** 12:24
**comes** 21:22
23:16
**coming** 38:8
40:22
**commence**
13:1
**commenced**
32:16
**commercial**
34:6
**comparable**
32:3
**compare** 32:1
**compared**
18:23 40:22
**compelled** 32:9
41:20
**complaint** 7:22
8:2,14,17
10:10,12,13,16

11:18 12:23,25
13:2 14:18
15:3 16:1,19
22:9,17 23:1
28:15,18,25
29:3,9 30:6,15
32:3,11 34:9
37:11,15 39:19
40:9 41:3,7,12
46:14,25 47:10
47:17,21 48:24
**complaints**
33:16 42:8
**completed**
45:10
**completely**
45:15
**comply** 25:19
**complying**
14:17 37:23
**concern** 15:10
**concerned**
18:25 20:13
**concerns** 7:8
**concluded** 50:6
**condition** 42:1
**conduct** 14:25
**confirm** 47:1
47:23
**connection**
13:14
**consequences**
13:10 14:2
**consider** 14:14
**consideration**
14:9,13 18:20
30:18,24 31:15

35:20 37:13,15
**constitute** 9:7
14:3
**constitutes**
14:12
**constructive**
7:10 8:9 11:19
12:11 28:17,23
**contain** 43:18
**contained**
16:18
**contains** 10:2
**contemplate**
46:1
**contemplated**
43:24
**contemplates**
10:22
**contingent**
17:3
**continuing**
38:19,20 41:23
**contract** 13:4
13:16 32:9
**contractually**
38:6
**contrary** 14:19
**control** 25:14
**conveyance** 8:9
8:24 9:15
11:20 12:13
20:4 22:8
28:17 42:9,22
**correct** 44:1,16
44:23 47:11
48:12

**counsel** 5:5,13
22:21 42:11
**count** 8:2,6,10
9:3,21 10:19
11:16,18 12:2
12:4,12,13,15
12:15 14:5
15:11,17 17:9
18:5,8 22:16
22:17 28:14,15
28:22 32:5
37:11 40:8
41:5 42:18
44:4
**country** 51:21
**counts** 15:4,5
16:20 42:12,12
**course** 25:9
48:3 50:2
**court** 1:1,19
5:9,18,20,22
6:23 7:5 9:14
11:5 15:22
18:2,10,13
19:8,11,15,17
19:20,23,24
20:8,10 21:5,7
21:14,16,20
22:2,11,13
23:4,13,21
24:19 25:2,5,7
25:23 26:1,6
26:11,17,25
27:3,8,14,17
27:18,20,22,23
28:3,6,8,10,12
28:23 29:14

[court - discussed]                                                    Page 6

31:13,16,20,23
32:1,17,25
33:12,14,20
34:1,16,21,23
35:12,19,21
36:2,9,13 37:8
38:2,13,15,22
39:11,21 40:1
40:21 42:25
44:10,17,21
45:1,4,6,9,13
45:13,16,19
46:8,13,23
47:10,12,20,22
48:1,8,10,16
49:2,8,9,11,16
49:21,23,25
**courts** 32:19
33:24
**covenant** 41:23
**covers** 16:17
**create** 13:25
34:20,24
**created** 13:20
**creates** 49:3
**creditor** 20:15
**creditors** 16:15
18:23 19:1
**crisis** 13:20
14:1
**critically** 10:7
**cross** 31:9
**custom** 9:14

**d**

**d** 5:1 17:10,13
**damage** 36:18
36:20

**damages** 13:3
**date** 7:15 41:17
41:18 46:4,5,9
46:17,21 47:14
48:19 51:25
**dates** 21:25
41:15,21 48:22
**day** 14:20 31:7
**days** 14:12
16:11 18:16
40:15 46:21,24
47:7
**deals** 45:21
**deanna** 5:18,20
**death** 34:22
**debt** 8:19,21
8:25 9:7 12:10
19:2,4 20:11
31:8,8,9 38:23
40:23 43:11
**debtor** 1:9 7:11
7:20 10:7,15
10:23,25 11:2
11:22,23,24,24
16:2,14 19:5
20:16 23:14,16
23:19,22,22
28:24 29:7,14
29:19 30:14,16
30:20 33:2,2
**debtor's** 10:10
11:5 12:9
13:13,21 37:19
**debtors** 7:18
8:6,11,14 9:3
9:10,12,19
10:3,3,4,6,8,13

10:19 11:8,19
12:1,5,15
13:20,23 14:5
14:13,15,18,20
14:21 15:2,17
15:21 16:12
17:5,16,19
18:13,17,22
19:1,13,16
20:2,13 21:2
22:21 23:8
24:9 26:20
30:8 31:11,17
31:19,21 34:11
37:4 41:8,20
42:2 43:21
44:1,5 47:1
**debts** 12:7 16:5
29:16,20,22
44:3
**december**
21:24 47:8,9
**deciding** 36:10
**declaration**
10:2 14:6
24:23,23,25
**deemed** 22:12
**default** 41:23
41:24
**defendant**
22:21
**defendants**
1:17 4:12 5:13
6:5 7:3 13:17
14:16 15:11,23
18:22,24 31:9
32:25 37:20,22

38:21 40:11,13
40:16 41:4,25
43:3,6 45:24
**defined** 25:20
43:13 46:3
**defines** 46:20
**definition**
12:20
**demand** 32:13
**demands** 38:20
**demonstrating**
14:11
**dependent**
42:15,20
**derives** 11:9
**details** 32:12
**determinations**
42:21
**determined**
23:11
**difference**
23:24
**different** 7:8
9:4,23 10:2,15
10:16 17:2
20:20 37:17
43:20 48:22
**directly** 14:19
28:10
**disallow** 17:10
**disallowance**
17:13
**disappear** 20:6
21:2
**discuss** 23:25
**discussed** 8:7
15:13

**[discussing - fact]**                                                     Page 7

discussing 42:4
discussions
37:20
dismiss 3:3
6:25 8:23
10:11,12 16:3
16:16 18:1,4
21:6,20 22:12
25:1,23 27:13
27:17 32:20
39:22 41:10
42:8 49:19,24
dismissal 8:10
28:5
dismissed 9:21
11:16 12:4
15:5,6 17:8,15
17:23
dismissing
12:1,12
dispute 15:20
disputed 12:17
distinct 16:2
distinction
26:2,14 27:5
27:25 29:17
district 1:2
21:5,7,19
25:23 27:17,22
27:23
doc 3:3
document 35:6
36:24
documentation
37:6
documents
38:7

doing 34:13
39:3
dollar 9:6,7,20
9:20
draws 29:17
due 13:4,19
21:24 29:21,23
30:2 32:6
37:13 43:22
49:19,20 50:2
duress 12:16
13:16 32:7,8
32:22 37:13,18
38:19 44:9

**e**

e 2:1,1 4:1,1,8
5:1,1 51:1
earlier 13:15
40:15 46:1
easiest 7:24
easily 26:17
economic
38:19
ecro 2:5
effect 36:3
44:14
effectively
17:22
effort 14:23
either 17:17
22:7
elements 12:17
elevate 18:22
18:23 22:6
ends 9:9
enter 33:4

entered 12:6
18:16 30:4
entering 30:25
32:12
entirely 11:15
43:18
entirety 8:10
11:6 12:5 15:6
17:11 18:21
22:23 23:12
entities 13:24
14:22 15:1
17:11,17 19:5
25:11 30:9,20
31:3 43:21,23
44:2 46:5
entitled 40:20
entity 43:11
equity 29:4
equivalent
8:13 9:7 18:19
29:8 30:18
31:5 32:4 41:9
41:11,13
essential 21:8
establish 32:21
40:18
establishes
17:2
et 1:13,16 3:1,2
5:4,4 44:18
event 17:1 44:5
46:7
exactly 33:4
44:20
excellent 34:5

except 31:22
exchange
18:19 31:5,7
excuse 18:22
28:15 47:18
executed 7:18
14:21
exercise 12:19
44:14
exercising
25:15 43:14
44:22 46:16
exhibit 10:1
24:22,24
existed 38:19
43:14
existing 19:2
explain 13:2
explained
10:23 11:25
expressing
39:9
extensions
44:24
extent 10:13
11:16 12:2,13
18:6 40:17
49:7
extremely 13:7
28:5

**f**

f 2:1 51:1
f.supp. 49:13
fact 9:4 18:24
20:25 22:15
28:19 31:2
33:3 35:3

[fact - given]                                              Page 8

37:22
**facts**  8:12 9:11
    12:24 13:22
    14:19 15:21
    16:1,4,12
    19:24 22:12
    28:25 30:5
    31:4,14 32:25
    36:24 37:25
    38:4,8,17 43:8
**factual**  40:6
    43:9
**fail**  23:15,18
**failed**  13:24
    26:20
**failing**  29:15
**failure**  13:3
**faith**  33:24
    35:1 41:25
    49:6
**fall**  20:13
**family**  25:18
**far**  30:4
**fashion**  42:14
**features**  7:14
**february**  7:19
    7:21 29:12
    31:1
**federal**  45:8
    49:10
**file**  32:20 33:15
    34:4,9 36:17
**filed**  14:22
    21:21 32:19
    35:2 36:19
    49:18

**filing**  18:16
    34:23,25 35:8
    36:4,18 38:5
    39:1 43:7
**final**  14:5
**financial**  30:9
    42:1
**financials**  33:9
**financing**
    14:22
**find**  38:12
    39:21 46:19
**finding**  17:17
**fine**  26:12
**finishing**  31:24
**first**  7:9 14:8
    14:10 15:11
    22:9,16 23:1
    28:15,18,22
    30:15 32:3,11
    32:13 37:11,14
    40:8 41:2,7,12
    42:8 44:8
    47:10
**five**  16:18
    41:17
**floor**  4:15
**focused**  10:11
**focuses**  41:10
**follow**  23:13
    23:13,18
**forbear**  20:16
    33:22 42:4
    43:14,17
**forbearance**
    7:17 9:5,23
    10:17,23 11:17

    11:25 12:6,16
    14:7,11,17,21
    14:24 15:7
    16:8 18:14,15
    18:17 19:3
    20:1,6,12,19
    20:22 21:2,10
    22:4,5,17,20
    22:23 23:2,7
    24:3,5,16,18
    24:22 25:20,21
    26:10 28:16,20
    29:5,12,21
    30:14,19,25
    31:6,6,7 32:6
    32:15 33:14,21
    34:8,12 35:2,5
    35:8,11,23
    36:16,23 37:2
    37:6,12,16,21
    37:23 38:8,25
    39:2,2,20
    40:15 42:3
    43:5,7,9 44:12
    44:17 47:19
    48:6,10,17,25
    49:1
**forbearances**
    43:12
**forbearing**
    45:21
**foregoing**  51:3
**forth**  37:14,20
**founded**  13:11
**four**  10:15
**fraudulent**
    7:10 8:9,24

    9:15 11:20
    12:11,13 15:13
    20:3 22:7
    28:17,21,23
    42:9,22
**free**  12:20
    32:10
**freehills**  4:11
    6:5 7:2
**front**  18:14
    25:7 28:11
    49:11
**frozen**  13:9
**full**  41:25 47:8
**fully**  33:8,8,9
**function**  6:2
**fund**  13:24
**further**  21:3
    24:18 25:13
    42:23 45:17

g

**g**  5:1
**general**  22:1
**generally**
    12:25
**george**  4:21
    10:7,14 12:2
    26:18 45:8
**give**  5:6,13
    6:15 38:9,11
    45:9,11 49:11
**given**  6:14
    30:24 31:5
    32:1 46:24
    47:2,13,23
    48:6

[giving - indicates]                                                    Page 9

**giving**  48:16,24
**glenn**  2:2 45:5
**go**  7:5,25 11:13
   22:2 26:12
   28:12 35:5,12
   36:13 37:8
   39:7 40:1,2
   45:16
**goes**  24:1 32:11
   44:8
**going**  5:9,14
   6:24 22:10
   33:1,8 34:19
   36:14 38:24
   49:25
**gonzalez**  8:22
**good**  5:7 6:24
   33:24 35:1
   49:6
**governance**
   25:15
**governing**  27:4
**government**
   3:3
**grander**  21:8
**grant**  19:6
**granted**  10:6
   14:23 18:1
**granting**  8:23
   18:7
**green**  1:20
**grist**  34:6
**ground**  15:18
**grounds**  32:7
**guarantee**  10:8
   19:6,22 20:7,9
   20:11,16,21,24

20:25 21:1,9
21:12,25 23:23
24:1,4,11,12
24:17 25:10
26:3,3,15,15
26:19 27:6,6
27:25 28:1
**guaranteed**
   10:5 26:18
   27:9
**guarantees**
   11:1,1,3 12:3
   19:13 20:4
   25:11 31:9
**guarantors**
   23:22 31:16,18
**guess**  48:13
   49:7
**gwa**  1:13 3:1
   5:3 7:11 8:4
   10:4 19:4
   40:11,22,22
   44:17

**h**

**hand**  6:2 36:8
   36:8
**handles**  15:6
**handling**  6:11
**happened**  33:5
   40:6
**happens**  36:19
**hard**  34:2
**harm**  33:3
   34:20,24 39:17
**hart**  49:15
**hear**  5:14,20
   36:17

**heard**  49:24
**hearing**  3:1,2
   5:2 21:24
**held**  8:23 16:24
**hellerstein**
   49:11,17
**herbert**  4:11
   6:4 7:2
**hereunder**
   25:13
**holding**  12:10
   14:3
**holdings**  4:13
   6:7 7:4
**holds**  9:6
**hon**  2:2
**honor**  5:7 8:17
   17:24 18:11,13
   19:14 20:18
   22:3,11,25
   23:7,10,25
   24:7 26:5,22
   27:7,10 28:2,4
   28:11,14,18
   29:2,3,6,13,18
   30:1,5,13,17
   30:19 31:12,22
   31:24 32:11,23
   33:6,17,23
   34:15 35:10,14
   35:25 36:6
   37:5,10,11
   38:12,12 39:15
   40:3 41:2,12
   42:6,14,23
   45:12,18 47:4
   47:15,25 48:3

48:14,21 49:5
49:22 50:4,5
**honor's**  48:4
**hurford**  37:10
**hyde**  3:25 51:3
   51:8
**hypothetical**
   15:24 16:7

**i**

**idea**  22:1
**illicit**  13:23
**important**  9:25
**impossibly**
   13:11
**inability**  29:20
**include**  11:1
   32:8
**included**  11:7
   44:13
**includes**  10:24
   11:25
**including**  11:1
   14:12 17:12
   25:15 34:10
   35:16
**incurred**  11:23
   18:18
**indebtedness**
   30:2
**independent**
   12:5 16:25
**indicate**  39:16
   48:5
**indicated**
   14:16
**indicates**  31:12

[indiscernible - keep]                                              Page 10

**indiscernible**
40:1 46:19
**individually**
21:5,23
**inferred** 16:6
**inflated** 13:18
**influence** 32:7
32:8,22
**initial** 44:12,15
**initiate** 43:24
**initiating** 43:6
43:18
**injury** 12:21
12:25 13:12
14:4
**inside** 8:8
**insofar** 20:13
**insolvency**
29:1,10
**insolvent** 28:24
29:7,15,20,20
30:16 41:8
**instance** 20:1
41:1
**intended** 18:21
23:2 24:8
**intent** 15:1
19:2 22:5 23:3
23:6,9 37:22
**intention** 14:17
**interest** 10:22
10:25 11:22
13:19 14:23
18:18 19:6
20:3 23:8 24:9
**interests** 10:6
18:7

**interpret** 48:14
**interpreted**
48:15,16
**interpreting**
26:17
**invalidate**
10:17
**investing** 42:2
**investment**
30:11
**investments**
1:16 3:2 4:13
5:4 6:6 7:3,12
8:4
**invoke** 11:19
16:19
**invoked** 43:21
46:4
**involve** 10:3,3
**involved** 30:10
**irrelevant** 9:13
11:15 16:9
**irreparable**
33:3 34:20,24
39:17
**irrevocable**
25:10
**island** 49:14
**issue** 8:3 15:8
21:6 38:24,25
43:25
**issued** 7:12
10:8 11:1
13:18,23 20:21
**issues** 31:13

**j**

**j** 10:1 24:22,24
**jefferies** 1:16
3:2 4:12 5:4
6:5 7:3,11 8:4
13:1,24 14:22
15:1 17:10,17
19:12 21:4
22:7 25:11
26:18 29:22
30:2,6,9,12,21
30:22 31:8,10
33:6,7,15,18
34:9 35:1,8,19
35:22 36:3
37:3 43:6,10
43:20,23 44:2
46:5
**john** 4:8 5:7
6:11 18:12
**joined** 5:25
6:18
**joining** 5:10
**jones** 4:18 6:4
6:4 7:1,2,5,7
18:2,5 36:15
36:17 38:24
42:25 43:2,2
44:16,20,23
45:2,10,16,17
45:25 46:10,18
46:25 47:5,11
47:22,24,25
50:5
**jsi** 7:21 16:6,8
16:10,13,14
40:9 43:14

44:13 45:23
**judge** 2:3 5:21
6:21 8:22 45:5
49:11,17
**july** 44:15
**jureller** 4:3,8
5:7,8,11 6:10
6:11 10:1
18:10,11,12
19:8,10,14,16
19:18,21 20:9
20:18 21:15,18
22:3 23:6,20
23:24 24:20,21
25:4,6,9 26:4,9
26:16,22 27:2
27:7,10,16,19
28:2,4,7,9,14
29:2,18 31:18
31:21,24 32:23
33:13,17,21
34:14,17,22
35:10,14,20,22
35:24 36:6,12
37:5 38:11,17
39:10,15 40:2
40:3 42:25
43:1 47:4,12
47:15,21 48:1
48:3,9,13,21
49:5,12 50:4
**justifies** 12:1

**k**

**kaplan** 4:20
**karen** 2:5
**keep** 30:11
38:8

A-662

**[key - minutes]**                                                  Page 11

**key**  7:14 49:13
**kind**  22:1 32:5
  40:6
**klestadt**  4:3,9
  5:8,9 6:9,9,9
  18:12
**knell**  34:22
**know**  9:25 20:2
  20:14 21:18
  25:2 34:1 39:8
  40:5 49:1
**knowledge**
  34:18 42:1
**known**  41:23
**knows**  22:11

**l**

**l**  4:9 49:14
**lack**  14:8 37:13
  37:13
**language**  24:15
  24:19 25:3,24
  26:10,12,18
  44:13 45:21
  48:17,19
**large**  34:5,6
**law**  9:4 12:11
  16:23 27:4,24
  32:7 33:10
  43:8 44:4
**laws**  29:16
**lawsuit**  32:21
  34:24,25 35:2
  35:8 36:4,11
  36:17,19 38:5
  39:8 43:6,18
**lawsuits**  32:19
  36:19 43:24

**leaves**  15:7
**ledanski**  3:25
  51:3,8
**legal**  51:20
**legally**  37:3
**length**  14:12
**leucadia**  4:13
  6:6 7:3
**liabilities**  16:5
**liable**  17:14,18
**limited**  24:12
  24:12,17 25:24
  25:24
**line**  6:20
**linked**  11:24
**liquidation**
  13:21
**liquidity**  13:20
  13:25
**listed**  40:23
**litigation**  13:1
  13:7,9,10 14:1
  14:3 32:16,17
  39:22
**llc**  1:7,13,16
  3:1,2 4:13,14
  5:4,4 6:6,7 7:3
  7:4
**llp**  4:11,20 6:5
**loans**  20:23
**long**  49:13
**longer**  21:11
  21:11,12
**look**  19:24
  24:14,15 26:13
  33:7,24 34:1
  35:5 36:9

  40:21
**looked**  27:8
**looking**  32:5
  34:17,18 35:15
**looks**  22:13
  31:13 32:25
**loop**  35:15
**lost**  24:23
**lot**  21:8

**m**

**made**  7:11,14
  7:20 8:4,8,13
  8:15,19,20,21
  9:1 15:15,19
  16:14 25:12
  27:1,5 40:10
  40:17 41:8
  43:22
**main**  8:11
  10:10
**make**  9:19
  41:20 44:11
  46:13 47:22
**makes**  9:10
**man**  5:16
**management**
  4:13 6:6 7:4
  25:16
**manifestation**
  15:1
**manipulation**
  41:14
**margin**  13:18
  13:23
**marketing**
  42:2

**martin**  2:2
**mattel**  49:13
**matter**  1:5
  6:11 12:10
  43:9 49:17
  50:1
**matured**  29:16
**maturity**  41:15
  41:17,21
**mean**  20:13
  29:21 32:18
**means**  16:16
  32:9
**meeting**  37:14
**memo**  16:23
**mention**  17:20
**mentioned**
  45:25
**mg**  1:3,11 3:1
**michael**  4:18
  6:3,4 7:2 43:2
**michelle**  4:25
  45:7
**million**  7:10,19
  8:3,7,8,15 15:8
  15:14 30:2
  31:10 35:25
  36:5 37:1
  38:23 39:6
  40:9,23,24
  41:4,6,21
  44:18
**mind**  34:25
**minds**  37:14
**mineola**  51:23
**minutes**  6:22

**[miraculously - optional]**                                   Page 12

**miraculously**
49:3
**monday** 32:14
**money** 33:16
38:5 40:16
**monies** 20:23
40:20
**month** 21:22
**monthly** 30:9
**morning** 5:7
5:15 6:1,14,19
6:24 32:14,14
33:10
**motion** 3:3
6:25 7:1,25
8:23 10:11
15:3 18:1,4,24
21:6,20 22:12
22:22 25:1,22
27:12,16,20,22
27:23 28:5
39:22 41:10
42:7 49:18,24
**motions** 32:19
**moved** 10:12
21:19
**moving** 9:22
14:10
**multi** 1:7 19:5
**multiple** 20:14
**mute** 43:1

**n**

**n** 4:1 5:1 51:1
**name** 45:7
**nature** 24:13
**necessarily**
8:25 23:18

**necessary**
12:18
**need** 33:7
**needs** 19:24
**negative** 29:4
**negotiated**
9:15
**negotiation**
30:11
**negotiations**
33:25 34:3
35:3
**neighborhood**
35:25
**new** 1:2,21 4:6
4:11,16,23 6:5
32:7
**night** 32:14
33:11
**non** 10:3,7,15
11:1,24 12:1
19:13,16 20:16
23:14,19,22
31:17,19
**nonvoidable**
11:7
**nosed** 34:2
**note** 8:18,20
9:13 13:4
15:15 41:19
46:20
**notes** 7:12,21
8:5,16,25 9:11
9:14 10:5 12:7
13:25 30:3
41:15,16,18,18
41:22,23 43:13

