# 25-914-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————

JEFFERIES STRATEGIC INVESTMENTS, LLC,
LEUCADIA ASSET MANAGEMENT HOLDINGS LLC,

*Plaintiffs-Appellees,*

— v. —

GEORGE WEISS,

*Defendant-Appellant.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 4 of 5 (Pages A-756 to A-1006)

SCOTT BALBER
MICHAEL P. JONES
DANIEL GOMEZ
HERBERT SMITH FREEHILLS
    KRAMER NEW YORK LLP
*Attorneys for Plaintiffs-Appellees*
200 Park Avenue, 16th Floor
New York, New York 10166
(917) 542-7810

BRIAN A. KATZ
PETER M. SARTORIUS
DANIEL M. STONE
OLSHAN FROME WOLOSKY LLP
*Attorneys for Defendant-Appellant*
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300

CP COUNSEL PRESS   (800) 4-APPEAL • (382243)

i

# TABLE OF CONTENTS

**Page**

United States District Court Docket Entries .............. A-1

Notice of Removal, by Defendant, dated
    June 7, 2024 ........................................................... A-12

    Exhibit A to Notice -
    Summons and Complaint in the New York State
    Supreme Court Matter *Jefferies Strategic*
    *Investments, LLC and Leucadia Asset*
    *Management Holdings LLC v. George Weiss*
    ("New York State Matter"), dated May 6, 2024 .... A-17

Order Regulating Proceedings, by the Honorable
    Alvin K. Hellerstein, dated October 11, 2024 ....... A-39

Answer to Complaint, dated October 25, 2024 ......... A-40

Notice of Motion, by Defendant, for an Order
    Granting Summary Judgment, dated
    November 5, 2024 .................................................. A-52

Memorandum of Law, by Defendant, in Support of
    Motion, dated November 5, 2024 ......................... A-54

Statement of Material Facts, by Defendant, in
    Support of Motion, dated November 5, 2024 ........ A-83

Declaration of Defendant George Weiss, in Support
    of Motion, dated November 5, 2024 ..................... A-97

Declaration of Jeffrey Dillabough, in Support of
    Motion, dated November 5, 2024 ......................... A-104

    Exhibit 1 to Foregoing Documents -
    Draft Forbearance Agreement, dated
    February 1, 2024 ................................................... A-112

ii

**Page**

Exhibit 2 to Foregoing Documents -
Email from Jeffrey Dillabough to Sonia Han
Levovitz, dated February 12, 2024 ...................... A-120

Exhibit 3 to Foregoing Documents -
Forbearance Agreement, dated February 12, 2024 A-123

Exhibit 4 to Foregoing Documents -
Redlined Forbearance Agreement, dated
February 11, 2024 ................................................. A-136

Exhibit 5 to Foregoing Documents -
Email from Scott Balber to Jeffrey Dillabough,
dated February 12, 2024 ........................................ A-150

Exhibit 6 to Foregoing Documents -
Email from Nick Daraviras to
jvisser@hweiss.com, dated February 17, 2024 ..... A-155

    Attached to Email -
    (i) Draft Redacted Complaint............................ A-156

Exhibit 7 to Foregoing Documents -
Email from Scott Balber to Tracy Kelstadt, dated
March 26, 2024 ...................................................... A-183

    Attached to Email -
    (i) Draft Complaint ........................................... A-184

Notice of Motion, by Plaintiffs, for an Order
Granting Summary Judgment, dated
November 5, 2024 ................................................. A-209

Table of Contents of Documents Related to
Plaintiffs' Motion for Summary Judgment, dated
November 5, 2024 ................................................. A-211

Declaration of Scott S. Balber, for Plaintiffs, in
Support of Motion, dated November 5, 2024 ........ A-215

iii

**Page**

Exhibit 1 to Balber Declaration -
Declaration of Nicholas Daraviras, in the United
State Bankruptcy Court for the Southern District
of New York Matter *In Re: Weiss Multi-Strategy
Advisers LLC, et al.*, dated August 22, 2024 ......... A-221

Exhibit A to Daraviras Declaration -
Strategic Relationship Agreement, dated
May 1, 2018 ........................................................ A-228

Exhibit B to Daraviras Declaration -
Note Purchase Agreement, dated
December 3, 2019 ............................................... A-254

Exhibit C to Daraviras Declaration -
Note, dated January 13, 2020............................ A-291

Exhibit D to Daraviras Declaration -
Note, dated December 3, 2019........................... A-294

Exhibit E to Daraviras Declaration -
Assignment and Assumption Agreement, dated
December 1, 2021 ............................................... A-297

Exhibit F to Daraviras Declaration -
Note Purchase Agreement, dated
December 1, 2021 ............................................... A-301

Exhibit G to Daraviras Declaration -
Note, dated September 21, 2022 ....................... A-330

Exhibit H to Daraviras Declaration -
Notice of Optional Redemption......................... A-333

Exhibit I to Daraviras Declaration -
Forbearance Agreement, dated
February 12, 2024 .............................................. A-335

iv

**Page**

Exhibit J to Daraviras Declaration -
UCC Financing Statement ................................. A-349

Exhibit K to Daraviras Declaration -
Copy of Spreadsheet ........................................... A-351

Exhibit L to Daraviras Declaration -
Invoices Reflecting Attorneys' Fees .................. A-356

Exhibit 2 to Balber Declaration -
Chapter 11 Voluntary Petition for Non-Individual,
in the Bankruptcy Matter, dated April 29, 2024,
with Exhibits............................................................ A-360

Exhibit 3 to Balber Declaration -
Chapter 11 Voluntary Petition for Non-Individual
in the United States Bankruptcy Court for the
Southern District of New York Matter *In Re:
GWA, LLC*, dated April 29, 2024, with Exhibits.... A-370

Exhibit 4 to Balber Declaration -
Chapter 11 Voluntary Petition for Non-Individual
in the United States Bankruptcy Court for the
Southern District of New York Matter *In Re:
OGI, LLC,* dated April 29, 2024 ........................... A-380

Exhibit 5 to Balber Declaration -
Chapter 11 Voluntary Petition for Non-Individual
in the United States Bankruptcy Court for the
Southern District of New York Matter *In Re:
Weiss Special Operations LLC*, dated
April 29, 2024........................................................ A-390

Exhibit 6 to Balber Declaration -
Declaration of Pierce Archer, in the United State
Bankruptcy Court for the Southern District of
New York Matter *In Re: Weiss Multi-Strategy
Advisers LLC, et al.*, dated April 30, 2024............. A-400

v

**Page**

Exhibit 7 to Balber Declaration -
Declaration Under Penalty of Perjury for Non-
Individual Debtors, with Exhibits, in the United
States Bankruptcy Court for the Southern District
of New York Matter *In Re: Weiss Multi-Strategy
Advisers LLC, et al.*, dated June 11, 2024.............. A-449

Exhibit 8 to Balber Declaration -
Declaration Under Penalty of Perjury for Non-
Individual Debtors, with Exhibits, in the United
States Bankruptcy Court for the Southern District
of New York Matter *In Re: GWA, LLC*, dated
June 11, 2024 ........................................................ A-453

Exhibit 9 to Balber Declaration -
Declaration Under Penalty of Perjury for Non-
Individual Debtors, with Exhibits, in the United
States Bankruptcy Court for the Southern District
of New York Matter *In Re: OGI, LLC*, dated
June 11, 2024 ........................................................ A-455

Exhibit 10 to Balber Declaration -
Declaration Under Penalty of Perjury for Non-
Individual Debtors, with Exhibits, in the United
States Bankruptcy Court for the Southern District
of New York Matter *In Re: OGI, LLC*, dated
June 11, 2024 ........................................................ A-457

Exhibit 11 to Balber Declaration -
Chapter 11 Voluntary Petition for Non-Individual,
with Exhibits, in the United States Bankruptcy
Court for the Southern District of New York
Matter *In Re: Weiss Multi-Strategy Funds LLC*,
dated June 19, 2024 ................................................ A-459

vi

**Page**

Exhibit 12 to Balber Declaration -
Global Notes, Methodology and Specific
Disclosures Regarding WMSF's Schedules of
Assets and Liabilities and Statement of Financial
Affairs, in the United States Bankruptcy Court
for the Southern District of New York Matter *In
Re: Weiss Multi-Strategy Funds LLC*, filed
June 28, 2024 ........................................................... A-461

Exhibit 13 to Balber Declaration -
Complaint to Avoid and Recover Avoidable
Transfers, in the United States Bankruptcy Court
for the Southern District of New York Matter
*GWA, LLC et al. v. Jefferies Strategic
Investments, LLC et al.* ("Adversary
Proceeding"), dated April 29, 2024 ....................... A-484

Exhibit 14 to Balber Declaration -
First Amended Complaint in the Adversary
Proceeding, dated June 25, 2024 ........................... A-506

Exhibit 15 to Balber Declaration -
Memorandum of Law, by Plaintiffs, in Support of
Partial Motion, in the Adversary Proceeding,
dated July 16, 2024 ................................................. A-541

Exhibit 16 to Balber Declaration -
Memorandum of Law, by Plaintiffs, in
Opposition to Motion, in the Adversary
Proceeding, dated August 6, 2024 ......................... A-571

Exhibit 17 to Balber Declaration -
Transcript of Proceedings held before the
Honorable Martin Glenn, in the Adversary
Proceeding, dated September 11, 2024 ................... A-601

Exhibit 18 to Balber Declaration -
BrokerCheck Report for George Allen Weiss ........ A-671

vii

Page

Local Rule 56.1 Statement in Support of Plaintiffs'
Motion for Summary Judgment, dated
November 5, 2024 ................................................. A-680

Memorandum of Law, by Plaintiffs, in Support of
Motion for Summary Judgment, dated
November 5, 2024 ................................................. A-689

Memorandum of Law, by Defendant, in Opposition
to Motion for Summary Judgment, dated
November 22, 2024 ............................................... A-705

Defendant's Response to Plaintiffs' Local Rule 56.1
Statement, dated November 22, 2024 .................... A-741

Declaration of Brian A. Katz, for Defendant, in
Opposition to Motion for Summary Judgment,
dated November 22, 2024 ...................................... A-754

Exhibit A to Katz Declaration -
Reply in Support of Partial Motion to Dismiss
First Amended Complaint in the Adversary
Proceeding, dated August 16, 2024 ...................... A-756

Exhibit B to Katz Declaration -
Order of the Honorable Martin Glenn in the
Adversary Proceeding, dated September 24, 2024    A-771

Exhibit C to Katz Declaration -
Examiner's Report of Christopher K. Kiplok, in
the Adversary Proceeding, dated
November 21, 2024 ............................................... A-847

Local Rule 56.1 Counterstatement of Material Facts
in Opposition to Plaintiffs' Motion for Summary
Judgment, dated November 22, 2024 .................... A-931

viii

**Page**

Memorandum of Law, by Plaintiffs, in Opposition
to Defendant's Motion for Summary Judgment,
dated November 22, 2024 .................................... A-983

Reply Memorandum of Law, by Defendant, in
Further Support of Motion for Summary
Judgment, dated December 4, 2024 ...................... A-1006

Reply, by Defendant, to Plaintiff's Local Rule 56.1
Counterstatement .................................................. A-1030

Reply Memorandum of Law, by Plaintiffs, in
Further Support of Motion for Summary
Judgment, dated December 4, 2024 ...................... A-1082

Opinion and Order of the Honorable Alvin K.
Hellerstein, dated March 12, 2025 ...................... A-1108

Judgment, dated March 12, 2025 .............................. A-1117

Attachment to Judgment -
(i) United States District Court for the Southern
District of New York Appeal Instructions and
Forms ................................................................... A-1118

Notice of Motion, by Defendant, for an Order
Granting Reconsideration of and/or Amending
and Altering the Order and Judgment, dated
March 26, 2025 .................................................... A-1128

Memorandum of Law, by Defendant, in Support of
Motion for Reconsideration, dated
March 26, 2025 .................................................... A-1130

Notice of Motion, by Plaintiffs, for an Order
Correcting Omission in Judgment, dated
March 26, 2025 .................................................... A-1146

ix

                                                                    **Page**

Exhibit A to Notice -
Proposed Corrected Judgment ............................... A-1148

Exhibit B to Notice -
Plaintiffs' Calculation of Pre-Judgment Interest
and Total Amounts Owed ...................................... A-1150

Memorandum of Law, by Plaintiffs, in Support of
Motion to Correct Judgment, dated
March 26, 2025 ....................................................... A-1156

Memorandum of Law, by Plaintiffs, in Opposition
to Motion for Reconsideration, dated
April 9, 2025 ........................................................... A-1163

Memorandum of Law, by Defendant, in Opposition
to Motion to Correct Judgment, dated
April 9, 2025 ........................................................... A-1178

Notice of Appeal, by Defendant, dated April 10,
2025, with Opinion and Order, Appealed From .... A-1191

Reply Memorandum of Law, by Defendant, in
Further Support of Motion for Reconsideration,
dated April 16, 2025 ............................................... A-1202

Reply Memorandum of Law, by Plaintiffs, in
Further Support of Motion to Correct Judgment,
dated April 16, 2025 ............................................... A-1213

Order of the Honorable Alvin K. Hellerstein, dated
May 15, 2025 ......................................................... A-1224

Order of the Honorable Alvin K. Hellerstein, dated
May 16, 2025 ......................................................... A-1226

Amended Order of the Honorable Alvin K.
Hellerstein, dated May 20, 2025 ........................... A-1229

Corrected Judgment, dated May 21, 2025 ................. A-1232

x

**Page**

Attachment to Judgment -
(i) United States District Court for the Southern
District of New York Appeal Instructions and
Forms ........................................................................ A-1233

Amended Notice of Appeal, by Defendant, dated
May 22, 2025 .......................................................... A-1243

Exhibit 1 to Amended Notice -
Opinion and Order of the Honorable Alvin K.
Hellerstein, dated March 12, 2025.......................... A-1245

Exhibit 2 to Amended Notice -
Order of the Honorable Alvin K. Hellerstein,
dated May 15, 2025 ................................................ A-1254

Exhibit 3 to Amended Notice -
Amended Order of the Honorable Alvin K.
Hellerstein, dated May 20, 2025............................ A-1256

A-756

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 24-10743 (MG) |
| WEISS MULTI-STRATEGY ADVISERS | Case No. 24-10744 (MG) |
| LLC, *et al.* | Case No. 24-10745 (MG) |
| | Case No. 24-10746 (MG) |
| | Case No. 24-10747 (MG) |
| Debtors. | (Jointly Administered) |
| | |
| GWA, LLC, WEISS MULTI-STRATEGY | |
| ADVISERS LLC, OGI ASSOCIATES, LLC, | |
| WEISS SPECIAL OPERATIONS LLC, and | Adv. Proc. No. 24-01350 (MG) |
| WEISS MULTI-STRATEGY FUNDS LLC | |
| | |
| Plaintiffs, | |
| | |
| vs. | |
| | |
| JEFFERIES STRATEGIC INVESTMENTS, | |
| LLC and LEUCADIA ASSET | |
| MANAGEMENT HOLDINGS LLC, | |
| | |
| Defendants. | |

**REPLY BRIEF IN FURTHER SUPPORT OF JEFFERIES STRATEGIC
INVESTMENTS, LLC'S AND LEUCADIA ASSET MANAGEMENT HOLDINGS
LLC'S PARTIAL MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

A-757

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ ii

PRELIMINARY STATEMENT ......................................................... 1

ARGUMENT ..................................................................................... 2

I.    The Debtors Cannot Avoid the Forbearance
Agreement as a Preferential or Fraudulent Transfer ......................... 2

    A.    The Forbearance Agreement
Contains Provisions that Are Not Avoidable ..................... 2

    B.    The Debtors Admit that the Purported "Fraudulent
Transfers" Were Made on Account of Antecedent Debts ....... 3

II.    The Debtors' Rescission Claims Fail .......................................... 5

    A.    The Debtors Fail to Allege Duress ............................... 5

    B.    The Debtors Fail to Allege a Lack of Consideration ............. 6

    C.    The Debtors Fail to Allege a Lack of Acceptance ................ 7

III.    The Debtors Fail to Plead that the
$3 Million Payment was a Preferential Transfer ............................... 8

IV.    The Debtors Fail to Plead that the $17
Million Payments were Fraudulent Transfers ................................. 9

V.    The Debtors' Claims Under
11 U.S.C. §§ 550, 551, and 502(d) Should Be Dismissed ................ 9

VI.    The Debtors Should Not Receive Further Leave to Amend ............ 10

CONCLUSION .............................................................................. 10

i

A-758

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Prop. Consultants v. Cedar Income Fund P'ship L.P.*,
    31 A.D.3d 306 (1st Dep't 2006) ................................................................ 7, 8

*Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
    233 F.R.D. 327 (S.D.N.Y. 2005) ................................................................ 10

*Dan-Bunkering (Am.), Inc. v. Tecnologias Relacionadas*
    *con Energia y Servicios Especializados, S.A. de C.V.*,
    2020 WL 3893281 (S.D.N.Y. July 10, 2020) ............................................ 7

*Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.)*,
    507 B.R. 452 (Bankr. S.D.N.Y. 2014) ...................................................... 4

*In re 37-02 Plaza LLC*,
    387 B.R. 413 (Bankr. E.D.N.Y. 2008) ...................................................... 7

*In re Asia Glob. Crossing, Ltd.*,
    333 B.R. 199 (Bankr. S.D.N.Y. 2005) ...................................................... 8

*In re Eldridge*,
    22 B.R. 218 (Bankr. D. Me. 1982) ............................................................ 2

*In re TMST*,
    518 B.R. 329 (Bankr. D. Md. 2014) .......................................................... 3

*Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*,
    263 B.R. 406 (S.D.N.Y. 2001) .................................................................. 4

*MM Arizona Holdings LLC v. Bonanno*,
    658 F. Supp. 2d 589 (S.D.N.Y. 2009) ...................................................... 6, 7

*Off. Comm. of Unsecured Creditors of Vivaro*
*Corp. v. Leucadia Nat'l Corp. (In re Vivaro Corp.)*,
    524 B.R. 536 (Bankr. S.D.N.Y. 2015) ...................................................... 4, 9

*Oquendo v. CCC Terek*,
    111 F. Supp. 3d 389 (S.D.N.Y. 2015) ...................................................... 5

*O'Toole v. Karnani (In re Trinsum Grp., Inc.)*,
    460 B.R. 379 (Bankr. S.D.N.Y. 2011) ...................................................... 4, 5, 8

*Paradigm Air Carriers, Inc. v. Tex. Rangers Baseball Partners*
  *(In re Tex. Rangers Baseball Partners),*
  498 B.R. 679 (Bankr. N.D. Tex. 2013) ............................................................... 3

*Richman v. Brookhaven Servicing Corp.,*
  80 Misc. 2d 563 (Dist. Ct. Suffolk Cnty. 1975) .................................................. 8

*Salim v. Nisselson (In re Big Apple Volkswagen, LLC),*
  571 B.R. 43 (S.D.N.Y. 2017) ............................................................................. 10

*Savignano v. Play,*
  210 A.D.3d 1228 (3d Dep't 2022) ........................................................................ 7

*Silverberg v. SML Acquisition LLC,*
  2017 WL 758520 (S.D.N.Y. Feb. 27, 2017) ......................................................... 5

*Tese-Milner v. Edidin & Assocs. (In re Operations NY LLC),*
  490 B.R. 84 (Bankr. S.D.N.Y. 2013) ................................................................. 8, 9

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.,*
  2012 WL 3100778 (N.D. Tex. July 31, 2012) ...................................................... 8

## Statutes

11 U.S.C. § 502 ...................................................................................................... 10

11 U.S.C. § 550 .................................................................................................... 9, 10

11 U.S.C. § 551 .................................................................................................... 9, 10

The Jefferies Entities, by and through their undersigned counsel, respectfully submit this reply brief in further support of their partial motion to dismiss (the "Motion") the First Amended Complaint (the "FAC") filed by the Debtors in the above-captioned adversary proceeding.[1]

## PRELIMINARY STATEMENT

1.    The Debtors' claims are not viable as a matter of law.  As is most relevant here, the Jefferies Entities have demonstrated that:  (i) a personal guarantee assumed by George Weiss, the Debtors' chief executive officer and founder, in the Forbearance Agreement does not constitute a "transfer of an interest in the property of any debtor" or an "obligation" of a Debtor and, therefore, cannot be avoided; and (ii) the Debtors failed to plead any basis to avoid more than $17 million in payments that the Debtors admit were made to discharge antecedent debts.

2.    The Opposition, which largely regurgitates the FAC and asserts, in conclusory fashion, that the Debtors have asserted viable claims, confirms that the Debtors have no answer to either of these grounds for dismissal.[2]

3.    Instead, the Debtors attempt to invent an alternate reality in a desperate effort to protect non-debtor George Weiss, a veteran hedge fund manager who operated the Debtors' business for over 46-years, from paying the Jefferies Entities the more than $100 million that his companies owe, and which he contractually guaranteed.  To advance that fictional narrative, the Debtors—extremely sophisticated parties with extremely sophisticated internal and external counsel—complain that they signed the Forbearance Agreement due to "coercion" and "duress."

---

[1]    Capitalized terms not defined herein have the meanings set forth in the *Memorandum of Law in Support of Jefferies Strategic Investments, LLC's And Leucadia Asset Management Holdings LLC's Partial Motion to Dismiss the First Amended Complaint* (ECF No. 19; the "Memo").

[2]    "Opposition" or "Opp." refers to *Plaintiffs' Memorandum of Law in Opposition to Defendants' Partial Motion to Dismiss the First Amended Complaint* (ECF No. 20).

1

A-761

4.      However, it is undisputed that at least $95 million is owed now and was owed at the time the Forbearance Agreement was signed.  Debtors chose—of their own free will, with the advice of counsel—to sign the Forbearance Agreement in an effort to buy time in the hope that they would be able to convince a third party to bail them out of their financial woes.  While their gambit failed and the third party walked away, the Debtors cannot credibly claim that that they entered into the Forbearance Agreement under duress.  Indeed, any Forbearance Agreement, by definition, involves one party making concessions in exchange for the other party's forbearance.  The Debtors (and George Weiss) need to be held to the bargain that they struck.

5.      The Debtors' desperate attempts to avoid their bargain and the payments that they admit were made to pay down prior debts owed to the Jefferies Entities should be rejected.

## ARGUMENT

### I.      The Debtors Cannot Avoid the Forbearance Agreement as a Preferential or Fraudulent Transfer

#### A.      The Forbearance Agreement Contains Provisions that Are Not Avoidable

6.      The Debtors agree that, under the Bankruptcy Code, only a "transfer of an interest of the [D]ebtor[s] in property," or an "obligation" of the Debtors, may be avoided as a preferential or fraudulent transfer.  (*See* Opp. at 10, 14).  The Debtors also do not dispute that the Forbearance Agreement contains provisions that are not "transfers" or "obligations" of any Debtor:  *e.g.*, a personal guarantee issued by the Debtors' founder and CEO, George Weiss.  (*See* Memo at 12).

7.      Accordingly, the Debtors' claim seeking to avoid the Forbearance Agreement in its entirety—including the personal guarantee that is not subject to avoidance—should be dismissed.  (*See* Memo ¶¶ 35–39 (citation omitted)); *see also In re Eldridge*, 22 B.R. 218, 221 (Bankr. D. Me. 1982) (rejecting position that an "entire security agreement as a whole is avoidable").

2

8. Nevertheless, without citing any authority, the Debtors claim that if certain elements of the Forbearance Agreement are avoided (*i.e.*, the granting of a security interest), the "practical effect" would be the invalidation of the entire agreement. (Opp. at 12).

9. There is no law to support the Debtors' position. *Paradigm Air Carriers, Inc. v. Texas Rangers Baseball Partners (In re Tex. Rangers Baseball Partners)*, 498 B.R. 679, 687 (Bankr. N.D. Tex. 2013), the sole case cited by the Debtors, addressed only whether a trustee had constitutional standing to bring an avoidance action, and "pleaded the [requisite] fraudulent intent." It says nothing about a debtor's attempt to avoid non-avoidable elements of an agreement based upon some "practical effect." Meanwhile, *In re TMST.*, 518 B.R. 329, 347–48 (Bankr. D. Md. 2014), is directly on point, holding that any "argument that an entire agreement can be avoided as opposed to specific transfers and obligations . . . fails as a matter of law."

10. Accordingly, to the extent the Debtors are seeking to avoid the guarantees issued in the Forbearance Agreement, that claim should be dismissed.

**B.** **The Debtors Admit that the Purported "Fraudulent Transfers" Were Made on Account of Antecedent Debts**

11. The Debtors' claim to avoid the Forbearance Agreement as a constructive fraudulent transfer should also be dismissed because the Debtors have admitted that any transfers were "for or on account of antecedent debts . . . ." (FAC ¶ 85).

12. In their Opposition, the Debtors ignore that dispositive admission, as well as the abundant case law holding that, when a debtor admits that a transfer was made on account of an antecedent debt, the Court should presume that the transfer was for reasonably equivalent value. (*See* Memo ¶¶ 42–44 (collecting cases)). Instead, the Debtors cite a handful of cases which make the noncontroversial—and inconsequential—observation that the "[t]he question of reasonably equivalent value is based on the 'facts and circumstances of each case . . . .'" (Opp. at 15).

3

13. However, in this case, the Debtors have affirmatively pled that the transfers and obligations set forth in the Amended Forbearance Agreement were "on account of antecedent debts." (FAC ¶ 85). By alleging this, the Debtors have admitted that the transfers were "for value," as the Forbearance Agreement itself explicitly states. (ECF No. 7-7 § 10(c) ("Each Weiss Party and Weiss acknowledges and agrees that . . . the terms of this [Forbearance] Agreement, including the guaranty provided herein and the security interests granted herein, constitute reasonably equivalent value for the benefit it is receiving from entering into this Agreement.")). *See Off. Comm. of Unsecured Creditors of Vivaro Corp. v. Leucadia Nat'l Corp. (In re Vivaro Corp.),* 524 B.R. 536, 556 (Bankr. S.D.N.Y. 2015) ("[P]ayments made on account of . . . [an] antecedent debt . . . are 'presumed [to be] made "for value."'" (citation omitted) (alteration in original)); *O'Toole v. Karnani (In re Trinsum Grp., Inc.),* 460 B.R. 379, 388–89 (Bankr. S.D.N.Y. 2011) (similar).

14. None of the cases cited by the Debtors support a contrary conclusion. *See In re Vivaro Corp.,* 524 B.R. at 556 (noting that transfers "made on account of that antecedent debt and are 'presumed [to be] made "for value."'"); *Harrison v. N.J. Cmty. Bank (In re Jesup & Lamont, Inc.),* 507 B.R. 452, 470 (Bankr. S.D.N.Y. 2014) (finding, on summary judgment, an issue of fact as to whether transfer was not for value where trustee claimed, *inter alia,* that "[the transferor] did not owe an antecedent debt to [the transferor] at the time of the . . . Transfer"); *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.),* 263 B.R. 406, 466–67 (S.D.N.Y. 2001) (finding, after trial, that transfers were not for reasonably equivalent value, in part, because there were no records that the debtor ever received the contemplated consideration).[3] Accordingly, "[t]he Amended

---

[3] Moreover, the Debtors' chief argument, that the Jefferies Entities' "agree[ment] not to *immediately* sue all of the Debtors' employees," was of insufficient value (Opp. at 16–17) is directly undercut by their own admission that the lawsuit planned by the Jefferies Entities would have "led to the demise of the companies" (FAC ¶ 112). *See also In re Jesup & Lamont, Inc.,* 507 B.R. at 471 ("[F]orbearance can constitute 'reasonably equivalent value.'").

Complaint[], . . . fail[s] to meet the reasonably equivalent value requirement . . . ." *In re Trinsum Grp., Inc.*, 460 B.R. at 389.

## II.   The Debtors' Rescission Claims Fail

### A.   *The Debtors Fail to Allege Duress*

15.    There are two elements of a recission claim based on duress:  (i) that the agreement was procured by a "wrongful threat," and (ii) that the threat "precluded the exercise of its free will."  (Memo ¶ 47).  The Debtors' recission claim should be dismissed because they failed to plead any "***wrongful*** threat."  (*Id.* ¶¶ 46–49).  Specifically, because the Debtors alleged—at most— a "threatened breach of contract for which there are adequate legal remedies," the Debtors' claims must be dismissed.  *Oquendo v. CCC Terek*, 111 F. Supp. 3d 389, 408 (S.D.N.Y. 2015).

16.    The Debtors do not even address the "wrongful threat" requirement.  Instead, they parrot the FAC's allegations that, if the Jefferies Entities initiated litigation to collect the nearly $100 million indisputably owed to them, the Debtors would have faced "damages due to [their] breaches," potential "claw[ing] back [of] compensation payments," potential "freez[ing] [of] the Debtors' bank accounts," and "the demise of the company."  (Opp. at 18–19).  Putting aside that these things would have happened because of the Debtors' conduct, "[u]nder New York law, threats to enforce a party's legal rights under a contract—or even that party's *interpretation* of its rights— cannot constitute a wrongful threat sufficient to establish . . . duress."  *Oquendo*, 111 F. Supp. 3d at 408 (emphasis in original) (citation omitted).  Accordingly, the Debtors' cause of action to void the Forbearance Agreement on the basis of duress should be dismissed.  *See, e.g.*, *Silverberg v. SML Acquisition LLC*, 2017 WL 758520, at \*8 (S.D.N.Y. Feb. 27, 2017) (no duress where "Plaintiff could have refused [an agreement] and . . . pursued his legal remedies").

17.    Likewise, the Debtors, highly sophisticated and experienced asset management entities represented by equally sophisticated and experienced counsel, exercised their free will.

Indeed, the Debtors undoubtedly exercised their free will when they:  (i) refused to execute the original Forbearance Agreement (FAC ¶ 56); (ii) rejected the Jefferies Entities' demand not to pay nearly $30 million in bonuses to their senior management and employees (*see id.*); (iii) refused the Jefferies Entities' request to seek a Chapter 7 liquidation; and (iv) led the Jefferies Entities to believe that a settlement was near only to pull that settlement offer at the eleventh hour and to push their company into a Chapter 11 filing.  (*See* Declaration of Nicholas Daraviras ¶¶ 30–33, *In re Weiss Multi-Strategy Advisors, LLC*, No. 24-10743 (May 6, 2024) (ECF No. 20-3)).  The Debtors exercised their free will and acted in their self-interest in entering into the Forbearance Agreement.

### B.  The Debtors Fail to Allege a Lack of Consideration

18.      The Debtors' cause of action to avoid the Forbearance Agreement for lack of consideration must be dismissed because the Debtors admit that the Jefferies Entities agreed to not pursue claims against the Debtors for at least two days which, as a matter of law, is consideration.  (Memo ¶¶ 51–53).

19.      The Debtors make two meritless arguments.  *First*, the Debtors claim that the two-day forbearance was "meaningless," because, according to the Debtors, the Jefferies Entities had previously agreed to "forbear on taking any action under the Notes and Note Purchase Agreement until September 1, 2024."  (Opp. at 19).  That is false.  While JSI had previously agreed only to forbear from exercising a "Trigger Redemption prior to September 1, 2024" (ECF No. 15-8 § 1), JSI retained—and as the Debtors admit, ultimately exercised—its right to "redeem each Note . . . on each applicable Optional Redemption Date."  Thus, as of February 12, 2024, JSI had the express right to begin collection efforts for the more than $54 million which was then due and payable on the Notes.  (*See* ECF Nos. 7-6, 7-8 ¶¶ 120–21, 21-8).  Under the Forbearance Agreement, JSI agreed to forebear on that enforcement right for at least two days which, as a matter of law, constitutes "consideration."  *MM Arizona Holdings LLC v. Bonanno*, 658 F. Supp. 2d 589, 593

(S.D.N.Y. 2009) ("[F]orbearance of any length can constitute valid consideration.").

20.     *Second*, the Debtors argue that OGI, WSO, and WMSF—who were not parties to the original agreements, but issued guarantees under the Forbearance Agreement—received no consideration for their participation in the Forbearance Agreement.  However, "under contract law, a contract is supported by consideration even if the consideration flows solely to a third party."  *See In re 37-02 Plaza LLC*, 387 B.R. 413, 419 (Bankr. E.D.N.Y. 2008) (citation omitted).  Accordingly, "it is enough that something is promised, done, forborne or suffered by the [the promisee] . . . as consideration for the promise made to him," even if each party does not benefit from each promise, act, or forbearance.  *Dan-Bunkering (Am.), Inc. v. Tecnologias Relacionadas con Energia y Servicios Especializados, S.A. de C.V.*, 2020 WL 3893281, at *7 (S.D.N.Y. July 10, 2020).  Thus, the Debtors' allegation that the Jefferies Entities' forbearance did not benefit OGI, WSO and WMSF directly because they were not parties to the original agreements is meaningless.

### C.     *The Debtors Fail to Allege a Lack of Acceptance*

21.     Separately, while unclear, the Debtors appear to argue that the Jefferies Entities did not actually agree to enter into the Forbearance Agreement at all.  (Opp. at 20).

22.     However, as the Memo made clear, the FAC alleges that the Jefferies Entities took "objective actions support[ing] the conclusion that [they] accepted [the Forbearance A]greement," as evidenced by their "promptly fil[ing] UCC-1 financing statements against certain of the parties to the . . . Forbearance Agreement, in an effort to seek to perfect the security interests . . . granted under the . . . Forbearance Agreement."  (Memo ¶ 56 (citations omitted)).

23.     Accordingly, because the Debtors have admitted to facts which demonstrate the Jefferies Entities' acceptance of the Forbearance Agreement, the Debtors' allegations to the contrary fail.  *See, e.g.*, *Savignano v. Play*, 210 A.D.3d 1228, 1231 (3d Dep't 2022) (party accepted agreement "by proceeding with" performance); *Am. Prop. Consultants v. Cedar Income Fund*

*P'ship L.P.*, 31 A.D.3d 306, 306–07 (1st Dep't 2006) (finding that "the parties' conduct evidenced

acceptance" of an agreement); *see also Richman v. Brookhaven Servicing Corp.*, 80 Misc. 2d 563,

565 (Dist. Ct. Suffolk Cnty. 1975) ("promise . . . to close [a] mortgage . . . was made binding and

obligatory upon," *inter alia*, "the plaintiff's . . . forbearing to seek out another mortgage banker").

### III.   The Debtors Fail to Plead that the $3 Million Payment was a Preferential Transfer

24.     Count VIII of the FAC, seeking to avoid a February 15, 2024, $3 million payment

by OGI to JSI, should be dismissed because the Debtors fail to plead that, as a result of that transfer,

JSI received more than it would have in a hypothetical chapter 7 proceeding. (Memo ¶ 57). The

Debtors admit that, on the petition date, OGI owed the Jefferies Entities $95,664,183.00. (*See*

Declaration of George Weiss, *In re OGI, LLC*, No. 24-10745 (May 2, 2024) (ECF No. 5)). OGI

has no other creditors. (*Id.*). Thus, based on the Debtors' filings, the Debtors cannot show that

JSI received more than it would have in a hypothetical chapter 7 proceeding for OGI itself.

25.     In the Opposition, the Debtors' only response is to claim that OGI owed JSI nothing,

based upon the Debtors' separately alleged preference and fraudulent conveyance claims.

26.     However, the guarantee issued by OGI is not a "transfer" which he avoided as

a preferential transfer. (Memo ¶ 38 (citing *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 2012

WL 3100778, at *5 (N.D. Tex. July 31, 2012)). *See also In re Asia Glob. Crossing, Ltd.*, 333 B.R.

199, 204 (Bankr. S.D.N.Y. 2005) (holding that a guarantee was not a "transfer"). Moreover, the

Debtors have admitted that OGI's guarantee was made "for or on account of antecedent debts."

Accordingly, OGI's guarantee was for "reasonably equivalent value" and not avoidable as a

fraudulent transfer. *See, e.g.*, *In re Trinsum Grp., Inc.*, 460 B.R. at 389.

27.     Thus, OGI's debt to the Jefferies Entities is not actually in dispute. And, because

OGI has no other creditors entitled to any distribution in a hypothetical chapter 7 case, the Debtors'

$3 million preference claim should be dismissed. *See Tese-Milner v. Edidin & Assocs. (In re*

*Operations NY LLC)*, 490 B.R. 84, 102 (Bankr. S.D.N.Y. 2013) (dismissing preference claims for

failure to plead that creditor would have received less in a hypothetical chapter 7 proceeding).

## IV.   The Debtors Fail to Plead that the $17 Million Payments were Fraudulent Transfers

28.     The Debtors' claims to avoid—as constructive fraudulent transfers—$17 million of

payments used to pay down antecedent debts should be dismissed because the Debtors plead no

facts to show such payments were not for "reasonably equivalent value." (Memo ¶¶ 60–65).

29.     In their Opposition, the Debtors assert that there is a "a question of fact as to

whether the Debtors received reasonably equivalent value for the $17 million in payments." (Opp.

at 22). Not so. As the case law cited in the Memo explained—and which the Debtors do not even

attempt to distinguish—the Debtors received $17 million in value for that payment, in the form of

a reduced obligation to JSI under the Notes. (Memo ¶ 62 (collecting cases)).

30.     The Opposition cites no contrary case law. Instead, the Debtors argue that there

was a "manipulated acceleration" of the Notes, and "bad faith" by the Jefferies Entities. (Opp. at

22). Those claims are false. Even so, they do not remedy the Debtors' admission that they received

$17 million in credits for the $17 million payments. That admission warrants dismissing the

Debtors' constructive fraudulent transfer claims. *See, e.g.*, *In re Vivaro Corp.*, 524 B.R. at 556.

## V.   The Debtors' Claims Under 11 U.S.C. §§ 550, 551, and 502(d) Should Be Dismissed

31.     The Debtors completely ignore the case law holding that Sections 550 and 551 of

the Bankruptcy Code do not provide any independent causes of action but, instead, set forth certain

"statutory effects" that occur *after* an interest or obligation is avoided. (Memo ¶ 66–72).

Nevertheless, the Debtors argue—without citing any authority—that these claims should not be

dismissed because they are "conditioned upon any of the alleged avoidable transfers being upheld

by order of the Bankruptcy Court . . . ." (Opp. at 24). However, that the Debtors' claims are

"condition[al]" does not change that the law does not recognize a cause of action under Sections 550 or 551. Accordingly, Count IV, V, X, and XI of the FAC should be dismissed.

32.    The Debtors also ignore the case law holding that Section 502(d) may only be used to disallow a creditor's claim *after* the Court determines that a creditor "is liable" for a voidable transfer. (Memo ¶¶ 71–72). Accordingly, the Debtors' cause of action to disallow all of the Jefferies Entities' claims at this time is not ripe and should be dismissed. (*Id.* ¶ 72).

## VI.    The Debtors Should Not Receive Further Leave to Amend

33.    Finally, the Debtors request that, if the Court were to grant any portion of the Jefferies Entities' motion, the Debtors be given further leave to amend their pleading. However, the Debtors have already amended their complaint once, and have provided no additional facts that they would seek to include in some hypothetical further amendments. (Opp. at 25). For both reasons, the Court should deny the Debtors' request for leave to further amend their plainly deficient complaint. *See Salim v. Nisselson (In re Big Apple Volkswagen, LLC)*, 571 B.R. 43, 58 (S.D.N.Y. 2017) (denying leave to amend where the plaintiff offered no evidence that "if given an opportunity to re-plead, he could cure [the] fatal defect[s] to his compliant"); *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 233 F.R.D. 327, 329 (S.D.N.Y. 2005) (denying "a motion for leave to amend [the] complaint" based on the "failure to attach any proposed amended complaint").

## CONCLUSION

34.    For the foregoing reasons, the Jefferies Entities respectfully request that the Court dismiss Counts I, II, and IV through XII of the Debtors' FAC in their entirety, and Count III to the extent it asserts a constructive fraudulent conveyance claim.

A-770

Respectfully submitted,

Dated: New York, New York      **HERBERT SMITH FREEHILLS**
        August 16, 2024           **NEW YORK LLP**

     By: _/s/ Scott S. Balber_
       Scott S. Balber
       Michael P. Jones
       Daniel Gomez
200 Park Avenue
New York, New York 10166
Tel: (917) 542-7810
Fax: (917) 542-7601
Email: Scott.Balber@hsf.com
        Michael.Jones@hsf.com
        Daniel.Gomez@hsf.com

*Attorneys for Jefferies Strategic
Investments, LLC and Leucadia
Asset Management Holdings LLC*

A-771

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>WEISS MULTI-STRATEGY ADVISERS LLC, *et al.,*<br><br>               Debtors. | **FOR PUBLICATION**<br><br>Case No. 24-10743 (MG)<br><br>Chapter 11 |
| GWA, LLC, WEISS MULTI-STRATEGY ADVISERS LLC, OGI ASSOCIATES, LLC, WEISS SPECIAL OPERATIONS LLC, and WEISS MULTI-STRATEGY FUNDS LLC,<br><br>               Plaintiffs,<br><br>vs.<br><br>JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS, LLC,<br><br>               Defendants. | Adv. Pro. No. 24-01350 (MG) |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART JEFFERIES STRATEGIC INVESTMENTS, LLC'S AND LEUCADIA
ASSET MANAGEMENT HOLDINGS LLC'S PARTIAL MOTION TO DISMISS**

*A P P E A R A N C E S :*

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
*Attorneys for the Debtors*
200 West 41st Street, 17th Floor
New York, New York 10036
By:    Tracy L. Klestadt, Esq.
        John E. Jureller, Jr, Esq.
        Lauren C. Kiss, Esq.
        Stephanie R. Sweeney, Esq.

$$\boxed{\text{A-772}}$$

HERBERT SMITH FREEHILLS NEW YORK LLP
*Attorneys for Jefferies Strategic Investments, LLC,*
*Leucadia Asset Management Holdings LLC, and Jefferies LLC*
200 Park Avenue
New York, New York 10166
By:  Scott S. Balber, Esq.
  Michael P. Jones, Esq.
  Daniel Gomez, Esq.

**I.  BACKGROUND** ........................................................................................................... **5**

  A.  Overview of the Debtors' Businesses ....................................................................... 5

  B.  Debtors' Prepetition Agreements with the Jefferies Entities ................................... 6

    1.  Strategic Relationship Agreement and Related Agreements ............................ 7

    2.  Note Purchase Agreement and Notes ............................................................... 8

    3.  The Initial Forbearance Agreements & $17 Million in Payments ................... 11

      a.  The January 2022 Initial Forbearance Agreement and $15 Million in Payments .. 11

      b.  The September 2022 Initial Forbearance Agreement ............................. 13

      c.  The July 2023 Initial Forbearance Agreement and the $2 Million Payment .......... 15

  C.  The Notice of Optional Redemption ...................................................................... 16

  D.  Debtors' Payment of Bonuses and Signing of the 2024 Forbearance Agreement ........... 17

  E.  The 2024 Forbearance Agreement ......................................................................... 19

  F.  OGI's $3 Million Payment to JSI .......................................................................... 22

  G.  Commencement of the Chapter 11 Cases ............................................................... 23

  H.  The Adversary Proceeding ..................................................................................... 23

  I.  The Motion .............................................................................................................. 25

  J.  The Debtors' Opposition ........................................................................................ 27

  K.  The Jefferies Entities' Reply ................................................................................. 29

**II.  LEGAL STANDARD** ................................................................................................ **30**

**III.  DISCUSSION** .............................................................................................................. **32**

  A.  Validity and Binding Nature of the 2024 Forbearance Agreement ....................... 32

    1.  Rescission of the 2024 Forbearance Agreement as a Product of Duress ..................... 32

      a.  Wrongful Threats ................................................................................... 35

      b.  Threats Precluded the Exercise of Free Will ........................................ 41

    2.  Null and Void for Lack of Consideration, Intent to Comply, and Countersignature ..... 43

      a.  Lack of Consideration ........................................................................... 43

      b.  Lack of Intent to Comply ...................................................................... 46

      c.  Lack of Countersignature ...................................................................... 48

   3.   Counts VI and VII ............................................................................. 50

B.   Avoidance of the 2024 Forbearance Agreement and the Security Interests .................... 50

   1.   Avoidance of the 2024 Forbearance Agreement ........................................ 50

        a.   Preferential Transfer Pursuant to 11 U.S.C. § 547(b) ............................ 50

        b.   Fraudulent Transfer and Obligation Pursuant to 11 U.S.C. § 548(a)(1)(B) ........... 58

   2.   Avoidance of the Security Interests and Guarantees as a Fraudulent Transfers and
        Obligations Pursuant to 11 U.S.C. § 548(a)(1)(B) ................................... 62

   3.   Claims Seeking Contingent Relief ....................................................... 64

        a.   Preservation of Avoided Transfers Pursuant to 11 U.S.C. § 551 ........... 64

        b.   Liability of Transferee of Avoided Transfers Pursuant to 11 U.S.C. § 550(a) ....... 65

   4.   Counts I, II, III, IV, and V ............................................................. 66

C.   Avoidance of the Alleged Avoidable Transfers ................................................ 67

   1.   The $3 Million Alleged Avoidable Transfer as a Preferential Transfer Pursuant to 11
        U.S.C. § 547(b) ......................................................................... 67

   2.   The $20 Million in Alleged Avoidable Transfers as Fraudulent Transfers Pursuant to 11
        U.S.C. § 548(a)(1)(B) ................................................................... 69

   3.   Claims Seeking Contingent Relief ....................................................... 72

        a.   Preservation of Avoided Transfers Pursuant to 11 U.S.C. § 551 ........... 72

        b.   Liability of Transferee of Avoided Transfers Pursuant to 11 U.S.C. § 550(a) ....... 72

   4.   Counts VIII, IX, X, and XI .............................................................. 73

D.   Disallowance of the Jefferies Entities' Claims .............................................. 73

   1.   Count XII ............................................................................... 74

E.   Leave to Further Amend ....................................................................... 74

IV.   CONCLUSION ................................................................................. 76

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the contested motion (the "Motion," ECF Doc. # 19) of

Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC

("LAM Holdings," and with JSI, the "Jefferies Entities" or "Defendants").[1]  The Motion seeks

---

[1]         Unless otherwise indicated, all docket references shall refer to docket entries in the above-captioned
adversary proceeding.

partial dismissal of the *First Amended Complaint*[2] (the "FAC," ECF Doc. # 13-2) filed by GWA, LLC ("GWA"), Weiss Multi-Strategy Advisers LLC ("WMSA"), OGI Associates, LLC ("OGI"), Weiss Special Operations LLC ("WSO"), and Weiss Multi-Strategy Funds LLC ("WMSF" and, together with GWA, WMSA, OGI, and WSO, the "Debtors" or "Plaintiffs") in the above-captioned adversary proceeding (the "Adversary Proceeding") pursuant to Rule 7012 of the Federal Rules of Bankruptcy Procedure.

Annexed to the Motion is a supporting memorandum of law (the "Supporting Memorandum," ECF Doc. # 19-1). While no supporting declaration was filed with the Motion, the Jefferies Entities previously filed a partial motion to dismiss in connection with the first iteration of the adversary complaint. In support of that motion, the Jefferies Entities filed the supporting declaration of Scott S. Balber, partner at Herbert Smith Freehills New York LLP (the "Balber Declaration," ECF Doc. # 7-2). The *Notice of Jefferies Strategic Investments, LLC's and Leucadia Asset Management Holdings LLC's Partial Motion to Dismiss* (ECF Doc. # 19 at 1–2) indicates that the Jefferies Entities seek partial dismissal of the FAC in reliance upon, among other things, the Balber Declaration and the exhibits attached thereto.

On August 6, 2024, the Debtors filed an opposition (the "Opposition Brief," ECF Doc. # 20) to the Motion. In support of the Opposition, the Debtors filed the supporting declaration of John E. Jureller, Jr., a member of law firm Klestadt Winters Jureller Southard & Stevens, LLP (the "Jureller Declaration," ECF Doc. # 21). On August 16, 2024, the Jefferies Entities filed a reply brief (the "Reply Brief," ECF Doc. # 22) in further support of the Motion.

On September 11, 2024, the Court held a hearing on the Motion.

---

[2]     On July 15, 2024, the Debtors and the Jefferies Entities entered into a stipulation pursuant to which the Debtors were granted leave to file the FAC, which the Court so-ordered the next day. (*See* ECF Doc. # 18.)

For the reasons discussed below, the Court **GRANTS** the Motion in part and **DENIES**

the Motion in part as follows:

- Counts I, II, VIII, IX, X, and XI are dismissed in their entirety.

- Count III is dismissed except to the extent it asserts a preference claim that seeks to avoid the granting of security interests under the 2024 Forbearance Agreement (defined below) pursuant to 11 U.S.C. § 547(b).

- Counts IV and V are dismissed except to the extent they relate to the avoidance of security interests and guarantees arising under the 2024 Forbearance Agreement as preferential transfers under 11 U.S.C. § 547(b).

- Count VI is dismissed except to the extent such claim is asserted against OGI, WSO, and WMSF as is and WSMA with respect to the Jefferies Entities' threats of clawback litigation and freezing of bank accounts.

- Count VII is dismissed except to the extent it seeks a judgment that the 2024 Forbearance Agreement is null and void for lack of consideration as to OGI, WSO, and WMSF.

- Count XII survives dismissal in its entirety.

The Debtors may amend the FAC in accordance with the Court's ruling.

## I.   BACKGROUND[3]

### A.  Overview of the Debtors' Businesses

Each of the Debtors is "part of a constellation of financial services companies which, at

the direction of George A. Weiss . . . operated as a hedge fund since approximately 1978."

(Supporting Memorandum ¶ 10.)  At the helm is GWA, the holding company and parent—in

whole or in part—of the other Debtors.  (*Declaration of Pierce Archer, Senior Vice President*

*and Chief Operating Officer of the Debtors Pursuant to Local Bankruptcy Rule 1007-2 in*

*Support of Chapter 11 Petitions* (the "Initial Debtors First Day Declaration"), Case No. 24-

10743, ECF Doc. # 6 ¶ 12.)

---

[3]      The facts set forth herein are based on the "Statement of Alleged Facts" in the Jefferies Entities' Supporting
Memorandum, which itself is primarily predicated on facts set forth in the FAC.  The Jefferies Entities indicate that,
"[f]or purposes of this [M]otion only, the Jefferies Entities assume, but do not admit, the truth of all well-pleaded
factual allegations contained in the FAC."  (Supporting Memorandum at 4 n.3.)

A-776

Meanwhile, the remaining Debtors served in a variety of roles.  Historically, WMSA acted as a discretionary investment adviser to a number of private investment funds organized by WMSA, a mutual fund, and an Undertakings for Collective Investment in Transferable Securities fund.  (*Id.* ¶ 18.)  WMSA also advised managed accounts owned by institutional investors over which it exercised sole investment discretion.  (*Id.*)  OGI was an investment company that contained GWA's excess capital while WSO provided administrative services for certain investment funds and has been in the process of liquidating its assets since 2016.  (*Id.* ¶¶ 20, 22.)

Lastly, WMSF, formed in 2003 under the name Weiss Investment Management Services LLC, was a "limited purpose captive broker-dealer whose sole purpose was to solicit investors for the investment funds managed by WMSA, its . . . affiliate."  (*Declaration of Michele M. Lanzoni, Chief Financial Officer of Weiss Multi-Strategy Funds LLC, Pursuant to Local Bankruptcy Rule 1007-2* ("WMSF First Day Declaration"), Case No. 24-11075, ECF Doc. # 2 ¶ 11.)  WMSF, established for regulatory purposes, never held customer assets nor carried customer accounts for any clients.  (*Id.*; Supporting Memorandum ¶ 11.)  On June 4, 2024, the U.S. Securities and Exchange Commission approved WMSF's withdrawal and termination as a broker-dealer.  (FAC ¶ 26.)

**B.  Debtors' Prepetition Agreements with the Jefferies Entities**

From 2018 to 2022, GWA executed several contracts with the Jefferies Entities, through which it obtained financial support for the Debtors' business operations in exchange for certain payment obligations. (Supporting Memorandum ¶ 12.)  These agreements include: (i) a strategic relationship agreement (the "Strategic Relationship Agreement," ECF Doc. # 7-3) and a related investment management agreement (the "IMA"); (ii) two note purchase agreements (collectively, the "Note Purchase Agreements"); and (iii) certain forbearance agreements.

6

A-777

The Jeffries Entities state that, as of the commencement of the Adversary Proceeding, GWA owed to LAM Holdings approximately $52.5 million under the Strategic Relationship Agreement and more than $50 million, plus interest, under certain notes issued pursuant to the Note Purchase Agreements (each, a "Note," and collectively, the "Notes"). (*Id.* ¶¶ 17–18.)

Each of these agreements is discussed in turn.

    1.  Strategic Relationship Agreement and Related Agreements

On May 1, 2018, LAM Holdings' predecessor and GWA entered into the Strategic Relationship Agreement pursuant to which LAM Holdings obtained a "profit equity interest" in GWA. (*Id.* ¶ 13.) That interest entitled LAM Holdings to a share of the Debtors' revenue as an unsecured creditor.[4] (*Id.*; FAC ¶ 40 (representing that, at all relevant times, LAM Holdings was an unsecured creditor under the Strategic Relationship Agreement).) In addition, none of WMSA, OGI, WSO, and WMSF (i) were parties to or guarantors of obligations arising thereunder; (ii) granted any security interests or provided any offset; or (iii) received any consideration. (*Id.* ¶ 41; *see also id.* at 16 n.3 (stating that OGI and WSO were not signatories to nor guarantors of the Strategic Relationship Agreement).)

In connection with the Strategic Relationship Agreement, WMSA and JSI also entered into the Investment Management Agreement, dated May 1, 2018 (the "IMA"). (*Id.* ¶ 31.)

---

[4]    Note that, with respect to amounts GWA owes to LAM Holdings, the Jefferies Entities rely on the figure GWA provides in its court filings, which is higher than the figure in the Jefferies Entities' own records. (*Compare* Supporting Memorandum ¶ 17 (citing *Chapter 11 or Chapter 9 Cases Non-Individual: List of Creditors Who Have 20 Largest Unsecured Claims and Are Not Insiders*, Case No. 24-10743, ECF Doc. # 12 at 2, which specifies an amount of $52,473,259.00), *with Declaration of Nicholas Daravaras in Support of Jefferies Strategic Investments, LLC and Leucadia Asset Management Holdings LLC Motion for Conversion of the Debtors' Cases to Chapter 7 Pursuant to 11 U.S.C. § 1112(b)*, Case No. 24-10743, ECF Doc. # 20-3 ¶ 4 (stating that the Jefferies Entities' records reflect that GWA owes LAM Holdings $50,902,392.00 in revenue sharing fees on account of the Strategic Relationship Agreement).)

7

### 2. Note Purchase Agreement and Notes

GWA, WMSA, and JSI, as successor to JFG Funding LLC, entered into the two Note

Purchase Agreements on December 3, 2019 (the "2019 Note Purchase Agreement," ECF Doc.

# 21-1) and September 21, 2022 (the "2022 Note Purchase Agreement," ECF Doc. # 21-4). (*Id.*

¶¶ 34, 36.) Pursuant to the Note Purchase Agreements, GWA issued the Notes, which JSI agreed

to purchase, as follows: (i) a $31,250,000 Note dated December 3, 2019 issued pursuant to the

2019 Note Purchase Agreement (the "December 2019 Note," ECF Doc. # 21-2) and maturing on

December 3, 2024; (ii) a $18,750,000 Note dated January 13, 2020 issued pursuant to the 2019

Note Purchase Agreement (the "January 2020 Note," ECF Doc. # 21-3) and maturing on January

13, 2025; and (iii) a $3,000,000 Note dated September 21, 2022 issued pursuant to the 2022 Note

Purchase Agreement (the "September 2022 Note," ECF Doc. # 21-5) and maturing on September

21, 2029. (*Id.* ¶¶ 35, 37; *see also* Supporting Memorandum ¶ 14 ("JSI agreed to purchase $53

million in notes . . . issued by GWA under two 'Note Purchase Agreements'.").)

The Debtors represent that, under the Note Purchase Agreements, JSI was at all relevant

times an unsecured creditor of GWA and WMSA. (FAC ¶ 38.) There were no guarantees,

security interests, or rights of setoff under the Note Purchase Agreements or the Notes. (*Id.*) In

particular, none of OGI, WSO, and WMSF were parties to the Note Purchase Agreements, the

Notes, or any other related agreement with the Jefferies Entities and none guaranteed, granted a

security interest, provided for any offset, or received any consideration in connection with the

foregoing. (*Id.* ¶ 39.)

Notably, sections 7.2 and 7.3 of the Note Purchase Agreements provide certain

redemption rights with respect to the Notes. (*See* Supporting Memorandum ¶¶ 15–16.)

Specifically, section 7.2 of each Note Purchase Agreement grants GWA and JSI certain optional

8

A-779

redemption rights as to the applicable Notes and is virtually identical to the other.  Section 7.2 of

the 2019 Note Purchase Agreement provides:

> Each of [GWA] and [JSI] shall have the right to redeem each Note, in whole
> but not in part, on each applicable Optional Redemption Date (an "Optional
> Redemption") by at least 10 calendar days' prior written notice to the other
> party prior to the applicable Optional Redemption Date,[5] and [GWA] will
> pay [JSI] the Redemption Payment on the applicable Optional Redemption
> Date and the applicable Note will cease to be outstanding upon payment in
> full thereof.

(2019 Note Purchase Agreement § 7.2 (granting with respect to the December 2019 Note and

January 2020 Note); *see also* 2022 Note Purchase Agreement § 7.2 (granting the same with

respect to the September 2022 Note).)

Meanwhile, section 7.3 of the Note Purchase Agreements provides JSI with a "trigger

redemption" right as to the applicable Notes.  Section 7.3 of the 2019 Note Purchase Agreement

states:

> [JSI] shall have the right to redeem the Notes, in whole but not in part, at
> any time following the occurrence of either (a) Cause by prior written notice
> to [GWA] at any time or (b) a Members Equity Event by at least 10 calendar
> days' prior written notice to the Company (any such redemption, a "Trigger
> Redemption").   If the Notes are redeemed pursuant to a Trigger
> Redemption, [GWA] will pay [JSI] the Redemption Payment on the date
> specified by [JSI] in the applicable notice (the "Trigger Redemption Date")
> and the Notes will cease to be outstanding upon payment in full thereof.

(2019 Note Purchase Agreement § 7.3 (granting with respect to the December 2019 Note and

January 2020 Note); *see also* 2022 Note Purchase Agreement § 7.3 (granting the same with

---

[5]     With respect to the December 2019 Note, the Optional Redemption Date is defined to be "monthly, on the
last calendar day of each month, beginning the third anniversary of the December Closing."  (2019 Note Purchase
Agreement at A-4).  As for the January 2020 Note, such date is defined to be "monthly, on the last calendar day of
each month, beginning the third anniversary of the January Closing."  (*Id.*)  Finally, as for the September 2022 Note,
this date is defined to be "monthly, on the last calendar day of each month."  (2022 Note Purchase Agreement at A-
3.)

respect to the September 2022 Note).)[6]  Under the Note Purchase Agreements, a "Members

Equity Event" is deemed to have occurred when the "member's equity [in GWA]" is "equal to or

less than $10 million," calculated as if the applicable Notes had been redeemed in full as of such

day.  (2019 Note Purchase Agreement at A-4 (with respect to the December 2019 and January

2020 Notes only); 2022 Note Purchase Agreement at A-3 (with respect to all the Notes).)

In the event of an Optional Redemption or a Trigger Redemption, amounts due under the

Notes—computed in the manner set forth in the applicable Note Purchase Agreement—"shall

become due and payable" on the applicable Optional Redemption Date or Trigger Redemption

Date.  (2019 Note Purchase Agreement § 7.4; 2022 Note Purchase Agreement § 7.4.)

The Jefferies Entities maintain that JSI had the "right to redeem the Notes at its option

beginning in December 2022 and January 2023, so long as it provided at least 10 calendar days'

notice" pursuant to section 7.2 of the Note Purchase Agreements.  (Supporting Memorandum

¶ 15.)  At the hearing held on September 11, 2024, Debtors' counsel acknowledged that the

Jefferies Entities provided such notice, which triggered the Optional Redemption Date.  (*See*

Sept. 11, 2024 Hr'g Tr. at 47:12–19 (acknowledging to the Court that the Debtors received such

notice as set forth in paragraph 53 of the FAC).)  The Jefferies Entities also contend that,

pursuant to section 7.3 of the Note Purchase Agreements, JSI possessed the right to redeem the

Notes if GWA members' equity in GWA dropped to less than $10 million, which occurred in

late 2021.  (Supporting Memorandum ¶¶ 16, 21.)

---

[6]     Section 7.3 of the 2022 Note Purchase Agreement contains language notwithstanding the Table of Contents
that indicates that section 7.3 is "[RESERVED]."  Section 17.3(d) of the 2022 Note Purchase Agreement provides
that "all references herein to Sections and Schedules shall be construed to refer to Sections of, and Schedules to, this
Agreement."  (2022 Note Purchase Agreement § 17.3(d).)

10

### 3. The Initial Forbearance Agreements & $17 Million in Payments

On January 1, 2022, September 21, 2022, and July 25, 2023, JSI, on the one hand, and GWA and WMSA, on the other hand, entered into certain forbearance letters (each, an "Initial Forbearance Agreement," and collectively, the "Initial Forbearance Agreements"), pursuant to which JSI agreed to forbear from exercising certain remedies subject to certain conditions. (FAC ¶¶ 43, 47, 50.) Under each of the Initial Forbearance Agreements, the Debtors submit that GWA and WMSA continued to operate in the ordinary course of business, including, among other things, paying ordinary course obligations such as bimonthly salary and year-end bonus/compensation. (*Id.* ¶ 51.) Indeed, the majority of the employees were paid their annual compensation at year-end in February, which the Debtors represent was in accordance with "industry standard." (*Id.*) At no point, the Debtors emphasize, was the payment of employees' annual compensation and year-end bonuses prohibited under the Note Purchase Agreements "or any of the Debtors' agreements with Defendants." (*Id.*) Indeed, the Debtors made "similar ordinary course compensation and bonus payments to their employees each year, in February . . . from 2020 through 2024." (*Id.* ¶ 57.)

Each of the Initial Forbearance Agreements is governed by New York law. (*See* January 2022 Initial Forbearance Agreement, ECF Doc. # 21-6 ¶ 6; September 2022 Initial Forbearance Agreement, ECF Doc. # 21-7 ¶ 5; July 2023 Initial Forbearance Agreement ECF Doc. # 21-8 ¶ 5.)

#### a. *The January 2022 Initial Forbearance Agreement and $15 Million in Payments*

The January 2022 Initial Forbearance Agreement, which applied solely to the 2019 Note Purchase Agreement and the December 2019 and January 2020 Notes, provided, in relevant part, that:

> Notwithstanding (a) anything to the contrary in section 7.3(b) of the [2019] Note Purchase Agreement and (b) the occurrence and continuation of a Members Equity Event, ***JSI hereby agrees that it will not exercise its rights to affect a Trigger Redemption prior to July 1, 2023*** . . . <u>provided</u> that the [December 2019 and January 2020 Notes] shall be repaid by [GWA] in accordance with the following schedule . . . (i) at least $5,000,000 aggregate principal amount thereof, on or prior to April 30, 2022, (ii) an additional aggregate principal amount thereof of at least $10,000,000, on or prior to July 31, 2022, and (iii) an additional aggregate principal amount thereof of at least $20,000,000, on or prior to July 1, 2023. At [GWA's] sole option, it can accelerate or make additional payments of principal at any time. For the avoidance of doubt, if [GWA] shall cease and JSI shall thereafter have the right to redeem the [December 2019 and January 2020 Notes] pursuant to Section 7.3(b) of the [2019] Note Purchase Agreement.

(January 2022 Initial Forbearance Agreement ¶ 1 (emphasis added).)

As consideration for the foregoing, the parties agreed to amend the Strategic Relationship Agreement to clarify the relationship between LAM Holdings, successor-in-interest to LAM Holding LLC, and GWA. (*Id.* ¶¶ 1–2; *see also id.*, Ex. A at 2 (amending the Strategic Relationship Agreement to provide that LAM Holdings "shall not be deemed for any purpose . . . to be a partner or joint venturer, nor to be involved in any syndicate, with [GWA] or any of its Affiliates").) The parties "acknowledge[d] and agree[d] that they have received adequate and sufficient consideration for entering into [the January 2022 Initial Forbearance Agreement]." (*Id.* ¶ 5.)

Additionally, the January 2022 Initial Forbearance Agreement included a reservation of rights that made clear that nothing therein "extinguish[ed] the obligations for the payment of money outstanding under the Notes," among other things. (*Id.* ¶ 4.) Moreover, the agreement further provided that nothing therein should be construed as (i) a "substitution or novation of the obligations outstanding on the Notes or under the [2019] Note Purchase Agreement or any instruments, documents and agreements securing the same," or (ii) a "release or other discharge

12

of [GWA] or its affiliates from any of its obligations and liabilities under the Note or the [2019]

Note Purchase Agreement." (*Id.*)

In accordance with the terms of the January 2022 Initial Forbearance Agreement, GWA

made payments to JSI in the amounts of $5 million on April 29, 2022 and $10 million on July

29, 2022. (*See* FAC ¶ 44; *id.*, Schedule 1.) The Debtors characterized the January 2022 Initial

Forbearance Agreement as a "unilateral renegotiation of the agreed Maturity Dates under these

Notes by Defendants." (*Id.* ¶ 44.) Specifically, they allege that (i) GWA was "coerced to pay JSI

the sum of $5,000,000 on April 29, 2022 and $10,000,000 on July 29, 2022"; (ii) even if they

were applied to obligations under the Notes, they were arbitrarily required to be paid

approximately 3 years before maturity due to an "immaterial covenant default"; (iii) GWA and

WMSA did not receive reasonable equivalent value as there was "no clear right to declare a

Trigger Redemption from which JSI agreed to forbear"; and (iv) the "modification under the

Notes as a result of the January 2022 Initial Forbearance Agreement" occurred when GWA and

WMSA were insolvent or made insolvent, or were otherwise caused to incur a debt "beyond their

ability to pay as such debts matured." (*Id.*; *see also id.* ¶ 45 (detailing the Debtors' first quarter

financials in 2022 that were provided to the Defendants and reflected assets of $342,802,679,

liabilities of $368,237,411, and members' equity of negative $25,434,732).)

> b. *The September 2022 Initial Forbearance Agreement*

On the same day as the parties' entry into the 2022 Note Purchase Agreement, the parties

also entered into the September 2022 Initial Forbearance Agreement. (*See* FAC ¶ 48 (noting that

"on the same date, JSI purchased the $3 million note from GWA").) While the terms of JSI's

agreement to forbear were substantially similar to those in the January 2022 Initial Forbearance,

such terms now applied to the 2022 Note Purchase Agreement and addressed all three Notes.

Specifically, the September 2022 Initial Forbearance Agreement provided, in relevant part, that:

13

A-784

Notwithstanding (a) anything to the contrary in Section 7.3(b) of the [2022] Note Purchase Agreement and (b) the occurrence and continuation of a Members Equity Event, ***JSI hereby agrees that it will not exercise its rights to affect a Trigger Redemption prior to July 1, 2023 Forbearance*** . . . provided that [GWA] shall repay at least $20,000,000 of the aggregate outstanding principal amount of the [December 2019 and January 2020 Notes] on or prior to July 1, 2023. At [GWA's] sole option, it can accelerate or make additional payments of principal of the [Notes] at any time. For the avoidance of doubt, if [GWA] shall fail to make any payment pursuant to this Section 1, the Forbearance shall cease and JSI shall thereafter have the right to redeem the [September 2022 Note] pursuant to Section 7.3(b) of the [2022] Note Purchase Agreement.

(September 2022 Initial Forbearance Agreement ¶ 1 (emphasis added).)

As reflected above, GWA was still required to make an aggregate payment in the amount of $20,000,000 to JSI on or prior to July 1, 2023. Moreover, like the January 2022 Initial Forbearance Agreement, this agreement also contained a similar reservation of rights with respect to the September 2022 Note and the 2022 Note Purchase Agreement and an acknowledgment that the parties received "adequate and sufficient consideration" for their entry into the same. (*See id.* ¶¶ 3–4.)

The Debtors argue that GWA and WMSA entered into the September 2022 Initial Forbearance Letter only because they had "no other options." (FAC ¶ 47.) The Debtors rearticulate a number of arguments they asserted with respect to the January 2022 Initial Forbearance Agreement, contending that (i) GWA and WMSA did not receive "reasonably equivalent value for the modification of the Maturity Dates under the Notes and the accelerated payment thereunder" as "no extension of the existing forbearance was offered and no new default was identified"; (ii) the Debtors did not "execute any acknowledgment of the occurrence of a default"; and (iii) the "modification under the Notes" was made when GWA and WMSA were insolvent or made insolvent or were otherwise caused to incur a debt "beyond their ability to pay as such debts matured." (*Id.*)

14

> c. *The July 2023 Initial Forbearance Agreement and the $2 Million Payment*

GWA and WMSA were unable to make the $20 million payment by the July 1, 2023 deadline, which the Debtors suggest should not have come as a surprise to the Jefferies Entities given their receipt of "detailed monthly financial statements from the Debtors at this time and . . . constant communication with the Debtors about such situation." (*Id.* ¶ 49.) The Jefferies Entities, the Debtors argue, were "well aware of [their] precarious financial situation at all relevant times." (*Id.*)

Accordingly, GWA, WMSA, and JSI entered into the July 2023 Initial Forbearance Agreement, the third in the series, which provided that:

> Notwithstanding (a) anything to the contrary in Section 7.3 of each of the [2019 and 2022] Note Purchase Agreements, (b) the occurrence and continuation of a Members Equity Event, and (iii) anything to the contrary in the [January 2022 Forbearance Agreement], ***JSI hereby agrees that it will not exercise its rights to affect a Trigger Redemption prior to September 1, 2024.*** At [GWA's] sole option, it can accelerate or make additional payments of principal at any time.

(July 2023 Initial Forbearance Agreement ¶ 1 (emphasis added); *see also* Supporting Memorandum ¶ 21 (acknowledging JSI's commitment to forbear with respect to a trigger redemption until September 1, 2024).) Like the prior Initial Forbearance Agreements, this agreement also included a similar reservation of rights as to all three Notes and the 2019 and 2022 Note Purchase Agreements as well as an acknowledgment and agreement that the parties received "adequate and sufficient consideration" for their entry into the same. (*Id.* ¶¶ 3–4.)

The Jefferies Entities maintain that notwithstanding the July 2023 Initial Forbearance Agreement, pursuant to section 7.2 of the Note Purchase Agreements, JSI was "still free to 'redeem each Note, in whole but not in part, on each applicable Optional Redemption Date.'"

(Supporting Memorandum ¶ 21 (quoting 2019 Note Purchase Agreement § 7.2 and citing 2022

Note Purchase Agreement § 7.2).)

    **C.   The Notice of Optional Redemption**

    On November 28, 2023, GWA made a $2 million payment to JSI.  (*See* FAC ¶ 52; *id.*,

Schedule 1.)  On December 21, 2023, JSI delivered the *Notice of Optional Redemption* (the

"Optional Redemption Notice," ECF Doc. # 21-9) to GWA pursuant to section 7.2 of the Note

Purchase Agreements.  (Supporting Memorandum ¶ 22; FAC ¶ 53.)  As set forth in the Optional

Redemption Notice, JSI elected to exercise its "right to redeem 100% of the outstanding

aggregate principal amount" of the December 2019 Note, the January 2020 Note, and the

September 2022 Note.  (Optional Redemption Notice at 1; *see also* Supporting Memorandum ¶

22 ("GWA[] was required to pay all outstanding aggregate principal and interest on the Notes on

December 31, 2023.").)  The Debtors indicate that these amounts totaled $54,223,110.00 and

were due to JSI within 10 days or by December 31, 2023.  (FAC ¶ 53.)  Nonetheless, the Debtors

failed to repay these amounts.  (Supporting Memorandum ¶ 22 ("December 31, 2023, came and

passed, and the Debtors failed to repay the amounts then outstanding under the Notes."); *see also*

FAC ¶ 54 (acknowledging that, "[a]t the time of the issuance of the [Optional Redemption

Notice], Defendants were fully aware that GWA and WMSA were unable to make the required

$54 million payment").)

    The Jefferies Entities maintain that JSI's delivery of the Optional Redemption Notice

granted JSI the "right to commence litigation against GWA to compel it to repay the amounts

that were owed under the Notes" as of December 31, 2023.  (Supporting Memorandum ¶ 23

(suggesting that the Debtors were in default under the Note Purchase Agreements); 2019 Note

Purchase Agreement § 10.2 (indicating that in the event of default, JSI was entitled to "protect

and enforce [its] rights . . . by an action at law, suit in equity or other appropriate proceeding");

2022 Note Purchase Agreement § 10.2 (stating the same).)

The Debtors appear to suggest that the Jefferies Entities' delivery of the Optional

Redemption Notice was covered under the July 2023 Initial Forbearance Agreement because the

effect was the same.  Specifically, they assert that, while the notice was styled as an Optional

Redemption, "by its terms the [Optional Redemption Notice] required the same immediate

payment of the Redemption Amount as would a notice of Trigger Redemption—the remedy

from which Defendants had agreed to forbear from exercising until September [1,] 2024."  (FAC

¶ 53.)  Moreover, they indicate that at the time of issuance, the Jefferies Entities were "fully

aware that GWA and WMSA were unable to make the required $54 million payment" and had

been working on a "potential third-party transaction involving the Debtors, which, among other

things, would have paid or substantially paid amounts due under the Notes."  (*Id.* ¶ 54.)

### D.  Debtors' Payment of Bonuses and Signing of the 2024 Forbearance Agreement

Concerned that the Debtors would "prioritize the payment of other creditors above the

Jefferies Entities," including making approximately $30 million in bonus payments to

employees, the Jefferies Entities delivered a draft forbearance agreement to the Debtors on

February 1, 2024.  (Supporting Memorandum ¶ 24.)  As set forth in that draft agreement, the

Jefferies Entities "offered to forbear from commencing any litigation against the Debtors, as long

as the Debtors agreed to not make the $30 million in bonus payments."  (*Id.*)  The Debtors

"initially refused" to enter into the agreement as it would have "restricted payments to their

employees, violated their ongoing fiduciary obligations to their clients and their regulatory

obligations and undermine the potential third party transaction."  (FAC ¶ 56.)  One week later,

the Debtors disclosed that they had paid employees more than $30 million in bonuses, which the

Jefferies Entities allege breached the Strategic Relationship Agreement and rendered all amounts

17

owed thereunder due and payable within five business days of February 8, 2024. (Supporting Memorandum ¶ 25; *see also* FAC ¶ 51 ("GWA and WMSA continued to operate in the ordinary course of business, including, among other things, payment of . . . bi-monthly salary and year-end bonus/compensation.").)

In light of this, the Jefferies Entities informed the Debtors that, barring an agreement otherwise, they intended to "initiate litigation" to recover damages for Debtors' failure to repay debts owed and to avoid certain of the bonus payments made as fraudulent or preferential transfers.[7] (Supporting Memorandum ¶ 26.) The Debtors add more color to the passage of events. They indicate that the Jefferies Entities "threatened" to commence such litigation on the morning of February 12, 2024 at 2:10 a.m. against the Debtors and their founder, George Weiss, if the Debtors failed to sign the draft forbearance agreement by 7:00 a.m. that same day. (FAC ¶ 58.) Aside from litigation, the Jefferies Entities also "threatened to unlawfully freeze the Debtors' bank accounts" and "ruin Mr. Weiss's reputation in the industry" while stating that things would get "extremely ugly." (*Id.* (quotation marks omitted).)

The Debtors believed at the time that if the Jefferies Entities were to carry out on these "threats," it would collectively mean the "certainty of loss of key personnel, the collapse of . . . [a potential] third-party transaction, and the demise of the companies." (*Id.* ¶ 60.) The Debtors argue that, in actuality, the Jefferies Entities possessed "no legal right to take threatened enforcement actions" as to GWA and WMSA since GWA and WMSA were under a "preexisting obligation to forbear from taking [action] through September 1, 2024" or the remaining Debtors or George Weiss since they were not parties to the Notes or the Initial Forbearance Agreements.

---

[7]   Copies of the draft state court complaints that the Debtors believed were "in furtherance of [these] threat[s]" were delivered to the Debtors on February 17, 2024 and March 26, 2024. (FAC ¶¶ 68–69.) A copy of the first draft complaint delivered on February 17, 2024 is included as Exhibit F to the Balber Declaration (the "First Draft State Complaint," ECF Doc. # 7-8).

(*Id.* ¶ 59.)  Additionally, they assert that the Jefferies Entities had neither the legal right to claw back compensation (as payment of such was not otherwise prohibited under any agreement) nor the right to freeze bank accounts.  (*Id.*)

Ultimately, however, the Debtors and their founder and CEO, George Weiss, signed the draft forbearance agreement (the "2024 Forbearance Agreement," ECF Doc. # 21-10) on February 12, 2024.[8]  (Supporting Memorandum ¶ 27.)  The Debtors allege that their signature, which took place at approximately 4:00 a.m. that day, was compelled and a product of duress. (FAC ¶¶ 61, 66.)

### E.  The 2024 Forbearance Agreement

In exchange for the Jefferies Entities' agreement to forbear from exercising their rights in connection with the Notes and the Strategic Relationship Agreement for a period of up to two business days,[9] the Debtors and George Weiss "agreed to take four categories of action" that the Jefferies Entities believe are "relevant here."  (Supporting Memorandum ¶ 28; *see* 2024 Forbearance Agreement § 6 (indicating that JSI agreed to forbear from seeking relief or exercising any remedies under the Bankruptcy Code or filing an enforcement action from the "earlier of (x) two Business Days after [February 12, 2024] or (y) the occurrence of any Forbearance Default").)

*First*, each of the Debtors (other than GWA) agreed to guarantee GWA's obligations under the Notes and the Strategic Relationship Agreement, among other things.  (*See* 2024 Forbearance Agreement § 3(a); FAC ¶ 63.)  Section 3 of the 2024 Forbearance Agreement

---

[8]      George Weiss is party to the 2024 Forbearance Agreement only with respect to sections 5(a), 9, and 10(c).

[9]      While JSI and LAM Holdings were both parties to the 2024 Forbearance Agreement, section 6 of the 2024 Forbearance Agreement, which sets forth the terms of the forbearance, states only that JSI agreed to forbear and does not include LAM Holdings.  (*See* 2024 Forbearance Agreement § 6.)

19

provides that WMSA, WSO, OGI, and WMSF would "guarantee[] to each of JSI and LAM Holdings . . . and their successors, transferees and assigns as a primarily obligor the prompt and complete payment and performance by GWA and each other [Debtor] when due . . . of the Guaranteed Obligations . . . ." (2024 Forbearance Agreement § 3(a).) "Guaranteed Obligations" is defined to comprise:

> [A]ll the obligations of GWA and each other [Debtor] arising under any Note Purchase Agreement, the Notes, the [Strategic Relationship] Agreement and this Agreement, any loss, damage, penalty, action, judgment, suit, cost, expense, disbursement, liability, claim or other obligation, incurred by or behalf of any Beneficiary (including but not limited to reasonable out-of-pocket attorneys' fees and costs) arising out or, relating to or in connection with any Note Purchase Agreement, any Note, the [Strategic Relationship] Agreement, this Agreement or the transaction contemplated thereby.

(*Id.*) Such guaranty remains in "full force and effect until the Guaranteed Obligations are paid in full." (*Id.*)

*Second*, the Debtors' founder and CEO, George Weiss, "unconditionally and irrevocably" personally guaranteed to "[LAM Holdings, JSI, and their affiliates] the accuracy of the representations made by, and the performance of the agreements of, the [Debtors] hereunder." (*Id.* § 9.) Weiss also agreed that he would "take all actions within his control . . . with respect to each of the other [Debtors], any of their subsidiaries and any of his personal or his family's trusts to cause such persons to comply with the terms of [the 2024 Forbearance] Agreement." (*Id.*)

*Third*, the Debtors granted the Jefferies Entities a security interest in substantially all of their assets. (Supporting Memorandum ¶ 30; FAC ¶ 63.) The Debtors represented and warranted that the Jefferies Entities would be entitled to a "first priority perfected security interest in the Collateral" to secure the "full and punctual payment of the Guaranteed

20

Obligations."[10]  (*Id.* §§ 4(a) and (b).)  Such security interest would "continually exist until all Guaranteed Obligations have been paid in full."  (*Id.* § 4(a).)

*Fourth*, WMSA agreed to offset any amounts owed by JSI to WMSA under the IMA by amounts owed to JSI under the Notes:

> WMSA hereby agrees as of the date hereto to treat any amounts JSI owes WMSA pursuant to the IMA (including but not limited to any amounts for the period of January 1, 2023 through December 31, 2023, including but not limited to the Investment Teams Bonus Fees) as offsetting GWA's payment obligations to JSI under the Notes, and as a result (I) JSI shall have been deemed to have paid such amounts to WMSA and (ii) such deemed paid amounts shall be deemed to be a receipt by JSI of a payment by GWA on the Notes of such amounts.

(*Id.* § 8; *see also* FAC ¶ 63.)

In addition to the foregoing, the Debtors note that the 2024 Forbearance Agreement also required the Debtors to provide the Jefferies Entities with updated financial reports, which they had already been doing "for at least two years."  (*Id.* ¶ 64.)  The Debtors indicate that the Jefferies Entities' agreement to forbear is the only "purported consideration under the 2024 Forbearance Agreement" that they have provided.  (*Id.* ¶ 65.)

---

[10]  "Collateral" is defined to include:

> [A]ll goods, accounts, equipment, inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, general intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, securities accounts, certificates of deposit, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and all of each [Debtor's] books and records relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds or any or all of the foregoing. Terms used in this definition shall have the meanings given to such terms in Article 9 of the Code (as defined below), as applicable.

(2024 Forbearance Agreement § 4(a).)

21

As of the date of the FAC, the Debtors have not received a countersigned copy of the 2024 Forbearance Agreement.[11]  (*Id.* ¶ 66.)  Nonetheless, the Jefferies Entities filed UCC-1 financing statements on February 12, 2024 and February 13, 2024, seeking to perfect the security interests "purportedly granted under the 2024 Forbearance Agreement" (the "Security Interests").  (*Id.*; *see also* 2024 Forbearance Agreement § 4(c) (authorizing JSI, as the "Secured Party" under the agreement to "file financing statements . . . to perfect or protect the Secured Party's interest or rights [t]hereunder").)  The Debtors do not believe that the Jefferies Entities have sought to perfect "any purported security interest" against WMSF.  (FAC ¶ 66.)

The Debtors contend that the 2024 Forbearance Agreement lacks consideration as the Jefferies Entities were already under a preexisting obligation to not call the Notes through September 1, 2024 as to GWA and WMSA, and none of the other Debtors were subject to the Note Purchase Agreements, Notes, or the Initial Forbearance Agreements.  (*Id.* ¶ 62.)  Like the Initial Forbearance Agreements, the 2024 Forbearance Agreement is also governed by New York law.  (2024 Forbearance Agreement § 10(h).)

**F.  OGI's $3 Million Payment to JSI**

On February 15, 2024, OGI paid $3,000,000 to JSI on account of the outstanding Notes on behalf of GWA.  (Supporting Memorandum ¶ 32; FAC ¶ 71, Schedule 1.)  After accounting for this payment, the Jefferies Entities maintain that approximately $50 million remains due and payable under the Notes.  (*Id.*; *see also id.* ¶ 33 (noting that GWA's own court filings disclose that it owes $43,190,924 to JSI on account of the Notes).)

---

[11]      The signature page to the 2024 Forbearance Agreement reflects only George Weiss's signature on behalf of the Debtors and himself.  (*See* 2024 Forbearance Agreement at 11.)

22

### G.  Commencement of the Chapter 11 Cases

On April 29, 2024 (the "Initial Debtors Petition Date"), WMSA, GWA, OGI, and WSO

(collectively, the "Initial Debtors") each filed voluntary petitions for chapter 11 relief.  (*See, e.g.*,

Case No. 24-10743, ECF Doc. # 1.)  On June 19, 2024 (the "New Debtor Petition Date"),

WMSF filed a voluntary petition for chapter 11 relief.  (*See* Case No. 24-11075, ECF Doc. # 1.)

The Debtors' cases are being jointly administered.  (*See Order Pursuant to Rule 1015(b)*

*of the Federal Rules of Bankruptcy Procedure Directing Joint Administration of Chapter 11*

*Cases*, Case No. 24-10743, ECF Doc. # 51; *Order Directing Certain Orders in Chapter 11*

*Cases of Weiss Multi-Strategy Advisers LLC, et al. be Made Applicable to Weiss Multi- Strategy*

*Funds LLC*, Case No. 24-10743, ECF Doc. # 120.)

The Jefferies Entities highlight that the Debtors' court filings disclose the following:

- GWA owes $43,190,924.00 to JSI under the Notes, and $52,473,259.00 to LAM Holdings pursuant to the Strategic Relationship Agreement;

- the Jefferies Entities are the only creditors of OGI and WSO; and

- WMSA owes $95,664,183.00 to the Jefferies Entities while the remainder of its liabilities have nearly all been categorized as "contingent."

(Supporting Memorandum ¶ 33.)

### H.  The Adversary Proceeding

In conjunction with the chapter 11 filing, the Debtors commenced the Adversary

Proceeding against the Jefferies Entities.  Pursuant to the FAC, the Debtors seek, at the outset,

entry of a judgment against the Defendants for the avoidance of the 2024 Forbearance

Agreement, including any security interests and guarantees arising thereunder as preferential

and/or fraudulent transfers, and the recovery of any property of the Debtors' estates.  (FAC

¶¶ 80–108.)  Alternatively, they argue that, because the Debtors entered into the 2024

Forbearance Agreement under duress, rescission of the 2024 Forbearance Agreement is

appropriate. (*Id.* ¶¶ 109–17.) Lastly, the Debtors believe that the Defendants' failure to execute

the 2024 Forbearance Agreement and the overall lack of consideration thereunder and intent to

comply warrant a judgment deeming the 2024 Forbearance Agreement null and void and

otherwise unenforceable. (*Id.* ¶¶ 118–23.)

The Debtors also seek money judgments relating to (i) $3 million as an avoidable

preferential transfer made within 90-day period prior to the Initial Debtors Petition Date from

January 31, 2024 through April 29, 2024 (the "Preference Period") and (ii) $20 million in the

aggregate in connection with certain alleged avoidable fraudulent transfers (each, an "Alleged

Avoidable Transfer" and collectively, the "Alleged Avoidable Transfers") made during the two

years prior to the Initial Debtors Petition Date from April 29, 2022 through April 29, 2024 (the

"Fraudulent Conveyance Period").[12] (*Id.* ¶¶ 124–39.) The Alleged Avoidable Transfers are as

follows:

| Transferor | Transferee | Date | Amount |
|---|---|---|---|
| GWA, LLC | JSI | 4/29/2022 | $5,000,000 |
| GWA, LLC | JSI | 7/29/2022 | $10,000,000 |
| GWA, LLC | JSI | 11/28/2023 | $2,000,000 |
| OGI Associates, LLC | JSI | 2/15/2024 | $3,000,000 |
| | | | $20,000,000 |

(*Id.*, Schedule 1.)

The following sets forth an overview of the 12 causes of action asserted in the FAC:

- Counts I and II respectively seek avoidance of the 2024 Forbearance Agreement as (i) a preferential transfer pursuant to section 547(b) of the Bankruptcy Code and (ii) a fraudulent transfer pursuant to section 548(a)(1)(B) of the Bankruptcy Code. (*Id.* ¶¶ 80–97.)

- Count III seeks avoidance of the Security Interests, including any related UCC-1 filing, and the guarantees arising under the 2024 Forbearance Agreement as (i) a preferential

---

[12] As discussed later in this memorandum, it is unclear how much the Debtors are actually seeking to avoid as constructive fraudulent transfers as the FAC and the Debtors' Opposition Brief refer to different amounts (*i.e.*, $20 million versus $17 million).

transfer pursuant to section 547(b) of the Bankruptcy Code and/or (ii) a fraudulent transfer pursuant to sections 548(a)(1)(B) of the Bankruptcy Code.  (*Id.* ¶¶ 98–101.)

- Counts IV and X respectively seek, for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code, preservation of the interests and obligations incurred and/or transferred under (i) the 2024 Forbearance Agreement (or value thereof) and (ii) the Avoidable Transfers.  (*Id.* ¶¶ 102–04, 140–42.)

- Counts V and XI respectively seek, pursuant to section 550(a) of the Bankruptcy Code, to (i) avoid the 2024 Forbearance Agreement, including the Security Interests arising thereunder, and (ii) recover from Defendants, in an amount to be determined at trial, at least the amount of the Avoidable Transfers set forth on Schedule 1 to the FAC plus interest and costs.  (*Id.* ¶¶ 105–08, 143–46.)

- Count VI seeks the rescission of the 2024 Forbearance Agreement has having been the product of duress.  (*Id.* ¶¶ 109–17.)

- Count VII seeks judgment holding that the 2024 Forbearance Agreement is null and void, and unenforceable for the Jefferies Entities' failure to countersign and the general lack of consideration thereunder and intent to comply.  (*Id.* ¶¶ 118–23.)

- Count VIII seeks avoidance of the $3,000,000.00 as a preferential transfer pursuant to section 547(b) of the Bankruptcy Code.  (*Id.* ¶¶ 124–34.)

- Count IX seeks avoidance of the Alleged Avoidable Transfers as fraudulent transfers pursuant to section 548(a)(1)(B) of the Bankruptcy Code.  (*Id.* ¶¶ 135–39.)

- Count XII seeks disallowance, pursuant to section 502(d) of the Bankruptcy Code, of any and all claims of Defendants and their assignees against the Debtors' estates or the Debtors until the 2024 Forbearance Agreement is deemed null and void and/or the Defendants pay Debtors all amounts sought for the Alleged Avoidable Transfers.  (*Id.* ¶¶ 147–51.)

**I.   The Motion**

The Jefferies Entities seek, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to the Adversary Proceeding by Rule 7012 of the Federal Rules of Bankruptcy Procedure, partial dismissal of the causes of action asserted in the FAC.  (*See* Supporting Memorandum ¶ 73.)  As set forth in the Motion, they seek the dismissal of (i) "Counts I, II, and IV through XII of the Complaint in their entirety," and (ii) "Count III to the extent it asserts a constructive fraudulent conveyance claim."  (*Id.*)  At the hearing held on

25

September 11, 2024, counsel to the Jefferies Entities clarified that Count I, consistent with Count III, would also survive dismissal "to the extent that it asserts a preference claim seeking to avoid the granting of security interests." (Sept. 11, 2024 Hr'g Tr. at 18:2–9.)

As a gating matter, the Jefferies Entities contend that the 2024 Forbearance Agreement, as a whole, is neither a transfer of an interest in the Debtors' property nor an obligation that is voidable under the Bankruptcy Code. (Supporting Memorandum ¶ 34.) In light of such, Counts I and II, the Jefferies Entities argue, should be dismissed as there is no legal basis to support the Debtors' conclusion that the entire 2024 Forbearance Agreement can be avoided as opposed to specific transfers and obligations. (*Id.* ¶¶ 4, 34–39.)

Additionally, the Jefferies Entities believe that dismissal of Counts II and III of the FAC is also appropriate given the Debtors' acknowledgment that the 2024 Forbearance Agreement was entered into on account of antecedent debts. (*Id.* ¶¶ 4, 43–44; *see* FAC ¶ 85 ("The 2024 Forbearance Agreement was for or on account of antecedent debts owed by certain of the Plaintiffs to Defendants.").) The Court should therefore, the Jefferies Entities contend, construe any transfers or obligations incurred under the 2024 Forbearance Agreement as having been made for reasonably equivalent value. (Supporting Memorandum ¶ 44.)

As for the remainder of the causes of action, the Jefferies Entities argue that dismissal of (i) Counts VI, VIII, and IX is appropriate because the Debtors have failed to plead facts that support or establish elements of these claims (*id.* ¶¶ 47–48, 57–59, 60–65); (ii) Count VII because the 2024 Forbearance Agreement was supported by consideration, and the Debtors have pled facts that establish that the Jefferies Entities accepted the 2024 Forbearance Agreement notwithstanding their failure to countersign the agreement (*id.* ¶¶ 50–56); (iii) Counts IV, V, X,

and XI as they cannot stand as independent causes of action (*id.* ¶¶ 66–68); and (iv) Count XII as

it is premature and procedurally improper (*id.* ¶ 70).

### J.   The Debtors' Opposition

The Debtors oppose the Motion and argue, instead, that each claim in the FAC is

"adequately pled" such that dismissal would be inappropriate at this juncture.  (Opposition Brief

at 3.)  With respect to Counts I and III, the Debtors assert that the FAC has sufficiently pled

claims that the 2024 Forbearance Agreement, including the Security Interests, should be avoided

as preferential transfers.  (*Id.* at 14.)  They detail that the FAC properly alleges that (i) the

Jefferies Entities were creditors; (ii) the 2024 Forbearance Agreement was a transfer of an

"interest of the Debtors in property"; (iii) the Debtors were insolvent at the time of the alleged

transfer (*i.e.*, the Debtors' entry into the 2024 Forbearance Agreement); and (iv) the agreement

enabled the Defendants to receive more than they would have if the Debtors were in chapter 7,

such agreement had not been made, and the Defendants otherwise received payment of such debt

as permitted under the Bankruptcy Code.  (*Id.* at 10–14.)  The Debtors reject the Jefferies

Entities' argument that the 2024 Forbearance Agreement cannot be avoided in its entirety since

the obligations and transfers the Debtors seek to avoid constitute the "substance of the 2024

Forbearance Agreement, such that their avoidance will have the practical effect of invalidating

the eve-of-bankruptcy transaction as a whole."  (*Id.* at 12.)

For similar reasons, the Debtors also maintain that dismissal of Counts II and III, the

latter of which also alleges that the Security Interests should be avoided as a fraudulent transfer,

is inappropriate since the FAC alleges that (i) the 2024 Forbearance Agreement was a transfer of

an interest of the Debtors in property or incurrence of an obligation, and (ii) consideration given

was for less than reasonably equivalent value.  (*Id.* at 14–18.)  Moreover, in any event, whether

reasonably equivalent value was given, the Debtors note, is a question of fact.  (*Id.* at 16.)

27

With respect to Count VI, the FAC, the Debtors argue, alleges that the Jefferies Entities' actions, which they had no right to take, constituted wrongful threats and prevented the Debtors "free will . . . by giving them no alternative to signing" and resulted in nothing more than irreparable harm. (*Id.* at 19.) The FAC, the Debtors maintain, also makes clear that they possess no adequate remedy at law such that rescission to restore the status quo is appropriate. (*Id.*) With respect to Count VII, the Debtors maintain that the FAC sufficiently pleads lack of consideration and, regardless, there is a question of fact whether there was a "meeting of the minds" that would need to exist for a valid agreement. (*Id.* at 20.)

As for avoidance of the $3 million payment as a preferential transfer and the $17 million payments as fraudulent transfers under Counts VIII and IX, respectively, the Debtors argue that the FAC properly alleges each element of the respective claim. (*Id.* at 20–22.) Additionally, with respect to the latter, the Debtors suggest that the FAC, at a minimum, has established that a question of fact exists whether the Debtors were or were rendered insolvent or left with unreasonably small capital at the time of the Alleged Avoidable Transfers. (*Id.* at 23.)

With respect to the remaining claims, the Debtors acknowledge the conditionality of relief sought in Counts IV, V, X, and XI but note, however, that the FAC has properly alleged each of these claims is adequately pled. (*Id.* at 24.) Indeed, the Debtors argue that it is undisputed that the Jefferies Entities were "initial transferees" under any of the alleged avoidable transfers pled in the FAC. (*Id.*) As for Count XII, the Debtors maintain that because they have asserted claims under sections 547 and 548 of the Bankruptcy Code, this claim is sufficiently pled as well. (*Id.* at 24–25.)

Finally, the Debtors seek leave to file a further amended adversary complaint in the event the Court grants dismissal of any counts asserted in the FAC. (*Id.* at 25.)

**K.  The Jefferies Entities' Reply**

The Jefferies Entities characterize the FAC as nothing more than a "desperate effort to protect non-debtor George Weiss . . . from paying the Jefferies Entities the more than $100 million that his companies owe, and which he contractually guaranteed."  (Reply Brief ¶ 3; *see id.* ¶ 4 ("[I]t is undisputed that at least $95 million is owed now and was owed at the time the [Amended] Forbearance Agreement was signed.").)  They maintain that they have demonstrated that (i) George Weiss's personal guarantee cannot be avoided as it neither constitutes a "transfer of an interest in the property of any debtor" or an "obligation" of a debtor, and (ii) the Debtors have failed to plead any basis to avoid more than $17 million in payments that the Debtors conceded were on account of antecedent debts.  (*Id.* ¶ 1.)

Accordingly, the Jefferies Entities argue that avoidance of the 2024 Forbearance Agreement in its entirety—including George Weiss's personal guarantee—is without support and should be dismissed.  (*Id.* ¶¶ 7–10.)  Moreover, dismissal of the claim for the avoidance of the 2024 Forbearance Agreement as a constructive fraudulent transfer is also appropriate given the Debtors' failure to affirmatively plead that the alleged fraudulent transfers were made on account of antecedent debts.  (*Id.* ¶¶ 11–13.)

As for the Debtors' claim for rescission of the 2024 Forbearance Agreement, the Jefferies Entities argue that such claim is without merit as (i) the FAC fails to plead any wrongful threat that would support a claim for duress (*id.* ¶¶ 15–17); (ii) the Debtors' allegations of lack of consideration are without merit (*id.* ¶¶ 18–20); and (iii) the Debtors have otherwise admitted to facts that demonstrate the Jefferies Entities' acceptance of the 2024 Forbearance Agreement (*id.* ¶¶ 21–23).

The Jefferies Entities further contend that Debtors' $3 million preference claim should also be dismissed since the Debtors cannot establish that JSI received more than it would have in

29

a hypothetical chapter 7 case and, in any event, OGI's guarantee is not avoidable as a fraudulent transfer. (*Id.* ¶¶ 24–27.) Likewise, the Jefferies Entities assert that the Debtors have failed to plead facts that the $17 million payments were for "reasonably equivalent value," admitting instead that they received "$17 million in credits for $17 million in payments." (*Id.* ¶¶ 28–30.) This, the Jeffries Entities argue, warrants a dismissal of the Debtors' constructive fraudulent transfer claims as well. (*Id.* ¶ 30.)

As for the remaining claims, the Jefferies Entities reiterate their prior arguments. With respect to Counts IV, V, X, and XI, the Jefferies Entities assert that dismissal is appropriate since such claims cannot stand as independent causes of action. (*Id.* ¶ 31.) With respect to Count XII, the Jefferies Entities state again that this claim is "not ripe." (*Id.* ¶ 32.)

Finally, the Jefferies Entities argue that the Court should deny the Debtors' request for further opportunity to amend the adversary complaint. (*Id.* ¶ 33.) They argue that the Debtors already had a "bite at the apple," having amended the complaint once already and have "provided no additional facts that they would seek to include" if so permitted. (*Id.*)

## II.   <u>LEGAL STANDARD</u>

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7012 of the Federal Rules of Bankruptcy Procedure, a complaint need only allege "enough facts to state a claim for relief that is ***plausible*** on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (emphasis in original) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A party need only plead "a short and plain statement of the claim" with sufficient factual "heft to sho[w] that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007) (internal quotation marks and citations omitted). Under this standard, the pleading's "[f]actual allegations

30

must be enough to raise a right to relief above the speculative level," *id*. at 555, and present

claims that are "plausible on [their] face," *id*. at 570.

"Where a complaint pleads facts that are merely consistent with a defendant's liability, it

stops short of the line between possibility and plausibility of entitlement to relief." *In re Vivaro*

*Corp.*, 524 B.R. 536, 547 (Bankr. S.D.N.Y. 2015) (quoting *Iqbal*, 556 U.S. at 678). Plausibility

"is not akin to a probability requirement," but rather requires "more than a sheer possibility that a

defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks

omitted). "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Id.* (citations omitted); *see also Twombly*, 550 U.S. at

555 (stating that a pleading that offers "labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do"). Rather, pleadings "must create the possibility of a

right to relief that is more than speculative." *Spool v. World Child Int'l Adoption Agency*, 520

F.3d 178, 183 (2d Cir. 2008) (citation omitted). "A claim has facial plausibility when the

pleaded factual content allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663 (citing *Twombly*, 550 U.S. at 556).

Generally, courts use a two-pronged approach when considering a motion to dismiss.

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 717 (2d Cir. 2013)

(stating that motion to dismiss standard "creates a 'two-pronged approach' . . . based on '[t]wo

working principles'") (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79)); *McHale v.*

*Citibank, N.A.* (*In re the 1031 Tax Grp., LLC*), 420 B.R. 178, 189–90 (Bankr. S.D.N.Y. 2009)

(stating that courts use a two-prong approach when considering a motion to dismiss). First, a

court must accept all factual allegations in the complaint as true, discounting legal conclusions

clothed in factual garb. *See, e.g.*, *Iqbal*, 556 U.S. at 677–78; *Kiobel v. Royal Dutch Petroleum*

*Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory factual allegations in the complaint to be true") (citing *Iqbal*, 556 U.S. at 678). Second, a court must determine if these well-pleaded factual allegations state a plausible claim for relief—"a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted). "Dismissal is only warranted where it appears beyond doubt that the plaintiff can prove no sets of facts in support of her claim which would entitle her to relief." *In re Nanobeak Biotech Inc.*, 656 B.R. 350, 361 (Bankr. S.D.N.Y. 2024).

Courts deciding motions to dismiss must draw all reasonable inferences in favor of the nonmoving party and must limit their review to facts and allegations contained in (1) the complaint, (2) documents either incorporated into the complaint by reference or attached as exhibits, and (3) matters of which the court may take judicial notice – such as public records, including complaints filed in state courts. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (citations omitted).

## III.   <u>DISCUSSION</u>

### A.  **Validity and Binding Nature of the 2024 Forbearance Agreement**

As an initial matter, the Debtors have asserted claims centered on the validity and binding nature of the 2024 Forbearance Agreement generally, including claims for rescission and a judgment that the agreement is otherwise null and void. Each is addressed in turn.

1. <u>Rescission of the 2024 Forbearance Agreement as a Product of Duress</u>

Under New York law, which governs the 2024 Forbearance Agreement, rescission is an equitable and "extraordinary" remedy that is unavailable "when there is an adequate remedy at law." *Ward v. TheLadders.com*, 3 F. Supp. 3d 151, 164–65 (S.D.N.Y. 2014) (citing *Ellington v. Sony/ATV Music Publ'g LLC*, 925 N.Y.S.2d 20, 22 (App. Div. 2011)); *see also Bangkok Crafts*

A-803

*Corp. v. Capitolo Di San Pietro in Vaticano*, No. 03 Civ. 0015 (RWS), 2006 WL 1997628, at

*12 (S.D.N.Y. July 18, 2006) ("Re[s]cission is an equitable remedy posed in the interest of

justice where there is no action at law."); *Robinson v. Sanctuary Record Grps., Ltd.*, 826 F. Supp.

2d 570, 575 (S.D.N.Y. 2011) ("Under New York law, [r]ecession is an extraordinary remedy . . .

.") (alterations in original) (quoting *Krumme v. WestPoint Stevens, Inc.*, 239 F.3d 133, 143 (2d

Cir. 2000)).  "The effect of rescission is to declare the contract void from its inception and to put

or restore the parties to ***status quo***."  *County of Orange v. Grier*, 817 N.Y.S.2d 146, 148 (App.

Div. 2006) (emphasis in original) (internal quotation marks omitted) (quoting *Schwartz v. Nat'l

Comput. Corp.*, 345 N.Y.S.2d 579, 582 (App. Div. 1973)).

      Generally, "[t]here is no hard and fast rule on the subject of rescission, for the right

usually depends on the circumstances of the particular case."  *Creative Waste Mgmt., Inc. v.

Capitol Env't Servs., Inc.*, 429 F. Supp. 2d 582, 606 (S.D.N.Y. 2006) (alterations in original)

(quoting *Callanan v. Powers*, 92 N.E. 747, 752 (N.Y. 1910)).  Recission may be permitted in

instances of "fraud or ***duress in the inducement of the contract***, failure of consideration,

inability to perform, or a breach of the contract so substantial that it defeats the object of the

parties in making the contract."  *Id.* (emphasis added) (citations omitted); *see also Highland

CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, No. 12 Civ. 2827 (NRB), 2013 WL

1191895, at *9 (S.D.N.Y. Mar. 22, 2013) ("Economic duress is a theory of recovery for

rescission . . . ."); *Bangkok*, 2006 WL 1997628, at *12 ("The grounds for rescission of a contract

include duress . . . in situations where the complaining party is compelled to agree to the contract

by means of a wrongful threat which precludes the exercise of free will.").

      To establish a claim for economic duress under New York law, a party must show that

the agreement in question was "procured by means of (1) a wrongful threat that (2) precluded the

exercise of its free will."[13]  *Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) (collecting cases).  Put another way, the party asserting economic duress must show "(1) threats of an unlawful act by one party [that] (2) compel[] performance by the other party of an act [that] it had a legal right to abstain from performing."  *In re Lehman Bros. Holdings Inc.*, 855 F.3d 459, 477 (2d Cir. 2017) (alterations in original) (quoting *Chase Manhattan Bank v. New York,* 787 N.Y.S.2d 155, 157 (App. Div. 2004)).  A contract entered into under duress, under New York law, is "generally considered not void, but merely voidable . . . and one who would repudiate a contract procured by duress must act promptly or will be deemed to have elected to affirm it."  *U.S. v. Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 89 (2d Cir. 2011) (quoting *Sci. Holding Co. v. Plessey Inc.*, 510 F.2d 15, 23 (2d Cir. 1974)).

Like rescission, economic duress under New York law is "reserved for extreme and extraordinary cases."  *Lehman*, 855 F.3d at 477 (quoting *VKK Corp. v.* NFL, 244 F.3d 114, 123 (2d Cir. 2001)); *see also Citibank, N.A. v. Tormar Assocs. LLC*, No. 15-CV-1932 (JPO), 2015 WL 7288652, at *4 (S.D.N.Y. Nov. 17, 2015) ("In general, agreements governed by New York law may be voided on grounds of economic duress only in extreme and extraordinary cases.") (internal quotation marks and citations omitted)).  And, in cases involving sophisticated parties, duress is "particularly difficult to meet."  *Tormar*, 2015 WL 7288652, at *4.  To demonstrate duress, a sophisticated party must "do more than allege 'financial or business pressure' or unequal bargaining power," *id.*, including "merely claim[ing] that the other party knew about and used his or her poor financial condition to obtain an advantage in contract negotiations," *Davis & Assocs., Inc. v. Health Mgmt. Servs., Inc.*, 168 F. Supp. 2d 109, 114 (S.D.N.Y. 2001) (quoting

---

[13]      While the Debtors do not make explicit whether they are alleging economic duress, the Opposition Brief suggests that this is the case as the Debtors argue that the FAC has sufficiently alleged "wrongful threats" on the part of the Defendants whose actions "prevented the free will of Plaintiffs by giving them no alternative to signing the [2024] Forbearance Agreement but irreparable harm."  (Opposition Brief at 19.)

*DuFord v. Aetna Life Ins.*, 818 F. Supp. 578, 582 (S.D.N.Y. 1993)). *See also Interpharm*, 655 F.3d at 142 (stating the same). Rather, a plaintiff would need to demonstrate that the other party's actions "deprived him of his free will, and that the ordinary remedy of an action for breach of contract would not be adequate." *Davis*, 168 F. Supp. 2d at 114 (quoting *Berman v. Parco*, No. 96 Civ. 0375 (KMW), 1996 WL 465749, at *7 (S.D.N.Y. Aug. 15, 1996)).

### a. Wrongful Threats

To demonstrate duress, "[t]he law demands threatening conduct that is wrongful, *i.e.*, outside a party's legal rights." *Interpharm*, 655 F.3d at 142 (internal quotations marks and citations omitted). Accordingly, while a threat to withhold performance one was contractually obligated to provide in order to compel the other party to submit to demands may constitute a wrongful threat, a threat to exercise a legal right in pursuit of those same demands is not. *Id.* at 142–43 (collecting cases). In other words, "threats to enforce a party's legal rights under a contract—or even that party's interpretation of its rights—cannot constitute a wrongful threat sufficient to establish a claim of economic duress." *Davis*, 168 F. Supp. 2d at 115 (quoting *DiRose v. PK Management Corp.*, 691 F.2d 628, 633 (2d Cir.1982)).

Here, the FAC alleges that the Jefferies Entities demanded that the Debtors sign the 2024 Forbearance Agreement or "unlawful" litigation would be commenced against "the Debtors and George Weiss" to collect damages stemming from the "Debtors' purported breaches" of the Note Purchase Agreements and Notes and to claw back compensation payments made to the Debtors' employees as fraudulent transfers. (FAC ¶ 58.) The FAC further alleges that the Defendants "threatened to unlawfully freeze the Debtors' bank accounts"[14] and "ruin George Weiss's

---

[14] Paragraph 58 of the FAC states that these bank accounts were the Debtors' while paragraph 59 of the FAC states that these were Defendants' bank accounts. It should make sense that they are Debtors' bank accounts as opposed those of the Jefferies Entities.

35

reputation in the industry, including by filing fraud claims against him." (*Id.*) Notably, in the

Debtors' mind, the Jefferies Entities' threatened actions were, collectively, a death sentence—the

"certainty of loss of key personnel," the "collapse" of a potential third-party financing

transaction, and the "demise of the companies" that would foreclose any opportunity for an

orderly winddown and for the Debtors to comply with their fiduciary duties and obligations to

regulatory agencies. (*Id.* ¶ 60.)

Meanwhile, the Jefferies Entities contend that the Debtors have failed to plead any

wrongful threat in the FAC since the Jefferies Entities were merely enforcing legal rights they

possessed. (Supporting Memorandum ¶ 48; Reply Brief ¶ 15.) With respect to GWA and

WMSA and alleged breaches of the Note Purchase Agreements and Notes, this may be true. The

FAC argues that the Defendants lacked any "legal right" to pursue enforcement actions against

GWA and WMSA as they were under a preexisting obligation to forbear through September 1,

2024. (*See* FAC ¶ 111.) However, that preexisting obligation to forbear was limited solely to

JSI exercising its right to affect a Trigger Redemption under the Note Purchase Agreements.

(*See* July 2023 Initial Forbearance Agreement ¶ 1.) The Trigger Redemption provision provided

JSI with the right to redeem the Notes, in whole or in part, at any time after the occurrence of

certain events. (*See, e.g.*, 2019 Note Purchase Agreement § 7.3.) Meanwhile, the July 2023

Initial Forbearance Agreement included a reservation of rights that provides that the agreement

"shall not, by implication or otherwise, constitute a termination, waiver or amendment of, or

otherwise affect the rights and remedies of JSI as a holder of the Notes." (July 2023 Initial

Forbearance Agreement ¶ 3.) Additionally, JSI "reserve[d] all rights and remedies . . . that JSI is

entitled to exercise under the Notes, the Note Purchase Agreements, any related documents or

otherwise at law or in equity." (*Id.*)

These remedies include a right for JSI to initiate legal action to enforce its rights. Section 10.2 of the Note Purchase Agreements provides that, in the event of a default or an event of default, "the holders of the Notes at the time outstanding may proceed to protect and enforce the rights of such holders by an action at law, suit in equity, or other appropriate proceeding." (2019 Note Purchase Agreement § 10.2; *see* 2020 Note Purchase Agreement § 10.2 (stating the same as to the September 2022 Note).) Such a proceeding may be for "specific performance of any agreement contained [t]herein or in the Notes, or for an injunction against a violation of any of the terms hereof or thereof, or in aid of the exercise of any power granted hereby or thereby or by law or otherwise." (2019 Note Purchase Agreement § 10.2; *see* 2020 Note Purchase Agreement § 10.2 (stating the same to the September 2022 Note).) An "event of default" is defined to encompass, among other things, GWA's default in the "payment of the Redemption Payment on the Note[s] . . . when those [N]otes become due and payable." (*Id.* § 9(a); *see* 2019 Note Purchase Agreements § 9(a) (stating the same as to the December 2019 Note and the January 2020 Note).)

The Jefferies Entities issued the Optional Redemption Notice, requiring GWA to pay all outstanding amounts on the Notes on December 31, 2023, which the Debtors acknowledged they failed to pay. (*See* FAC ¶¶ 53–54.) As the Jefferies Entities' exercise of its rights for Optional Redemption was not subject to the July 2023 Initial Forbearance Agreement and is separate and apart from JSI's right to a Trigger Redemption, the Debtors' failure to timely pay the outstanding amounts by the December 31, 2023 constituted an event of default under the Note Purchase Agreements. Therefore, the Jefferies Entities were well within their right to commence an enforcement action against GWA and WMSA pursuant to section 10.2 of the Note Purchase

Agreements and any threat to do so cannot constitute a wrongful threat.[15]  *See Davis*, 168 F.
Supp. 2d at 115 (providing that threats to enforce legal rights under a contract cannot constitute a
wrongful threat sufficient to establish a claim of economic duress).

　　　　Similarly, the Jefferies Entities' threats of clawback litigation and the possible freezing of
the Debtors' bank accounts were also an enforcement of the Jefferies Entities' legal rights under
the Strategic Relationship Agreement.  The FAC alleges that there was no legal basis for the
Jefferies Entities to threaten either.  (*See* FAC ¶ 59.)  However, section 2(a) of the Strategic
Relationship Agreement prohibits GWA, subject to certain exceptions, from entering into "any
agreements or other arrangements . . . to, take any action that could reasonably be expected to
***prevent, restrict or delay [GWA] from making any payment due under Section 1***."[16]  (Strategic
Relationship Agreement § 2(a) (emphasis added).)  This includes, "without limitation, any
agreement or other arrangement that ***could have the effect of diluting or subordinating*** [LAM
Holdings'] interest" in GWA's profits or revenue "in addition to ***all other remedies available to
such Party at law or in equity***, subject to the terms of [the Strategic Relationship Agreement]."
(*Id.* (emphasis added).)  In the event of a breach or even threatened breach of the Strategic

---

[15]　　　When questioned at the September 11, 2024 hearing whether the Debtors had any support for their
contention that the Jefferies Entities (or any party) were precluded from filing a lawsuit to recover money they were
contractually owed, the Debtors cited to *In re TMST Inc.*, 518 B.R. 329 (Bankr. D. Md. 2014), *vacated in part*, No.
09-17787-DK, 2014 WL 6390312 (Bankr. D. Md. Nov. 14, 2014).  (*See* Sept. 11, 2024 Hr'g Tr. at 38:11–14 ("I
believe . . . that the Court in *TMST* . . . addresses this").  Debtors' counsel stated that he read the case to "indicate
that if one party believed there would be irreparable harm as a result of the actions taken by another party and was
able to sufficiently plead that in the complaint, that that was . . . sufficient for the Court to find that at this stage of
litigation . . . that claim is viable or plausible."  (Sept. 11, 2024 Hr'g Tr. at 39:15–23.)  However, the *TMST* court,
applying New York law, only reached this conclusion after determining that there was no lawful exercise of
contractual rights.  *See TMST*, 518 B.R. at 352 (rejecting the Defendants' characterization of the pleaded facts as
"reciting only lawful exercise of contractual rights" and finding the specific allegations of unlawful and inflated
margin calls sufficient to establish a wrongful threat).  Therefore, *TMST* is inapplicable to this point.  (*See also*
Opposition Brief at 19 (citing to *TMST* only for the principle that "*free will is precluded* if irreparable harm would
be suffered should the threat be carried out and circumstances permit no other alternative to the agreement"
(emphasis added)).)

[16]　　　Section 1 of the Strategic Relationship Agreement governs LAM Holdings' rights to share in GWA's
profits and revenue and sets forth, among other things, a payment schedule.  (*See* Strategic Relationship Agreement
§ 1.)

Relationship Agreement, LAM Holdings and GWA are each entitled to seek "equitable relief, including an injunction and specific performance" as "monetary damages may be an inadequate remedy . . . because of the difficulty of ascertaining the amount of damage that will be suffered." (Strategic Relationship Agreement § 5(a).)

The Debtors concede that amounts were owed to the Jefferies Entities under the Strategic Relationship Agreement.  In the Initial Debtors First Day Declaration, the Debtors disclose that, as of the Petition Date, the Jefferies Entities were owed approximately $43.2 million on account of the Notes and approximately $52.5 million on account of the Strategic Relationship Agreement.  (Initial Debtors First Day Declaration ¶ 46.)  Indeed, at the September 11 hearing, Debtors' counsel admitted that, *prior to* entering into the 2024 Forbearance Agreement, the Debtors collectively owed the Jefferies Entities over $100 million for amounts due under different agreements.  (*See* Sept. 11, 2024 Hr'g Tr. at 35:21–36:1 (disclosing that the Jefferies Entities were owed "in the neighborhood of 100 million . . . under various agreements" before the 2024 Forbearance Agreement was signed).)  The Jefferies Entities believed that the employee compensation payments constituted a breach of the Strategic Relationship Agreement, rendering all amounts arising thereunder due and payable.  (*See* Supporting Memorandum ¶ 25.)  Section 5(a) of the Strategic Relationship Agreement entitled LAM Holdings then to seek "equitable relief" as well as "all other remedies available . . . at law or in equity."  (Strategic Relationship Agreement § 5(a).)  Therefore, the Jefferies Entities' threats to commence clawback litigation and freeze bank accounts cannot constitute wrongful threats with respect to GWA.  (*See* FAC ¶ 41 (making clear that WMSA, OGI, WSO, and WMSF were not parties to and did not guarantee, grant any security interest, provide any offset, or receive any consideration in connection with the Strategic Relationship Agreement).)

39

Nonetheless, while "an action cannot amount to a wrongful threat if the party taking it interprets the contract in good faith to allow it," there is a lack of clarity whether the Jefferies Entities possessed the legal right to take the other threatened legal actions. *Interpharm, Inc. v. Wells Fargo Bank, N.A.*, No. 08 Civ. 11365 (RJH), 2010 WL 1257300 (S.D.N.Y. 2010), *aff'd*, 655 F.3d 136 (2d Cir. 2011). While it may be that the Jefferies Entities possessed certain legal rights against GWA and WMSA, it is less clear whether the Jefferies Entities possessed the same rights against the remaining Debtors and non-debtor George Weiss. The FAC alleges that the Jefferies Entities lacked such rights as none of the foregoing were a party to or guaranteed the obligations arising thereunder and there was otherwise no legal basis. (FAC ¶ 111 ("Defendants had no legal right to take threatened enforcement actions against any of the remaining Debtors or their founder who were not parties to the Notes or Initial Forbearance Agreements."); *id.* (arguing that there was no legal basis for the Jefferies Entities to claw back compensation payments or to freeze bank accounts); *see also id.* ¶¶ 38–39 (noting there were no guarantees, security interests or rights of setoff under the Note Purchase Agreements or the Notes, including from OGI, WSO, and WMSF—none of whom were parties to the Note Purchase Agreements, the Notes or other related agreements); *id.* ¶ 41 (noting the same with respect to WMSA, OGI, WSO, and WMSF and the Strategic Relationship Agreement).) It is also unclear whether there was any legal right for the Jefferies Entities to threaten to "ruin George Weiss's reputation in the industry" and file "fraud claims against him." (*See id.* ¶ 58.) The Jefferies Entities also do not shed light on any lawful basis to freeze bank accounts or claw back employee compensation payments as to the remaining Debtors other than a simple statement that "these things would have happened because of the Debtors' conduct." (Reply Brief ¶ 16.) With respect to the employee compensation payments in particular, the FAC alleges that none of the agreements

with the Jefferies Entities before the 2024 Forbearance Agreement "permitted the Defendants to control, limit, restrict or approve any such payments." (FAC ¶ 57.)

Accordingly, neither the Jefferies Entities' threats to commence litigation to seek damages relating to alleged breaches of the Note Purchase Agreement and Notes as to GWA and WMSA nor their threats to initiate clawback litigation and freeze bank accounts as to GWA can constitute wrongful threats. The Court, therefore, **GRANTS** the Motion in this limited respect and **DIRECTS** that Debtors amend Count VI of the FAC accordingly. Whether the Jefferies Entities' remaining conduct actually constituted wrongful threats cannot be determined based on the pleadings alone. At this juncture, however, the Debtors have pled sufficient facts that the Jefferies Entities engaged in actions that went beyond "a mere demonstration of financial pressure or unequal bargaining power." *Interpharm*, 655 F.3d at 142.

### b.   Threats Precluded the Exercise of Free Will

To demonstrate a preclusion of free will, a party must show that it would have suffered "irreparable harm" if the wrongful threats were to be carried out, and there are no adequate remedies at law. *Davis*, 168 F. Supp. at 116 (citing *Dollar Dry Dock Savs. Bank v. Hudson Street Dev. Assocs.*, No. 92 Civ. 3737 (SAS), 1995 WL 412572, at *7 (S.D.N.Y. July 12, 1995) ("A threat to breach an enforceable contract can constitute duress only if the breach will cause irreparable harm to the threatened party and there are no adequate remedies at law.")); *see also Interpharm*, 2010 WL 1257300, at *10 (stating the same).

As noted, the Debtors viewed the Jefferies Entities' threatened actions collectively as the "certainty of loss of key personnel," the "collapse" of a potential third-party financing transaction, and the "demise of the companies" that would foreclose any opportunity for an orderly winddown and for the Debtors to comply with their fiduciary duties and obligations to regulatory agencies. (FAC ¶ 60.) It is against this backdrop of what the Debtors deem

41

"irreparable harm" that the Debtors contend that, they "along with founder and CEO George

Weiss, individually, were compelled to sign [the 2024 Forbearance Agreement] with

Defendants" as a result of the Jefferies Entities' threats.  (*Id.* ¶ 61.)

The Jefferies Entities argue, instead, that the Debtors acted out of their own free will and

otherwise had adequate legal remedies at their disposal.  (*See* Supporting Memorandum ¶ 49;

Reply Brief ¶ 17.)  However, they offer no support for their conclusory statement that the

Debtors acted out of their own free will and "self-interest" when entering into the 2024

Forbearance Agreement.  (*See id.*)  Moreover, their assertion that JSI's threatened breach of its

obligation to forbear through September 1, 2024 meant that the Debtors had other legal remedies

available to them, including a potential claim against JSI, is unpersuasive.  (*See id.* ¶ 15.)  As

discussed already, JSI only agreed to forbear from invoking its Trigger Redemption right, which

it did not seek to exercise and was not in breach of the July 2023 Initial Forbearance Agreement.

Accordingly, the Debtors have alleged sufficient facts that the Jefferies Entities' actions

precluded their free will at least with respect to OGI, WSO, and WMSF and WMSA in a limited

respect.  The Debtors were, at the time, concerned that "irreparable harm" would result if the

Jefferies Entities' carried out their threatened actions, and did not believe there was another

alternative as the Jefferies Entities effectively gave them what amounted to an ultimatum—sign

or else.

Notwithstanding, the Court is dubious whether the Debtors can successfully establish that

their free will was actually precluded.  These are highly sophisticated parties represented by

competent and similarly sophisticated counsel, and the notion that they were forced into entering

an agreement they would not otherwise have entered seems highly improbable.  However, while

the Court expresses its skepticism, it is not what is required for a Rule 12(b)(6) motion.

    2.  <u>Null and Void for Lack of Consideration, Intent to Comply, and</u>
<u>Countersignature</u>

Under New York law, the elements of contract formation are "an offer, acceptance of the

offer, consideration, mutual assent, and an intent to be bound." *Kasowitz, Benson, Torres &*

*Friedman, LLP v. Reade*, 950 N.Y.S.2d 8, 9 (App. Div. 2012), *aff'd*, 20 N.Y.3d 1082 (2013)

(indicating that a plaintiff seeking to establish the existence of an enforceable agreement must

show each of the foregoing) (quoting *Kowalchuk v. Stroup*, 873 N.Y.S.2d 43, 46 (App. Div.

2009)). Here, Count VII, which the Jefferies Entities request that the Court dismiss, seeks a

declaration that the 2024 Forbearance Agreement is null and void because the agreement lacks

consideration, the Jefferies Entities did not intend to be bound, and the agreement was not

otherwise signed and returned. (FAC ¶¶ 118–23.) Each is addressed in turn.

*a. Lack of Consideration*

Consideration, in general, "consists of either a benefit to the promisor or a detriment to

the promisee." *Lebedev v. Blavatnik*, 142 N.Y.S.3d 511, 517 (App. Div. 2021) (quoting *Weiner*

*v. McGraw-Hill, Inc.*, 443 N.E.2d 441, 444 (N.Y. 1982)). "A valuable consideration, in the

sense of the law, may consist either in some right, interest, profit, or benefit accruing to the one

party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by

the other." *Id.* (quoting *Hamer v. Sidway*, 27 N.E. 256, 257 (N.Y. 1891)). Indeed, "[t]he

slightest consideration is sufficient to support the most onerous obligation." *Id.* (quoting

*Mencher v. Weiss*, 114 N.E.2d 177 (N.Y. 1953)). "Under the traditional principles of contract

law, the parties to a contract are free to make their bargain, even if the consideration exchanged

is grossly unequal or of dubious value." *Apfel v. Prudential-Bache Sec. Inc.*, 616 N.E.2d 1095,

1097 (N.Y. 1993) (citations omitted). "Absent fraud or unconscionability, the adequacy of

consideration is not a proper subject for judicial scrutiny." *Id.* (citation omitted). Rather, "[i]t is

enough that something of 'real value in the eye of the law' was exchanged." *Id.* (citations

omitted); *see also In re 37-02 Plaza LLC*, 387 B.R. 413, 418 (Bankr. E.D.N.Y. 2008)

("Discerning the existence, rather than the adequacy, of consideration is the court's primary

task.").

Here, the Debtors have pled that the 2024 Forbearance Agreement is null and void for

lack of consideration because (i) the two-day forbearance period granted to GWA and WMSA

was "effectively meaningless by virtue of its duration"; (ii) the Jefferies Entities were under a

"preexisting obligation to not call the Notes through September 2024" pursuant to the July 2023

Initial Forbearance Letter; and (iii) no consideration was given to the OGI, WSO, and WMSF

who were "previously unobligated" under the Note Purchase Agreements, the Notes, or the

Initial Forbearance Agreements. (FAC ¶ 121.)

With respect to GWA and WMSA specifically, the Debtors have failed to adequately

plead that the 2024 Forbearance Agreement lacks consideration. *First*, "[i]t is settled that

forbearance is valuable consideration supporting the enforcement of an obligation." *All Terrain

Properties, Inc. v. Hoy,* 705 N.Y.S.2d 350, 355 (App. Div. 2000); *see also Rogowsky v.

McGarry*, 865 N.Y.S.2d 670, 671 (App. Div. 2008) ("[F]orbearance from the assertion of a legal

right has long been held to constitute valid consideration."). It is also a "settled principle of New

York contract law that courts will rarely if ever investigate the adequacy of the consideration

exchanged." *MM Arizona Holdings LLC v. Bonanno*, 658 F. Supp. 2d 589, 593 (S.D.N.Y.

2009). Indeed, "[u]nder New York law, forbearance of ***any length*** can constitute valid

consideration." *Id.* at 593 (emphasis added) (citation omitted). Accordingly, the duration of the

forbearance is irrelevant; rather, the focus is whether there was forbearance at all of a right the

Jefferies Entities possessed at the time. The Debtors' reliance on such is, therefore, insufficient

to support a plausible claim that the 2024 Forbearance Agreement lacks consideration as to

GWA and WMSA.

    *Second*, as already discussed, JSI's obligation to forbear under July 2023 Initial

Forbearance Agreement was limited solely to JSI exercising its right to affect a Trigger

Redemption under the Note Purchase Agreements against GWA.  In contrast, under the 2024

Forbearance Agreement, JSI agreed to forbear from (i) "seeking relief or exercising any

remedies" under the Bankruptcy Code, including, among other things, commencing an

insolvency proceeding under the Bankruptcy Code against GWA, an assignment for the benefit

of the creditors proceeding, a receivership, or other similar insolvency proceeding and (ii) filing

an "Enforcement Action," which the 2024 Forbearance Agreement defines to be JSI's "right to

immediately commence and enforcement action, suit, litigation, claim or other action" against

GWA in connection with the past due amounts under the Notes and certain actions of the

Debtors.  (2024 Forbearance Agreement ¶ 6; *id.* at 2.)  These were rights separate and apart from,

and in addition to, JSI's right to affect a Trigger Redemption under the Note Purchase

Agreements, which if triggered, enabled JSI to redeem the Notes, in whole or in part, at any time

after the occurrence of certain events.  (*See, e.g.*, 2019 Note Purchase Agreement § 7.3.)

Accordingly, the Debtors' contention that JSI was under a preexisting obligation to not call the

Notes is also unsupported and not adequately pled.

    However, with respect to OGI, WSO, and WMSF, the Debtors have adequately pled a

plausible claim that the 2024 Forbearance Agreement lacks consideration.  As discussed, none of

OGI, WSO, and WMSF were parties to the Note Purchase Agreements, the Notes, or any other

related agreement with the Jefferies Entities, and none guaranteed, granted a security interest,

provided for any offset, or received any consideration in connection with the foregoing.  (FAC

¶ 39.)  It is unclear whether the agreed-to forbearance under the 2024 Forbearance Agreement,

therefore, encompasses any rights JSI possessed against these entities.  The language of the

forbearance provision provides that JSI forbears from "seeking relief or exercising any remedies

under title 11 of the United States Code" and commencing an Enforcement Action, the latter of

which the 2024 Forbearance Agreement defines as being against GWA only.  (2024 Forbearance

Agreement at 2; *id.* § 6.)  The Jefferies Entities, effectively conceding this, argue that a contract

may nonetheless be supported by consideration "even if the consideration flows solely to a third

party."  (Reply Brief ¶ 20 (quoting *37-02 Plaza LLC*, 387 B.R. at 419)).  However, the Jefferies

Entities do not point to any benefits that flow to OGI, WSO, and WMSF from the Debtors' entry

into the 2024 Forbearance Agreement.

Accordingly, the Court **GRANTS** the Motion with respect to Count VII to the extent it

asserts a claim that the 2024 Forbearance Agreement is null and void for lack of consideration as

to GWA and WMSA because (i) the two-day forbearance period granted to GWA and WMSA

was "effectively meaningless by virtue of its duration" and (ii) the Jefferies Entities were under a

"preexisting obligation to not call the Notes through September 2024" pursuant to the July 2023

Initial Forbearance Letter.

*b.  Lack of Intent to Comply*

The Debtors further allege that the 2024 Forbearance Agreement should be deemed null

and void as the Jefferies Entities' actions "further indicated that they had no intention of

complying" with its terms, including "subsequent continued correspondence and threat to

commence action against the Debtors and their employees."  (FAC ¶ 120.)  However, the

Jefferies Entities' actions taken after the Debtors signed the 2024 Forbearance Agreement

suggest otherwise.  Therefore, the FAC has not alleged sufficient facts to support a plausible

46

A-817

claim that the Jefferies Entities did not intend to comply with the terms of the 2024 Forbearance

Agreement.

The Debtors entered into the 2024 Forbearance Agreement on February 12, 2024.  (*Id.* ¶

1.)  The FAC states that the Defendants filed UCC-1 financing statements on February 12, 2024

and February 13, 2024, no later than one day after the Debtors signed, "in an effort to seek to

perfect the security interests purportedly granted under the 2024 Forbearance Agreement."[17]  (*Id.*

¶ 66.)

Moreover, under the 2024 Forbearance Agreement, JSI was only required to forbear until

the "earlier of (x) two Business Days after such date or (y) the occurrence of any Forbearance

Default," subject to a possible extension of one business day.  (2024 Forbearance Agreement §

6.)  There is no indication that the forbearance period was extended.  (*See, e.g.*, FAC ¶ 62

(stating that the forbearance period was only for two days).)  At the conclusion of the two-day

forbearance period, the FAC states that the Jefferies Entities delivered the first of two draft state

court complaints on February 17, 2024, five days after the Debtors signed.  (*See id.* ¶¶ 68–69.)

In other words, the Jefferies Entities' delivery of the state court complaints only came after they

fulfilled their agreement to forbear.

Accordingly, the Court **GRANTS** the Motion as to Count VII to the extent it alleges that

the 2024 Forbearance Agreement should be declared null and void for the Jefferies Entities' lack

of intent to comply.  The Jefferies Entities' objective actions as alleged in the FAC do not

support a claim that they lacked an intent to comply.

---

[17]     As discussed below, under New York law, the 2024 Forbearance Agreement does not need to be
countersigned in order for it to be enforceable so long as there is objective evidence showing that parties intended to
be bound.

A-818

### c. Lack of Countersignature

"Under New York law, a contract need not be signed by either or both parties in order to be enforceable." *Asesores y Consejeros Aconsec CIA, S.A. v. Glob. Emerging Markets N. Am., Inc.*, 841 F. Supp. 2d 762, 766 (S.D.N.Y. 2012); *see also Pludeman v. N. Leasing Sys., Inc.*, 929 N.Y.S.2d 246, 248 (App. Div. 2011) ("We note that there is no legal requirement that a party's signature appear at the end of a written agreement."). "In the absence of a signed writing, parties can demonstrate the existence of a contractual agreement by making a showing of the 'objective manifestations of the intent of the parties as gathered by their expressed words and deeds.'" *Asesores*, 841 F. Supp. 2d at 766 (quoting *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 61 N.E.2d 999, 1001 (N.Y. 1977)); *see also Cotich v. Town of Newburgh*, 174 N.Y.S.3d 740, 742 (App. Div. 2022) ("[A]n unsigned contract may be enforceable, provided there is objective evidence establishing that the parties intended to be bound." (quoting *Flores v. Lower E. Side Serv. Ctr., Inc.*, 828 N.E.2d 593, 597 (N.Y. 2005)).

The Second Circuit articulated four factors for a court to consider when determining whether parties intended to be bound "in the absence of a document executed by both sides":

> The court is to consider (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Winston v. Mediafare Ent. Corp.*, 777 F.2d 78, 80 (2d Cir. 1985) (citations omitted). "No one *Winston* factor is decisive, and the analysis ultimately hinges on the parties' intent demonstrated through their objective communications and conduct." *In re Motors Liquidation Co.*, 580 B.R. 319, 344 (Bankr. S.D.N.Y. 2018) (citations omitted).

Here, the FAC asserts a claim that the 2024 Forbearance Agreement should be deemed null and void for the Jefferies Entities' failure to sign and return the agreement. (FAC ¶¶ 120,

48

122.)  New York law, however, does not require an agreement to be countersigned in order to be

enforceable, and the Debtors do not point to anything showing that the parties agreed to such,

including language in the 2024 Forbearance Agreement itself.  *See, e.g.*, *Scheck v. Francis*, 260

N.E.2d 493, 494 (N.Y. 1970) ("It is well settled that, if the parties to an agreement do not intend

it to be binding upon them until it is reduced to writing and signed by both of them, they are not

bound and may not be held liable until it has been written out and signed.") (citations omitted).

Indeed, the Debtors fail to point to any language in the 2024 Forbearance Agreement that

explicitly requires full execution of the agreement before it is binding and effective.  *See Motors*

*Liquidation*, 580 B.R. at 351–52 (noting the plain language of the settlement agreement provided

that the agreement would be effective and binding when it was "fully executed by each of the

Parties").

　　Moreover, "[e]ven where there is no *explicit* reservation by the parties not to be bound

until execution of a written agreement, the parties' language and conduct can nevertheless imply

the existence, or absence, of such an intent."  *Id.* at 345 (emphasis in original) (citing *Johnson v.*

*Fordham University*, No. 1:11-cv-04670 (ALC), 2016 WL 450424, at *4 (S.D.N.Y. Feb. 4,

2016)).  Here, as discussed, the Jefferies Entities took "objective" actions to show that they

intended to be bound by the 2024 Forbearance Agreement.  Indeed, as noted, the FAC states that

no later than one day after the Debtors signed the 2024 Forbearance Agreement, the Jefferies

Entities filed UCC-1 financing statements to perfect the security interests granted under the 2024

Forbearance Agreement.  (*Id.* ¶ 66.)

　　Accordingly, the Court **GRANTS** the Motion as to Count VII to the extent it asserts a

claim that the 2024 Forbearance Agreement is null and void for lack of countersignature.

### 3. Counts VI and VII

For the reasons discussed above, the Court **GRANTS** the Motion in part as to Counts VI and VII in part. Count VI, which seeks recission of the 2024 Forbearance Agreement as a product of duress, should survive dismissal only with respect to OGI, WSO, and WMSF as is and WMSA with respect to the Jefferies Entities' threats of clawback litigation and the freezing of bank accounts. Count VII—which seeks a declaration that the 2024 Forbearance Agreement is unenforceable for lack of consideration, intent to comply, and countersignature—should survive dismissal only with respect to lack of consideration as to OGI, WSO, and WMSF.

### B. Avoidance of the 2024 Forbearance Agreement and the Security Interests

The Debtors assert claims to avoid the 2024 Forbearance Agreement in its entirety and the Security Interests and guarantees arising thereunder as either a preferential or fraudulent transfer. Each is addressed in turn.

### 1. Avoidance of the 2024 Forbearance Agreement

#### a. Preferential Transfer Pursuant to 11 U.S.C. § 547(b)

Section 547(b) of the Bankruptcy Code provides, in relevant part, that a trustee may avoid any "**transfer** of an interest of the debtor in property": (1) made to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) made while the debtor was insolvent; (4) made on or within 90 days before the date of the filing of the petition; and (5) that enables such creditor to receive more than it would have received if the case were a chapter 7 liquidation case, the transfer had not been made, and the creditor received payment of the debt to the extent provided by provisions under the Bankruptcy Code. 11 U.S.C. § 547(b) (emphasis added). In establishing that a preferential transfer exists, it is generally the trustee who bears the burden of proving each of the foregoing elements by a preponderance of the evidence. *See* 11 U.S.C. § 547(g) ("[T]he trustee has the burden of proving

the avoidability of a transfer under subsection (b) of this section."); *Lawson v. Ford Motor Co.*

*(In re Roblin Indus., Inc.)*, 78 F.3d 30, 34 (2d Cir. 1996) (stating that the trustee bears the burden

of proving each of the elements by a "preponderance of the evidence").

      Section 101(54) of the Bankruptcy Code defines "transfer" to be:

        (A) the creation of a lien;

        (B) the retention of title as a security interest;

        (C) the foreclosure of a debtor's equity of redemption; or

        (D) each mode, direct or indirect, absolute or conditional, voluntary or
        involuntary, of disposing of or parting with--

            (i) property; or

            (ii) an interest in property.

11 U.S.C. § 101(54). Generally, this definition should be construed "as broad as possible," and

what constitutes a transfer is a "matter of federal law." 5 COLLIER ON BANKRUPTCY ¶ 547.03

(quoting S. Rep. No. 989, 95th Cong., 2d Sess. 27 (1978) and citing *Barnhill v. Johnson*, 503

U.S. 393, 397 (1992)).

      Here, the Debtors seek to avoid the 2024 Forbearance Agreement in its entirety as a

preferential transfer pursuant to 11 U.S.C. § 547(b). (*See* FAC ¶ 90.) Specifically, the FAC

alleges that the 2024 Forbearance Agreement constituted a "transfer of an interest of the Initial

Debtors in property" that was "made to, or for the benefit of, Defendants," who were creditors of

the Debtors, "for or on account of antecedent debts owed by certain of the Plaintiffs to

Defendants" when the "Initial Debtors were insolvent" and within 90 days prior to the Petition

Date. (*Id.* ¶¶ 83–87.) Moreover, the 2024 Forbearance Agreement, the Debtors contend,

enabled the Jefferies Entities to receive more than they would have if the "Initial Debtors' cases

was [sic] cases under chapter 7 . . . the [2024] Forbearance Agreement had not been made . . .

and Defendants received payment to the extent provided by provisions under the Bankruptcy Code." (*Id.* ¶ 88.)

In support, the Debtors allege that the various transactions contemplated under the 2024 Forbearance Agreement constitute, "on the whole," transfers of the "Debtors' interests in property to the Defendants." (Opposition Brief at 11.) Specifically, the FAC provides that, "[t]he [2024] Forbearance Agreement, and the terms set forth therein, was a transfer of an interest of the Initial Debtors in property."[18] (FAC ¶ 83.) These transactions "includ[e], among other things, (i) the granting of a priority security interest in all of the Initial Debtors' assets, (ii) the issuance of guarantees by each of the Initials [sic] Debtors (whether or not a party to the Note Purchase Agreements, Notes, or [Strategic Relationship] Agreement), and (iii) an offset of significant fees owed by JSI to GWA under the IMA." (*Id.*) The Debtors maintain that these "obligations and transfers to be avoided," which belong to them, "are the substance of the [2024] Forbearance Agreement." (Opposition Brief at 11–12.) Therefore, their "avoidance will have the practical effect of invalidating the eve-of-bankruptcy transaction as a whole." (*Id.* at 12.) In light of this, the Debtors believe that the 2024 Forbearance Agreement can be avoided in its entirety.

It may be that if the Court finds that each individual transaction under the 2024 Forbearance Agreement constitutes a preferential transfer, then the 2024 Forbearance Agreement can be avoided in its entirety. However, certain of the transactions that the Debtors cite are not "transfers," and the Debtors fail to account for all transactions and parties under the 2024 Forbearance Agreement, including the personal guarantee of non-debtor George Weiss and WMSF who are parties to the 2024 Forbearance Agreement. The FAC, therefore, fails to plead

---

[18]    While the Opposition Brief refers to the Debtors and the Debtors' interests, the FAC refers only to the Initial Debtors and excludes WMSF.

sufficient facts to establish that the specific transactions and parties that the Debtors highlight

constitute the entire essence of the 2024 Forbearance Agreement and would justify avoiding the

entire agreement "as a whole."

*First*, the FAC cites to, among other things, the "issuance of joint and several guarantees

by each of the Initials [sic] Debtors" as one of the transactions that constitutes a "transfer of an

interest of the Initial Debtors in property."  (FAC ¶ 83.)  Guarantees, however, are not generally

considered "transfers" for purposes of 11 U.S.C. § 101(54) but rather "obligations."  *See, e.g.*, *In*

*re Asia Glob. Crossing, Ltd.*, 333 B.R. 199, 204 (Bankr. S.D.N.Y. 2005) ("[T]he Guaranty gave

[the defendant] a chose in action against [the debtor], conditioned on the default of the [primary

obligor].  It did not grant [the defendant] any interest in or right to [the debtor's] property.  As

such, it was an 'obligation' rather than a 'transfer' . . . ."); *Covey v. Com. Nat'l Bank*, 960 F.2d

657, 661 (7th Cir. 1992) (noting that while notes or guarantees are not "transfers" under 11

U.S.C. § 101(54), both "note and guarantee are obligations") (citations omitted).

*Second*, as the Jefferies Entities argue, the 2024 Forbearance Agreement also includes

(i) a personal guarantee by George Weiss, a non-debtor, of "the accuracy of the representations

made by, and the performance of the agreements of, the [Debtors]" as well as (ii) an agreement

by George Weiss that:

> [H]e shall take all actions within his control, including by exercising all of
> his voting, governance, management and other rights and powers with
> respect to each of the other [Debtors], any of their subsidiaries and any of
> his personal or his family's trusts to cause such persons to comply with the
> terms of [the 2024 Forbearance Agreement].

(2024 Forbearance Agreement § 9.)  As discussed, the Bankruptcy Code only permits the

avoidance of transfers of interests in a debtor's property or a debtor's incurrence of an obligation,

subject to certain requirements.  As the 2024 Forbearance Agreement also provides for the

personal guarantee of non-debtor George Weiss, the 2024 Forbearance Agreement cannot be

avoided in its entirety solely based on the transactions the Debtors have cherry-picked as collectively representing the "substance of the [2024] Forbearance Agreement."  (*See* Opposition Brief at 12.)

The Debtors argued at the September 11, 2024 hearing that the 2024 Forbearance Agreement may avoided notwithstanding George Weiss's guarantee because his guarantee was only a "performance guarantee of obligations of these parties under the [2024 Forbearance Agreement], not of the obligations under the loans or any other monies that are owed."  (Sept. 11, 2024 Hr'g Tr. at 20:20–24; *see also id.* 20:24–25 (stating that Weiss's personal guarantee was "solely a performance guarantee rather than a payment guarantee").)  In support of this, counsel to George Weiss referred the Court to three cases: *Caldor, Inc. v. Mattel, Inc.*, 817 F. Supp. 408 (S.D.N.Y. 1993); *Solco Plumbing Supply, Inc. v. Hart*, 999 N.Y.S.2d 126 (App. Div. 2014); and *Key Bank of Long Island v. Burns*, 556 N.Y.S.2d 829 (App. Div. 1990).[19]  (*See* Sept. 11, 2024 H'rg Tr. at 49:10–15.)

However, none of these cases make a distinction between a performance guarantee versus a payment guarantee.[20]  What is consistent between each of these cases, though, is the notion that

---

[19]    At the September 11 hearing, Debtors' counsel disclosed that the Jefferies Entities sued George Weiss individually in District Court in the Southern District of New York where a motion to dismiss is currently pending. (Sept. 11, 2024 Hr'g Tr. at 21:4–12; *see* Defendant George Weiss's Motion to Dismiss Plaintiffs' Complaint and, In Addition or as an Alternative, for a Stay of the Action, Jefferies Strategic Invs. v. Weiss, No. 1:24-cv-04369 (AH) (S.D.N.Y. June 7, 2024), ECF No. 15 (the "Weiss Motion to Dismiss")).  Counsel indicates that these three cases were cited in the memo to support the "essential argument" in the Weiss Motion to Dismiss that George Weiss's guarantee was a "performance guarantee solely of this [2024 Forbearance Agreement]."  (Sept. 11, 2024 Hr'g Tr. at 21:4–12, 49:10–15.)  In the Weiss Motion to Dismiss, George Weiss argues that (i) the 2024 Forbearance Agreement generally separates him from the Debtors; (ii) he is not specifically identified in section 3 of the 2024 Forbearance Agreement; (iii) section 9 could have, but does not refer to, "Guaranteed Obligations"; (iv) the "agreements" mentioned in section 9 are a reference to the agreements listed in section 2; and (v) a personal guarantee of $100 million by implication would be unreasonable.  (*See generally* Weiss Motion to Dismiss.)

[20]    The Court will not address the underlying merits of the Weiss Motion to Dismiss, which is pending before Judge Hellerstein in the Southern District of New York.  However, as the parties have raised this particular issue in support of their contention that the 2024 Forbearance Agreement may be voided notwithstanding the personal guarantee of George Weiss, a non-debtor, the Court notes that these three cases are distinguishable from the case at

a guarantee agreement under New York law should be narrowly construed in accordance with its

terms. *See Caldor*, 817 F. Supp. at 410–11 (citations omitted) ("A guarantee agreement is to be

construed like other contracts in order to give effect to the parties' intentions . . . [and] must be

strictly construed according to the terms of the agreement."); *Solco*, 999 N.Y.S.2d at 800 ("The

terms of a guaranty are to be strictly construed . . . and a guarantor should not be found liable

beyond the express terms of the guaranty . . . ." (citations omitted)); *Key Bank*, 556 N.Y.S.2d at

503 ("It is well settled that the liability of a guarantor is to be narrowly construed and cannot be

extended by construction beyond the plain and explicit language of the contract.") (citations

omitted)).

In general, New York courts view guarantees as contracts, and in interpreting them, will

"look first to the words the parties used." *Louis Dreyfus Energy Corp. v. MG Ref. & Mktg., Inc.*,

812 N.E.2d 936, 939 (N.Y. 2004). A "court should not read a contract so as to render any term,

phrase, or provision meaningless or superfluous, but should give effect to all of the contract's

provisions." *Solco*, 123 A.D.3d at 800 (citations omitted); *see also Bombay Realty Corp. v.

Magna Carta, Inc.*, 790 N.E.2d 1163 (N.Y. 2003) (noting generally that courts will look to a

contract as a whole to determine its meaning, so that one section does not conflict with another).

Applying these principles here, a strict construction of the 2024 Forbearance Agreement,

even in Weiss's favor, makes clear that Weiss's performance guarantee was also a guarantee of

payment. Pursuant to section 9 of the 2024 Forbearance Agreement, George Weiss personally

---

hand. At issue in *Caldor* was the guarantee of "payment of any indebtedness . . . owing to [defendant]," which explicitly provided for the guarantee of payment. *Caldor*, 817 F. Supp. at 409. Meanwhile, *Key Bank* dealt with the question whether a guarantee of debts and obligations of a corporation who subsequently became a guarantor on a note issued by an individual could be interpreted as imposing an obligation on defendants who served as guarantors of such individual's debts. *See generally Key Bank*, 556 N.Y.S.2d 829. Finally, the *Solco* court, in dealing with a "financially interested" guarantor's "guarantee [of] payment . . . of all indebtedness of the . . . customer," focused solely on whether the "financially interested" language in the guarantee created a contingency and whether this contingency was satisfied. *Solco*, 999 N.Y.S.2d at 799, 801.

guaranteed the "performance of the ***agreements of the [Debtors] hereunder***," including taking "all actions within his control . . . to cause such persons to comply with terms of [the] Agreement." (2024 Forbearance § 9 (emphasis added).) These agreements include, among other things, each of the Debtors' (other than GWA's) irrevocable and unconditional guarantee of the "prompt and complete payment and performance by GWA and each other [Debtor] when due . . . of the Guaranteed Obligations . . . until the Guaranteed Obligations are paid in full." (*Id.* § 3(a); *see also id.* §§ 1, 10(d) (making clear that the 2024 Forbearance Agreement was intended to address, among other things, the amounts past due under the Note Purchase Agreements, the Notes, and the Optional Redemption Notice).) "Guaranteed Obligations" is defined under the agreement to encompass "all the obligations of GWA and each other [Debtor] arising under any Note Purchase Agreement, the Notes, the [Strategic Relationship Agreement] and this Agreement," among other things. (*Id.*; *see also id.* § 10(d) ("This Agreement addresses the Past Due Obligations [on the Notes pursuant to the Note Purchase Agreements, the Notes themselves, and the Optional Redemption Notice] and the amounts in the IMA referenced in Section 8.").)

Indeed, courts have found that guarantees of performance can include guarantees of payments even when the language of the guarantee does not explicitly provide for such. *See, e.g.*, *Am. Trading Co. v. Fish*, 364 N.E.2d 1309, 1313 (N.Y. 1977) (finding that since defendant guaranteed performance of the terms and conditions of the agreement that required payment by means of trade acceptances, the guarantee "must be interpreted as including payment according to and as provided in the agreement") (citation omitted); *Merch. Cash & Cap., LLC v. Haute Soc'y Fashion, Inc.*, No. 16-CV-2696 (ILG), 2017 WL 2912452, at *3 (E.D.N.Y. July 6, 2017) (concluding that a personal guarantee of performance included a guarantee of payment despite the lack of explicit language providing for such since "it would be challenging to prescribe some

other meaningful purpose the Guaranty was intended to serve"). Accordingly, the Court is unpersuaded.

*Third*, the FAC was amended to only include transfers of the Initial Debtors and exclude WMSF, a fellow Debtor, who was also a party to the 2024 Forbearance Agreement. As set forth in the 2024 Forbearance Agreement, WMSF also granted a security interest in all of its assets and was also party to the joint and several guarantee referenced above. (*See Plaintiffs' Memorandum of Law in Support of Motion for Leave to Amend Adversary Complaint*, ECF Doc. # 13, Ex. B (blackline of FAC against prior iteration).) The Debtors have not offered anything in the FAC to support how the 2024 Forbearance Agreement, which involves other transactions and parties, can be avoided in its entirety based solely on the parties and transactions that the Debtors have highlighted. The FAC, therefore, fails to plead sufficient facts to support a plausible claim for relief.

Alternatively, the FAC pleads that, to the extent the 2024 Forbearance Agreement is not avoided in its entirety, "all provisions therein which purport to transfer property of the Initial Debtors should be avoided and set aside as a preferential transfer pursuant to 11 U.S.C. § 547(b)." (FAC ¶ 91.) Indeed, the Jefferies Entities have indicated that Count I should survive dismissal to the extent it asserts a preference claim that seeks to avoid the granting of security interests under the 2024 Forbearance Agreement with such relief duplicative of the relief sought in Count III. (*See* Sept. 11, 2024 Hr'g Tr. at 18:2–9 ("So, we would agree that Count 1, to the extent that it asserts a preference claim seeking to avoid the granting of security interests has been sufficiently alleged. I think the same is true under Count 3. I think that that is it.").)

However, the FAC does not identify which specific provisions purport to transfer property of the Initial Debtors. Paragraph 83 of the FAC, which lists the transactions the Debtors

believe render the 2024 Forbearance Agreement a "transfer of an interest of the Initial Debtors in property," includes the language "among other things," suggesting that they do not represent the universe of all transactions. It is, therefore, unclear what alternative relief the Debtors are actually seeking and, in any event, survival of Count I in the limited respect that the Jefferies Entities are requesting would be duplicative of the surviving relief sought in Count III, which is discussed in greater detail below. *See, e.g.*, *Sands Harbor Marina Corp. v. Wells Fargo Ins. Servs. of Oregon, Inc.*, 156 F. Supp. 3d 348, 362 (E.D.N.Y. 2016) ("Duplicative claims shall be dismissed when they are based on identical conduct and seek the same relief." (citing *Paladini v. Capossela, Cohen, LLC*, No. 11–CV–2252, 2012 WL 3834655, at *6 (S.D.N.Y. Aug. 15, 2012))).

Accordingly, the Court **GRANTS** the Motion as to Count I and **DISMISSES** it in its entirety for failure to state a claim upon which relief can be granted.

> b. *Fraudulent Transfer and Obligation Pursuant to 11 U.S.C. § 548(a)(1)(B)*

Section 548(a)(1)(B) provides, in relevant part, that a trustee may avoid:

> [A]ny ***transfer*** . . . of an interest of the debtor in property, or any ***obligation*** . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily— . . .

> (B)

>> (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

>> (ii)

>>> (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B) (emphasis added).

Thus, to prevail on a constructive fraudulent conveyance claim under the Bankruptcy Code, a trustee must show, *inter alia*, that the debtor received "less than a reasonably equivalent value in exchange for such transfer." 11 U.S.C. § 548(a)(1)(B)(i). "The heightened federal pleading standard for allegations of fraud does not apply to a complaint to avoid transfers as constructively fraudulent." *Bernard L. Madoff Inv. Secs. LLC*, 445 B.R. 206, 225 (Bankr. S.D.N.Y. 2011) (citing *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 801–02 (Bankr. S.D.N.Y. 2005)). "As the party seeking to avoid the transaction, the Trustee bears the burden of proof by a preponderance of the evidence" on all elements of a claim for constructive fraudulent conveyance under § 548(a)(1)(B). *Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Grp., Inc.)*, 232 B.R. 565, 570 (Bankr. N.D.N.Y. 1999) (citation omitted).

However, unlike the word "transfer," which is defined in the Bankruptcy Code, the term "obligation" is not, and this Court has recognized that the words mean different things. *See In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 445 (Bankr. S.D.N.Y. 2012) (citing examples from other jurisdictions, involving among other things, sections 547 and 548, which "confirm that the words 'transfers' and 'obligations' have different meanings and may be distinguished in construing other sections of the Bankruptcy Code"); *In re MacMenamin's Grill Ltd.*, 450 B.R. 414, 429 (Bankr. S.D.N.Y. 2011) ("The distinction between a transfer and the incurrence of an

59

obligation has also been recognized in the case law.").  Presumably, the word "obligation" under the Bankruptcy Code means "[a] formal binding agreement or acknowledgment of a liability to pay a certain amount or to do a certain thing for a particular person or set of persons; esp., a duty arising by contract." *Asia Glob*, 333 B.R. at 203 (alteration in original) (quoting BLACK'S LAW DICTIONARY 1104 (8th ed. 2004)).  "In most situations, . . . 'obligation' will impose a 'debt' on the obligor, and give a 'claim' to the obligee." *Id.* (footnote omitted).

Here, the Debtors also seek to avoid the 2024 Forbearance Agreement in its entirety as a fraudulent conveyance pursuant to 11 U.S.C. § 548(a)(1)(B).  (*See* FAC ¶ 97.)  Specifically, the FAC alleges that the 2024 Forbearance Agreement constitutes a "transfer[] of an interest of the Debtors in property, or an incurrence of an obligation by the Debtors" that was made within 2 years prior to the Petition Date and "to, or for the benefit of, the Defendants" without the Debtors receiving reasonably equivalent value in exchange.  (*See id.* ¶¶ 93–96.)  As with Count I, the Debtors cite the same transactions as "transfers of an interest of the Debtors in property, or an incurrence of an obligation by the Debtors" that, "*among other things*," collectively render the 2024 Forbearance Agreement a constructive fraudulent conveyance: "(i) the granting of a priority security interest in all of Plaintiffs' assets, (ii) the issuance of joint and several guarantees by each of the Debtors . . . and (iii) an offset on any fees that JSI owes to GWA or any other Debtor under the IMA."  (*Id.* ¶ 95 (emphasis added).)

However, the plain language of the 2024 Forbearance Agreement itself provides that:

> Each [of the Debtors] and [George] Weiss acknowledges and agrees that it is receiving a ***direct benefit from the transactions contemplated by this Agreement, and the terms of this Agreement, including the guaranty provided herein and the security interests granted herein, constitute reasonably equivalent value for the benefit it is receiving from entering into this Agreement.***  Each [Debtor] and [George] Weiss agrees that it shall not, nor shall it cause, directly or indirectly, any person controlled by, or under common control with, it, to take any action inconsistent with the

terms of this Agreement.  Each party represents and warrants that it has full
power and authority to enter into and perform this Agreement, and that the
person executing this Agreement on behalf of that party has been properly
authorized and empowered to enter into this Agreement and to bind that
party hereto.

(2024 Forbearance Agreement § 10(c) (emphasis added).)  Thus, the Debtors explicitly agreed

that the transactions provided under the 2024 Forbearance Agreement and all its terms constitute

reasonably equivalent value for the benefit the Debtors are receiving.

Moreover, as discussed with Count I, the Debtors fail to account for the personal

guarantee and agreement of non-debtor George Weiss and, therefore, do not account for **all**

transactions under the 2024 Forbearance Agreement.  Guarantees, as discussed above, constitute

an "obligation."  Since the 2024 Forbearance Agreement also encompasses the obligations of

other non-debtor parties, and section 548(a)(1)(B) only permits the avoidance of, among other

things, obligations "incurred **by the debtor**," the 2024 Forbearance Agreement cannot be avoided

in its entirety based solely on the transactions the Debtors highlight.  11 U.S.C. § 548(a)(1)(B)

(emphasis added).  Therefore, as with Count I, the FAC fails to sufficiently plead how the

transactions the Debtors cherry-picked constitute the entire thrust of the agreement and warrant

avoidance of the agreement in its entirety.

The Jefferies Entities also highlight that the FAC states that the 2024 Forbearance

Agreement "was for or on account of antecedent debts owed by certain of the Plaintiffs to

Defendants."  (FAC ¶ 85.)  This, the Jefferies Entities contend, is a concession that the "transfer"

was made for reasonably equivalent value and therefore, that requirement cannot be satisfied.

(Supporting Memorandum ¶ 42.)  Section 548(d)(2)(A) defines "value" as being "property, or

satisfaction or securing of a present or antecedent debt of the debtor."  11 U.S.C. § 548(d)(2)(A).

Generally, transfers made on account of antecedent debt are presumed to have been made "for

value."  *See O'Toole v. Karnani (In re Trinsum Grp., Inc.)*, 460 B.R. 379, 388 (Bankr. S.D.N.Y.

61

2011) (stating that where "the transfers are viewed as paying an antecedent debt . . . it is presumed the transfers were made 'for value'").  "With this type of value, something is exchanged or given for the purpose of reducing an obligation or debt already incurred and outstanding" such that "[p]ayment of a pre-existing debt is value, and if the payment is dollar-for-dollar, full value is given."  5 COLLIER ON BANKRUPTCY ¶ 548.03.  As the FAC already fails to adequately plead that the 2024 Forbearance Agreement can be avoided in its entirety as a fraudulent conveyance, the Court need not reach this issue as to Count II.

Accordingly, the Court **GRANTS** the Motion as to Count II for failure to state a claim upon which relief can be granted.

> 2.   Avoidance of the Security Interests and Guarantees as a Fraudulent Transfers and Obligations Pursuant to 11 U.S.C. § 548(a)(1)(B)

The Debtors also seek, on a more limited basis, avoidance of the Security Interests, including any UCC-1 filings in furtherance thereof, and guarantees granted under the 2024 Forbearance Agreement as preferential transfer and/or fraudulent conveyance.  However, as the Jefferies Entities only seek dismissal of this Count to the extent it asserts a claim for constructive fraudulent conveyance, this Opinion does not address the Debtors' claim seeking avoidance of the Security Interests and guarantees as preferential transfers pursuant to 11 U.S.C. § 547(b).

The FAC alleges that the Security Interests and guarantees granted under the 2024 Forbearance Agreement constitute "transfers of property of the Debtors' estates, and/or an incurrence of an obligation of the Debtors' estates, all without fair or reasonable consideration therefor, and enabled Defendants to receive more than they would receive if (a) Plaintiffs' cases was [sic] cases under chapter 7 of the Bankruptcy Code, (b) the [2024] Forbearance Agreement and [] Security Interests and guarantees had not been made, and (c) Defendants received

62

payment of such debt to the extent provided by the provisions of the Bankruptcy Code."  (FAC ¶ 100.)

Again, the Debtors explicitly agreed that the Security Interests and the guarantees provided under the 2024 Forbearance Agreement constitute "reasonably equivalent value" for the benefit the Debtors are receiving.  (*See* 2024 Forbearance Agreement § 10(c) ("Each [of the Debtors] and [George] Weiss acknowledges and agrees that it is receiving a direct benefit from the transactions contemplated by this Agreement, and the terms of this Agreement, ***including the guaranty provided herein and the security interests granted herein***, constitute reasonably equivalent value for the benefit it is receiving from entering into this Agreement." (emphasis added)).

Additionally, as with Count II, the Jefferies Entities contend that the FAC provides that the 2024 Forbearance Agreement, including the Security Interests and guarantees, were "for or on account of antecedent debts owed by certain of the Plaintiffs to Defendants."  (Supporting Memorandum ¶ 43 (quoting FAC ¶ 85).)  Section 10(d) of the 2024 Forbearance Agreement confirms this, stating that "[t]his Agreement addresses the Past Due Obligations and the amounts under the IMA referenced in Section 8."  (2024 Forbearance Agreement § 10(d).)  "Past Due Obligations" is defined as the amounts due and owing under the Notes as calculated therein.  (*See id.* § 1.)  However, as the plain language of the 2024 Forbearance Agreement itself provides that the Security Interests and the guarantees thereunder constitute "reasonably equivalent value for the benefit [the Debtors and George Weiss are] receiving," the Court need not reach this.

Accordingly, in light of the foregoing, the Court **GRANTS** the Motion as to Count III, which only seeks dismissal of Count III to the extent it asserts a claim for constructive fraudulent conveyance.

### 3. Claims Seeking Contingent Relief

#### a. *Preservation of Avoided Transfers Pursuant to 11 U.S.C. § 551*

The FAC also asserts a claim pursuant to section 551 of the Bankruptcy Code, seeking to preserve the value of the interests and obligations incurred and/or transferred under the 2024 Forbearance Agreement, including the Security Interest and guarantees, for the benefit of Plaintiffs' estates. (FAC ¶ 104.) In support, the FAC pleads that such interest and obligations are property of the Debtors' estates. (*Id.* ¶ 103.)

Section 551 provides that "[a]ny ***transfer avoided*** under section . . . 547 [or] 548 . . . of this title . . . is preserved for the benefit of the estate but only with respect to property of the estate." 11 U.S.C. § 551 (emphasis added). In other words, as both the Debtors and the Jefferies Entities acknowledge, relief is contingent upon a transfer having been avoided in the first instance pursuant to one of the enumerated sections of the Bankruptcy Code. (*See* Supporting Memorandum ¶ 67 (stating that section 551 provides a remedy once a transfer is deemed avoidable); Opposition Brief at 24 (stating that this provision "remains conditioned upon any of the alleged avoidable transfers being upheld").) The Jefferies Entities argue, therefore, that this claim cannot stand alone as an independent cause of action. (*See* Supporting Memorandum ¶ 8.) However, there is no reason why such a claim cannot be asserted when there are surviving claims that potentially offer a basis for the contingent relief sought, and the FAC otherwise alleges sufficient facts to support a plausible claim for such relief.

Therefore, in light of the dismissal of Counts I and II in their entirety and Count III to the extent it seeks to avoid the Security Interests and guarantees as constructive fraudulent conveyances, the Court **GRANTS** the Motion as to Count IV, in part. Specifically, Count IV survives dismissal only to the extent it seeks relief under section 551 as to the avoidance of the Security Interests and guarantees as preferential transfers, the surviving claim under Count III.

64

A-835

The Court also **DIRECTS** the Debtors to amend the FAC to make explicit that the relief sought in this Count is contingent on a finding that the Debtors are entitled to relief under sections 547 or 548 of the Bankruptcy Code as that is not clear.  As it is currently drafted, it states that the Debtors are entitled to relief under section 551 of the Bankruptcy Code because the "interest and obligations incurred and/or transferred under the [2024] Forbearance Agreement . . . are property of Plaintiffs' estates."  (FAC ¶ 103.)

> b. *Liability of Transferee of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)*

Similarly, the FAC asserts a claim pursuant to 11 U.S.C. § 550(a) which, after avoidance of a transfer pursuant to one of the enumerated provisions, permits a trustee to recover the property or the value of the property transferred.  Specifically, section 550(a) provides, in relevant part, that:

> (a)　　Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 547 [or] 548 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> > (1)　　the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
> >
> > (2)　　any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

The FAC alleges that the Debtors are "entitled to avoid the [2024] Forbearance Agreement, and any security interests and guarantees granted therein, pursuant to 11 U.S.C. § 547(b) as a preferential transfer and the [2024] Forbearance Agreement, and any security interests and guarantees granted therein, pursuant to 11 U.S.C. § 548(a)(1)(B) as a fraudulent transfer."  (FAC ¶ 106.)  The FAC contends this is warranted as the Jefferies Entities were "initial transferee[s] of one or more of the interests and obligations incurred and/or transferred

under the [2024] Forbearance Agreement, the immediate or mediate transferee of such initial

transferee, or the person for whose benefit the [2024] Forbearance Agreement was made." (*Id.* ¶

107.) The Debtors, therefore, argue that they are "entitled to avoid the [2024] Forbearance

Agreement, including the [] Security Interests and guarantees" pursuant to 11 U.S.C. § 550(a).

(*Id.* ¶ 108.)

The Jefferies Entities do not dispute that they were initial transferees but instead contend,

as with Count IV, that this claim must be dismissed because it cannot survive as an independent

cause of action. (*See* Supporting Memorandum ¶ 67.) However, the FAC makes clear that the

relief they are seeking is predicated on the Debtors' position that they are "entitled to avoid the

[2024] Forbearance Agreement, and any security interests and guarantees granted therein,"

pursuant to sections 547 and 548 of the Bankruptcy Code. (FAC ¶ 106.) Again, there is no

reason why such a claim cannot be asserted when there are surviving claims that potentially offer

a basis for the contingent relief sought, and the FAC otherwise alleges sufficient facts to support

a plausible claim for such relief.

Therefore, for the same reasons as Count IV, the Court **GRANTS** the Motion as to Count

V, in part, and permits Count V to survive dismissal only to the extent it seeks relief under

section 550 as to the avoidance of the Security Interests and guarantees as preferential transfers,

the surviving claim under Count III.

### 4. Counts I, II, III, IV, and V

For the reasons discussed, the Court **GRANTS** the Motion as to Counts I, II, and III as

follows: the Court **DISMISSES** Counts I and II in their entirety and **GRANTS** the Motion as to

Count III and **DISMISSES** Count III only to the extent it asserts a claim for constructive

fraudulent conveyance. Consistent with this, the Court **GRANTS** the Motion as to Counts IV

and V, in part, and permit such Counts to survive dismissal to the extent they seek relief in the

event the Security Interests and the guarantees arising under the 2024 Forbearance Agreement are found to constitute preferential transfers under 11 U.S.C. § 547(b).

### C. Avoidance of the Alleged Avoidable Transfers

The Debtors assert claims that seek to avoid the Alleged Avoidable Transfers as either preferential and/or constructive fraudulent transfers, as applicable. Each is addressed in turn.

1. <u>The $3 Million Alleged Avoidable Transfer as a Preferential Transfer Pursuant to 11 U.S.C. § 547(b)</u>

The FAC asserts a claim that seeks the avoidance of OGI's February 15, 2024 payment of $3 million to JSI on GWA's behalf as an avoidable preference under section 547(b) of the Bankruptcy Code, which was made during the Preference Period. (FAC ¶¶ 71, 125.) The Debtors allege that the payment, which constitutes a transfer of an interest of the Debtors in property, was made (i) to the Jefferies Entities who were creditors at the time; (ii) to, or for the benefit of, the Jefferies Entities as it "either reduced or fully satisfied [debt(s)] then owed by Plaintiffs to Defendants"; (iii) for or on account of antecedent debts owed; (iv) while the Debtors were insolvent and within 90 days of the Petition Date; and (v) enabled the Defendants to receive more than they would have if the cases were in chapter 7, such payment had not been made, and the Defendants received payment to the extent provided by the Bankruptcy Code. (*Id.* ¶¶ 126–32.) Moreover, the Debtors further allege that the Jefferies Entities were "either the initial transferee of the $3 million . . . or were the immediate or mediate transferee of the initial transferee." (*Id.* ¶ 133.)

The Jefferies Entities argue that this claim should be dismissed since (i) the FAC fails to plead facts that show that, as result of the $3 million payment, JSI received more than it would have in a hypothetical chapter 7 (Supporting Memorandum ¶ 57); (ii) the payment was pursuant to a "guarantee issued by OGI," which is not a "transfer [that] can he [sic] avoided as a

67

preferential transfer" (Reply Brief ¶ 26); and (iii) OGI's debt to the Jefferies Entities is not

otherwise in dispute (*id.* ¶ 27.).[21]

The FAC pleads that at the time OGI made the payment on behalf of GWA, OGI had no

obligation to JSI for any payment except with respect to its obligations under the 2024

Forbearance Agreement, and GWA had other creditors to which it owed obligations.  (FAC ¶

71.)  "In either case," the FAC contends, "JSI received more than it would have received in a

chapter 7 proceeding."  (*Id.*)  However, as the Jefferies Entities correctly note, the FAC does not

offer anything other the foregoing conclusory allegation.  (*See* Supporting Memorandum ¶ 59.)

There is nothing in the FAC concerning GWA's, OGI's, or any other Debtor's assets or

liabilities as of the Petition Date that would enable the Court to determine whether JSI received

more than it would have if the Debtors' cases were in chapter 7.  Whether GWA had other

creditors to which it owed obligations only partially sheds light on whether OGI's $3 million

payment to JSI was more than what JSI could have recovered from OGI in a hypothetical chapter

7 proceeding.

The FAC suggests that OGI's guarantee obligation to pay on GWA's behalf in

connection with the Notes stems from the 2024 Forbearance Agreement.  Section 3 of the 2024

Forbearance Agreement provides that "[e]ach [Debtor] (other than GWA) hereby irrevocably

and unconditionally guarantees to each of JSI and LAM Holdings . . . as a primary obligor the

***prompt and complete payment and performance by GWA and each other [Debtor] when due*** of

the Guaranteed Obligations."  (2024 Forbearance Agreement § 3(a) (emphasis added).)

"Guaranteed Obligations" is defined to include "all the obligations of GWA and each other

---

[21]     The Jefferies Entities also argue in the Reply Brief that the Debtors admitted that OGI's guarantee was
made on account of antecedent debts such that it was for reasonably equivalent value and cannot be avoided as a
fraudulent transfer.  (Reply Brief ¶ 26.)  However, as the Debtors are seeking relief here under section 547(b), this
argument will not be addressed in this section.

A-839

[Debtor] arising under any Note Purchase Agreement, the Notes, the [Strategic Relationship]

Agreement and this Agreement." (*Id.*)  Therefore, JSI could also have sought payment from the

other Debtors, but the FAC fails to plead sufficient facts to even make a plausible determination

whether this could be the case.  Thus, this reason alone is enough to conclude that the FAC has

failed to sufficiently plead facts that support a plausible claim for relief.

Accordingly, the Court **GRANTS** the Motion as to Count VIII.

2. <u>The $20 Million in Alleged Avoidable Transfers as Fraudulent Transfers
Pursuant to 11 U.S.C. § 548(a)(1)(B)</u>

As an initial matter, it is unclear how much the Debtors are actually seeking to avoid as

constructive fraudulent transfers since the FAC and Opposition Brief, both of which were filed

by the Debtors, refer to different amounts.  Specifically, the FAC seeks a money judgment for

$20 million in alleged avoidable fraudulent transfers, which includes the $3 million alleged

preferential payment from OGI to JSI.  (*See* FAC ¶ 4 ("Plaintiffs seek a money judgment relating

to avoidable fraudulent transfers in the aggregate sum of $20,000,000 . . . ."); *see also id.* ¶ 77

("The Debtors are seeking to avoid all applicable [Alleged] Avoidable Transfers of an interest in

any of the Debtors' property made by the Debtors to Defendants within the Preference Period

and the Fraudulent Conveyance Period.").)  Meanwhile, the Debtors, in their Opposition Brief,

make no mention of the $20 million figure and state, instead, that the FAC is seeking to avoid

$17 million in payments made to the Defendants as fraudulent transfers.  (*See* Opposition Brief

at 21–22 ("During the two years prior to the Petition Date, the Debtors were caused to pay an

aggregate sum of $17 million to Defendants.  The [FAC] alleges that these [Alleged] Avoidable

Transfers were made for less than reasonably equivalent value.").)  Note that the latter figure of

$17 million is consistent with what the Jefferies Entities have stated in their Supporting

Memorandum and Reply Brief.  (*See, e.g.*, Supporting Memorandum ¶ 7 ("[T]he Debtors seek to

avoid, as constructive fraudulent transfers, $17 million in payments that were made to JSI under the Notes.").)  For purposes of this Opinion, however, the Debtors' original figure of $20 million (and the transfers that comprise it) will serve as the basis for the discussion below as that is the figure that is used in the FAC.

The FAC asserts a claim to avoid the Alleged Avoidable Transfers in the collective amount of $20 million as fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B).  (FAC ¶ 139.)  Specifically, the FAC alleges that these transfers were made within 2 years of the Petition Date to, or for the benefit of, the Defendants.  (*Id.* ¶¶ 136–37.)  Moreover, in exchange for these transfers, the Debtors did not receive "reasonably equivalent value" because "(a) . . . the value of the services and/or goods received was in fact less than the [Alleged] Avoidable Transfers or (b) the Debtors that received such goods and/or services were not the parties (*i.e.*, Plaintiffs) that had incurred the debt, and Plaintiffs were: (i) insolvent on the dates of the [Alleged] Avoidable Transfers or became insolvent as a result of the [Alleged] Avoidable Transfers; and/or (ii) engaged in business or a transaction for which any property remaining with Plaintiffs was an unreasonably small capital at the time of, or as a result of, the [Alleged] Avoidable Transfers; and/or (iii) Plaintiffs intended to incur, or believed that Plaintiffs would incur, debts that would be beyond Plaintiffs' ability to pay as such debts matured."  (*Id.* ¶ 138.)

As set forth in the FAC, "[o]n information and belief, the [Alleged] Avoidable Transfers were ***on account of an antecedent debt*** or were not prepayments for goods and/or services subsequently received."  (*Id.* ¶ 75 (emphasis added).)  Nonetheless, the Debtors maintain that such transfers were for less than "reasonably equivalent value" as they were paid as a result of, among other things:

> (i) [A] manipulated acceleration of the negotiated Maturity Dates under the Notes, (ii) a manufactured or immaterial covenant default under the Notes

70

such that the purported forbearance was illusory, (iii) "bad faith" by the Defendants in their dealings with the Debtors, including with full knowledge of the Debtors' financial condition, while at the same time continuing to invest, and invest their clients' money, with the Debtors' managed funds, and market the Debtors' managed funds to their clients, and (iv) in breach of the Initial Forbearance Agreements.

(*Id.* ¶ 76.)  The foregoing, the Debtors argue, supports a finding that the FAC "adequately alleges material facts which establish (or may establish) that the Debtors ***did not receive what was bargained for*** under the Note Purchase Agreements and Notes."  (Opposition Brief at 23 (emphasis in original).)

However, as already discussed, transfers made on account of antecedent debt are presumed to have been made "for value."  *See Trinsum*, 460 B.R. at 388 (stating that where "the transfers are viewed as paying an antecedent debt . . . it is presumed the transfers were made 'for value'").  In such an instance, the reasonably equivalent value requirement cannot be satisfied because "the transfers are considered 'for value' under the statute."  *Id.* at 388–89.  Therefore, the Debtors' admission that the Alleged Avoidable Transfers were "on account of antecedent debt" is alone sufficient to determine that the FAC fails to sufficiently plead the "less than reasonably equivalent value" requirement.  (FAC ¶ 75.)

Additionally, the FAC pleads that at least two of the four Alleged Avoidable Transfers were made pursuant to the January 2022 Initial Forbearance Agreement.  (*See id.* ¶ 44 (indicating that the $5 million and $10 million payments made on April 29, 2022 and July 29, 2022, respectively, were made pursuant to the January 2022 Initial Forbearance Agreement).)  Specifically, the January 2022 Initial Forbearance Agreement established a repayment schedule, including requiring that at least (i) $5 million be repaid by April 30, 2022 and (ii) $10 million repaid by July 31, 2022.  (January 2022 Initial Forbearance Agreement ¶ 1.)  That agreement also provided GWA the sole option to "accelerate or make additional payments of principal at

71

any time." (*Id.*; *see also* September 2022 Initial Forbearance Agreement ¶ 1 (identical

language); July 2023 Initial Forbearance Agreement ¶ 1 (identical language).)

Notably, paragraph 5 of the January 2022 Initial Forbearance Agreement provides that

"[a]ll parties acknowledge and agree that they have received ***adequate and sufficient***

***consideration*** for entering into this [January 2022 Initial Forbearance] Agreement." (January

2022 Initial Forbearance Agreement ¶ 5 (emphasis added).) Identical language was included in

each of the other Initial Forbearance Agreements. (*See* September 2022 Initial Forbearance

Agreement ¶ 4; July 2023 Initial Forbearance Agreement ¶ 4.) This undercuts the Debtors'

contention that they received "less than what was bargained for" under Note Purchase

Agreements and Notes.

Accordingly, the Court **GRANTS** the Motion as to Count IX.

3.   Claims Seeking Contingent Relief

a.   *Preservation of Avoided Transfers Pursuant to 11 U.S.C. § 551*

The FAC asserts a claim pursuant to section 551 seeking to preserve the value of the

Alleged Avoidable Transfers for the benefit of the Debtors' estates. As discussed, such relief is

contingent, however, on a transfer having been avoided in the first instance pursuant to, among

others, sections 547 or 548 of the Bankruptcy Code. *See* 11 U.S.C. § 551.

In light of the dismissal of Counts VIII and IX, the Court **GRANTS** the Motion as to

Count X as well.

b.   *Liability of Transferee of Avoided Transfers Pursuant to 11 U.S.C. § 550(a)*

The FAC also asserts a claim pursuant to section 550(a) of the Bankruptcy Code,

contending that the Debtors are entitled to (i) avoid the 2024 Forbearance Agreement and

(ii) recover from the Jefferies Entities an amount to be determined at trial of no less than $20

million plus interest and the costs of this action.  (FAC ¶ 146.)  This is warranted, the FAC

pleads, because the Debtors are entitled to avoid the Alleged Avoidable Transfers pursuant to

sections 547(b) and 548(a)(1)(B) of the Bankruptcy Code.  (*Id.* ¶ 144.)  Moreover, the Jefferies

Entities were "initial transferee[s] of one or more of the [Alleged] Avoidable Transfers, the

immediate or mediate transferee of such initial transferee, or the person for whose benefit one or

more of the [Alleged] Avoidable Transfers were made."  (*Id.* ¶ 145.)

Again, like Count X, relief under this Count is contingent on a transfer having been

avoided in the first instance pursuant to one of the enumerated provisions, including sections 547

and 548 of the Bankruptcy Code.  In light of the dismissal of Counts VIII and IX, the Court also

**GRANTS** the Motion as to Count XI.

4.   Counts VIII, IX, X, and XI

For the reasons discussed, the Court **GRANTS** the Motion as to Counts VIII, IX, X, and

XI and **DISMISSES** the claims in their entirety.

**D.  Disallowance of the Jefferies Entities' Claims**

The FAC asserts a claim pursuant to section 502(d) of the Bankruptcy Code that seeks

the disallowance of "any and all Claims of Defendants and/or their assignees, against the

Debtors' Chapter 11 estate or the Debtors" until the 2024 Forbearance Agreement is deemed

"null and void" and/or the Jefferies Entities pay all amounts sought for the Alleged Avoidable

Transfers.[22]  (*Id.* ¶ 151.)  The Jefferies Entities contend that dismissal of this claim is appropriate

as it is "premature and procedurally improper."  (Supporting Memorandum ¶ 70.)

Section 502(d) of the Bankruptcy Code provides, in relevant part, that:

(d)      Notwithstanding subsections (a) and (b) of this section, the court
shall disallow any claim of any entity from which property ***is recoverable***

---

[22]      The claims register reflects that the Jefferies Entities have filed proofs of claims in each of the Debtors'
bankruptcy cases.

73

> under section 542, 543, 550, or 553 of this title or that *is a transferee* of a transfer avoidable under section . . . 547 [or] 548 . . . of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d) (emphasis added). Generally, this provision "automatically disallows the claim of any entity that has received an avoidable transfer until the transfer is repaid." *In re Wonderwork, Inc.*, 611 B.R. 169, 216 (Bankr. S.D.N.Y. 2020); *see also* 4 COLLIER ON BANKRUPTCY ¶ 502.05 ("[Section 502(d)] requires disallowance of a claim of a transferee of a voidable transfer *in toto* if the transferee has not paid the amount or turned over the property received" as required under the enumerated sections "under which the transferee's liability arises.").

Therefore, as relief under this Count is derivative of other causes of action that survive the Motion (*i.e.*, Counts III, IV, and V in part), it would be premature to dismiss this claim at this juncture. *See, e.g.*, *Tese-Milner v. Lockton Cos. (In re Flywheel Sports Parent, Inc.)*, No. 20-12157 (JPM), Adv. Pro. No. 22-01109 (JPM), 2023 WL 2245382, at *6 (Bankr. S.D.N.Y. Feb. 27, 2023) (concluding that dismissal of a section 502(d) claim would be premature as it is relief that is a remedy derivative of other avoidance claims and is inapplicable until such claims are liquidated).

1. Count XII

Accordingly, for the reasons discussed above, the Court **DENIES** the Motion as to Count XII.

**E. Leave to Further Amend**

The Debtors seek leave to replead any Counts in a further amended complaint to the extent the Court dismisses any of Counts in the FAC. (Opposition Brief at 25.) Rule 15(a) of the Federal Rules of Civil Procedure, made applicable by Rule 7015 of the Federal Rules of

Bankruptcy Procedure, generally provides that leave to amend a pleading should be "freely given when justice so requires." FED. R. CIV. P. 15(a)(2). Generally, the decision whether to allow an amendment is left to the "broad discretion" of the trial court judge. *See Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000). "Mere delay . . . absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981). Rather, "[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Sherman v. Fivesky, LLC*, 19-cv-8015 (LJL), 2020 WL 5105164, at *1 (S.D.N.Y. Aug. 31, 2020) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). However, "[a] proposed amendment is . . . deemed futile if the proposed claim could not withstand a Rule 12(b)(6) motion to dismiss." *In re Big Apple Volkswagen, LLC*, 571 B.R. 43, 58 (S.D.N.Y. 2017) (quoting *Mason Tenders Dist. Council of Greater N.Y. v. Phase Constr. Servs., Inc.*, 318 F.R.D. 28, 36 (S.D.N.Y. 2016)).

The Jefferies Entities oppose granting Debtors leave to further amend the FAC on grounds that the Debtors have (i) amended their complaint once already and (ii) provided no additional facts that they would seek to include. (Reply Brief ¶ 33.) However, the Debtors should be afforded an opportunity to amend the FAC and replead in accordance with and pursuant to the Court's ruling. While the Debtors have amended the complaint once before, the amendment was made before the complaint was subject to any Rule 12(b)(6) motion review. There is no suggestion of "bad faith" or "undue prejudice" on the part of the Debtors.

Accordingly, the Court **GRANTS** the Debtors' request for leave to further amend the FAC in accordance with the Court's ruling.

## IV.     <u>CONCLUSION</u>

For the reasons discussed, the Court **GRANTS** the Motion in part and **DENIES** the

Motion in part.  The Debtors may amend the FAC in accordance with the Court's ruling.

**IT IS SO ORDERED.**

Dated:  September 24, 2024
      New York, New York

_Martin Glenn_
MARTIN GLENN
Chief United States Bankruptcy Judge

A-847

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x
                                          :

In re:                                   :             **Chapter 11**

**WEISS MULTI-STRATEGY ADVISERS**      :
**LLC, *et al.*,**[1]                          :             **Case No. 24-10743 (MG)**
                                            :

                **Debtors.**                :             **(Jointly Administered)**
                                            :
-------------------------------------------------------- x

## REPORT OF CHRISTOPHER K. KIPLOK, EXAMINER

 

**HUGHES HUBBARD & REED LLP**
Dustin P. Smith
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000

*Counsel to the Examiner*

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Weiss Multi-Strategy Advisers LLC (7518); GWA, LLC (7079); OGI Associates LLC (4493); Weiss Special Operations LLC (7626), and Weiss Multi-Strategy Funds LLC (8004). The location of Debtor Weiss Multi-Strategy Advisers LLC's principal place of business was formerly 320 Park Avenue, 20th Floor, New York, New York 10022 and the Debtors' service address in these Chapter 11 Cases is P.O. Box 2857, Meriden, Connecticut 06450.

A-848

## TABLE OF CONTENTS

**Page**

PART ONE: BACKGROUND AND ASSIGNED DUTIES .................................................5

   I.   The Examiner's Appointment and Assigned Duties ....................................5

   II.   The Examiner's Methodology...........................................................................7

PART TWO: CORPORATE BACKGROUND .............................................................9

   I.   Company Function and Overview....................................................................9

        A.   Overview of Firm Management ...............................................10

             1.   George Weiss – Founder & CEO ...............................10

             2.   Jordi Visser – CIO .....................................................10

             3.   Mike Edwards– Deputy CIO & Chief Administrative Officer....................11

             4.   Pierce Archer ("Archer") – COO ...............................11

             5.   Jeff Dillabough ("Dillabough") – General Counsel ...................................11

             6.   Michele Lanzoni ("Lanzoni") – Controller ...............11

        B.   Role and Authority of Committees ...........................................12

        C.   Investment Professionals...........................................................13

        D.   Support and Back-Office............................................................14

   II.   The Weiss Bonus Structure ...........................................................................14

        A.   Staff and Management Bonuses.................................................14

        B.   Investment Professional Bonuses..............................................15

        C.   Historic Bonus Payment Dates ..................................................19

A-849

PART THREE: THE 2024 BONUS PAYMENTS ...................................................... 20

    I.    Overview of the February 2024 Bonus Payments ...................................... 20

    II.    REITs Retention Bonuses ......................................................................... 23

    III.    Events Surrounding the Payment of the 2024 Bonus Payments ................. 24

        A.    The Jefferies Relationship ................................................................ 24

        B.    Bonus Payments Information Exchange............................................. 26

        C.    "Project Washington" ...................................................................... 29

        D.    The Draft Forbearance Agreement.................................................... 31

        E.    Weiss's Decision to pay the 2024 Bonus Payments ........................... 32

        F.    Notification to Jefferies of Bonus Payments..................................... 34

        G.    Closing/Liquidation ........................................................................ 37

PART FOUR: THE BONUS PAYMENTS WERE CONSISTENT WITH CONTRACTUAL
OBLIGATIONS AND INDUSTRY STANDARDS ................................................ 38

    I.    The 2024 Bonus Payments Were Consistent with Weiss Contractual
    Obligations ............................................................................................. 38

    II.    The 2024 Bonus Payments Were Generally Consistent with Historical
    Practice.................................................................................................. 39

    III.    The 2024 Bonus Payments Were Consistent with Industry Practice ........... 41

        A.    Investment Manager Compensation Generally ................................... 41

        B.    Weiss Bonus Program was consistent with Industry Standards ........... 42

PART FIVE: OTHER INSIDER TRANSFERS........................................................ 42

        I.    George Weiss Note, Compensation, and Legal Expenses ................... 42

II.    Jordi Visser Notes ........................................................................... 44

III.   Other Employee Bonuses .............................................................. 44

IV.   Miscellaneous Disbursements ...................................................... 45

V.    Corporate Aircraft ........................................................................ 45

PART SIX: VIABILITY OF AVOIDANCE CAUSES OF ACTION ...................... 46

I.    Fraudulent Transfers under the Bankruptcy Code: ...................... 47

    A.   Intentional Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A) .............. 47

    B.   Constructive Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B) ............ 48

    C.   Defenses To Fraudulent Transfer Actions .......................... 50

    D.   Preferential Transfers ............................................... 51

    E.   Preference Defenses ............................................... 52

        1.  Contemporaneous Exchange for New Value ................. 52

        2.  Ordinary Course of Business ......................... 53

        3.  New Value Defense ................................. 54

    F.   State Law Avoidance Claims ....................................... 54

II.   Analysis of Potential Causes of Action .......................... 55

    A.   Intentional Fraudulent Transfer Claims under 11 USC § 548(a)(1)(A) ......... 56

    B.   Constructive Fraudulent Transfer Claim – 11 USC § 548(a)(1)(B) ........... 61

        1.  Less than Reasonably Equivalent Value .................. 61

        2.  Insolvency ........................................ 63

        3.  Defenses to Fraudulent Transfers ...................... 64

    C.   Preference Claims ............................................... 65

        1.  Affirmative Defenses ................................ 67

SECTION SEVEN: RECOMMENDATIONS ........................................ 71

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re 360networks (USA) Inc.*, 338 B.R. 194 (Bankr. S.D.N.Y. 2005)......................................71

*In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2006 WL 687153 (Bankr.
    S.D.N.Y. Mar. 6, 2006)....................................................................................................49

*In re Bankr. Estate of Norske Skogindustrier ASA*, 629 B.R. 717
    (Bankr. S.D.N.Y. 2021)..............................................................................................48, 58

*In re Bayou Grp.*, 396 B.R. 810 (Bankr. S.D.N.Y. 2008) ..................................................51, 64

*In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171 (2d Cir. 2021)..................................51

*In re Bernard, LLC*, 458 B.R. 87 (Bankr. S.D.N.Y. 2011)..................................................61

*In re Churchill Mortg. Inv. Corp.*, 256 B.R. 664 (Bankr. S.D.N.Y. 2000)..........................61

*In re CIS Corp.*, 195 B.R. 251 (Bankr. S.D.N.Y. 1996)......................................................66

*In re Cyberrebate.com, Inc.*, 296 B.R. 639 (Bankr. E.D.N.Y. 2003).................................69

*In re Dearborn Bancorp, Inc.*, 583 B.R. 395 (Bankr. E.D. Mich. 2018)..........................67, 71

*In re Dewey & LeBoeuf LLP*, No. 14-01919 (MG), 2014 WL 4746209
    (Bankr. S.D.N.Y. Sept. 23, 2014)...............................................................................passim

*In re Dreier LLP*, 452 B.R. 391 (Bankr. S.D.N.Y. 2011) ..................................................51, 64

*In re Dreier LLP*, 453 B.R. 499 (Bankr. S.D.N.Y. 2011) ..................................................52

*In re Eight-11 Assocs., LLC*, 650 B.R. 43 (Bankr. S.D.N.Y. 2023)..............................47, 54, 55

*In re Enron Corp*, 01-16034-AJG, 2005 WL 6237551 (Bankr. S.D. Tex. 2005).....................71

*In re Enron Corp.*, 357 B.R. 32 (Bankr. S.D.N.Y. 2006)..........................................51, 52, 53, 71

*In re Fabrikant & Sons, Inc.*, No. 06–12737 (SMB) 2010 WL 4622449
    (Bankr. S.D.N.Y. Nov. 4, 2010)....................................................................................69

*In re George G. Sharp, Inc.*, No. 20-10590 (MEW), 2022 Bankr. LEXIS 1484 (Bankr.
    S.D.N.Y. May 25, 2022)..................................................................................................54

*In re George*, Bankr. LEXIS 1484 (Bankr. S.D.N.Y. May 25, 2022).................................54

*In re Jesup & Lamont, Inc.*, 507 B.R. 452 (Bankr. S.D.N.Y. 2014) ..................................... 49, 63

*In re Jones Truck Lines, Inc.*, 130 F.3d 323 (8th Cir. 1997)....................................................67

*In re Kaiser*, 722 F.2d 1574 (2d Cir. 1983)...........................................................................47

*In re Knippen*, 355 B.R. 710 (Bankr. N.D. Ill. 2006)) ..............................................................63

*In re Lyondell Chem. Co.*, 541 B.R. 172 (Bankr. S.D.N.Y. 2015)..........................................48

*In re Lyondell Chem. Co.*, 567 B.R. 55 (Bankr. S.D.N.Y. 2017).....................................passim

*In re Musicland Holding Corp.*, 462 B.R. 66 (Bankr. S.D.N.Y. 2011) ...................................54

*In re Nanobeak Biotech Inc.*, 656 B.R. 350 (Bankr. S.D.N.Y. 2024)..................................48, 58

*In re Quebecor World (USA) Inc.*, 491 B.R. 363 (Bankr. S.D.N.Y. 2013)...............................53

*In re Roblin Inds.*, 78 F.3d 30 (2d Cir. 1996). .......................................................................49

*In re Schick*, 234 B.R. 337 (Bankr. S.D.N.Y.1999)...............................................................69

*In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005)...............................................................47

*In re Teligent, Inc.*, 315 B.R. 308 (Bankr. S.D.N.Y. 2004) ......................................................54

*In re Trib. Co. Fraudulent Conv. Litig.*, No. 12-mc-2296 (RJS) 2018 WL 6329139
(S.D.N.Y. Nov. 30, 2018)......................................................................................................52

*In re Tronox Inc.*, 503 B.R. 239 (Bankr. S.D.N.Y. 2013) ........................................................49

*In re Waterford Wedgwood USA, Inc.*, 508 B.R. 821 (Bankr. S.D.N.Y. 2014) .......................68

*In re Wonderwork, Inc.*, 611 B.R. 169 (Bankr. S.D.N.Y 2020)..................................................61

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635 (3d Cir. 1991) ..............................50

**STATUTES**

11 U.S.C. § 101.........................................................................................................49, 63

11 U.S.C. § 544.........................................................................................................47, 54

11 U.S.C. §§ 544-551.......................................................................................................46

11 U.S.C. § 547................................................................................................46, 52, 53, 65

11 U.S.C. § 548....................................................................................................passim

11 U.S.C. § 549 ...................................................................................................46


**OTHER AUTHORITIES**

5 COLLIER ON BANKRUPTCY ¶ 547.01 ............................................................51

5 COLLIER ON BANKRUPTCY ¶ 547.04 ............................................................67

5 COLLIER ON BANKRUPTCY ¶ 548.05 ............................................................50

## EXECUTIVE SUMMARY

Financial firms are fragile organisms. In the event of a collapse, the failure is abrupt, dramatic, and rarely, if ever, produces winners. The failure of the longstanding Weiss firm appears no different.

This is the Report of Christopher K. Kiplok, as "Examiner" in the Chapter 11 bankruptcy cases of Weiss Multi-Strategy Advisers, LLC ("Weiss")[2] and its affiliated debtors (the "Report"), Case No. 24-bk-10743 (Bankr. S.D.N.Y., The Honorable Chief Judge Martin Glenn, presiding). The Report seeks to provide objective clarity to the events that led to the bankruptcy filing, specifically as to bonuses and other compensation in the firm's final days.

Under the Southern District of New York Bankruptcy Court's August 15, 2024 Order (the "Scope Order"), the Court directed the appointment of an Examiner to investigate (the "Investigation") "the Debtors' compensation and bonus payments made in February 2024, as well as any other transfers made by the Debtors to the Debtors' insiders during the period from April 29, 2022 to April 29, 2024 . . ." and to determine:

> (i) whether the payments or transfers were consistent with the relevant contractual obligations, business history and industry standards;
> (ii) whether the payments or transfers were made in the ordinary course of the Debtors' businesses; [and]
> (iii) whether the Debtors have any viable causes of action for avoidance of the payments or transfers[.][3]

The Scope Order also instructed the Examiner "to report and recommend a course of action, if any, related to the avoidance and recovery of any payments or transfers."[4]

---

[2]  To minimize confusion, "Weiss" shall refer exclusively to Weiss Multi-Strategy Advisers, LLC and George Weiss shall always be identified by his full name.

[3]  Order Directing the Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code, ECF No. 173 at ¶ 3.

[4]  *Id.*

**A. Summary of Findings and Conclusions**

In accordance with the Scope Order, the Report addresses whether the Debtors made any transfers that are subject to avoidance actions. The Report's primary focus is the award of the 2024 Bonus Payments (terms defined *infra*), including: (i) the February 2024 Bonus Payments, which in turn included Staff and Management Bonuses and Investment Professional Bonuses; (ii) the January 2024 REITs Retention Bonuses; and (iii) certain "Other Bonuses." In addition, the Report addresses other transfers, including: (i) notes issued by Weiss to George Weiss and Jordi Visser, (ii) bonus payments in the years 2022 and 2023 (the "2022-23 Bonus Payments"), (iii) miscellaneous disbursements, and (iv) use of Weiss's airplane (collectively, the "Other Transfers").

As detailed more fully in the Report, the Examiner's conclusions are as follows:

- The 2024 Bonus Payments were consistent with Weiss' contractual obligations, as set forth in the applicable employee contracts, employee Handbook, and Weiss' Bonus Plan. In limited instances where employees received bonuses separate from the Bonus Plan, those discrete bonuses were memorialized in new employment agreements.

- The February 2024 Bonus Payments were substantially consistent with historical practice at Weiss. The timing of the payments was in accordance with the Bonus Plan, which directed that the payment be made in February.

- The 2024 Bonus Payments were consistent with industry practice. The value of these bonuses was consistent with preceding years and consistent with industry standards. The Bonus Plan provided that investment professionals received performance-based compensation derived from their investment strategies' P&L. Discretionary payments

2

to staff and management were within industry norms and were awarded consistently year-to-year.

- With regard to the February 2024 Bonus Payments, the Examiner concludes that there are no viable claims for intentional fraudulent transfer under 11 U.S.C. § 548(a)(1)(A) and constructive fraudulent transfer under 11 U.S.C. § 548(a)(1)(B). Even had there been a fraudulent transfer, the transferees acted in good faith and may be entitled to the "good faith" defense to an otherwise avoidable transfer under Section 548(c). The Investigation found that there was substantial evidence of a legitimate business purpose justifying the 2024 Bonus Payments. The Examiner also concludes that the February 2024 Bonus Payments should not be avoided as a preference under 11 U.S.C. § 547(b), because the payments fall under the 11 U.S.C. § 547(c)(2) affirmative defense of occurring in the ordinary course of business.

- Conversely, the Examiner concludes that there are viable claims arising from the REITs Retention Bonuses for constructive fraudulent transfer under 11 U.S.C. § 548(a)(1)(B) because the Debtors did not receive reasonably equivalent value for these three $1 million payments. The Examiner also concludes there is a viable cause of action to avoid the portion of the REITs Retention Bonus that was paid to the REITs' Portfolio Manager, an insider of the Debtor, as a preference under 11 U.S.C. § 547(b).

- The Examiner concludes that the Other Transfers are not actionable. The 2022-23 Insider Bonus Payments were, like the 2024 Bonus Payments, consistent with contractual guarantees, and historical and industry practice. A note issued to George Weiss was fully reimbursed, and Debtors entered a settlement of potential causes of action with Visser. Miscellaneous disbursements were itemized, supported by documentation, largely

minimal, and consistent with past practices. The corporate aircraft has been sold, and all payments have been made to the third party that administered its use.

As detailed in the Recommendations Section (*infra* § Part Seven), the Examiner believes that the estate would benefit from a prompt mediation of the claims arising from the payment of the REITs Retention Bonuses. The Examiner's recommendation is informed by the viability of these claims, the amount at issue, and the potential cost and delay of litigation to both the estate and the transferees. The Examiner believes these claims can yield significant value for creditor recoveries if resolved in a prompt and efficient manner.

### B. Structure of the Report

The Report is structured as follows. Part One sets forth the Examiner's methodology, and addresses the Examiner's document requests, communications with parties with information relevant to the Investigation, and the interviews undertaken by the Examiner.

Part Two of the Report describes Weiss' corporate background and includes an overview of Weiss' functions, structure and management, and key personnel. Part Two also describes Weiss' bonus structure and the documents and principles according to which bonuses are allocated.

Part Three of the Report sets forth the events surrounding the payment of bonuses in 2024 and aims to situate the bonus payment within Weiss' broader business history, including its business relationship with Jefferies. As described in Part Three, the bonus payments were made during a dynamic month in which Weiss was trying to ensure the retention of key employees during negotiations for an investment relationship with ███████.

Part Four of the Report analyzes the bonuses paid in February 2024.

Part Five of the Report addresses other insider transfers within the Examiner's purview. The principal such transfer was the award of the REITs Retention Bonuses: three $1 million

4

retention bonuses paid in January 2024 to members of the highly sought-after REITs investment strategy. In addition, the Examiner addresses historic notes to George Weiss and Jordi Visser, Weiss' awards of bonuses in 2022 and 2023, miscellaneous disbursements to employees, and the use of Weiss' corporate aircraft.

Part Six includes the Examiner's legal analysis of the viability of avoidance causes of action, including fraudulent and preferential transfers, as well as the defenses to these causes of action.

Part Seven includes the Examiner's Recommendations.

### PART ONE: BACKGROUND AND ASSIGNED DUTIES

Part One of this Report sets out the relevant history of these bankruptcy cases, the scope of the Investigation, and the Examiner's methodology.[5]

### I.     The Examiner's Appointment and Assigned Duties

On April 29, 2024 (the "Petition Date"), Weiss Multi-Strategy Advisers LLC and its affiliates (the "Debtors") filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). On July 15, 2024, the Debtors moved for an appointment of an examiner pursuant to Section 1104(c) of the United States Bankruptcy Code (the "Bankruptcy Code") to "investigate and analyze the Debtors' year end compensation payments made in February 2024 . . . ."[6] On August 6, 2024, Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC, and Jefferies LLC (collectively, "Jefferies" or the "Jefferies Parties") filed a limited objection to the Debtors' motion and requested

---

[5]     The redactions in the report are made pursuant to the Confidentiality Agreement and Joint Stipulated Protective Order (ECF No. 210) as amended by the Amendment to Confidentiality Agreement and Joint Stipulated Protective Order Among the Debtors and Examiner (ECF No. 265).

[6]     Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C.§ 1104(C) Directing the Appointment of an Examiner, ECF No. 135 at 11.

that the Bankruptcy Court "expand the proposed scope of the [E]xaminer's investigation to include

an investigation as to whether the Debtors made any additional, potentially voidable transfers to

the Debtors' insiders within the two years preceding the [P]etition [D]ate."[7]

On August 15, 2024 the Court in the Scope Order directed the appointment of an Examiner

to investigate "the Debtors' compensation and bonus payments made in February 2024, as well as

any other transfers made by the Debtors to the Debtors' insiders during the period from April 29,

2022 to April 29, 2024 . . ." and to determine:

> (i) whether the payments or transfers were consistent with the relevant contractual
> obligations, business history and industry standards;
> (ii) whether the payments or transfers were made in the ordinary course of the Debtors'
> businesses; [and]
> (iii) whether the Debtors have any viable causes of action for avoidance of the payments
> or transfers[.][8]

The Scope Order also instructed the Examiner "to report and recommend a course of action, if any,

related to the avoidance and recovery of any payments or transfers."[9]

The United States Trustee (the "U.S. Trustee") then filed an application requesting an order

appointing Christopher K. Kiplok as Examiner on August 20, 2024,[10] and the Bankruptcy Court

entered the order on the same day.[11] On August 29, 2024, the Examiner filed: (i) a motion to

approve his motion and budget,[12] and (ii) a motion for an order authorizing the retention of Hughes

Hubbard & Reed LLP ("Hughes Hubbard") as attorneys for the Examiner (the "Retention

---

[7]    Limited Objection of Jefferies Strategic Investments, LLC, Leucadia Asset Management Holdings LLC, and Jefferies LLC to the Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 1105(C) Directing the Appointment of an Examiner, ECF No. 163 at ¶ 24. The Debtors filed a reply to Jefferies' limited objection on August 9, 2024: Debtors' Reply to the Limited Objection of the Jefferies Entities to the Debtors' Motion for Entry of an Order Pursuant to 11 U.S.C. § 1104(C) Directing the Appointment of an Examiner, ECF No. 168.

[8]    Order Directing the Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code, ECF No. 173 at ¶ 3.

[9]    Id.

[10]    Application for Order Approving the Appointment of Examiner, ECF No. 178.

[11]    Order Approving Appointment of an Examiner, ECF No. 179.

[12]    Examiner's Motion to Approve Work Plan and Budget, ECF No. 192.

Application").[13] No objections to the Retention Application were filed.[14] The Bankruptcy Court granted both motions on September 5, 2024,[15] and September 13, 2024,[16] respectively.[17]

## II.    The Examiner's Methodology

To conduct the Investigation outlined in this Report, the Examiner obtained, reviewed, and analyzed more than twenty-five hundred Weiss documents. These documents were provided by Weiss through its bankruptcy counsel, former employees of Weiss, Jefferies, and a third-party plane leasing company. The Examiner's document collection and review consisted primarily of an iterative and collaborative process with Weiss' counsel. The Examiner's counsel engaged in several calls with Weiss' counsel and proposed the production of various categories of documents relevant to the Scope Order. The Examiner's counsel also proposed search terms based on key words associated with the investigative topics outlined in the Scope Order. Next, the Examiner's counsel revised and focused the search terms based on the volume and responsiveness of responsive documents. Weiss' counsel produced approximately 2,500 responsive and non-privileged documents to the Examiner. In addition, Weiss reviewed documents from Jefferies' counsel and counsel for several of the Insiders.[18]

---

[13]    Examiner's Application for Entry of an Order Authorizing the Retention and Employment of Hughes Hubbard & Reed LLP as Attorneys for the Examiner Effective as of August 20, 2024, ECF No. 193.

[14]    Certificate of No Objection Regarding Examiner's Application for Entry of an Order Authorizing the Retention and Employment of Hughes Hubbard & Reed LLP as Attorneys for the Examiner Effective as of August 20, 2024, ECF No. 198.

[15]    Order Approving Examiner's Work Plan and Budget, ECF No. 196.

[16]    Order Authorizing the Retention and Employment of Hughes Hubbard & Reed LLP as Attorneys for the Examiner Effective as of August 20, 2024, ECF No. 199.

[17]    The Examiner filed a motion on October 17, 2024, seeking to extend the deadline for filing the Report, based on certain delays in document production to the Examiner, which delayed scheduling of several interviews. Examiner's Motion to Extend the Deadline for Filing of the Examiner's Report and Related Relief, ECF No. 233. The Court granted the motion on October 24, 2024. Order Extending the Deadline for Examiner's Filing of the Examiner's Report and Granting Related Relief, ECF No. 249.

[18]    To protect confidentiality interests, on September 20, 2024, Hughes Hubbard and Debtors' counsel Klestadt Winters Jureller Southard & Stevens LLP ("Klestadt") signed and filed a confidentiality agreement (the "Confidentiality Agreement").

Additionally, in accordance with the Scope Order, from September 20, 2024, to November 5, 2024, the Examiner's professionals conducted fact interviews of 18 individuals, including the Debtors' management, critical staff, Portfolio Managers ("Portfolio Managers"), and analysts, as well as individuals from Jefferies with knowledge of the Debtors' business and finances. Individuals interviewed include:

| Name | Role/Relationship |
|---|---|
| George Weiss | Founder, CEO, Treasurer, and Chairman |
| Jordi Visser | Chief Investment Officer |
| Michael Edwards | Deputy Chief Investment Officer and Chief Administrative Officer |
| Pierce Archer | Chief Operating Officer |
| Jeffrey Dillabough | General Counsel and Chief Compliance Officer |
| Michele Lanzoni | SVP and Controller |
| Ron Lior | Portfolio Manager – REITs |
| ██████████ | Portfolio Manager – Global Staples |
| ██████████ | Portfolio Manager – Consumer Services |
| ██████████ | Portfolio Manager – Late Cyclicals |
| ███████ | Portfolio Manager – Diversified Industrials |
| ████████ | Trader – REITs |
| ████████ | Analyst – REITs |
| ████████ | Analyst – REITs |
| █████████ | Analyst – Late Cyclicals |
| █████████ | Co-President (Jefferies) |
| ████████ | Investing and Strategic Planning (Jefferies) |
| ███████ | Chief Operating Officer (Jefferies) |

The interviewees were cooperative in scheduling and participating in the interviews, which included several re-interviews. Lastly, the Examiner's staff attempted to interview five additional investment professionals and staff who did not respond to these requests.

The Examiner thoroughly reviewed all information gathered through interviews and documents for the preparation of this Report. The Scope Order tasked the Examiner with investigating payments made to insiders of the Debtors during the two-year period preceding the Petition Date, including the bonus payments made in February 2024 (the "Disputed Payments"), along with determining whether the Disputed Payments were made in the ordinary course of the Debtors' businesses. As mentioned above, the Examiner based his Investigation on the guidelines provided in the Scope Order, which instructed the Examiner to investigate and report any findings regarding the Disputed Payments. The Examiner did not investigate every matter or potential issue related to the Debtors and their bankruptcy and only focused on matters assigned to him. This Report should not be interpreted to include the Examiner's conclusions on any matters beyond what was prescribed by the Scope Order.

## PART TWO: CORPORATE BACKGROUND

### I.  Company Function and Overview

Weiss Multi-Strategy Advisers LLC ("Weiss") operated as a market-neutral, multi-strategy investment firm, comprised of 22 sector-specific strategies. George Weiss founded Weiss Associates, Inc., a brokerage and trading firm, in 1978 and entered the hedge fund business in 1986.[19] At its peak, Weiss managed approximately $4 billion in assets under management ("AUM"), but at the time of filing, managed $2.3 billion.[20] Weiss was marketed as a safe money manager that would provide consistent returns with low volatility. Weiss promoted its firm culture and longevity to prospective investors, highlighting the ten-year-plus average tenure of its Portfolio Managers.[21]

---

[19]  Employee Handbook, at 7.
[20]  Weiss Alternative Market Neutral Fund Presentation, at 3; Archer Decl. ¶21, *In re Weiss Multi-Strategy Advisors LLC* (filed Apr. 29, 2024) Case No. 24-bk-10743.
[21]  Weiss Alternative Market Neutral Fund Presentation, at 3.

9

Weiss had offices in Manhattan and Hartford, Connecticut. Investment Professionals were based in the New York office and approximately 40 operations and support staff were based in the Hartford office. Weiss' management operated between the two offices to ensure proper coordination. Investment Professionals were permitted to work remotely.

### A.     Overview of Firm Management

#### 1.     George Weiss – Founder & CEO

George Weiss was the founder, CEO, Treasurer, and Chairman of Weiss.[22] George Weiss's professional reputation, long tenure in the industry, relationships, and capital were central to the firm's longevity and facilitated its strategic partnerships. Approximately ten years ago, George Weiss transferred the day-to-day operations of the firm to Jordi Visser ("Visser"), although George Weiss remained active and retained certain decision-making authority. Through the firm's closure, George Weiss remained Chairman, CEO, and member of the Executive Committee, but reported that he spent the majority of his time on philanthropy. George Weiss was typically the final decision maker over significant hires and discretionary bonus distributions, although he characterized his overall contributions as minimal in recent years.

#### 2.     Jordi Visser – CIO

Visser was the Chief Investment Officer ("CIO") and President of Weiss. Visser joined Weiss in August of 2005 as a Portfolio Manager and member of the risk committee. In 2008 he was promoted to CIO. Visser managed the day-to-day operation of the firm and was highly involved in marketing activities, developing the Jefferies relationship (*see infra* § Part Three, III., A.), and working to increase Weiss's AUM.

---

[22]     Schedule of Insiders.

### 3. Mike Edwards– Deputy CIO & Chief Administrative Officer

Mike Edwards ("Edwards") was hired as the Deputy CIO and Chief Administrative Officer in 2019 and was responsible for overseeing portfolios, Portfolio Managers, and hiring.[23] Edwards was also involved in high-level planning, collaborating with marketing, meeting with prospective clients, and setting the macroeconomic strategy. Edwards had a banking background and took a central role in both the Jefferies and ▮▮▮▮▮ negotiations (see infra § Part Three, III.).

### 4. Pierce Archer ("Archer") – COO

Archer was the Chief Operating Officer ("COO") at Weiss since December 2019. Archer oversaw the back-office departments, including operations, finance, accounting, tax, and HR.

### 5. Jeff Dillabough ("Dillabough") – General Counsel

Dillabough was the General Counsel at Weiss. Dillabough provided legal counsel to firm management concerning the bonus awards that are the subject of this Report and helped coordinated major strategic decisions. For example, Dillabough helped negotiate the award of retention bonuses to certain members of the Real Estate Investment Trust ("REITs") strategy, advised management on the timing of the 2024 bonus payments (see infra § Part Three, III.), and responded to Jefferies' February 2024 demands (see infra § Part Three, III.).

### 6. Michele Lanzoni ("Lanzoni") – Controller

Lanzoni was the Senior Vice President and Controller at Weiss.[24] Lanzoni managed financial reporting, expense reimbursements, and the back-office distribution of bonuses.[25] Lanzoni calculated the investment professional bonus pool amounts and coordinated the funding

---

[23]  Schedule of Insiders.
[24]  Schedule of Insiders.
[25]  Lanzoni Employment Agreement.

and payment of bonus allocations to the Portfolio Managers. In addition, Lanzoni had a central role in communicating and sharing financial documents with Jefferies.

### B. Role and Authority of Committees

Weiss's management relied on thirteen committees to govern important decisions facing the firm.[26] The Executive Committee was the only committee with authority over compensation decisions. From 2020 to 2024, it consisted of George Weiss, Visser, Edwards, Lundy Wright (Portfolio Manager - Interest Rate), Ron Lior (Portfolio Manager - REITs), and Dave Betten (Portfolio Manager - Technology Strategies). It met at least monthly to discuss important firm decisions, such as launching a new product or hiring a new team. Meetings were scheduled more frequently to address ongoing issues and the Executive Committee was treated as a check on individual managers' perspectives.

In 2021, the Executive Committee revised and adopted the Weiss Multi-Strategy Advisers LLC Bonus Plan for Investment Professionals (the "Bonus Plan"). The Bonus Plan replaced an earlier bonus plan and significantly amended the processes for calculation and disbursement of bonuses at Weiss (*see infra* § Part Two, II., B.). The Executive Committee also approved special contractual bonus provisions, although it was not involved in deciding the annual discretionary bonus allotments given to staff and management.

For the purposes of this Report, the Examiner classified the members of firm management and the Executive Committee as falling under either the statutory or non-statutory definitions of insiders.[27]

---

[26] Regulatory Compliance Manual & Code of Ethics, at 135-36.
[27] Weiss also shared a list of insiders with the Examiner that reflects this categorization. *See* Schedule of Insiders.

### C.    Investment Professionals

Over the last four years, there were between 16 and 22 strategies at Weiss.[28] The most successful and consistent strategies were the REITs, Late Cyclicals, Consumer Services, and Diversified Industrials groups.

The REITs strategy was led by Ron Lior ("Lior"), who had been at Weiss for over 30 years.[29] In 2023, Lior's strategy included two analysts, ██████ and ██████, and a trader, ██████.[30] The REITs strategy was consistently in the top three performing strategies at Weiss and was profitable every year between 2022 and 2024.

The Late Cyclicals strategy was led by ██████ ("██████ was a Weiss analyst from 2004 to 2007 and returned to the firm as a Portfolio Manager in 2014. ██████ had a reputation as a "portfolio manager factory," since many of the most successful Portfolio Managers at Weiss began as his analysts. In 2023, Late Cyclicals had three analysts: ██████, ██████ and ██████ (who left in October 2023).

Consumer Services was launched in 2023 and was managed and staffed exclusively by ██████ ("██████

Diversified Industrials was managed by ██████ ("██████ started at Weiss in 2016 and was promoted to Portfolio Manager in 2020. ██████ was the sole professional on the strategy.

██████ ("██████ managed the Global Staples strategy, Weiss's most profitable strategy in 2023, generating over ██████ in income.[31] ██████ joined Weiss in 2018 and had a team of five investment professionals: ██████, ██████ ██████, ██████, and ██████.

---

[28]    2023 FY Bonus by Strategy for 02.09.24 ADP submission.
[29]    Lior First Employment Agreement.
[30]    2023 FY Bonus by Strategy for 02.09.24 ADP submission.
[31]    2023 FY Bonus by Strategy for 02.09.24 ADP submission.

### D.    Support and Back-Office

In 2023, Weiss had 23 employees working in a back-office and support capacity.[32] These roles included administrative support, compliance, accounting, IT, software development, risk management and marketing roles.[33] The salaries and bonuses of back-office employees varied considerably, and depended on an employee's tenure, their contributions, the size of the team the individual managed, and what the individual could receive elsewhere.

## II.    The Weiss Bonus Structure

Weiss employees all had a provision in their employment agreements providing that they would have an opportunity to receive a bonus, but the nature and criteria for the bonus was dependent on the individual's role at Weiss. Additionally, the Weiss Employee Handbook (the "Handbook") explicitly characterized all bonuses as discretionary, barring any contrary agreement.[34] The Handbook stated in part, "employees may be eligible for an annual discretionary bonus" and further, "except as otherwise explicitly set forth in written contract between the Firm and an employee, no employee at the Firm is entitled to any bonus payment in any amount. The Firm shall determine in its sole discretion whether to award a bonus to any employee…."[35] In practice, Weiss' bonus structure was effectively divided into two broad categories: (i) "Staff and Management Bonuses" and (ii) "Investment Professional Bonuses."

### A.    Staff and Management Bonuses

Staff and Management Bonuses were awarded to operations, support staff, and management. Weiss' staff and management had provisions within their employment agreements describing their bonuses as discretionary and contingent on remaining employed by the firm

---

[32]    2023 FY Bonus by Strategy for 02.09.24 ADP submission.
[33]    *Id.*
[34]    Employee Handbook, at 19.
[35]    *Id.*

14

through the bonus payment date.[36] There was no written policy, guidance, or formula addressing the calculation of Staff and Management Bonuses. As a general matter, Staff and Management Bonuses were determined at year-end by George Weiss, Jordi Visser, and Pierce Archer based on the employee's performance and benchmarked against the previous year's bonus payments. Generally, Weiss sought to keep the budget for each department's bonuses consistent year-over-year. Archer would first speak to the managers of each department, who would determine the amount their staff would receive. Next, Archer would report his findings to George Weiss and Visser,[37] who would make the final determinations. Typically, Weiss management deferred to each department's discretion, although Archer, George Weiss, and Visser ultimately approved the bonuses. Generally, Weiss management professed an interest in balancing efforts to keep bonuses low with also maintaining employee satisfaction. This was directly related to employee retention as employees would often wait to receive their bonuses before deciding whether to stay at the firm. While Staff and Management Bonuses were discretionary under the relevant employment agreements, they were awarded consistently and on substantially the same monetary terms during the period from 2021 to 2024 that was investigated during the Examination.

**B.    Investment Professional Bonuses**

The Investment Professional Bonuses were awarded to Portfolio Managers, analysts, and traders. The language within investment professionals' employment agreements varied based on their role. The relevant employment agreement language for the Portfolio Managers' bonus provisions stated that bonuses would be determined pursuant to the current Bonus Plan.[38]

---

[36]    *See, e.g.,* ▮▮▮ Employment Agreement, at 1-2.
[37]    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[38]    ▮▮▮▮▮ Employment Agreement, at 2.

15

Alternatively, the traders' and analysts' employment provisions had the same language as the staff's and management's, which described the bonuses as discretionary.[39] However, whereas George Weiss, Visser, and Archer exercised "discretion" for the Staff and Management Bonuses, the Portfolio Manager for the relevant strategy would exercise discretion in distributing bonus amounts to the analysts and traders working on his or her strategy. In practice, this meant that a bonus pool was created for each strategy pursuant to the Bonus Plan, and then the relevant Portfolio Manager would have the discretion to distribute bonuses to the analysts and traders who worked within their strategy. While the analyst and trader bonuses were described as "discretionary" in their employment contracts, they were accounted for on Weiss' books and records as accrued throughout the year for the purposes of tax deferrals.

The calculation of the bonus pool for each strategy was done pursuant to the terms of the Bonus Plan. The Bonus Plan's calculation was uniformly applied to all strategies in the interest of fairness and to maintain the firm's culture.[40]

At the end of each plan year, the Plan Administrator independently calculated each strategy's bonus pool by multiplying the ▮▮▮▮▮▮▮ by the ▮▮▮▮▮▮▮ and subtracting any additional ▮▮▮▮▮▮▮" The ▮▮▮▮▮▮ were determined by taking ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and subtracting the ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[39] Limited instances were identified during the examination where a Portfolio Manager's employment agreement retained the analyst bonus language because they joined the firm as an analyst and never signed an updated employment agreement after being promoted to a Portfolio Manager.

[40] Very few employees at Weiss had special contractual provisions altering their bonus allotments, although when special provisions were present, they were pre-negotiated and placed in the individual's employment agreement; Weiss Multi-Strategy Advisers LLC, Bonus Plan for Investment Professionals (2023), at 5.

16



████████████████████.[41] The ███████████ was a ████████████. It began at ████

████████████████████████████████████████████████████████

████████████████████████████████████████████. While the Bonus Plan did not have ████

████████████████████████████████████████████████████████

████████████████████████.[42] ████████████████ were typically all other ██████

████████████████████████████████████████.[43] In sum, the bonus

pool of each strategy was approximately ███████████████████████████████████

████████████████████. If a strategy did not accumulate any gains, there would be no bonus pool

established and the Portfolio Managers and the investment professionals for that strategy would

not receive a bonus.[44]

Once the Plan Administrator calculated the strategy's bonus pool, the Portfolio Manager

would be notified and directed to allot the bonus pool to members of his or her strategy. Portfolio

Managers had discretion in allocating their strategies' bonuses; some Portfolio Managers split the

amount evenly across the investment professionals within their strategy, others had individual

informal agreements with specific investment professionals.

The Investment Professional Bonuses were paid in three installments over the two years

following the fund's plan year.[45] The Bonus Plan had a payment schedule with different

disbursement timetables based on the payout amounts.[46] The first payment was to be made in the

---

[41]  Weiss Multi-Strategy Advisers LLC, Bonus Plan for Investment Professionals (2023), at 4.
[42]  *Id.* at 15, 18.
[43]  *Id.* at 15.
[44]  Although not relevant to the transfers at issue in the examination, the Bonus Plan also provided investment professionals an opportunity to receive equity bonus payouts. Weiss Multi-Strategy Advisers LLC, Bonus Plan for Investment Professionals (2023).
[45]  Weiss Multi-Strategy Advisers LLC, Bonus Plan for Investment Professionals (2023), at 7.
[46]  *Id.*

February following the plan year.[47] The second payment to be made in November of that same year, and the final payment was to be made the following November (two years after the plan year).[48]

| Cash Bonus | February immediately following Plan Year | First November immediately following Plan Year | Second November following Plan Year |
|---|---|---|---|
| First ██████ | ████ | ████ | ████ |
| Next ██████ | ████ | ████ | ████ |
| Next ██████ | ████ | ████ | ████ |
| Next ██████ | ████ | ████ | ████ |
| Any amounts in excess of the foregoing | ████ | ████ | ████ |

The second and third payments were subject to deferral if the strategy was not profitable in the subsequent years.[49] Weiss would retain the bonus until the strategy in a future year achieved a cumulative gain.[50]

Weiss management adopted a three-payment bonus structure for strategic reasons. *First*, the delayed payments helped with cash retention when strategies performed inconsistently. Between ██████ of the earned bonus pool amounts were exposed to a potential deferral.[51] If a strategy had a successful year, but failed to produce in subsequent years, the second and third bonus payments were retained by the firm until performance improved.[52] *Second*, the three payment dates helped reduce netting risk. In years where some strategies had large profits, while others had large losses, the loss Weiss would need to fill would be reduced, as payments were

---

47    *Id.*
48    *Id.*
49    *Id.*
50    *Id.* at 10-11.
51    Weiss Multi-Strategy Advisers LLC, Bonus Plan for Investment Professionals (2023), at 7.
52    *Id.* at 10-11.

18

spread out. Instead, by spreading the bonus payments across 23 months, Weiss flattened its cash flow, allowing time for cash to reaccumulate through the payment of quarterly management fees. Spreading out payments helped alleviate cash flow risk. *Finally*, the extended payment timeline lessened attrition. Investment professionals were incentivized to stay in order to receive all of their earned bonus amounts.

When the Weiss operating account could not cover bonus costs—a result of netting risk—the firm's capital account would pay the difference.[53] In these unprofitable years, money would be transferred from OGI (the partner's capital trading vehicle) into GWA (the partnership account), then sent to WMSA (the firm's operating account) and finally submitted to payroll.[54]

### C. Historic Bonus Payment Dates

In 2021, Weiss updated its bonus plan which altered the payment structure. Weiss divided investment professionals' bonuses into three tranches and aligned the pay date of Staff and Management Bonuses with the first tranche of Investment Professional Bonuses. The historic pay dates were:[55]

| Fiscal Year | Staff | Management |
|---|---|---|
| 2016 | 12/29/2016 | 2/17/2017 |
| 2017 | 12/28/2017 | 2/16/2018 |
| 2018 | 12/27/2018 | 2/19/2019 |
| 2019 | 12/27/2019 | 2/21/2020 |
| 2020 | 12/29/2020 | 2/12/2021 |
| 2021 | 2/24/2022 | 2/24/2022 |
| 2022 | 2/24/2023 | 2/24/2023 |
| 2023 | 2/12/2024 | 2/12/2024 |

---

[53] 2024-10-04 S. Sweeney to K. Rosenkilde Weiss follow up [capital account + plane].
[54] *See* Entity Structure; 2024-10-04 S. Sweeney to K. Rosenkilde Weiss follow up [capital account + plane].
[55] Bonus pay dates 2016-2024.

19

A-873

## PART THREE: THE 2024 BONUS PAYMENTS

### I.  Overview of the February 2024 Bonus Payments

In February 2024, Weiss distributed $28,179,283 in bonus and compensation payments to its employees (the "February 2024 Bonus Payments"). [56] The February 2024 Bonus Payments were comprised of: (i) Staff and Management Bonuses, representing $6,725,750; (ii) Investment Professional Bonuses of $19,725,307.15; (iii) "Other Bonuses" amounting to $1,615,725.58; and (iv) $112,500 as "tips."[57]

The Staff and Management Bonuses were discretionary bonuses determined by Weiss management. The Investment Professional Bonuses were formulaically calculated based on a strategy's profits and losses ("P&L") for the 2023 fiscal year. "Other Bonuses" were paid to staff, management, or investment professionals but were distinct from the Bonus Plan and included, deferred bonuses that had become payable, separate contractual guarantees resulting from employees' signing bonuses, and bonus amounts derived from Weiss' products outside the multi-strategy.[58] "Tips" were not technically a separate bonus award. Rather, they were amounts earned and due under the Bonus Plans that were directed by Portfolio Managers to administrative and operations staff they felt should be rewarded for their performance. A chart of the bonuses and compensation received by each employee is included as Exhibit "Weiss Compensation and Bonus History 2021-2024".

With specific reference to the Investment Professionals' Bonuses that made up the lion share of the 2024 Bonus Payments, six of the 22 strategies made a profit in 2023 and 19 of the 54

---

[56]   Exhibit – Weiss Compensation and Bonus History 2021-2024.
[57]   Id.
[58]   GWA LLC offered a variety of products with some falling outside the purview of the Bonus Plan. As a result, these investment professionals were paid under a different calculation.

investment professionals were paid bonuses in 2024.[59] The profitable strategies were: REITs, Late

Cyclicals, Global Staples, Diversified Industrials, Consumer Services, and Tactical Situations.[60]

Once the bonus pool for each of these strategies was calculated, it was distributed as follows:



- Lior, Portfolio Manager of the REITs strategy, maintained discretion in distributing the REITs bonus pool. At the beginning of the year, Lior would inform the group what their percentage payouts would be. For 2023, Lior allotted $ ████ to himself, $ ████ to $ ████ to ████ and $ ████ to ████ had just joined the REITs group in March 2023, so received a smaller distribution than the rest of the strategy but was also given a $ ████ guarantee.[61]

- The Late Cyclicals strategy was run by ████.[62] Analysts on Late Cyclicals had "sub-portfolios" and bonus pool distributions were dictated by discrete agreements primarily influenced by an investing professional's individual performance. ████ was paid $ ████, $ ████ and $ ████, as senior analyst, made more than ████ the Portfolio Manager, because his sub-portfolio was highly profitable, while the entire Late Cyclicals strategy had a smaller percentage gain due to ████ and ████ performance. ████ was fired in October 2023 so he was not given any bonus distributions.

- ████ the Portfolio Manager of Global Staples, retained 70% of the bonus pool for himself, ████ and distributed the remainder to the five individuals on his strategy in amounts of $ ████ $ ████ $ ████ $ ████ and $ ████.

- Diversified Industrials was solely operated by ████ and Consumer Services was solely operated by ████ they retained the entirety of their bonus pool amounts of $ ████ and $ ████ respectively.[65]

- Tactical Situations was run by ████ (████ who had four other members on his strategy.[66] ████ had a unique bonus structure stemming from negotiations at the time of his hiring. ████ was guaranteed ████ in yearly compensation in 2024, and Weiss would pay the difference if his strategy's gains did not cover the cost.[67] In 2022, management attempted to hire ████ from

---

[59] Exhibit – Weiss Compensation and Bonus History 2021-2024.
[60] 2023 FY Bonus by Strategy for 02.09.24 ADP submission.
[61] 2023 FY Bonus by Strategy for 02.09.24 ADP submission.
[62] 2023 FY Bonus by Strategy for 02.09.24 ADP submission.
[63] 2023 FY Bonus by Strategy for 02.09.24 ADP submission.
[64] 2023 FY Bonus by Strategy for 02.09.24 ADP submission.
[65] Id.
[66] Id.
[67] ████ Employment Agreement, at 2.

21



█████████, where ███ had a guaranteed bonus. In negotiations to have ███ join Weiss, and through approval by the Executive Committee, ███ special bonus structure was implemented. In 2023, Tactical Situations did not cover the $███ amount, so ███ received an $███ bonus, classified as an "other bonus."[68] Osier's bonus was calculated by taking his $█████ guarantee and subtracting his base pay ($█████) his 2023 signing bonus ($████ and Tactical Situations' bonus pool ($████ which came out to $████ Osier then elected to allocate $███ of his guarantee to his team's bonus pool, leaving him with the $█████ amount.[69]

The final two investment professionals receiving a bonus were █████ ("███ and █████ ("████.[70] ███ and ████ were Quantitative Analysts under █████ ("███ the Portfolio Manager for the Weiss Enhanced Global Macro fund ("<u>WEGM</u>"), a fund that was separate from Weiss Multi-Strategy LLC and outside the Bonus Plan.[71] WEGM had a separate bonus pool based on a different percentage of management, incentive, and R&D fees, subtracted by certain expenses.[72] Similar to the Bonus Plan, the Portfolio Manager of WEGM, █████ had discretion on how to allocate the fund's bonus pool.[73] ███ and ███ both received a bonus of $█████

Weiss estimated its February 2024 bonuses in December 2023 for tax purposes, and in the weeks leading to payment of the bonuses, finalized spreadsheets with the values for payment. In January 2024, Lanzoni and her staff provided the Weiss Portfolio Managers' estimated bonus pool calculations through December 2023.[75] The calculations set forth each strategy's P&L and the data including above-the-line and below-the-line expenses from which each bonus pool was calculated in accordance with the Bonus Plan (*see supra* § Part Two, II., B.).[76] After the bonus pool

---

[68]   *Id.*; 2023 FY Bonus by Strategy for 02.09.24 ADP submission.
[69]   2023 FY Bonus by Strategy for 02.09.24 ADP submission.
[70]   Exhibit – Weiss Compensation and Bonus History 2021-2024.
[71]   Org Chart - Investment Prof; Confidential Private Offering Memo WEGM.
[72]   2024-11-06 M. Lanzoni to A. Guttentag - RE: Follow up question regarding EG MOU.
[73]   *Id.*
[74]   Exhibit – Weiss Compensation and Bonus History 2021-2024.
[75]   *See, e.g.,* 2024-01-12 ███ to ███ – Estimated bonus pool thru 12-31-2023 – Infrastructure.
[76]   *See id.*

calculations were finalized, a schedule of payments with proposed bonus amounts was created. In accordance with the Bonus Plan, the February 2024 Bonuses represented the first tranche of the investment professionals' bonus awards stemming from fiscal year 2023.[77] In late January, Edwards and Archer reviewed a schedule/table of payments over time.

## II.    REITs Retention Bonuses

As investor interest in multi-strategy hedge funds grew over the past five years, firms have aggressively pursued talented Portfolio Managers.[78] As a result, certain Weiss investment professionals began receiving competing offers higher than they had received in years past. This was particularly true of the REITs group, whose continued employment at Weiss was critical to the ██████ Transaction (the "██████ Transaction").

In the summer of 2023, Lior, who was a member of the Executive Committee, contacted Visser to request additional pay for the REITs strategy in light of the competitive talent market for high performing Portfolio Managers. Over the ensuing months, Lior negotiated with Edwards and Dillabough for a retention bonus for himself and two REITs members. In December 2023, they reached an agreement: $1 million bonuses for Lior, ██████ and ██████ to be paid in full in January 2024.[79] This was the first time Weiss had ever paid a retention bonus.

---

[77]    By way of example, for 2023, Late Cyclicals Portfolio Manager ██████ earned a bonus of $██████ The Bonus Chart reflects $██████ which is the first tranche payment, in February 2024. 2023 FY Bonus by Strategy for 02.09.24 ADP submission; Exhibit – Weiss Compensation and Bonus History 2021-2024.

[78]    Jack Springate et al, Industrializing Alpha: A Look At Multi-Manager Hedge Funds and Modern Allocation Strategies, Goldman Sachs (Apr. 10, 2024); Nishant Kumar, Hedge Funds at War for Top Traders Dangle $120 Million Payouts, Bloomberg (June 1, 2023), *available at* https://www.bloomberg.com/news/articles/2023-06-01/top-traders-see-120-million-paydays-as-hedge-funds-fight-for-talent.

[79]    Lior Amended Employment Agreement, at 2; ██████ Amended Employment Agreement, at 2; ██████ Amended Employment Agreement, at 2.

### A. Amended Employment Agreements

On December 14 and 15, 2023, Lior, ▮▮▮▮ and ▮▮▮ signed new employment agreements (the "Amended Employment Agreements") which provided for the award of the REITs Retention Bonuses. The retention provision within the Amended Employment Agreement required Lior, ▮▮▮▮ and ▮▮▮ to stay with the firm through 2027, barring "Good Reason."[80] One of the listed examples for Good Reason is if, "after September 30, 2024, the Company cannot reasonably be expected to operate in a financially sustainable fashion for the reasonable future or will operate under a different management structure that has been objected by you in a signed writing."[81]

### III. Events Surrounding the Payment of the 2024 Bonus Payments

The 2024 Bonus Payments were made during a contentious period in the Weiss-Jefferies relationship and resulted in a series of disputes between Weiss and the Jefferies Parties. This section of the Report provides relevant background on the Weiss-Jefferies relationship, Weiss' efforts to find a new strategic partner, and the events leading to and surrounding the 2024 Bonus Payments.

### A. The Jefferies Relationship

Weiss' business relationship with Jefferies was born from George Weiss' friendship with Jefferies' ▮▮▮▮ ▮▮▮▮ and Weiss' desire to increase the firm's market exposure and assets under management.[82] In accordance with the May 1, 2018 Strategic Relationship Agreement between GWA, LLC and LAM Holding LLC (the "SRA"), Jefferies received a profit share and

---

[80] Lior Amended Employment Agreement, at 2; ▮▮▮ Amended Employment Agreement, at 2; ▮▮▮ Amended Employment Agreement, at 2.

[81] Lior Amended Employment Agreement, at 4; ▮▮▮ Amended Employment Agreement, at 4; ▮▮▮ Amended Employment Agreement, at 4.

[82] Lior Amended Employment Agreement, at 4; ▮▮▮ Amended Employment Agreement, at 4; ▮▮▮ Amended Employment Agreement, at 4.

24

revenue sharing interest from GWA.[83] On the same date, Weiss Multi-Strategy Advisers LLC ("WMSA") entered an Investment Management Agreement with Leucadia Funding LLC ("Leucadia") to manage an investment account with $250 million of Leucadia's funds.[84] LAM Holding LLC assigned its rights under the SRA to Jefferies Asset Management Holding LLC.[85] The SRA represented an opportunity for Jefferies to partner with an established hedge fund, and an opportunity for Weiss to scale its business and increase its marketing exposure.

In accordance with the SRA, Weiss was obligated to furnish to Jefferies, among other documents, (i) an audited consolidated balance sheet, statements of income, stockholders' equity and cash flows following the end of each fiscal year; and (ii) an unaudited balance sheet, statements of income, stockholders' equity, and cash flows following each quarter.[86] This information was necessary for Jefferies, a public company, to report on its finances. The SRA also set guardrails on George Weiss' compensation, which was motivated by Jefferies' concerns around the ability to get capital out of its investment in Weiss.

In the years following the SRA, Weiss became substantially indebted to Jefferies. The February 12, 2024 Forbearance Agreement (*see infra* § Part Three, II., F.) reflects "Past Due Obligations" to Jefferies in excess of $54 million.[87] A listing of the largest creditors attached to the First Day Declaration of Archer includes claims in excess of $95 million owed to the Jefferies parties.[88]

---

[83]   2018-05-01 Strategic Relationship Agreement, at 1-2.
[84]   *Id.* (Whereas Clause states this will happen concurrently).
[85]   2018-10-18 Assignment and Assumption Agreement.
[86]   2018-05-01 Strategic Relationship Agreement, at 3-4.
[87]   *See* 2024-02-12 Forbearance Agreement § 1.
[88]   Declaration of Pierce Archer, Senior Vice President and Chief Operating Officer of the Debtors Pursuant to Local Bankruptcy Rule 1007-2 in Support of Chapter 11 Petitions, ECF 6 at 46.

A-879

### B.    Bonus Payments Information Exchange

In the lead up to the 2024 Bonus Payments, Weiss notified the Jefferies Parties on numerous occasions of its intention to make annual bonus payments in February of 2024, including the provision of various financial records from which Weiss' bonuses were calculated and which demonstrated bonus accruals. During all relevant times, Weiss complied with its reporting obligations under the SRA, a fact that Jefferies representatives recognized in their discussions with the Examiner's professionals.

*First*, Jefferies received periodic, often monthly, financial reports from Weiss that reflected the bonus accruals and enabled Jefferies to see how Weiss was performing. For example, the January 31, 2024 unaudited financial reports sent by Lanzoni to Jefferies included a consolidated statement of financial condition dated January 31, 2023 which reflected, under current liabilities, a $34,225,043 entry for compensation payable.[89] Compensation payable represents the accrued bonuses for fiscal year 2023, in addition to certain benefits and taxes. Communications between Weiss and Jefferies show that their accounting groups were in regular contact concerning the financial documents.[90]

*Second,* among the financial documents that Weiss sent Jefferies were charts reflecting allotments for the bonus payments, by category of payment type. In communications between Edwards and representatives of the Jefferies Parties on December 27-28, 2023, and in response to questions from the Jefferies Parties concerning the breakdown of Weiss' finances, balance sheets

---

[89]    Exhibit C - M. Lanzoni Monthly Financial Exchange, Declaration of Jeffrey Dillabough, ECF 40-3 at 3.
[90]    *See, e.g.,* 2024-01-04 M. Lanzoni to D. Butler RE: December 31, 2023 Note Balance ("Weiss's Fund Accounting dept has been working with ███████ and ███████ in the Jefferies Fund accounting group to reconcile the NAV and ROR in order to ensure that both Weiss and Jefferies agree on these numbers.").

26

and liabilities, Edwards provided a chart reflecting both the $3 million in retention bonuses, which were payable on January 26, 2024,[91] and Weiss' Other Bonuses (**Fig. 1** below).[92]



**Fig. 1**

*Third*, in 2023, Jefferies actively participated in evaluating Weiss' performance through financial models that provided for Weiss' payment of bonuses for fiscal year 2023, including bonuses for investment professionals, management bonuses, deferred compensation, and guarantees.[93] These were the bonuses paid in February 2024. On August 28, 2023, Edwards and representatives of Jefferies met remotely and discussed Edwards' financial model, which was attached to their correspondence (**Fig. 2** below).[94]

---

[91]     2024-01-22 ▮▮▮▮ to M. Lanzoni Retention.
[92]     2023-12-28 M. Edwards to ▮▮▮▮ RE: Guests.
[93]     2023-08-23 M. Edwards to ▮▮▮▮ RE: Projection Update.
[94]     *Id.*

27



**Fig. 2**

The model discussed by Edwards and the Jefferies Parties' representatives provided for $32 million in estimated "Strategy Payouts," which were the contractual Investment Professional Bonuses. Of the Strategy Payouts, under the model, $18 million would be paid in February 2024 (1Q 2024), and the remaining funds were deferred under Weiss' three-tranche bonus payment structure, with a second payment scheduled for November 2024, and a third scheduled for November 2025. The model also estimated that in February 2024 there would be $7 million in "Mgmt / Staff Bonuses" and $5 million in deferred or guaranteed payments. While Jefferies' representatives and Edwards discussed the assumptions of the model, including whether the base financials provided for repayment of $5 million or $2.5 million to Jefferies, Jefferies' representative did not dispute or contest the repayment of bonuses—in February 2024—that was built into the model.

*Fourth,* in the second half of 2023, Jefferies sought a $5 million payment from Weiss under the SRA. Edwards' analysis showed that Weiss could not afford to pay $5 million because of its

28

bonus payment obligation, so Weiss negotiated with Jefferies to provide a significantly lower payment to ensure it could meet its bonus obligations. On November 28, 2023, Weiss wired $2 million to Jefferies as payment toward the debt, with $1 million applied toward the principal of the first note under the Note Purchase Agreement dated December 3, 2019 (the "Note Purchase Agreement"), and $1 million paid toward the revenue sharing principal amount under the SRA.[95]

The intention to make the 2024 Bonus Payments in February as reflected in the financial disclosures and discussions was also reiterated in discussions between Weiss management and the Jefferies Parties. For example, there was an early December 2023 meeting between Dillabough, George Weiss, and representatives of the Jefferies Parties focused on the status of the business relationship between Jefferies and Weiss.[96] Representatives of Weiss recalled that they stated in substance that once bonuses were paid in February there would not be much left for Jefferies, and the parties discussed alternative approaches to getting value to Jefferies from the firm.

In sum, heading into February 2024, Jefferies had been informed of Weiss' intention to make the 2024 Bonus Payments as well as the approximate amount of the intended bonus payments.

C.    "Project Washington"

In the years following the commencement of the SRA with Jefferies, Weiss management consistently felt that they needed additional investment capital to succeed as a firm under their then existing business model, beyond what was made available by Jefferies. This was described in various interviews as "excess capacity, but insufficient capital." As an example, The REITs group felt that the lack of available capital at Weiss was a constraint to its growth, and inhibited

---

[95]    2023-11-15 P. Archer to ▮▮▮▮ November 28 – payment.
[96]    See 2023-12-04 ▮▮▮▮ to G. Weiss Thanks for lunch.

29

investment in certain sectors such as ███████████████. Facing increasing difficulties and
debts arising from the Jefferies relationship, in the second half of 2023, Weiss began looking for
alternative parties to partner with to infuse capital into the firm in order to right the business and
correct the capital/capacity imbalance.

These efforts eventually led to discussions and negotiations with ████████████████
LLC ("██████ from approximately November 2023 to February 2024 that proceeded under
the moniker "Project Washington" (the "██████ Transaction"). If consummated, Project
Washington would have resulted in the infusion of additional investment capital into Weiss, the
termination of certain Weiss employees, the closure of certain underperforming portfolios,
increased compensation calculations to certain retained investment professionals, limitations on
the solicitation of new clients, and the payment of certain liabilities to the Jefferies Parties.[97]
Additionally, retained Weiss management would have maintained day-to-day control of the firm.[98]

A central aspect of the Project Washington discussions was the retention of certain key
employees, including certain well-performing Portfolio Managers, which Weiss understood to be
of particular importance to ████████ based on their negotiations. The development and progress
of Project Washington was reflected in various formal and informal term sheets and emails
throughout February 2024.[99]

In light of the obligations owed by Weiss to the Jefferies Parties under the SRA, Weiss
endeavored to keep Jefferies appraised of the developments in the Project Washington negotiations
throughout their discussions with ████████ For example, on or around December 4, 2023, as
negotiations with ████████ were ongoing, George Weiss had lunch with ████████ of

---

[97] 2024-02-05 Proposed Summary of Terms.
[98] Id.
[99] 2024-02-05 Proposed Summary of Terms.

Jefferies and informed him of the prospective business relationship.[100] Following this meeting, certain management of Weiss, including Edwards and Visser, and representatives of the Jefferies Parties engaged in discussions and communications regarding the proposed strategy for the negotiations with ▉▉▉▉▉ and to discuss the progress of the negotiations.[101]

### D. The Draft Forbearance Agreement

Starting in January and early February 2024, the decision to pay the 2024 bonuses that were scheduled for February 2024 began to intersect with the ongoing ▉▉▉▉ discussions. During this period, Jefferies expressed concerns to Weiss that the ▉▉▉▉ Transaction would amount to handing control of the company to another firm, which could strip Jefferies of the economics of the company. Moreover, Jefferies felt that the communications with ▉▉▉▉ were not moving at an adequate pace and thought that the negotiations should have been resolved prior to February.

On February 1, 2024, Jefferies sent to Weiss a draft forbearance agreement (the "Draft Forbearance Agreement") under which Jefferies would forbear from commencing any enforcement action arising from Weiss' past due obligations.[102] In exchange, Weiss would, among other restrictions, be prohibited from "pay[ing], grant[ing] or transfer[ring] (directly or indirectly) any bonus compensation or other compensation or other payment in excess of base salaries to any of their employees . . . without the prior written consent of the Jefferies Parties[.]"[103] In addition, under the Draft Forbearance Agreement, Jefferies would not pay Weiss the amount it owed in IMA fees, approximately $2.6 million.[104]

---

[100]  *See* 2023-12-04 ▉▉▉▉ to G. Weiss Thanks for Lunch.
[101]  2023-12-22 M. Edwards to ▉▉▉▉ RE: reconnect re: table-setting.
[102]  2024-02-01 Draft Forbearance Agreement. There had previously been executed forbearance agreements on January 1, 2022, September 1, 2022 and July 25, 2023.
[103]  *Id.* at § 2(b).
[104]  *Id.* at § 5; 2024-02-02 J. Dillabough to M. Edwards re Weiss Investment Teams Bonus Fee.

31

The Draft Forbearance Agreement laid bare a difference in opinion between Weiss and the Jefferies Parties as to the best method to ensure that key employees remained with Weiss through the conclusion of the potential ███████ Transaction. In Jefferies' view, the provision of the Draft Forbearance Agreement related to employee bonuses was a necessary retention tool during the then-ongoing ███████ negotiations: withholding the bonuses until the deal was finalized would ensure the investment professionals' employment; otherwise, there would be no financial incentive for them to stay at Weiss after they were paid.

Weiss management was of the opposite opinion as to the effect of withholding the bonus payment. At all times, Weiss planned to pay bonuses in February 2024 and never considered withholding bonuses in 2024. Paying the bonuses was viewed as necessary to fulfill Weiss' contractual obligations to its employees, and not paying the bonuses would cause the employees to leave, ending any chance of a deal with ███████ This belief was confirmed during the Examiner's interviews of former investment professionals who confirmed that they would have left Weiss if they had not received their expected bonus.

Weiss did not immediately execute the Draft Forbearance Agreement and viewed it at the time as a nonstarter. Specifically, in addition to concerns over employee retention, Weiss believed that it could not agree to its terms because under relevant investment agreements with its clients, Weiss would have to notify them if it ceded its control of its finances which could lead to an escalating series of capital withdrawals. Moreover, Weiss was concerned that the Draft Forbearance Agreement would jeopardize the ███████ Transaction, because the crux of that transaction was to ensure that key Portfolio Managers were retained.

### E.  Weiss's Decision to pay the 2024 Bonus Payments

While Weiss did not immediately sign the Draft Forbearance Agreement, it did have the effect of expediting the timeline for the payment of the 2024 Bonuses. Specifically, Weiss became

concerned that Jefferies may seek to take legal action to, among other things, block the payment of the 2024 Bonus Payments. While Weiss internally believed that this legal action would be meritless, they were concerned that the practical effect of such actions by Jefferies would delay the payment of bonuses, which would result in key employees leaving the firm and have the effect of spiking the ███████ negotiations that were ongoing.

The February 2024 Bonus Payments were originally scheduled to have been paid on February 23. However, following the receipt of the Draft Forbearance Agreement, Weiss' management began to explore the technical feasibility of paying the February 2024 Bonus Payments on an earlier date. As Weiss preferred to pay bonuses in the weeks between the bi-weekly pay cycle for normal compensation for accounting purposes, it was determined that bonuses could be approved in the week ending on February 8, 2024.

On February 7 or 8, Dillabough met individually first with George Weiss and then with Visser to discuss the payment of the 2024 bonuses. The conversation between Weiss' management regarding the 2024 Bonus Payments was informed by advice that it had received from its outside counsel, Seward & Kissel LLP, ("Seward & Kissel"). As early as December 2023, Weiss had sought non-adversarial advice[105] as to whether Weiss had authority to make the 2024 Bonus Payments and whether there would be any avoidance risk if it made the payment. In early February 2024, after Weiss received the Draft Forbearance Agreement, Weiss again consulted with Seward & Kissel on these issues and was informed that the advice had not changed. Weiss management, specifically George Weiss and Visser, approved the 2024 Bonus Payments to begin on February 8 (and be paid out on February 12) based on: (i) Seward & Kissel's legal advice; (ii) Weiss' belief

---

[105]    By Sunday, February 11, 2024, Weiss' discussions with Jefferies became adversarial / litigation-related and Weiss was required to seek advice from different outside legal counsel.

that the 2024 Bonus Payments were necessary to retain key employees; (iii) Weiss' belief that retaining key employees was necessary to ensure the viability of the ███████ transaction; and (iv) Weiss' belief that the ██████ Transaction was in the best interest of Weiss' clients and creditors.

Weiss management uniformly stated that at the time the bonuses were approved they believed that Weiss was viable and that its business operations would continue well into the future. In support of this position, they noted that the ██████ negotiations were (as of February 12) in full swing, seeming to provide for the future viability of the firm. Weiss staff, including Edwards and ████████, were scheduled to meet in Hawaii in March 2024 with the ████████████████ ████████████████ an existing client which was interested in increasing its investment.[106] Additionally, certain Portfolio Managers were engaging in the retention of new investment analysts, demonstrating the forward growth focus of the firm.

### F. Notification to Jefferies of Bonus Payments

On Sunday, February 11, Visser informed Jefferies of the 2024 Bonus Payments during a call regarding the status of the negotiations with ████████ Representatives of Jefferies expressed displeasure with the bonus payments and accused Weiss of having misled Jefferies as to the 2024 Bonus Payments.

Weiss and Jefferies vehemently dispute whether Weiss or its representatives made any representation or assurance that bonuses would not be paid until the end of February 2024. The Examiner's review of relevant documents produced by both Weiss and Jefferies did not reveal any written or documented assurance that the 2024 Bonus Payments would not be made.

---

[106]     2024-01-31 ████████ to ██████ Re: Hawaii Trip.

34

According to representatives of Jefferies, Edwards stated by phone on several instances that bonuses would be paid in late February, and the result of those and additional communications with George Weiss, Visser and Archer was Jefferies' understanding that bonuses would be paid after February 15. Jefferies representatives stated that had they known bonuses would be paid earlier, they would have obtained an injunction to prevent the bonus payment. Jefferies acknowledges that Weiss did not need to provide notice to Jefferies, nor obtain Jefferies' consent to make the payments. Several of Jefferies' communications that were sent after learning that the bonuses had been paid reference that the payments were made contrary to Weiss' assurances, but these communications do not include specifics as to the underlying purported assurances that were made prior to the 2024 Bonus Payments.[107]

In contrast, it is Weiss' position that they never provided any written or oral assurances regarding the 2024 Bonuses, including that they would not be paid before a specific date. Additionally, they viewed the emails from Jefferies as post-hoc attempts to create a record for potential future litigation.

Jefferies' understanding is grounded in part in communications with Jeffrey Dillabough. On February 8, 2024, a Jefferies representative wrote to Edwards and Dillabough, copying ███ and George Weiss, asking whether Weiss had undertaken any fraudulent conveyances or made any bonus or other payments; asking that Weiss finalize the forbearance agreement; stating that the ███ discussions were not moving at an acceptable pace; and threatening that Jefferies would file for a TRO on Monday, February 12.[108] Dillabough responded "I can assure you that we are operating the business in the normal course. As we have all agreed, it is in all of

---

[107] 2024-02-11 ███ to G. Weiss RE: Sad.
[108] 2024-02-11 J. Dillabough to. M. Edwards RE: Follow up.

35

our interests not to disrupt the teams in order to preserve the value of the organization."[109] It is Jefferies' view that the bonuses that were paid were not in the "normal course," as set forth in Dillabough's email, because the payments were made early, while Weiss is of the position that the bonus payments were made in the "normal course" since they were paid in February consistent with the Bonus Plan and general past practice This issue is discussed in greater detail in section Part Six, I., E., 2.

Following Visser's February 11 call with representatives of Jefferies, there were numerous communications in which Jefferies' leadership expressed their anger that Weiss paid its bonuses, threatened to file a lawsuit, accused Weiss of securities fraud and pressed Weiss to sign a forbearance agreement.[110] In response, Weiss agreed to execute a revised forbearance agreement. Weiss met with Jefferies and its counsel from Herbert Smith Freehills LLP on Sunday evening, and after 2:00 am, Jefferies sent Weiss an updated forbearance agreement, which they asked to be executed by 7:00 am.[111] Weiss then revised the forbearance agreement (the "Signed Forbearance Agreement") and returned it to Jefferies after 4:00 am.[112] In the Signed Forbearance Agreement, Dillabough, on behalf of Weiss, removed language indicating that Weiss made statements that bonuses would not be made until the second half of February 2024.[113]

---

[109]  Id.
[110]  2024-02-11 M. Edwards to ███████ Re: Shocked; 2024-02-11 ███████ to G. Weiss Sad.
[111]  2024-02-12 J. Dillabough to ███████ RE: Call.
[112]  Id.
[113]  2024-02-12 Draft Forbearance Agreement, Revised by Dillabough.

WHEREAS, representatives of the Jefferies Parties and the Weiss Parties have been in ongoing discussions since December 2023 regarding the terms under which the Jefferies Parties may be willing to forebear from exercising their remedies in connection with the Enforcement Actions and in connection therewith representatives of the Weiss Parties made statements to the representatives of the Jefferies Parties that certain bonus payments would not be made until the second half of February 2024;

WHEREAS, the Jefferies Parties delivered to the Weiss Parties on February 1, 2024 a draft Forbearance Agreement that was conditioned upon such bonus payment not being paid and such bonus payments were made by the Weiss Parties on February 8, 2024 in contravention of the statements made by the Weiss Parties; and

Dillabough noted that these changes were made "because we do not agree with the characterization of the facts."[114]

Under the Signed Forbearance Agreement, Weiss acknowledged past due obligations of approximately $54.5 million to Jefferies;[115] agreed to provide Jefferies with a security interest in Weiss' property;[116] agreed to promptly deliver to Jefferies financial records, including records of the 2024 Bonus Payments; and agreed to take no actions to diminish the value of Weiss or make any transfers in any day in excess of $10,000, excluding normal course trading payments.[117] In accordance with the Signed Forbearance Agreement, beginning at 1:37am on February 12, Weiss began producing the requested documents.[118]

## G.    Closing/Liquidation

Ultimately, Project Washington was not successful, and negotiations ceased around February 27 or February 28. Weiss retained bankruptcy counsel and the liquidation of positions commenced on February 28.[119] On the Petition Date, April 29, 2024, Weiss Multi-Strategy

---

[114]    2024-02-12 J. Dillabough to ▇▇▇▇▇ RE: Call.
[115]    ("Each party agrees that pursuant to the terms of the Note Purchase Agreements, the Notes and the Redemption Notice, GWA is past due with respect to the following payment obligations to JSI (each calculated as of January 15, 2024): (i) $23,650,410.10 on the Note dated December 3, 2019, (ii) $27,457,310.08 on the Note dated January 13, 2020 and (iii) $3,420,395.60 on the Note dated September 21, 2022 (collectively, the "Past Due Obligations").")
[116]    2024-02-12 Forbearance Agreement, at § 4(a).
[117]    Id. at § 2(a)(i), 2(c).
[118]    2024-02-12 J. Visser to ▇▇▇▇▇ FW: Info request EMAIL 1 of 7.
[119]    ▇

37

A-891

Advisers LLC and its affiliates filed for Chapter 11 bankruptcy in the Bankruptcy Court. On June

19, 2024, WMSF filed a voluntary petition for Chapter 11 relief.

### PART FOUR: THE BONUS PAYMENTS WERE CONSISTENT WITH CONTRACTUAL OBLIGATIONS AND INDUSTRY STANDARDS

**I.      The 2024 Bonus Payments Were Consistent with Weiss Contractual Obligations**

All of the 2024 Bonus Payments were made in a manner consistent with the contractual

provisions contained within the applicable employee contracts, the Handbook, and the Bonus Plan.

The investment professionals who received bonuses and compensation payments had

employment agreements with Weiss providing that they would be paid bonuses based on their

strategy's performance. Specifically, the Portfolio Managers' employment agreements, stated

███████████████████████████████████████████████████████

██████████████████████████████████"[120] As part of the Investigation, the

Examiner's professionals reviewed the data and workbooks used by the Debtors to calculate the

2024 Investment Professionals' Bonuses and confirmed that they were calculated in a manner

consistent with the policy as detailed above.

Staff, management, and non-Portfolio Manager investment professionals all have similar

language in their employment agreements. The bonus provision in these contracts states, ██████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████."[121] Accordingly,

---

[120]   *See, e.g.,* ███████ Employment Agreement, at 2.
[121]   *See, e.g.,* ███████ Employment Agreement, at 2.

the Staff and Management Bonus Plans were made pursuant to and consistent with these contractual provisions.

Finally, the Handbook reconfirms the contractual characterization of the employee's bonuses. The Handbook states in part, "███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████...."[122] While the obligation to pay bonuses to employees was described as discretionary, the payment of the bonuses itself was not inconsistent with this policy or the terms of any individual employment contract.

In the limited circumstances where an employee received a discrete bonus outside his or her department's standard bonus plan, the agreement was memorialized within the individual's employment contract. For example, the three REITs investment professionals who negotiated a retention bonus documented the agreement in a revised employment contract, which included the new bonus provision.[123]

## II. The 2024 Bonus Payments Were Generally Consistent with Historical Practice

Weiss' bonuses paid in February 2024 were consistent with Weiss' business history and with the bonuses paid in the preceding two years. The timing of the bonus award in 2024 was in accordance with the Bonus Plan, which simply directed that the payment be made in "████████ ████████████████████"[124] As discussed *infra* Section Part Six, II., A., the date of the bonus payment was advanced from February 23, 2024 to February 12, 2024, which was

---

[122] Employee Handbook, at 19.
[123] *See* Lior Amended Employment Agreement; ███ Amended Employment Agreement; ███ Amended Employment Agreement.
[124] Weiss Multi-Strategy Advisers LLC, Bonus Plan for Investment Professionals (2023), at 11.

approximately two weeks earlier than in the preceding years. On balance, the date remained within the parameters of the Bonus Plan, and that it was made eleven days earlier, is not a material difference.

For investment professionals, including Portfolio Managers, the dollar value of their annual bonuses could vary dramatically year to year, since bonuses were derived from a percentage of each strategy's P&L. Nevertheless, the bonuses were administered and awarded in the same manner from 2022 through 2024, in accordance with the formula set forth in the Bonus Plan.

Unlike the Investment Professional Bonuses, the Staff and Management Bonuses were discretionary and were not calculated by reference to profits. Although discretionary, these bonuses were awarded in a consistent manner so that the awards were similar year to year; some, such as Visser's bonus, actually decreased significantly in 2023 and 2024.[125] Staff with significantly higher bonuses were awarded these based on the significance of their roles, whether they advanced Weiss' business, whether they had management responsibilities and the length of their tenure.

In contrast to the February 2024 bonuses, the three $1 million REITs Retention Bonuses in January 2024 were without precedent at Weiss and were not consistent with the business history. As discussed *supra* Section Part Three, II., these bonuses were negotiated for several months, beginning in 2023, and they were awarded for the legitimate business purpose of retaining Weiss' most valuable team, which Jefferies recognized was essential both to Weiss' business and to a capital transaction between Weiss and █████████.

---

[125]    Exhibit – Weiss Compensation and Bonus History 2021-2024.

40

## III.   The 2024 Bonus Payments Were Consistent with Industry Practice

### A.   Investment Manager Compensation Generally

Hedge funds' investment professionals can commonly be compensated via (i) a base salary and a discretionary bonus; (ii) allocated profits, if they are admitted as general partners; or (iii) draws or guaranteed payments and a share of net fees if they are admitted as limited partners.[126] Within these employee categories, there are a variety of ways for funds to structure compensation. Some of the most common methods include paying discretionary bonuses to investment professionals from management fees, from the firm's profits, or from compensation pools that are allocated to pool participants in a discretionary or formulaic manner.[127] The chosen payment structures reflect the incentive management is trying to construct to achieve positive returns in line with the fund's goals.[128]

Bonus payments for investment professionals are calculated at the end of the year and are most commonly either disbursed in a single payment in the first quarter of the following year, or split into tranches paid at set times during the year to encourage retention.[129] Although Portfolio Managers who work for multi-strategies typically receive non-discretionary, contractual bonuses reflecting a percentage of their own strategy's yearly gains, the percentage of the P&L earmarked for the Portfolio Manager can vary across firms.[130] Based on the Examiner's experience, the experience of his counsel, and a review of publicly available information, these percentages can range from 15% on the low end to above 20% on the high end, and are often related to the total size of the assets under management for the relevant strategy.

---

[126]   Holly Weiss, Hedge Fund Employee Compensation, Practical Law 2019, at 2.
[127]   Id.
[128]   Id.
[129]   Hedge Fund Compensation Report, Trends in Hedge Fund Bonus Pay, Benchmark Compensation 2016, at 13.
[130]   Nishant Kumar, Hedge Funds at War for Top Traders Dangle $120 Million Payouts, Bloomberg (June 1, 2023).

### B. Weiss Bonus Program was consistent with Industry Standards

The Weiss Multi-Strategy Advisers Bonus Plan aligned closely with industry standards. First, in calculating the cash bonus pool, Weiss considered similar performance factors as other funds in structuring their bonus plan. The bonus pool calculation considers fund expenses, previous performance of the fund, and has a typical ███ taking of fund profits. Similarly, the staggering of Weiss's bonus payments for investment professionals was consistent with market trends. A new uniform position that was held by the management of Weiss, as well as its former employees, was that the ███ rate of compensation was below market standards, but was balanced by the firm's culture as well as the opportunity to receive equity in the firm pursuant to provisions of the Investment Professional Bonus Program.

### PART FIVE: OTHER INSIDER TRANSFERS

In addition to the 2024 Bonus Payments, the Examiner's professionals also conducted a review of Weiss' books and records and other information provided at their request to identify any other potential transfers to Insiders within the period from April 29, 2022 to April 29, 2024. The transfers during this time that were reviewed include: (i) notes issued to George Weiss, as well as legal expenditures relating to George Weiss; (ii) notes issues to Visser; (iii) employee bonuses to certain investment professionals, staff, and management in the years 2022 and 2023; (iv) miscellaneous disbursements; and (v) work- related and non-work-related use of Weiss's airplane.

### I. George Weiss Note, Compensation, and Legal Expenses

George Weiss did not receive a salary, and was compensated through distributions from his capital account. Following the signing of the SRA with Jefferies in 2018 (*see supra* § Part Three, III., A.), George Weiss was restricted in making withdrawals.[131] The SRA provided in part

---

[131] 2018-05-01 Strategic Relationship Agreement.

that George Weiss could not be paid in years the firm was unprofitable, and in profitable years, there was a $1 million salary limit.[132] In practice, each year Weiss was unprofitable before 2023, Jefferies waived the provision, allowing George Weiss to be paid.[133] In 2021 and 2022, George Weiss was paid $83,333 per month, or $1 million per year.[134] In January 2023, Jefferies denied the request and George Weiss was not compensated in that year.

In addition to his capital account distributions, in September 2022, George Weiss received a $500,000 note from GWA LLC.[135] George Weiss arranged for the note after he personally sold artwork for which he would not be compensated for four months. George Weiss took the loan in the interim and paid back the full note amount with interest in December 2022.[136] There were no other notes identified during the examination between George Weiss and the firm.

Separate from George Weiss' compensation, Weiss took on certain legal expenses in a tax lawsuit. On February 1, 2023, Dillabough confirmed to Jefferies that George Weiss agreed to be personally responsible for all fees and expenses in connection with the tax lawsuit since June 30, 2022, as well as all fees and expenses associated with the Weiss airplane since that date.[137] Dillabough noted further that "[t]o the extent that any airplane or tax lawsuit fees and expenses are paid by or charged to GWA, LLC or any of its affiliates (collectively, "GWA") in 2023, George will wire an amount to GWA no later than quarterly for such fees and expenses."[138] George Weiss also wired $5.5 million on February 1, 2023, with $4.3 million for the tax lawsuit and $1.2 million for use of the airplane.[139]

---

[132]  *Id.* at 22.
[133]  2023-01-10 J. Dillabough to ▮▮▮▮▮ - RE: GW salary discussion.
[134]  GW 2021 distributions; GW 2022 distributions.
[135]  2022-09-30 GWA LLC Notes Receivable.
[136]  2022-12-01 Bank of America Statement, Redacted.
[137]  2023-02-01 J. Dillabough to ▮▮▮▮▮ RE: Follow-up.
[138]  *Id.*
[139]  *Id.*

43

After the February 1, 2023 transfer, George Weiss reimbursed Weiss for an additional $1.6+ million in expenses. On March 31, 2023, George Weiss' counsel wired $802,582.65 on George Weiss' behalf as further reimbursement.[140] On June 15, 2023, George Weiss' counsel wired an additional $802,417.35 on his behalf as additional reimbursement.[141]

## II.   Jordi Visser Notes

Between 2022 and 2024, Visser was guaranteed a $1 million salary and a $500,000 bonus.[142] Despite the guarantee, in 2022 and 2023, Visser elected to voluntarily receive a smaller payment of $400,000 and $300,000.[143] In addition to his $1.5 million guarantee, Visser also received a forgivable note from Weiss.[144] The note gave Visser an additional $1.5 million a year for a 3-year period.[145] Since the filing of the Weiss bankruptcy, Visser and Weiss have reached a settlement on the treatment of the note.[146]

## III.   Other Employee Bonuses

The "other bonuses" referenced in Exhibit "Weiss Compensation and Bonus History 2021-2024" stem from bonuses paid outside the Staff and Management and Investment Professional Bonus Plans. These include a deferred payment owed based on an earlier year's P&L, an employment contract guarantee, and investment fees paid to two analysts generated from products outside the Weiss multi-strategy.

---

[140]  George A. Weiss Payments to GWA, LLC Excel.
[141]  *Id.*
[142]  Exhibit – Weiss Compensation and Bonus History 2021-2024.
[143]  *Id.*
[144]  2022-09-30 Jordi Visser Note.
[145]  *Id.*
[146]  Debtor's Motion for Entry of an Order, Pursuant to Bankruptcy Rule 9019, Authorizing and Approving the Proposed Stipulation of Settlement between GWA, LLC and Jordi Visser, ECF No. 218; Order, Pursuant to Bankruptcy Rule 9019, Granting Debtors' Motion and Authorizing and Approving the Proposed Stipulation of Settlement between GWA, LLC and Jordi Visser, ECF No. 248.

44

███ received a $███ "other bonus" representing deferred payments he originally earned in 2020.[147] ███ received a ███ "other bonus."[148] ███ strategy's gains did not cover his contractual compensation guarantee, so Weiss paid him an additional bonus outside the Bonus Plan. Finally, ███ and ███ received $14,583.34 each stemming from WEGM's investment activities.[149]

## IV. Miscellaneous Disbursements

In accordance with Weiss' Employee Handbook, reimbursements to Weiss' employees for travel and other expenses were itemized and supported by documentation.[150] The Examiner's staff have reviewed these materials, which were largely minimal, consistent with past practices, or did not include transfers to Insiders.

## V. Corporate Aircraft

Weiss owned and utilized a corporate jet from 2007 to 2023.[151] The jet was chartered and used for firm business. Firm management was allowed to charter the plane for personal use and Weiss used Executive Jet Management ("EJM") to coordinate the chartering of the plane to third parties. When the plane was personally used or chartered by third parties, the firm was reimbursed.

In 2022, Jefferies raised objections to the firm's ownership of the private jet. After multiple conversations between Jefferies and George Weiss, in January 2023, George Weiss agreed to assume all fees and expenses relating to the plane, retroactively covering costs beginning on June 30, 2022.[152] As noted *supra* Section Part Five, I., on February 1, 2023, George Weiss wired $5.5

---

[147]   In 2020 ███ earned a roughly $3 million bonus and was paid $2.2 million of it, with the rest deferred. Because ███ lost money in 2021, and his gains did not cover his expenses in 2022, the remaining balance continued to be deferred until his strategy's success in 2023 allowed him to be paid the deferred amount in February 2024.

[148]   Exhibit – Weiss Compensation and Bonus History 2021-2024.

[149]   *Id.*

[150]   *See* Weiss Employee Handbook, at 21, 44.

[151]   2023-02-13 Priority Search Certificate, Aero-Space Reports.

[152]   2023-02-01 J. Dillabough to ███ - RE: Follow-up.

45

million, $1.2 million of which concerned use of the airplane to that date.[153] Weiss sold the plane approximately six weeks after George Weiss' reimbursement payment, on March 14, 2023.[154] EJM has confirmed that there are no amounts due and all payments have been made.[155]

### PART SIX: VIABILITY OF AVOIDANCE CAUSES OF ACTION

The Bankruptcy Code and state law permit a debtor, trustee, or other party appointed as a representative of the estate to recover property from third parties by undoing, or "avoiding," a transfer of the debtor's property.[156] These avoidance powers help ensure the equal distribution of assets among the debtor's creditors by clawing back assets that were preferentially, fraudulently, or otherwise improperly transferred either prepetition or post-petition.

The Examiner has analyzed two common avoidance claims that could be considered in the context of the compensation and bonus payments and the REITs Retention Bonuses: preferential transfer claims and fraudulent transfer claims.[157] This section of the Report examines potential preference and fraudulent transfer claims. It analyzes the legal requirements and viability of preference claims under bankruptcy law, and intentional and constructive fraudulent transfer claims under federal and state law with respect to compensation and bonus payments and retention bonuses, as well as the legal requirements of the most significant defenses to such claims.

---

[153]   2023-02-01 J. Dillabough to ███████ - RE: Follow-up.
[154]   2023-03-14 ███████ to M. Lanzoni FW: CashPro: Incoming Wire Transfer.
[155]   2024-11-01 A. Hauter to S. Sweeney RE: GWA - EJM Plane Records.
[156]   11 U.S.C. §§ 544-551.
[157]   Other categories of potential avoidance actions available under the bankruptcy code are not applicable to the compensation and bonus payments, which were made pre-petition and did not involve any liens. *See* 11 U.S.C. §§ 547 and 549.

A-900

## I.  Fraudulent Transfers under the Bankruptcy Code:

Bankruptcy Code Section 548 grants a debtor (or other appropriate party) the power to

avoid actual and constructive fraudulent transfers.[158] Section 544(b) also enables such plaintiffs to

avoid intentional and constructive transfers that are voidable by a creditor under state law.[159]

### A.  Intentional Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(A)

In order to prove a transfer was intentionally fraudulent, the plaintiff must show: (i) a

transfer was made involving property of the estate; (ii) the transfer was made within two years

before the petition date; and (iii) the debtor voluntarily or involuntarily "made such transfer or

incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the

debtor was or became . . . indebted."[160] Actual fraud claims must meet the heightened pleading

standard of Federal Rule of Civil Procedure Rule 9(b) and must therefore state with particularity

the circumstances constituting the alleged actually fraudulent transfer.[161]

As overt evidence of fraudulent intent can be difficult to find, courts have recognized

various "badges of fraud" that they will consider to be evidence of a fraudulent conveyance in

appropriate cases.[162] A non-exhaustive list of common "badges of fraud" include:

1. the lack or inadequacy of consideration;
2. the family, friendship or close associate relationship between the parties;
3. the retention of possession, benefit or use of the property in question;
4. the financial condition of the party sought to be charged both before and after
   the transaction in question;

---

[158]   11 U.S.C. § 548.
[159]   11 U.S.C. § 544(b).
[160]   11 U.S.C. § 548(a)(1)(A).
[161]   *See In re Eight-11 Assocs., LLC*, 650 B.R. 43, 56 (Bankr. S.D.N.Y. 2023) (noting however that the Rule 9(b) requirement is relaxed when a claim is being plead by a trustee).
[162]   *In re Lyondell Chem. Co.*, 567 B.R. 55, 117 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (Bankr. S.D.N.Y. 2018) (citing *In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005) ("Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case."); *see also In re Kaiser*, 722 F.2d 1574, 1582-83 (2d Cir. 1983) (applying badges in finding actual fraud).

47

5. the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors;
6. the general chronology of the event and transactions under inquiry;
7. a questionable transfer not in the usual course of business; and
8. the secrecy, haste, or unusualness of the transaction.[163]

The existence of a single badge of fraud, or even multiple badges of fraud, does not by itself constitute conclusive proof of actual fraudulent intent, but the more badges present, the stronger the inference that will be drawn by the fact finder.[164] Even with the presence of badges of fraud, actual intent still must be proven; it cannot be presumed. The actual intent to defraud "need not target any particular entity or individual as long as the intent is generally directed toward present or future creditors of the debtor."[165]

### B.   Constructive Fraudulent Transfer under 11 U.S.C. § 548(a)(1)(B)

Unlike an intentional fraudulent transfer claim, a constructive fraudulent transfer claim does not require a showing of a transferor's fraudulent intent. Rather, the central element is whether the debtor received "reasonably equivalent value" in exchange for the transfer at issue.[166] In addition, the debtor must demonstrate that it:

1. was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
2. was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
3. intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
4. made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.[167]

---

[163] *See In re Nanobeak Biotech Inc.*, 656 B.R. 350, 366-67 (Bankr. S.D.N.Y. 2024); *In re Bankr. Estate of Norske Skogindustrier ASA*, 629 B.R. 717, 733 (Bankr. S.D.N.Y. 2021).

[164] *In re Lyondell*, 567 B.R. at 117 (quoting *In re Lyondell Chem. Co.*, 541 B.R. 172, 187 (Bankr. S.D.N.Y. 2015)), *see also* UNIF. FRAUDULENT TRANSFER ACT § 4 (1984).

[165] *In re Lyondell*, 567 B.R. at 117 (quoting *In re Lyondell Chem. Co.*, 541 B.R. 172, 187 (Bankr. S.D.N.Y. 2015)).

[166] 11 U.S.C. § 548(a)(1)(B)(i).

[167] 11 U.S.C. § 548(a)(1)(B)(ii).

In determining whether a debtor has received reasonably equivalent value, courts will use a two-step analysis: first, a court must determine "whether the debtor received any value at all in exchange for the transfer, i.e. any realizable commercial value as a result of the transaction;" and second, a court must determine "whether that value was in fact reasonably equivalent . . . ."[168] In general, "[f]air equivalence only requires that the value of the consideration be reasonably equivalent rather than exactly equivalent in value to the property transferred or obligation assumed."[169]

In addition to proving that the debtor did not receive reasonably equivalent value, a plaintiff must also satisfy one of three financial condition tests: (i) balance-sheet insolvency, (ii) unreasonably small capital, and (iii) the intent to incur debts beyond the debtor's ability to pay the debts as they come due.[170]

The first financial condition test analyzes whether "the sum of [an] entity's debts is greater than all of such entity's property, at a fair valuation . . . ."[171] Fair value, in turn, "is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts."[172] Accordingly, under this financial condition test, the Trustee must prove that the debtor was balance-sheet "insolvent on the date that

---

[168]   *In re Lyondell*, 567 B.R. at 113-14 (quoting *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2006 WL 687153, at *11 (Bankr. S.D.N.Y. Mar. 6, 2006)).

[169]   *Id*. at 114 (citation omitted); *In re Jesup & Lamont, Inc.*, 507 B.R. 452, 472 (Bankr. S.D.N.Y. 2014) ("A finding of reasonably equivalent value does not require an exact equivalent exchange of consideration. However, the benefits the debtor receives from the transfer must approximate its expected costs.").

[170]   *In re Lyondell*, 567 B.R. at 109.

[171]   11 U.S.C. § 101(32)(A); *In re Tronox Inc.*, 503 B.R. 239, 296 (Bankr. S.D.N.Y. 2013) ("The analysis of solvency for fraudulent conveyance purposes is a 'balance sheet test,' examining whether debts in the aggregate are greater than assets in the aggregate.") (internal citation omitted).

[172]   *In re Roblin Inds.*, 78 F.3d 30, 35 (2d Cir. 1996).

49

[the] transfer was made or [when the] obligation was incurred, or became insolvent as a result of such transfer."[173]

The "capital adequacy" financial condition test is satisfied if a debtor engaged in a transaction "for which any property remaining with the debtor was an unreasonably small capital...."[174] "Unreasonably small capital" is not defined in the Bankruptcy Code, but bankruptcy courts in this district have "explained that 'unreasonably small capital' typically refers to the 'inability to generate sufficient profits to sustain operations,' which is a condition that naturally 'must precede an inability to pay obligations as they come due,' and as such, 'unreasonably small capital' is a term that 'would seem to encompass financial difficulties short of equitable insolvency.'"[175]

The third financial condition tests inquires whether the debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured ...."[176] "While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured."[177]

## C.    Defenses To Fraudulent Transfer Actions

Section 548(c) of the Bankruptcy Code provides a "good faith" defense to an otherwise avoidable transfer:

> "Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or oblige of such

---

[173] *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1991), as amended (Oct. 28, 1991) (quoting 11 U.S.C. § 548).

[174] 11 U.S.C. § 548(a)(1)(B)(ii)(II).

[175] *In re Lyondell*, 567 BR at 109.

[176] 11 U.S.C. § 548(a)(1)(B)(ii)(III).

[177] 5 COLLIER ON BANKRUPTCY ¶ 548.05[3][c] (Richard Levin & Henry J. Sommer eds. 16th ed. 2010).

> a transfer or obligation that takes for value and in good faith has a lien on or may
> retain any interest transferred or may enforce any obligation incurred, as the case
> may be, to the extent that such transferee or obligation gave value to the debtor in
> exchange for such transfer or obligation.[178]

Section 548(c) provides a defense to both actual and constructive fraudulent conveyance claims

under the Bankruptcy Code.[179] A transferee bears the burden of proving the elements of the good

faith defense by showing that it gave value to the debtor in exchange for the transfer and that it did

so "in good faith."[180]

The Bankruptcy Code does not define "good faith," and courts evaluate good faith on a

case-by-case basis. To do so, "federal courts have reached a consensus that 'good faith' [under the

Bankruptcy Code provisions is] determined according to an 'objective' or 'reasonable person'

standard. . . ."[181] Under this standard, courts look to what the transferee objectively 'knew or

should have known.'"[182] Courts have also found an absence of good faith when transferees do not

perform sufficient due diligence when alerted to such circumstances to put them on notice of an

improper purpose for the transfer. [183]

### D.    Preferential Transfers

Under Section 547(b) of the Bankruptcy Code, a debtor is permitted to avoid certain pre-

petition transfers if doing so would serve the important bankruptcy policy goal of treating all

similarly situated creditors equally.[184] In order to avoid a transfer as a preference, a plaintiff must

show: (i) a transfer to or for the benefit of a creditor, (ii) for or on account of an antecedent debt,

(iii) made while the debtor was insolvent, (iv) on or within 90 days before the date of the filing of

---

[178]   11 U.S.C. § 548(c).
[179]   *In re Dreier LLP*, 452 B.R. 391, 426 (Bankr. S.D.N.Y. 2011).
[180]   *Id.*
[181]   *In re Bayou Grp.*, 396 B.R. 810, 844 (Bankr. S.D.N.Y. 2008), *rev'd on other grounds*, 439 B.R. 284 (Bankr. S.D.N.Y. 2010).
[182]   *See id.*; *In re Enron Corp.*, 357 B.R. 32, 44-46 (Bankr. S.D.N.Y. 2006).
[183]   *In re Bernard L. Madoff Inv. Sec. LLC*, 12 F.4th 171, 192 (2d Cir. 2021), *cert. denied*, 142 S.Ct. 1209 (2022).
[184]   5 COLLIER ON BANKRUPTCY ¶ 547.01 (Richard Levin & Henry J. Sommer eds. 16th ed. 2010).

the bankruptcy petition, (v) that enabled the creditor to receive more than it would otherwise have received if the transfer had not been made and the case had proceeded under Chapter 7 of the Bankruptcy Code.[185] When asserting a preference claim, the plaintiff has an obligation to take into account the transferee's known or reasonably knowable affirmative defenses.[186]

The Bankruptcy Code and the Second Circuit treat "debt" and "obligation" as equivalent terms.[187] Further, the legal obligation to pay a debt, in the context of Section 547, occurs not when the agreement was breached or payment is due, but when the agreement is made.[188]

### E.    Preference Defenses

Section 547(c) of the Bankruptcy Code provides exceptions from attack as preferences for some transfers. Even if all of the elements listed in Section 547(b) are present, the transfer may not be avoided if the defendant transferee can show that one of the exceptions listed in Section 547(c) of the Bankruptcy Code applies. Moreover, Section 547(c) lists only specific defenses, and does not preclude the use of other general defenses (such as statute of limitations). The following defenses are of particular relevance to the transfers that were reviewed by the Examiner.

#### 1.    Contemporaneous Exchange for New Value

For the contemporaneous exchange exception to apply under Section 547(c)(1) of the Bankruptcy Code, the exchange must meet the following three requirements: "(1) the transferee delivered new value, (2) the parties intended the exchange to be contemporaneous, and (3) the exchange was, in fact, substantially contemporaneous."[189] Within the context of a preferential

---

[185]    11 U.S.C. § 547(b).

[186]    *Id.*

[187]    *In re Trib. Co. Fraudulent Conv. Litig.*, No. 12-mc-2296 (RJS) 2018 WL 6329139 *13 (S.D.N.Y. Nov. 30, 2018).

[188]    *See id.*; *In re Enron Corp.*, 357 B.R. 32, 44-46 (Bankr. S.D.N.Y. 2006).

[189]    *In re Dewey & LeBoeuf LLP*, No. 14-01919 (MG), 2014 WL 4746209, at *8 (Bankr. S.D.N.Y. Sept. 23, 2014) (quoting *In re Dreier LLP*), 453 B.R. 499, 515 (Bankr. S.D.N.Y. 2011).

transfer, new value is defined as "money or money's worth in goods, services or new credit . . . but does not include an obligation substituted for an existing obligation."[190] Courts have interpreted this term to include the continued services of employees and payments to those employees to be considered as "contemporaneous" so long as the employer-debtor pays such employees' salaries as they come due.[191] This presumption may be rebutted with evidence that demonstrates a contract was not "negotiated at arm's length or that the payments were excessive as compared to services rendered."[192]

> 2.    *Ordinary Course of Business*

Under Section 547(c)(2) of the Bankruptcy Code, a creditor can raise as an affirmative defense that the payment was made in the ordinary course of business. "To make an ordinary course of business defense, a creditor 'bears the burden of proving the defense[] by a preponderance of evidence.'"[193] A primary purpose underlying the ordinary course exception is to discourage unusual action by either the debtor or its creditors prior to bankruptcy. "In order to prevail, a defendant must prove either the subjective test under Section 547(c)(2)(A), or the objective test under Section 547(c)(2)(B)."[194] The "subjective element [ ] requires an examination of whether [the] transfer was ordinary between the parties to the transfer."[195] Under this test, the court should consider: "(i) the prior course of dealing between the parties, (ii) the amount of the payment, (iii) the timing of the payment, (iv) the circumstances of the payment, (v) the presence of unusual debt collection practices, and (vi) changes in the means of payment." [196] The creditor

---

[190]    11 U.S.C. § 547(a)(2).
[191]    *See In re Enron Corp.*, 357 B.R. 32, 50 (Bankr. S.D.N.Y. 2006) ("While . . . contractually-agreed upon payments can generally be presumed to equal the value of the services (or goods) provided, sufficient facts [may] rebut that presumption.").
[192]    *In re Dewey*, WL 4746209 at *9.
[193]    *Id.* (citation omitted).
[194]    *In re Quebecor World (USA) Inc.*, 491 B.R. 363, 368 (Bankr. S.D.N.Y. 2013).
[195]    *In re Dewey*, WL 4746209 at *9.
[196]    *Id.*

"must establish a 'baseline of dealings' that will enable the court to evaluate the parties' prior practices and compare that with the transfers in question." [197] On the other hand, the "objective test [] 'looks not to the specifics of the transaction between the debtor and the particular creditor, but rather focuses on the general practices in the industry, in particular the industry of the creditor.'" [198] The transfer "must comport with ordinary business terms used by similarly situated debtors and creditors faced with similar circumstances."[199]

### 3.    New Value Defense

Section 547(c)(4) provides that a plaintiff may not avoid a transfer "to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor."[200] The "new value" effectively repays and offsets the earlier preference, and the transferee must demonstrate the extent to which new value replenishes the estate.[201] The "new value" definition under section 547 of the Bankruptcy Code only requires that a transferee provide goods, services or credit that the debtor did not previously have.[202] There is no requirement that such goods, services or credit be provided under a "separate" contract or transaction.[203]

### F.    State Law Avoidance Claims

Under Section 544(b)(1) of the Bankruptcy Code, the debtor's estate can step into the shoes of an unsecured creditor to bring avoidance claims under applicable law, including state law.[204]

---

[197]    *Id.*
[198]    *Id.*
[199]    *Id.*
[200]    *In re George G. Sharp, Inc.*, No. 20-10590 (MEW), 2022 Bankr. LEXIS 1484, at *12 (Bankr. S.D.N.Y. May 25, 2022).
[201]    *In re Teligent, Inc.*, 315 B.R. 308, 315 (Bankr. S.D.N.Y. 2004); *In re Musicland Holding Corp.*, 462 B.R. 66, 70 (Bankr. S.D.N.Y. 2011) ("The party relying on the defense must show that it gave unsecured new value after the preferential transfer.").
[202]    *In re George*, Bankr. LEXIS 1484, at *15 (Bankr. S.D.N.Y. May 25, 2022).
[203]    *Id.*
[204]    11 U.S.C. § 544(b)(1); *See In re Eight-115 Assocs., LLC*, 650 B.R. at 55 ("Pursuant to Section 544 of the Bankruptcy Code, the Trustee can assert fraudulent conveyance claims rooted in New York Debtor and Creditor Law(s) ("NY DCL") §§ 272–275.").

The estate's right to pursue state law avoidance claims under this subsection depends on the existence, as of the petition date, of at least one unsecured creditor with the right to pursue such avoidance claims under state law.[205]

The reach-back periods in state fraudulent transfer statutes are often longer than the Bankruptcy Code's two-year clawback period. However, the compensation and bonus payments as well as the REITs Retention Bonuses occurred within the two-year period and the scope of the examination was otherwise limited by the Appointment Order to the two-year period. The Examiner believes that it is likely that New York law would apply to any Section 544(b) claim. As New York's fraudulent transfer and preference statues have effectively the same provisions as the relevant Bankruptcy Code provisions, the analysis under state law would be substantially the same as under the Bankruptcy Code.

## II.    Analysis of Potential Causes of Action

In this section of the Report, the Examiner analyzes the merits of potential fraudulent transfer and preference claims related to the following transfers (i) the February 2024 Bonus Payments, and (ii) the REITs Retention Bonuses (collectively the "Analyzed Transfers"). This section of the Report has certain limitations. For example, given the time constraints of the Investigation, the Examiner could not replicate the full discovery process that would proceed in an adjudication on the merits of the claims analyzed in this section. Similarly, while the Examiner conducted interviews of many of the individuals who would have knowledge related to the transfers at issue, formal depositions were not conducted and the Examiner did not seek sworn testimony from any individuals with knowledge relevant to the transfers at issue. Additionally,

---

[205]   *See In re Eight-115 Assocs., LLC*, 650 B.R. at 55 ("Section 544 clearly marks the Petition Date, not any date post-petition, as the relevant date [to determine the existence of an unsecured creditor that could assert state law avoidance claims].").

certain issues analyzed below if taken to a final adjudication would potentially involve financial advisors or expert testimony, and the Examiner did not think it prudent to incur the additional expense of these retentions and instead relied on his team and their review of relevant records to conduct this analysis.

### A.    Intentional Fraudulent Transfer Claims under 11 USC § 548(a)(1)(A)

The Examiner does not believe it would be subject to serious dispute that the Analyzed Transfers would meet the first two factors of the intentional fraudulent transfer analysis: (1) that the transfer was made involving property of the estate; and (2) that the transfer was made within two years before the petition date.[206] In determining whether the third element is established—that Weiss voluntarily or involuntarily "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud"—the Examiner reviewed each category of transfer independently to determine if this element was satisfied.

With regards to the February 2024 Bonus Payments, the Court may consider Jefferies' arguments that Weiss leadership intended to defraud them. Jefferies' position is reflected in communications [omitted] that accused Weiss of "blatantly [lying] . . . that bonuses are paid at the end of the month"[207] and of "inappropriately" taking "a meaningful amount of our money."[208]

However, Jefferies' arguments may not ultimately be persuasive because the Investigation has demonstrated that there was substantial evidence of a legitimate business purpose justifying the payment of each of the February 2024 Bonus Payments.[209] Specifically, the evidence available

---

[206]    11 U.S.C. § 548(a)(1)(A).
[207]    2024-02-11 M. Edwards to ███████ Re: Shocked.
[208]    2024-02-11 ███████ to G. Weiss Re: Sad.
[209]    In addition to the 2024 bonuses, the Examiner has also investigated other transfers from 2022 through 2024, including the payment of bonuses in 2022 and 2023 and Weiss' issuance of notes to Visser and George Weiss. With respect to the earlier bonuses, there has been no evidence of impropriety in the timing or value of those bonuses. The note to George Weiss was promptly reimbursed, and Visser has reached a settlement. *See* Order, Pursuant to Bankruptcy Rule 9019, Granting Debtors' Motion and Authorizing and Approving the Proposed Stipulation of Settlement between GWA, LLC and Jordi Visser, ECF No. 248.

to the Examiner demonstrated that these payments were made for the legitimate purpose of compensating Weiss' employees for work they had performed in the prior year, disbursed at a time when the firm still appeared to be viable, and were made to facilitate the retention of employees during the negotiations with ███████ With respect to the other investment professionals who received bonuses, the bonuses were made in accordance with the Bonus Plan; only investment professionals who worked on profitable strategies received bonuses, and the majority of investment professionals did *not*, in fact, receive bonuses.[210]

For hedge fund investment professionals, bonuses are an integral component of overall compensation and Weiss management was concerned that investment professionals would not remain at the firm if the bonuses were not paid.[211] With respect to the Staff and Management Bonuses awarded in 2024, these were also an integral part of the employees' compensation and consistent with the bonuses awarded in previous years.[212] In contrast to the contested timing of the bonus payments, the dollar *value* of these bonuses was not contested and was estimated in financials that were sent to Jefferies well in advance of the bonus payment.[213] Moreover, the lack of bad faith in authorizing the payment of the 2024 bonuses is also evinced from the fact that George Weiss' determination to pay the bonuses was predicated on (i) Seward & Kissel's legal advice as conveyed by Dillabough, and (ii) Dillabough's own legal advice to George Weiss concerning the threat that Jefferies would, without sufficient legal basis, seek to prevent the payment of bonuses, imperiling the ███████ negotiations. In sum, the Examiner's Investigation yielded no evidence that the February 2024 Bonus Payments were made with actual intent to

---

[210] *See* Salary History - Staff and Management and for Investment Professionals Under the Contractual Bonus Plan for 2021-2024.

[211] *See* Holly Weiss, Hedge Fund Employee Compensation, Practical Law 2019.

[212] *See* Salary History - Staff and Management and for Investment Professionals Under the Contractual Bonus Plan for 2021-2024.

[213] *See supra* § Part Three, III. B.

"defraud, hinder or delay" any creditor including the Jefferies Parties, as opposed to being an effort to preserve the ███████ negotiations.

The Court may also consider the non-exhaustive "badges of fraud" enumerated in the UFTA. Several of these were of particular relevance to the Examiner's analysis: (i) a questionable transfer not in the usual course of business; (ii) the transfer or obligation was undisclosed or concealed; (iii) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit the general chronology; and (iv) the transfer or obligation was to an insider.[214]

With regards to the first badge, the Examiner's Investigation did reveal that the February 2024 Bonus Payments were advanced from February 23 to February 12 and paid at a time marked by contentious discussions with Jefferies concerning the execution of the February 1 Draft Forbearance Agreement. However, the fact that the bonuses were paid eleven days before they were originally scheduled does not indicate that they were fraudulent; the bonuses were paid in February, as they were required to be under the Bonus Plan, and at roughly the same time of the month as the preceding three years, albeit slightly less than two weeks earlier.[215] The Bonus Plan does not dictate any particular date or time of February for the payment.[216] In addition, Jefferies' representatives acknowledged in their interview that Weiss did not need to seek Jefferies' consent before payment of the bonuses, and the Investigation did not yield sufficient evidence to establish that Weiss staff represented to Jefferies that they would not pay bonuses until the end of the month. Moreover, Weiss relied on the advice of outside counsel from Seward & Kissel in drafting its response to Jefferies, in which it represented that Weiss was operating in the "normal course."

---

[214] *See In re Nanobeak Biotech Inc.*, 656 B.R. at 366-67; *In re Bankr. Estate of Norske Skogindustrier ASA*, 629 B.R. at 733.
[215] Bonus pay dates 2016-2024.
[216] Weiss Multi-Strategy Advisers LLC, Bonus Plan for Investment Professionals (2023), at 7.

With regard to the second badge, Weiss's intention to make the February 2024 Bonus Payments would have been well known to the Jefferies Parties. As described *supra* Section Part Three, III., B., Weiss notified the Jefferies Parties of its intention to make annual bonus payments in February 2024, including the provision of various financial records from which Weiss' bonuses were calculated and which demonstrated bonus accruals. While Weiss management did not notify Jefferies of the actual bonus payments until after they had been made, Weiss did not have an obligation to provide such notification or to seek the Jefferies Parties' approval before doing so.

As to the third badge, while Weiss management had some internal concerns over the actions that the Jefferies Parties may potentially take in light of the contentious discussions between the parties, at the time they authorized the February 2024 Bonus Payments, they had not actually been sued or threatened with a lawsuit. Although the precise moment that the bonuses were authorized is not clear, available evidence indicates that the decision was made before the Jefferies Parties February 8 email (at 4:08 pm) threatening a TRO.[217]

The factor that the transfer or obligation was to an insider is mixed, because some of the bonus recipients, including Visser, REITs Portfolio Manager Ron Lior, and several other members of firm leadership, were insiders, but the majority of the transferees were not.[218] The bonus recipients who received the largest transfers were Portfolio Managers and other investment professionals, and those amounts were determined by formula from their strategies' P&L.[219]

Even if it could be proven that the 2024 Bonus Payments satisfied several of these badges of fraud, "actual intent still must be proven; it cannot be presumed."[220] The Examiner has not seen

---

[217]   2024-02-11 J. Dillabough to. M. Edwards RE: Follow up.
[218]   *See* Salary History - Staff and Management and for Investment Professionals Under the Contractual Bonus Plan for 2021-2024.
[219]   *See id.*
[220]   *In re Lyondell*, 567 B.R. at 117.

59

evidence that the February 2024 Bonus Payments were in furtherance of a fraud. To the contrary, the evidence developed in the Investigation strongly suggests that the bonuses were awarded for the legitimate business purposes of compensating Weiss employees for their historic work pursuant to the firm's historic practices and existing bonus plans, retaining employees, and maintaining its business operations to pursue the strategic relationship with ▮▮▮▮ which Weiss management believed was in the best interest of Weiss and its creditors.

As to the other Analyzed Transfers, the Examiner reached a similar conclusion that there is insufficient evidence to indicate that any of the transfers were undertaken with an actual intent to defraud creditors. For example, with respect to the REITs Retention Bonuses, it is uncontested that REITs was one of the most valuable—if not *the* most consistently profitable—team at Weiss. For 2023 (the year underlying the 2024 bonuses), the REITs trading P&L was in excess of $▮▮ ▮▮.[221] Representatives of Jefferies acknowledged in an interview, in substance, that the REITs team was "key to the ▮▮▮▮ deal." Weiss awarded the REITs Retention Bonuses out of recognition that the REITs team was highly sought after and important to the future of the firm. Additionally, the REITs Retention Bonuses were negotiated and paid before Weiss received the February 1 Forbearance Agreement. Similarly, the other Analyzed Transfers were undertaken for legitimate business reasons and did not have any indication of a fraudulent intent by Weiss.[222]

The Examiner concludes that, based on the facts developed in the Investigation, Jefferies (and any other prospective plaintiff) is unlikely to prevail on a claim for intentional fraudulent transfer under 11 USC § 548(a)(1)(A) for the Analyzed Transfers.

---

[221] The REITs 2023 trading P&L was $▮▮▮▮ 2023 FY Bonus By Strategy.
[222] This holds true for the "Other Bonuses." ▮▮▮▮ $▮▮▮ "other bonus" represented deferred payments he originally earned in 2020, that were not paid until his strategy was profitable, in accordance with the Bonus Plan. ▮▮▮ received a bargained-for guaranteed bonus that was part of his employment agreement with Weiss, and was negotiated since his prior employer, Nomura, had a guaranteed bonus. ▮▮▮ and ▮▮▮ received distinct bonuses that stemmed from WEGM's investment activities.

### B.   Constructive Fraudulent Transfer Claim – 11 USC § 548(a)(1)(B)

The Analyzed Transfers would meet the first requirement of a constructive fraudulent transfer claim because, for the same reasons noted with respect to the intentional fraudulent transfer claim above, the transfers were made within two years before the Petition Date.[223] However, in order to prevail on this claim, Weiss must also have received less than reasonably equivalent value for the transfers at issues and must have been insolvent, unable to pay its debts as they matured, or left with unreasonably small capital. As a starting point, the payment of bonuses to employees, even discretionary bonuses, will most likely be seen as providing "value" to Weiss.[224] Accordingly, the Examiner's analysis focused on whether Weiss received less "reasonably equivalent" value for the Analyzed Transfers.

#### 1.   Less than Reasonably Equivalent Value

In the context of compensation, Courts will look to the services rendered by the employee to focus on the value of the services provided to the debtor to determine if they are reasonably equivalent to the compensation that was paid.[225] In conducting this review, courts will also take into account the contractual provisions that may exist between the debtor and the relevant employee related to the calculation of any compensation, such as bonuses as well as comparisons to the reasonableness of the compensation when compared to market practice.[226] Courts will also

---

[223]   11 U.S.C. § 548(a)(1)(B).

[224]   *See In re F-Squared Inv. Mgt., LLC*, 600 BR 294, 306-07 (Bankr. D Del 2019)("Rewarding your best employees(s) with a discretionary bonus (especially where the prospect of a discretionary bonus is included in both the employer's employee handbook and the employee's offer letter) undoubtedly helps to build the loyalty of the employee and increase morale, generally, if nothing else. Failure to award the bonus, even if discretionary, could cause a company's best employees to seek employment elsewhere.").

[225]   *See In re Bernard, LLC*, 458 B.R. 87, 110 (Bankr. S.D.N.Y. 2011); *In re Churchill Mortg. Inv. Corp.*, 256 B.R. 664, 679 (Bankr. S.D.N.Y. 2000), *aff'd sub nom. Balabar-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. 2001).

[226]   *In re Churchill*, 256 B.R. at 679-80; *see also In re Wonderwork, Inc.*, 611 B.R. 169, 209-10 (Bankr. S.D.N.Y 2020).

consider the role that bonus compensation plays in retaining employees when conducting a reasonably equivalent value analysis.[227]

The Examiner believes that the Debtors received reasonably equivalent value for the February 2024 Bonus Payments, as well as the 2022-23 Bonuses, for which the findings and analysis are identical. The Investment Professional Bonuses were meritocratic in that they were directly tied to each strategy's P&L, and the majority of investment professionals—those whose strategies were not profitable—did *not* receive bonuses.[228] Additionally, they were calculated and paid pursuant to the specific provisions of the Bonus Plan, and the Examiner believes that the criteria used to calculate the bonus pool that funded these bonuses was reasonable and consistent with, or below market standards. Additionally, the role that the bonuses paid in incentivizing the investment professionals to stay with Weiss during the course of the ▬▬▬ negotiations would be seen as having provided additional value to Weiss.

The Staff and Management Bonuses likewise appear to be for reasonably equivalent value. While the Staff and Management Bonuses were discretionary, they were awarded after Weiss conducted an internal analysis to ensure the relevant employees were meeting expectations. Moreover, there was no evidence gleaned during the Examination that any employee who received a bonus was not providing his or her expected contribution to the firm. Additionally, the Staff and Management Bonuses in February 2024 were overall consistent in terms of value with the bonuses that had been paid in prior years. The Examiner also believes that the value of the Staff and Management Bonuses were generally consistent with the market compensation for similarly situated employees in similar hedge funds.

---

[227] *Id.*
[228] *See* Salary History - Staff and Management and for Investment Professionals Under the Contractual Bonus Plan for 2021-2024.

In contrast, the payment of the REITs Retention Bonuses presents facts that could support a colorable argument that Weiss did not receive a reasonably equivalent value in exchange. By their express terms, the REITs Retention Bonuses were not based on services previously provided to Weiss, but were instead forward looking and intended to ensure the retention through December 31, 2027 of Lior, ▉▉▉ and ▉▉▉ While value is determined at the time of the transfer in question, the Debtors could raise a colorable argument that they did not receive reasonably equivalent value for the payment of the REITs Retention Bonuses due to the subsequent failure of the ▉▉▉ negotiations and the corporate filing.

2.  *Insolvency*

As to the insolvency, the debtor must show that (i) the debtor was insolvent on the date that the transfer was made or became insolvent as a result of such transfer; (ii) was left with unreasonably small capital; (iii) intended or believed that it would incur debts beyond its ability to pay; or (iv) made the transfer for an insider outside the ordinary course of business.[229]

The crux of insolvency is whether the sum of the debtor's debts is greater than the value of all of its property.[230] "To prove insolvency, a trustee may rely on 'balance sheets, financial statements, appraisals, expert reports, and other affirmative evidence.'"[231] It appears that Weiss was insolvent when the February 2024 Bonuses were paid as well as when the REITs Retention Bonuses were paid. For fiscal year 2023, Weiss earmarked $▉▉▉ for bonuses.[232] On February 12, 2024, the day the bonuses were paid, Weiss acknowledged in the Forbearance Agreement that it had "Past Due Obligations" to Jefferies in the amount of $54,528,115.78.[233]

---

[229]  11 U.S.C. § 548(a)(1)(B)(ii).
[230]  11 U.S.C. § 101(32).
[231]  *In re Jesup*, 507 B.R. at 473 (quoting *In re Knippen*, 355 B.R. 710, 722-23 (Bankr. N.D. Ill. 2006)).
[232]  Exhibit – Weiss Compensation and Bonus History 2021-2024.
[233]  2024-02-12 Forbearance Agreement § 1.

Moreover, Weiss' Consolidated Statement of Financial Condition dated December 31, 2023, reflects total liabilities in excess of ████████ and total assets of $████████. Accordingly, for the purposes of this analysis, the Examiner assumed that the Debtors were insolvent based on the available information.

### 3. Defenses to Fraudulent Transfers

Section 548(c) provides a defense to both actual and constructive fraudulent conveyance claims under the Bankruptcy Code. A transferee bears the burden of proving the elements of the good faith defense by showing that it gave value to the debtor in exchange for the transfer and that it did so "in good faith."[234] "Good faith" in turn is determined under an objective standard.[235] The determination of "value" is closely related to the analysis of reasonably equivalent value previously discussed, and with the exception of the REIT Retention Bonuses, the Examiner believes that the recipients of the Analyzed Transfers gave value for substantially the same reasons previously detailed.

The evidence before the Examiner establishes the good faith of the Weiss transferees. Bonuses for the Investment Professionals were based on their strategies' individual financial merit. Moreover, in interviews, many of the investment professionals were not aware of the firm's overall precarious financial position, both because their substantial bonuses reflected their productive financial performance, they were not privy to the discussions with Jefferies concerning Weiss' debts, and some investment professionals worked remotely and were removed from office conversations.

---

[234]  *In re Dreier*, 452 B.R. at 426.
[235]  *In re Bayou Grp.*, 396 B.R. at 844.

With respect to the Staff and Management Bonuses, although several members of Weiss' leadership were aware of Weiss' financial strain, at the time the bonuses were made, they strongly believed Weiss business operations would continue through the ███████ Transaction. Moreover, the 2024 Staff and Management Bonuses were consistent with the preceding years and within industry-standard compensation – perhaps even below market, and would not have put any of the recipients on notice of any larger issues with the firm. These findings hold true for the 2022-23 Bonuses for the same reasons.

Accordingly, and for substantially the same reasons that the Examiner concludes that the bonuses were awarded for a legitimate business purpose, the Examiner concludes based on the record evidence that the bonus transferees acted in good faith.

### C.    Preference Claims

The February 2024 Bonus Payments and at least a portion of the REITs Retention Bonuses facially satisfy the criteria set out for preference in Section 547(b) of the Bankruptcy Code as they are (i) transfers to creditors, (ii) for or on account of an antecedent debt, (iii) made while the debtor was insolvent, (iv) within 90 days before the date of the filing of the bankruptcy petition (or within one year if the recipient was an insider), (v) that enabled the creditor to receive more than it would otherwise have received if the transfer had not been made and the case had proceeded under Chapter 7 of the Bankruptcy Code.[236]

The February 2024 Bonus Payments facially satisfy these criteria. The obligation to pay the February 2024 Bonus Payments was imposed by the relevant employee contracts and, where applicable, the Bonus Plan accrued throughout the 2023 fiscal year. They arose prior to the February 2024 payment date making them antecedent debts. As detailed above, the Examiner

---

[236]    11 U.S.C. § 547(b).

believes there is a valid argument that the Debtors were balance sheet insolvent at the time of the
February 2024 Bonus Payments, which was also within 90 days of the Petition Date. Generally,
any amount received by an unsecured creditor during the preference period will enable that creditor
to receive more than he would have received in liquidation, if the bankrupt estate would be unable
to satisfy all its debts.[237] Based on the information currently known to the Examiner, he believes
that the estate will not be able to pay unsecured creditors in full and that the recipients of the
February 2024 Bonus Payments received more than they would have received in a Chapter 7
liquidation.

As to the REITs Retention Bonuses, the Trustee believes that the bonus paid to Lior would
also satisfy the preference criteria, but that the remaining REITS Retention Bonuses would not be
subject to preference claims. The obligation to pay the REITs Retention Bonuses was imposed at
the time the new employment agreements with Lior, ███ and ███ were signed in December
2023, making them antecedent debts. However, the actual payment of the REITs Retention Bonus
occurred January 26th, 2024, 94 days before the bankruptcy filing.[238] As a result, the REITs
Retention Bonuses would only be avoidable if made to an insider subject to the one-year look-
back window. Lior, who was with the firm for over 30 years and was a member of the Executive
Committee, was classified by the Debtors as an insider in information provided to the Examiner.[239]
Accordingly, the Trustee believes that the REITs Retention Bonus paid to Lior would be subject
to the one-year look-back period. As with the February 2024 Bonus Payments, the Examiner
believes that Lior received more than he would have received in a Chapter 7 liquidation.

---

[237]   *See In re CIS Corp.*, 195 B.R. 251, 262 (Bankr. S.D.N.Y. 1996).
[238]   2024-01-22 ███████ to M. Lanzoni Retention.
[239]   Schedule of Insiders.

Accordingly, the Examiner believes that the February 2024 Bonus Payments and the REITs Retention Bonus made to Lior could be subject to a preference claim unless the recipient processed a valid defense under Section 547(c) Bankruptcy Code. The following section examines the defenses available to the recipients of these transfers.

    *1.    Affirmative Defenses*

        *i.    Contemporaneous Exchange for New Value*

The bonus payments to staff, management, and investment professionals were not contemporaneously made for new value. The new value defense hinges on whether the payments were made to pay for past or ongoing services.[240] The end-of-year bonus payments were made in recognition of work done in the previous year. Consequently, they do not fall under this affirmative defense.

The REITs Retention Bonuses also do not fall under the contemporaneous exchange of new value defense. While the transfers were not owed because of previously performed work—they were made as an incentive for the strategy members to remain at the firm—the exchange of value was not contemporaneous. Unlike salary payments, a large, upfront payment for three years of service would not be classified as a contemporaneous exchange.[241] Further, the Section 547(c)(1) defense protects transfers only to the extent of the new value given.[242] Here, the REITs

---

[240]  *In re Jones Truck Lines, Inc.*, 130 F.3d 323, 327 (8th Cir. 1997) ("assume that an employer fails to pay an employee's salary and benefits when due. The employee complains and threatens to resign . . . If the employer responds by paying . . . the past-due salary or benefits, that transfer is not for new value. If the employer also resumes paying the employee's current salary and benefits when due, and the employee keeps working, those current payments are contemporaneous exchanges for 'new value,' the employee's continuing services.").

[241]  *See e.g. In re Dearborn Bancorp, Inc.*, 583 B.R. 395, 428 (Bankr. E.D. Mich. 2018) (finding § 547(c)(1) was not a valid defense because defendants failed to show the timing of the services performed or the value of the services were proximate to the transfer).

[242]  5 COLLIER ON BANKRUPTCY ¶ 547.04 (Richard Levin & Henry J. Sommer eds. 16th ed. 2010); *In re Dearborn*, 583 B.R. at 419 ("one of the purposes of § 547(c)(1) is to give credit for new value that replenishes the debtor's estate. This purpose is served only to the extent of the amount of the new value given to the debtor.").

67

Retention Bonus recipients received $1 million to stay at the firm for three years.[243] The large upfront payment covering a three-year period would not fall under the Section 547(c)(1) affirmative defense.

*ii.*      *Ordinary Course of Business*

For a transfer to qualify as ordinary course, it must satisfy either the subjective or objective ordinary course of business test.[244] As detailed above, the subjective test examines whether the transfer was ordinary between the parties to the transfer and looks at (i) the prior course of dealing between the parties, (ii) the amount of the payment, (iii) the timing of the payment, (iv) the circumstances of the payment, (v) the presence of unusual debt collection practices, and (vi) changes in the means of payment.[245] By contrast, the "objective test [] 'looks not to the specifics of the transaction between the debtor and the particular creditor, but rather focuses on the general practices in the industry, in particular the industry of the creditor.'"[246]

Based on the facts and information gained through his Investigation, the Examiner believes that the February 2024 Bonus Payments would satisfy the subjective ordinary course test. The February 2024 Bonus Payments were generally consistent with the historic bonus payment practices of Weiss. First, they were calculated using the same methodology as prior years bonus payments. Second, the February 2024 Bonus Payments were of approximately the same amount per relevant employee as they had been in prior years. And while the portion of the February 2024 Bonus Payments that were related to investment professionals varied from prior years, this was inherent in their nature as these were directly tied to the profitability of the individual strategies. These bonuses were calculated in a manner consistent with historic practice and Weiss' obligation

---

[243]    Lior Amended Employment Agreement, at 2.
[244]    *In re Waterford Wedgwood USA, Inc.*, 508 B.R. 821, 827 (Bankr. S.D.N.Y. 2014).
[245]    *In re Dewey*, WL 4746209 at *9.
[246]    *Id.*

under the relevant employee contracts and the Bonus Plan. In sum, based on the information

provided during the Examiner's Investigation, the payment of the February 2024 Bonus Payments,

including the process of determining and accruing the bonus payments, was basically

indistinguishable from prior years.[247]

The only potential exception to the ordinary course nature of the February 2024 Bonus

Payments concerns the timing of the payment, but the Examiner believes that this alone would be

insufficient to negate the transferees' ordinary course of business defense to a transfer claim. When

analyzing the timing of a potentially preferential transfer, "[t]he starting point—and often ending

point—involves consideration of the average time of payment" where "the creditor must establish

a 'baseline of dealings' between the parties in order to 'enable the court to compare the payment

practices during the preference period with the prior course of dealing.'"[248] When it comes to the

actual difference in timing, "a narrow band of difference is acceptable."[249]

As a starting point, the Bonus Plan instructs generally that payments are to be made "[the]

February Immediately following [the] Plan Year" and does not provide a specific date upon which

the bonus payments are required to be paid.[250] Over the past seven years, between 2016 and 2022,

Weiss paid bonuses between February 16 and February 24.[251] In 2024, the bonuses were paid on

the 12th.[252] While the payment on February 12th was the earliest of the historic payment dates, the

Examiner does not believe that it was sufficiently outside of the historic payment process (four

---

[247] For the same reasons, the 2022-23 Bonuses likewise were in the ordinary course of business.

[248] *In re Fabrikant & Sons, Inc.*, No. 06–12737 (SMB) 2010 WL 4622449, at *3 (Bankr. S.D.N.Y. Nov. 4, 2010); *In re Schick*, 234 B.R. 337, 348 (Bankr. S.D.N.Y.1999).

[249] *In re Cyberrebate.com, Inc.*, 296 B.R. 639, 643 (Bankr. E.D.N.Y. 2003) (reviewing various cases which determined the ranges of time that were either acceptable or unacceptable).

[250] *See* Weiss Multi-Strategy Advisers LLC, Bonus Plan for Investment Professionals (2023), at 7.

[251] Bonus pay dates 2016-2024.

[252] *Id.*

69

days earlier then the earliest previous payment and eight days earlier than the mean bonus payment date) that it would negate the ordinary course of business defense.

The Examiner also believes that the February 2024 Bonuses would satisfy the objective test. The objective test "looks not to the specifics of the transaction between the debtor and the particular creditor, but rather focuses on the general practices in the industry."[253] In other words, the transfer "must comport with ordinary business terms used by similarly situated debtors and creditors faced with similar circumstances."[254] Based on information gained during the course of his investigation, research on hedge fund practices, and his experience and the experience of his team members, the Examiner believes that the methodology, calculation and amount of the bonuses was consistent with the general practice of the hedge fund industry (*see supra* § Part Four, III). This is particularly applicable to the portion of the February 2024 Bonus Payments related to investment professionals, which were directly tied to the profitability of individual strategies.

In contrast, the Examiner believes that there would be significant issues of disputed facts related to whether the REITs Retention Bonus would be entitled to an ordinary course of business defense. Weiss had no previous history of agreeing to retention bonuses and the REITs Retention Bonuses represented the first time that the company had agreed to make a payment of this nature. Further, the fact that the REITs Bonuses were agreed to and paid outside of the normal bonus process and cycle and against the backdrop of the unique ███████ negotiations would further support an argument that the bonuses were not paid in the ordinary course transaction.

---

[253]    *In re Dewey*, WL 4746209, at *9.
[254]    *Id.*

   <u>iii.</u>  *New Value Defense*

  As previously discussed, the Staff and Management Bonuses and Investment Professional Bonuses were not for new value, and would not fall under the Section 547(c)(4) defense.

  As to the REIT's Retention Bonuses, there would be significant factual issues as to whether they would fall under this defense. While there is a presumption that new value exists when a transferee provides services that they had not previously performed, here the relevant employees were not contracting to provide new services but rather to continue in their existing role.[255] Additionally, courts will look to whether the "contractual arrangement was not negotiated at arm's length or that the payments were excessive as compared to the services rendered."[256] While the information gained during the Examiner's Investigation indicated the negotiation of the REITs Retention Bonuses was at arm's length, there is not clear evidence demonstrating the degree of new value provided by the REITs employees and a creditor could dispute whether the amount of the retention bonuses was excessive in light of the agreement to continue to provide the same services.[257]

## SECTION SEVEN: RECOMMENDATIONS

  The Examiner has concluded that the February 2024 Bonuses and the 2022-23 Bonuses paid to insiders were not intentional fraudulent transfers, constructive fraudulent transfers, or preferences. The Examiner accordingly believes that it would not be an efficient use of time or in the best interests of the Debtors' creditors to pursue claims against the Weiss transferees with

---

[255] *See In re Enron Corp.*, 357 B.R. at 50; *In re 360networks (USA) Inc.*, 338 B.R. 194, 205 (Bankr. S.D.N.Y. 2005) (stating the legal principle that "new value is not provided if the contract party merely forbears from canceling or ceasing performance under a contract" but finding that the record is not sufficient to demonstrate whether the employees provided "new value").

[256] *In re Dewey*, WL 4746209 at *9.

[257] *See also In re Enron Corp*, 01-16034-AJG, 2005 WL 6237551 (Bankr. S.D. Tex. 2005); *cf. In re Dearborn*, 583 B.R. at 424-25 (holding that when the debtor is an insider, there is no presumption that the value of the transferee's services equals the price of the contract and thus the transferee must prove the value of their services).

respect to these payments. Conversely, the Examiner has concluded that there are viable avoidance claims concerning the REITs Retention Bonuses, and specifically the payment to REITs Portfolio Manager Ron Lior.

Premised on the analysis contained in this Report, the Examiner believes that the most efficient path for the resolution of these claims is through prompt mediation, ideally commenced within 30 days of the issuance of this Report. The Examiner is hopeful that such a mediation could be conducted on a consensual basis, but to the extent that the relevant parties are unable to agree on a mediator or a mediation process, the Examiner believes a Court-directed mediation conducted by a sitting or retired bankruptcy judge would prove beneficial. In any event, the Debtors and the transferees should enter the mediation with a reasonable expectation of settlement based on the analysis contained in this Report.

The Examiner further recommends that the Debtors include the Jefferies Parties as a consultation party in the mediation process. While the ultimate decision on any potential settled outcome would be held by the Debtors, subject to the Court's approval under the standards set forth by FRBP 9019 and related case law, the Examiner believes that consultation between the Debtors and Jefferies would assist in achieving a successfully mediated outcome.

The Examiner believes that mediation should be conducted on an expedited and streamlined basis with the parties submitting short letter briefs to address their positions, but otherwise relying on the factual and legal framework provided by this Report. The Examiner's intent is that this approach would result in the complete resolution of the issues related to the REITs Retention Bonuses within a month of the appointment of a mediator. Overall, the Examiner's recommendations are informed by the Examiner's belief that litigation would bring unnecessary cost and delay to the estate and to the transferees, along with the risk of equally unnecessary

reputational harm to the transferees of a public airing of compensation issues. The Examiner is of the view that these claims will enhance creditor recoveries if they are resolved in a prompt, efficient manner.

Dated: New York, New York
November 21, 2024

Respectfully submitted,

By: _____

Christopher K. Kiplok
*Chapter 11 Examiner*

**HUGHES HUBBARD & REED LLP**
Dustin P. Smith
Jeffrey S. Margolin
Kiran H. Rosenkilde
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726
Email: dustin.smith@hugheshubbard.com
       jeff.margolin@hugheshubbard.com
       kiran.rosenkilde@hugheshubbard.com

*Counsel to the Examiner*[*]

---

[*] *Adam G. Guttentag (Not Yet Admitted) also assisted in the preparation of this Report.*

# Exhibit 1

24-1770, Doc-0289, Filed 10/02/2024, Document 4, Page 82 of 84

Pg 82 of 84



Weiss February Compensation and Bonus History 2021-2024

Bonus and Salary (actual)

A-929

**Weiss February Compensation and Bonus History 2021-2024**



| Name | Department | 2021 (paid in 2022) | | | | 2022 (paid in 2023) | | | | 2023 (paid in 2024) | | | |
|------|-----------|---------------------|--|--|--|---------------------|--|--|--|---------------------|--|--|--|
| | | Base Pay | Staff and Mgmt Bonuses | Contractual Bonus Plan | Other Bonuses | Base Pay | Staff and Mgmt Bonuses | Contractual Bonus Plan | Other Bonuses | Base Pay | Staff and Mgmt Bonuses | Contractual Bonus Plan | Other Bonuses |
| Hopkins, David | Risk Management | $250,000 | $175,000 | | | $250,000 | $200,000 | | | $250,000 | $250,000 | | |
| | Risk Management | | | | | | | | | | | | |
| | Risk Management | | | | | | | | | | | | |
| | Investment Solutions | | | | | | | | | | | | |
| | Investment Solutions | | | | | | | | | | | | |
| | Marketing | | | | | | | | | | | | |
| | Marketing | | | | | | | | | | | | |
| | Marketing | | | | | | | | | | | | |
| | Marketing | | | | | | | | | | | | |
| | Marketing | | | | | | | | | | | | |
| | Portfolio Finance | | | | | | | | | | | | |
| | Centralized Trading Desk | | | | | | | | | | | | |
| | Centralized Trading Desk | | | | | | | | | | | | |
| | Other | | | | | | | | | | | | |
| | Other | | | | | | | | | | | | |
| | Other | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | $250,000 | | $3,484,290 | | $250,000 | | | | $250,000 | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| Benton, David | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | $250,000 | | $2,037,446 | | $250,000 | | $222,276 | | $250,000 | | $1,502,340 | |
| Uler, Ron | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |

A-930

**Weiss February Compensation and Bonus History 2021-2024**

| Name | Department | 2021 (paid in 2022) | | | | 2022 (paid in 2023) | | | | 2023 (paid in 2024) | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Base Pay | Staff and Mgmt Bonuses | Contractual Bonus Plan | Other Bonuses | Base Pay | Staff and Mgmt Bonuses | Contractual Bonus Plan | Other Bonuses | Base Pay | Staff and Mgmt Bonuses | Contractual Bonus Plan | Other Bonuses |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| Wright L Lundy | Investment Professionals | $250,000 | | $201,764 | | $250,000 | | $1,962,100 | | $250,000 | | | |
| | Investment Professionals | | | | | | | | | | | | |
| | Investment Professionals | | | | | | | | | | | | |
| **Sub Total:** | | | | | | | | | | | | | |
| **Total Bonus Payments** | | | | | | | | | | | | | |

Bonus and Salary (actual)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS LLC, | Case No. 1:24-cv-04369-AKH |
| Plaintiffs, | |
| -against- | |
| GEORGE WEISS, | |
| Defendant. | |

**PLAINTIFFS' LOCAL RULE 56.1**
**COUNTERSTATEMENT OF MATERIAL FACTS IN**
**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1, plaintiffs Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC ("LAM Holdings," and with JSI, "Plaintiffs") jointly submit this Counterstatement of Material Facts in Opposition to Plaintiffs' Motion for Summary Judgment.

**A.     Parties**

1.     George Weiss is the founder of each of GWA, LLC ("GWA"), Weiss Multi-Strategy Funds LLC ("WMSF"), OGI Associates LLC ("OGI"), Weiss Special Operations LLC ("WSPO"), Weiss Multi-Strategy Advisers LLC ("WMSA," and collectively with GWA, WMSF, OGI, and WSPO, the "Weiss Companies").  Declaration of George Weiss, dated November 5, 2024 ("Weiss Decl.") ¶ 4.

**RESPONSE 1:  Not disputed.**

2.    Until recently, the Weiss Companies were some of the longest tenured hedge funds in the United States, managing approximately $4 billion at their peak. Weiss Decl. ¶ 5.

**RESPONSE 2:  Not disputed, but irrelevant.  The assertions in paragraph 2 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b). The tenure of the Weiss Companies[1] is immaterial and irrelevant to this dispute, which turns only on George Weiss's ("Weiss") failure to pay amounts under a guarantee made to Plaintiffs.**

3.    In 46 years of operation, the Weiss Companies ended a financial year with losses on only four occasions.  Weiss Decl. ¶ 5.

**RESPONSE 3:  Not disputed, but irrelevant.  The assertions in paragraph 3 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b). The Weiss Companies' financial performance over the last 46 years is immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

4.    Plaintiff JSI is a Delaware LLC and a subsidiary of Jefferies Financial Group. Complaint, ECF No. 1, Ex. A ¶ 11.

**RESPONSE 4:  Not disputed, but irrelevant.  The assertions in paragraph 4 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b).**

---

[1]    "Weiss Companies" refers to GWA, LLC ("GWA"), Weiss Multi-Strategy Funds LLC ("WMSF"), OGI Associates LLC ("OGI"), Weiss Special Operations LLC ("WSPO"), and Weiss Multi-Strategy Advisers LLC ("WMSA").

**Where JSI is organized, and its corporate structure, are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

5.     Plaintiff Leucadia is a Delaware LLC and a subsidiary of Jefferies Financial Group.  Complaint, ECF No. 1, Ex. A ¶ 12.

**RESPONSE 5:  Not disputed, but irrelevant.  The assertions in paragraph 5 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b). Where LAM Holdings is organized, and its corporate structure, are irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

B.     **The Contracts Between Plaintiffs and Certain Weiss Companies**

6.     Jefferies has been in business with the Weiss Companies since 2018, when Leucadia entered into a "Strategic Relationship Agreement" with the Weiss Companies. Weiss Decl. ¶ 7; Declaration of Jeffrey Dillabough, dated November 5, 2024 ("Dillabough Decl.") ¶ 5.

**RESPONSE 6:  Not disputed that on or about May 1, 2018, LAM Holding LLC and GWA entered into a Strategic Relationship Agreement (as amended, the "Strategic Relationship Agreement").  (Balber Decl. Ex. 1-A).[2]  Also not disputed that, on or about October 18, 2018, LAM Holding LLC assigned all of its rights under the Strategic**

---

[2]     "Balber Decl." refers to the Declaration of Scott S. Balber (ECF No. 30).  References to "Ex. __" refer to the exhibits to the Balber Decl.

Relationship Agreement to LAM Holdings, pursuant to an Assignment and Assumption Agreement. (Dillabough Decl. Ex. 3 at 1; Balber Decl. Ex. 6 ¶ 26).[3]

Otherwise, disputed. Weiss defines "Jefferies" as JSI and LAM Holdings, and the "Weiss Companies," as including GWA, WMSF, OGI, WSPO, and WMSA. However, only LAM Holdings and GWA were parties to the Strategic Relationship Agreement. (*See* Balber Decl. Ex. 1-A). Weiss does not submit any evidence of a connection between JSI and any of the "Weiss Companies" as of 2018, and the proffered evidence shows only that LAM Holdings had a contractual relationship with GWA at that time, but not any of the other Weiss Companies. (*See id.*).

7.      As part of this arrangement, Jefferies provided financing to GWA through promissory notes. Weiss Decl. ¶ 7; Dillabough Decl. ¶ 5.

RESPONSE 7: Disputed. Under the Strategic Relationship Agreement, Leucadia Funding LLC, a non-party to this action, agreed to "open an investment account and fund it with $250,000,000 of Notional Value," and to share certain revenues and profits generated by GWA's business. (Balber Decl. Ex. 1-A at 1). The proffered evidence does not establish that JSI or LAM Holdings provided "financing to GWA through promissory notes" via the Strategic Relationship Agreement.

However, on or about December 3, 2019, GWA, WMSA, and JFG Funding LLC, entered into a Note Purchase Agreement (as amended, the "2019 Note Purchase Agreement"). (Balber Decl. Ex. 1-B). Then, on December 1, 2021, JFG Funding LLC and JSI entered into an Assignment and Assumption Agreement. (Balber Decl. Ex. 1-E). And, on or about September 21, 2022, GWA, WMSA, and JSI entered into a Note

---

[3]      "Dillabough Decl." refers to the Declaration of Jeffrey Dillabough (ECF No. 28). References to "Ex. __" refer to the exhibits to the Dillabough Decl.

Purchase Agreement (as amended, the "2022 Note Purchase Agreement" and collectively with the 2019 Note Purchase Agreement, the "Note Purchase Agreements"). (Balber Decl. Ex. 1-F). Pursuant to those Note Purchase Agreements, GWA issued three notes to JSI (the "Notes"). (Balber Decl. Exs. 1-C, 1-D, 1-G).

8.    Mr. Weiss is not personally a party to any of these agreements and did not guaranty any of the Weiss Companies' obligations. Weiss Decl. ¶ 7.

**RESPONSE 8: Disputed. It is not clear which "agreements" or "obligations" Weiss is referencing in paragraph 8. However, pursuant to a February 12, 2024 forbearance agreement (the "Forbearance Agreement"), the Weiss Companies "irrevocably and unconditionally guarantees to each of JSI and LAM Holdings . . . and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other Weiss Party when due . . . ." (Dillabough Decl. Ex. 3 § 3). And Weiss, in turn, guaranteed "the performance of the agreements of, the [Weiss Companies]," which included "the prompt and complete payment" of the "Guaranteed Obligations" as defined in the Forbearance Agreement. (*Id.* § 9).**

C.    <u>The Working Relationship Between the Weiss Companies and Jefferies</u>

9.    Beginning in 2018, Jefferies and the Weiss Companies worked cooperatively to market the Weiss Companies, including to Jefferies clients. Dillabough Decl. ¶ 7.

**RESPONSE 9: Not disputed, but irrelevant. The assertions in paragraph 9 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried." *See* S.D.N.Y. Local Civil Rule 56.1(b). Whether Jefferies and the Weiss Companies worked cooperatively at any point in the past to market the Weiss Companies is immaterial and irrelevant to this dispute.**

10.    Over the years, the Weiss Companies paid down a portion of the amounts owed to Jefferies under the Strategic Relationship Agreement and to JSI under the promissory notes, but the amounts continued to accrue.  The parties operated under the assumption that GWA would pay these amounts down as cash became available.  Weiss Decl. ¶ 8; Dillabough Decl. ¶ 6.

**RESPONSE 10:  Not disputed that amounts owed to Plaintiffs under the Strategic Relationship Agreement and Notes have "continued to accrue."  Disputed, however, that "[t]he parties operated under the assumption that GWA would pay these amounts down as cash became available."**

**First, that assertion is improper because it does not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  See S.D.N.Y. Local Civil Rule 56.1(b).  The parties' "assumptions" are subjective beliefs and not fact.**

**Second, that assertion is belied by the language of the Strategic Relationship Agreement and Note Purchase Agreements, which contain merger clauses disclaiming any unwritten understandings between the parties.  (Balber Decl. Ex. 1-A § 8; Balber Decl. Ex. 1-B § 14; Balber Decl. Ex. 1-F § 14).**

11.    The financial condition of the Weiss Companies was fully disclosed to Jefferies, and the Weiss Companies regularly provided Jefferies with financial records and projections.  Weiss Decl. ¶ 9.

**RESPONSE 11:  It is not clear what Weiss means by "financial condition" or by the term "fully disclosed" in paragraph 11.  It is undisputed that the Weiss Companies provided certain disclosures to the Plaintiffs pursuant to the agreements between the parties.  (See, e.g., Dillabough Decl. Ex. 3 § 2(a)).  To the extent Weiss is implying that**

**the disclosure of financial information somehow provides a defense to the claims in this action, disputed. The assertion that the Weiss Companies "fully disclosed" their financial condition is improper, because whether something is "fully disclosed" is subjective, and not a material fact "as to which it is contended that there exists a genuine issue to be tried."** *See* **S.D.N.Y. Local Civil Rule 56.1(b). In any event, the Weiss Companies' disclosures of financial information to the Plaintiffs are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

12.    In November 2023, Mr. Weiss began having discussions with a potential new strategic partner (the "Strategic Partner"). Weiss Decl. ¶ 10; Dillabough Decl. ¶ 8.

**RESPONSE 12: Not disputed, but irrelevant. The assertions in paragraph 12 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."** *See* **S.D.N.Y. Local Civil Rule 56.1(b). Discussions between Weiss and a potential new strategic partner are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

13.    Mr. Weiss promptly informed Jefferies's CEO, Richard Handler, and co-presidents Brian Friedman and Nick Daraviras, about these discussions. Weiss Decl. ¶ 11; Dillabough Decl. ¶ 9.

**RESPONSE 13: Not disputed, but irrelevant. The assertions in paragraph 13 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."** *See* **S.D.N.Y. Local Civil Rule 56.1(b). Discussions between Weiss and a potential new strategic partner, along with any notice Weiss provided to other members of the Weiss Companies, are immaterial and**

7

**irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

14.    Jefferies initially expressed support for the proposed transaction.  Weiss Decl. ¶ 11; Dillabough Decl. ¶ 9.

**RESPONSE 14:  Disputed.  It is not clear what Weiss means by "the proposed transaction" in paragraph 14 and, in turn, Plaintiffs cannot fully respond to this assertion.  In any event, the assertions in paragraph 14 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b).  Any proposed transaction with a potential new strategic partner, assuming that is what Weiss is referring to, is immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

**D.    Negotiations with the Strategic Partner and the Forbearance Agreement**

15.    On February 1, 2024, Jefferies sent the Weiss Companies a draft Forbearance Agreement (the "Draft Forbearance Agreement").  Weiss Decl. ¶ 13; Dillabough Decl. ¶ 11; Dillabough Decl. Ex. 1

**RESPONSE 15:  Not disputed.**

16.    This draft prohibited the Weiss Companies from paying "any bonus compensation or other compensation or other payment in excess of base salaries to any of their employees . . . in respect of any period" unless Jefferies agreed in its "sole and absolute discretion."  Dillabough Decl., Ex. 1 § 2(b).

**RESPONSE 16:  Not disputed.**

17.    In exchange, JSI offered not to seek relief under title 11 of the bankruptcy code or take any other enforcement action for at most five business days.  Dillabough Decl., Ex. 1 § 3.

**RESPONSE 17:  Not disputed.**

18.    Mr. Dillabough, general counsel to the Weiss Companies, informed Jefferies' representative Mr. Daraviras that the Weiss Companies could not agree to this provision and that the Weiss Companies had to maintain control over the payment of bonuses.  Dillabough Decl. ¶ 12.

**RESPONSE 18:  Disputed.**

**The assertions in paragraph 18 that "the Weiss Companies had to maintain control over the payment of bonuses" is improperly argumentative and a legal conclusion and should therefore be disregarded.  *Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002).  These assertions are also improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  Whether the Weiss Companies communicated to Plaintiffs the necessity of the "Weiss Companies . . . maintain[ing] control over the payment of bonuses" is immaterial and irrelevant to this matter, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

**In any event, Plaintiffs also dispute these assertions.  Dillabough did not inform anyone at the Plaintiffs that "the Weiss Companies had to maintain control over the payment of bonuses."**

**Instead, on February 8, 2024, Nicholas Daraviras sent an email to Michael Edwards ("Edwards"), a Deputy Chief Investment Officer at WMSA, Dillabough, and Weiss.  That email requested, in part, that the Weiss team:  "confirm that the**

management team at Weiss has not undertaken any fraudulent conveyance or other bad act contrary to [the Plaintiffs'] rights and the protection of [the Plaintiffs'] interests, including the transfer of any value out of OGI or any other Weiss entity or making any bonus or other payments to employees or other owners or related parties, and will not do so while Weiss is insolvent unless we are paid what is due to us but we need this to be evidenced in writing and legally enforceable." (Mot. to Convert Decl. ¶ 20).[4]

Dillabough responded to that email stating "I can assure you that we are operating the business in the normal course.  As we all agreed, it is in all of our interests not to disrupt the teams in order to preserve the value of the organization.  George is meeting with [a multi-fund manager] at 3pm to try to work through some (hopefully) final hurdles." (*Id.* ¶ 21).

Yet, far from operating in the "normal course," the Weiss Companies distributed approximately $30 million in bonuses and employee compensation that same day. (*Id.* ¶ 22).

19.    Mr. Dillabough and another representative of the Weiss Companies advised Mr. Daraviras that paying the bonuses was necessary for the Weiss Companies to survive and for the potential pending deal with the Strategic Partner to progress.  Dillabough Decl. ¶ 12; *see* Weiss Decl. ¶ 14.

**RESPONSE 19:  Disputed.**

---

[4]    "Mot. to Convert Decl." refers to the Decl. of Nicholas Daraviras in Support of Jefferies Strategic Investments, LLC And Leucadia Asset Management Holdings LLC Motion for Conversion of the Debtors' Cases to Chapter 7 Pursuant To 11 U.S.C. § 1112(B), In re Weiss Multi-Strategy Advisers LLC, No. 24-10743 (MG) (Bankr. S.D.N.Y.) (ECF No. 20-3).

A-941

The assertions in paragraph 19 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried." *See* S.D.N.Y. Local Civil Rule 56.1(b).  Any potential bonuses paid, or pending deal with a Strategic Partner are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.

In any event, Dillabough did not inform anyone at the Plaintiffs "that paying the bonuses was necessary for the Weiss Companies to survive and for the potential pending deal with the Strategic Partner to progress."

Instead, on February 8, 2024, Nicholas Daraviras sent an email to Edwards, Dillabough, and Weiss.  That email requested that Weiss and his team:  "confirm that the management team at Weiss has not undertaken any fraudulent conveyance or other bad act contrary to [the Plaintiffs'] rights and the protection of [the Plaintiffs'] interests, including the transfer of any value out of OGI or any other Weiss entity or making any bonus or other payments to employees or other owners or related parties, and will not do so while Weiss is insolvent unless we are paid what is due to us but we need this to be evidenced in writing and legally enforceable."  (Mot. to Convert Decl. ¶ 20).

Dillabough responded to that email stating "I can assure you that we are operating the business in the normal course.  As we all agreed, it is in all of our interests not to disrupt the teams in order to preserve the value of the organization.  George is meeting with [a multi-fund manager] at 3pm to try to work through some (hopefully) final hurdles."  (*Id.* ¶ 21).

Yet, far from operating in the "normal course," the Weiss Companies distributed approximately $30 million in bonuses and employee compensation that same day. (*Id.* ¶ 22).

20.    Mr. Dillabough also was concerned that delegating to a creditor this decision concerning the retention of the Weiss Companies' employees and compliance with its contractual commitments to the portfolio managers could breach the Weiss Companies' duties to their clients. Dillabough Decl. ¶ 12.

**RESPONSE 20: Disputed.**

The assertions in paragraph 20 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried." *See* S.D.N.Y. Local Civil Rule 56.1(b). Dillabough's subjective "concerns" over delegation are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.

In any event, Dillabough did not convey those "concerns" to the Plaintiffs. Instead, on February 8, 2024, Nicholas Daraviras sent an email to Edwards, Dillabough, and Weiss. That email requested that Weiss and his team: "confirm that the management team at Weiss has not undertaken any fraudulent conveyance or other bad act contrary to [the Plaintiffs'] rights and the protection of [the Plaintiffs'] interests, including the transfer of any value out of OGI or any other Weiss entity or making any bonus or other payments to employees or other owners or related parties, and will not do so while Weiss is insolvent unless we are paid what is due to us but we need this to be evidenced in writing and legally enforceable." (Mot. to Convert Decl. ¶ 20).

Dillabough responded to that email stating **"I can assure you that we are operating the business in the normal course. As we all agreed, it is in all of our interests not to disrupt the teams in order to preserve the value of the organization.  George is meeting with [a multi-fund manager] at 3pm to try to work through some (hopefully) final hurdles."  (*Id.* ¶ 21).**

Yet, far from operating in the **"normal course," the Weiss Companies distributed approximately $30 million in bonuses and employee compensation that same day.  (*Id.* ¶ 22).**

21. During the week of February 5, 2024, Jefferies threatened to seek a temporary restraining order from a court, including in an email to Mr. Dillabough, on February 8, 2024. Dillabough Decl. ¶ 13; Weiss Decl. ¶ 15.

**RESPONSE 21:  Disputed.**

The assertions in paragraph 21 are improper because they do not contain any material facts **"as to which it is contended that there exists a genuine issue to be tried." *See* S.D.N.Y. Local Civil Rule 56.1(b).  That "Jefferies" advised Weiss that it was considering seeking a temporary restraining order due to the conduct of Weiss and the Weiss Companies is immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

In any event, the assertion is misleading to the extent it suggests that the Plaintiffs lacked a legal basis for seeking a temporary restraining order.  Indeed, in early 2024, the Plaintiffs learned that the Weiss Companies were intending to pay, at the end of February 2024, approximately $30 million in bonuses and employee compensation, comprised of $2.7 million in "management fees," $8 million in staff and management bonuses, and $19.6 million in "strategy payouts," despite being hopelessly

**insolvent and owing the Plaintiffs nearly $100 million.  (Mot. to Convert Decl. ¶ 16).**
**The Weiss Companies, however, represented that that they would not make those**
**payments until the end of February 2024. (Mot. to Convert Decl. ¶¶ 16–22).  Concerned**
**that the Weiss Companies would deplete what little assets they had to pay back the**
**obligations owed to the Plaintiffs, Plaintiffs considered seeking a temporary restraining**
**order from a court.  Ultimately, Plaintiffs could not seek that relief, as, in direct**
**violation of their prior representations, the Weiss Companies surreptitiously made the**
**bonus payments on February 8, 2024, mooting any potential motion.  (*Id.* ¶¶ 16–22).**

22.     The email again demanded that the Weiss Companies not pay bonuses,
including bonuses that the Weiss Companies were contractually committed to pay to its
portfolio managers, even though Mr. Dillabough had just explained that failing to pay these
bonuses would destroy the firm and would jeopardize the negotiations with the potential
Strategic Partner. Dillabough Decl. ¶ 13; Weiss Decl. ¶ 14.

**RESPONSE 22:  Disputed.**

     **The assertions in paragraph 22 are improper because they do not contain any**
**material facts "as to which it is contended that there exists a genuine issue to be tried."**
***See* S.D.N.Y. Local Civil Rule 56.1(b).  Any purported "demands" made by Plaintiffs**
**are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to**
**pay amounts under a guarantee made to Plaintiffs.**

     **In any event, the cited email does not state that "failing to pay these bonuses**
**would destroy the firm and would jeopardize the negotiations with the potential**
**Strategic Partner."**

     **Instead, on February 8, 2024, Daraviras sent an email to Edwards, Dillabough,**
**and Weiss.  That email stated:  "confirm that the management team at Weiss has not**

undertaken any fraudulent conveyance or other bad act contrary to [the Plaintiffs'] rights and the protection of [the Plaintiffs'] interests, including the transfer of any value out of OGI or any other Weiss entity or making any bonus or other payments to employees or other owners or related parties, and will not do so while Weiss is insolvent unless we are paid what is due to us but we need this to be evidenced in writing and legally enforceable." (Mot. to Convert Decl. ¶ 20).

Dillabough responded to that email stating "I can assure you that we are operating the business in the normal course. As we all agreed, it is in all of our interests not to disrupt the teams in order to preserve the value of the organization.  George is meeting with [a multi-fund manager] at 3pm to try to work through some (hopefully) final hurdles." (*Id.* ¶ 21).

Yet, far from operating in the "normal course," the Weiss Companies distributed approximately $30 million in bonuses and employee compensation that same day.  (*Id.* ¶ 22).

23.    Mr. Weiss and Mr. Dillabough both viewed these threats as bullying tactics and an effort to gain leverage in connection with the negotiations with the Strategic Partner. Dillabough Decl. ¶ 14; Weiss Decl. ¶ 15.

**RESPONSE 23:  Not disputed, but irrelevant.  The assertions in paragraph 23 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  Weiss and Dillabough's "views" about any "threats" are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

**E.**    **The Superbowl Sunday Ultimatum**

24.    On February 11, 2024, Jefferies was told that the Weiss Companies had paid the bonuses due.  Dillabough Decl. ¶ 15.

**RESPONSE 24:  Not disputed, but irrelevant.  The assertions in paragraph 24 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  When the Weiss Companies told the Plaintiffs they had improperly paid out bonuses is immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

25.    On February 11, 2024, Jefferies CEO, Richard Handler, called Mr. Weiss and accused him of committing securities fraud in "stealing" Jefferies' money. Mr. Handler also said that there would be a public news article that would destroy Mr. Weiss's reputation and the reputations of key Weiss employees.  Weiss Decl. ¶ 17.

**RESPONSE 25:  Disputed.  The assertions in paragraph 25 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b).  Any discussions with any of Plaintiffs' representatives are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

**Moreover, in direct contrast to Weiss's current contention, each of the Strategic Relationship Agreement, Note Purchase Agreements, and Forbearance Agreement contain express merger clauses disclaiming any unwritten understandings or conversations between the parties.  (Balber Decl. Ex. 1-A § 8; Balber Decl. Ex. 1-B § 14; Balber Decl. Ex. 1-F § 14; Balber Decl. Ex. 1-F § 14; Dillabough Decl. Ex. 3 § 10(g)).**

**Thus, to the extent Weiss is implying that he signed the Forbearance Agreement as a result of the statements referred to in paragraph 25, such implication is denied.**

26.    Mr. Handler further threatened that unless Defendant signed a forthcoming revised forbearance agreement, Jefferies would sue Mr. Weiss and employees of the Weiss Companies. Mr. Handler did not mention a personal guarantee.  Weiss Decl. ¶ 17.

**RESPONSE 26:  Disputed.  The assertions in paragraph 26 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  Any discussions with any of Plaintiffs' representatives are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

**Moreover, in direct contrast to Weiss's current contention, each of the Strategic Relationship Agreement, Note Purchase Agreements, and Forbearance Agreement contain express merger clauses disclaiming any unwritten understandings or conversations between the parties.  (Balber Decl. Ex. 1-A § 8; Balber Decl. Ex. 1-B § 14; Balber Decl. Ex. 1-F § 14; Balber Decl. Ex. 1-F § 14; Dillabough Decl. Ex. 3 § 10(g)). Thus, to the extent Weiss is implying that he signed the Forbearance Agreement as a result of the statements referred to in paragraph 26, such implication is denied.**

27.    On February 11, 2024, Jefferies' outside counsel, Scott Balber, arranged a call between Mr. Weiss, Mr. Dillabough, Mr. Daraviras, and others.  During that call, Mr. Daraviras and Mr. Balber railed against Mr. Weiss and Mr. Dillabough.  Weiss Decl. ¶ 18; Dillabough Decl. ¶ 15.

**RESPONSE 27:  Disputed.  The assertions in paragraph 27 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b).  Any discussions with any of**

**Plaintiffs' representatives are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

**Moreover, in direct contrast to Weiss's current contention, each of the Strategic Relationship Agreement, Note Purchase Agreements, and Forbearance Agreement contain express merger clauses disclaiming any unwritten understandings or conversations between the parties.  (Balber Decl. Ex. 1-A § 8; Balber Decl. Ex. 1-B § 14; Balber Decl. Ex. 1-F § 14; Balber Decl. Ex. 1-F § 14; Dillabough Decl. Ex. 3 § 10(g)). Thus, to the extent Weiss is implying that he signed the Forbearance Agreement as a result of the phone call referred to in paragraph 27, such implication is denied.**

28.     They reiterated Mr. Handler's threat to ruin the reputations of everyone involved in a public litigation to be filed the following morning unless the Weiss Companies signed a new forbearance agreement they would send over later that evening.  Weiss Decl. ¶ 18; Dillabough Decl. ¶ 15.

**RESPONSE 28:  Disputed.  The assertions in paragraph 28 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b).  Any discussions with any of Plaintiffs' representatives are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

**Moreover, in direct contrast to Weiss's current contention, each of the Strategic Relationship Agreement, Note Purchase Agreements, and Forbearance Agreement contain express merger clauses disclaiming any unwritten understandings or conversations between the parties.  (Balber Decl. Ex. 1-A § 8; Balber Decl. Ex. 1-B § 14; Balber Decl. Ex. 1-F § 14; Balber Decl. Ex. 1-F § 14; Dillabough Decl. Ex. 3 § 10(g)).**

**Thus, to the extent Weiss is implying that he signed the Forbearance Agreement as a result of the statements referred to in paragraph 28, such implication is denied.**

29.    Plaintiffs also threatened to claw back compensation payments to employees, freeze the Weiss Companies' bank accounts and ruin Mr. Weiss's reputation in the industry. Weiss Decl. ¶ 18; Dillabough Decl. ¶ 15.

**RESPONSE 29: Disputed. The assertions in paragraph 29 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."** *See* **S.D.N.Y. Local Civil Rule 56.1(b). Any discussions with any of Plaintiffs' representatives are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

**Moreover, in direct contrast to Weiss's current contention, each of the Strategic Relationship Agreement, Note Purchase Agreements, and Forbearance Agreement contain express merger clauses disclaiming any unwritten understandings or conversations between the parties. (Balber Decl. Ex. 1-A § 8; Balber Decl. Ex. 1-B § 14; Balber Decl. Ex. 1-F § 14; Balber Decl. Ex. 1-F § 14; Dillabough Decl. Ex. 3 § 10(g)). Thus, to the extent Weiss is implying that he signed the Forbearance Agreement as a result of the statements referred to in paragraph 29, such implication is denied.**

30.    At no point did anyone on the February 11, 2024 call arranged by Mr. Balber discuss Mr. Weiss personally guaranteeing any amounts owed to Jefferies. Weiss Decl. ¶ 18; Dillabough Decl. ¶ 16.

**RESPONSE 30: Disputed. The assertions in paragraph 30 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."** *See* **S.D.N.Y. Local Civil Rule 56.1(b). Any discussions with any of**

**Plaintiffs' representatives are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

**Moreover, in direct contrast to Weiss's current contention, each of the Strategic Relationship Agreement, Note Purchase Agreements, and Forbearance Agreement contain express merger clauses disclaiming any unwritten understandings or conversations between the parties. (Balber Decl. Ex. 1-A § 8; Balber Decl. Ex. 1-B § 14; Balber Decl. Ex. 1-F § 14; Balber Decl. Ex. 1-F § 14; Dillabough Decl. Ex. 3 § 10(g)). Thus, to the extent Weiss is implying that he signed the Forbearance Agreement as a result of the phone call referred to in paragraph 30, such implication is denied.**

31.    On February 12, 2024, at 2:10 am and 2:20 am, Plaintiffs sent a revised Forbearance Agreement to the Weiss Companies and reminded them of the deadline to sign "by 7 am today, Monday, Feb 12" or face litigation.  Dillabough Decl. ¶ 17; Dillabough Decl., Ex. 2.

**RESPONSE 31:  Not disputed.**

32.    The Weiss Companies believed that Jefferies' threats would lead to the immediate demise of the Weiss Companies.  Dillabough Decl. ¶ 24.

**RESPONSE 32:  Not disputed, but irrelevant.  The assertions in paragraph 32 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b). The Weiss Companies' "beliefs" are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

33.    Before this point, only GWA and WMSA had contractual obligations to Jefferies— none of the remaining entities nor Mr. Weiss had any contractual obligations to Jefferies.  *See* Dillabough Decl. ¶ 22; *see also* Dillabough Decl., Ex. 3 Recitals.

**RESPONSE 33:  Not disputed, but irrelevant.  The assertions in paragraph 33 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b). Whether any parties other than GWA and WMSA "had contractual obligations to" the Plaintiffs before Weiss and Plaintiffs entered into the Forbearance Agreement is immaterial and irrelevant to this dispute, which turns only on Weiss's obligations under the Forbearance Agreement.**

34.    There was no discussion or negotiation concerning the terms of the draft forbearance agreement.  Jefferies sent the draft and demanded that Weiss sign it as written. Dillabough Decl. ¶ 17; Weiss Decl. ¶ 20.

**RESPONSE 34:  Disputed.**

**The assertions in paragraph 34 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried." *See* S.D.N.Y. Local Civil Rule 56.1(b).  Any discussions with any of Plaintiffs' representatives are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

**In any event, the cited evidence does not support Plaintiffs' assertion.  Instead, the Weiss and Dillabough declarations make clear that Weiss and the Weiss Companies refused to sign the Forbearance Agreement until they had negotiated an agreement acceptable to them.  For example, Weiss attests that on February 1, 2024, [Plaintiffs] emailed [his] team a draft 'forbearance agreement,'" which he and his companies "refused to sign . . . ."  (Weiss Decl. ¶¶ 13–14).[5]  Then, as Dillabough attests, "[o]n February 11, 2024, Superbowl Sunday, [he and Weiss] had a call with [representatives**

---

[5]    "Weiss Decl." refers to the Declaration of George Weiss (ECF No. 27).

for Plaintiffs including] outside and in-house counsel . . . ."  (Dillabough Decl. ¶ 11).
The outcome of that call was a revised forbearance agreement, which Dillabough
"reviewed."  (*See id.* ¶ 18).  Dillabough then "deleted . . . statements" from that
agreement.  (*Id.*).  Under Dillabough's advice, Weiss then agreed to the "revised version
of the forbearance agreement" by signing it and delivering it to the Plaintiffs.  (*Id.* ¶ 24,
Ex. 3; Weiss Decl. ¶ 19).

**F.**     **The Terms of the Forbearance Agreement**

35.     On February 12, 2024, at 4 am, the Weiss Companies and Mr. Weiss, under
threat of imminent public destruction, signed a modified version of the forbearance
agreement that Jefferies had sent.  Weiss Decl. ¶ 22; Dillabough Decl. ¶ 24; Dillabough
Decl., Ex. 2.

**RESPONSE 35:  Disputed in part.  Plaintiffs do not dispute that the Weiss Companies
and Weiss signed the Forbearance Agreement.  (Dillabough Decl. Ex. 3).  Plaintiffs
deny Weiss's speculation regarding the imminent "public destruction" of the Weiss
Companies, which is not a "fact," and, in any event, is immaterial.  Accordingly, it is
not a material fact "as to which it is contended that there exists a genuine issue to be
tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b).**

36.     Mr. Weiss signed a version of the Forbearance Agreement that the Weiss
Companies edited to remove two admissions Jefferies sought from Mr. Weiss and the Weiss
Companies – specifically, that the bonus payments were made "in contravention of the
statements made by the Weiss" Companies.  Dillabough Decl. ¶¶ 18, 24; Dillabough Decl.,
Ex. 4.

**RESPONSE 36:  Not disputed.**

37.    This version of the Forbearance Agreement has three categories of parties: the Weiss Companies; Mr. Weiss himself; and Jefferies.  *See* Dillabough Decl. ¶ 24; Dillabough Decl., Ex. 3.

**RESPONSE 37:  Disputed.  The cited evidence does not support Plaintiffs' assertion. Nothing in the Forbearance Agreement denotes "categories" of parties.  (*See* Dillabough Decl. Ex. 3).  Undisputed that Weiss, the Weiss Companies, and Plaintiffs were parties to the Forbearance Agreement.  (*Id.*).**

38.    Mr. Weiss was only a party to "Sections 5(a), 9, and 10(c)."  Dillabough Decl., Ex. 3 Preamble, Signatures.

**RESPONSE 38:  Not disputed, but irrelevant.  The assertions in paragraph 38 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b). Whether Weiss was a party to certain sections of the Forbearance Agreement other than his personal guarantee in section 9 is immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under the guarantee contained in section 9 of the Forbearance Agreement.**

     1)    **The Weiss Companies' Three Primary Obligations**

39.    Pursuant to the Forbearance Agreement, the Weiss Companies purported to undertake three primary obligations.  Dillabough Decl., Ex. 3 §§ 2-4.

**RESPONSE 39:  Disputed.  The cited evidence does not support Weiss's assertion that the Weiss Companies purported to undertake "three primary obligations."  (*See* Dillabough Decl. Ex. 3).  Nothing in the Forbearance Agreement states which of the Weiss Companies' obligations were "primary."**

40. First, Section 2 contains the "Weiss [Companies] Agreements," which generally required the Weiss Companies to provide specific information to Jefferies no later than 5:00 pm on February 13. Dillabough Decl. ¶ 20; Dillabough Decl., Ex. 3 § 2.

**RESPONSE 40: Disputed. The cited evidence does not support Plaintiffs' assertion that Section 2 "generally required the Weiss Companies to provide specific information to Jefferies no later than 5:00 pm on February 13." Rather Section 2 states, in full:**

**(a) To the extent they have not done so prior to the execution of this Agreement, the Weiss Parties agree to deliver the following information to the Jefferies Parties no later than 5:00 p.m. on February 13, 2024:**

**(i) A schedule of bonus payments made to each employee during 2024 including (A) the name of the recipient employee, (B) the aggregate amounts paid to such recipient employee, and (C) the date or dates on which such bonus payments were made to such employee.**

**(ii) Schedules of assets and liabilities of each of GWA, WMSF, OGI, WSPO, WMSA and each of their subsidiaries as of each of January 31, 2024 and February 9, 2024.**

**(iii) Copies of statements from each brokerage, futures, commodities, custodial, bank, deposit or similar account held by any of the entities referred to in clause (ii) above.**

**(iv) The name and address of each entity referred to in clause (ii) above and of each bank or brokerage firm where the accounts referred to in clause (iii) above are held.**

**(v) A schedule of each client account managed by WMSA or its affiliates (the "Weiss Client Accounts"), including the amount of any accrued but unpaid fees or allocations owed to WMSA from each Weiss Client Account.**

**(vi) The operative and offering documents of each Weiss Client Account, including each Private Placement Memorandum, Offering Memorandum, Limited Partnership Agreement, Limited Liability Company Agreement, Memorandum and Articles of Association, Investment Management Agreement and all similar documents.**

**(vii) Copies of every invoice for accrued but unpaid fees or allocation that have been sent to any Weiss Client.**

**(b) The Weiss Parties agree to provide promptly, and in any event within 24 hours of such request, any other information requested by the Jefferies Parties related to the Weiss Parties' and any of their subsidiaries' respective financial operations or financial conditions, the Past Due Obligations or the representations or obligations set forth in this Agreement.**

**(c) The Weiss Parties hereby agree that none of them will (i) pay, grant or transfer (directly or indirectly) to any other person or entity an aggregate amount in excess of $10,000 on any day, except for payments made in the course of normal course trading consistent with past practices (*e.g.*, payments to prime and executing brokers, payments against delivery and payments to ISDA counterparties), (ii) take any action or fail to take any action that may result in OGI's net assets being reduced or diminished in any respect other than permitting normal course trading consistent with past practices or (iii) take any other action or fail to take any action that would be reasonably expected to reduce the net asset value of the Weiss Parties or their subsidiaries, in each case without the prior written consent of the Jefferies Parties, which may be granted or withheld in their sole and absolute discretion.**

**(Dillabough Decl. Ex. 3 § 2).**

41.    The "Weiss [Companies] Agreements" also include that they would not make any payment, grant or transfer in excess of $10,000 "except for payments made in the course of normal trading consistent with past practices" "without the prior written consent of [Jefferies], which may be granted or withheld in their sole and absolute discretion." Dillabough Decl. ¶ 20; Dillabough Decl., Ex. 3 § 2(c).

**RESPONSE 41:  Not disputed.**

42.    Second, in Section 3 of the Forbearance Agreement, the Weiss Companies, other than GWA and definitionally excluding Mr. Weiss, purported to guaranty "the prompt and complete payment and performance by GWA and each other Weiss [Company] when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations . . . [under] any Note Purchase Agreement, any Note, the [Strategic

Relationship] Agreement [and] this Agreement. . . ."  Dillabough Decl., Ex. 3 § 3(a); *see* Dillabough Decl. ¶ 22.

**RESPONSE 42:  Disputed.  The cited evidence misleadingly omits portions of Section 3 of the Forbearance Agreement, which states, in full:**

> **(a) Guaranty of Obligations. Each Weiss Party (other than GWA) hereby irrevocably and unconditionally guarantees to each of JSI and LAM Holdings (collectively, the "Beneficiaries") and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other Weiss Party when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations (as herein defined).  This guaranty shall remain in full force and effect until the Guaranteed Obligations are paid in full, notwithstanding any increase in the amount of the Guaranteed Obligations or any modification or amendment of any instrument governing the Guaranteed Obligations.  As used herein, the term "Guaranteed Obligations" shall mean all the obligations of GWA and each other Weiss Party arising under any Note Purchase Agreement, the Notes, the SR Agreement and this Agreement, and any loss, damage, penalty, action, judgment, suit, cost, expense, disbursement, liability, claim or other obligation, incurred by or behalf of any Beneficiary (including but not limited to reasonable out-of-pocket attorneys' fees and costs) arising out or, relating to or in connection with any Note Purchase Agreement, any Note, the SR Agreement, this Agreement or the transaction contemplated thereby.**

**(Dillabough Decl. Ex. 3 § 3(a)).**

43.    Section 3 turned each of WMSF, OGI, and WSPO into guarantors for the notes and the SR Agreement.  *See* Dillabough Decl. ¶ 22; Dillabough Decl., Ex. 3 § 3(a).

**RESPONSE 43:  Disputed.  The cited evidence misleadingly omits the complete section, which states, in full:**

> **(a) Guaranty of Obligations. Each Weiss Party (other than GWA) hereby irrevocably and unconditionally guarantees to each of JSI and LAM Holdings (collectively, the "Beneficiaries") and their successors, transferees and**

> **assigns as a primary obligor the prompt and complete payment and performance by GWA and each other Weiss Party when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations (as herein defined). This guaranty shall remain in full force and effect until the Guaranteed Obligations are paid in full, notwithstanding any increase in the amount of the Guaranteed Obligations or any modification or amendment of any instrument governing the Guaranteed Obligations. As used herein, the term "Guaranteed Obligations" shall mean all the obligations of GWA and each other Weiss Party arising under any Note Purchase Agreement, the Notes, the SR Agreement and this Agreement, and any loss, damage, penalty, action, judgment, suit, cost, expense, disbursement, liability, claim or other obligation, incurred by or behalf of any Beneficiary (including but not limited to reasonable out-of-pocket attorneys' fees and costs) arising out or, relating to or in connection with any Note Purchase Agreement, any Note, the SR Agreement, this Agreement or the transaction contemplated thereby.**

**(Dillabough Decl. Ex. 3 § 3(a)).**

44.    Section 3 was clear that the "guaranty [was] an irrevocable, absolute, and continuing guaranty of the full and punctual payment and performance and not a guaranty of collection." Dillabough Decl., Ex. 3 § 3(b).

**RESPONSE 44:  Not disputed.**

45.    Third, the Weiss Companies agreed to grant Jefferies a security interest in all of their assets. Dillabough Decl., Ex. 3 § 4(a).

**RESPONSE 45:  Not disputed.**

46.    Section 5 of the Forbearance Agreement, the "Representations," set forth several representations from the Weiss Companies, including, among others, representations that they were authorized to enter the agreements, that no default of the underlying agreements had occurred, and that the financial statements were correct. Dillabough Decl., Ex. 3 § 5.

**RESPONSE 46:  Disputed.  The Forbearance Agreement specifically acknowledged that GWA was in default under the Notes, stating:  "Each party agrees that pursuant to the terms of the Note Purchase Agreements, the Notes and the Redemption Notice, GWA is past due with respect to the following payment obligations to JSI (each calculated as of January 15, 2024):  (i) $23,650,410.10 on the Note dated December 3, 2019, (ii) $27,457,310.08 on the Note dated January 13, 2020 and (iii) $3,420,395.60 on the Note dated September 21, 2022 (collectively, the "Past Due Obligations").  Each party further agrees that the Past Due Obligations are owed without defense, set-off or counter claim, and are past due."  (Dillabough Decl. Ex. 3 § 1).**

2)    **Mr. Weiss's Limited Obligations**

47.    The Forbearance Agreement provides that Mr. Weiss was only a party "for purposes of Section 5(a), 9, and 10(c)."  Dillabough Decl., Ex. 3 Preamble, Signatures.

**RESPONSE 47:  Not disputed, but irrelevant.  The assertions in paragraph 47 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b).  Whether Weiss was a party to certain sections of the Forbearance Agreement other than his personal guarantee in section 9 is immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under the guarantee contained in section 9 of the Forbearance Agreement.**

48.    Section 5(a) is a limited representation that the contract is enforceable, subject to "equitable principles relating to enforceability."  Dillabough Decl., Ex. 3 § 5(a).

**RESPONSE 48:  Disputed.  The cited evidence misleadingly fails to quote the entirety of Section 5(a), which states, in full:**

> **Each Weiss Party and Weiss hereby represents and warrants that (x) this Agreement has been duly executed**

28

> **and delivered by such Weiss Party and Weiss and (y) this Agreement is the legal, valid and binding obligation of such Weiss Party and Weiss, and is enforceable against each such Weiss Party and Weiss, in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by equitable principles relating to enforceability.**

**(Dillabough Decl. Ex. 3 § 5(a)).**

49.    Section 10(c) is a purported acknowledgement that the agreement was supported by "reasonably equivalent value." Dillabough Decl., Ex. 3 § 10(c).

**RESPONSE 49:  Disputed.  The cited evidence misleadingly fails to quote the entirety of Section 10(c), which states in full:**

> **Each Weiss Party and Weiss acknowledges and agrees that it is receiving a direct benefit from the transactions contemplated by this Agreement, and the terms of this Agreement, including the guaranty provided herein and the security interests granted herein, constitute reasonably equivalent value for the benefit it is receiving from entering into this Agreement. Each Weiss Party and Weiss agrees that it shall not, nor shall it cause, directly or indirectly, any person controlled by, or under common control with, it, to take any action inconsistent with the terms of this Agreement. Each party represents and warrants that it has full power and authority to enter into and perform this Agreement, and that the person executing this Agreement on behalf of that party has been properly authorized and empowered to enter into this Agreement and to bind that party hereto.**

**(Dillabough Decl. Ex. 3 § 10(c)).**

50.    Section 9 provides:

> Weiss unconditionally and irrevocably personally guarantees to the Jefferies Entities the accuracy of the representations made by, and the performance of the agreements of, the Weiss [Companies] hereunder. Weiss further agrees that he shall take all actions within his control, including by exercising all of his voting, governance management and other rights and powers with respect to each of the other Weiss [Companies], any of their subsidiaries and any of his personal or his family's

trusts to cause such persons to comply with the terms of this agreement. Dillabough Decl., Ex. 3 § 9.

**RESPONSE 50:  Not disputed.**

51.    The reference to the "agreements of[] the Weiss [Companies] hereunder" in Section 9 is a direct reference to Section 2, the "Weiss [Companies] Agreements," which required Mr. Weiss to use his authority to ensure the performance of those agreements by the Weiss Companies.  Dillabough Decl., Ex. 3 § 2.

**RESPONSE 51:  Disputed.  The assertion is improperly argumentative and a legal conclusion and should therefore be disregarded.  *Epstein*, 210 F. Supp. 2d at 314.  In any event, the statement is also not supported by the evidence.  Under the Forbearance Agreement, the Weiss Companies "irrevocably and unconditionally guarantees to each of JSI and LAM Holdings . . . and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other Weiss Party when due . . . ."  (Dillabough Decl. Ex. 3 § 3).  Weiss, in turn, guaranteed "the performance of the agreements of, the [Weiss Companies]," which included "the prompt and complete payment" of the "Guaranteed Obligations" as defined in the Forbearance Agreement.  (*Id.* § 9).**

52.    Nowhere in the agreement does Mr. Weiss guarantee any payment, much less "the full and punctual payment and performance" guaranteed by Weiss Companies. Dillabough Decl., Ex. 3 §§ 3(b), 9.

**RESPONSE 52:  Disputed.  The assertion is improperly argumentative and a legal conclusion and should therefore be disregarded.  *Epstein*, 210 F. Supp. 2d at 314.  In any event, the statement is also not supported by the evidence.  Under the Forbearance Agreement, the Weiss Companies "irrevocably and unconditionally guarantees to each of JSI and LAM Holdings . . . and their successors, transferees and assigns as a primary**

obligor the prompt and complete payment and performance by GWA and each other Weiss Party when due . . . ." (Dillabough Decl. Ex. 3 § 3). Weiss, in turn, guaranteed "the performance of the agreements of, the [Weiss Companies]," which included "the prompt and complete payment" of the "Guaranteed Obligations" as defined in the Forbearance Agreement. (*Id.* § 9).

53.    There is no provision in the Forbearance Agreement pursuant to which Mr. Weiss personally guaranteed payment of over $50 million in notes or note purchase agreements. Dillabough Decl. ¶ 25; *see* Dillabough Decl., Ex. 3.

**RESPONSE 53:  Disputed.  The assertion is improperly argumentative and a legal conclusion and should therefore be disregarded.** *Epstein*, **210 F. Supp. 2d at 314.  In any event, the statement is also not supported by the evidence.  Under the Forbearance Agreement, the Weiss Companies "irrevocably and unconditionally guarantees to each of JSI and LAM Holdings . . . and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other Weiss Party when due . . . ." (Dillabough Decl. Ex. 3 § 3).  Weiss, in turn, guaranteed "the performance of the agreements of, the [Weiss Companies]," which included "the prompt and complete payment" of the "Guaranteed Obligations" as defined in the Forbearance Agreement.  (*Id.* § 9).**

54.    There is also no provision in the Forbearance Agreement pursuant to which Mr. Weiss personally guaranteed payment of over $50 million allegedly due under the Strategic Relationship Agreement. Dillabough Decl. ¶ 25; *see* Dillabough Decl., Ex. 3.

**RESPONSE 54:  Disputed.  The assertion is improperly argumentative and a legal conclusion and should therefore be disregarded.** *Epstein*, **210 F. Supp. 2d at 314.  In any event, the statement is also not supported by the evidence.  Under the Forbearance**

Agreement, the Weiss Companies "irrevocably and unconditionally guarantees to each of JSI and LAM Holdings . . . and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other Weiss Party when due . . . ."  (Dillabough Decl. Ex. 3 § 3).  Weiss, in turn, guaranteed "the performance of the agreements of, the [Weiss Companies]," which included "the prompt and complete payment" of the "Guaranteed Obligations" as defined in the Forbearance Agreement.  (*Id.* § 9).

55.    At no point prior to the initiation of this lawsuit did Jefferies ever discuss with Mr. Weiss a $100 million guaranty of the Weiss Companies' corporate debts or assert that Section 9 could be understood to include a personal payment guarantee.  Weiss Decl. ¶ 31

**RESPONSE 55:  Disputed.  The assertions in paragraph 55 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b).  Any discussions with any of Plaintiffs' representatives are immaterial and irrelevant to this dispute because the Forbearance Agreement contains an express merger clause disclaiming any unwritten understandings or conversations between the parties.  (Dillabough Decl. Ex. 3 § 10(g)).**

**Moreover, under the Forbearance Agreement, the Weiss Companies "irrevocably and unconditionally guarantees to each of JSI and LAM Holdings . . . and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other Weiss Party when due . . . ." (Dillabough Decl. Ex. 3 § 3).  Weiss, in turn, guaranteed "the performance of the agreements of, the [Weiss Companies]," which included "the prompt and complete payment" of the "Guaranteed Obligations" as defined in the Forbearance Agreement. (*Id.* § 9).**

**3)    JSI's Sole Obligation Under the Forbearance Agreement.**

56.    JSI had a single obligation under the Forbearance Agreement: it simply agreed to forbear from commencing an action to recover under the notes against the Weiss Companies for no more than two business days.  Dillabough Decl., Ex. 3 § 6.

**RESPONSE 56:  Disputed.  Plaintiffs misleadingly omit portions of Section 6 of the Forbearance Agreement, which states in full:**

> **In exchange for the Weiss Parties agreeing to and complying with the terms of this Agreement, JSI agrees to (a) forbear from seeking relief or exercising any remedies under title 11 of the United State Code (the "Bankruptcy Code"), including, but not limited to, commencing an involuntary case against GWA under sections 301 or 303 of the Bankruptcy Code, as well as initiating or causing the initiation of an assignment for the benefit of creditors proceeding, a receivership or other similar insolvency proceeding and (b) forbear from filing an Enforcement Action, in each case, for the period (the "Forbearance Period") beginning on the date hereof until the earlier of (x) two Business Days after such date or (y) the occurrence of any Forbearance Default, except that the Forbearance Period will be automatically extended by an additional one Business Day at the conclusion of the Forbearance Period unless the Jefferies Parties give written notice of a termination of the Forbearance Period to the Weiss Parties on or prior to the conclusion of the Forbearance Period. (For the avoidance of doubt, the Forbearance Period shall automatically terminate upon the occurrence of a Forbearance Default.) For the purposes hereof, "Forbearance Default" shall mean the occurrence of any of the events described on Exhibit A attached hereto and "Business Day" shall have the meaning given to such term in the SR Agreement."**

**(Dillabough Decl. Ex. 3 § 6).**

57.    JSI did not agree to forego suit against Mr. Weiss or any Weiss Companies' employees for any period.  Dillabough Decl., Ex. 3 § 6.

**RESPONSE 57:  Disputed.  Weiss misleadingly omits portions of Section 6 of the Forbearance Agreement, which states in full:**

**In exchange for the Weiss Parties agreeing to and complying with the terms of this Agreement, JSI agrees to (a) forbear from seeking relief or exercising any remedies under title 11 of the United State Code (the "Bankruptcy Code"), including, but not limited to, commencing an involuntary case against GWA under sections 301 or 303 of the Bankruptcy Code, as well as initiating or causing the initiation of an assignment for the benefit of creditors proceeding, a receivership or other similar insolvency proceeding and (b) forbear from filing an Enforcement Action, in each case, for the period (the "Forbearance Period") beginning on the date hereof until the earlier of (x) two Business Days after such date or (y) the occurrence of any Forbearance Default, except that the Forbearance Period will be automatically extended by an additional one Business Day at the conclusion of the Forbearance Period unless the Jefferies Parties give written notice of a termination of the Forbearance Period to the Weiss Parties on or prior to the conclusion of the Forbearance Period. (For the avoidance of doubt, the Forbearance Period shall automatically terminate upon the occurrence of a Forbearance Default.) For the purposes hereof, "Forbearance Default" shall mean the occurrence of any of the events described on Exhibit A attached hereto and "Business Day" shall have the meaning given to such term in the SR Agreement."**

**(Dillabough Decl. Ex. 3 § 6).**

58.     Leucadia had no obligations whatsoever under the Forbearance Agreement.

*See* Dillabough Decl., Ex. 3.

**RESPONSE 58: Disputed. In the Forbearance Agreement, LAM Holdings agreed to submit to jurisdiction in the New York courts and litigate any cases under New York Law. (Dillabough Decl. Ex. 3 § 9(h)).**

**G.      Jefferies Rejects the "Unilaterally Modified" Forbearance Agreement**

59.     At 8:53 am on February 12, 2024, Jefferies' outside attorney, Mr. Balber, wrote a letter to the Weiss Companies stating that the Weiss Companies' edits to the Forbearance Agreement were not acceptable. Dillabough Decl. ¶ 27; Dillabough Decl., Ex. 5.

**RESPONSE 59:  Disputed.  The letter from Plaintiffs' outside attorney does not state that the edits to the Forbearance agreement "were not acceptable."  Instead, the letter states that the Weiss "unilaterally modified portions of the draft Forbearance Agreement, including by deleting the Weiss Parties' acknowledgement that they had previously stated that the bonus payments would not be made until the second half of February 2024 . . . ."  (Dillabough Decl. Ex. 5).  The letter then notes that Plaintiffs "expect[ed] the Weiss Parties to abide by the representations made to the Jefferies Parties in the unilaterally modified Forbearance Agreement."  (*Id.*).**

60.     Mr. Balber explained, "At 2:20 a.m. this morning, the Jefferies Parties provided you with a draft Forbearance Agreement, pursuant to which they offered to temporarily forego commencing any Enforcement Action against the Weiss [Companies] during the Forbearance Period. As part of that offer, the Jefferies Parties required that: the Weiss [Companies] admit that they had made statements to the Jefferies Parties that they would not make certain bonus payments under the second half of February 2024 . . . [and] admit that they had paid the bonuses on February 8, 2024."  Dillabough Decl., Ex. 5 (emphasis added).

**RESPONSE 60:  Not disputed.**

61.     As a result of the Weiss Companies' deletion of the required admissions, Jefferies made clear that there was no agreement, but nonetheless demanded that, "in the meantime," the Weiss Companies comply with their representations and the agreement to produce financial records.  Dillabough Decl., Ex. 5.

**RESPONSE 61:  Disputed.  The letter does not state that "there was no agreement."  Instead, the letter states that the Weiss "unilaterally modified portions of the draft Forbearance Agreement, including by deleting the Weiss Parties' acknowledgement**

that they had previously stated that the bonus payments would not be made until the second half of February 2024 . . . ." (Dillabough Decl. Ex. 5). The letter then notes that Plaintiffs "expect[ed] the Weiss Parties to abide by the representations made to the Jefferies Parties in the unilaterally modified Forbearance Agreement." (*Id.*).

62.    The letter also noted that the "Jefferies Parties reserve[d] all of their rights to bring claims and pursue remedies arising from the Weiss [Companies'] misconduct." Dillabough Decl., Ex. 5.

**RESPONSE 62:  Not disputed.**

63.    In other words, Jefferies informed the Weiss Companies that it was not bound by its sole obligation not to bring a claim to enforce the notes.  Dillabough Decl. Ex. 5; Dillabough Decl. Ex. 3 § 6.

**RESPONSE 63:  Disputed.**

**This assertion is improperly argumentative and a legal conclusion and should therefore be disregarded.  *Epstein*, 210 F. Supp. 2d at 314.  In any event, the assertion is not supported by the evidence.  The letter from Plaintiffs' outside attorney does not state that Plaintiffs were "not bound by [their] sole obligation not to bring a claim to enforce the notes."  Instead, the letter states that Weiss "unilaterally modified portions of the draft Forbearance Agreement, including by deleting the Weiss Parties' acknowledgement that they had previously stated that the bonus payments would not be made until the second half of February 2024 . . . ."  (Dillabough Decl. Ex. 5).  The letter then notes that Plaintiffs "expect[ed] the Weiss Parties to abide by the representations made to the Jefferies Parties in the unilaterally modified Forbearance Agreement." (*Id.*).**

The assertion also misleadingly ignores the objective steps Plaintiffs took reflecting that they accepted the Forbearance Agreement as modified.

For instance, under the Forbearance Agreement, the Plaintiffs were required to forbear from bringing suit until the "earlier of (x) two Business Days after such date or (y) the occurrence of any Forbearance Default." (Dillabough Decl. Ex. 3 § 6). Plaintiffs did just that, only notifying Weiss that they were considering exercising their rights five days after entering into the Forbearance Agreement. (*See* Dillabough Decl. Ex. 6).

Similarly, consistent with the Forbearance Agreement, on February 13, 2024, just one day after entering into the Forbearance Agreement, JSI filed a UCC Financing Statement with the New York Department of State, recording the security interests granted in the Forbearance Agreement. (Balber Decl. Ex. 1 ¶ 22; Ex. 1-J).

64.    Jefferies never signed the Forbearance Agreement.  Dillabough Decl. ¶ 28.

RESPONSE 64:  Not disputed, but irrelevant.  The assertions in paragraph 64 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b). Whether or not Plaintiffs signed the Forbearance Agreement is immaterial and irrelevant to this dispute, given the ample evidence the Plaintiffs otherwise agreed to the Forbearance Agreement.

For instance, under the Forbearance Agreement, the Plaintiffs were required to forbear from bringing suit until the "earlier of (x) two Business Days after such date or (y) the occurrence of any Forbearance Default." (Dillabough Decl. Ex. 3 § 6). Plaintiffs did just that, only notifying Weiss that they were considering exercising

**their rights five days after entering into the Forbearance Agreement.  (*See* Dillabough Decl. Ex. 6).**

**Similarly, consistent with the Forbearance Agreement, on February 13, 2024, just one day after entering into the Forbearance Agreement, JSI filed a UCC Financing Statement with the New York Department of State, recording the security interests granted in the Forbearance Agreement.  (Balber Decl. Ex. 1 ¶ 22; Ex. 1-J).**

65.    During the week of February 12, in the hopes that Jefferies would refocus on negotiations with the Strategic Partner, the Weiss Companies transmitted the information requested in the Forbearance Agreement — most of which Jefferies already possessed. Dillabough Decl. ¶ 28.

**RESPONSE 65:  Not disputed, but irrelevant.  The assertions in paragraph 65 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b). The Weiss Companies' "hopes" are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

66.    The Weiss Companies did not comply with certain provisions of the purported forbearance agreement, such as setting up account control agreements, since Jefferies never accepted or signed the modified Forbearance Agreement that Mr. Dillabough had sent them.  Dillabough Decl. ¶ 28.

**RESPONSE 66:  Not disputed, but irrelevant.  The assertions in paragraph 66 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b). The Weiss Companies' additional breaches of the Forbearance Agreement are**

**immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

67.    On February 15, 2024, GWA repaid $3 million owed under the notes. Dillabough Decl. ¶ 29.

**RESPONSE 67:  Not disputed.**

68.    Both the Weiss Companies and Jefferies refocused on the transaction with the Strategic Partner, exchanging numerous term sheets and discussing what amount Jefferies would accept to be bought out of its position.  Dillabough Decl. ¶ 29.

**RESPONSE 68:  Not disputed, but irrelevant.  The assertions in paragraph 68 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b). The Weiss Companies' negotiations with the Strategic Partner are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

69.    The negotiations with the Strategic Partner included paying Jefferies a $30 million payment from the Strategic Partner, and additional consideration of approximately $12 million from the Weiss Companies, in full satisfaction of the amounts owed to Jefferies. Weiss Decl. ¶ 25; Dillabough Decl. ¶ 8.

**RESPONSE 69:  Disputed.**

**The assertions in paragraph 69 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried." *See* S.D.N.Y. Local Civil Rule 56.1(b).  The Weiss Companies' negotiations with the Strategic Partner are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

In any event, Plaintiffs were not aware of any offer of a "$30 million payment." Instead, as of February 23, 2024, Weiss sent Nicholas Daraviras an email indicating that the strategic partner proposed "$25-30mm for Weiss to repay Leucadia and obtain FULL RELEASE from Leucadia of any future obligations" but that "Leucadia treatment" was still not "specified" and was a "next step."  (Suppl. Mot. to Convert Decl. Ex. A).[6]  Daraviras responded on February 26, 2024, proposing terms which were acceptable to Plaintiffs.  These included "$30MM cash from" the strategic partner. (Suppl. Mot. to Convert Decl. Ex. B).  Weiss rejected that proposal highlighting that "he did]n't care how much he owe[d]" Plaintiffs.  (*Id.*).  Within the next two days, Daraviras was told that the proposed deal between the Weiss Companies and the strategic partner had fallen through because the strategic partner had concerns regarding certain portfolio managers associated with the Weiss Companies.  (Suppl. Mot. to Convert Decl. ¶ 11).

### H.    The Weiss Companies Shut Down and Jefferies Ramps Up Threats of Litigation to Maximize Its Payment

70.    On February 17, five days after rejecting the "unilaterally modified Forbearance Agreement," Mr. Daraviras emailed Mr. Dillabough a draft complaint (the "February Draft Complaint"). Dillabough Decl. ¶ 30; Dillabough Decl., Ex. 6; Weiss Decl. ¶ 26.

**RESPONSE 70:  Not disputed that, on February 17, 2024, "Mr. Daraviras emailed Mr. Dillabough a draft complaint," but that fact is irrelevant.**

---

[6]    "Suppl. Mot. to Convert Decl." refers to the Suppl. Decl. of Nicholas Daraviras in Support of Jefferies Strategic Investments, LLC And Leucadia Asset Management Holdings LLC Motion for Conversion of the Debtors' Cases to Chapter 7 Pursuant To 11 U.S.C. § 1112(B), *In re Weiss Multi-Strategy Advisers LLC*, No. 24-10743 (MG) (Bankr. S.D.N.Y.) (ECF No. 46-3).  References to "Suppl. Mot. to Convert Decl. Ex. __" refer to the exhibits to the Suppl. Mot. to Convert Decl.

The assertions in paragraph 70 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried." *See* S.D.N.Y. Local Civil Rule 56.1(b).  Any action contemplated by the Plaintiffs after the Forbearance Agreement's "Forbearance Period" expired are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.

Disputed that the Plaintiffs "reject[ed] the 'unilaterally modified Forbearance Agreement.'"  Plaintiffs did no such thing.  Under the Forbearance Agreement, the Plaintiffs were required to forbear from bringing suit until the "earlier of (x) two Business Days after such date or (y) the occurrence of any Forbearance Default." (Dillabough Decl. Ex. 3 § 6).  Plaintiffs did just that, only notifying Weiss that they were considering exercising their rights five days after entering into the Forbearance Agreement.  (*See* Dillabough Decl. Ex. 6).

Similarly, consistent with the Forbearance Agreement, on February 13, 2024, just one day after entering into the Forbearance Agreement, JSI filed a UCC Financing Statement with the New York Department of State, recording the security interests granted in the Forbearance Agreement.  (Balber Decl. Ex. 1 ¶ 22; Ex. 1-J).

71.    The February Draft Complaint was a threat to sue Mr. Weiss, GWA, WMSA, and 79 other employees of the Company personally.  Dillabough Decl. ¶ 30; Dillabough Decl., Ex. 6; Weiss Decl. ¶ 26.

RESPONSE 71:  Not disputed, but irrelevant.  The assertions in paragraph 71 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  Any action contemplated by the Plaintiffs after the Forbearance Agreement's "Forbearance Period" expired are immaterial and

**irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

72. The February Draft Complaint does not reference the Forbearance Agreement. *See* Dillabough Decl. Ex. 6.

**RESPONSE 72: Not disputed, but irrelevant. The assertions in paragraph 72 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried." *See* S.D.N.Y. Local Civil Rule 56.1(b). Whether the "February Draft Complaint" references the Forbearance Agreement is immaterial and irrelevant to this dispute, which turns on the allegations made in the Complaint that was filed in this action.**

73. The February Draft Complaint does not allege that Mr. Weiss guaranteed the corporate debts owed to Jefferies. *See* Dillabough Decl., Ex. 6.

**RESPONSE 73: Not disputed, but irrelevant. The assertions in paragraph 73 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried." *See* S.D.N.Y. Local Civil Rule 56.1(b). Whether the "February Draft Complaint" alleges that Weiss guaranteed the corporate debts owed to Plaintiffs is immaterial and irrelevant to this dispute, which turns on the allegations made in the Complaint that was filed in this action.**

74. After transmitting the February Draft Complaint, Jefferies rejected the $30 million offer made by the Strategic Partner and demanded $50 million in cash. Weiss Decl. ¶ 28; Dillabough Decl. ¶ 31.

**RESPONSE 74: Disputed.**

**The assertions in paragraph 74 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."**

*See* **S.D.N.Y. Local Civil Rule 56.1(b).  The Weiss Companies' negotiations with the Strategic Partner are immaterial and irrelevant to this dispute, which turns only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

**In any event, Plaintiffs did not reject any "$30 million payment."  Instead, as of February 23, 2024, Weiss sent Nicholas Daraviras an email indicating that the strategic partner proposed "$25-30mm for Weiss to repay Leucadia and obtain FULL RELEASE from Leucadia of any future obligations" but that "Leucadia treatment" was still not "specified" and was a "next step."  (Suppl. Mot. to Convert Decl. Ex. A). Daraviras responded on February 26, 2024, proposing terms which were acceptable to Plaintiffs.  These included "$30MM cash from" the strategic partner.  (Suppl. Mot. to Convert Decl. Ex. B).  Weiss rejected that proposal highlighting that "he did[n't care how much he owe[d]" Plaintiffs.  (*Id.*).  Within the next two days, Daraviras was told that the proposed deal between the Weiss Companies and the strategic partner had fallen through because the strategic partner had concerns regarding certain portfolio managers associated with the Weiss Companies.  (Suppl. Mot. to Convert Decl. ¶ 11). At no point did the Plaintiffs reject the proposal offered by the strategic partner.  (*Id.* ¶¶ 4–6, 12).**

75.    On February 28, 2024, the Strategic Partner informed Mr. Weiss that it would not agree to the transaction at the level that Jefferies was demanding. Weiss Decl. ¶ 29; Dillabough Decl. ¶ 31.

**RESPONSE 75:  Disputed.**

**The assertions in paragraph 75 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b).  The Weiss Companies' negotiations**

**with the Strategic Partner are immaterial and irrelevant to this dispute, which turns**

**only on Weiss's failure to pay amounts under a guarantee made to Plaintiffs.**

      **In any event, Plaintiffs were informed that the proposed deal between the**

**Weiss Companies and the strategic partner had fallen through because the strategic**

**partner had concerns regarding certain portfolio managers associated with the Weiss**

**Companies, and not because "it would not agree to the transaction at the level that**

**[Plaintiffs were] demanding."  (Suppl. Mot. to Convert Decl. ¶ 11).**

      76.    On March 26, 2024, Jefferies, through counsel, Mr. Balber, sent a second

draft complaint (the "March Draft Complaint").  Dillabough Decl. ¶ 32; Dillabough Decl.,

Ex. 7; Weiss Decl. ¶ 30.

**RESPONSE 76:  Not disputed, but irrelevant.  The assertions in paragraph 76 are**

**improper because they do not contain any material facts "as to which it is contended**

**that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b).**

**Whether the Plaintiffs "sent a second draft complaint" to Weiss is immaterial and**

**irrelevant to this dispute, which turns on the allegations made in the Complaint filed**

**in this action.**

      77.    The March Draft Complaint dropped the 79 employees from the suit, and

alleged that Mr. Weiss and "his close cronies" abused their position and treated the

companies as their "personal piggy bank."  *See* Dillabough Decl., Ex. 7 ¶ 1.

**RESPONSE 77:  Not disputed, but irrelevant.  The assertions in paragraph 77 are**

**improper because they do not contain any material facts "as to which it is contended**

**that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b).**

**Whether the "March Draft Complaint dropped the 79 employees from the suit, and**

**alleged that Mr. Weiss and 'his close cronies' abused their position and treated the**

companies as their 'personal piggy bank'" is immaterial and irrelevant to this dispute, which turns on the allegations made in the Complaint filed in this action.

78.    The March Draft Complaint does not allege that Mr. Weiss personally guaranteed the corporate debts owed to Jefferies. Dillabough Decl., Ex. 7 ¶¶ 70-78.

**RESPONSE 78:  Not disputed, but irrelevant.  The assertions in paragraph 78 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b). Whether the "March Draft Complaint . . . allege[s] that . . . Weiss personally guaranteed the corporate debts owed to" Plaintiffs is immaterial and irrelevant to this dispute, which turns on the allegations made in the Complaint filed in this action.**

79.    The sole allegation regarding Mr. Weiss's breach of the Forbearance Agreement was that he "fail[ed] to take all actions within his control" to prevent the Weiss Companies from making the March 1 payments to vendors.  Dillabough Decl., Ex. 7 ¶¶ 76, 106-09.

**RESPONSE 79:  Not disputed, but irrelevant.  The assertions in paragraph 79 are improper because they do not contain any material facts "as to which it is contended that there exists a genuine issue to be tried."  *See* S.D.N.Y. Local Civil Rule 56.1(b). Any allegations in draft complaints not before the Court are immaterial and irrelevant to this dispute, which turns on the allegations made in the Complaint filed in this action.**

80.     The Demand for Relief summarizes Jefferies' understanding that Mr. Weiss
could only be found liable for a breach of the Weiss Party Agreements, not for a Section 3
guaranty:

> WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor
> and against defendants as follows:
>
> (a)     On the First Cause of Action, a judgment in JSI's favor and against GWA,
> WMSA, WMSF, OGI, and WSPO for money damages in an amount to be
> determined at trial, but believed to be not less than $49,832,562.00, representing
> the outstanding principal and interest owed to JSI under the Notes;
>
> (b)     On the Second Cause of Action, a judgment in LAM Holdings' favor and against
> GWA, WMSA, WMSF, OGI, and WSPO for money damages in an amount to be
> determined at trial, but believed to be not less than $50,597,604.00, representing
> all outstanding principal and interest owed to LAM Holdings under the Strategic
> Relationship Agreement as of December 31, 2023;
>
> (c)     On the Third and Fourth Causes of Action, a judgment in Plaintiffs' favor and
> against the Insiders voiding the voidable transfers set forth above;
>
> (d)     On the Fifth Cause of Action, a judgment in JSI's and LAM Holdings' favor and
> against GWA, WMSA, WMSA, WMSF, OGI, WSPO, and George Weiss for
> money damages in an amount to be determined at trial, but believed to be not less
> than $470,370.98, representing the amounts transferred by GWA and WMSA in
> breach of the February Forbearance Agreement on March 1, 2024;

*Dillabough Decl., Ex. 7, Demand for Relief (emphasis added).*

**RESPONSE 80:  Disputed.  Plaintiffs understood, and currently contend, that Weiss**
**can be liable for failing to perform under his guarantee of any of the Weiss Companies'**
**obligations, including their payment obligations.  Under the Forbearance Agreement,**
**the Weiss Companies "irrevocably and unconditionally guarantees to each of JSI and**
**LAM Holdings . . . and their successors, transferees and assigns as a primary obligor**
**the prompt and complete payment and performance by GWA and each other Weiss**
**Party when due . . . ."  (Dillabough Decl. Ex. 3 § 3).  Weiss, in turn, guaranteed "the**
**performance of the agreements of, the [Weiss Companies]," which included "the**
**prompt and complete payment" of the "Guaranteed Obligations" as defined in the**
**Forbearance Agreement.  (*Id.* § 9).**

**Moreover, any allegations in draft complaints not before the Court are immaterial and irrelevant to this dispute, which turns on the allegations made in the Complaint filed in this action.**

81.    At no point before, during or after the signing of the Forbearance Agreement did anyone communicate to Mr. Weiss that Mr. Weiss might be personally responsible for the entire amount owed.  Weiss Decl. ¶¶ 3, 21, 23, 31.

**RESPONSE 81:  Disputed.  Under the Forbearance Agreement, the Weiss Companies "irrevocably and unconditionally guarantees to each of JSI and LAM Holdings . . . and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other Weiss Party when due . . . ."  (Dillabough Decl. Ex. 3 § 3).  Weiss, in turn, guaranteed "the performance of the agreements of, the [Weiss Companies]," which included "the prompt and complete payment" of the "Guaranteed Obligations" as defined in the Forbearance Agreement. (*Id.* § 9).**

\*     \*     \*

**PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS**

82.    On or about May 1, 2018, LAM Holding LLC and GWA entered into the Strategic Relationship Agreement.  (Balber Decl. Ex. 1-A).

83.    On or about October 18, 2018, LAM Holding LLC assigned all of its rights under the Strategic Relationship Agreement to LAM Holdings, pursuant to an Assignment and Assumption Agreement.  (Dillabough Decl. Ex. 3 at 1; Balber Decl. Ex. 6 ¶ 26).

84.    On or about December 3, 2019, GWA, WMSA, and JFG Funding LLC, entered into the 2019 Note Purchase Agreement.  (Balber Decl. Ex. 1-B).

85.    On December 1, 2021, JFG Funding LLC and JSI entered into an Assignment and Assumption Agreement.  (Balber Decl. Ex. 1-E).

86.    On or about September 21, 2022, GWA, WMSA, and JSI entered into the 2022 Note Purchase Agreement.  (Balber Decl. Ex. 1-F).

87.    The Forbearance Agreement contains a broad merger clause which provides that:

> All agreements, covenants, representations and warranties, express or implied, oral and written, of the parties hereto concerning the subject matter hereof, are contained herein. No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any party hereto to any other concerning the subject matter hereof.  All prior and contemporaneous conversations, negotiations, possible and alleged agreements, representations, covenants and warranties concerning the subject matter hereto are merged herein.

(Dillabough Decl. Ex. 3 § 10(g)).

88.    On February 13, 2024, JSI filed a UCC Financing Statement with the New York Department of State.  (Balber Decl. Ex. 1 ¶ 22; Ex. 1-J).

89.    On April 29, 2024, GWA, WMSA, WSPO, and OGI filed voluntary petitions for relief pursuant to Chapter 11 of the United States Bankruptcy Code.  (Balber Decl. Exs. 2–5).

90.    On or about June 11, 2024, WMSA filed a List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (the "WMSA Statement").  The WMSA Statement reflects that WMSA owes LAM Holdings $52,473,259.00."  (Balber Decl. Ex. 7).

91.    Those amounts are owed to LAM Holdings pursuant to the Strategic Relationship Agreement.  (*See* Balber Decl. Ex. 1-A, Balber Decl. Ex. 7).

92.    The WMSA Statement further reflects that WMSA owes JSI $43,190,924.00. (Balber Decl. Ex. 7).

93.     Those amounts are owed to JSI under the Notes.  (*See* Balber Decl. Exs. 1-C, 1-D, 1-G; Balber Decl. Ex. 7).

94.     On or about June 11, 2024, GWA filed a List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (the "GWA Statement").  The GWA Statement reflects that GWA owes LAM Holdings $52,473,259.00.  (Balber Decl. Ex. 8).

95.     Those amounts are owed to LAM Holdings pursuant to the Strategic Relationship Agreement.  (*See* Balber Decl. Ex. 1-A, Balber Decl. Ex. 8).

96.     The GWA Statement further reflects that GWA owes JSI $43,190,924.00. (Balber Decl. Ex. 8).

97.     Those amounts are owed to JSI under the Notes.  (*See* Balber Decl. Exs. 1-C, 1-D, 1-G; Balber Decl. Ex. 8).

98.     On or about June 11 2024, OGI filed a List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (the "OGI Statement").  The OGI Statement reflects that OGI owes LAM Holdings $52,473,259.00.  (Balber Decl. Ex. 9).

99.     Those amounts are owed to LAM Holdings pursuant to the Strategic Relationship Agreement.  (*See* Balber Decl. Ex. 1-A, Balber Decl. Ex. 9).

100.    The OGI Statement further reflects that OGI owes JSI $43,190,924.00. (Balber Decl. Ex. 9).

101.    Those amounts are owed to JSI under the Notes.  (*See* Balber Decl. Exs. 1-C, 1-D, 1-G; Balber Decl. Ex. 9).

102.    On or about June 11, 2024, WSPO filed a List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders (the "WSPO Statement").  The WSPO Statement reflects that WSPO owes LAM Holdings $52,473,259.00.  (Balber Decl. Ex. 10).

103.    Those amounts are owed to LAM Holdings pursuant to the Strategic Relationship Agreement.  (*See* Balber Decl. Ex. 1-A, Balber Decl. Ex. 10).

104.    The WSPO Statement further reflects that WSPO owes JSI $43,190,924.00. (Balber Decl. Ex. 10).

105.    Those amounts are owed to JSI under the Notes.  (*See* Balber Decl. Exs. 1-C, 1-D, 1-G; Balber Decl. Ex. 10).

106.    On June 19, 2024, WMSF filed a voluntary petition for relief pursuant to Chapter 11 of the United States Bankruptcy Code.  (Balber Decl. Ex. 11).

107.    On or about June 28, 2024, WMSF filed the Global Notes, Methodology and Specific Disclosures Regarding WMSF's Schedules of Assets and Liabilities and Statement of Financial Affairs (the "WMSF Statement").  The WMSF Statement reflects that WMSF owes LAM Holdings $52,473,259.00.  (Balber Decl. Ex. 12).

108.    Those amounts are owed to LAM Holdings pursuant to the Strategic Relationship Agreement.  (*See* Balber Decl. Ex. 1-A, Balber Decl. Ex. 12).

109.    The WMSF Statement further reflects that WMSF owes JSI $43,190,924.00. (Balber Decl. Ex. 12).

110.    Those amounts are owed to JSI under the Notes.  (*See* Balber Decl. Exs. 1-C, 1-D, 1-G; Balber Decl. Ex. 12).

111.    On April 29, 2024, GWA, WMSA, WSPO, and OGI commenced an adversary proceeding against the Jefferies Parties captioned *GWA, LLC et al v. Jefferies Strategic Investments, LLC et al.*, No. 24-01350 (MG).  (Balber Decl. Ex. 13).

112.    On June 25, 2024, the Weiss Companies filed an amended complaint in the Adversary Proceeding.  (Balber Decl. Ex. 14).

113.    In the amended complaint in the Adversary Proceeding, the Weiss Companies "demand[ed] judgment holding that the Amended Forbearance Agreement [and, in turn, the personal guarantee contained therein] is null and void, and unenforceable" reasoning that there was not a "meeting of the minds" because Plaintiffs "never executed and returned the Amended Forbearance Agreement," but instead "indicated that they did not agree with certain of the modified terms." (Balber Decl. Ex 14 ¶¶ 120, 123).

114.    On July 16, 2024, Plaintiffs moved to dismiss the Weiss Companies' amended complaint in part. (*See* Balber Decl. Ex. 15).

115.    On August 6, 2024, the Weiss Companies filed an opposition to the Plaintiffs' motion to dismiss. (*See* Balber Decl. Ex. 16).

116.    On September 11, 2024, the Bankruptcy Court held a hearing on the Plaintiffs' (defendants in the adversary proceeding) motion to dismiss. (Balber Decl. Ex. 17).

117.    Weiss's personal counsel, who is also representing Weiss in this matter, appeared at the hearing on the motion to dismiss. (*Id.* 45:5–15).

A-982

Dated:  New York, New York
       November 22, 2024

Respectfully submitted,

HERBERT SMITH FREEHILLS
  NEW YORK LLP

By: /s/ *Scott S. Balber*
    Scott S. Balber
    Michael P. Jones
    Daniel Gomez
200 Park Avenue
New York, New York 10166
Tel: (917) 542-7810
Fax: (917) 542-7601
Email:    Scott.Balber@hsf.com
           Michael.Jones@hsf.com
           Daniel.Gomez@hsf.com

*Attorneys for Plaintiffs*
*Jefferies Strategic Investments, LLC and*
*Leucadia Asset Management Holdings LLC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS LLC, <br><br> Plaintiffs, <br><br> -against- <br><br> GEORGE WEISS, <br><br> Defendant. | Case No. 1:24-cv-04369-AKH |

**JEFFERIES STRATEGIC INVESTMENTS, LLC AND LEUCADIA**
**ASSET MANAGEMENT HOLDINGS LLC'S MEMORANDUM OF LAW IN**
**OPPOSITION TO GEORGE WEISS'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..................................................................................ii

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF FACTS ....................................................................................3

    I.    Weiss Executes the Forbearance
           Agreement to Protect the George Weiss Companies ...................................3

    II.   Plaintiffs Accept the Forbearance Agreement by their Conduct ..................5

    III.  The George Weiss Companies Declare Bankruptcy
           and the Bankruptcy Court Rejects Weiss's Arguments ................................5

ARGUMENT .........................................................................................................7

    I.    The Forbearance Agreement is Enforceable ...............................................8

          A.    Weiss is Collaterally Estopped from Disputing
                the Enforceability of the Forbearance Agreement ..........................8

          B.    There Was a "Meeting of the Minds" as a Matter of Law ............10

    II.   Weiss Personally Guaranteed His Companies' Payment Obligations ........14

          A.    Weiss is Collaterally Estopped
                from Disputing His Payment Obligation .......................................14

          B.    Weiss's Guarantee Requires Payment as a Matter of Law ............14

          C.    Weiss's Textual Arguments are Unavailing .................................15

CONCLUSION ....................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

<b>Page(s)</b>

*Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*,
    578 F. Supp. 3d 467 (S.D.N.Y. 2022) ...................................................... 11

*Am. Trading Co. v. Fish*,
    42 N.Y.2d 20 (1977)..................................................................... 15, 17

*Asesores y Consejeros Aconsec CIA, S.A. v. Glob. Emerging Markets N. Am., Inc.*,
    841 F. Supp. 2d 762 (S.D.N.Y. 2012) ...................................................... 12

*Bazak Int'l Corp. v. Tarrant Apparel Grp.*,
    378 F. Supp. 2d 377 (S.D.N.Y. 2005) ...................................................... 11

*Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*,
    310 F. Supp. 2d 556 (S.D.N.Y. 2003) ...................................................... 16

*Eldor Contracting Corp. v. Cnty. of Nassau*,
    272 A.D.2d 509 (2d Dep't 2000).......................................................... 13

*Fernicola v. Specific Real Prop. in Possession,*
    *Custody, Control of Healthcare Underwriters Mut. Ins. Co.*,
    2001 WL 1658257 (S.D.N.Y. Dec. 26, 2001) ......................................... 9, 14

*GWA, LLC v. Jefferies Strategic Inv., LLC*
    *(In re Weiss Multi-Strategy Advisers LLC)*,
    2024 WL 4276161 (Bankr. S.D.N.Y. Sept. 24, 2024)............................... 6, 7, 10

*HSH Nordbank AG v. Street*,
    421 Fed. App'x 70 (2d Cir. 2011) .......................................................... 7

*J. Pub. Co. v. Am. Home Assur. Co.*,
    740 F. Supp. 1015 (S.D.N.Y. 1990) ....................................................... 19

*Kaplan v. Bennett*,
    465 F. Supp. 555 (S.D.N.Y. 1979) .......................................................... 8

*Keis Distribs., Inc. v. Northern Distrib. Co.*,
    226 A.D.2d 967 (3d Dep't 1996)........................................................... 11

*Kensington House Co. v. Oram*,
    293 A.D.2d 304 (1st Dep't 2002) ........................................................... 7

*Merch. Cash & Cap., LLC v. Haute Soc'y Fashion, Inc.*,
    2017 WL 2912452 (E.D.N.Y. July 6, 2017)........................................... 15, 17

*Muscatello v. Artco Chem. Inc.*,
    251 A.D.2d 882 (3d Dep't 1998) ............................................................................. 12

*Quadrant Structured Prod. Co. v. Vertin*,
    23 N.Y.3d 549 (2014) ............................................................................................. 18

*Richman v. Brookhaven Servicing Corp.*,
    80 Misc. 2d 563 (Dist. Ct. Suffolk Cnty. 1975) ........................................................ 12

*Roche Diagnostics GmbH v. Enzo Biochem, Inc.*,
    992 F. Supp. 2d 213 (S.D.N.Y. 2013) ................................................................... 14

*Savignano v. Play*,
    210 A.D.3d 1228 (3d Dep't 2022) ......................................................................... 13

*Sterling Investor Servs., Inc. v. 1155 Nobo Assocs., LLC*,
    30 A.D.3d 579 (2d Dep't 2006) ............................................................................. 18

*Superior Funding Corp. v. Big Apple Cap. Corp.*,
    738 F. Supp. 1468 (S.D.N.Y. 1990) ................................................................ 9, 10

*Taj Int'l Corp. v. Bashian & Sons, Inc.*,
    674 N.Y.S.2d 307 (1st Dep't 1998) ........................................................................ 11

*Tucker Leasing Cap. Corp. v. Pizzuti Dev., Inc.*,
    1992 WL 554186 (E.D.N.Y. Jan. 7, 1992) ............................................................. 16

*U.S. Bank N.A. v. Perlmutter*
*(In re S. Side House, LLC)*,
    470 B.R. 659 (Bankr. E.D.N.Y. 2012) ..................................................................... 8

*U.S. Tr. Co. of N.Y. v. Sec. Planners, Inc.*,
    238 A.D.2d 114 (1st Dep't 1997) ........................................................................... 18

*Wang v. Pataki*,
    396 F. Supp. 2d 446 (S.D.N.Y. 2005) ................................................................ 9, 14

*WCW, Inc. v. Atlantis Indus., Inc.*,
    698 F.Supp.3d 708 (D. Vt. 2023) .......................................................................... 11

*Westside Winery, Inc. v. SMT Acquisitions, LLC*,
    2022 WL 4329735 (E.D.N.Y. Sept. 19, 2022) ....................................................... 11

**Rules**

Fed. R. App. P. 4 ....................................................................................................... 10

iii

Plaintiffs Jefferies Strategic Investments, LLC ("JSI") and Leucadia Asset Management Holdings LLC ("LAM Holdings," and with JSI, "Plaintiffs"), by and through their undersigned counsel, respectfully submit this memorandum of law in opposition to the motion for summary judgment (ECF No. 24; the "Motion") filed by defendant George Weiss ("Weiss").

## PRELIMINARY STATEMENT

Weiss moves for summary judgment seeking to disavow the plain terms of an agreement he signed and to relitigate a dispute he already lost. The Motion should be denied.

In February 2024, a group of hedge fund companies bearing Weiss's name (the "George Weiss Companies") owed approximately $100 million to Plaintiffs. In a calculated effort to protect those entities from Plaintiffs' imminent collection activities, Weiss entered into a Forbearance Agreement with Plaintiffs on behalf of the George Weiss Companies and in his personal capacity. As part of that agreement, Plaintiffs agreed to temporarily "forbear from seeking relief or exercising any remedies under title 11 of the United State Code," and from bringing any "enforcement action, suit, litigation, claim or other action" to recover the amounts owed by the George Weiss Companies. (CSUF ¶ 56).

In return, the George Weiss Companies agreed to guarantee each other's obligations, provide security for their obligations, and furnish Plaintiffs with certain information. (CSUF ¶¶ 40–45). And Weiss, personally, agreed that he "unconditionally and irrevocably personally guarantee[] to [the Plaintiffs] . . . the performance of the agreements of, the [George Weiss Companies] hereunder." (CSUF ¶ 50). As the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") has already held when analyzing the Forbearance Agreement, that guarantee constitutes a promise from Weiss to ensure the "prompt and complete payment" of the George Weiss Companies' obligations "when due." *See GWA, LLC v. Jefferies*

1

*Strategic Inv., LLC (In re Weiss Multi-Strategy Advisers LLC)*, 2024 WL 4276161, at *28 (Bankr. S.D.N.Y. Sept. 24, 2024).

Nonetheless, through this Motion, Weiss seeks an order declaring that: (i) he is not bound by the Forbearance Agreement—even though he signed it and Plaintiffs performed under it—because there was no "meeting of the minds"; and (ii) the personal guarantee contained in the Forbearance Agreement does not guarantee the George Weiss Companies' payment obligations (even though it does exactly that). Neither of these arguments has any merit.

Weiss's contention that there was not a "meeting of the minds" ignores reality and fails as a matter of law. The record unequivocally shows, and the Bankruptcy Court already found as a matter of law, that Plaintiffs accepted the Forbearance Agreement through their objective actions, including by filing U.C.C. financing statements which perfected security interests granted to them in the Forbearance Agreement. Weiss is precluded from relitigating this issue here.

Weiss's argument that the Forbearance Agreement does not contain a "payment guarantee" is equally misplaced. Under well-settled New York law, a personal guarantee of "performance," like the one here extends, of course, to the performance of the underlying payment obligation. For that very reason, the Bankruptcy Court specifically rejected Weiss's identical argument. Weiss attempts to avoid this well-settled law by vainly ignoring the Bankruptcy Court's decision, and introducing after-the-fact affidavits attesting to what Weiss and his subordinates now claim they believed when he signed the Forbearance Agreement. This extrinsic evidence is irrelevant and should not be considered as any basis to undermine the words in the document Weiss signed. Indeed, the Forbearance Agreement contains a clear, unambiguous, and unavoidable merger clause that expressly precludes the consideration of the kind of extraneous "facts" which Weiss seeks to deploy here.

2

Accordingly, because Weiss contractually guaranteed the George Weiss Companies' payment obligations, the Motion should be denied.

## STATEMENT OF FACTS

### I.  Weiss Executes the Forbearance Agreement to Protect the George Weiss Companies

Defendant George Weiss is the founder of the George Weiss Companies.  (CSUF ¶ 1).[1] From 2018 to 2022, one of those companies—GWA, LLC ("GWA")—entered into several agreements with Plaintiffs, pursuant to which GWA assumed certain payment obligations to Plaintiffs.  (CSUF ¶¶ 6–7, 82–86).  At least $95,664,183.00 is due and owing under those agreements and, as of February 12, 2024, Plaintiffs were entitled to pursue the entirety of those amounts.  (*See* CSUF ¶¶ 90–105, 107–110, Balber Decl. Ex. 1-I).[2]

In his Motion, Weiss creates a one-sided account of the negotiations that occurred in early 2024 regarding this indebtedness.  (*See generally* Weiss Memo at 5–6).[3]  While Plaintiffs disagree with nearly every single implication of this narrative (and note that it is uncontested that Plaintiffs had previously provided the George Weiss Companies with *years* of forbearances), Weiss's entire exercise is irrelevant.  What matters is that on February 12, 2024, in a calculated move to protect his companies from Plaintiffs' collection efforts, Weiss—a 46-year veteran of the hedge fund business, who was being directly counselled by experienced counsel—reviewed, amended, and then signed the Forbearance Agreement.  (CSUF ¶¶ 2–3, 35).

---

[1]    "CSUF" refers to the Plaintiffs' Responses to Defendant George Weiss's Statement of Material Facts Pursuant to Local Rule 56.1.

[2]    "Balber Decl." refers to the Declaration of Scott S. Balber (ECF No. 30).  References to "Ex. __" refer to the exhibits to the Balber Decl.

[3]    "Weiss Memo" refers to Defendant George Weiss's Memorandum of Law in Support of Motion for Summary Judgment (ECF No. 25).

Section 3(a) of the Forbearance Agreement provides that each of the George Weiss Companies, "(other than GWA) . . . irrevocably and unconditionally guarantees to each of JSI and LAM Holdings . . . and their successors, transferees and assigns as a primary obligor the prompt and complete payment and performance by GWA and each other [of the George Weiss Companies] when due (whether at the stated maturity, by acceleration or otherwise) of the Guaranteed Obligations (as herein defined)." (CSUF ¶ 43). The Guaranteed Obligations included, *inter alia*, "all the obligations of GWA and each other [of the George Weiss Companies] arising under any Note Purchase Agreement, the Notes, the [Strategic Relationship] Agreement and this Agreement . . . ." (CSUF ¶¶ 43–44).

George Weiss also agreed to a sweeping personal guarantee of the George Weiss Companies' performance under the Forbearance Agreement. The personal guarantee provides:

> ***Weiss unconditionally and irrevocably personally guarantees*** to the [Plaintiffs] the accuracy of the representations made by, and ***the performance of the agreements of, the [George Weiss Companies] hereunder***. Weiss further agrees that he shall take all actions within his control, including by exercising all of his voting, governance, management and other rights and powers with respect to each of the other Weiss Parties, any of their subsidiaries and any of his personal or his family's trusts to cause such persons to comply with the terms of this Agreement.

(CSUF ¶ 50 (emphasis added)).

In addition, the Forbearance Agreement contains a broad merger clause which provides that:

> All agreements, covenants, representations and warranties, express or implied, oral and written, of the parties hereto concerning the subject matter hereof, are contained herein. No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any party hereto to any other concerning the subject matter hereof. All prior and contemporaneous conversations, negotiations, possible and alleged agreements, representations, covenants and warranties concerning the subject matter hereto are merged herein.

4

(CSUF ¶ 87).

## II. Plaintiffs Accept the Forbearance Agreement by their Conduct

The record is clear that Plaintiffs offered not to enforce their rights against Weiss and the George Weiss Companies in exchange for Weiss and his companies' agreeing to the terms of the Forbearance Agreement.  The record is equally clear that Weiss and the George Weiss Companies, all represented by experienced counsel, accepted that offer and agreed to the terms of the Forbearance Agreement.  And, the record is also clear that Plaintiffs performed under the Forbearance Agreement.  Under the Forbearance Agreement, the Plaintiffs were required to forbear from bringing suit until the "earlier of (x) two Business Days after such date or (y) the occurrence of any Forbearance Default."  (CSUF ¶ 56).  Plaintiffs did just that: they did not bring any actions against the Weiss Companies within the two business days following its execution. (*See* CSUF ¶ 70).  They also did not threaten to bring any actions against the Weiss Companies in those two days.  (*See* CSUF ¶ 70).

Moreover, on February 13, 2024—one day after Weiss executed the Forbearance Agreement—JSI filed a UCC Financing Statement with the New York Department of State, recording the security interests granted to it through the Forbearance Agreement.  (CSUF ¶ 88).

## III. The George Weiss Companies Declare Bankruptcy and the Bankruptcy Court Rejects Weiss's Arguments

Notwithstanding their obligations under the Forbearance Agreement, the George Weiss Companies failed to make payment of any of the Guaranteed Obligations.  (CSUF ¶¶ 90–105, 107–110).  As of this filing, the George Weiss Companies admit that they owe—either pursuant to the pre-existing contractual agreements or the Forbearance Agreement—$95,664,183.00 to Plaintiffs. (CSUF ¶¶ 90–105, 107–110).  Not a single penny of that has been paid, either by the George Weiss Companies or by Weiss as guarantor.

Instead, on April 29, 2004, the George Weiss Companies filed voluntary petitions under chapter 11 of title 11 of the United States Code.  Simultaneously, the George Weiss Companies filed an adversary proceeding against the Plaintiffs which sought, in relevant part, to invalidate the Forbearance Agreement, including Weiss's personal guarantee.  (CSUF ¶ 111).  As part of that adversary proceeding, both Weiss and the George Weiss Companies had a full and fair opportunity to present their arguments that Weiss's guarantee was not a "payment guarantee," but lost their arguments.  (CSUF ¶¶ 115–117).  The Bankruptcy Court expressly and unequivocally rejected the argument raised by Weiss, holding that "*a strict construction of the 2024 Forbearance Agreement, even in Weiss's favor, makes clear that Weiss's performance guarantee was also a guarantee of payment*."  *GWA, LLC*, 2024 WL 4276161, at *28 (emphasis added).

The George Weiss Companies also "demand[ed] judgment holding that the Amended Forbearance Agreement [and, in turn, the personal guarantee contained therein] is null and void, and unenforceable" reasoning that there was not a "meeting of the minds" because Plaintiffs "never executed and returned the Amended Forbearance Agreement," but instead "indicated that they did not agree with certain of the modified terms."  (CSUF ¶ 113).

The Bankruptcy Court expressly rejected that argument as well, finding—as a matter of law—as follows:

> The Debtors further allege that the . . . Forbearance Agreement should be deemed null and void as the Jefferies Entities' actions "*further indicated that they had no intention of complying*" with its terms, including "*subsequent continued correspondence and threat to commence action against the Debtors and their employees*."  The Jefferies Entities' actions taken after the Debtors signed the . . . Forbearance Agreement suggest otherwise. Therefore, the FAC has not alleged sufficient facts to support a plausible claim that the Jefferies Entities did not intend to comply with the terms of the 2024 Forbearance Agreement.

*GWA, LLC*, 2024 WL 4276161, at *24 (emphasis added) (citations omitted).  The Bankruptcy Court supported that decision and found that Plaintiffs established their agreement to the terms of the Forbearance Agreement by taking "'objective' actions [that] show[ed] that they intended to be bound by the [] Forbearance Agreement," including by (i) "fil[ing] UCC-1 financing statements to perfect the security interests granted under the [] Forbearance Agreement"; and (ii) by refraining from bringing suit, or providing the George Weiss Companies with notice that they intended to bring suit, until after they fulfilled their agreement to forbear.  *Id.* at *25.

Weiss's Motion ignores that binding decision.  Instead, Weiss cites to a letter that was sent by Plaintiffs' counsel shortly following Weiss's execution of the Forbearance Agreement.  Weiss claims that letter announced that Plaintiffs were "not bound by [their] sole obligation not to bring a claim against the [George] Weiss Companies to enforce the notes."  (Weiss Memo at 10).  But the letter says no such thing.  Rather, in direct contrast to Weiss's current contention, the letter states that Plaintiffs "expect[ed] the Weiss Parties to abide by the representations made to [Plaintiffs] in the unilaterally modified Forbearance Agreement."  (*Id.*).

Now, through this Motion, Weiss repeats both of the arguments that the Bankruptcy Court expressly rejected, and claims that he is entitled—as a matter of law—to dismissal of the guarantee claims that have been asserted against him.  (Weiss Memo at 13–23).  For the reasons set forth below, Weiss's Motion must be denied.

## ARGUMENT

To establish its right to summary judgment dismissing a breach of guarantee claim, a guarantor must show that there is no triable fact that there is:  (i) no guaranty; (ii) no underlying debt; or (iii) no failure to perform under the guarantee.  *HSH Nordbank AG v. Street*, 421 Fed. App'x 70, 72 (2d Cir. 2011) (quoting *Kensington House Co. v. Oram*, 293 A.D.2d 304, 305 (1st Dep't 2002)).

7

A-994

The Weiss Memo does nothing to establish any of these points.  Indeed, it fails to even attempt to rebut Plaintiffs' showing that the very opposite is true, since:  (i) Weiss "unconditionally and irrevocably personally guarantee[d] . . . the performance of the agreements of, the [George Weiss Companies]" under the Forbearance Agreement (CSUF ¶ 50); (ii) at least $95,664,183.00 is due and owing under the Strategic Relationship Agreement, the Notes, and the Note Purchase Agreements (CSUF ¶¶ 90–105, 107–110); and (iii) Weiss has not made any payment to Plaintiffs of the amounts owed (CSUF ¶¶ 90–105, 107–110).

Because Weiss cannot meet his burden to prove that any of the above elements are not met, he must establish—as a matter of law—a *bona fide* defense to his liability.  *See U.S. Bank N.A. v. Perlmutter (In re S. Side House, LLC)*, 470 B.R. 659, 677 (Bankr. E.D.N.Y. 2012).  His Motion fails to do so.

## I.    <u>The Forbearance Agreement is Enforceable</u>

Weiss argues that he is entitled to summary judgment because—in his self-serving, after-the-fact view—there is no genuine issue of material fact that "the material terms of the Forbearance Agreement were never mutually agreed to by the parties, there was no meeting of the minds and no contract was formed."  (Weiss Memo at 13).  This argument fails for several reasons.

### A.    **Weiss is Collaterally Estopped from Disputing the Enforceability of the Forbearance Agreement**

This Court need not even consider Weiss's challenge to the enforceability of the Forbearance Agreement because he has already litigated this precise issue and lost and, in turn, is collaterally estopped from raising this argument again.

Collateral estoppel bars a party from relitigating: (i) an "issue necessarily decided on the merits in [a] prior suit;" (ii) where they "had a full and fair opportunity to litigate the issue."

8

*Kaplan v. Bennett*, 465 F. Supp. 555, 559 (S.D.N.Y. 1979). Here, both elements of the test are satisfied.

*First*, Weiss had a full and fair opportunity to litigate the issue. A party has a full and fair opportunity to litigate an issue where the "previous action involve[s] the [same party] or those in privity with them." *Fernicola v. Specific Real Prop. in Possession, Custody, Control of Healthcare Underwriters Mut. Ins. Co.*, 2001 WL 1658257, at *4 (S.D.N.Y. Dec. 26, 2001).

Here, Weiss's own counsel appeared and argued at the hearing before the Bankruptcy Court. (*See* Balber Decl. Ex. 17 45:5–15, 49:10–15). That alone is sufficient to establish that Weiss availed himself of a full and fair opportunity to litigate his position. *See Wang v. Pataki*, 396 F. Supp. 2d 446, 455 (S.D.N.Y. 2005) (precluding relitigating issue in later case where the defendant's principal made an appearance in prior case). But, even if Weiss's personal counsel had not appeared, Weiss would also be barred be Bankruptcy Court's ruling because the George Weiss Companies are controlled by Weiss—their founder, manager, and executive—and litigated this exact issue. *See, e.g.*, *Superior Funding Corp. v. Big Apple Cap. Corp.*, 738 F. Supp. 1468, 1470 ("The law is well settled that guarantors of payment of a corporate debt, particularly where such guarantors are controlling shareholders, executive officers and directors of that corporation, are parties to and control the lawsuit against the borrower, and had a full and fair opportunity to contest the granting of the judgment, are in privity with the corporate borrower and therefore bound by a judgment against the corporation."); *Fernicola*, 2001 WL 1658257, at *4 (precluding corporate officer from relitigating issue decided in litigation against the company he led).

*Second*, the issue was already plainly decided by the Bankruptcy Court. In both the adversary proceeding and on this Motion, Weiss argues that:

(i)    "the Amended Forbearance Agreement is null and void, and unenforceable," (*compare* Balber Decl. Ex 14 ¶ 123, *and* Balber Decl. Ex. 16 at 20, *with* Weiss Memo at 13–16);

(ii)    Plaintiffs "never executed and returned the Amended Forbearance Agreement," "indicated that they did not agree with certain of the modified terms," and "that they had no intention of complying with the . . . Forbearance Agreement, including [in] subsequent continued correspondence and threat[s] to commence action against the Debtors and their employees" (*compare* Balber Decl. Ex 14 ¶ 120, *and* Balber Decl. Ex. 16 at 20, *with* Weiss Memo at 15–16, *and* CSUF ¶¶ 62, 70–81); and

(iii)    there was at least a question of fact as to whether there was a "meeting of the minds" with respect to the Forbearance Agreement (*see* Balber Decl. Ex. 16 at 20).

The Bankruptcy Court properly rejected these arguments, finding that Plaintiffs established their agreement to the terms of the Forbearance Agreement by taking "'objective' actions to show that they intended to be bound by the [] Forbearance Agreement," including by (i) "no later than one day after [Weiss] signed the [] Forbearance Agreement, . . . fil[ing] UCC-1 financing statements to perfect the security interests granted under the [] Forbearance Agreement"; and (ii) by refraining from bringing suit, or providing the George Weiss Companies with notice that they intended to bring suit until after they fulfilled their agreement to forbear. *GWA, LLC*, 2024 WL 4276161, at *24–25 (citations omitted).

Accordingly, the question as to whether Plaintiffs agreed to the Forbearance Agreement has been definitively decided in Plaintiffs' favor. *See Superior Funding Corp.*, 738 F. Supp. at 1470–71 (S.D.N.Y. 1990) (determination of liability under contract collaterally estopped relitigating issues in action regarding guarantee).[4]

**B.    There Was a "Meeting of the Minds" as a Matter of Law**

Even if this Court were to consider Weiss's argument that there was no "meeting of the minds and no contract was formed," (Weiss Memo at 13), Weiss's Motion would still fail.

---

[4]    The George Weiss Companies have not filed a notice of appeal from the Bankruptcy Court's order. The time to appeal expired on October 24, 2024. Fed. R. App. P. 4.

To obtain summary judgment that a contract is invalid for lack of the meeting of the minds, Weiss must show that "[c]onstruing evidence in the light most favorable to the non-moving party," the parties' actions do not "demonstrate . . . objective assent for a reasonable jury to find intent to form a contract." *Bazak Int'l Corp. v. Tarrant Apparel Grp.*, 378 F. Supp. 2d 377, 389 (S.D.N.Y. 2005). This standard is exceedingly high. *See Westside Winery, Inc. v. SMT Acquisitions, LLC*, 2022 WL 4329735, at *3 (E.D.N.Y. Sept. 19, 2022) ("[s]ummary judgment is appropriate [only] where the record taken as a whole could not lead a rational trier of fact to find for the [non-movant]." (alterations in original)). Indeed, in assessing an evidentiary showing that there was no meeting of the minds, "the court looks 'not to the[] [parties'] after-the-fact professed subjective intent, but their objective intent as manifested by their expressed words and deeds at the time'" of contracting. *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*, 578 F. Supp. 3d 467, 497 (S.D.N.Y. 2022) (alterations in original). When the parties' "expressions and conduct would lead a reasonable person to conclude that they intended to reach a binding agreement, the agreement is enforceable." *Id*.

Here, there can be no dispute that Weiss, a seasoned industry professional who was represented by experienced counsel, agreed to the terms of the Forbearance Agreement by signing it. *See Taj Int'l Corp. v. Bashian & Sons, Inc.,* 674 N.Y.S.2d 307, 309 (1st Dep't 1998) (defendant's signature and actions taken consistent with the agreement following its signing, pointed towards the binding nature of the agreement and the parties "mutual intent to be bound" by the agreement); *Keis Distribs., Inc. v. Northern Distrib. Co.,* 226 A.D.2d 967, 968 (3d Dep't 1996) (plaintiff's signing an offer was enough to bind the parties despite plaintiff's indication that counsel needed to work out the "wording of the final details"); *see also WCW, Inc. v. Atlantis*

*Indus., Inc.*, 698 F.Supp.3d 708, 719–720 (D. Vt. 2023) (signing of agreement indicated acceptance of terms, despite requesting changes to the terms of the offer).

Moreover, the plain purpose of the Forbearance Agreement was to bind Weiss. (*See* Dillabough Decl. Ex. 3 § 5(a) ("Each Weiss Party and Weiss hereby represents and warrants that . . . this Agreement is the legal, valid and binding obligation of such Weiss Party and Weiss . . . .")). That alone should dispose of the issue. *See Muscatello v. Artco Chem. Inc.*, 251 A.D.2d 882, 883 (3d Dep't 1998) ("The absence of a signature by the party seeking to enforce the agreement is without legal significance."); *see also Richman v. Brookhaven Servicing Corp.*, 80 Misc. 2d 563, 565 (Dist. Ct. Suffolk Cnty. 1975) ("The promise of the defendant to close the mortgage for a discount rate of 3 percent was made binding and obligatory upon the plaintiff's acts of forbearing to seek out another mortgage banker, submitting the mortgage application to defendant, and scheduling and preparing for the closing of title."). Nonetheless, in a futile effort to avoid his obligations, Weiss crafts two arguments.

*First*, Weiss claims that he rejected the Forbearance Agreement by changing two of the WHEREAS clauses that existed in a prior draft. (Weiss Memo at 15). But wishes do not make things come true. Weiss and the George Weiss Companies executed the Forbearance Agreement, which contained the exact same performance obligations as the draft agreement that Weiss purportedly rejected. Plaintiffs also unquestionably performed all of the obligations set forth in that agreement. Indeed, as the record shows, Plaintiffs: (i) fully complied with their obligation and did forbear from bringing suit against GWA (*see* CSUF ¶ 70); and (ii) promptly filed UCC-1 financing statements against certain of the parties to the Forbearance Agreement, in an effort to perfect the security interests granted under the Forbearance Agreement (*see* Balber Decl. Ex. 1 ¶ 22; Ex. 1-J). Plaintiffs' "objective manifestations of the intent" made clear that they "accepted

[the Forbearance A]greement . . . ," even as modified by Weiss.  *Asesores y Consejeros Aconsec CIA, S.A. v. Glob. Emerging Markets N. Am., Inc.*, 841 F. Supp. 2d 762, 766 (S.D.N.Y. 2012); *Savignano v. Play*, 210 A.D.3d 1228, 1231 (3d Dep't 2022) ("[P]laintiff's transmission of the form contract and rider constituted an offer, and the sellers counteroffered by signing and returning to plaintiff only the form contract without the rider.  Plaintiff then accepted the counteroffer by proceeding with the inspections [on the property that was subject to the agreement], as 'a counteroffer may be accepted by conduct.'"  (citations omitted)); *Eldor Contracting Corp. v. Cnty. of Nassau*, 272 A.D.2d 509 (2d Dep't 2000) (finding that a prime contractor accepted a subcontractor's terms and conditions where:  (i) the prime contractor sent the subcontractor a contract, (ii) the subcontractor sent it back "agreeing to undertake the work provided that" the prime contractor agree to, *inter alia*, abide by the subcontractor's limitations of liability in their T&C's, and (iii) the prime contractor "did not reply . . . but . . . shipped the first motor to [the subcontractor] for rehabilitation").

*Second*, Weiss argues that Plaintiffs rejected, as a matter of law, the Forbearance Agreement by sending a letter stating that they "reserve[d] all of their rights to bring claims and pursue remedies arising from the [George] Weiss [Companies'] misconduct."  (CSUF ¶ 62).  That argument fails for two reasons.  First, Weiss conveniently omits that the letter states that Plaintiffs "expect[ed] the Weiss Parties to abide by the representations made to the Jefferies Parties in the unilaterally modified Forbearance Agreement . . . ."  (Dillabough Decl. Ex. 5 at 6).  Second, the letter is irrelevant because, after it was sent, Plaintiffs objectively manifested their intent to accept the Forbearance Agreement.  (*See* Statement of Facts § II, *supra*).

Accordingly, because the evidence shows that the Plaintiffs formally offered the terms of the Forbearance Agreement, that Weiss accepted those terms, and that Plaintiffs *did* comply with the Forbearance Agreement, Weiss's argument to the contrary should be denied.

**II.    Weiss Personally Guaranteed His Companies' Payment Obligations**

Weiss separately argues that he is entitled to summary judgment dismissing the claims against him because "[t]he plain language of the Forbearance Agreement makes clear that Section 9 is not a guaranty of personal payment." (Weiss Memo at 17). Weiss is estopped from making this meritless argument.

**A.    Weiss is Collaterally Estopped from Disputing His Payment Obligation**

As set out in the Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment (the "Jefferies Motion Memo," ECF No. 32), this Court need not even consider the substance of Weiss's argument, since he has already litigated this precise issue and lost. (Jefferies Motion Memo § Arg. (II)(A)). Thus, just like his "meeting of the minds" argument, Weiss is also barred from disputing that the personal guarantee does not extend to a payment obligation. *See, e.g.*, *Fernicola*, 2001 WL 1658257, at *4 (decision in case against corporation precluded relitigating issue in case against its corporate officer); *Wang*, 396 F. Supp. 2d at 455 (corporation was precluded from litigating issue already decided in earlier action against its CEO).

**B.    Weiss's Guarantee Requires Payment as a Matter of Law**

Even assuming for the sake of argument that Weiss is not estopped, the Court should nevertheless deny Weiss's Motion.

"Under New York law, the first step in assessing a contract claim is to determine whether the contract is unambiguous with respect to the question disputed by the parties. That is a question of law for the court, [and s]ummary judgment is appropriate if the terms of the contract are

14

unambiguous." *See Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 217 (S.D.N.Y. 2013).

The guarantee in the Forbearance Agreement is unambiguous. Weiss guaranteed "the performance of the agreements of, the [George Weiss Companies]," which included "the prompt and complete payment" of the "Guaranteed Obligations" as defined in the Forbearance Agreement. (CSUF ¶¶ 43–44, 50). These "Guaranteed Obligations" included the debts arising under Note Purchase Agreement, the Notes, and the Strategic Relationship Agreement. (CSUF ¶¶ 43–44). Weiss's alternate reading of the guarantee is contrary to well-settled law holding that where a party "guarantee[s] performance of the terms and conditions of the agreement," which terms and conditions "require[] payment . . . , the guarantee must be interpreted as including payment according to and as provided in the agreement." *Am. Trading Co. v. Fish*, 42 N.Y.2d 20, 27–28 (1977); *see also Merch. Cash & Cap., LLC v. Haute Soc'y Fashion, Inc.*, 2017 WL 2912452, at *3 (E.D.N.Y. July 6, 2017) (personal guarantee of performance included a guarantee of payment despite the lack of explicit language providing for payment because "it would [otherwise] be challenging to prescribe some other meaningful purpose the Guaranty was intended to serve").

### C.    Weiss's Textual Arguments are Unavailing

As set forth above and in the Jefferies Motion Memo, a plain—and even generous—reading of the Forbearance Agreement establishes that Weiss guaranteed payment of the George Weiss Companies' debts to Plaintiffs, and in turn, Weiss's Motion should be denied. Nevertheless, in a desperate effort to add confusion where none exists, Weiss makes four arguments, which he posits establish that his personal guarantee does *not* extend to any payment obligation.

#### i.    *Weiss's External Evidence Should be Ignored*

*First*, Weiss attempts to introduce a variety of extrinsic evidence regarding the meaning of the personal guarantee, including his—and his counsel's—after-the-fact affidavits. (Weiss Memo

at 20–21).  However, New York law is clear that this extrinsic evidence may not be considered when interpreting an otherwise unambiguous contract.  *See, e.g.*, *Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F. Supp. 2d 556, 562 (S.D.N.Y. 2003) ("Under New York law, 'if a contract is unambiguous, courts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning.'").  Equally important and controlling, consideration of those affidavits are precluded by the Forbearance Agreement's merger clause which states:

> All agreements, covenants, representations and warranties, express or implied, oral and written, of the parties hereto concerning the subject matter hereof, are contained herein.  No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any party hereto to any other concerning the subject matter hereof.  All prior and contemporaneous conversations, negotiations, possible and alleged agreements, representations, covenants and warranties concerning the subject matter hereto are merged herein.

(CSUF ¶ 87).  The affidavits cannot now be credited.  *Tucker Leasing Cap. Corp. v. Pizzuti Dev., Inc.*, 1992 WL 554186, at *9 (E.D.N.Y. Jan. 7, 1992) (merger clause precluded consideration of the parties' "understanding" or any "larger context" to vary "the contract's plain and clear meaning").

    *ii.*    *Weiss Guaranteed the "Guaranteed Obligations"*

Alternatively, Weiss argues—without any support—that:  (i) because the Forbearance Agreement defines a set of "Guaranteed Obligations," which includes payment of the Notes and Strategic Relationship Agreement obligations; and (ii) Weiss's personal guarantee does not refer to the "Guaranteed Obligations"; that (iii) Weiss's guarantee does not cover any payment obligations.  (Weiss Memo at 19–20).

However, the Forbearance Agreement nowhere excludes the "Guaranteed Obligations" from Weiss's personal guarantee.  To the contrary, Weiss broadly guaranteed all "***the***

**representations** made by, and **the performance of the agreements of**, the [George Weiss Companies]," and additionally undertook to "**take all actions within his control**" to cause the George Weiss Companies "to comply with the terms of this Agreement." Balber Decl. Ex. 1-I § 9. Those "representations" and "agreements," of course, included the George Weiss Companies' guarantees of the "Guaranteed Obligations." *Fish*, 42 N.Y.2d at 27–28 (guarantee of performance "must be interpreted as including payment" where performance obligations included an obligation to pay); *Merch. Cash & Cap.*, 2017 WL 2912452, at *3 (personal guarantee of performance included a guarantee of payment despite the lack of explicit language).

  *iii. The Guarantee is Not Limited to the "Weiss Parties Agreements"*

  Weiss's third argument is that his guarantee only applies to the "Weiss Party Agreements" set forth in Section 2 of the Forbearance Agreement, which do not specifically include a payment obligation. (Motion at 17–19). This argument fails for at least two reasons.

  *First*, Weiss's personal guarantee is not limited to the "Weiss Party Agreements." That phrase is not used in Weiss's personal guarantee at all. Instead, in Weiss's guarantee, he personally guaranteed "the representations made by, and the performance of the agreements of, the [George Weiss Companies]." As is noted above, those "agreements" *included* the George Weiss Companies' agreement to pay the debts owed to Plaintiffs by GWA. *See Fish*, 42 N.Y.2d at 27 (performance obligations include an obligation to pay); *Merch. Cash & Cap.*, 2017 WL 2912452, at *3 (personal guarantee of performance required payment).

  *Second*, had the parties intended to limit the guarantee to obligations set forth in a particular section of the Forbearance Agreement (such as Section 2), they would have said so. When the parties intended to limit an obligation of the Forbearance Agreement by referencing a specific section, they did so explicitly. (*See, e.g.*, ECF No. 28-3 §§ 4(b) ("Each Weiss Party represents, warrants, and covenants that the security interest granted herein, and until expiration of the security

interests as provided in *Section 4(a)* . . . ." (emphasis added)), 4(e) ("Each Weiss Party shall within

five Business Days of this Agreement, execute and deliver an account control agreement in respect

of each account referred to in *Section 2(a)(iii)* . . . ." (emphasis added)), 10 ("This Agreement

addresses the Past Due Obligations and the amounts under the IMA referenced in *Section 8*

*hereof*." (emphasis added)). In contrast, Weiss's personal guarantee contains no reference to any

other section of the Forbearance Agreement. For that reason, Weiss's guarantee was not limited

to any particular provision but rather applied to ***all obligations***—including the payment

obligations—set forth in the Forbearance Agreement, regardless of the section in which they

appeared. *See Quadrant Structured Prod. Co. v. Vertin*, 23 N.Y.3d 549, 560 (2014) ("[I]f parties

to a contract omit terms . . . the inescapable conclusion is that the parties intended the omission.");

*Sterling Investor Servs., Inc. v. 1155 Nobo Assocs., LLC*, 30 A.D.3d 579, 581 (2d Dep't 2006)

("Under accepted canons of contract construction, when certain language is omitted from a

provision but placed in other provisions, it must be assumed that the omission was intentional");

*U.S. Tr. Co. of N.Y. v. Sec. Planners, Inc.*, 238 A.D.2d 114, 114 (1st Dep't 1997) (reversing denial

of plaintiffs' summary judgment motion finding that, notwithstanding the defendants'

understanding that "the guaranty [was] limited to a particular sum, far less than the amount

sought," summary judgment was appropriate because "[t]he guaranty contains no such

limitation").

### iv. The Forbearance Agreement is Unambiguous

Finally, Weiss misrepresents New York law and argues that, based on his (implausible)

textual arguments above, he has raised an ambiguity, which should "be strictly construed in favor

of . . . Weiss," and in turn provide a basis for granting the Motion. (Weiss Memo at 21). This

argument misses the mark. "The mere assertion of an ambiguity [by the nonmoving party]" is

insufficient to create an ambiguity. Instead, "[a]mbiguity resides in a writing when—after it is

A-1005

viewed objectively—more than one meaning may reasonably be ascribed to the language used."

*J. Pub. Co. v. Am. Home Assur. Co.*, 740 F. Supp. 1015, 1018 (S.D.N.Y. 1990).  As noted above,

the meaning of Weiss's guarantee is unambiguous and apparent.  Weiss's *ipse dixit* to the contrary

does not warrant summary judgment in his favor.

## CONCLUSION

For the foregoing reasons, the Court should follow the Bankruptcy Court's finding of law

and deny Weiss's Motion for summary judgment.

Dated:   New York, New York                          Respectfully submitted,
       November 22, 2024

                                              HERBERT SMITH FREEHILLS
                                                NEW YORK LLP
                                          By: /s/ *Scott S. Balber*
                                                Scott S. Balber
                                                Michael P. Jones
                                                Daniel Gomez
                                          200 Park Avenue
                                          New York, New York 10166
                                          Tel: (917) 542-7810
                                          Fax: (917) 542-7601
                                          Email:        Scott.Balber@hsf.com
                                                       Michael.Jones@hsf.com
                                                       Daniel.Gomez@hsf.com

                                          *Attorneys for Plaintiffs*
                                          *Jefferies Strategic Investments, LLC and*
                                          *Leucadia Asset Management Holdings LLC*

A-1006

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEFFERIES STRATEGIC INVESTMENTS, LLC and LEUCADIA ASSET MANAGEMENT HOLDINGS LLC,

                    Plaintiffs,

      -against-

GEORGE WEISS,

                    Defendant.

Case No. 1:24-cv-04369 (AH)

---

**DEFENDANT GEORGE WEISS'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

12711680-10