43:18,22 46:1
46:2,6,10
**notice** 41:24
43:20 45:22
46:6,8,16,18
46:22,24 47:2
47:6,7,9,13,23
48:5,23
**noting** 17:12
**november**
49:20
**null** 14:7 37:12
40:5
**number** 5:5
**ny** 1:21 4:6,16
4:23 51:23

**o**

**o** 2:1 5:1 49:14
49:14 51:1
**objective** 14:25
**obligated**
30:23
**obligation** 8:18
8:20 11:23
21:3 31:3
40:14,18
**obligations**
9:20 10:5,14
11:7,7,13 12:1
12:7 18:18
19:4,7 20:5,21
20:23 21:1
24:4,6 29:23
29:25 30:20
37:23
**observation**
16:9

**obtaining**
19:12
**obtains** 20:16
**obviously**
21:11 34:10
40:4
**occur** 33:3
**occurred** 16:11
**october** 49:20
49:20
**officially** 42:8
**ogi** 7:20 15:9
16:2,8,14
30:21 40:9,10
40:14,22
**ogi's** 16:4
**okay** 5:9,12,17
5:22 6:8,12
25:4,6 31:20
31:23,24 33:12
36:25 37:8,10
40:3 45:1,16
47:12 49:8,21
**old** 51:21
**open** 17:24
25:7 39:9
**opening** 16:23
**opposition** 9:3
9:8,10 12:9
13:2,13 14:15
16:3 17:6,19
21:21 25:1
26:23 27:12
**option** 48:18
**optional** 43:19
46:4,9,17,20
47:6,14 48:5,5

[optional - position]                                          Page 13

48:11,18,23
**order**  10:18
46:8
**outright**  16:3
**outset**  18:13
**outside**  7:14
9:15
**overreaching**
10:12
**owe**  16:8
**owed**  16:10
20:24 31:10
33:16 35:21,22
35:24 36:5
38:6,23 39:5
40:16
**owing**  8:16
29:23

**p**

**p**  4:1,1,18 5:1
**page**  9:8 44:11
**paid**  26:19
**papers**  14:11
**paragraph**
14:20 24:21
44:13 47:5,9
47:16 48:4
**paragraphs**
8:16
**park**  4:15
**part**  15:5
**particular**
13:17 14:13
15:12 19:25,25
21:15,23,25
22:10 29:19
31:3,25 33:19

34:19 39:20
41:22 43:13
**parties**  5:25
6:13,18 19:12
20:22 21:4
22:7 23:14
25:13,17 26:19
30:21,22 31:10
31:21 33:6,7
33:24 34:5,10
34:19 35:3,7
35:16 36:8
37:17 49:6
**partner**  6:10
**party**  12:22
23:16 30:11
32:9 33:9,23
33:25 34:24
35:4 36:10,21
36:25 38:4
39:16,18 46:22
**party's**  32:10
**pause**  5:23,24
6:16,17
**pay**  7:21 8:15
13:3 15:15
29:15,20 44:18
**payable**  43:22
**paying**  8:25
**payment**  7:20
8:8 15:8,11,12
15:14,23 16:14
20:25 24:5
26:3,15 27:6,9
28:1 40:9,10
40:17,21,24
41:5,20,22

**payments**  7:10
7:13 8:4,7,12
8:15,19,20
9:21 13:19
15:14 41:6,15
42:10
**pending**  21:16
21:19 49:25
**pennysaver**
17:12
**perfect**  14:23
**performance**
20:21,24 21:1
21:9,11 25:12
25:25 26:3,15
27:6,8,25
**performances**
10:9
**period**  7:15 8:9
9:16 15:19
29:6,10 30:10
30:16,21 41:6
46:16,18 48:25
**personal**  10:8
12:3 25:18
35:17
**personally**
25:10
**persons**  25:18
**persuading**
39:11
**petition**  7:15
**picking**  39:6
**place**  34:12
39:1 47:19
48:7

**plain**  11:2
**plaintiff**  38:18
39:5
**plaintiff's**  43:7
**plaintiffs**  1:14
4:4 5:5,8 6:10
**plausible**  22:14
38:18 39:23
**plead**  8:12
15:20 39:18
**pleaded**  12:18
**pleads**  41:3,13
**please**  6:1,15
6:19
**pled**  17:4 22:9
23:1 40:11
42:13,16
**plumbing**
49:15
**pm**  50:7
**point**  14:10
23:5,17 24:19
26:11 27:14,15
28:8 29:19
31:25 35:22
36:15 38:2,7
39:25 45:3
48:19
**pointed**  36:14
**pointing**  26:12
37:7 48:4
**points**  13:15
20:25
**portions**  12:12
18:3
**position**  17:21
22:6 23:10

[position - record]                                                    Page 14

24:7,14 34:13
43:8 48:23
49:2,5
**positions** 18:23
34:14
**possible** 28:19
**possibly** 32:18
**potential** 36:20
**powers** 25:16
**precise** 25:2
28:8
**precisely** 34:7
**preclude** 38:4
**precluded**
12:19 34:12
35:7 36:4 37:3
39:1,2 43:5,10
**precludes**
32:10
**precluding**
35:4 36:21,25
**preference**
7:15 8:9 15:19
15:21 18:6
20:2 23:16
24:10 26:21
**preferences**
42:22
**preferential**
10:20 22:8,18
23:11 29:6
40:10 41:3
**premature**
17:16,23
**prepetition** 8:3
**preserve** 45:23

**presumed** 8:21
29:6
**presumption**
29:9,17 30:5
**previously**
11:25
**principal** 8:16
13:19 15:15
20:17
**principals**
23:22
**prior** 16:7
40:14 41:6
43:6,15 44:15
46:21
**prioritize** 19:1
**problem** 10:10
**proceeding** 3:1
7:7 16:7 41:1
**proceedings**
50:6 51:4
**product** 12:16
**prohibition**
19:12,22
**prong** 22:11
44:8
**property** 10:23
10:25 11:23
18:18 22:20,24
**provide** 16:25
23:7 24:8 28:9
31:7 46:6
**provided** 30:18
31:15 41:24
44:17 47:7,9
**provides** 9:25
16:25 19:11

**providing** 30:8
48:24
**provision** 17:3
24:16 26:23
43:19 45:19,20
**provisions**
10:2 16:20
17:7 20:5
22:19 28:22
44:24
**purport** 16:21
**purported**
31:6
**purports** 22:20
**pursuant**
28:17
**pursue** 44:5
**putative** 39:5

**q**

**question** 9:9,18
15:17 16:10,11
19:9 34:25
37:22 40:24
43:4 47:17
**questioning**
27:4
**questions**
17:24 42:24
45:18
**quickly** 10:18
38:13 42:11
**quite** 11:21

**r**

**r** 2:1 4:1 5:1
43:15 51:1

**raised** 6:2 14:8
**raising** 26:11
31:8
**rangers** 11:11
**rather** 20:24
**read** 20:19
23:2 25:4 28:3
28:4 39:13,15
40:1
**really** 7:16
**reason** 8:11
12:5
**reasonable**
29:8
**reasonably**
8:13 18:19
30:18 31:4
32:4 41:9,10
41:13
**reasoning**
41:22
**reasons** 15:4
**recall** 29:11
**receive** 9:12,20
**received** 15:23
16:6,13 32:2
40:13,25
**recognized**
8:17 9:14
**recognizes**
26:14 27:24
47:5
**record** 5:15 6:1
6:13,19,20
18:12 43:3
46:23 51:4

[recover - secured]                                                    Page 15

**recover** 33:16
36:4 37:1 38:5
38:23
**recovery** 42:15
**redeemed** 46:2
**redemption**
43:15,19 44:15
44:22 46:3,4,9
46:17,21 47:6
47:14 48:6,12
48:19,22,22,23
**reduction** 9:7
9:20
**reference** 48:4
**refused** 13:18
**regarding** 29:3
**rejected** 11:5
**related** 12:8
43:11 48:11
**relates** 24:17
29:11 41:5
**relating** 9:11
9:24 44:3
**relationship**
12:8
**relied** 32:24
**relief** 22:14
**rely** 13:6 39:25
**relying** 26:2
27:10,13 44:19
**remainder**
20:12
**remedies** 17:1
43:13
**remedy** 44:5
**repayment**
47:8

**repeat** 17:6
**repeated** 38:6
**repeats** 17:20
**reply** 21:24
49:20
**represent** 45:8
**representation**
34:5
**representations**
25:12
**representing**
21:22
**represents**
14:25
**reputation**
13:8 36:20
**reputational**
36:3,18
**request** 17:25
**requested**
49:12
**required** 8:12
15:21 21:12
46:8,16 47:7,8
**requirements**
13:25
**requires** 32:1
46:21
**rescind** 12:16
13:15
**rescission**
12:18 32:6,8
**respect** 19:22
20:4,4 22:12
22:16 25:16
26:4,23 28:14
29:10,17,22,25

30:2,3,19,24
31:13 32:4,12
37:16,24 40:4
40:4,5,7,8,11
41:4,5,18,19
42:9,12,18,21
47:4 49:24
**respectfully**
17:25 32:2
**respond** 14:13
**response** 49:19
**restructuring**
11:6
**result** 16:12
38:19 39:17
47:18
**resulting** 9:6
**returned** 14:10
**review** 31:4
36:7 46:10
**rice** 4:20,25
45:5,7,7,9,12
45:14 49:9,10
49:18,21,22
**right** 5:2,14,17
6:16 18:10
23:24 27:2
28:9,12 29:2
29:18 33:18
35:12 37:8
43:23 45:4
46:5 48:1 49:8
49:8,25
**rights** 25:16
34:25 36:11,22
36:22 37:1
39:8 44:14,22

45:23 49:3
**rise** 38:18
**road** 51:21
**rough** 34:4
**roughly** 39:7
**ruin** 35:17
**ruined** 13:8
**rule** 32:19 50:2
**running** 30:12

**s**

**s** 4:1 5:1 49:14
**satisfied** 46:19
**saying** 34:7,8
34:21 36:2,6
47:23
**says** 22:21 25:6
25:9 36:9
38:17,17
**scenarios** 46:1
**schedules**
40:22
**scott** 5:13
**second** 7:16
9:22 11:18
14:9 21:4
24:25 38:11
44:10
**section** 8:11
9:4 10:4,5,7,20
10:25,25 11:2
11:12,14,19,20
16:22,24 17:3
46:20 48:18
**secure** 19:3
20:3 22:4
**secured** 31:9

**[securing - suit]**                                    Page 16

securing  12:10

security  10:6
14:23 18:7
19:6 20:3 23:7
24:9

see  6:16 22:13
26:17 27:3
32:18 39:13

seek  8:6,7
38:22 39:8

seeking  10:13
12:22 14:6
17:10 18:6
32:16 34:3

seeks  7:9 11:16
12:2 22:17
28:16 40:9

seen  20:14
45:20

separate  7:20
43:19

separately
31:11

separation
44:21

september
1:23 5:3 33:23
36:16 42:5
43:16 44:12
48:7 51:25

series  7:12

set  37:14 43:20

setoffs  31:10

seven  41:19
48:18

several  9:23
10:2 17:12

37:16

sheet  29:15,19

show  8:12 31:4
36:9

showing  16:12
17:4 40:12

shows  46:24

sign  37:21

signature  51:6

signed  14:10
32:15 33:11
35:23 37:18
43:10 44:25

similar  13:22
17:15 44:23

similarly  8:23
17:3

situation  30:7

skepticism
39:9

smith  4:11 6:4
7:2

solco  49:14

solely  20:7,24
21:9 22:6 24:8
29:11

solutions  51:20

somewhat
20:20

sonya  3:25
51:3,8

sophisticated
34:5

sorry  24:23
29:13 35:21
43:1

southard  6:10

southern  1:2

speaking  5:15
6:1,13,19

specific  28:22

specifically
11:5 16:24
19:15,21 36:14
36:15 38:25
43:13

spent  34:2

stage  39:21,22
42:7,8

stand  20:11
23:23

standard  42:19

standpoint
37:19

start  7:1

started  6:21,23
6:24

starting  5:2
32:13

state  6:20

stated  22:22
33:16 34:9

statements
13:6 14:22
30:9

states  1:1,19

stating  35:1

status  21:17,20
49:17

statute  11:10

statutorily
17:1

stevens  6:10

stop  44:10

strategic  1:16
3:2 4:12 5:4
6:6 7:3,11 8:4
12:8

strategy  1:7
19:5

street  4:5,22

strong  28:5,6

styled  47:6

subject  8:10
9:17 21:6
25:22 33:21

subjective  13:6

submission
50:1

submit  9:2
32:2 41:11
42:7

submitted
21:21 27:11,12

subsidiaries
25:17

substance  23:9

sudden  48:25

sued  21:4 34:3

sufficient
28:19 32:21
39:21 46:6

sufficiently
18:8 22:9
39:18

suggesting
13:10

suit  34:4

[suite - tumble]                                                    Page 17

**suite** 4:22 51:22

**summarily** 17:8

**sunday** 32:14 33:11

**supply** 49:15

**support** 12:12 27:4,24 29:1 38:3 39:4

**supported** 39:13

**supports** 19:24 26:7,14 32:20 38:9,16 39:12

**supposedly** 17:18

**sure** 25:9 28:3 44:11 46:13 47:22

**survive** 18:3

**suspect** 41:2

**sustained** 13:16

**t**

**t** 43:15 51:1,1

**take** 6:3 10:18 17:5,5,21 25:14 44:3 50:1

**taken** 19:3 35:20 39:17

**takes** 8:3

**talked** 37:19

**talking** 19:18 39:7

**tell** 24:24 36:24 49:16

**ten** 46:21,24 47:7

**term** 46:3

**terms** 20:19 25:19

**texas** 11:11

**text** 10:21 11:2 11:9,21

**thank** 5:12,16 5:17 6:8,12,24 7:5,7 18:11 37:10 40:3 42:25 45:15 47:25 49:21,22 49:23 50:1,4,5

**theories** 10:15

**theory** 11:18 11:20 14:5

**thing** 36:13,23 38:7

**things** 11:21 20:14 35:17 41:14

**think** 7:24 8:10 9:8 11:15 12:4 12:23 15:4,20 17:7 18:8,9 19:23 20:18 23:24 24:13 29:18 34:15,17 42:16 46:11,18 48:17

**third** 7:19 12:15 30:11 33:9 41:19

**thought** 45:14 45:25

**threat** 12:19,21 12:21 13:11 32:10,17,20 44:4

**threatened** 13:1,20 35:16 43:25

**threatening** 33:10

**threats** 13:3,7 14:1,3

**three** 7:8,13 16:10,17 30:20 40:15

**time** 18:25 21:22 28:25 29:4,4,10,19 30:13,16,21,23 32:19 33:1,2 33:19 35:21,23 42:1 48:25

**timeline** 7:24

**times** 20:14

**tmst** 11:4 12:20 13:14 32:24 38:13 39:3,15,24

**today** 49:25

**told** 45:10

**took** 49:6

**total** 7:13

**tracy** 4:9 6:8,9

**transaction** 7:16,17 12:22 33:9

**transactions** 7:9 9:22 34:6

**transcribed** 3:25

**transcript** 51:4

**transfer** 8:1,1 10:20,22,24 11:22 12:11 15:8,13,18 16:11,13 22:8 22:18,20,24 23:11 28:21,24 40:10 41:3

**transferee** 17:14

**transferred** 18:18

**transfers** 7:10 8:24 9:6,18 17:18 41:8

**treatises** 26:25

**trigger** 43:15 44:15,21 45:22 46:2,9 48:11 48:22

**triggering** 47:13

**trinsum** 8:22 9:14

**true** 18:8 22:13 22:15 51:4

**trust** 25:18

**trustee** 17:1

**try** 30:11

**trying** 38:12

**tumble** 34:4

**[turn - york]**                                                    Page 18

**turn** 13:18
43:23
**turning** 49:1
**two** 7:14,15
9:15 11:13
12:17,19 14:7
14:12 15:4,10
20:25 22:11
26:1 30:10
31:7 38:3 41:6
41:18 45:2,3
46:1 48:21
**types** 31:13
**typical** 23:21
42:14

**u**

**u.s.** 2:3
**ucc** 14:22
**ugly** 13:7
**ultimately** 7:8
43:21,24
**unconditiona...**
25:10
**unconsciona...**
44:8
**under** 7:12 8:5
8:11,16 9:12
10:5,9,16,20
11:2,12,14
12:7 13:4,16
14:23 16:22
17:2,10 18:8
18:17 20:6,22
20:23 21:2,7,8
22:18 24:5,6
25:20,25 26:19
32:7 35:25

37:15,18,23
41:15,16,21,23
42:13,15,19,21
43:13 44:4
50:1
**underlying**
9:11 30:22
**understand**
7:25 23:4,5,17
34:7 44:12
45:14 46:13
**understanding**
28:2
**understands**
33:2
**undue** 32:7,8
32:21
**united** 1:1,19
**unlawful** 12:21
12:24 13:1,5
13:12 14:4
**unlawfully**
13:17
**unmute** 6:2,15
6:19
**unsecured** 19:2
19:4 31:8
40:23
**unusual** 36:7
36:10
**use** 6:1
**using** 3:3

**v**

**v** 1:15 3:2 5:4
49:13,14,15
**vague** 13:6

**valid** 47:18
**value** 8:13,21
9:1,8,18 15:16
18:19 29:8
31:5 32:4 41:9
41:11,13
**various** 16:19
35:16,25
**veritext** 51:20
**viable** 15:20
17:4 39:23
**viewed** 8:24
**vivaro** 8:18
**void** 10:14 14:7
37:13 40:5
**voidable** 10:20
11:3,14,15
17:18
**voidance** 9:17
**voting** 25:15

**w**

**wait** 6:22
**walking** 36:8
**want** 6:22 25:4
28:6 34:7 38:2
44:11 46:13
**wanted** 47:22
47:24 49:9
**way** 24:13 26:9
42:17 48:13,14
**we've** 15:13
27:11 47:15
**weighs** 31:14
**weis** 4:21
**weiss** 1:7 10:7
10:15 12:2
19:4,15,18,19

19:23 20:6,11
20:20 21:3,4,7
21:23 23:19
24:1,11 25:9
25:10,13,13,17
26:18 27:9,21
27:23 31:17,22
34:10 35:17
36:3 37:4 45:8
**west** 4:5,22
**willing** 20:15
**winters** 4:3 5:8
6:9 18:12
**wished** 49:24
**wmsa** 19:4
**wmsf** 30:22
**written** 46:22
**wrong** 43:8
**wrongful**
12:19,21 32:10
32:18,21 38:20
38:22 44:4
**wso** 30:21

**x**

**x** 1:4,10,12,18

**y**

**yeah** 26:11
45:2,25 47:2
**year** 9:15
30:10 41:6
**years** 7:15
20:15 34:2
41:17,19
**yep** 19:10
**york** 1:2,21 4:6
4:11,16,23 6:5

**[york - zoom]**                                                        Page 19

| 32:7 |
| --- |
| **z** |
| **zoom**  3:3 6:2 |



FINTA

## BrokerCheck Report

## GEORGE ALLEN WEISS

CRD# 462367

| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Broker Qualifications | 2 - 3 |
| Registration and Employment History | 5 - 6 |

Please be aware that fraudsters may link to BrokerCheck from phishing and similar scam websites, trying to steal your personal information or your money. Make sure you know who you're dealing with when investing, and contact FINRA with any concerns. For more information read our investor alert on imposters.



## About BrokerCheck®

BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**

  - BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.

  - Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

- **Where did this information come from?**

  - The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
    - o information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
    - o information that regulators report regarding disciplinary actions or allegations against firms or brokers.

- **How current is this information?**

  - Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.

- **What if I want to check the background of an investment adviser firm or investment adviser representative?**

  - To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at https://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.

- **Are there other resources I can use to check the background of investment professionals?**

  - FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.

- **Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck.  It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.







# GEORGE A. WEISS

CRD# 462367

This broker is not currently registered.

## Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

## Broker Qualifications

**This broker is not currently registered.**

**This broker has passed:**

- 2 Principal/Supervisory Exams
- 4 General Industry/Product Exams
- 0 State Securities Law Exams

## Registration History

**This broker was previously registered with the following securities firm(s):**

**B** **WEISS MULTI-STRATEGY FUNDS LLC**
CRD# 130991
NEW YORK, NY
11/2012 - 04/2024

**B** **WEISS INVESTMENT MANAGEMENT SERVICES, LLC**
CRD# 130991
GARDEN CITY, NY
03/2008 - 09/2008

**B** **GEORGE WEISS ASSOCIATES, INC.**
CRD# 7683
HARTFORD, CT
09/1978 - 02/2006

## Disclosure Events

All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

Are there events disclosed about this broker?   **No**

©2024 FINRA. All rights reserved. Report about GEORGE A. WEISS.

1



User Guidance

www.finra.org/brokercheck

# Broker Qualifications

## Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each license, and the date on which it became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

This broker is not currently registered.

©2024 FINRA. All rights reserved. Report about GEORGE A. WEISS.

2

A-675

www.finra.org/brokercheck

FIN`a

User Guidance

# Broker Qualifications

## Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below.

**This individual has passed 2 principal/supervisory exams, 4 general industry/product exams, and 0 state securities law exams.**

### Principal/Supervisory Exams

| Exam | Category | Date |
|------|----------|------|
| Financial Principal Examination | F04 | 08/29/1979 |
| Registered Principal Examination | Series 40 | 08/24/1978 |

### General Industry/Product Exams

| Exam | Category | Date |
|------|----------|------|
| Operations Professional Examination | Series 99TO | 01/02/2023 |
| Limited Representative-Private Securities Offerings | Series 82TO | 01/02/2023 |
| Securities Industry Essentials Examination | SIE | 10/01/2018 |
| Registered Representative Examination | Series 1 | 04/01/1966 |

### State Securities Law Exams

| Exam | Category | Date |
|------|----------|------|
| No information reported. | | |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

©2024 FINRA. All rights reserved. Report about GEORGE A. WEISS.



www.finra.org/brokercheck

# Broker Qualifications

## Professional Designations

This section details that the representative has reported **0** professional designation(s).

No information reported.

©2024 FINRA. All rights reserved. Report about GEORGE A. WEISS.

User Guidance

# Registration and Employment History

## Registration History

The broker previously was registered with the following firms:

| | Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|---|
| B | 11/2012 - 04/2024 | WEISS MULTI-STRATEGY FUNDS LLC | 130991 | NEW YORK, NY |
| B | 03/2008 - 09/2008 | WEISS INVESTMENT MANAGEMENT SERVICES, LLC | 130991 | GARDEN CITY, NY |
| B | 09/1978 - 02/2006 | GEORGE WEISS ASSOCIATES, INC. | 7683 | HARTFORD, CT |
| B | 05/1997 - 05/2005 | GEORGE WEISS & COMPANY LLC | 41526 | HARTFORD, CT |
| B | 11/1977 - 11/1978 | SHEARSON LOEB RHOADES INC. | 7506 | |
| B | 03/1977 - 11/1977 | FAULKNER, DAWKINS & SULLIVAN INC. | 1790 | |
| B | 11/1971 - 04/1977 | BACHE & CO INCORPORATED | 7058 | |
| B | 04/1966 - 12/1971 | HORNBLOWER & WEEKS - HEMPHILL, NOYES INCORPORATED | 412 | |

## Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

**Please note that the broker is required to provide this information only while registered with FINRA or a national securities exchange and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment | Employer Name | Position | Investment Related | Employer Location |
|---|---|---|---|---|
| 08/2012 - Present | WEISS MULTI-STRATEGY FUNDS LLC | REGISTERED REPRESENTATIVE | Y | NEW YORK, NY, United States |
| 05/2005 - Present | WEISS MULTI-STRATEGY ADVISERS LLC | CEO | Y | NEW YORK, NY, United States |

## Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

SINCE 2006, MR. WEISS IS THE CHIEF EXECUTIVE OFFICER AND MANAGER  OF WEISS MULTI-STRATEGY ADVISERS LLC, AN SEC

©2024 FINRA. All rights reserved. Report about GEORGE A. WEISS.

5



User Guidance

**Registration and Employment History**

**Other Business Activities, continued**

REGISTERED INVESTMENT ADVISER AND AFFILIATE OF THE FIRM, LOCATED AT THE SAME ADDRESS AS THE FIRM. AS CEO AND MANAGER, MR. WEISS DEVOTES APPROXIMATELY 120 TO 140 HOURS PER MONTH, ALL DURING TRADING HOURS. MR. WEISS IS ALSO INVOLVED WITH THE FOLLOWING INVESTMENT RELATED AFFILIATES AND INDIRECT OWNERS OF WEISS MULTI-STRATEGY ADVISERS: GWA, LLC (MANAGER SINCE 1996, ROCKY HILL, CT), (DIRECTOR, ), SOMERSET REINSURANCE HOLDINGS LTD (DIRECTOR, HOLDING COMPANY FOR AN INVESTMENT RELATED RISK MANAGEMENT/REINSURANCE COMPANY LOCATED IN PEMBROKE, SOMERSET REINSURANCE LTD, BERMUDA SINCE 2021.), SOMERSET HOLDINGS INTERNATIONAL LTD (DIRECTOR SINCE DECEMBER 2022, HOLDINGS COMPANY OF SOMERSET REINSURANCE HOLDINGS LTD), OGI ASSOCIATES LLC (INDIRECT OWNERSHIP THROUGH GWA LLC, ROCKY HILL, CT, SINCE 1994), WEISS FAMILY INTERESTS LLC (MANAGER, ROCKY HILL, CT, SINCE 1997), WEISS SPECIAL OPERATIONS LLC (MANAGER, AFFILIATE OF THE ADVISER, ROCKY HILL, CT, SINCE 2005), AND DEVOTES APPROXIMATELY LESS THAN AN AGGREGATE OF 10 HOURS PER MONTH, ALL DURING TRADING HOURS. GEORGE A. WEISS REVOCABLE TRUST (TRUSTEE, FISHER ISLAND, FL, SINCE 2012), BENJAMIN PENN LLC (MANAGER, FAIRFIELD, CT, SINCE 2010). MR. WEISS HAS INTEREST IN SEVERAL ENTITIES THAT HOLDS REAL ESTATE, ART AND OTHER TANGIBLE ASSETS FOR ESTATE PLANNING PURPOSES: GW BEACON HILL LLC (ESTATE PLANNING, SINCE 2015), GW CHANNEL HOLDINGS LLC (ESTATE PLANNING, SINCE 2015), GW CROWN HOLDINGS LLC (ESTATE PLANNING, SINCE 2015). MR. WEISS IS ALSO A MEMBER OF THE BOARD OF DIRECTORS OR BOARD OF TRUSTEES OF THE FOLLOWING NONPROFIT/EDUCATIONAL ORGANIZATIONS: ORPHAN DISEASE PATHWAY PROJECT (TRUSTEE, HARTFORD, CT, SINCE 2010), UNIVERSITY OF PENNSYLVANIA (TRUSTEE EMERITUS, SINCE 2013), PENN MEDICINE (TRUSTEE EMERITUS, SINCE 2018). ALL OF THE FOREGOING ARE OR MAY BE INVESTMENT RELATED ACTIVITIES (PRIMARILY DUE TO THE SCOPE OF HIS AUTHORITY, NOT NECESSARILY HIS ACTUAL ACTIVITIES) AND MR. WEISS GENERALLY DEVOTES APPROXIMATELY LESS THAN 20 HOURS PER MONTH IN THE AGGREGATE TO THESE OUTSIDE CHARITABLE ACTIVITIES, APPROXIMATELY LESS THAN 10 HOURS DURING TRADING HOURS.

©2024 FINRA. All rights reserved. Report about GEORGE A. WEISS.

A-679



User Guidance

**End of Report**

**This page is intentionally left blank.**

©2024 FINRA. All rights reserved. Report about GEORGE A. WEISS.

7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEFFERIES STRATEGIC INVESTMENTS, LLC
and LEUCADIA ASSET MANAGEMENT
HOLDINGS LLC,

                          Plaintiffs,

              -against-

GEORGE WEISS,

                      Defendant.

Case No. 1:24-cv-04369-AKH

---

**LOCAL RULE 56.1 STATEMENT
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, plaintiffs Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC ("LAM Holdings," and with JSI, "Plaintiffs"), by and through their undersigned counsel, submit this statement of material facts as to which the Jefferies Entities contend there is no genuine issue to be tried.

**I.    George Weiss's Control Over the George Weiss Companies**

    1.    Defendant George Weiss ("Weiss") is the manager of Weiss Family Interests LLC. Balber Decl. Ex. 18 at 6.[1]

    2.    Weiss is the manager of Benjamin Penn LLC. *Id.*

    3.    Weiss is the trustee of the George A. Weiss Revocable Trust. *Id.*

    4.    Weiss is the manager of GWA, LLC ("GWA"). *Id.*

---

[1]    "Balber Decl." refers to the Declaration of Scott S. Balber in Support of Plaintiffs' Motion for Summary Judgment. References to "Ex. __" refer to the exhibits to the Balber Decl.

5.      GWA is owned by the following entities and individuals, in the following percentages:  (i) Weiss Family Interests LLC (15.9%); (ii) Benjamin Penn LLC (15.9%); (iii) George A. Weiss Revocable Trust (23.8%); and (iv) a certain number of employees of WMSA (44.4%).  Balber Decl. Ex. 6 ¶ 12.

6.      GWA is the parent (in whole or in part) of Weiss Multi-Strategy Advisers LLC ("WMSA"), Weiss Multi-Strategy Funds, LLC ("WMSF"), OGI Associates, LLC ("OGI"), Weiss Special Operations LLC ("WSPO," collectively with GWA, WMSA, WMSF, and OGI the "George Weiss Companies").  *Id.* ¶¶ 12–15.

7.      Weiss is the Chairman and Chief Executive Officer of WMSA.  *See* Balber Decl. Ex. 6 ¶ 16.

8.      Weiss is the manager of WSPO.  Balber Decl. Ex. 18 at 6.

## II.     **The George Weiss Companies Enter Into Agreements with Plaintiffs**

9.      On or about May 1, 2018, LAM Holding LLC and GWA entered into a Strategic Relationship Agreement dated as of (as amended, the "Strategic Relationship Agreement"). Balber Decl. Ex. 1-A.

10.     Section 1(a) of the Strategic Relationship Agreement provides:  "LAM shall have a right to receive the Profit Share Percentage of the Company Profits for the Profit Share Period (the 'Profit Share Amount').  The Profit Share Amount shall be calculated and paid in accordance with the terms of this Section 1."  *Id.* § 1(a).

11.     Section 1(b) of the Strategic Relationship Agreement provides:  "LAM shall have a perpetual right to receive the Revenue Share Percentage of the Company Revenues for each Revenue Share Period (the 'Revenue Share Amount').  The Revenue Share Amount shall be calculated and paid in accordance with the terms of this Section 1."  *Id.* § 1(b).

12.    Under Section 5(b) of the Strategic Relationship Agreement, GWA agreed to "indemnify and hold harmless LAM and each of its Affiliates and their respective directors, officers, employees, agents and representatives . . . to the fullest extent permitted by law from and against any and all costs, losses, Claims, Taxes incurred, damages, liabilities and expenses, including reasonable costs of investigation and defense, and reasonable attorneys' fees and expenses . . . incurred by the Indemnified Party as a result of, in connection with, or related to this Agreement . . . ." *Id.* § 5(b).

13.    On or about October 18, 2018, LAM Holding LLC assigned all of its rights under the Strategic Relationship Agreement to LAM Holdings, pursuant to an Assignment and Assumption Agreement.  Balber Decl. Ex. 1-I at 1; Balber Decl. Ex. 6 ¶ 26.

14.    On or about December 3, 2019, GWA, WMSA, and JFG Funding LLC, entered into a Note Purchase Agreement (as amended, the "2019 Note Purchase Agreement").  Balber Decl. Ex. 1-B.

15.    The 2019 Note Purchase Agreement provides, in part, that "the Company [GWA, LLC] will pay to each holder of a Note, on demand, such further amount as shall be sufficient to cover all costs and expenses of such holder incurred in any enforcement or collection . . . including reasonable attorneys' fees, expenses and disbursements." *Id.* § 10.3.

16.    On or about December 3, 2019, GWA issued a $31,250,000 Note to JSI.  Balber Decl. Ex. 1-D.

17.    On or about January 13, 2020, GWA issued a $18,750,000 Note to JSI.  Balber Decl. Ex. 1-C.

18.    On December 1, 2021, JFG Funding LLC and JSI entered into an Assignment and Assumption Agreement.  Balber Decl. Ex. 1-E.

19.    GWA, WMSA, and JSI entered into a Note Purchase Agreement dated as of September 21, 2022 (as amended, the "2022 Note Purchase Agreement" and collectively with the 2019 Note Purchase Agreement, the "Note Purchase Agreements").  Balber Decl. Ex. 1-F.

20.    The 2022 Note Purchase Agreement provides, in part, that "the Company [GWA, LLC] will pay to each holder of a Note, on demand, such further amount as shall be sufficient to cover all costs and expenses of such holder incurred in any enforcement or collection . . . including reasonable attorneys' fees, expenses and disbursements." *Id.* § 10.3.

21.    On or about September 21, 2022, GWA issued a $3,000,000 Note to JSI.  Balber Decl. Ex. 1-G.

### III.    Weiss and the George Weiss Companies Enter Into the Forbearance Agreement

22.    On December 21, 2023, JSI sent a document titled "Notice of Optional Redemption" to GWA.  Balber Decl. Ex. 1-H.

23.    On February 12, 2024, Weiss and the George Weiss Companies executed a forbearance agreement (the "Forbearance Agreement").  Balber Decl. Ex. 1-I.

24.    Section 3(a) of the Forbearance Agreement provides as follows: "Each Weiss Party (other than GWA) . . . irrevocably and unconditionally guarantees to each of JSI and LAM Holdings . . . and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other Weiss Party when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations (as herein defined)." *Id.* § 3.

25.    The Guaranteed Obligations included, *inter alia*, "all the obligations of GWA and each other Weiss Party arising under any Note Purchase Agreement, the Notes, the SR Agreement and this Agreement . . . ." *Id.*

4

26.     Section 9 of the Forbearance Agreement provides that:

> Weiss unconditionally and irrevocably personally guarantees to the
> Jefferies Entities the accuracy of the representations made by, and
> the performance of the agreements of, the Weiss Parties hereunder.
> Weiss further agrees that he shall take all actions within his control,
> including by exercising all of his voting, governance, management
> and other rights and powers with respect to each of the other Weiss
> Parties, any of their subsidiaries and any of his personal or his
> family's trusts to cause such persons to comply with the terms of
> this Agreement.

*Id.* § 9.

## IV.     The George Weiss Companies File for Bankruptcy

27.     On April 29, 2024, GWA, WMSA, WSPO, and OGI filed voluntary petitions for

relief pursuant to Chapter 11 of the United States Bankruptcy Code.  Balber Decl. Exs. 2–5.

28.     On or about June 11, 2024, WMSA filed a List of Creditors Who Have the 20

Largest Unsecured Claims and Are Not Insiders (the "WMSA Statement").  The WMSA Statement

reflects that WMSA owes LAM Holdings $52,473,259.00."  Balber Decl. Ex. 7.

29.     Those amounts are owed to LAM Holdings pursuant to the Strategic Relationship

Agreement.  *See* Balber Decl. Ex. 1-A, Balber Decl. Ex. 7.

30.     The WMSA Statement further reflects that WMSA owes JSI $43,190,924.00.

Balber Decl. Ex. 7.

31.     Those amounts are owed to JSI under the Notes.  *See* Balber Decl. Exs. 1-C, 1-D,

1-G; Balber Decl. Ex. 7.

32.     On or about June 11, 2024, GWA filed a List of Creditors Who Have the 20 Largest

Unsecured Claims and Are Not Insiders (the "GWA Statement").  The GWA Statement reflects

that GWA owes LAM Holdings $52,473,259.00.  Balber Decl. Ex. 8.

33.     Those amounts are owed to LAM Holdings pursuant to the Strategic Relationship

Agreement.  *See* Balber Decl. Ex. 1-A, Balber Decl. Ex. 8.

5

34. The GWA Statement further reflects that GWA owes JSI $43,190,924.00. Balber Decl. Ex. 8.

35. Those amounts are owed to JSI under the Notes. *See* Balber Decl. Exs. 1-C, 1-D, 1-G; Balber Decl. Ex. 8.

36. On or about June 11 2024, OGI filed a List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (the "OGI Statement"). The OGI Statement reflects that OGI owes LAM Holdings $52,473,259.00. Balber Decl. Ex. 9.

37. Those amounts are owed to LAM Holdings pursuant to the Strategic Relationship Agreement. *See* Balber Decl. Ex. 1-A, Balber Decl. Ex. 9.

38. The OGI Statement further reflects that OGI owes JSI $43,190,924.00. Balber Decl. Ex. 9.

39. Those amounts are owed to JSI under the Notes. *See* Balber Decl. Exs. 1-C, 1-D, 1-G; Balber Decl. Ex. 9.

40. On or about June 11, 2024, WSPO filed a List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (the "WSPO Statement"). The WSPO Statement reflects that WSPO owes LAM Holdings $52,473,259.00. Balber Decl. Ex. 10.

41. Those amounts are owed to LAM Holdings pursuant to the Strategic Relationship Agreement. *See* Balber Decl. Ex. 1-A, Balber Decl. Ex. 10.

42. The WSPO Statement further reflects that WSPO owes JSI $43,190,924.00. Balber Decl. Ex. 10.

43. Those amounts are owed to JSI under the Notes. *See* Balber Decl. Exs. 1-C, 1-D, 1-G; Balber Decl. Ex. 10.

44.    On June 19, 2024, WMSF filed a voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code.  Balber Decl. Ex. 11.

45.    On or about June 28, 2024, WMSF filed the Global Notes, Methodology and Specific Disclosures Regarding WMSF's Schedules of Assets and Liabilities and Statement of Financial Affairs (the "WMSF Statement").  The WMSF Statement reflects that WMSF owes LAM Holdings $52,473,259.00.  Balber Decl. Ex. 12.

46.    Those amounts are owed to LAM Holdings pursuant to the Strategic Relationship Agreement.  *See* Balber Decl. Ex. 1-A, Balber Decl. Ex. 12.

47.    The WMSF Statement further reflects that WMSF owes JSI $43,190,924.00.  Balber Decl. Ex. 12.

48.    Those amounts are owed to JSI under the Notes.  *See* Balber Decl. Exs. 1-C, 1-D, 1-G; Balber Decl. Ex. 12.

**V.    The Bankruptcy Court Rejects Weiss's Arguments**

49.    On April 29, 2024, GWA, WMSA, WSPO, and OGI commenced an adversary proceeding against the Jefferies Parties captioned *GWA, LLC et al v. Jefferies Strategic Investments, LLC et al.*, No. 24-01350 (MG).  Balber Decl. Ex. 13.

50.    On June 25, 2024, the George Weiss Companies filed an amended complaint in the Adversary Proceeding.  Balber Decl. Ex. 14.

51.    On July 16, 2024, Plaintiffs moved to dismiss the George Weiss Companies' amended complaint in part.  *See* Balber Decl. Ex. 15.

52.    On August 6, 2024, the George Weiss Companies filed an opposition to the Plaintiffs' motion to dismiss.  *See* Balber Decl. Ex. 16.

53.    In that opposition, the George Weiss Companies stated, in part:

>Weiss . . . agreed to provide, at most, a guarantee of 'performance
>of the agreements of the Weiss Parties' under the Amended
>Forbearance Agreement.  He did not guarantee any payments by the
>Debtors.

*Id.* at 13.

54.     On September 11, 2024, the Bankruptcy Court held a hearing on the Plaintiffs'

(defendants in the adversary proceeding) motion to dismiss.  Balber Decl. Ex. 17.

55.     During that hearing, the Bankruptcy Court asked:

>Why wouldn't the agreement of Mr. Weiss to guarantee some or all
>of the debt stand, whether or not the remainder of the forbearance
>agreement, at least insofar as the Debtors are concerned, would fall?
>I mean, it's, you know, one of the things I've seen multiple times
>over the years is that a creditor will often be willing to forbear if it
>obtains a guarantee from a non-debtor principal.  And that's what
>this is.

*Id.* 20:10–17.

56.     In response, counsel for the George Weiss Companies argued that:

>Mr. Weiss has only issued a performance guarantee of obligations
>of these parties under the amended forbearance agreement, not of
>the obligations under the loans or any other monies that are owed.
>This is solely a performance guarantee rather than a payment
>guarantee.

*Id.* 20:18–21:12; 25:22–25.

57.     Weiss's personal counsel, who is also representing Weiss in this matter, appeared

at the hearing on the motion to dismiss.  *Id.* 45:5–15.

58.     At the hearing, Weiss's counsel stated:

>The case in the federal court is in front of Judge Alvin Hellerstein
>and I will give you a few case cites that you requested of Mr.
>Jureller.  The Caldor Inc. v. Mattel, 817 F.Supp. 408; Key Bank of

A-688

Long Island v. Burns, 162 A.D.2d 501; and Solco, S-O-L-C-O, Plumbing Supply Inc. v. Hart, 123 A.D.3d 798.

*Id.* 49:10–15.

Dated:  New York, New York
November 5, 2024

Respectfully submitted,

HERBERT SMITH FREEHILLS
  NEW YORK LLP
By: /s/ *Scott S. Balber*
    Scott S. Balber
    Michael P. Jones
    Daniel Gomez
200 Park Avenue
New York, New York 10166
Tel: (917) 542-7810
Fax: (917) 542-7601
Email:      Scott.Balber@hsf.com
            Michael.Jones@hsf.com
            Daniel.Gomez@hsf.com

*Attorneys for Plaintiffs*
*Jefferies Strategic Investments, LLC and*
*Leucadia Asset Management Holdings LLC*

9

A-689

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS LLC, | Case No. 1:24-cv-04369-AKH |
| Plaintiffs, | |
| -against- | |
| GEORGE WEISS, | |
| Defendant. | |

**JEFFERIES STRATEGIC INVESTMENTS, LLC AND LEUCADIA**
**ASSET MANAGEMENT HOLDINGS LLC'S MEMORANDUM**
**OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

A-690

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS .................................................................................... 2

    I.    The George Weiss Companies Enter Into the Underlying Agreements ...................... 2

    II.    Weiss Enters Into the Forbearance Agreement .............................................. 3

    III.    Weiss Immediately Breaches His Guarantee Obligations ........................... 5

    IV.    The George Weiss Companies Declare Bankruptcy
        and the Bankruptcy Court Rejects Weiss's Arguments................................ 5

ARGUMENT ........................................................................................................ 7

    I.    Plaintiffs Have Established Their
       *Prima Facie* Entitlement to Summary Judgment ...................................... 7

    II.    Weiss Cannot Establish Any Defense to his Liability.................................. 8

        A.    Weiss is Collaterally Estopped
            From Disputing His Payment Obligation ......................................... 8

        B.    Weiss's Guarantee Requires Payment as a Matter of Law........................ 10

        C.    Weiss's Affirmative Defenses Fail to Raise Triable Issues of Fact ............ 11

CONCLUSION..................................................................................................... 12

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Trading Co. v. Fish*,
   42 N.Y.2d 20 (1977)................................................................................................... 10

*Boco Enters., Inc. v. Saastopankkien Keskus-Osaki-Pannki (In re Boco Enters., Inc.)*,
   204 B.R. 407 (Bankr. S.D.N.Y. 1997)..................................................................... 10

*D.S. America (East), Inc. v. Chromagrafx Imaging Sys., Inc.*,
   873 F.Supp. 786 (E.D.N.Y. 1995)............................................................................ 11

*Fernicola v. Specific Real Prop. in Possession,*
*Custody, Control of Healthcare Underwriters Mut. Ins. Co.*,
   2001 WL 1658257 (S.D.N.Y. Dec. 26, 2001) .......................................................... 9

*GWA, LLC v. Jefferies Strategic Inv., LLC (In re Weiss Multi-Strategy Advisers LLC)*,
   2024 WL 4276161 (Bankr. S.D.N.Y. Sept. 24, 2024)......................................... 6, 8

*HSH Nordbank AG v. Street*,
   421 Fed. App'x 70 (2d Cir. 2011) ............................................................................. 7

*Kaplan v. Bennett*,
   465 F. Supp. 555 (S.D.N.Y. 1979) ........................................................................... 8

*Kensington House Co. v. Oram*,
   293 A.D.2d 304 (1st Dep't 2002) .............................................................................. 7

*Legal Recovery Assocs. LLC v. Brenes L. Grp., P.C.*,
   2023 WL 2253138 (S.D.N.Y. Feb. 13, 2023) ........................................................ 11

*Louis Dreyfus Energy Corp. v. MG Ref. & Mktg., Inc.*,
   2 N.Y.3d 495 (2004)................................................................................................. 10

*Merch. Cash & Cap., LLC v. Haute Soc'y Fashion, Inc.*,
   2017 WL 2912452 (E.D.N.Y. July 6, 2017)........................................................... 11

*Software Publishers Ass'ns v. Scott & Scott, LLP*,
   2007 WL 2325585 (N.D. Tex. 2007) ...................................................................... 11

*Superior Funding Corp. v. Big Apple Cap. Corp.*,
   738 F. Supp. 1468 (S.D.N.Y. 1990) .......................................................................... 9

*TD Bank, N.A. v. Clinton Ct. Dev., LLC*,
   105 A.D.3d 1032 (2d Dep't 2013)............................................................................. 7

*Telectronic Proprietary, Ltd., v. Medtronic, Inc.*,
  687 F.Supp 832 (S.D.N.Y. 1988) .............................................................................................. 11

*U.S. Bank N.A. v. Perlmutter (In re S. Side House, LLC)*,
  470 B.R. 659 (Bankr. E.D.N.Y. 2012) .............................................................................. 7, 11

*Wang v. Pataki*,
  396 F. Supp. 2d 446 (S.D.N.Y. 2005) ............................................................................... 9, 10

**Rules**

Fed. R. Civ. P. 8 ........................................................................................................................ 11

A-693

Plaintiffs Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC ("LAM Holdings," and with JSI, "Plaintiffs"), by and through their undersigned counsel, respectfully submit this memorandum of law in support of their motion for summary judgment.

## PRELIMINARY STATEMENT

George Weiss ("Weiss") is the founder and chief executive officer of a hedge fund business, which operated through a constellation of companies bearing his name (the "George Weiss Companies"). By February 2024, certain of those companies owed approximately $100 million to Plaintiffs, and Plaintiffs had an immediate right to collect that debt.

In a calculated decision to forestall any collection efforts by Plaintiffs, on February 12, 2024, Weiss executed a Forbearance Agreement. As part of the Forbearance Agreement, Weiss agreed that he would personally guarantee the obligations of the George Weiss Companies. Specifically, the Forbearance Agreement provides that:

- each of the George Weiss Companies "irrevocably and unconditionally guarantees to each of [the Plaintiffs] . . . the prompt and complete payment and performance by GWA and each other [of the George Weiss Companies] when due . . . ."; and

- Weiss, personally, "unconditionally and irrevocably personally guarantees to [the Plaintiffs] . . . the performance of the agreements of, the [George Weiss Companies] hereunder."

Weiss does not contest that he signed the Forbearance Agreement which contains his personal guarantee of the George Weiss Companies' obligations to Plaintiffs. However, he has nonetheless failed to pay any of the money that he and his companies owe, instead seeking to shirk his plain obligations by relying on a contrived argument that the words in the Forbearance Agreement do not mean what they say. Weiss's argument is contrary to well-settled New York law, and—unsurprisingly—was expressly rejected by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which is adjudicating the Chapter 11

1

proceedings commenced by the George Weiss Companies.  Weiss appeared personally in those proceedings, argued for the interpretation of the Forbearance Agreement that he seeks to advance here, and lost.  Accordingly, he is now collaterally estopped from challenging the holding of the Bankruptcy Court.  Because there are no genuine issues of material fact regarding the enforceability of the guarantee, its meaning, or the amounts owed, this Court should grant summary judgment in favor of Plaintiffs and require Weiss to pay the debts he guaranteed.

## STATEMENT OF FACTS

I.     **The George Weiss Companies Enter Into the Underlying Agreements**

Defendant George Weiss is the Chairman and Chief Executive Officer of Weiss Multi-Strategy Advisers LLC ("WMSA"), the investment advisory entity which manages the George Weiss Companies' funds.  (SUF ¶¶ 1–8).[1]  Weiss, through his family trusts, owns a controlling stake in the George Weiss Companies' parent entity, GWA, LLC ("GWA"), and in turn, controls the George Weiss Companies' decision making.  (SUF ¶ 5).

From 2018 to 2022, GWA entered into several agreements with Plaintiffs, pursuant to which GWA assumed certain payment obligations to Plaintiffs.  (SUF ¶¶ 9–21).

Specifically on May 1, 2018, LAM Holdings' predecessor, LAM Holding LLC, and GWA and WMSA entered into a strategic relationship agreement (the "Strategic Relationship Agreement"), pursuant to which LAM Holdings obtained the "right to receive" a share of certain profits and revenues realized by GWA.  (SUF ¶¶ 9–12).  GWA and WMSA acknowledge and agree (and it is therefore undisputed) that, as of April 29, 2024, they owed $52,473,259.00 to LAM Holdings under the Strategic Relationship Agreement.  (SUF ¶¶ 27–28).

---

[1]     "SUF" refers to the Local Rule 56.1 Statement of Undisputed Facts in Support of the Plaintiffs' Motion for Summary Judgment

2

In December 2019 and September 2022, JSI agreed to purchase $53 million in notes (the "Notes") issued by GWA and WMSA under two "Note Purchase Agreements." (SUF ¶¶ 14–21). GWA and WMSA acknowledge and agree (and it is therefore undisputed) that, as of April 29, 2024, JSI is owed $43,190,924.00 under the Notes and Note Purchase Agreements. (SUF ¶ 30).

Separately, under Section 5(b) of the Strategic Relationship Agreement, GWA agreed to "indemnify and hold harmless LAM and each of its Affiliates and their respective directors, officers, employees, agents and representatives . . . to the fullest extent permitted by law from and against any and all costs, losses, Claims, Taxes incurred, damages, liabilities and expenses, including reasonable costs of investigation and defense, and reasonable attorneys' fees and expenses . . . incurred by the Indemnified Party as a result of, in connection with, or related to this Agreement . . . ." (SUF ¶ 12). Similarly, each of the Note Purchase Agreements provided that Plaintiffs could recover "all costs and expenses of such holder incurred in any enforcement or collection . . . including reasonable attorneys' fees, expenses and disbursements." (SUF ¶ 15).

## II.    Weiss Enters Into the Forbearance Agreement

As of February 12, 2024, Plaintiffs were entitled to pursue the full amounts due and owing under the Strategic Relationship Agreement, the Notes, and the Note Purchase Agreements. (*See* SUF ¶ 22, Ex. 1-I). However, in order to protect his companies from Plaintiffs' lawful collection efforts, Weiss signed—in his personal capacity and on behalf of all of the George Weiss Companies—the Forbearance Agreement. (SUF ¶ 23). The Forbearance Agreement contains two key provisions.

*First*, each of the George Weiss Companies agreed to guarantee payment of the approximately $100 million that is owed to the Plaintiffs under both the Notes and the Strategic Relationship Agreement. Specifically, Section 3(a) of the Forbearance Agreement provides that each of the George Weiss Companies, "(other than GWA) . . . irrevocably and unconditionally

3

guarantees to each of JSI and LAM Holdings . . . and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other [of the George Weiss Companies] when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations (as herein defined)." (SUF ¶ 24). The Guaranteed Obligations included, *inter alia*, "all the obligations of GWA and each other [of the George Weiss Companies] arising under any Note Purchase Agreement, the Notes, the [Strategic Relationship] Agreement and this Agreement . . . ." (SUF ¶ 25).

*Second*, George Weiss agreed to a sweeping personal guarantee of the George Weiss Companies' performance under the Forbearance Agreement. Specifically, George Weiss's personal guarantee provides as follows:

> ***Weiss unconditionally and irrevocably personally guarantees*** to the [Plaintiffs] the accuracy of the representations made by, and ***the performance of the agreements of, the [George Weiss Companies] hereunder***. Weiss further agrees that he shall take all actions within his control, including by exercising all of his voting, governance, management and other rights and powers with respect to each of the other Weiss Parties, any of their subsidiaries and any of his personal or his family's trusts to cause such persons to comply with the terms of this Agreement.

(SUF ¶ 26 (emphasis added)). Plainly included among the "agreements of, the [George Weiss Companies]" (*id.*) was "the prompt and complete payment" of the "Guaranteed Obligations" as defined in the Forbearance Agreement, notably the debts arising under Note Purchase Agreement, the Notes, and the Strategic Relationship Agreement (*see* SUF ¶ 24).

### III.    Weiss Immediately Breaches His Guarantee Obligations

Notwithstanding their obligations under the Forbearance Agreement, the George Weiss Companies to failed to make payment of any of the Guaranteed Obligations. (SUF ¶¶ 28–48). Under the terms of the Forbearance Agreement, Weiss was obligated to satisfy those obligations. (SUF ¶ 26). Weiss has failed to do so and therefore breached his obligations under the Forbearance Agreement. (*See id.*).

### IV.    The George Weiss Companies Declare Bankruptcy
### and the Bankruptcy Court Rejects Weiss's Arguments

On April 29, 2024, the George Weiss Companies filed voluntary petitions under chapter 11 of title 11 of the United States Bankruptcy Code. Simultaneously, the George Weiss Companies filed an adversary proceeding against the Plaintiffs which sought, in part, to avoid the entire Forbearance Agreement (including Weiss's personal guarantee) as a preferential or fraudulent transfer. (SUF ¶ 49). The George Weiss Companies then amended their complaint in order to add two new claims seeking to hold Weiss's personal guarantee (*i.e.*, the subject of this lawsuit) unenforceable. (SUF ¶ 50). Plaintiffs (*i.e.*, the defendants in the adversary proceeding) moved to dismiss the complaint, in part, arguing that the George Weiss Companies had failed to provide any basis for avoiding George Weiss's personal guarantee or otherwise finding it unenforceable. (SUF ¶ 51). In opposition to that motion, the George Weiss Companies expressly challenged the enforceability of Weiss's personal guarantee, arguing that "Weiss . . . agreed to provide, at most, a guarantee of 'performance of the agreements of the Weiss Parties' under the Amended Forbearance Agreement. He did not guarantee any payments by the Debtors." (SUF ¶ 53).

On September 11, 2024, the Bankruptcy Court held a hearing on the Plaintiffs' (defendants in the adversary proceeding) motion. (SUF ¶ 54). During that hearing, the Bankruptcy Court asked counsel for the George Weiss Companies why Weiss's personal guarantee could not survive

5

the avoidance of other portions of the Forbearance Agreement.  (SUF ¶ 55).  In response, counsel for the George Weiss Companies argued that "Mr. Weiss has only issued a performance guarantee of obligations of these parties under the amended forbearance agreement, not of the obligations under the loans or any other monies that are owed.  This is solely a performance guarantee rather than a payment guarantee."  (SUF ¶ 56).  Counsel for Weiss personally (counsel of record in this action) also appeared at the hearing and requested, and was granted, the opportunity to argue the identical point.  (SUF ¶ 57).  Weiss's counsel directed the court to several cases purportedly supporting Weiss's argument that his guarantee did not extend to payment.  (SUF ¶ 58).

Having heard and considered argument from both counsel for the George Weiss Companies and Weiss's personal lawyer, the Court issued an order dated September 24, 2024, granting, in large part, Plaintiffs' motion to dismiss.  *See GWA, LLC v. Jefferies Strategic Inv., LLC (In re Weiss Multi-Strategy Advisers LLC)*, 2024 WL 4276161, at *39 (Bankr. S.D.N.Y. Sept. 24, 2024).  Notably, the Court expressly and unequivocally rejected the argument raised by Weiss, holding that "none of the[] cases [cited by Weiss] make a distinction between a performance guarantee versus a payment guarantee."  *Id*. at *28.  The Court reasoned:

> [A] strict construction of the 2024 Forbearance Agreement, even in Weiss's favor, ***makes clear that Weiss's performance guarantee was also a guarantee of payment***.  Pursuant to section 9 of the . . . Forbearance Agreement, George Weiss personally guaranteed the "performance of the agreements of the [Debtors] hereunder," including taking "all actions within his control . . . to cause such persons to comply with terms of [the] Agreement." . . . These agreements include, among other things, each of the Debtors' (other than GWA's) irrevocable and unconditional guarantee of the "prompt and complete payment and performance by GWA and each other [Debtor] when due . . . of the Guaranteed Obligations . . . until the Guaranteed Obligations are paid in full." . . . "Guaranteed Obligations" is defined under the agreement to encompass "all the obligations of GWA and each other [Debtor] arising under any Note Purchase Agreement, the Notes, the [Strategic Relationship Agreement] and this Agreement," among other things.

6

*Id.* (emphasis added).

## ARGUMENT

### I.    Plaintiffs Have Established Their *Prima Facie* Entitlement to Summary Judgment

In order to establish a *prima facie* entitlement to summary judgment against a guarantor on an absolute guarantee, a lender "need prove no more than an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guarantee." *HSH Nordbank AG v. Street*, 421 Fed. App'x 70, 72 (2d Cir. 2011) (quoting *Kensington House Co. v. Oram*, 293 A.D.2d 304, 305 (1st Dep't 2002)); *see also U.S. Bank N.A. v. Perlmutter (In re S. Side House, LLC)*, 470 B.R. 659, 677 (Bankr. E.D.N.Y. 2012) (same); *TD Bank, N.A. v. Clinton Ct. Dev., LLC*, 105 A.D.3d 1032, 1035 (2d Dep't 2013) (A plaintiff asserts a prima facie case for summary judgment against a guarantor where it "present[s] evidence of the existence of the promissory notes and personal guaranties executed by each of the guarantors with respect to the [relevant loan], and their failure to make payment in accordance with the terms of those instruments.").

There is no dispute that:   (i) Weiss "unconditionally and irrevocably personally guarantee[d] . . . the performance of the agreements of, the [George Weiss Companies]" under the Forbearance Agreement (SUF ¶ 26); (ii) at least $95,664,183.00 is due and owing under the Strategic Relationship Agreement, the Notes, and the Note Purchase Agreements (SUF ¶¶ 28–48); and (iii) Weiss has not made payment to Plaintiffs of the amounts owed (SUF ¶¶ 28–48).  Plaintiffs have therefore established their *prima facie* entitlement to summary judgment.  *See In re S. Side House, LLC*, 470 B.R. at 676 ("When a guarantor has given an unconditional guaranty, its liability is clear as a matter of law."  (citations omitted)) (recommending grant of summary judgment against principal of bankrupt company for breaching guaranty of amounts owed by those companies to their largest creditor).

II.    <u>Weiss Cannot Establish Any Defense to His Liability</u>

Weiss's only counter to his liability is to argue that he made no "absolute and unconditional guaranty" to pay the debts of the George Weiss Companies because, his guarantee does not include the word "payment."  (*See* ECF No. 15 at 10, 13).  As set forth below, that argument fails for several reasons.

A.    <u>Weiss is Collaterally Estopped from Disputing His Payment Obligation</u>

This Court need not even consider the substance of Weiss's argument, since he—and the George Weiss Companies—have already litigated this precise issue and lost.  Weiss is therefore barred by the doctrine of collateral estoppel from relitigating that issue here.

In general, a party is collaterally estopped from relitigating: (i) an "issue necessarily decided on the merits in [a] prior suit;" (ii) where they "had a full and fair opportunity to litigate the issue."  *Kaplan v. Bennett*, 465 F. Supp. 555, 559 (S.D.N.Y. 1979).  Here, both elements of the test are satisfied.

*First*, the Bankruptcy Court specifically decided that Weiss's guarantee was not "solely a performance guarantee rather than a payment guarantee."  (SUF ¶ 56; *In re Weiss Multi-Strategy Advisers*, 2024 WL 4276161, at *28).  Indeed, in opposing Plaintiffs' motion to dismiss portions of the adversary proceeding, the George Weiss Companies argued that the personal guarantee— as a matter of law—did *not* constitute a payment guarantee.  (SUF ¶ 56).  Yet the Bankruptcy Court rejected this argument, holding that even "a strict construction of the . . . Forbearance Agreement, [] in Weiss's favor, makes clear that Weiss's performance guarantee was also a guarantee of payment."  *In re Weiss Multi-Strategy Advisers*, 2024 WL 4276161, at *28.

*Second*, Weiss "had a full and fair opportunity to litigate the issue" before the Bankruptcy Court.  A party has a full and fair opportunity to litigate an issue where the "previous action involve[s] the [same party] or those in privity with them."  *Fernicola v. Specific Real Prop. in*

8

*Possession, Custody, Control of Healthcare Underwriters Mut. Ins. Co.*, 2001 WL 1658257, at *4 (S.D.N.Y. Dec. 26, 2001).  A party is in "privity" with a previous litigant where "the relationship between parties is sufficiently close, so as to warrant preclusion," such as "a corporate officer and the entity he or she leads." *Id.*; *see also Wang v. Pataki*, 396 F. Supp. 2d 446, 455 (S.D.N.Y. 2005) (corporation "was in privity with [its chief executive officer and majority shareholder] in the state court proceedings."); *Superior Funding Corp. v. Big Apple Cap. Corp.*, 738 F. Supp. 1468, 1470–71 (S.D.N.Y. 1990) ("The law is well settled that guarantors of payment of a corporate debt, particularly where such guarantors are controlling shareholders, executive officers and directors of that corporation, are parties to and control the lawsuit against the borrower, and had a full and fair opportunity to contest the granting of the judgment, are in privity with the corporate borrower and therefore bound by a judgment against the corporation.").

Here, both Weiss and the George Weiss Companies (which are in privity with Weiss) had a full and fair opportunity to litigate the meaning of the guarantee.  Indeed, Weiss's own personal counsel appeared at the motion to dismiss hearing and argued that the guarantee was not a "payment" guarantee.  (SUF ¶¶ 57–58).  That appearance is more than sufficient to satisfy the "opportunity to litigate" standard.  *Cf. Wang*, 396 F. Supp. 2d at 455 (precluding relitigating issue in later case where the defendant's principal made an appearance in prior case).  Moreover, the George Weiss Companies also raised the same argument that Weiss raises here.  (SUF ¶ 56).  And because the George Weiss Companies are controlled by Weiss, their chief executive officer, Weiss is also bound by the ruling issued against his companies.  *See, e.g., Fernicola*, 2001 WL 1658257, at *4 (decision in case against corporation precluded relitigating issue in case against its corporate officer); *Wang*, 396 F. Supp. 2d at 455 (corporation was precluded from litigating issue already decided in earlier action against its CEO).

Accordingly, Weiss is collaterally estopped from arguing that he did not issue a payment guarantee, and his arguments to the contrary are precluded here.

**B.      Weiss's Guarantee Requires Payment as a Matter of Law**

Even if the Court were to consider Weiss's renewed arguments that his guarantee did not impose a payment obligation, Weiss's reading of the guarantee is also contrary to well-settled law.

Under New York law, courts interpret guarantees like any other contract, and in interpreting them, will "look first to the words the parties used." *Louis Dreyfus Energy Corp. v. MG Ref. & Mktg., Inc.*, 2 N.Y.3d 495, 500 (2004). "If the language is plain, it does not become ambiguous because the parties promote different interpretations of it, especially if one interpretation strains the contract language." *Boco Enters., Inc. v. Saastopankkien Keskus-Osaki-Pannki (In re Boco Enters., Inc.)*, 204 B.R. 407, 417 (Bankr. S.D.N.Y. 1997) (granting motion for summary judgment despite guarantor's alternative interpretation of guarantee). And, where a party "guarantee[s] performance of the terms and conditions of the agreement," which terms and conditions "require[] payment . . . , the guarantee must be interpreted as including payment according to and as provided in the agreement." *Am. Trading Co. v. Fish*, 42 N.Y.2d 20, 27–28 (1977).

Here, Weiss specifically guaranteed "the performance of the agreements of, the [George Weiss Companies] hereunder." (SUF ¶ 26). The George Weiss Companies, meanwhile, agreed to guarantee payment of GWA's and WMSA's obligations under the Notes and the Strategic Relationship Agreements. (SUF ¶¶ 24–25). In turn, as a matter of well-settled New York law, Weiss's personal guarantee extends to the George Weiss Companies' payment obligations. *Fish*, 42 N.Y.2d at 27–28 (guarantee of performance "must be interpreted as including payment" where performance obligations included an obligation to pay); *Merch. Cash & Cap., LLC v. Haute Soc'y Fashion, Inc.*, 2017 WL 2912452, at *3 (E.D.N.Y. July 6, 2017) (personal guarantee of

10

performance included a guarantee of payment despite the lack of explicit language providing for payment because "it would [otherwise] be challenging to prescribe some other meaningful purpose the Guaranty was intended to serve").

  **C. Weiss's Affirmative Defenses Fail to Raise Triable Issues of Fact**

  Because Plaintiffs have established their "*prima facie* case, [] the burden shifts to the defendant to show the existence of a triable issue of fact with respect to a *bona fide* defense." *In re S. Side House, LLC*, 470 B.R. at 677.

  To date, Weiss has articulated no *bona fide* defense to his personal liability. Instead, in his Answer, Weiss has listed a handful of boilerplate "affirmative defenses," none of which is supported by any factual statement at all. (*See* ECF No. 21 at 10–11).

  These conclusorily pleaded affirmative defenses do not meet the requirements of Fed. R. Civ. P. 8 and, in turn, should be disregarded. *D.S. America (East), Inc. v. Chromagrafx Imaging Sys., Inc.*, 873 F.Supp. 786, 797–98 (E.D.N.Y. 1995); *Telectronic Proprietary, Ltd., v. Medtronic, Inc.*, 687 F.Supp 832, 841 (S.D.N.Y. 1988) (pleading the word "estoppel" without more was insufficient statement of defense); *Software Publishers Ass'ns v. Scott & Scott, LLP*, 2007 WL 2325585, at *2 (N.D. Tex. 2007) ("[T]he defendant's bald assertions that the plaintiff's claims are barred, in whole or in part 'by the doctrine of waiver, estoppel, and ratification', 'by the doctrine of laches', and due to the plaintiff's 'unclean hands'" warranted that such defenses be "stricken from the answer."); *see also Legal Recovery Assocs. LLC v. Brenes L. Grp., P.C.*, 2023 WL 2253138, at *2 (S.D.N.Y. Feb. 13, 2023) (affirmative defense of "undue influence and duress" stricken because it lacked "any supporting factual allegations"), *report and recommendation adopted*, 2023 WL 2266534 (S.D.N.Y. Feb. 28, 2023).

## **CONCLUSION**

For the foregoing reasons, the Court should issue an order granting Plaintiffs' motion for summary judgment against Weiss and decree that Plaintiffs are entitled to recover:

- $52,473,259.00, representing amounts it is undisputed are owed under the Strategic Relationship Agreement, which Weiss guaranteed;

- $43,190,924.00, representing amounts it is undisputed are owed under the Notes and Note Purchase Agreements, which Weiss guaranteed; as well as

- An award of attorneys' fees incurred by Plaintiffs in an amount to be determined by the Court upon subsequent application by the Plaintiffs.

Dated:  New York, New York
        November 5, 2024

Respectfully submitted,

HERBERT SMITH FREEHILLS
  NEW YORK LLP
By: /s/ *Scott S. Balber*
    Scott S. Balber
    Michael P. Jones
    Daniel Gomez
200 Park Avenue
New York, New York 10166
Tel: (917) 542-7810
Fax: (917) 542-7601
Email:    Scott.Balber@hsf.com
          Michael.Jones@hsf.com
          Daniel.Gomez@hsf.com

*Attorneys for Plaintiffs*
*Jefferies Strategic Investments, LLC and*
*Leucadia Asset Management Holdings LLC*

12

A-705

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEFFERIES STRATEGIC INVESTMENTS,
LLC and LEUCADIA ASSET
MANAGEMENT HOLDINGS LLC,

                              Plaintiffs,

              -against-

GEORGE WEISS,

                              Defendant.

Case No. 1:24-cv-04369 (AH)

---

**DEFENDANT GEORGE WEISS'S MEMORANDUM OF LAW IN OPPOSITION TO
JEFFERIES' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Table of Contents

Page

PRELIMINARY STATEMENT ........................................................1

COUNTER STATEMENT OF FACTS ............................................2

    A.    Jefferies Enters Into Strategic Business Agreements with Two
        Weiss Companies, Not Mr. Weiss ...........................................2

    B.    Jefferies Begins Applying Undue Pressure to Extract Money from
        the Weiss Companies..............................................................3

    C.    The Terms of the Forbearance Agreement .................................4

    D.    Jefferies Rejects the Modified Forbearance Agreement .............5

    E.    Jefferies Intensifies Its Threats As The Strategic Partnership Falls
        Through....................................................................................6

    F.    The Adversary Proceeding........................................................7

ARGUMENT ..................................................................................13

  I.    Jefferies Fails to Demonstrate The Existence of An Enforceable Contract..........14

  II.    The Bankruptcy Court's Remarks Concerning Section 9 of the
      Forbearance Agreement Are Not Entitled to Preclusive Effect.........................15

    A.    The Issues Are Not Identical...................................................15

    B.    The Interpretation of Section 9 Was Not Necessary to the
        Bankruptcy Court's Decision...................................................16

    C.    Weiss Did Not Have A Full and Fair Opportunity to Litigate the
        Issue for which Jefferies Seeks Preclusion ...............................18

  III.    Jefferies Fails To Demonstrate that the Forbearance Agreement Contains a
       Personal Payment Guarantee .....................................................22

    A.    The Plain Language of the Forbearance Agreement Supports Mr.
        Weiss's Interpretation ............................................................22

    B.    Extrinsic Evidence Also Supports Mr. Weiss's Interpretation of the
        Forbearance Agreement ..........................................................25

  IV.    Mr. Weiss's Affirmative Defenses Preclude Summary Judgment In
       Jefferies' Favor .......................................................................26

A-707

CONCLUSION.................................................................................................................29

A-708

Table of Authorities

Page

CASES

*665-75 Eleventh Ave. Realty Corp. v. Schlanger*,
265 A.D.2d 270 (1st Dep't. 1999) ..................................................23

*American Trading Co. v. Fish*,
42 N.Y.2d 20 (1977). Jefferies Mem. .............................................24

*Autocrafting Fleet Sols., Inc. v. All. Fleet Co.*,
148 A.D.3d 1564 (4th Dep't 2017) .................................................23

*Ball v. A.O. Smith Corp.*,
451 F.3d 66 (2d Cir. 2006) ...........................................................15

*Bear, Stearns & Co. v. 1109580 Ontario, Inc.*,
409 F.3d 87 (2d Cir. 2005) ...........................................................17

*Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*,
402 U.S. 313 (1971) .....................................................................19

*Bobby v. Bies*,
556 U.S. 825 (2009) .....................................................................18

*Bombay Realty Corp. v. Magna Carta, Inc. (In re Bombay Realty Corp.)*,
100 N.Y.2d 124 (2003) .................................................................22

*Braun v. CMGI, Inc.*,
No. 99 CIV. 12328 (WHP), 2001 WL 921170 (S.D.N.Y. Aug. 14, 2001),
*aff'd*, 64 F. App'x 301 (2d Cir. 2003) ............................................14

*Carroll v. LeBoeuf, Lamb, Greene & MacRae, LLP*,
623 F. Supp. 2d 504 (S.D.N.Y. 2009) ............................................17

*Chase Manhattan Bank, N.A. v. Am. Nat. Bank & Tr. Co. of Chicago*,
93 F.3d 1064 (2d Cir. 1996) ..........................................................25

*CMEG NYMEX Holding Inc. v. Optionable, Inc.*,
No. 09-CV-3677, 2012 WL 3683560 (S.D.N.Y. Aug. 24, 2012) ...........28

*Coutard v. Mun. Credit Union*,
848 F.3d 102 (2d Cir. 2017) .....................................................13, 26

*D.S. Am. (E.), Inc. v. Chromagrafx Imaging Sys., Inc.*,
873 F. Supp. 786 (E.D.N.Y. 1995) ................................................27

Table of Authorities
(continued)

Page

*Empower Fed. Credit Union v. Empower Annuity Ins. Co. of Am.*,
    No. 5:23-cv-941, 2024 WL 3639440 (N.D.N.Y. Aug. 2, 2024)..............................................29

*Est. of Smith v. Cash Money Recs., Inc.*,
    No. 14cv2703, 2018 WL 2224993 (S.D.N.Y. May 15, 2018)................................................13

*Fernicola v. Specific Real Property*,
    2001 WL 1658257 (S.D.N.Y. Dec. 26, 2001) .......................................................................21

*GEOMC Co. v. Calmare Therapeutics Inc.*,
    918 F.3d 92 (2d Cir. 2019)...............................................................................................27, 28

*Greystone Partnerships Grp., Inc. v. Koninklijke Luchtvaart Maatschappij N.V.*,
    815 F. Supp. 745 (S.D.N.Y. 1993) .........................................................................................15

*Hickerson v. City of New York*,
    146 F.3d 99 (2d Cir. 1998).....................................................................................................19

*INTL FCStone Markets, LLC v. Intercambio Mexicano de Comercio S.A. de C.V.*,
    No. 18 Civ. 1004 (AKH), 2021 WL 5304285 (S.D.N.Y. Nov. 15, 2021)........................27, 28

*Legal Recovery Assocs. LLC v. Brenes L. Grp., P.C.*,
    No. 22CV1778, 2023 WL 2253138 (S.D.N.Y. Feb. 13, 2023) ...............................................27

*Merch. Cash & Cap., LLC v. Haute Soc'y Fashion, Inc.*,
    No. 16-CV-2696 (ILG), 2017 WL 2912452 (E.D.N.Y. July 6, 2017) ...................................24

*Mesquite Creek Wind LLC v. Mars Wind, Inc.*,
    213 A.D.3d 529 (1st Dep't 2023) ...........................................................................................25

*New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*,
    599 F.3d 102 (2d Cir. 2010)....................................................................................................25

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982)...................................................................................................................18

*Proctor v. LeClaire*,
    715 F.3d 402 (2d Cir. 2013)....................................................................................................19

*Republic of Ecuador v. Chevron Corp.*,
    638 F.3d 384 (2d Cir. 2011)....................................................................................................15

*Robinson v. Volkswagenwerk AG*,
    56 F.3d 1268 (10th Cir. 1995) ................................................................................................19

Table of Authorities
(continued)

Page

*Software Publishers Ass'n v. Scott & Scott, LLP*,
   C.A. No. 306CV0949G, 2007 WL 2325585 (N.D. Tex. Aug. 15, 2007) ...............................27

*Standard Gen. L.P. v. Travelers Indem. Co. of Connecticut*,
   261 F. Supp. 3d 502 (S.D.N.Y. 2017) .......................................................................13

*Stern v. Marshall*,
   564 U.S. 462 (2011) ...................................................................................................18

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het
   Kapitaal Van Saybolt Int'l B.V. v. Schreiber*,
   327 F.3d 173 (2d Cir. 2003) ......................................................................................20

*Superior Funding Corp. v. Big Apple Capital Corp.*,
   738 F. Supp. 1468 (S.D.N.Y. 1990) ..........................................................................22

*Symbol Techs., Inc. v. Voicenet (Aust.) Ltd.*,
   No. CV-03-6010 SJF ARL, 2008 WL 89626 (E.D.N.Y. Jan. 4, 2008) ...................25

*Tavarez v. Moo Organic Chocolates, LLC*,
   623 F. Supp. 3d 365 (S.D.N.Y. 2022) .........................................................................1

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) ...................................................................................................22

*Telectronics Proprietary, Ltd. v. Medtronic, Inc.*,
   687 F. Supp. 832 (S.D.N.Y. 1988) ...........................................................................27

*Two Locks, Inc. v. Kellogg Sales Co.*,
   68 F. Supp. 3d 317 (E.D.N.Y. 2014) ...................................................................23, 24

*United States v. Grayson*,
   879 F.2d 620 (9th Cir.1989) .....................................................................................22

*Volt Elec. NYC Corp. v. A.M.E., Inc.*,
   586 F. Supp. 3d 262 (S.D.N.Y. 2022) ......................................................................25

*Wang v. Pataki*,
   396 F. Supp. 2d (S.D.N.Y. 2005) .............................................................................21

*White Rose Food v. Saleh*,
   99 N.Y.2d 589 (2003) ................................................................................................23

*Wooding v. City of Hartford*,
   2024 WL 4349049 (D. Conn. Sept 30, 2024) ...........................................................29

v

<u>Table of Authorities</u>
(continued)

<u>Page</u>

STATUTES

11 U.S.C. § 101(54)............................................................................12

11 U.S.C. § 547(b)......................................................................8, 10, 17

11 U.S.C. § 548................................................................8, 12, 10, 17

28 U.S.C. § 157............................................................................18

OTHER AUTHORITIES

Restatement (Second) of Judgments § 27....................................17, 18

Defendant George Weiss, by his undersigned counsel, respectfully submits this memorandum of law in opposition to Plaintiffs Jefferies Strategic Investments LLC's ("JSI") and Leucadia Asset Management Holdings LLC's ("Leucadia" and collectively with JSI, "Plaintiffs" or "Jefferies") motion for summary judgment.[1]

## PRELIMINARY STATEMENT

Far from demonstrating the absence of any genuine dispute of material facts compelling summary judgment in its favor, Jefferies' motion highlights the weaknesses in its claims. As an initial matter, the motion fails to establish the *existence* of a valid enforceable contract between the parties – much less a guarantee by Mr. Weiss to repay $100 million. Indeed, it is telling that Jefferies failed to attach a fully executed, mutually agreed upon version of the Forbearance Agreement. That is because no such agreement exists. No doubt cognizant of this fact, Jefferies asserts that Mr. Weiss is somehow "estopped" from defending against their $100 million claims because – as best as can be understood from the confusing mix of facts offered by Jefferies – there is an ongoing adversary proceeding involving certain corporate entities, but not Mr. Weiss, pending in bankruptcy court. Merely to state the proposition demonstrates its absurdity. The existence and scope of Mr. Weiss's supposed personal guarantee are being adjudicated by Mr. Weiss for the first time in these dueling summary judgment motions, as Jefferies well knows. There is no estoppel.

Jefferies' efforts to twist the language and structure of the unagreed-to Forbearance Agreement into a so-called "payment guarantee" fare no better. Indeed, Jefferies' interpretation runs afoul of longstanding cannons of contract interpretation – including that (i) any so-called

---

[1]    Jefferies' motion entirely ignores its second claim. It cannot raise that claim on reply. *See Tavarez v. Moo Organic Chocolates, LLC*, 623 F. Supp. 3d 365, 370 (S.D.N.Y. 2022) ("Generally, a court does not consider issues raised in a reply brief for the first time because if a party raises a new argument in a reply brief the opposing party may not have an adequate opportunity to respond to it.") (citations omitted).

"guaranty" must be strictly construed against Jefferies; (ii) that contracts must be read in their

totality – not by isolating terms and evaluating them in a vacuum (as Jefferies does); and (iii) that

the surrounding facts and circumstances of the Forbearance Agreement – which Jefferies also

ignores – can be considered if the Forbearance Agreement is ambiguous.  Under these canons of

construction, the clause in question is, at most, a guarantee by Mr. Weiss of the accuracy of

certain corporate representations and to cause the companies to abide by certain corporate

controls (a so-called "performance guaranty") as opposed to a payment guaranty, as Jefferies

mistakenly claims.  At a minimum, such facts demonstrate that the meaning of the clause in

question raises issues of fact that cannot be resolved on this record.  For all these reasons and

those set forth below, and in Mr. Weiss's motion for summary judgment, Jefferies' motion

should be denied.

## COUNTER STATEMENT OF FACTS

The facts outlined below are drawn from Defendant George Weiss's Statement of

Material Facts Pursuant to Local Rule 56.1, ECF No. 26 ("56.1 Statement"), the accompanying

Declarations of Mr. Weiss, ECF No. 27 (the "Weiss Decl."), and Mr. Dillabough, ECF No. 28

(the "Dillabough Decl."), Defendant Weiss's Response to Jefferies' Local Rule 56.1 Statement

("56.1 Response"), the Declaration of Scott Balber, ECF No. 30 (the "Balber Decl."), and the

Declaration of Brian Katz ("Katz Decl.") which are incorporated by reference herein.  For the

sake of brevity, only those facts germane to the resolution of Jefferies' motion are set forth

below.

      A.    <u>Jefferies Enters Into Strategic Business Agreements with Two Weiss Companies,
Not Mr. Weiss</u>

From 2018 to 2022, GWA, LLC ("GWA") and Weiss Multi-Strategy Advisers LLC

("WMSA") entered into several agreements with JSI, Leucadia and their corporate predecessors

pursuant to which the parties agreed, among other things, to work together on select business initiatives, and for Jefferies to provide liquidity to GWA and WMSA. 56.1 Response ¶¶ 9, 14, 16-19, 21. None of Weiss Multi-Strategy Funds LLC ("WMSF"), OGI Associates LLC ("OGI") or Weiss Special Operations LLC ("WSPO") were parties to any of those agreements. *See* 56.1 Response ¶¶ 9, 14, 16-19, 21. Mr. Weiss was not personally a party to any of those agreements. *See* 56.1 Response ¶¶ 9, 14, 16-19, 21.

Until late 2023, Jefferies and the Weiss Companies (comprised of GWA, WMSA, WMSF, OGI, and WSPO) worked together collaboratively. 56.1 Statement ¶¶ 9-12. Given certain differences of opinion on the overall success of the parties' collaboration, in November 2023, the Weiss Companies began exploring a relationship with a new strategic partner. 56.1 Statement ¶¶ 12-13. Jefferies initially supported these discussions. 56.1 Statement ¶ 14.

B.    Jefferies Begins Applying Undue Pressure to Extract Money from the Weiss Companies

By early 2024, however, Jefferies began applying pressure to the Weiss Companies and Mr. Weiss to obtain leverage in the negotiations with the strategic partner. Among other things, Jefferies abruptly declared a default on the Weiss Companies' debts under the Notes. 56.1 Response ¶ 22. Jefferies also demanded control over the Weiss Companies' bonus payments for their employees' performance in 2023. 56.1 Statement ¶¶ 15-16. The Weiss Companies refused to give Jefferies control over employee compensation and explained to Jefferies that delegating this authority could immediately cause employee retention and compliance issues. 56.1 Statement ¶¶ 18-20. Jefferies threatened to seek a restraining order unless the Weiss Companies agreed in writing not to make the bonus payments. 56.1 Statement ¶¶ 21-23. The Weiss Companies again refused and in early February 2024, the Weiss Companies paid its employees their 2023 bonuses and informed Jefferies of the same. 56.1 Statement ¶¶ 22-24. In response,

3

Jefferies threatened to sue Mr. Weiss, the Weiss Companies, and their employees with the stated intention of ruining their reputation.  56.1 Statement ¶¶ 25-28.  Jefferies informed the Weiss Companies and Mr. Weiss that the only way to avoid damaging public litigation would be to sign a forthcoming agreement before 7:00 am the next day.  56.1 Statement ¶¶ 25-28.  At no point, however, did anyone indicate that the agreement would include a personal guarantee of payment from Mr. Weiss.  56.1 Statement ¶ 30.

At 2:10 am and 2:20 am on February 12, 2024, Plaintiffs emailed the Weiss Companies and Mr. Weiss a draft forbearance agreement, containing two critical factual admissions inculpating the Weiss Companies for improperly making the bonus payments, and preserving Jefferies' ability to pursue legal claims against the Weiss Companies based on those admissions. 56.1 Statement ¶¶ 35-36; Dillabough Decl. Ex. 4.  Jefferies reiterated a deadline to sign "by 7 am today, Monday, Feb 12."  56.1 Statement ¶ 31; Dillabough Decl. Ex. 2.  The Weiss Companies refused to accede to Jefferies' proposed Agreement.  56.1 Statement ¶¶ 35-36.  Instead, they counteroffered with a revised version that removed the factual admissions Jefferies insisted on. Mr. Weiss signed that proposed revised version and forwarded it to Jefferies at approximately 4:00 am.  56.1 Statement ¶¶ 35-36.  Mr. Weiss was only personally a party to "Sections 5(a), 9, and 10(c)" of the document he signed.  56.1 Statement ¶ 38.

C.    The Terms of the Forbearance Agreement

The Forbearance Agreement primarily contains obligations of the Weiss Companies. Section 2 contains the "Weiss [Companies] Agreements," which generally required the Weiss Companies to provide specific information and capital controls.  56.1 Statement ¶¶ 40-41; Dillabough Decl. Ex. 3 § 2.  Section 3 contains a "guaranty" of payment from each of the Weiss Companies (but not Mr. Weiss).  56.1 Statement ¶¶ 42-44; Dillabough Decl. Ex. 3 § 3.  Section 4 contains a grant of security interests from the Weiss Companies.  56.1 Statement ¶ 45;

4

Dillabough Decl. Ex. 3 § 4(a).  Finally, Section 5 contains several representations from the

Weiss Companies.  56.1 Statement ¶ 46; Dillabough Decl. Ex. 3 § 5.

Mr. Weiss's personal guarantee was explicitly limited to only two of these obligations: he

only guaranteed the "accuracy of the representations, and the performance of the agreements of,

the Weiss [Companies]."  56.1 Statement ¶ 50; Dillabough Decl. Ex. 3 § 9 (emphasis added).

This language corresponds directly to two sections of the Forbearance Agreement: the Weiss

Companies' Section 2 Agreements and their Section 5 Representations.  56.1 Statement ¶ 51.

Nowhere in the Forbearance Agreement did Mr. Weiss guaranty *any* payment, much less the

"full and punctual payment and performance" guaranteed by the Weiss Companies.  56.1

Statement ¶ 52.  No one ever mentioned to Mr. Weiss until the initiation of this lawsuit that the

Forbearance Agreement could be construed to include a personal guaranty of the Weiss

Companies' corporate debt.  56.1 Statement ¶ 55.

JSI, for its part, agreed only to forbear from bringing an "Enforcement Action," defined

as a "suit, litigation, claim or other action with respect to the Past Due Obligations (as defined

below) and the actions of the Weiss Companies referred to above," for no more than two days.

56.1 Statement ¶ 56; Dillabough Decl. Ex. 3 Recitals, § 6.  The "actions of the Weiss Companies

referred to above" include the fact that the bonus payments were made after Jefferies had

demanded that the bonuses be withheld.  56.1 Statement ¶ 56; Dillabough Decl. Ex. 3 Recitals.

D.    Jefferies Rejects the Modified Forbearance Agreement

Mere hours after receiving Mr. Weiss's modified Forbearance Agreement, at 8:53 am,

Jefferies' outside attorney, Mr. Balber, unequivocally rejected the Weiss Companies'

counteroffered Forbearance Agreement.  56.1 Statement ¶ 59.  As Mr. Balber explained

> At 2:20 a.m. this morning, the Jefferies Parties provided you with a
> draft Forbearance Agreement, pursuant to which they offered to
> temporarily forego commencing any Enforcement Action against

5

the Weiss [Companies] during the Forbearance Period. As part of that offer, the Jefferies Parties ***required*** that: the Weiss [Companies] admit that they had made statements to the Jefferies Parties that they would not make certain bonus payments until the second half of February 2024 [and] admit that they had paid the bonuses on February 8, 2024."

56.1 Statement ¶ 60; Dillabough Decl. Ex. 5 (emphasis added).

Jefferies then withdrew its sole consideration to the Forbearance Agreement—reserving "all of their rights to bring claims and pursue remedies arising from the Weiss [Companies'] misconduct." 56.1 Statement ¶ 62. Jefferies made clear that even though there was no agreement, "in the meantime," the Weiss Companies should still comply with their representations and the agreement to produce financial records. 56.1 Statement ¶ 61. Jefferies never signed the Forbearance Agreement. 56.1 Statement ¶ 64. The Weiss Companies did provide certain information called for in the Forbearance Agreement, but did not comply with other terms of the Forbearance Agreement, such as setting up certain capital controls. 56.1 Statement ¶¶ 65-66; Dillabough Decl. Ex. 3 § 4(e).

E.    Jefferies Intensifies Its Threats As The Strategic Partnership Falls Through

Days later, on February 17, 2024, Jefferies emailed the Weiss Companies with a draft complaint threatening to sue Mr. Weiss, GWA, WMSA, and 79 other employees of the Company (the "February Draft Complaint"). 56.1 Statement ¶¶ 70-71. The February Draft Complaint does not even reference the Forbearance Agreement that Jefferies had rejected days prior, or any supposed personal payment guarantee from Mr. Weiss. 56.1 Statement ¶¶ 72-73. Shortly thereafter, Jefferies rejected a $30 million payment in connection with the potential strategic partnership, and that potential deal fell apart. 56.1 Statement ¶¶ 74-75.

Jefferies continued to pressure Mr. Weiss to extract personal payment, though they never invoked any supposed personal payment guarantee in the Forbearance Agreement. On March

6

26, 2024, Jefferies sent the Weiss Companies another draft complaint (the "March Draft Complaint"). 56.1 Statement ¶ 76. The March Draft Complaint no longer threatened all 79 employees and refocused on allegations that Mr. Weiss and "his close cronies" abused their positions to enrich themselves. 56.1 Statement ¶ 77.[2] Tellingly, however, while the March Draft Complaint included allegations regarding the Forbearance Agreement, it does not allege that Mr. Weiss personally guaranteed $100 million. 56.1 Statement ¶ 78. Instead, the March Draft Complaint only pursued Mr. Weiss, as guarantor, for potential breaches of the Section 2 "Weiss [Companies] Agreements" – not the Section 3 Guaranty. 56.1 Statement ¶¶ 79-80.

At no point prior to or after signing the Forbearance Agreement did anyone communicate to Mr. Weiss that the Forbearance Agreement could be understood to include a personal guaranty of payment for the full amount Jefferies demanded; the first time Mr. Weiss learned of that potential interpretation was when the instant lawsuit was filed. 56.1 Statement ¶¶ 55, 81.

    F.    <u>The Adversary Proceeding</u>

        1.    <u>The Claims in the Adversary Proceeding</u>

After the Weiss Companies (other than WMSF) sought Chapter 11 protection on April 29, 2024, they commenced an adversary proceeding against Jefferies and Leucadia to avoid and recover transfers made by one or more Debtors[3] for the benefit of Jefferies and Leucadia (the "Adversary Proceeding"). 56.1 Response ¶¶ 27, 49-50. Debtors filed an amended complaint (the

---

[2]    Like the February and March Draft Complaints, the operative complaint in this case contains scandalous allegations about alleged misuse of corporate funds by Mr. Weiss. These allegations are irresponsible and wrong. Indeed, on November 21, 2024, an Independent Examiner, appointed by the Trustee to investigate the veracity of these very claims in the bankruptcy proceedings, issued his findings on the matter. The Examiner's Report, filed publicly in the Bankruptcy Court, categorically rejects Jefferies allegations. The Report concludes that these allegations are spurious – finding that the bonus payments were not fraudulently made, that Mr. Weiss had not enriched himself at the Companies Expense, and that Jefferies knew both of these things. *See* 56.1 Response ¶ 61; Katz Decl. Ex. C at 3, 42-46.

[3]    The Bankruptcy Court refers to the Weiss Companies as the Debtors. For ease of reference, where Mr. Weiss discusses the Bankruptcy proceedings, he uses the term "Debtors" to refer to the Weiss Companies.

"FAC") on June 25, 2024 after WMSF sought Chapter 11 protection.  56.1 Response ¶ 50.  Weiss is not a party to the Adversary Proceeding.

The 12-Count FAC does not discuss or interpret Section 9 of the Forbearance Agreement. In Count I, Debtors seek to avoid the entire Forbearance Agreement as a preference, pursuant to 11 U.S.C. § 547(b), contending that the Forbearance Agreement constituted an improper transfer of an interest of the Debtors in property, including (i) granting of a priority security interest in the Debtors' assets, (ii) the issuance of joint and several guarantees by the Debtors, and (iii) an offset of significant fees owed by Jefferies to GWA.  Balber Decl. Ex. 14 (¶ 83).  In Count II, the Debtors seek to avoid the entire Forbearance Agreement as a fraudulent transfer, pursuant to 11 U.S.C. § 548(a)(1)(B), based on the same allegations, and further contending that they did not receive reasonably equivalent value for the Forbearance Agreement, or the grant of security or additional compensation thereunder, because the value of the services and/or goods received was less than the value of the Forbearance Agreement or because the Debtors that had entered into the Forbearance Agreement were not the parties that had incurred or were obligated to pay the debt. Balber Decl. Ex. 14 (¶¶ 95-96).

2.    Jefferies' Partial Motion to Dismiss

Jefferies moved to dismiss most of the counts of the FAC.  56.1 Response ¶ 51.  In its 25-page opening brief, Jefferies provided extensive argument, including with respect to Counts I and II, that (i) guarantees do not involve transfers of interests in property and cannot be avoided; (ii) only specific transfers and obligations of the **Debtors** under the Forbearance Agreement can be avoided; and (iii) the Forbearance Agreement could not be invalidated in its entirety because a non-debtor, Mr. Weiss, was a party to it.  Balber Decl. Ex. 15 ¶¶ 34-39.  Jefferies quoted Section 9 in the fact section of its brief to demonstrate that the Forbearance Agreement contains a non-

8

debtor guaranty but provided no legal analysis concerning the scope of Weiss's obligations.  Balber Decl. Ex. 15 ¶¶ 29, 38.

In opposition, Debtors submitted a 25-page brief discussing, among other issues, their contentions that the guarantees and grant of security interests were both avoidable.  Balber Decl. Ex. 16.  Debtors also argued that the entire Forbearance Agreement was avoidable because those provisions were the principal obligations under the Forbearance Agreement.  *Id.* at 9.  In one short paragraph, Debtors responded to Jefferies' argument that Weiss's status as a party to the Forbearance Agreement precluded the avoidance claim, contending that Jefferies' statements concerning Section 9 were irrelevant because if the bankruptcy court relieved Debtors of their obligations to perform under their guarantees, Weiss's guarantee of "the performance of the agreements of" the Debtors would be nullified because there would be no further performance required.  *Id.* ¶ at 13-14.

In reply, Jefferies repeated its argument that guarantees are not transfers of an interest in property but rather are obligations that cannot be avoided.  *See* 56.1 Response ¶ 59; Katz Decl. Ex. A.  There is no discussion of the scope of Section 9 in the reply.

None of these briefs addressed the interpretation of Section 9 under New York law, including the well-established rules of construction, the meaning of the plain language of the provision, or the many other arguments made by Mr. Weiss in this case.

Weiss did not submit a brief in the Adversary Proceeding.  Mr. Weiss was not given notice by any of the parties or the Court that the Court would issue any ruling involving the meaning of Section 9, or that these bankruptcy proceedings could estop him from later contesting this lawsuit, which was filed months before the bankruptcy court argument.

3.    The Oral Argument on the Partial Motion to Dismiss

The bankruptcy court held a hearing on the motion to dismiss on September 11, 2024.  56.1
Response ¶ 54.  With respect to Count I, Jefferies argued that Count I can be dismissed to the
extent that it seeks to avoid the entire Forbearance Agreement because, under 11 U.S.C. § 547(b),
guarantees are not voidable because they are not transfers of an interest in property.  Balber Decl.
Ex. 17 at 10:19-11:10.  With respect to Count II, Jefferies argued that Count II can be dismissed
to the extent that it seeks to avoid the entire Forbearance Agreement because, under 11 U.S.C. §
548, only transfers of interests in property of the debtors or obligations of the debtors are avoidable,
which would not include the Weiss guaranty in Section 9.  *Id.* at 11:18-12:14.  Jefferies did not
proffer an interpretation of section 9 during oral argument on the motion to dismiss, arguing only
that Weiss was a non-Debtor party to the Forbearance Agreement.  *Id.*

In response, Debtors argued that, in the event that the Forbearance Agreement is "avoided
as to the Debtors," "then the obligations of Mr. Weiss under the [] forbearance agreement
disappear."  *Id.* at 19:11-20:6.  In response to questions from the bankruptcy court, Debtors stated
that "Mr. Weiss has only issued a performance guarantee of obligations of these [debtors] under
the [] forbearance agreement, not of the obligations under the loans or any other monies that are
owed. . . .  If it's only a performance guarantee and the obligations of the Debtors under the []
forbearance agreement disappear and are avoided, than Mr. Weiss has no further obligation."  *Id.*
at 20:10-21:3.  Debtors then noted that Jefferies had sued Mr. Weiss individually in the District
Court.[4]  *Id.* at 21:4-12.

Debtors' counsel then was asked various questions concerning the avoidance of the
Forbearance Agreement in its entirety, including why the Forbearance Agreement "would fail as

---

[4]    This prompted the bankruptcy court to inquire as to who was presiding over the case and its status.  Debtors'
counsel did not know.  Balber Decl. Ex. 17 at 21:14-22:1.

to Mr. Weiss as well because he's a non-debtor. . . ." *Id.* at 23:13-19. Debtors responded, noting that the section 9 guaranty was very limited and only related to the Forbearance Agreement, and not to the underlying notes or other obligations to which Weiss is not a party. 56.1 Response ¶ 56; Balber Decl. Ex. 17 at 20:18-21:12. None of these issues were addressed in the parties' briefs.

The bankruptcy court then asked for case citations Debtors are relying on for their distinction between guarantees of performance and guarantees of payment. Balber Dec. Ex. 17 at 26:1-28:11. Lacking notice that this would be an issue at the hearing, Debtors' counsel was unable to identify the cases, but ultimately referred the bankruptcy court to cases cited in Mr. Weiss's motion to dismiss filed in this Court. *Id.*

After the argument concluded, counsel for Mr. Weiss answered two of the bankruptcy court's questions. She informed the bankruptcy court that "[t]he case in the federal court is in front of Judge Alvin Hellerstein" and provided case citations from Mr. Weiss's then-pending motion to dismiss. *Id.* at 49:8-22. Mr. Weiss's counsel made no arguments concerning the interpretation of Section 9; nor was she invited by the bankruptcy court to do so.

4.  The Bankruptcy Court Opinion

On September 24, 2024, the bankruptcy court issued an opinion and order granting in part and denying in part Jefferies partial motion to dismiss. *See* 56.1 Response ¶ 60; Katz Decl. Ex. B (the "Bankruptcy Order"). The Bankruptcy Order begins with the appearances of counsel—Mr. Weiss's personal counsel is not listed. Bankruptcy Order at 1-2.

The bankruptcy court dismissed Count I, finding that (i) "[g]uarantees . . . are not generally considered 'transfers' for purposes of 11 U.S.C. § 101(54) but rather 'obligations,'" and (ii) that the "Bankruptcy Code only permits avoidance of transfers of interest in a debtor's property or a debtor's incurrence of an obligation, subject to certain requirements." Bankruptcy Order at 53.

The bankruptcy court did not avoid the Forbearance Agreement in its entirety because it contains a guaranty of a non-debtor. *Id.* at 53-54.

The bankruptcy court dismissed Count II, finding that (i) the transactions in the Forbearance Agreement "constitute reasonably equivalent value for the benefit the Debtors are receiving" and (ii) that, because 11 U.S.C. § 548(a)(1)(B) only permits the avoidance of "obligations 'incurred **by the debtor**,' the entire Forbearance Agreement could not be avoided. *Id.* at 61.

The bankruptcy court stated that it ***"will not address the underlying merits of the Weiss Motion to Dismiss, which is pending before Judge Hellerstein in the Southern District of New York."*** *Id.* at 54 n.20 (emphasis added). Having already concluded that guarantees were not transfers of interests in property, and that the Debtors had received reasonably equivalent value for them (thus ending the inquiry under the bankruptcy code), it nonetheless analyzed whether guarantees of performance could include guarantees of payment. *Id.* at 54-57. Even though this issue was not briefed, the bankruptcy court found that that there are no categorical distinctions between guarantees of performance and guarantees of payment. The bankruptcy court also recognized that "a guarantee agreement under New York law should be narrowly construed in accordance with its terms," Bankruptcy Order at 55, but then provided the broadest possible interpretation of section 9 stating in dicta that Section 9 is a guarantee of payment (even though that is not what it says and the word "payment" nowhere appears in Section 9).[5]

---

[5]    Respectfully, in its discussion of section 9, it is clear that the bankruptcy court did not strictly construe section 9, which would have required the bankruptcy court to analyze section 9 in the light most favorable to Mr. Weiss. As discussed in this case, section 9 is at best ambiguous, and any ambiguity should be construed against Jefferies. *See* Weiss Mem. at 17-23.

## ARGUMENT

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories on file, together with the affidavits, if any, show there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Standard Gen. L.P. v. Travelers Indem. Co. of Connecticut*, 261 F. Supp. 3d 502, 505–06 (S.D.N.Y. 2017) (citations omitted). "The moving party bears the burden of demonstrating the absence of any genuine dispute of material fact." *Est. of Smith v. Cash Money Recs., Inc.*, No. 14cv2703, 2018 WL 2224993, at *3 (S.D.N.Y. May 15, 2018). Where parties submit dueling motions for summary judgment, the court, "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017) (internal citations omitted).

Jefferies' motion for summary judgment should be denied because Jefferies has failed to demonstrate the absence of undisputed material facts or its entitlement to judgment as a matter of law. First, Jefferies has not established the existence of a mutually-agreed upon enforceable contract. Second, Jefferies has failed to show that the Forbearance Agreement contains an unambiguous payment guarantee—either through its strained invocation of collateral estoppel or the plain language of the agreement, strictly construed. Faced with, at most, an ambiguous contract, the extrinsic evidence demonstrates that the Forbearance Agreement does not include a personal payment guarantee. Finally, summary judgment is also inappropriate given that Mr. Weiss has pleaded several affirmative defenses that raise important factual issues precluding summary judgment on this record.

13

I.    **JEFFERIES FAILS TO DEMONSTRATE THE EXISTENCE OF AN ENFORCEABLE CONTRACT**

Jefferies claims to have established a *prima facie* entitlement to summary judgment merely by asserting the Forbearance Agreement exists and that the debt remains outstanding. Jefferies' Memorandum of Law in Support of Motion for Summary Judgment, ECF No. 32 ("Jefferies Mem.") at 7. Jefferies is wrong.

As an initial matter, Jefferies' motion fails to establish that Mr. Weiss ever provided Jefferies with an absolute and unconditional guaranty. Instead, the parties never agreed on the substantive terms of the Forbearance Agreement. *See* Weiss Mem. at 13-16.

Jefferies' motion glosses over the circumstances in which the Forbearance Agreement was "negotiated" and fails to mention either the modifications made by the Weiss Companies or Jefferies' subsequent rejection. Jefferies Mem. at 7. Instead, Jefferies simply directs the Court to an unsigned version of the Forbearance Agreement and asks the Court to enforce it as a binding contract. Balber Decl. Ex. 1-I. Jefferies' blithe attempt to avoid establishing the existence of a contract is particularly galling in these circumstances given the Weiss Companies would only agree to a modified Forbearance Agreement, which Jefferies *rejected* because it did not contain certain "required" admissions from Mr. Weiss. 56.1 Statement ¶ 60; Dillabough Decl. Ex. 5. Jefferies' rejection of the Weiss Companies' counteroffer extinguished it, and no further offers or agreements were made by Mr. Weiss. *See* Weiss Mem. at 13-16; *see also Braun v. CMGI, Inc.*, No. 99 CIV. 12328 (WHP), 2001 WL 921170, at *9 (S.D.N.Y. Aug. 14, 2001), *aff'd*, 64 F. App'x 301 (2d Cir. 2003) ("Once Braun communicated this rejection, he extinguished his power to accept the offer."); *Greystone Partnerships Grp., Inc. v. Koninklijke Luchtvaart Maatschappij N.V.*, 815 F. Supp. 745, 753 (S.D.N.Y. 1993) (same). As a result, there was no meeting of the minds and there is no contract to enforce.

14

Because the parties never came to a meeting of the minds regarding the required terms of the Forbearance Agreement, there is no valid and unconditional guarantee. Indeed, far from demonstrating the absence of any genuine dispute of material fact in its favor, Jefferies' motion only underscores that summary judgment is, in actuality, appropriate in Mr. Weiss's favor. *See* Weiss Mem. at 13-16.

## II.    THE BANKRUPTCY COURT'S REMARKS CONCERNING SECTION 9 OF THE FORBEARANCE AGREEMENT ARE NOT ENTITLED TO PRECLUSIVE EFFECT

Collateral estoppel bars a party from relitigating an issue where "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Republic of Ecuador v. Chevron Corp.,* 638 F.3d 384, 400 (2d Cir. 2011); *Ball v. A.O. Smith Corp.,* 451 F.3d 66, 69 (2d Cir. 2006). Jefferies argues that it is entitled to judgment as a matter of law because Mr. Weiss is collaterally estopped from disputing that Section 9 of the Forbearance Agreement is a payment guaranty based on dicta from a bankruptcy court decision on entirely different claims. Jefferies Mem. at 8-9. Jefferies' argument fails because the scope of Section 9 was not raised in the Adversary Proceeding; the bankruptcy court, by its own admission, did not decide the merits of that issue and its dicta concerning Section 9 was not necessary to the dismissal of Counts I and II of the FAC, and Mr. Weiss did not have a full and fair opportunity to litigate the issues presented only in this Court. Jefferies is not entitled to summary judgment on collateral estoppel grounds.

### A.    The Issues Are Not Identical

The bankruptcy court did not decide either of the issues presented in Mr. Weiss's or Jefferies' summary judgment motions. It did not decide (i) whether the Forbearance Agreement is enforceable at all because there was no meeting of the minds of the parties during its negotiation

15

and execution, or (ii) whether Weiss breached Section 9 of the Forbearance Agreement, which on its face contains only non-monetary obligations.

The issues addressed in the bankruptcy decision related to preference and fraudulent conveyance law under the bankruptcy code. The Court could not, and did not, address whether Section 9 imposed a $100 million obligation on Mr. Weiss. The interpretation of Section 9's performance guarantee was not addressed in the FAC and was not briefed by any party to the Adversary Proceeding. The parties did not submit evidence concerning Section 9 on the motion because the issues before the bankruptcy court were resolvable without the need for such evidence. Moreover, because there was no notice that the difference between performance guarantees and payment guarantees would be raised for the first time at the hearing, Debtors were not prepared to meaningfully address that argument and Jefferies, which addressed the bankruptcy court both before and after the issue was raised, did not discuss it at all.

The claims and the issues in the Adversary Proceeding and this action are not identical. Collateral estoppel cannot apply.

B.    The Interpretation of Section 9 Was Not Necessary to the Bankruptcy Court's Decision

Without question, the Court did not rule that Mr. Weiss is liable for $100 million of corporate debt. Indeed, the bankruptcy court emphatically stated that it was not addressing or deciding ***the underlying merits of the Weiss Motion to Dismiss, which is pending before Judge Hellerstein in the Southern District of New York.*** Katz Decl. Ex. C at 54 n.20. (emphasis added). Because the collateral estoppel doctrine only precludes relitigation of determinations made on the

merits,[6] the bankruptcy court's statement alone is dispositive that issue preclusion is inappropriate here.

The bankruptcy court's commentary concerning performance guarantees also is dicta for two reasons. First, the bankruptcy court did not dismiss Counts I and II based on any findings that Section 9 is a payment guaranty. As the bankruptcy court's opinion makes clear, Count I was dismissed because guarantees, more broadly, are not deemed to be "transfers" but instead are generally considered to be obligations; and the entire Forbearance Agreement could not be avoided as a preferential transfer under Section 547(b) because it included an obligation (whatever its import) of a non-debtor. *Id.* at 51-53. Count II was dismissed because Debtors could not show that reasonably equivalent value was not provided for the transfers or obligations and because Section 548(a)(1)(B) only permits the avoidance of obligations "incurred by the debtor." *Id.* at 61-62. In other words, the bankruptcy court's commentary on the distinction between performance guarantees and payment guarantees was wholly unnecessary to the court's ultimate ruling.

Collateral estoppel does not apply where a determination is not dependent on the issue for which preclusion is sought. As comment h to Section 27 of the Restatement (Second) of Judgments provides:

> If issues are determined but the judgment is not dependent upon the determinations, relitigation of those issues in a subsequent action between the parties is not precluded. Such determinations have the characteristics of dicta, and may not ordinarily be the subject of an appeal by the party against whom they were made. In these circumstances, the interest in providing an opportunity for a considered determination, which if adverse may be the subject of an appeal, outweighs the interest in avoiding the burden of relitigation.

---

[6]    *Bear, Stearns & Co. v. 1109580 Ontario, Inc.*, 409 F.3d 87, 91 (2d Cir. 2005) ("Collateral estoppel is permissible as to a given issue" only if, among other requirements, "the resolution of the issue was necessary to support a valid and final judgment on the merits"); *Carroll v. LeBoeuf, Lamb, Greene & MacRae, LLP*, 623 F. Supp. 2d 504, 509 (S.D.N.Y. 2009) ("the doctrines of issue and claim preclusion apply only where there has been a final judgment on the merits").

*See Bobby v. Bies,* 556 U.S. 825, 834 (2009) (relying on section 27 of the Restatement and stating "[i]f a judgment does not depend on a given determination, relitigation of that determination is not precluded").

In addition, the bankruptcy court only has jurisdiction to hear and determine "core proceedings," including proceedings to avoid preferences and fraudulent conveyances, not state law claims like the instant contract dispute. *See* 28 U.S.C. § 157(b); *Stern v. Marshall,* 564 U.S. 462, 475-76 (2011). Where a proceeding is not a core proceeding, proposed findings of fact and conclusions of law must be submitted to the district court. "It is the district court that enters final judgment in such cases after reviewing de novo any matter to which a party objects." *Stern,* 564 U.S. at 462 (quoting 28 U.S.C. § 157(c)(1)).

To the extent that Jefferies is arguing that the bankruptcy court's remarks about Section 9 should be construed as a final decision on the merits with respect to the scope of Mr. Weiss's guarantee, Jefferies is essentially positing that the bankruptcy court exceeded its authority and jurisdiction under *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 71 (1982). In explaining the landmark *Marathon* decision, the Supreme Court has stated that "Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review." *Stern,* 564 U.S. at 494. The bankruptcy court plainly understood this limitation based on its statement that it was not addressing the merits of the issues before this Court.

C.    Weiss Did Not Have a Full and Fair Opportunity to Litigate the Issue for which Jefferies Seeks Preclusion

Collateral estoppel is also unwarranted because Mr. Weiss has not had ***any*** opportunity to litigate the issues raised in this case. "If a party is not shown to have had a full and fair opportunity

18

to litigate the issue, he is not precluded from litigating it in a subsequent case." *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d Cir. 2013). "Although neither judges, the parties, nor the adversary system performs perfectly in all cases, the requirement of determining whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate is a most significant safeguard." *Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 329 (1971). "[T]his inquiry normally focuses on whether there were procedural limitations or a lack of incentive to fully litigate an issue in the prior proceeding." *Robinson v. Volkswagenwerk AG*, 56 F.3d 1268, 1274 n.5 (10th Cir. 1995).

The relevant considerations for this prong of the collateral estoppel doctrine include "the nature of the forum and the importance of the claim in the prior litigation, the incentive and initiative to litigate and the actual extent of litigation, and the competence and expertise of counsel." *Hickerson v. City of New York,* 146 F.3d 99, 109 (2d Cir. 1998). The nature of the forum is an especially compelling consideration here because the context of the bankruptcy court decision was an adversary proceeding against a creditor to avoid the pre-bankruptcy transfer of interests and alleged fraudulent conveyances. These claims are created under the bankruptcy code and can only be asserted in a bankruptcy proceeding. Mr. Weiss was not a party to the adversary proceeding, nor could he be, since it is a dispute between Debtors and a creditor of the estate. Moreover, Debtors' counsel does not represent Weiss personally.

Jefferies argues that Mr. Weiss had a full and fair opportunity to litigate the scope of the guarantee because counsel for Weiss argued on his behalf during the hearing. Jefferies Mem. at 8-9. This is false. Mr. Weiss's counsel did not present any arguments at the hearing; she merely provided case citations and procedural information about the instant action. She did not discuss the form, structure, or interpretation of Section 9 because that matter was "pending before Judge

19

Hellerstein in the Southern District of New York."  *See* Balber Decl. Ex. 17 at 49:8-22; Katz Decl. Ex. C at 54 n.20.

Moreover, as noted above, neither the parties to the Adversary Proceeding nor the bankruptcy court gave Mr. Weiss any notice that his individual rights could be affected by the bankruptcy court's ruling in the Adversary Proceeding.  Nor did the parties' briefing provide such notice.  Indeed, if the parties themselves were unable to address the issue raised by the bankruptcy court, the expectation that a non-party, who had no notice and did not participate in the briefing on the motion, should be bound by the bankruptcy court's purported findings is unfair and unreasonable.

Jefferies' privity argument fares no better.  Privity for collateral estoppel purposes requires a showing that the interests of the person claimed to be in privity were adequately represented by a party with the authority to represent those interests or "depends on a finding that the person against whom collateral estoppel is applied actively participated in the previous litigation." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber,* 327 F.3d 173, 187 (2d Cir. 2003).  It is a "factual determination of substance, not mere form," and "must not be applied mechanically." *Id.* at 186 (citations omitted). Here, there is nothing in the record to suggest that Mr. Weiss authorized the Debtors to represent him in the Adversary Proceeding or that he personally actively participated in the Adversary Proceeding.  Moreover, Debtors' counsel, who were approved by the bankruptcy court to represent the Debtors' interests, did not and could not represent Mr. Weiss.  It would be an injustice were this Court to prevent Mr. Weiss from defending himself in a contract dispute before this Court due to proceedings in a non-Article III court in which Weiss is not a party.  *See, supra,* at 18.

20

Jefferies' cases alleged supporting its privity argument are inapposite. Jefferies Mem. at 9. For example, in *Wang v. Pataki,* 396 F. Supp. 2d 446 (S.D.N.Y. 2005), Wang, the principal, was the chief executive officer of an internet business, PCL. Wang and PCL were jointly represented co-plaintiffs in a federal action challenging the constitutionality of a New York statute. The federal action was subsequently stayed while various administrative and state court proceedings involving Wang proceeded. In those state court proceedings, Wang made the same constitutional argument that she and PCL had made in the district court. After the stay of the federal action was lifted, the district court held that both Wang and PCL were precluded from making the argument that Wang had lost in the state court. Thus, unlike the instant case, the issue was exactly the same and both parties collectively asserted the identical issue before and after the state court ruling. Moreover, Weiss is not a party to the adversary proceeding, and Debtors are not parties to this action. Debtors plainly were not acting as Mr. Weiss's agent.

Jefferies' other authorities are similarly unhelpful. *See Fernicola v. Specific Real Property*, No. 00 CIV. 5173, 2001 WL 1658257, at *4-5 (S.D.N.Y. Dec. 26, 2001) (privity being discussed in the context of defense collateral estoppel, which raises none of the due process concerns raised here); *Superior Funding Corp. v. Big Apple Cap. Corp.*, 738 F. Supp. 1468, 1469-71 (S.D.N.Y. 1990) (incorrectly citing *United States v. Grayson*, 879 F.2d 620, 625 (9th Cir.1989), to claim that "collateral estoppel applies to guarantor of corporate debt" despite *Grayson's* statement that "[t]here [was] nothing in the record to suggest that the district court's ruling was based on collateral estoppel").

Jefferies also fails to address the Supreme Court's decision in *Taylor v. Sturgell,* 553 U.S. 880 (2008), decided after all of the cases upon which Jefferies relies, which clarifies and narrows the standards for non-party issue preclusion. "A person who was not a party to a suit generally

21

has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit.  The application of claim and issue preclusion to nonparties thus runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'"  *Id.* at 892-93.  The Supreme Court outlined six exceptions that might trigger the application of issue preclusion, however, none of those exceptions are applicable here.

### III.    JEFFERIES FAILS TO DEMONSTRATE THAT THE FORBEARANCE AGREEMENT CONTAINS A PERSONAL PAYMENT GUARANTEE

A.    The Plain Language of the Forbearance Agreement Supports Mr. Weiss's Interpretation

Guarantees, like any other contract, must be interpreted according to their terms, and "[a]ll parts of a contract must be read in harmony to determine" the contract's meaning.  *Bombay Realty Corp. v. Magna Carta, Inc. (In re Bombay Realty Corp.)*, 100 N.Y.2d 124, 127 (2003). Instead of relying on the plain language of the Forbearance Agreement, however, Jefferies relies on contracts found in other cases to claim that "well-settled law" requires construing the personal guarantee broadly.  Jefferies Mem. at 10.  To the contrary, Jefferies' argument runs afoul of "well-settled law," which requires "[t]he terms of [a] guaranty . . . to be strictly construed in favor of a private guarantor."  *665-75 Eleventh Ave. Realty Corp. v. Schlanger*, 265 A.D.2d 270, 271 (1st Dep't. 1999).

Section 2 of the Forbearance Agreement is entitled "Weiss [Companies] Agreements" and Section 5 is entitled "Representations."  56.1 Statement ¶¶ 40-41, 46; Dillabough Decl. Ex. 3 §§ 2, 5.  Section 9 invokes both Sections 2 and 5 explicitly and does not reference any other section: "Weiss unconditionally and irrevocably personally guarantees to the Jefferies Entities the accuracy of the <u>representations</u> made by, and the performance of the <u>agreements</u> of, the Weiss [Companies] hereunder."  56.1 Statement ¶ 50; Dillabough Decl. Ex. 3 § 9 (emphasis added).

Section 9 does not reference either the Section 3 "Guaranty" or the Section 4 "Grant of Security." 56.1 Statement ¶ 50; Dillabough Decl. Ex. 3 § 9. This careful choice of words reflects that any alleged guarantee by Mr. Weiss would be limited to the listed sections. It cannot be implicitly broadened to other unreferenced sections. Had the parties wanted Mr. Weiss to guarantee every obligation of the Weiss Parties, it would have been easy enough to do so explicitly. *See Autocrafting Fleet Sols., Inc. v. All. Fleet Co.*, 148 A.D.3d 1564, 1565 (4th Dep't 2017) ("If the parties had wished to hold the individual guarantors personally liable for payment of the purchase price, they could have done so."). Mr. Weiss's understanding of the Forbearance Agreement gives meaning to each word (and omission) in the alleged personal guarantee, corresponds to the parties' supposed intent, and strictly construes the guarantee. *See Two Locks, Inc. v. Kellogg Sales Co.*, 68 F. Supp. 3d 317, 331 (E.D.N.Y. 2014) (court should strive to give effect and meaning to every term); *White Rose Food v. Saleh*, 99 N.Y.2d 589, 591 (2003) ("A guaranty is to be interpreted in the strictest manner.").

Jefferies' interpretation, by contrast, ignores Section 9's reference to specific sections and its omission of others. In effect, Jefferies asks the Court to rewrite Section 9 from the specific language drafted by Jefferies to the broader language used in *American Trading Co. v. Fish*, 42 N.Y.2d 20, 27-28 (1977). Jefferies Mem. at 10. But in that case, the contract guaranteed "***all*** the terms and conditions of this agreement," and so it is unsurprising that the court found that the guaranty covered payment, one of the "terms and conditions" of that agreement. *American Trading Co.*, 42 N.Y.2d at 27-28 (emphasis added). Likewise, as Mr. Weiss explained in his motion, the alleged personal "guarantee" contemplated Mr. Weiss deploying his corporate powers to cause the entities to perform their enumerated agreements – separate from their payment guaranties – and to confirm the accuracy of the representations of the corporate entities.

23

*See* Weiss Mem. at 16-20.  This narrower interpretation is more than sufficient to give the

Section 9 guarantee meaning.  *Cf. Merch. Cash & Cap., LLC v. Haute Soc'y Fashion, Inc.*, No.

16-CV-2696 (ILG), 2017 WL 2912452, at *3 (E.D.N.Y. July 6, 2017) (holding that guaranty

must include payment where "it would be challenging to prescribe some other meaningful

purpose the Guaranty was intended to serve.").[7]

Mr. Weiss's narrower construction of the Forbearance Agreement – and the construction

he understood when he signed the Forbearance Agreement – gives "[e]ffect and meaning . . . to

every term of the contract," and "harmonize[s] all of its terms."  *Two Locks*, 68 F. Supp. 3d at

331; 56.1 Statement ¶ 21.  By contrast, Jefferies' strained interpretation impermissibly expands

the guarantee beyond its plain language.  *See Mesquite Creek Wind LLC v. Mars Wind, Inc.*, 213

A.D.3d 529, 529-30 (1st Dep't 2023) ("[A] guarantor should not be bound beyond the express

terms of his guarantee.") (citations omitted).

Because Mr. Weiss has offered a reasonable alternative construction to Jefferies' implied

$100 million guaranty and because the Forbearance Agreement must be construed against

Jefferies, Jefferies' motion for summary judgment must be denied.  *See Symbol Techs., Inc. v.*

*Voicenet (Aust.) Ltd.*, No. CV-03-6010 SJF ARL, 2008 WL 89626, at *2 (E.D.N.Y. Jan. 4, 2008)

("A court must interpret a guaranty in the strictest manner in favor of the guarantor.") (internal

citations omitted); *Chase Manhattan Bank, N.A. v. Am. Nat. Bank & Tr. Co. of Chicago*, 93 F.3d

1064, 1073 (2d Cir. 1996) (same).

---

[7]      In *Merchant Cash*, the guarantor had specifically guaranteed that the underlying entity would not breach its
obligations to not default on the loan – a guaranty that could only be given meaning if it included a guaranty of
payment. *See Merch. Cash*, 2017 WL 2912452, at *2, *2 n.1.

B.     Extrinsic Evidence Also Supports Mr. Weiss's Interpretation of the Forbearance
       Agreement

Yet even if the Forbearance Agreement were ambiguous, Jefferies' motion for summary

judgment should still be denied.  "Even though summary judgment normally is inappropriate

when a contractual term is ambiguous because a triable issue of fact exists as to its interpretation,

it is appropriate on summary judgment to examine extrinsic evidence of the parties' intent in

order to determine whether there is a genuine issue of material fact as to their understandings of

the contract's meaning."  *Volt Elec. NYC Corp. v. A.M.E., Inc.*, 586 F. Supp. 3d 262, 277

(S.D.N.Y. 2022) (cleaned up).  The Court may "grant summary judgment where the extrinsic

evidence illuminating the parties' intended meaning of the contract is so one-sided that no

reasonable person could decide to the contrary" or where "there is no extrinsic evidence that

would support a resolution of [the] ambiguities in favor of the nonmoving party's case."  *New

York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 115 (2d Cir. 2010) (edits in

original).

Here, the extrinsic evidence uniformly supports Mr. Weiss's narrower interpretation.  No

extrinsic evidence has been offered in support of Jefferies' interpretation.  First, and most

importantly, Mr. Weiss never understood himself to be providing a personal guarantee to

Jefferies, and he would not have agreed to one if it had been included in the Forbearance

Agreement.  56.1 Statement ¶¶ 52-55, Weiss Decl. ¶¶ 3, 21.  Tellingly, no one at Jefferies ever

mentioned to Mr. Weiss that Jefferies was asking for a personal guaranty of their debt – and

Jefferies does not argue otherwise.  56.1 Statement ¶ 81.  It was not mentioned in the Zoom

meeting on the evening of February 11, 2024.  56.1 Statement ¶ 30.  It was not mentioned in the

call from Jefferies' CEO.  56.1 Statement ¶ 26.  It was not mentioned in the 2:20 am email

conveying Jefferies' offered forbearance agreement.  56.1 Statement ¶¶ 31, 34; Dillabough Decl.

Ex. 2. And it was not mentioned in either of the two draft complaints Jefferies sent to Mr. Weiss in the weeks following February 12, 2024, that sought to threaten and intimidate him into succumbing to their demands. 56.1 Statement ¶¶ 72, 76-81. The fact that Jefferies never even put Mr. Weiss on notice that they believed Mr. Weiss was guaranteeing their debt, and never once asserted such a position prior to the filing of this action, should end the inquiry—especially given the size of the potential guaranty.

Faced with such overwhelming and uniform extrinsic evidence, especially when the Court is required to make all inferences against Jefferies, the Court must deny Jefferies' motion for summary judgment. *See Coutard*, 848 F.3d at 114.

## IV.    MR. WEISS'S AFFIRMATIVE DEFENSES PRECLUDE SUMMARY JUDGMENT IN JEFFERIES' FAVOR

Even were Jefferies' correct that the Forbearance Agreement was mutually agreed to and that the parties agreed to Jefferies' strained interpretation, Jefferies would still not be entitled to summary judgment because Mr. Weiss has pleaded meritorious affirmative defenses. Jefferies' motion attempts to sidestep those defenses by arguing that they were insufficiently pleaded. *See* Jefferies Mem. at 11. While Jefferies' motion is not a model of clarity in this regard, it apparently seeks to strike Mr. Weiss's affirmative defenses pursuant to Rule 12(f), as the cases cited all concern motions to strike affirmative defenses rather than motions for summary judgment. *See D.S. Am. (E.), Inc. v. Chromagrafx Imaging Sys., Inc.*, 873 F. Supp. 786, 797 (E.D.N.Y. 1995) (ruling under Rule 12(f)); *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 687 F. Supp. 832, 840 (S.D.N.Y. 1988) (same); *Software Publishers Ass'n v. Scott & Scott, LLP*, C.A. No. 306CV0949G, 2007 WL 2325585, *1-2 (N.D. Tex. Aug. 15, 2007) (same); *Legal Recovery Assocs. LLC v. Brenes L. Grp., P.C.*, No. 22CV1778, 2023 WL 2253138, at *12

26

(S.D.N.Y. Feb. 13, 2023), *report and recommendation adopted,* No. 22-CV-1778, 2023 WL 2266534 (S.D.N.Y. Jan. 31, 2023) (same).

Tellingly, however, Jefferies does not provide the standard for a motion to strike pursuant to Rule 12(f) or any acknowledgement that "[m]otions to strike affirmative defenses are generally disfavored." *INTL FCStone Markets, LLC v. Intercambio Mexicano de Comercio S.A. de C.V.*, No. 18 Civ. 1004 (AKH), 2021 WL 5304285, at *3 (S.D.N.Y. Nov. 15, 2021). In the Second Circuit, a motion to strike an affirmative defense must meet a conjunctive test, showing that "(1) there is no question of fact which might allow the defense to succeed; (2) there is no question of law which might allow the defense to succeed; <u>and</u> (3) the plaintiff would be prejudiced by inclusion of the defense." *GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 96 (2d Cir. 2019) (emphasis added). The pleading standard for affirmative defenses is more relaxed and context dependent than that for complaints, given the abbreviated timeframe in which affirmative defenses must be asserted. *See id.* at 98.

Mr. Weiss's Answer, which generally denies the circumstances surrounding the Forbearance Agreement and includes straightforward contract defenses, such as a lack of mutual assent, failure of consideration, and duress, provides more than enough supporting facts given the circumstances outlined in the Complaint and the context in which the defenses were asserted. Answer ¶¶ 61-68; *id.* at 10-11; *see* Complaint at ¶¶ 63-68 (outlining terms of the Forbearance Agreement without pleading any consideration from Jefferies); *see* Katz Decl. Ex. B at 40-42, 45-46 (holding that Jefferies' alleged wrongful threats against Mr. Weiss constituted duress and that, other than as to GWA and WMSA, the Forbearance Agreement lacked consideration). That

27

is sufficient to preclude summary judgment.[8]  *See CMEG NYMEX Holding Inc. v. Optionable, Inc.*, No. 09-CV-3677, 2012 WL 3683560, at *7 (S.D.N.Y. Aug. 24, 2012) (denying motion for summary judgment as premature where "fact discovery is necessary to determine whether any of the numerous affirmative defenses proffered by Defendants preclude liability").

And, even if the Court were inclined to grant Jefferies' motion to strike, Mr. Weiss should be granted leave to replead the affirmative defenses because any failure to factually support the affirmative defenses can be cured.  *See Empower Fed. Credit Union v. Empower Annuity Ins. Co. of Am.*, No. 5:23-cv-941, 2024 WL 3639440, at *20 (N.D.N.Y. Aug. 2, 2024) (allowing leave to replead affirmative defenses to add further factual assertions).

---

[8]      While Jefferies' motion seeks only to strike Mr. Weiss's affirmative defenses pursuant to Rule 12(f), to the extent that Jefferies' reply attacks the affirmative defenses on their merits, that argument must be rejected.  The declarations submitted in support of Mr. Weiss's Motion for Summary Judgment demonstrate that, at a minimum, there exist material facts regarding Mr. Weiss's affirmative defenses, which would be further supported by discovery, that preclude summary judgment being entered in Jefferies' favor.  *See* Weiss Decl. ¶¶ 16-25 (outlining the "ultimatum" Jefferies made to Mr. Weiss that unless he signed the Forbearance Agreement, he would be sued and his reputation ruined); Dillabough Decl. ¶¶ 15-27 (describing Jefferies' threats and ultimatum, and Jefferies' reservation of right to sue despite Mr. Weiss signing the revised Forbearance Agreement); Fed. R. Civ. P. 56(d) (permitting the court to allow additional discovery before rendering judgment).

A-740

## **CONCLUSION**

For the reasons described above, the Court should deny Jefferies' motion for summary

judgment.[9]

Dated:  New York, New York
            November 22, 2024

                                        KAPLAN RICE LLP


                                        By:    /s/ Howard Kaplan
                                                Howard Kaplan
                                                Michelle Rice
                                                142 West 57th Street
                                                Suite 4A
                                                New York, New York 10019
                                                (212) 235-0300


                                        OLSHAN FROME WOLOSKY LLP


                                        By:    /s/ Brian A. Katz
                                                Brian A. Katz
                                                Daniel M. Stone
                                                1325 Avenue of the Americas
                                                New York, New York 10019
                                                (212) 451-2300

                                        *Attorneys for George Weiss*

---

[9]       Jefferies' memorandum closes with a request for attorneys' fees in an amount to be determined at a later
date but offers no argument in support of its supposed entitlement to attorneys' fees.  Jefferies Mem. at 12.
Jefferies' failure to support its claim for attorneys' fees with any support whatsoever waived its opportunity to
justify this request.  *See Wooding v. City of Hartford*, 2024 WL 4349049, at *9 (D. Conn. Sept 30, 2024) (plaintiffs'
failure to support its claim on summary judgment resulted in the claim being waived).

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JEFFERIES STRATEGIC INVESTMENTS,     Case No. 1:24-cv-04369-AKH
LLC and LEUCADIA ASSET
MANAGEMENT HOLDINGS LLC,

Plaintiffs,

-against-

GEORGE WEISS,

Defendant.

---

**DEFENDANT WEISS'S RESPONSE TO**
**JEFFERIES LOCAL RULE 56.1 STATEMENT**

Pursuant to Local Civil Rule 56.1(b) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, defendant George Weiss, by and through his undersigned counsel, submits this response to plaintiffs Jefferies Strategic Investments, LLC's ("JSI") and Leucadia Asset Management Holdings LLC's ("LAM Holdings," and with JSI, "Plaintiffs") statement of material facts (ECF No. 31).

## I.     George Weiss's Control Over the George Weiss Companies

1.     Defendant George Weiss ("Weiss") is the manager of Weiss Family Interests LLC. Balber Decl. Ex. 18 at 6.[1]

    Response:     Undisputed.

2.     Weiss is the manager of Benjamin Penn LLC. *Id.*

    Response:     Undisputed.

3.     Weiss is the trustee of the George A. Weiss Revocable Trust. *Id.*

---

[1] "Balber Decl." refers to the Declaration of Scott S. Balber in Support of Plaintiffs' Motion for Summary Judgment. References to "Ex.  " refer to the exhibits to the Balber Decl.

<u>Response:</u>    Undisputed.

4.    Weiss is the manager of GWA, LLC ("GWA"). *Id.*

<u>Response:</u>    Undisputed.

5.    GWA is owned by the following entities and individuals, in the following percentages: (i) Weiss Family Interests LLC (15.9%); (ii) Benjamin Penn LLC (15.9%); (iii) George A. Weiss Revocable Trust (23.8%); and (iv) a certain number of employees of WMSA (44.4%). Balber Decl. Ex. 6 ¶ 12.

<u>Response:</u>    Discovery has not occurred in this case and so Mr. Weiss cannot confirm or deny the facts in this paragraph. Mr. Weiss confirms, however, that the cited Declaration of Pierce Archer states the assertions made in this paragraph.

6.    GWA is the parent (in whole or in part) of Weiss Multi-Strategy Advisers LLC ("WMSA"), Weiss Multi-Strategy Funds, LLC ("WMSF"), OGI Associates, LLC ("OGI"), Weiss Special Operations LLC ("WSPO," collectively with GWA, WMSA, WMSF, and OGI the "George Weiss Companies"). *Id.* ¶¶ 12–15.

<u>Response:</u>    Discovery has not occurred in this case and so Mr. Weiss cannot confirm or deny the facts in this paragraph. Mr. Weiss confirms, however, that the cited Declaration of Pierce Archer states that WMSA, WMSF, OGI, and WSPO are owned, wholly or in part, by GWA.

7.    Weiss is the Chairman and Chief Executive Officer of WMSA. *See* Balber Decl. Ex. 6 ¶ 16.

<u>Response:</u>    Undisputed.

8.    Weiss is the manager of WSPO. Balber Decl. Ex. 18 at 6.

<u>Response:</u>    Undisputed.

2

**II.     The George Weiss Companies Enter Into Agreements with Plaintiffs**

9.      On or about May 1, 2018, LAM Holding LLC and GWA entered into a Strategic Relationship Agreement dated as of (as amended, the "Strategic Relationship Agreement"). Balber Decl. Ex. 1-A.

Response:      Undisputed.

10.      Section 1(a) of the Strategic Relationship Agreement provides: "LAM shall have a right to receive the Profit Share Percentage of the Company Profits for the Profit Share Period (the 'Profit Share Amount'). The Profit Share Amount shall be calculated and paid in accordance with the terms of this Section 1." *Id.* § 1(a).

Response:      Undisputed that Balber Decl. Ex. 1-A contains the quoted language in Section 5(a).

11.      Section 1(b) of the Strategic Relationship Agreement provides: "LAM shall have a perpetual right to receive the Revenue Share Percentage of the Company Revenues for each Revenue Share Period (the 'Revenue Share Amount'). The Revenue Share Amount shall be calculated and paid in accordance with the terms of this Section 1." *Id.* § 1(b).

Response:      Undisputed that Balber Decl. Ex. 1-A contains the quoted language in Section 1(b).

12.      Under Section 5(b) of the Strategic Relationship Agreement, GWA agreed to "indemnify and hold harmless LAM and each of its Affiliates and their respective directors, officers, employees, agents and representatives . . . to the fullest extent permitted by law from and against any and all costs, losses, Claims, Taxes incurred, damages, liabilities and expenses, including reasonable costs of investigation and defense, and reasonable attorneys' fees and expenses . . . incurred by the Indemnified Party as a result of, in connection with, or related to this Agreement . . . ." *Id.* § 5(b).

12699659-1

Response:    Undisputed that Balber Decl. Ex. 1-A contains the quoted language in Section 5(b), as modified by Plaintiffs.

13.    On or about October 18, 2018, LAM Holding LLC assigned all of its rights under the Strategic Relationship Agreement to LAM Holdings, pursuant to an Assignment and Assumption Agreement. Balber Decl. Ex. 1-I at 1; Balber Decl. Ex. 6 ¶ 26.

Response:    Discovery has not occurred in this case and so Mr. Weiss cannot confirm or deny the facts in this paragraph. Mr. Weiss confirms, however, that the cited paragraphs of the Forbearance Agreement and the Declaration of Pierce Archer states LAM Holding LLC assigned its rights under the Strategic Relationship Agreement to Jefferies Asset Management Holdings LLC and that Jefferies Asset Management Holdings LLC later changed its name to Leucadia Asset Management Holdings LLC.

14.    On or about December 3, 2019, GWA, WMSA, and JFG Funding LLC, entered into a Note Purchase Agreement (as amended, the "2019 Note Purchase Agreement"). Balber Decl. Ex. 1-B.

Response:    Undisputed.

15.    The 2019 Note Purchase Agreement provides, in part, that "the Company [GWA, LLC] will pay to each holder of a Note, on demand, such further amount as shall be sufficient to cover all costs and expenses of such holder incurred in any enforcement or collection . . . including reasonable attorneys' fees, expenses and disbursements." *Id.* § 10.3.

Response:    Undisputed that Balber Decl. Ex. 1-B contains the quoted language in Section 10.3, as modified by Plaintiffs.

16.    On or about December 3, 2019, GWA issued a $31,250,000 Note to JSI. Balber Decl. Ex. 1-D.

Response:    Undisputed.

17.    On or about January 13, 2020, GWA issued a $18,750,000 Note to JSI. Balber Decl. Ex. 1-C.

Response:    Undisputed.

4

18.     On December 1, 2021, JFG Funding LLC and JSI entered into an Assignment and Assumption Agreement. Balber Decl. Ex. 1-E.

Response:     Undisputed.

19.     GWA, WMSA, and JSI entered into a Note Purchase Agreement dated as of September 21, 2022 (as amended, the "2022 Note Purchase Agreement" and collectively with the 2019 Note Purchase Agreement, the "Note Purchase Agreements"). Balber Decl. Ex. 1-F.

Response:     Mr. Weiss admits that Balber Decl. Ex. 1-F is a September 21, 2022 Note Purchase Agreement between GWA, WMSA, and JSI. Paragraph 19 includes references to unidentified amendments to the September 21, 2022 Note Purchase Agreement but provides no evidentiary support for those amendments. As such, Mr. Weiss does not admit or deny any facts regarding any unidentified amendment of the September 21, 2022 Note Purchase Agreement.

20.     The 2022 Note Purchase Agreement provides, in part, that "the Company [GWA, LLC] will pay to each holder of a Note, on demand, such further amount as shall be sufficient to cover all costs and expenses of such holder incurred in any enforcement or collection . . . including reasonable attorneys' fees, expenses and disbursements." *Id.* § 10.3.

Response:     Mr. Weiss admits that Balber Decl. Ex. 1-F includes the quoted language in Section 10.3, as modified by Plaintiffs.

21.     On or about September 21, 2022, GWA issued a $3,000,000 Note to JSI. Balber Decl. Ex. 1-G.

Response:     Undisputed.

**III.    Weiss and the George Weiss Companies Enter Into the Forbearance Agreement**

22.     On December 21, 2023, JSI sent a document titled "Notice of Optional Redemption" to GWA. Balber Decl. Ex. 1-H.

Response:     Undisputed.

23.     On February 12, 2024, Weiss and the George Weiss Companies executed a forbearance agreement (the "Forbearance Agreement"). Balber Decl. Ex. 1-I.

    <u>Response:</u>    Disputed. First, Balber Decl. Ex. 1-I is unsigned by any party. Second, as described in further detail in Mr. Weiss's Summary Judgment papers, Mr. Weiss executed a version of the Forbearance Agreement that contained material modifications to that agreement which Plaintiffs rejected. Declaration of Jeffrey Dillabough ¶¶ 17-18, 24-27 (ECF No. 28); Dillabough Decl. Exs. 2-5 (ECF Nos. 28-2, 28-3, 28-4, 28-5).

    24.    Section 3(a) of the Forbearance Agreement provides as follows: "Each Weiss Party (other than GWA) . . . irrevocably and unconditionally guarantees to each of JSI and LAM Holdings . . . and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other Weiss Party when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations (as herein defined)." *Id.* § 3.

    <u>Response:</u>    Undisputed that Balber Decl. Ex. 1-I includes the quoted language in Section 3(a), as modified by the Plaintiffs. Mr. Weiss clarifies, however, the Mr. Weiss is not a "Weiss Party" as defined in Balber Decl. Ex. 1-I.

    25.    The Guaranteed Obligations included, *inter alia*, "all the obligations of GWA and each other Weiss Party arising under any Note Purchase Agreement, the Notes, the SR Agreement and this Agreement . . . ." *Id.*

    <u>Response:</u>    Undisputed that Balber Decl. Ex. 1-I includes the quoted language in Section 3(a), as modified by the Plaintiffs. Mr. Weiss clarifies, however, the Mr. Weiss is not a "Weiss Party" as defined in Balber Decl. Ex. 1-I.

    26.    Section 9 of the Forbearance Agreement provides that:

> Weiss unconditionally and irrevocably personally guarantees to the Jefferies Entities the accuracy of the representations made by, and the performance of the agreements of, the Weiss Parties hereunder. Weiss further agrees that he shall take all actions within his control, including by exercising all of his voting, governance, management and other rights and powers with respect to each of the other Weiss Parties, any of their subsidiaries and any of his personal or his family's trusts to cause such persons to comply with the terms of this Agreement.

*Id.* § 9.

12699659-1

Response:        Undisputed that Balber Decl. Ex. 1-I includes the quoted language in Section 9.

## IV.    The George Weiss Companies File for Bankruptcy

27.        On April 29, 2024, GWA, WMSA, WSPO, and OGI filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code. Balber Decl. Exs. 2–5.

Response:        Disputed to the extent that no voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code for WMSA was attached as an exhibit to the Balber Decl. Exhibit 2 is not a voluntary petition for relief pursuant to Chapter 11 of any of GWA, WMSA, WSPO, or OGI. Balber Decl. Ex. 2 is a voluntary petition for relief of WMSF, dated June 19, 2024. Otherwise, undisputed.

28.        On or about June 11, 2024, WMSA filed a List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (the "WMSA Statement"). The WMSA Statement reflects that WMSA owes LAM Holdings $52,473,259.00." Balber Decl. Ex. 7.

Response:        Disputed. Balber Decl. Ex. 7 only shows that LAM Holdings had a disputed claim of $52,473,259.00.

29.        Those amounts are owed to LAM Holdings pursuant to the Strategic Relationship Agreement. *See* Balber Decl. Ex. 1-A, Balber Decl. Ex. 7.

Response:        Disputed. Balber Decl. Ex. 7 only shows that LAM Holdings had a disputed claim to WMSA's assets, it does not identify the origin of said claim.

30.        The WMSA Statement further reflects that WMSA owes JSI $43,190,924.00. Balber Decl. Ex. 7.

Response:        Disputed. Balber Decl. Exhibit 7 only shows that JSI had a disputed claim of $43,190,924.00.

31.        Those amounts are owed to JSI under the Notes. *See* Balber Decl. Exs. 1-C, 1-D, 1-G; Balber Decl. Ex. 7.

Response:        Disputed. Balber Decl. Ex. 7 only shows that JSI had a disputed claim to WMSA's assets, it does not identify the origin of said claim.

32.     On or about June 11, 2024, GWA filed a List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (the "GWA Statement"). The GWA Statement reflects that GWA owes LAM Holdings $52,473,259.00. Balber Decl. Ex. 8.

   Response:     Disputed. Balber Decl. Ex 8 only shows that LAM Holdings had a disputed claim of $52,473,259.00.

33.     Those amounts are owed to LAM Holdings pursuant to the Strategic Relationship Agreement. *See* Balber Decl. Ex. 1-A, Balber Decl. Ex. 8.

   Response:     Disputed. Balber Decl. Ex. 8 only shows that LAM Holdings had a disputed claim to GWA's assets, it does not identify the origin of said claim.

34.     The GWA Statement further reflects that GWA owes JSI $43,190,924.00. Balber Decl. Ex. 8.

   Response:     Disputed. Balber Decl. Ex. 8 only shows that JSI had a disputed claim of $43,190,924.00.

35.     Those amounts are owed to JSI under the Notes. *See* Balber Decl. Exs. 1-C, 1-D, 1-G; Balber Decl. Ex. 8.

   Response:     Disputed. Balber Decl. Ex. 8 only shows that JSI had a disputed claim to GWA's assets, it does not identify the origin of said claim.

36.     On or about June 11 2024, OGI filed a List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (the "OGI Statement"). The OGI Statement reflects that OGI owes LAM Holdings $52,473,259.00. Balber Decl. Ex. 9.

   Response:     Disputed. Balber Decl. Ex. 9 only shows that LAM Holdings had a disputed claim of $52,473,259.00.

37.     Those amounts are owed to LAM Holdings pursuant to the Strategic Relationship Agreement. *See* Balber Decl. Ex. 1-A, Balber Decl. Ex. 9.

   Response:     Disputed. Balber Decl. Ex. 9 only shows that LAM Holdings had a disputed claim to OGI's assets, it does not identify the origin of said claim.

38.    The OGI Statement further reflects that OGI owes JSI $43,190,924.00. Balber Decl. Ex. 9.

Response:    Disputed. Balber Decl. Ex. 9 only shows that JSI had a disputed claim of $43,190,924.00.

39.    Those amounts are owed to JSI under the Notes. *See* Balber Decl. Exs. 1-C, 1-D, 1-G; Balber Decl. Ex. 9.

Response:    Disputed. Balber Decl. Ex. 9 only shows that JSI had a disputed claim to OGI's assets, it does not identify the origin of said claim.

40.    On or about June 11, 2024, WSPO filed a List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (the "WSPO Statement"). The WSPO Statement reflects that WSPO owes LAM Holdings $52,473,259.00. Balber Decl. Ex. 10.

Response:    Disputed. Balber Decl. Ex. 10 only shows that LAM Holdings had a disputed claim of $52,473,259.00.

41.    Those amounts are owed to LAM Holdings pursuant to the Strategic Relationship Agreement. *See* Balber Decl. Ex. 1-A, Balber Decl. Ex. 10.

Response:    Disputed. Balber Decl. Ex. 10 only shows that LAM Holdings had a disputed claim to WSPO's assets, it does not identify the origin of said claim.

42.    The WSPO Statement further reflects that WSPO owes JSI $43,190,924.00. Balber Decl. Ex. 10.

Response:    Disputed. Balber Decl. Ex. 10 only shows that JSI had a disputed claim of $43,190,924.00.

43.    Those amounts are owed to JSI under the Notes. *See* Balber Decl. Exs. 1-C, 1-D, 1-G; Balber Decl. Ex. 10.

Response:    Disputed. Balber Decl. Ex. 10 only shows that JSI had a disputed claim to WSPO's assets, it does not identify the origin of said claim.

44.    On June 19, 2024, WMSF filed a voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code. Balber Decl. Ex. 11.

Response:    Undisputed, however, Mr. Weiss notes that WMSF's voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code is Balber Decl. Ex. 2, not Balber Decl. Ex. 11.

45.    On or about June 28, 2024, WMSF filed the Global Notes, Methodology and Specific Disclosures Regarding WMSF's Schedules of Assets and Liabilities and Statement of Financial Affairs (the "WMSF Statement"). The WMSF Statement reflects that WMSF owes LAM Holdings $52,473,259.00. Balber Decl. Ex. 12.

Response:    Disputed. Balber Decl. Ex. 12 only shows that LAM Holdings had a disputed claim of $52,473,259.00.

46.    Those amounts are owed to LAM Holdings pursuant to the Strategic Relationship Agreement. *See* Balber Decl. Ex. 1-A, Balber Decl. Ex. 12.

Response:    Disputed. Balber Decl. Ex. 12 only shows that LAM Holdings had a disputed claim to WMSF's assets, it does not identify the origin of said claim.

47.    The WMSF Statement further reflects that WMSF owes JSI $43,190,924.00. Balber Decl. Ex. 12.

Response:    Disputed. Balber Decl. Ex. 12 only shows that JSI had a disputed claim of $43,190,924.00.

48.    Those amounts are owed to JSI under the Notes. *See* Balber Decl. Exs. 1-C, 1-D, 1-G; Balber Decl. Ex. 12.

Response:    Disputed. Balber Decl. Ex. 10 only shows that JSI had a disputed claim to WMSF's assets, it does not identify the origin of said claim.

**V.    The Bankruptcy Court Rejects Weiss's Arguments**

49.    On April 29, 2024, GWA, WMSA, WSPO, and OGI commenced an adversary proceeding against the Jefferies Parties captioned *GWA, LLC et al v. Jefferies Strategic Investments, LLC et al.*, No. 24-01350 (MG). Balber Decl. Ex. 13.

Response:    Undisputed.

50.    On June 25, 2024, the George Weiss Companies filed an amended complaint in the Adversary Proceeding. Balber Decl. Ex. 14.

_Response:_    Undisputed.

51.    On July 16, 2024, Plaintiffs moved to dismiss the George Weiss Companies' amended complaint in part. _See_ Balber Decl. Ex. 15.

_Response:_    Undisputed

52.    On August 6, 2024, the George Weiss Companies filed an opposition to the Plaintiffs' motion to dismiss. _See_ Balber Decl. Ex. 16.

_Response:_    Undisputed

53.    In that opposition, the George Weiss Companies stated, in part:

> Weiss . . . agreed to provide, at most, a guarantee of 'performance of the agreements of the Weiss Parties' under the Amended Forbearance Agreement. He did not guarantee any payments by the Debtors.

_Id._ at 13.

_Response:_    Undisputed that full paragraph quoted by Plaintiffs, and the only discussion in the Opposition at all regarding Mr. Weiss's alleged personal guarantee, is:

> "The remaining argument is focused on non-debtor George Weiss ("Weiss"). Wiess, the founder of the Debtors, was not a party to the original agreements with Defendants. Weiss signed the Amended Forbearance Agreement only under duress and agreed to provide, at most, a guarantee of 'performance of the agreements of the Weiss Parties' under the Amended Forbearance Agreement. He did not guarantee any payments by the Debtors.  Even under Defendants' tortured (and incorrect) interpretation of the Amended Forbearance Agreement, if the guarantee is avoid, there is no 'performance' required.

54.    On September 11, 2024, the Bankruptcy Court held a hearing on the Plaintiffs' (defendants in the adversary proceeding) motion to dismiss. Balber Decl. Ex. 17.

_Response:_    Undisputed

12699659-1

A-752

55.    During that hearing, the Bankruptcy Court asked:

Why wouldn't the agreement of Mr. Weiss to guarantee some or all of the debt stand, whether or not the remainder of the forbearance agreement, at least insofar as the Debtors are concerned, would fall? I mean, it's, you know, one of the things I've seen multiple times over the years is that a creditor will often be willing to forbear if it obtains a guarantee from a non-debtor principal. And that's what this is.

*Id.* 20:10–17.

Response:    Undisputed.

56.    In response, counsel for the George Weiss Companies argued that:

Mr. Weiss has only issued a performance guarantee of obligations of these parties under the amended forbearance agreement, not of the obligations under the loans or any other monies that are owed. This is solely a performance guarantee rather than a payment guarantee.

*Id.* 20:18–21:12; 25:22–25.

Response:    Undisputed that this response can be found in Balber Decl. Ex. 17 at 20:20-25. Disputed as to unquoted citations' relevance.

57.    Weiss's personal counsel, who is also representing Weiss in this matter, appeared

at the hearing on the motion to dismiss. *Id.* 45:5–15.

Response:    Undisputed that Ms. Rice, counsel to Mr. Weiss, spoke briefly at the hearing on the motion to dismiss.

58.    At the hearing, Weiss's counsel stated:

The case in the federal court is in front of Judge Alvin Hellerstein and I will give you a few case cites that you requested of Mr. Jureller. The Caldor Inc. v. Mattel, 817 F.Supp. 408; Key Bank of Long Island v. Burns, 162 A.D.2d 501; and Solco, S-O-L-C-O, Plumbing Supply Inc. v. Hart, 123 A.D.3d 798.

*Id.* 49:10–15.

Response:    Undisputed that Ms. Rice answered two questions from the Court: she listed certain cases as requested from Counsel for the George Weiss Companies and explained

A-753

the procedural posture of the instant matter. Undisputed that that was the extent of her participation in the hearing. *Id.* 27:20-28:11; 49:8-22.

## VI.    <u>Additional Undisputed Facts</u>

59.    On August 16, 2024, Plaintiffs submitted their Reply Brief in further support of their motion to dismiss.  Katz Decl. Ex. A.

60.    On September 24, 2024, the Bankruptcy Court granted-in-part and denied-in-part Jefferies' motion to dismiss in a memorandum opinion and order.  Katz Decl. Ex. B.

61.    On November 21, 2024, Chris K. Kiplok, the Examiner appointed in *In re Weiss Multi-Strategy Advisers, LLC,* Case No 24-10745 (MG) filed his Report.  Katz Decl. Ex. C.

Dated: New York, New York
November 22, 2024

                                              KAPLAN RICE LLP

                                    By:    *<u>/s/ Howard Kaplan</u>*
                                              Howard Kaplan
                                              Michelle Rice
                                              142 West 57th Street
                                              Suite 4A
                                              New York, New York 10019
                                              (212) 235-0300

                                      OLSHAN FROME WOLOSKY LLP

                                    By:    *<u>/s/ Brian A. Katz</u>*
                                              Brian A. Katz
                                              Daniel M. Stone
                                              1325 Avenue of the Americas
                                              New York, New York 10019
                                              (212) 451-2300

                                    *Attorneys for George Weiss*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEFFERIES STRATEGIC INVESTMENTS, LLC
and LEUCADIA ASSET MANAGEMENT
HOLDINGS LLC,

               Plaintiffs,

      -against-

GEORGE WEISS,

               Defendant.

Case No. 1:24-cv-04369 (AH)

---

**DECLARATION OF BRIAN A. KATZ IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Brian A. Katz, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am an attorney admitted to practice before this Court, and I am a partner at the law firm Olshan Frome Wolosky LLP, counsel for George Weiss ("Mr. Weiss").

2. I have personal knowledge of the matters set forth herein in my capacity as an attorney for Mr. Weiss and, if called upon to do so by the Court, I could and I would testify competently to the contents herein without any reservation.

3. I submit this declaration in opposition to Plaintiffs' Motion for Summary Judgment.

4. Attached hereto as **Exhibit A** is a true and correct copy of the Reply in Support of the Partial Motion to Dismiss the First Amended Complaint dated August 16, 2024 in the Adversary Proceeding captioned *In re Weiss Multi-Strategy Advisers LLC, et al.*, Adv. Proc. No. 24-01350 (MG).

12708959-1

A-755

5.      Attached hereto as **Exhibit B** is a true and correct copy of the Order dated

September 24, 2024 in the Adversary Proceeding captioned *In re Weiss Multi-Strategy Advisers*

*LLC, et al.*, Adv. Proc. No. 24-01350 (MG).

6.      Attached hereto as **Exhibit C** is a true and correct copy of the Examiner's Report

of Christopher K. Kiplok dated November 21, 2024 in the Adversary Proceeding captioned *In re*

*Weiss Multi-Strategy Advisers LLC, et al.*, Adv. Proc. No. 24-01350 (MG).

I, Brian A. Katz, declare under penalty of perjury that the foregoing is true and correct.

Executed November 22, 2024, in New York, New York.

/s/ Brian A. Katz
_____

Brian A. Katz

12708959-1